UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| GRAY & ASSOCIATES, LLC in its capacity As Trustee on behalf of the SVCMC Litigation Trust, | : : : : : | 08 CV 4401 ECF Case |

GRAY & ASSOCIATES, LLC in its capacity
As Trustee on behalf of the SVCMC Litigation
Trust,                                          :    08 CV 4401

                                               :    ECF Case

                                               :

                      Plaintiff,               :    **DECLARATION OF**
                                               :    **FREDERICK B. WARDER III**
                                               :    **IN SUPPORT OF**
                      v.                        :    **DEFENDANTS' MOTION TO**
                                               :    **DISMISS**

MCDERMOTT WILL & EMERY LLP,                    :
WILLIAM P. SMITH, STEPHEN B. SELBST,           :
and DAVID D. CLEARY,                           :
                                               :
                      Defendants.              :
                                               :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FREDERICK B. WARDER III, under penalty of perjury, states as follows:

1.      I am a member of Patterson Belknap Webb & Tyler LLP and counsel to Defendants McDermott Will & Emery LLP, William P. Smith, Stephen B. Selbst, and David D. Cleary (collectively "Defendants").  I respectfully submit this declaration in support of Defendants' motion to dismiss.

2.      True and correct copies of the following documents are attached as exhibits to this declaration:

| Exhibit A: | The Complaint filed in this matter |
|---|---|
| Exhibit B: | Excerpts from the docket for In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al., Jointly Administered Case No. 05-14945 (ASH) (Bankr. S.D.N.Y.)[1] |
| Exhibit C: | Objection of the United States Trustee to First Interim Application of McDermott |

---

[1] All documents attached as exhibits to this declaration relate to In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al., Jointly Administered Case No. 05-14945 (ASH) (Bankr. S.D.N.Y.), except for Exhibits A, AA, and BB.

Will & Emery LLP, dated March 7, 2006

Exhibit D:     Objections of the Official Committee of Unsecured Creditors to First Interim Application of McDermott, Will & Emery LLP, dated March 3, 2006

Exhibit E:     Transcript of Telephone Conference before the Honorable Adlai S. Hardin, Jr., July 20, 2006

Exhibit F:     Notice of Amendment of Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses [July 5, 2005 through September 30, 2005], dated July 21, 2006

Exhibit G:     Debtors' Application for Authority to Retain Venable LLP, dated October 16, 2006

Exhibit H:     Debtors' Response and Objection to First Interim Application of McDermott Will & Emery LLP, dated July 31, 2006

Exhibit I:     Excerpts of Transcript of Deposition of William P. Smith, dated September 26, 2006

Exhibit J:     Excerpts of Transcript of Deposition of Stephen Selbst, dated September 19, 2006

Exhibit K:     Affidavit of William P. Smith in Support of Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses July 5, 2005 through September 30, 2005, dated October 18, 2006

Exhibit L:     Declaration of Michael B. Solow Regarding the Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses July 5, 2005 through September 30, 2005, dated September 13, 2006

Exhibit M:     Declaration of Richard Boyle in Support of Debtors' Response and Objection to First Interim Application of McDermott Will & Emery LLP for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 through September 30, 2005, dated October 18, 2006

Exhibit N:     Declaration of Leo T. Crowley in Connection with Debtors' Response and Objection to First Interim Application of McDermott Will & Emery LLP for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 through September 30, 2005, dated October 18, 2006

Exhibit O:     Declaration of Elizabeth St. Clair in Support of Debtors' Response and Objection to First Interim Application of McDermott Will & Emery LLP for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 through September 30, 200, dated October 17, 2006

Exhibit P:     Affidavit of David D. Cleary in Support of Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses July 5, 2005

through September 30, 2005, dated September 15, 2006

Exhibit Q:  Declaration of Thomas Allison in Support of Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses July 5, 2005 through September 30, 2005, dated September 14, 2006

Exhibit R:  Affidavit of James M. Sullivan in Support of Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses July 5, 2005 through September 30, 2005, dated October 18, 2006

Exhibit S:  Affidavit of Stephen B. Selbst in Support of Application of McDermott Will & Emery LLP for Compensation and Reimbursement of Expenses July 5, 2005 through September 30, 2005, dated October 18, 2006

Exhibit T:  Declaration of Guy Sansone in Support of Debtors' Response and Objection to First Interim Application of McDermott Will & Emery LLP for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 through September 30, 2005, dated October 17, 2006

Exhibit U:  Excerpts of Transcript of Proceedings held on October 23, 2006 before the Honorable Adlai S. Hardin, Jr.

Exhibit V:  Excerpts of Transcript of Proceedings held on October 24, 2006 before the Honorable Adlai S. Hardin, Jr.

Exhibit W:  Excerpts of Transcript of Proceedings held on October 25, 2006 before the Honorable Adlai S. Hardin, Jr.

Exhibit X:  Post-Trial Statement of Economic Consequences to Debtors' Estates, dated November 10, 2006

Exhibit Y:  Decision on Objections to Application for Fees and Expenses, dated August 29, 2007

Exhibit Z:  Order Sustaining, In Part, Objections to First and Final Application of McDermott Will & Emery LLP, dated September 21, 2007

Exhibit AA:  Substitution Order, dated November 27, 2007, filed in Gray & Associates LLC v. Speltz & Weis LLC, et al., Index No. 150446/2007, Supreme Court of the State of New York, New York County

Exhibit BB:  Creditors Committee's Memorandum of Law in Opposition to Certain Defendants' Cross-Motion for Entry of an Alternative Document Preservation Order, dated November 1, 2007, filed in Gray & Associates LLC v. Speltz & Weis LLC, et al., Index No. 150446/2007, Supreme Court of the State of New York, New York County

Exhibit CC:  Excerpts of Transcript of Deposition of Timothy C. Weis, dated September 27, 2006

| | |
|---|---|
| Exhibit DD: | Post-Trial Memorandum in Support of Final Fee Application of McDermott Will & Emery LLP, dated November 10, 2006 |
| Exhibit EE: | Excerpts of Transcript of Deposition of David Cleary, dated September 29, 2006 |
| Exhibit FF: | Excerpts of Transcript of Deposition of Deirdre Martini, dated October 06, 2006 |
| Exhibit GG: | Excerpts of Transcript of Deposition of David Speltz, dated October 3, 2006 |
| Exhibit HH: | Excerpts of First Amended Chapter 11 Plan of Reorganization for Saint Vincents Catholic Medical Centers, dated June 5, 2007 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at New York, New York this 15th day of May, 2008.

/S/ Frederick B. Warder III

FREDERICK B. WARDER III

4

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

GRAY & ASSOCIATES, LLC, in its capacity as Trustee,
on behalf of the SVCMC LITIGATION TRUST,

Index No.: 601108/08

Plaintiff,

-against-

**COMPLAINT**

MCDERMOTT WILL & EMERY LLP,
WILLIAM P. SMITH, STEPHEN B. SELBST
and DAVID D. CLEARY

Defendants.

-----------------------------------------------------------------X

Plaintiff, Gray & Associates, LLC, in its capacity as Trustee, on behalf of the

SVCMC Litigation Trust (the "Trust") established in the bankruptcy case of *In re Saint Vincent*

*Catholic Medical Centers of New York, et al.*, by its undersigned counsel, sues McDermott Will

& Emery LLP ("McDermott"), William P. Smith ("Smith"), Stephen B. Selbst ("Selbst"), and

David D. Cleary ("Cleary") (McDermott, Smith, Selbst and Cleary collectively, the "McDermott

Defendants"), for breach of fiduciary duty, legal malpractice, attorney misconduct, fraudulent

concealment, aiding and abetting breaches of fiduciary duty, and aiding and abetting fraud, and

alleges as follows:

## INTRODUCTION

1.      This case is about deceit, divided loyalties, gross violations of fiduciary duties and

breaches of professional standards of care committed by attorneys who put their personal

relationships and selfish economic concerns above the interests of the charitable institution they

were entrusted to protect.

NEW YORK
COUNTY CLERK'S OFFICE

APR 14 2008

NOT COMPARED
WITH COPY FILE


2.      By December 2003, after suffering more than $100 million in net operating losses during 2002 and 2003, Saint Vincent Catholic Medical Centers of New York ("Saint Vincent" or the "System"), which was formed by a merger in 2000 of the 150-year old Saint Vincent's Hospital in Greenwich Village with hospitals in Brooklyn, Queens and Staten Island, was in a severe financial crisis.  In desperate need of professional guidance and direction, the Saint Vincent Board of Directors (the "Board") turned to McDermott, its longstanding legal counsel, for advice and protection in December 2003 in connection with Saint Vincent's retention of Speltz & Weis, LLC ("SWLLC") and its two principals, David Speltz ("Speltz") and Timothy Weis ("Weis") (collectively, "the Speltz and Weis Parties"), hospital turnaround management professionals who purportedly specialized in restructuring and turning around failing hospital systems.  What Saint Vincent received instead from McDermott were attorneys who abused their relationship of trust and confidence with that charitable institution by violating their fiduciary duties of care, candor, and loyalty, engaging in fraud, pursuing the conflicting interests of professional colleagues to the substantial detriment of Saint Vincent, and by committing malpractice by, among other things, failing to advise Saint Vincent to file timely for bankruptcy reorganization.

3.      By September 2004, three-quarters of a year after turning to McDermott for help, Saint Vincent's dire financial condition had significantly deteriorated and Saint Vincent was in a death spiral. Having already exhausted the full amount of the borrowings available under a $100 million working capital loan obtained just three months before in late May 2004, the System was well on its way to what would become a $143.4 million net operating loss for 2004.  Losing $400,000 a week, without taking into account debt service and needed capital expenditures, and unable to find a ready, willing and able buyer for its St. Mary's Hospital in Brooklyn that was

losing approximately $20 million a year (and for which McDermott had previously been specifically engaged to assist), Saint Vincent now faced the specter of even further eroding its valuable assets by placing multiple mortgages on its real estate to fund its continuing losses and to pay its professional advisers.

4.     Against this bitter backdrop, Saint Vincent further engaged McDermott in September 2004 to plan for a Chapter 11 reorganization filing under the protections of the United States Bankruptcy Code.  In clear recognition of Saint Vincent's dire situation and need for a Chapter 11 filing, McDermott made sure that it protected itself by requiring Saint Vincent to pay weekly attorneys' fees with next-day remittance via wire transfers.  Throughout its engagement, however, McDermott failed to advise the Board timely to restructure its operations under the protection of, and with the benefits afforded by, the Chapter 11 bankruptcy reorganization process, or to prepare adequately for a timely bankruptcy filing.

5.     For the purpose of assisting with the planning of a bankruptcy filing, McDermott, whose lead bankruptcy attorney, Smith, was based in its Chicago office, recommended to Saint Vincent's Board in September 2004 that the Chicago consulting firm of Huron Consulting Group, LLC ("Huron LLC"), a subsidiary of Huron Consulting Group, Inc. ("Huron Inc.") (collectively the "Huron Parties"), be engaged as an additional financial advisor for Saint Vincent purportedly to assist with the preparation of a plan for a Chapter 11 filing.  This engagement of Huron LLC was authorized by the Board at the direction of McDermott.

6.     On July 5, 2005, eighteen months after Saint Vincent sought McDermott's aid in December 2003, and three-quarters of a year after McDermott's engagement was expanded in September 2004 to specifically include preparation for the Chapter 11 filing, Saint Vincent was belatedly placed into Chapter 11 bankruptcy on an inadequately prepared and emergency basis.

The Chapter 11 reorganization was commenced, however, only after Saint Vincent had been exploited by its professional advisors for their own selfish interests, such that Saint Vincent was in such a cash-strapped and economically drained position that it was unable to make payroll for its approximately 12,500 employees.

7.      During the year and a half period of McDermott's involvement between December 2003 and July 5, 2005, Saint Vincent's financial distress steadily worsened as Saint Vincent's professional advisors -- McDermott, the Speltz and Weis Parties, and Huron LLC -- placed their relationships and avarice above the interests of their client and the charitable institution they had agreed to serve.  Unknown to the Board, but known to McDermott, after McDermott and Huron LLC were engaged in September 2004 to prepare for a Chapter 11 filing, the Speltz and Weis Parties and Huron Inc. were negotiating a deal for Huron Inc. to buy SWLLC's "book of business," which was principally its fees from Saint Vincent, for a price based upon revenues to be generated from contemplated billings to Saint Vincent.

8.      Notwithstanding their ethical duties and fiduciary obligations to their client, the McDermott Defendants concealed from the Board their knowledge of the secret negotiations between Huron Inc. and the Speltz and Weis Parties.  In this regard, the McDermott Defendants failed to disclose to the Board the evident and prohibitive conflicts of interest involved and also failed to explain the significant adverse consequences that an acquisition by Huron of SWLLC would cause Saint Vincent to suffer upon a filing of a Chapter 11 proceeding.  In particular, the McDermott Defendants failed to advise the Board that, among other things, the conflict-of-interest requirements of the federal bankruptcy laws and rules would severely limit, if not preclude, SWLLC and Huron LLC from being retained to furnish services simultaneously as crisis managers and financial advisors.  Such a disqualification was an unacceptable economic

risk to the Speltz and Weis Parties and Huron Parties, and they, together with McDermott, were determined to preserve their "team" over the interests of a successful restructuring of Saint Vincent through a Chapter 11 reorganization.

9.        With their loyalties divided, McDermott and Smith chose personal interests over duties to Saint Vincent to facilitate Huron Inc.'s acquisition of SWLLC by falsely telling Huron Inc.'s General Counsel that the Chairman of Saint Vincent's Board had asked Smith to call and advise Huron Inc. that the hospital was going to extend its consulting agreement with SWLLC and that the Board saw SWLLC and Huron LLC as a team it wanted to keep. Within a few days of Smith's wrongful choice of allegiance and his breach of duties to Saint Vincent by pretending to speak for the Chair of Saint Vincent's Board, Huron Inc. closed on its purchase of SWLLC. As a result, in addition to the enormous fees already taken from Saint Vincent, the Speltz and Weis Parties received a $14 million cash payment, a promissory note for $3 million and the promise of earnout payments based primarily on revenue that SWLLC would receive in the future from Saint Vincent. Huron Inc., in turn, received SWLLC's ongoing revenue stream, approximately 85% of which was generated from Saint Vincent.

10.        Determined to further business relationships with the Huron Parties and the Speltz and Weis Parties, the McDermott Defendants also set out to find ways to circumvent or manipulate the rules and procedures of the federal bankruptcy laws so that McDermott, the Speltz and Weis Parties and Huron LLC could perpetuate their wrongful scheme to remain as a "team," to ensure even more fees for their firms in the event of an inevitable bankruptcy filing. As the United States Bankruptcy Judge for Saint Vincent's belated Chapter 11 proceeding later found, "[w]hat is clear from the evidence is that McDermott never told Boyle [*i.e.* the Board's Chair] or the Executive Committee or the full Board until mid-August 2005 that the dual

retention of Huron [LLC] and SW [SWLLC] was *from the outset* a dead letter by reason of the

Jay Alix Protocol, Section 327(a) of the Bankruptcy Code and the serious conflicts of interest

and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the Huron Group

acquisition of SW in early May." *In re Saint Vincent's Catholic Medical Centers of New York*,

Case No. 05 B 14945 (ASH) (Bankr. S.D.N.Y. August 29, 2007) (emphasis in original) at p. 27.

And, as the United States Bankruptcy Court further found, "McDermott manifested an

insensitivity to the interests of its client, SVCMC [*i.e.* Saint Vincent], and the pitfalls inherent in

the Huron Group/SW negotiations and acquisition, from the outset." *Id.* at p. 19. As the

Bankruptcy Court also found, "[a]s counsel to SVCMC and ultimately its Board of Directors (not

Speltz and Weis), Smith should have disclosed his knowledge of the Huron Group/SW

negotiations to Boyle, as Chairman of the Board, and advised Boyle of the potential issues which

he advised the conflicted Messrs. Speltz and Weis, namely, 'disinterestedness, the Jay Alix

Protocol and conflicts." *Id.* at p. 19.

11.    Once in Chapter 11 bankruptcy, albeit belatedly, the McDermott Defendants

continued to abrogate their responsibilities and duties to Saint Vincent and instead placed their

loyalty with the Speltz and Weis Parties and the Huron Parties above the interests of Saint

Vincent's bankruptcy estate by insisting upon prohibited dual retention of SWLLC and Huron

LLC in the Chapter 11 proceeding, thereby unnecessarily delaying progress in the bankruptcy

case and alienating crucial constituencies whose trust and confidence are keys to a successful

Chapter 11 reorganization. In this regard, the United States Bankruptcy Court found that "the

McDermott services relating to retention of professionals, at the time those services were

rendered, were not only not beneficial to the debtors' [*i.e.* Saint Vincent] estates and not

reasonably likely to benefit the debtors' estates -- they were affirmatively detrimental to the debtors' estates." *Id.* at p. 33.

12.     As a direct result of the McDermott Defendants' various tortious conduct, Saint Vincent was harmed in multiple ways. In addition to the fees that McDermott was charging Saint Vincent, the McDermott Defendants enabled the Speltz and Weis Parties and the Huron Parties to continue to generate fees from Saint Vincent, and to generate the revenue to support Huron Inc.'s acquisition of SWLLC, all at a cost to Saint Vincent. As a direct result of their failure to provide Saint Vincent's Board with competent and timely advice, guidance and direction, the McDermott Defendants also caused Saint Vincent to keep money-losing hospitals open for an unnecessarily extended time, which should have been sold or closed long before the July 2005 bankruptcy filing, thereby causing Saint Vincent to incur significant operating losses and expenses which would not have been incurred had the McDermott Defendants exercised appropriate care, skill and diligence, and provided timely and appropriate advice and direction to the Board. Furthermore, McDermott had been engaged in June 2004 to dispose of one of the hospitals, but that hospital remained open until October 2005, at a cost of approximately $71,000 to $100,000 a day to Saint Vincent. The McDermott Defendants also caused Saint Vincent to incur unnecessary costs and expenses, including excessive and unnecessary S,G&A expenses, consultant fees, IT contract costs, and middle management costs, it was caused to suffer diminution of revenue, including revenue from managed care contracts, and it was caused to suffer substantial loss of its enterprise value.

## THE PARTIES

13.     On July 5, 2005, Saint Vincent and several of its affiliates filed for bankruptcy protection under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the

United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in the case styled *In re Saint Vincents Catholic Medical Centers of New York, et al.*, No. 05-B-14945 (ASH).

14.     Following Saint Vincent's filing of the Chapter 11 proceeding, the Office of the United States Trustee, a division of the U.S. Department of Justice, appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") comprised of several of the more substantial creditors at risk in the bankruptcy case. The Creditors Committee served as an official oversight body in a fiduciary role to all pre-bankruptcy unsecured creditors of Saint Vincent.

15.     On June 29, 2007, the Bankruptcy Court entered an Order granting the Creditors Committee standing and approving Saint Vincent's assignment to the Creditors Committee of its rights to prosecute all claims, rights, and causes of action that could have been brought or raised by, or on behalf of, Saint Vincent against all parties, including the defendants herein, and authorizing the Creditors Committee to commence and pursue such actions.

16.     Pursuant to an Order entered on July 27, 2007, the Bankruptcy Court confirmed the First Amended Chapter 11 Plan of Reorganization for Saint Vincent (the "Plan"). The Plan became effective on August 30, 2007. Pursuant to the terms of the Plan and the July 27, 2007 Order of the Bankruptcy Court, the rights of both the Creditors Committee and Saint Vincent to all of their claims, with certain irrelevant exceptions, were assigned to the Trust.

17.     In connection with the Bankruptcy Court's approval of the Plan, Saint Vincent, the Creditors Committee, the Trustee and certain other parties entered into a SVCMC Litigation Trust Agreement (the "Litigation Trust Agreement"). Like the Plan, under the Litigation Trust

Agreement, Saint Vincent and the Creditors Committee assigned all their rights, title, and interest in all claims, with certain irrelevant exceptions, to the Trust.

18.    At all times relevant to this matter, Saint Vincent was, and is, a New York not-for-profit corporation and one of the New York metropolitan area's most comprehensive health care systems. In accordance with its mission as a charitable institution, Saint Vincent provided over $100 million in charitable care to poor and uninsured patients in 2004 alone.

19.    McDermott is an American law firm with more than 1,100 attorneys and offices in nine U.S. cities, including New York, and in five foreign countries. McDermott's New York City office is located at 340 Madison Avenue. McDermott is an Illinois limited liability partnership that regularly does and solicits business, and derives substantial revenue from commerce, in New York. Several of McDermott's partners are residents of New York and the claims asserted herein arise out of the business conducted by McDermott in New York.

20.    Smith, a partner in McDermott's Chicago office, was at all relevant times the head of the firm's bankruptcy practice and, from June 2004 through September 2005, the McDermott partner in charge of the engagement with Saint Vincent. Smith transacted business in New York and supplied services to Saint Vincent in New York. Smith also regularly solicits business, engages in a persistent course of conduct, and derives substantial revenue from services rendered in New York, and he expected, and should reasonably have expected, that the acts complained of herein had consequences in New York.

21.    Selbst, a partner in McDermott's New York City office, is the head of McDermott's New York bankruptcy practice. Selbst resides and transacts business in New York, and he supplied services to Saint Vincent in New York. Selbst also regularly solicits business, engages in a persistent course of conduct, and derives substantial revenue from services

- 9 -

rendered in New York and he expected, and should reasonably have expected, that the acts complained of herein had consequences in New York.

22.    Cleary, who at all relevant times was a partner of McDermott, transacted business in New York and supplied services to Saint Vincent in New York. Cleary also regularly solicits business, engages in persistent course of conduct, and derives substantial revenue from services rendered in New York, and, he expected, and should reasonably have expected, that the acts complained of herein had consequences in New York.

## FACTUAL BACKGROUND

23.    Saint Vincent was formed in 2000 as a result of the merger of Saint Vincent Hospital and Medical Center with Catholic Medical Centers of Brooklyn and Queens, and Sisters of Charity Healthcare in Staten Island. After the merger, Saint Vincent annually treated more than 600,000 outpatients and 92,000 inpatients, and it provided more than 640,000 home care visits. Saint Vincent's emergency rooms, which included three Level 1 trauma centers, received 255,000 visits in 2004. Saint Vincent also served as the academic medical center of New York Medical College in New York City. As of Saint Vincent's Chapter 11 bankruptcy filing, the System included seven hospitals: Saint Vincent Hospital in Manhattan, Bayley Seton Hospital in Staten Island, Mary Immaculate Hospital in Queens, St. John's Hospital in Queens, St. Mary's Hospital in Brooklyn, Saint Vincent Hospital in Staten Island and Saint Vincent Hospital in Westchester. The System also included four skilled nursing facilities, a hospice, a home health agency, and more than sixty off-site ambulatory care centers. Saint Vincent was also one of the New York metropolitan area's largest employers, employing approximately 12,500 full and part-time employees. More than 2,500 physicians were affiliated with the charitable institution.

24.    The 2000 merger was designed to unify the operations of the various entities, to enhance the revenues of the various entities and to reduce expenses of the various entities by taking advantage of growth opportunities (including referrals of patients needing tertiary care from the outlying hospitals to Saint Vincent in Manhattan) and operational efficiencies theoretically available to the combined entity.  The financial health of Saint Vincent, however, declined after the merger due in part to the collective weight of the financially underperforming entities, and Saint Vincent suffered ever increasing net operating losses in 2001, 2002 and 2003. Indeed, between 2002 and 2003, the net operating loss more than tripled, from $22 million in 2002 to $81 million in 2003.  In 2004, after the Speltz and Weis Parties had been on the scene for nearly a year, Saint Vincent's net operating loss escalated to $143.4 million, six times Saint Vincent's 2002 net operating loss and nearly double its 2003 net operating loss.

### Saint Vincent's Retention of McDermott

25.    For years prior to 2003, McDermott had represented Saint Vincent in a number and variety of legal matters.  Among other things, McDermott had provided legal services and advice to Saint Vincent with respect to environmental matters, canon law issues, PHO questions regarding Saint Vincent's cancer center, relationships between Saint Vincent and medical groups, billing practices, a federal grand jury investigation, third party disputes and other general legal matters.

26.    By no later than early December 2003, the Board recognized that Saint Vincent was in a severe financial crisis and in need of direction from professional crisis and turnaround financial and legal advisors to address the System's worsening operational problems and financial distress.

- 11 -

27.    On or around December 16, 2003, Andrew Roth, a partner of McDermott, was informed by a third party that Saint Vincent was in financial distress and would "be bringing in an interim turnaround firm." Roth was advised that this news was "an excellent opportunity [for McDermott] to capitalize on" for further work from Saint Vincent.

28.    Within days, Roth, acting upon this information, was in communication with Bishop Joseph M. Sullivan, then Co-chairperson of the Board, regarding McDermott providing the legal services to Saint Vincent in connection with the hiring of professional crisis and turnaround advisors. As a result of this discussion, McDermott began providing legal services to Saint Vincent in connection with the retention of SWLLC, the turnaround firm that had been recommended to Saint Vincent.

29.    On or about February 5, 2004, McDermott executed an engagement letter with Saint Vincent relating to the services that McDermott had been providing to Saint Vincent since approximately mid-December 2003 "in connection with matters related to the Board's consideration and selection of a turnaround firm, and the negotiation of appropriate contract documents in connection therewith" and "such other matters as [Saint Vincent] may determine to assign to [McDermott]."

30.    Under the terms of the agreement for the retention of SWLLC, Speltz would become Saint Vincent's President and Chief Executive Officer ("CEO") and Weis would become its Chief Financial Officer ("CFO"). Because the SWLLC Agreement entailed a change in management, regulations promulgated by the New York State Department of Health ("DOH") required that DOH approve the SWLLC Agreement. Separately, the SWLLC Agreement was required to be approved by United States Department of Housing and Urban Development ("HUD"). Although Roth advised Saint Vincent to attempt to circumvent the required approval

from DOH, those attempts were unsuccessful and SWLLC was not completely approved for retention until April 13, 2004. Saint Vincent and SWLLC entered into a written management agreement dated as of April 13, 2004 (with subsequent amendments the "SWLLC Agreement"), to expire on April 30, 2005, unless extended.

31.    In January 2004, while awaiting the necessary governmental approvals, the Speltz and Weis Parties began work at Saint Vincent by, among other things, conducting an operational, financial and clinical assessment of the System and by agreeing to present a plan for addressing the problems identified in the assessment within 90 days. During these 90 days, Roth, who had earlier tried to help the Speltz and Weis Parties avoid regulatory requirements, met with Speltz to solicit further business for McDermott.

32.    McDermott's work with respect to Saint Vincent continued during this time frame, although for a conflicting party. In or around April 2004, McDermott was asked by another client, Fidelis Care New York ("Fidelis"), to provide legal advice in connection with a ten million dollar loan request that Saint Vincent had made of Fidelis. This financing for Saint Vincent was, at the time, of great significance to Saint Vincent.

33.    Though it stood in a direct conflict, albeit purportedly waived, to Saint Vincent's best interest and turnaround efforts for which McDermott had just been engaged, Roth counseled Fidelis, in a memo dated April 28, 2004, that Saint Vincent was in "dire financial straits"; that Saint Vincent's situation was "precarious"; that Saint Vincent was in "serious financial jeopardy"; that a Saint Vincent bankruptcy was imminent; that there would be a "serious risk of loss" if Fidelis were to make the requested loan; and that Fidelis' officers and directors might breach their fiduciary duties and responsibilities if they approved the loan.

34.    In the spring of 2004, the Speltz and Weis Parties recommended to the Board that two of the System's underperforming hospitals, St. Joseph's Hospital and St. Mary's Hospital, be closed or sold.   On or around May 3, 2004, Speltz suggested to Saint Vincent that it hire McDermott to lead the disposition.   Smith sent a proposal to Elizabeth St. Clair, the in-house counsel at Saint Vincent.   Internally at McDermott, Roth and Smith engaged in a struggle with regard to which attorney would receive the credit, and thus related financial reward within their firm, for the McDermott legal fees that would be generated from Saint Vincent in the future.

35.    In an effort to increase McDermott's fees from Saint Vincent, despite the McDermott Defendants' awareness that the charitable institution was in serious financial jeopardy, Roth suggested that McDermott could increase its then agreed-upon hourly rate structure with Saint Vincent significantly by having Smith charge a higher rate to Saint Vincent, than the discounted charitable institution rate that McDermott had theretofore charged Saint Vincent.   In fact, Smith billed Saint Vincent at $640 per hour for the new work, as opposed to $475 per hour for Roth's prior work.   In that same correspondence, Roth warned Smith to "be aware" of the need to protect McDermott's financial interest because Saint Vincent was "very close to Chapter 11."

### The Saint Mary's Matter in Summer 2004

36.    At the time that Saint Vincent asked the McDermott Defendants to provide services in connection with the disposition of St. Joseph's and St. Mary's hospitals, it was clear that the operating losses of Saint Vincent hospitals in Queens, Brooklyn and Staten Island were significant causes of cash drain that was destroying Saint Vincent.   In particular, Saint Mary's Hospital in Brooklyn was losing approximately $20 million per year.

37.     Though the closure of St. Joseph's Hospital was relatively orderly, the disposition

of St. Mary's Hospital was not.  In the summer of 2004, the McDermott Defendants and the

Speltz and Weis Parties knew that the only potential purchaser for St. Mary's was Kingsbrook

Jewish Medical Center ("Kingsbrook").  They also knew that there was no realistic prospect that

Kingsbrook would be able to go forward with a purchase.  As the McDermott Defendants and

Speltz and Weis Parties further knew, Kingsbrook required approximately $20 million in

financing before it could agree to consummate any purchase, and there was little or no likelihood

that the State, which was the only source for such financing, would supply the funds.

38.     The McDermott Defendants, nevertheless, assisted the Speltz and Weis Parties in

pressing the negotiations (with Kingsbrook) when it was clear to any reasonable observer that the

negotiations would be fruitless and that Kingsbrook was not reasonably able to purchase St.

Mary's Hospital.  Under the watch of the McDermott Defendants, the Speltz and Weis Parties,

on behalf of Saint Vincent, signed a letter of intent for the sale of St. Mary's Hospital which they

knew, or should have known, to be illusory from the moment it was signed.

39.     On or around September 16, 2004, after speaking with counsel for Kingsbrook,

Smith informed the Speltz and Weis Parties that Kingsbrook did "not have the wherewithal to do

the deal absent outside financing in an as yet undetermined amount" and that Kingsbrook "had

no idea" where they would find such financing.

40.     The McDermott Defendants and the Speltz and Weis Parties allowed the

negotiations and discussions over the possible sale of St. Mary's to Kingsbrook to drag on for

many months in the vain and unreasonable hope that this speculative transaction might somehow

materialize.  Throughout this period, the McDermott Defendants generated substantial legal fees

for themselves by preparing documents, conferring among themselves and communicating with

others about the proposed sale of St. Mary's to Kingsbrook that they knew, and should have known, would never take place.

41.    Assisted by the McDermott Defendants, the Speltz and Weis Parties continued to advise the Board that the potential sale of St. Mary's Hospital was viable even though the McDermott Defendants and the Speltz and Weis Parties knew and should have known that financing for the contemplated transaction was unavailable to Kingsbrook.  In December 2004, for example, the Speltz and Weis Parties delivered to the Board a Status Report indicating that, among other things, a letter of intent had been signed for the transfer of Saint Mary's to Kingsbrook. The Status Report did not mention, however, that Kingsbrook had warned that the potential sale was predicated upon Kingsbrook being able to find $20 million in financing and that it was so unlikely that Kingsbrook would be able to obtain those funds that Saint Vincent should not rely upon the letter of intent.

42.    On April 27, 2005, after almost a year of fruitless delay, Kingsbrook formally withdrew its letter of intent for the purchase of St. Mary's Hospital.  Despite their knowledge that the proposed Kingsbrook sale was never a viable option, and that St. Mary's was bleeding huge amounts of money daily, neither the McDermott Defendants nor the Speltz and Weis Parties availed themselves of the opportunity to develop an alternative closure plan while the tentative discussions with Kingsbrook were taking place.  Only after Kingsbrook withdrew the letter of intent did the McDermott Defendants and the Speltz and Weis Parties begin to make plans for the closure of that facility.

### The Extended Preparation For Bankruptcy Protection

43.    By the end of the summer of 2004, Saint Vincent determined that it should begin to prepare for seeking the protections afforded under Chapter 11 of the Bankruptcy Code.

44.    At a September 8, 2004 meeting, with Smith present, the Board requested that McDermott provide information on the Chapter 11 bankruptcy process. At that same meeting, Weis noted that Saint Vincent was currently facing another liquidity crisis and had negligible cash on hand despite having obtained a $100 million working capital loan in or around May 2004. Weis explained that Saint Vincent had borrowed $52 million, the total amount available under the borrowing base formula for that loan, and that Saint Vincent was burning its available cash (even before capital expenditures and debt service) at the rate of $400,000 per week. He also reported that critical real estate financing, which had been expected to provide funds to cover these enormous ongoing cash shortages, would be delayed because of legal and regulatory complexities, and that Saint Vincent's meager cash situation was becoming increasingly problematic and would only worsen during the following month.

45.    On September 22, 2004, the Board and the Saint Vincent Finance Committee held a special meeting. Smith and Selbst were present as the McDermott representatives. Speltz and Weis were also present. At Speltz's request, Smith made a presentation about the options that the Board might consider, including Chapter 11 bankruptcy protection, in the event that Saint Vincent's liquidity crisis continued or worsened. Smith explained that "advance preparation" for, and "smooth entrance" into, a Chapter 11 bankruptcy proceeding were "key to successful emergence" from Chapter 11 bankruptcy and was necessary to avoid a "free fall."

46.    At the same meeting, Speltz stated that Saint Vincent had nearly run out of money the prior week; that the effort to raise cash from "excess real estate" had "stalled" and that Saint Vincent's liquidity "squeeze ... could recur." Weis acknowledged that Saint Vincent was experiencing its third liquidity crisis since hiring the Speltz and Weis Parties, and that this latest crisis had been going on throughout the preceding four weeks. Weis admitted that the Speltz and

Weis Parties had not anticipated the latest cash crisis.  He also conceded that Saint Vincent's collections had "deteriorated," and were "still not back on track."  Weis also admitted that "Saint Vincent is as close to the edge as it had ever been."

47.    A week later, on September 30, 2004, the Board formally confirmed its request that McDermott begin "planning for a potential Chapter 11 filing . . . ."  McDermott's bankruptcy team was headed by Defendants Smith, Selbst and Cleary.  At McDermott's insistence, Saint Vincent agreed that McDermott would render weekly billings for its services, and that Saint Vincent would make next-day payments by wire transfer.

48.    At or around the time McDermott began preparing Saint Vincent's Chapter 11 bankruptcy filing, the McDermott Defendants knew and should have known that a Chapter 11 bankruptcy filing was essential to minimize the depletion of Saint Vincent's assets, to maximize Saint Vincent's enterprise value and to ensure that Saint Vincent's mission could be continued long-term.  Despite the need for seeking Chapter 11 bankruptcy protection, the McDermott Defendants failed to provide proper and timely direction to the Board that Saint Vincent should immediately authorize the filing for bankruptcy protection under Chapter 11 to facilitate a successful restructuring, reorganization and rehabilitation of the System.

49.    On or near the same day that Saint Vincent engaged McDermott, and with Saint Vincent's approval, McDermott engaged Huron LLC to act as financial advisor to prepare and plan for a Chapter 11 bankruptcy filing.  Weis and the McDermott Defendants were responsible for supervising and directing Huron LLC's work for, and billings to, Saint Vincent.

### "Pencils Down"

50.    Throughout the month of October 2004, the McDermott Defendants geared themselves for a Saint Vincent bankruptcy filing, which McDermott code-named "Project

- 18 -

Vulcan." McDermott created a "war room" in which it collected and utilized, among other things, copies of Saint Vincent's audit reports and financial statements, loan and security documents, bond documents, labor union contracts, organizational documents, reimbursement agreements, agreements with creditors, financial documents, and other due diligence documents regarding Saint Vincent. In short, the McDermott Defendants had all information pertinent to Saint Vincent's financial condition and necessary for commencement of the Chapter 11 for Saint Vincent.

51.    On or around October 26, 2004, Huron LLC provided the McDermott Defendants with a financial analysis of the existing business plan for Saint Vincent, a plan developed by the Speltz and Weis Parties. Huron's financial analysis revealed severe negative variances with the existing business plan, including negative variances of approximately $44 million and $66.8 million in Saint Vincent's EBIDA (earnings before interest, depreciation and amortization) and net cash flow, respectively, over the next 14 months if Saint Vincent remained in a non-bankruptcy setting. Additionally, Huron's financial analysis of the existing business plan and its view of Saint Vincent's cash flows over the 9 weeks from November 5, 2004 to December 31, 2004 and the 4 weeks from January 1, 2005 to January 20, 2005, revealed insufficient liquidity.

52.    The McDermott Defendants immediately delivered Huron's financial analysis to the Speltz and Weis Parties, having concluded that Saint Vincent "is out of gas by January." The McDermott Defendants did not, however, forward this critical financial analysis to the Board, and they made no effort to see to it that this analysis, which reflected negatively upon Speltz and Weis' efforts, was brought to the attention of the Board.

53.    During this same period of time, the Speltz and Weis Parties were providing misleading reports about their performance and about the status and purported success of their

turnaround plans. Because the Board did not have the benefit of the McDermott Defendants'
professional assessments and direction, they were not able to appreciate the extent and
significance of the Speltz and Weis Parties' failures.

54.    On or around October 27, 2004, despite the analysis provided to Saint Vincent's
senior management (i.e., the Speltz and Weis Parties) the day before, Smith sent an email to the
rest of the McDermott Defendants, informing them that Saint Vincent management (*i.e.*, Speltz
and Weis) had instructed all McDermott bankruptcy attorneys to put their "pencils down."
Smith noted that this instruction was "for now" and that management had decided "to manage
[Saint Vincent's financial] problem through existing lenders." Smith announced to the
McDermott bankruptcy attorneys that he was "skeptical, but it is [the Speltz and Weis Parties']
call." Smith further expressed his anticipation that the McDermott Defendants would "be back
to this one towards mid-December." Nonetheless, no communication of this was conveyed to
the Board, nor was direction given to the Board as to the noted skepticism of Speltz and Weis'
actions.

55.    Though the McDermott Defendants were admittedly skeptical of management in
October 2004, they nevertheless sat silently and failed to give the Board the benefit of their
unvarnished, frank and professional advice. Consequently, the Board was deprived of the benefit
of the McDermott Defendants' professional bankruptcy analysis, advice and direction, for which
McDermott had charged more than $400,000 by the end of October 2004, and the Board was
misled and not fully informed by the attorneys it had specifically engaged to counsel, advise and
direct them in this regard when they made business and bankruptcy decisions in the fall of 2004.

56.    The McDermott Defendants' conduct in facilitating the efforts of the Speltz and
Weis Parties to mislead the Board, and in avoiding their professional responsibilities to provide

candid assessments, advice and direction to the Board, began during the first month of McDermott's bankruptcy work and, as discussed below, continued to the severe detriment of Saint Vincent thereafter. The Board, as the governing body of Saint Vincent, was continuously deprived of material information from the McDermott Defendants. Decisions, action, and inaction by the Board were often based upon inadequate information, advice and guidance because the McDermott Defendants withheld material information, advice and guidance from the Board. The McDermott Defendants had the duty to provide the information, advice and guidance to the Board that they, as bankruptcy experts, knew was necessary for fully-informed Board action beneficial to Saint Vincent.

### The Secret Negotiations to Sell SWLLC to Huron Inc. Of Which The McDermott Defendants Knew

57.     When Huron LLC came on the scene in September 2004, the Huron Parties immediately recognized that the Speltz and Weis Parties had created a substantial cash flow for themselves, and the Huron Parties undertook to capitalize on that cash flow by attempting to purchase SWLLC from Speltz and Weis. Accordingly, in the fall of 2004, Gary Holdren ("Holdren"), the CEO of Huron Inc., telephoned Speltz and informed him that Huron Inc. wanted to purchase SWLLC.

58.     The substantial price Huron Inc. was willing to pay for SWLLC was directly tied to the income that the Speltz and Weis Parties had been able to generate, and would continue to generate, from Saint Vincent. The prospective sale of SWLLC in the midst of the Saint Vincent engagement, for a price that would be based on the payments the Speltz and Weis Parties were able to generate from Saint Vincent, placed Speltz and Weis in an irreconcilable and direct conflict of interest. While Saint Vincent's interests were in turning around Saint Vincent's financial affairs as promptly as possible, and with the least costs possible, the Speltz and Weis

- 21 -

Parties' interests were in extending their Saint Vincent engagement as long as possible and to maximize the fees and profits they would earn from the engagement in order to create the revenue stream to support a sale to Huron Inc. In this regard, a Chapter 11 filing would be directly at odds with the Speltz and Weis Parties' objectives.

59.    Under these circumstances, the prospective sale of SWLLC by Speltz and Weis to Huron Inc. was a fact that was critical to Saint Vincent's Board and to its making of fully informed business and financial decisions that it would be called upon to make at the recommendations of the Speltz and Weis Parties and the Huron Parties. However, notwithstanding the obvious and known materiality of the prospective sale to the Board's future decisions and actions, the Speltz and Weis Parties and the Huron Parties initiated and pursued their discussions about the prospective sale with deliberate deception. They agreed to conceal from the Board their discussions about the prospective sale and utterly failed to make any disclosure to the Board in this regard.

60.    Speltz and Weis were officers and fiduciaries of Saint Vincent. As such, the secret sale negotiations and eventual covert sale to Huron Inc. breached their fiduciary duties of loyalty, good faith, care, fair dealing, and obedience to Saint Vincent, as well as the terms of the SWLLC Agreement, Saint Vincent's by-laws, and its specific conflict of interest policy. Instead of revealing the negotiations, in January 2005 the Speltz and Weis Parties and the Huron Parties entered into a confidentiality agreement whereby they agreed to keep their negotiations secret.

61.    Also, at this same time in January 2005, the Speltz and Weis Parties were seeking to strengthen their position in their negotiations with Huron Inc. by requesting that the Board vote to extend the SWLLC Agreement, which was not set to expire for another three months. Speltz and Weis requested the extension of the SWLLC Agreement for the specific purposes of

- 22 -

guaranteeing the future cash flow for SWLLC and of enhancing the price Huron Inc. would pay Speltz and Weis for SWLLC. As later events would show, Huron Inc.'s willingness to purchase SWLLC was dependent upon the extension of the SWLLC Agreement.

### The McDermott Defendants' Misplaced Loyalty
### And Concealment Of The Secret Negotiations

62.    In or around February 2005, Speltz and Weis included the McDermott Defendants in their secret plans when they sought advice regarding the proposed sale of SWLLC to Huron Inc. Speltz and Weis told Smith that the information regarding their negotiations was secret by virtue of the confidentiality agreement between the Speltz and Weis Parties and Huron Parties. Consistent with the practice of the McDermott Defendants to inform one another of all important facts regarding the Saint Vincent engagement, Smith promptly informed Selbst and Cleary of those secret negotiations. Smith, along with the other McDermott Defendants, were not parties to the confidentiality agreement, but were Saint Vincent's lawyers and were under a fiduciary duty to disclose this critical information to the Board. Despite their clear legal obligations to Saint Vincent, however, the McDermott Defendants placed their loyalty with the Speltz and Weis Parties and wrongfully withheld the information from the Board. The McDermott Defendants did not reveal their knowledge of these critical circumstances until after the sale of SWLLC to Huron Inc. had closed in May 2005 and after Saint Vincent had been told of the closing.

63.    As professed bankruptcy experts, the McDermott Defendants knew that a combination between the Speltz and Weis Parties (Saint Vincent's management consultants) and the Huron Parties (Saint Vincent financial advisors) would be at a minimum severely limited, if not impermissible in a Saint Vincent bankruptcy because of the Bankruptcy Code and the so-called "Jay Alix Protocol." The Jay Alix Protocol is a set of specific conflict of interest and

Federal bankruptcy law disinterestedness principles and rules first promulgated in the District of Delaware and later adopted by Bankruptcy Courts in other jurisdictions, including the Southern District of New York. Since 2003, if not before, the United States Trustee for the Southern District of New York had posted the Jay Alix Protocol on its web site. Under the Jay Alix Protocol, a debtor in a Chapter 11 bankruptcy case may not employ the same firm, or two firms that are commonly owned, to function as crisis manager or turnaround expert (as SWLLC was functioning for Saint Vincent) and as financial advisor (as Huron LLC was functioning for Saint Vincent).

64.    As the secret negotiations between SWLLC and Huron Inc. progressed, the Speltz and Weis Parties and Huron Parties recognized, and the McDermott Defendants understood, that the benefits that would accrue to the Speltz and Weis Parties and Huron Parties were dependent upon their continued success at discouraging and preventing Saint Vincent from seeking bankruptcy protection and, conversely, that a bankruptcy filing by Saint Vincent would be disastrous to their personal economic interests because they were not likely to be permitted to function as professionals in a Saint Vincent bankruptcy.

65.    As the McDermott Defendants further understood, and as Speltz and Weis realized, any bankruptcy filing would thwart the sale of their interests in SWLLC to Huron Inc., because, among other things, (i) it would diminish and shorten the duration of the cash stream to SWLLC; (ii) the SWLLC Agreement and the retention of Huron LLC would be subject to Bankruptcy Court approval; (iii) the Bankruptcy Code disinterestedness requirements and the corresponding Jay Alix Protocol would prevent the retention of SWLLC and Huron LLC in the event that they were owned by a common parent; (iv) even if it were somehow possible for both entities to be retained by Saint Vincent in a bankruptcy, outside constituencies in the bankruptcy

process would closely monitor, criticize, and prevent the payment of the unnecessary and excessive fees charged by SWLLC and Huron LLC and certainly would oppose such charges by these two entities; and, therefore, (v) since the sale of SWLLC was essentially a sale of SWLLC's future cash flow, and Saint Vincent accounted for approximately 85% of SWLLC's revenue (and for all practical purposes was its only client) a bankruptcy filing by Saint Vincent would create such uncertainty about SWLLC's future cash flow that Speltz and Weis's ability to sell SWLLC would be extremely doubtful.

66.    While Speltz and Weis actively resisted a bankruptcy filing for these reasons, on March 11, 2005, Smith told Speltz and Weis that someone from Huron LLC was reviewing Weis's current projections and that Huron LLC appeared to believe that a bankruptcy filing might be inevitable.  The McDermott Defendants reported this to the McDermott attorneys working on the Saint Vincent engagement.  Preferring the Speltz and Weis Parties and Huron Parties over their fidelity and duties to Saint Vincent, Smith failed to advise the Board that its financial advisor, whom McDermott was tasked to supervise, believed Saint Vincent could not avoid seeking Chapter 11 protection.

67.    On March 17, 2005, Huron LLC delivered a report to Smith that noted that the company had secured $94.3 million of funding over the prior twelve months through asset sales and refinancings, which had gone to fund operating losses, and identified other Saint Vincent assets that could be sold or further encumbered to generate cash to pay the Speltz and Weis Parties and fund Saint Vincent's continued operating losses.  The report further included a bankruptcy analysis that assumed a bankruptcy filing on May 1, 2005, and enumerated benefits, including suspension of malpractice expenditures and debt service payments approximating $48 million, which Saint Vincent would be able to obtain if it were to file for bankruptcy protection.

With this knowledge, the McDermott Defendants failed again, however, to advise the Board to promptly file for bankruptcy protection.

68.    In April 2005, Speltz and Weis participated in a conference call with Smith for the purpose of discussing the conflict of interest issues that would face SWLLC and Huron LLC if they were under common ownership and Saint Vincent was in bankruptcy. Despite their understanding that those issues would arise if Saint Vincent were to file for bankruptcy protection, and would unnecessarily complicate and delay the progress of a Saint Vincent bankruptcy case, the Speltz and Weis Parties and Huron Inc. nevertheless continued with their primary goal of achieving their sale and both they and the McDermott Defendants continued to conceal the impending transaction from Saint Vincent.

69.    Beginning as early as April 22, 2005, Defendant Cleary, at Smith's request, began looking for a way for SWLLC and Huron LLC to circumvent the conflict of interest and disinterestedness requirements of the Bankruptcy Code and the Jay Alix Protocol.

70.    On April 26, 2005, and again the next day, Speltz, Weis and Smith spoke with Huron Inc.'s Chief Executive Officer, Gary Holdren, to allay his concerns regarding the effect of the Jay Alix Protocol in the event that Saint Vincent were to file for bankruptcy after Huron Inc. acquired SWLLC. In an email of April 27, 2005, Speltz described to Smith, Weis and Holdren the discussions they were having "to clarify how we ensure that the three of us and our respective companies remain as a team in case of a filing." In that same email, Speltz emphasized Smith's role in bringing "comfort" to SWLLC and the Huron Parties. The Board was not informed by the McDermott Defendants of Smith's telephone call to Huron Inc. and remained unaware of any aspect of the SWLLC and Huron Inc. transaction.

71.    On April 28, 2005, in an internal conference call among the McDermott Defendants, they confided to one another about problems that were not known by the Board. While the Speltz and Weis Defendants had been successfully preventing Saint Vincent from filing for bankruptcy protection to perpetuate its churning and accomplish their sale to Huron Inc., Saint Vincent's principal lender, Healthcare Finance Group, Inc. ("HFG"), was tightening the availability of cash and insisting to Speltz and Weis that Saint Vincent file for Chapter 11 protection. Even with the infusion of a new loan, it appeared likely to the bankruptcy attorneys that Saint Vincent "will be out of" cash by June or July. The attorneys also acknowledged among themselves that Huron Inc. was about to acquire SWLLC and that the acquisition could have the effect of "knocking both [SWLLC and Huron LLC] out of the picture" in the event of a bankruptcy filing.

72.    Also, on April 28, 2005, a McDermott attorney made a highly critical assessment of Speltz and Weis' efforts. The attorney noted that the Speltz and Weis' turnaround plan had not been oriented toward balance sheet maneuvers; that it burned through cash from real estate financings "with nothing to show;" that Saint Vincent's operations were not improving quick enough; and that Saint Vincent was financing and selling assets to fund current operations. The attorney also noted that Speltz and Weis want to avoid a bankruptcy filing.

73.    By April 29, 2005, Speltz and Weis were becoming increasingly concerned whether Huron Inc. would approve the acquisition of SWLLC at an upcoming Huron Inc. board of directors meeting scheduled for May 3, 2005. Speltz and Weis were particularly concerned that Huron Inc. would lose interest in the acquisition because of the dual retention prohibition if Saint Vincent were to file bankruptcy after SWLLC and Huron LLC were under common ownership and, also, because Saint Vincent had not yet signed the extension of the SWLLC

Agreement that, by its terms, expired on April 30, 2005. To ensure against such a negative reaction from Huron Inc., Speltz and Weis conferred with Smith, and the three decided that Smith would call Huron Inc.'s general counsel, Natalia Delgado, Esq., ("Delgado"), to allay any such concerns.

74.     On April 29, 2005, as he had agreed to do, Smith called Delgado. Delgado asked Smith if he was calling at the request of Speltz. In response, Smith falsely misrepresented to Delgado that he had not been requested to make the call by Speltz but, instead, was calling at the request of Richard Boyle ("Boyle"), the then Chairman of the Board of Saint Vincent. Smith also falsely represented that Boyle had asked Smith to confirm to Huron Inc. that SWLLC and Huron LLC would be able to continue to provide services in bankruptcy and that the Saint Vincent Board "saw S&W and Huron as a team of service providers that it wanted to keep on board." Smith assured Delgado that the extension to the SWLLC Agreement "would be executed within the next two weeks." Smith told Delgado that he knew that Huron Inc.'s board was going to consider approval of the acquisition the following week and that the Huron Inc. board is "likely to want to know this information in order to make its decision."

75.     Delgado promptly sent an email to Holdren reporting on Smith's call. Holdren, who was puzzled by Smith's call, forwarded the Delgado email to Speltz and Weis.

76.     Later that same day, Weis forwarded the Delgado and Holdren emails to Smith. Weis expressed surprise that Smith had falsely denied that it was Speltz who had asked him to call Delgado, observing that "the three of us [Speltz, Weis and Smith] agreed" that Smith would call Delgado "to mute her concerns before Huron's Board meeting." Weis also questioned Smith's prevarication that he was calling at the request of Saint Vincent's Chairman, stating that, "we are unaware that Dick Boyle knows of the pending Huron/SWLLC combination."

77.    The next day, April 30, 2005, Smith responded to Weis's email. Smith confirmed that Boyle knew nothing of the pending acquisition of SWLLC, stating that, "I haven't spoken with Dick since the last Board meeting I attended in the Fall." Smith went on state that he was angered by Holdren's reaction to his call to Delgado because Delgado had previously "called me first out of the blue asking for help" with the SWLLC acquisition.  Smith also had told Huron Inc.'s general counsel that the acquisition would not impair Huron LLC's ability to perform services for Saint Vincent if it filed bankruptcy.

78.    In other e-mails, to Speltz and Weis, at about the same time, Smith also discussed the issues relating to disinterestedness, the Jay Alix Protocol, and conflicts of interest. Smith advised Speltz and Weis as to how they could "swerve" if they received "significant pushback from the US Trustee" in opposition to their potential retention in bankruptcy.

79.    Indeed, unbeknownst to the Board, after learning of the discussions between Huron Inc. and SWLLC, Smith and Cleary had instructed McDermott attorneys to prepare a research memorandum regarding the issues that would arise from such an acquisition should Saint Vincent eventually seek bankruptcy protection.  Once more, neither the fact that this important research was being performed, nor the result of the research, was disclosed to the Board by the McDermott Defendants.

80.    As counsel to Saint Vincent and its Board (not to the Speltz and Weis Parties), the McDermott Deponents had a duty to disclose their knowledge of the Huron Inc./SWLLC negotiations to the Board, and to advise the Board of the conflicts, and the issues regarding disinterestedness and the related Jay Alix Protocol, that were posed by Huron Inc.'s proposed purchase of SWLLC.

81.    Competent counsel, as required by New York's Disciplinary Rule 5-109(b) and acting in the interests of the client, Saint Vincent -- as distinguished from the interests of senior management Speltz and Weis and their new employer Huron LLC -- should have recognized from the outset that the dual retention of Huron LLC under Section 327 of the Bankruptcy Code and approval of the SWLLC Agreement under Section 363 of the Bankruptcy Code would be a practical impossibility if full disclosure were made concerning all relevant terms of the Huron Inc. acquisition of SWLLC, the employment agreements between Huron LLC and Speltz and Weis, the earn-out provisions (especially the percentage of Saint Vincent earnings provision) and the breaches of fiduciary duty and conflicts of interest on the part of Speltz and Weis.

82.    In his April 30, 2005 email, Smith warned Speltz and Weis of a matter that was of "possibly greater significance." Smith recounted the difficulties that he had encountered the day before in attempting to secure approval of a new loan to finance Saint Vincent's continuing operating deficits. Smith noted that the Board was becoming concerned that Saint Vincent was "borrowing only to pay trade or go deeper into debt when the operations were not turning around;" that some members of the Board were expressing concern about their obligations "in the 'zone of insolvency;'" that, some members of the Board were becoming "skeptical" about "deteriorating hospital margins;" that "it wouldn't surprise [Smith] if [the Board] wanted a time table for the systematic realignment recommendations that they understand to be in process;" and that Speltz and Weis should be alerted that the Board was beginning to understand the "urgency" of Saint Vincent's problems and "may be more active and demanding in contrast to their historically more passive role."

83.    Despite the fact that Speltz, Weis and the McDermott Defendants met with members of the Board, and were in constant contact with the Board, they conspired and carefully

- 30 -

concealed from the Board, and from St. Clair, the facts of both the impending sale transaction among the Speltz and Weis Parties and Huron Parties and the extraordinary time and attention that the Speltz and Weis Parties, the Huron Parties and the McDermott Defendants were devoting to (and would be charging Saint Vincent for) the problems that the acquisition of SWLLC by Huron Inc. would cause in the event of a Saint Vincent bankruptcy filing. In fact, in mid-April, St. Clair had questioned Speltz about a rumor that Huron Inc. was about to acquire SWLLC, and Speltz falsely denied the rumor.

84.     On May 5, 2005, the Executive Committee of the Board, acting in ignorance and as a result of the Defendants' false pretenses, adopted a resolution approving the extension of the SWLLC Agreement. Speltz and Weis were both present, but neither of them disclosed the facts that they were about to sell SWLLC to Huron Inc. and that execution of the formal sale agreement and the closing of the sale were conditioned upon Saint Vincent's extension of the SWLLC Agreement.

## The Consummation of the Sale of SWLLC to Huron Inc.

85.     Until May 6, 2005, the Speltz and Weis Parties, the Huron Parties and the McDermott Defendants fraudulently concealed from the Board the discussions that had taken place among them leading to the execution of Acquisition Agreement. On May 5, 2005, however, after the SWLLC Agreement had been extended, and the Acquisition Agreement had been executed, Huron Inc., a public company, filed a disclosure of its execution of the purchase agreement with the United States Securities and Exchange Commission, as required by law.

86.     On or about May 6, 2006, Speltz telephoned Boyle and told him that Speltz and Weis had sold SWLLC to Huron Inc. Within days, Speltz also called St. Clair and told her about the acquisition. Speltz apologized to St. Clair for having previously denied that he and Weis

were negotiating with the Huron Parties. Speltz claimed that he had lied to St. Clair so as not to transgress the confidentiality agreement that the SWLLC Parties had signed with Huron Inc. Speltz offered no other explanation or excuse for having consciously violated his fiduciary duty of loyalty and his obligations to Saint Vincent in order to pursue his own, selfish financial interests by entering into the confidentiality agreement with Huron Inc. in the first place, and then by consummating a transaction from which he personally benefited at the expense of Saint Vincent.

87.     On May 9, 2005, the Speltz and Weis Parties and Huron Inc. closed on the Acquisition Agreement. As a part of the closing, Speltz and Weis each entered into an employment contract with Huron LLC, thereby becoming employees of Huron LLC. (The transaction evidenced by the Acquisition Agreement, closing documents, and employment agreements is referred to hereunder as the "SWLLC/Huron Transaction.")

88.     At the closing of the SWLLC/Huron Transaction, Speltz and Weis received consideration for their interests in SWLLC as follows: (i) a cash payment in the amount of $14 million; (ii) a note in the amount of $3 million payable over three years; and (iii) the promise of "earn-out" payments (the "Earn-Out").

89.     The Earn Out payments were of two types based on two formulas. Under one formula, Speltz and Weis were to receive Earn-Out payments based on the future profitability of SWLLC. Under the other formula, Speltz and Weis were to receive payments to be derived from future billings of Huron Inc. and its affiliates and subsidiaries attributable to work referred by Speltz or Weis, including referrals of work for Saint Vincent. These Earn-Out formulas encouraged Speltz and Weis to maximize billings to Saint Vincent for their own personal interests thereby causing a direct conflict of interest with the responsibilities and fiduciary duties

- 32 -

that Speltz and Weis owed Saint Vincent as its CEO and CFO, respectively, and that the Speltz and Weis Parties owed Saint Vincent by virtue of the trust and confidence that the Board had placed in them.

90.    Shortly thereafter, when the McDermott Defendants reviewed the SWLLC/Huron Transaction documents, the McDermott Defendants recognized that the Earn-Out payments created a conflict of interest that violated the fiduciary duties that the Speltz and Weis Parties owed Saint Vincent.  In emails among the McDermott Defendants, including an e-mail from Smith to Cleary, they observed that the "earn-out arrangements predicated on future business to Huron from legacy [SWLLC] clients and insolvency business referred to Huron based on S&W engagements" created an obvious financial conflict; that "it certainly smells like David [Speltz] and Tim [Weis] have a personal interest in pumping up the Huron revenues;" and that there would be severe adverse "reactions of external constituencies, such as [the Attorney General of New York,] examiners, the Creditors Committee and disgruntled employees, if the Debtors' [i.e. Saint Vincent's bankruptcy] cases become a meltdown."

### Promoting a Restructuring That Was "Too Little, Too Late"

91.    By the closing on the Acquisition Agreement, it had become clear to the McDermott Defendants and Huron LLC that the Speltz and Weis Parties' turnaround efforts were failing.  However, instead of counseling the Board that Saint Vincent should file for bankruptcy, the McDermott Defendants and Huron LLC continued to support the Speltz and Weis Parties' strategy of consistently presenting cash crises as short-term problems and supporting the Speltz and Weis Parties' efforts to present yet another revised turnaround plan to lenders and the Board.

92.     In an email in May 2005, Smith remarked to the other McDermott Defendants that Speltz and Weis were in denial concerning Saint Vincent's balance sheet and cash flow problems. Smith also suggested that Speltz and Weis were oblivious to the problems they were facing at Saint Vincent and to the inevitability of a Chapter 11 filing by Saint Vincent.

93.     McDermott also was aware of the inaccurate and unreliable nature of projections prepared by SWLLC, Speltz or Weis, and, when the McDermott Defendants desired reliable numbers, they turned to Huron LLC to supply projections. Again, despite their observation that the Speltz and Weis Parties were incompetent, and not handling their turnaround duties competently, the McDermott Defendants did not share their observation with the Board.

94.     Instead, on May 26, 2005, Smith sat by as Speltz issued a report to the Executive Committee of the Board in connection with the upcoming Board meeting, scheduled for June 1, 2005. Speltz stated in the report that, "in spite of numerous setbacks and surprises, the turnaround is a success to date," and "many positive signs have emerged" in recent weeks. Speltz presented to the Executive Committee a limited restructuring plan that the Speltz and Weis Parties would be presenting to the Board on June 1, 2005, and to creditors on June 2, 2005.

95.     On May 31, 2005, in advance of the presentation of the limited restructuring plan to the Board or to the creditors, Smith stated that the creditors would be "underwhelmed" by their plan. In an email of that date, Smith shared this opinion with the Speltz and Weis Parties, stating that in "anticipation of this, I suggest that we do a dry run page flip for the creditors' meeting." Smith noted that, "It would appear that HUD/DASNY may be underwhelmed with our strategic restructuring plan (*too little, too late, where have you been, etc.*)" (Emphasis added.) While Smith's assessment was correct, it was not conveyed to the Board. The secured creditors finally rejected Speltz and Weis' modest restructuring plan.

## The Creditors Bring An End To Financing Losses
## Sending Saint Vincent Into Bankruptcy

96.    At the same time that the McDermott Defendants, Speltz and Weis Parties and the

Huron Parties were conspiring to make sure that a Saint Vincent bankruptcy filing did not

interfere with the Acquisition Agreement, and the Speltz and Weis Parties were preparing their

"underwhelming" revised turnaround plan, Saint Vincent's creditors expressed their firm

conclusion that it was imperative that Saint Vincent be reorganized in bankruptcy.

97.    By the time of the April 28, 2005, internal conference call that Defendant Selbst

had with other attorneys at McDermott, the McDermott Defendants knew that Saint Vincent's

principal lender wanted Saint Vincent to file for Chapter 11 protection and had also said it would

provide further financing known as debtor-in-possession financing with Bankruptcy Court

protections if this was done.  Notwithstanding the knowledge of the McDermott Defendants that

debtor-in-possession financing was readily available from an identified source, the McDermott

Defendants failed to take advantage of this opportunity for the benefit of their client.

98.    On May 31, 2005, HFG reluctantly made an overadvance of only $6 million to

Saint Vincent on its existing line of credit to cover that week's cash shortfall.  In a conversation

with Smith, HFG's lawyers emphasized that, under the lending formula in the loan agreement,

Saint Vincent was not entitled to the advance and, further, that Saint Vincent was in default

under the loan agreement.  HFG's lawyers went on to state that HFG was adamant that its

willingness to make that overadvance was conditioned upon Saint Vincent seeking Chapter 11

protection.  HFG's lawyers made it clear that Saint Vincent should not count on further

overadvances if Saint Vincent did not proceed with a bankruptcy filing.

99.    Notwithstanding HFG's admonition to Smith that further advances were

conditioned upon Saint Vincent's rapid bankruptcy filing, and despite Smith's anticipation that

Saint Vincent's creditors would react negatively to the Speltz and Weis Parties' limited restructuring plan, the Speltz and Weis Parties nevertheless presented a new turnaround plan to the Board on June 1, 2005, and recommended that it be approved. Smith was present at the June 1, 2005 Board meeting.

100.    While they acknowledged in their June 1, 2005 presentation to the Board that they failed to meet their turnaround targets, and stated that the "the actual performance of [Saint Vincent] [had been] far worse than originally anticipated," the Speltz and Weis Parties, as Smith sat by, continued to encourage the Board that a bankruptcy filing was not necessary, advising specifically that "the turnaround has seen significant progress of the past year moving toward stabilizing cash flow and rebuilding operational infrastructure." Additionally, they attributed the failures in the performance of the turnaround plan to a $60 million error in projected net realizable accounts receivables that they tried to blame on others.

101.    The Speltz and Weis Parties went on to concede that, during the period from July 2004 to April 2005, there had been a $94 million shortfall in operating cash flow (as compared to the projections of the turnaround plan) before debt service, capital expenditures and third party payments. Taking these additional recurring cash deficiencies into account, the Speltz and Weis Parties acknowledged that, as June 1, 2005, Saint Vincent's was continuing to experience a cash shortfall of between $10 million and $14 million per month.

102.    As proposed by the Speltz and Weis Parties to the Board on June 1, 2005, the new restructuring plan was to be accomplished outside bankruptcy and, with the exception of St. Mary's and Bayley Seton, it made no plan for disposing or closing the other three hospitals in Queens and Staten Island (St. John's Queens, Mary Immaculate and Saint Vincent Staten Island) that continued to accumulate losses at the aggregate rate of $10 million per month. The Speltz

and Weis Parties' restructuring plan, the same as their previous failed turnaround plan, was wholly inadequate, unrealistic and unreasonable.

103.    On June 1, 2005, David Hyams, HFG's Chief Credit Officer, sent a letter to Weis, formalizing HFG's admonition that it would not commit to make additional advances to Saint Vincent on any basis in the future. Hyams also warned, ominously, that "Events Of Default" are "continuing as of the date hereof" and that HFG's "Lender rights ... have accrued thereunder." In the evening of June 1, 2005, at a meeting with an HFG representative, Weis acknowledged that "no access to capital is causing a death spiral." In an email after the meeting, Weis shared this observation with Speltz, Smith and the Huron Parties.

104.    On or about June 30, 2005, HFG terminated its loan to Saint Vincent and assessed an early termination fee as provided in the loan agreement between HFG and Saint Vincent.

105.    On June 30, 2005, at an emergency meeting of the Board, Boyle, reading from a memorandum prepared for him by Speltz, stated that "a severe liquidity crisis" had "overtaken" Saint Vincent and that Saint Vincent had "experienced an increasingly tight liquidity position" because of lower than expected revenues, increased pressure from trade vendors and "tightening" of the working capital loan leading to the declaration of an "event of default." Speltz noted that an "emergency request" for $15 million had been made of the Dormitory Authority for the State of New York ("DASNY") and that, if DASNY did not provide the funding, Saint Vincent would be unable to meet its payroll obligations on July 5, 2005. The Board empowered its Executive Committee to authorize the filing of a petition for Chapter 11 protection.

106.    On July 4, 2005, after DASNY had refused to grant the emergency request for $15 million, Speltz, with no evasive maneuvers left, finally relented, and recommended to the

Executive Committee of the Board that it authorize the filing of Saint Vincent's Chapter 11 petitions, which recommendation was adopted by the Executive Committee.

107.    On July 5, 2005, Saint Vincent belatedly filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. *See In re: Saint Vincent Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al.*, Jointly Administered Case No. 05-14945 (ASH). The Speltz and Weis Parties, Huron LLC, and McDermott failed to make adequate plans for the bankruptcy filing, and these failures and gross deficiencies directly contributed to the bankruptcy proceedings being chaotic, disruptive, haphazard, and more costly.

### Misguided Efforts to Retain both SWLLC and Huron LLC In Bankruptcy And The Free Falling Saint Vincent Bankruptcy

108.    When Saint Vincent filed for bankruptcy protection on July 5, 2005, the McDermott Defendants continued to put their interests and those of the Speltz and Weis Parties and Huron Parties above their client's interests, and embarked upon a disastrous plan to obtain the approval of the Bankruptcy Court for the retention of both SWLLC and Huron LLC. As the Bankruptcy Judge later observed, this dual retention strategy was *"from the outset* a dead letter by reason of the Jay Alix Protocol, Section 327(a) of the Bankruptcy Code, and the serious conflicts of interest and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the Huron [Inc.] acquisition of SW[LLC] in early May." Nevertheless, the McDermott Defendants pursued this strategy at significant expense to Saint Vincent and at the cost of serious and harmful delays in Saint Vincent's reorganization process. This dual retention strategy and related efforts nearly derailed Saint Vincent's Chapter 11 reorganization during the critical months immediately following the bankruptcy filing.

- 38 -

109.    In their initial bankruptcy pleadings, the McDermott Defendants initially sought Bankruptcy Court approval of the SWLLC Agreement under Bankruptcy Code § 363 and of Huron LLC's retention under Section § 327. The Motions and supporting papers filed on July 5, 2005 (the "July 5th Motions"), seeking approval of the SWLLC Agreement and retention of Huron LLC, were carelessly drawn, incomplete and inappropriate. The disclosure in the July 5 Motions was grossly and concededly inadequate, and none of the McDermott Defendants' subsequent draft retention motions contained complete or appropriate disclosures concerning the terms of the SWLLC/Huron Inc. Transaction and the Speltz and Weis conflicts and fiduciary breaches. Smith charged Cleary with the primary responsibility for the preparation of the retention Motions and their supporting documents. The Motions and related documents were reviewed by Cleary, Selbst and Smith before they were filed, and Cleary, Selbst and Smith authorized the filing of the Motions and related documents.

110.    Although the Motions drafted by the McDermott Defendants seeking approval disclosed the bare fact of the Huron Inc. acquisition of SWLLC, they violated the Bankruptcy Code and Rules by not disclosing any details of the acquisition, the Speltz and Weis Employment Agreements with Huron LLC, the impermissible relationships and connections between the Speltz and Weis Parties and the Huron Parties or the Earn-Out provisions. Nor did the Motions contain any disclosure of the conflicts or breaches of fiduciary duty resulting from the acquisition and related agreements or their implications for the Huron LLC and SWLLC retentions. Indeed, the Motions falsely and inaccurately alleged that SWLLC was a "materially disinterested person," despite the fact that the Speltz and Weis Parties were grossly conflicted as a consequence of the Huron Inc. acquisition of SWLLC and the Earn Out provisions.

111.    The McDermott Defendants, along with the Speltz and Weis Parties and the Huron Parties, intentionally failed to disclose to the Bankruptcy Court, to the United States Trustee for Region II ("U.S. Trustee"), and to Saint Vincent's Creditors Committee ("the Creditors Committee") and creditors at large, the complete and full information about the SWLLC/Huron Inc. Transaction. The McDermott Defendants knew that the problems of lack of disinterestedness, conflicts of interest and breaches of fiduciary duty by Speltz and Weis were of such gravity that those matters *could not be disclosed* to the Bankruptcy Court. They knew that full and candid disclosure would eliminate any possibility of approval of the SWLLC Agreement and would undermine public confidence in the management of Saint Vincent. The McDermott Defendants were fully aware of the terms of the SWLLC/Huron Transaction and the multiple conflicts and breaches of fiduciary duty on the part of Speltz and Weis relating thereto.

112.    Within a day after the July 5th motions were filed, the McDermott Defendants were made aware that the U.S. Trustee's office would oppose the retention of SWLLC and Huron LLC based on the Jay Alix Protocol. Nonetheless, on July 13, 2005, McDermott filed an Amended Motion for approval of the SWLLC Agreement and the dual retention of SWLLC and Huron LLC. The disclosures in the July 13 Amended Motion were also woefully deficient. In face of a renewed objection by the U.S. Trustee, the McDermott Defendants withdrew the Motion.

113.    Indeed, upon learning of the conflict of interest that disabled the Speltz and Weis Parties and Huron LLC, the U.S. Trustee advised the McDermott Defendants that her office objected to the dual retention of SWLLC and Huron LLC as impermissible under the Bankruptcy Code and the Jay Alix Protocol.

114.    Based on a July 21, 2005 conversation with Martin Bunin, counsel to the Creditors Committee, Smith understood that the Creditors Committee also objected to the Debtors' attempt to approve the SWLLC Agreement and to retain SWLLC and Huron LLC. Smith also understood from Bunin's comments, that there were no circumstances under which the Creditors Committee would agree to the retention of Speltz and Weis.

115.    Instead of advising the Board to retain new management, the McDermott Defendants attempted an alternative and equally flawed maneuver of having Huron LLC function as a subcontractor to SWLLC in the face of the stated position of the U.S. Trustee and the Creditors Committee that Huron's acquisition of SWLLC tainted Messrs. Speltz and Weis and that they would object to their retention.

116.    Consistent with their failure to make adequate disclosure concerning the SWLLC and Huron LLC proposed retentions, the McDermott Defendants did not provide the U.S. Trustee with copies of the May 6, 2005 Acquisition Agreement or related Speltz and Weis Employment Agreements until July 22, 2005, despite the fact that disclosure of these documents was required by the Bankruptcy Rules and essential for the U.S. Trustee to assess the propriety of the July 5th Motions to retain Huron LLC and approve the SWLLC Agreement.

117.    In mid-August 2005, in recognition of the criticism of Saint Vincent's management, Smith advised Weis to proceed on three fronts:  (i) try to run the business; (ii) try to develop a competent business plan; and (iii) attempt somehow to justify what the Speltz and Weis Parties had done at Saint Vincent over the last 18 months at a cost of approximately $30 million.

118.    Before August was over, the relationship between the U.S. Trustee and the Creditors Committee, on the one hand, and the McDermott Defendants and the Speltz and Weis

Parties and the Huron Parties, on the other hand, had become totally adversarial. The U.S. Trustee was concerned that neither the Speltz and Weis Parties nor the McDermott Defendants had accurately informed Saint Vincent of what was occurring in its bankruptcy case. Accordingly, the U.S. Trustee took the extraordinary action of insisting on meeting directly with members of the Board to advise them of the inappropriateness of the dual retention that the Speltz and Weis Parties and Huron Parties and the McDermott Defendants were trying to accomplish and of the disaster for Saint Vincent that lay ahead. The Board members were surprised by the U.S. Trustee's revelations.

119.    Had Cleary and the other McDermott Defendants made adequate and timely disclosures on the date of the bankruptcy filing, the only reasonable course of conduct would have been the immediate replacement of Speltz and Weis as management and Saint Vincent would have been spared the disruption, delay in progress of the bankruptcy case and adversarial relationship that developed between Saint Vincent, on the one hand, and the U.S. Trustee and the Creditors Committee, on the other hand. Nevertheless, the McDermott Defendants continued until August 1, 2005 to press for Bankruptcy Court approval of the SWLLC Management Agreement and Section 327 retention of Huron LLC.

120.    On August 1, 2005, the McDermott Defendants withdrew the Huron LLC application, but problems with the SWLLC approval continued. On August 12, 2005, the U.S. Trustee informed the McDermott Defendants by letter the that U.S. Trustee's "concerns have not been resolved by the amendments to the July 28 draft motion to approve the [SWLLC] Management Agreement."

121.    By early August, the Creditors Committee and the U.S. Trustee had reached the conclusion that there were grave doubts about the competence and efficacy of Speltz and Weis as

the senior management of Saint Vincent. Both the Creditors Committee and the U.S. Trustee had lost all confidence in Speltz and Weis.

122.    Because of the insistence on the dual resolution by the McDermott Defendants, the Speltz and Weis Parties and the Huron Parties and because of the incompetence of the McDermott Defendants in pursuing various issues in the bankruptcy case, the U.S. Trustee threatened on several occasions to move for the appointment of a trustee to take over the operations of Saint Vincent.

123.    It was not until the second week of August 2005 that Smith advised the Board that Speltz and Weis were at the heart of the retention problem and that the tenure of Speltz as CEO had become "unsupportable." Until then, Smith had been counseling Saint Vincent that the U.S. Trustee's and the Creditors Committee's objections were ordinary, expected and resolvable.

124.    On August 19, 2005, McDermott met with the U.S. Trustee and the counsel for the Creditors Committee. At the August 19 meeting, the U.S. Trustee stated that she would not consent to SWLLC's retention, and the U.S. Trustee and the Creditors Committee proposed the appointment of a "Chief Restructuring Officer" ("CRO").

125.    The U.S. Trustee's CRO proposal obviously had very serious implications for Saint Vincent and its management. Responding to this impetus, the Executive Committee of the Saint Vincent Board convened a "special" meeting on August 24, 2005 to discuss the August 19 meeting and its implications.

126.    At the August 24, 2005 meeting, Smith relayed to the Executive Committee the concerns articulated by the Creditors Committee and the U.S. Trustee regarding Speltz and Weis. After thorough and comprehensive discussion at the August 24 meeting, the Executive Committee decided to ask Speltz and Weis to resign from their positions as CEO and CFO,

respectively. In addition, the Executive Committee appointed Boyle as interim President and CEO and Thomas Allison as interim CFO of Saint Vincent.

### The "Radio Silence" Instruction and Obstruction

127. A further example of the McDermott Defendants' efforts to obstruct the orderly progress of the bankruptcy case and restructuring is the extraordinary shutdown of information, or "radio silence" instruction, issued by Smith. On August 11, 2005 the Creditors Committee informed Smith that it intended to object to the Saint Vincent's motion to retain SWLLC. The same day Smith sent an email to Saint Vincent's management, directing that they cease all communications and information transmittal to the Creditors Committee, cancel all meetings with the Creditors Committee's representatives and "maintain radio silence."

128. Specifically, Smith stated:

> Effective immediately, please stop ALL communication or information transmittal to the Committee, cancel ALL meetings with their representatives, and maintain radio silence. If asked, refer inquiries to me. . . . Lots more will follow, and positions may change, but for now, shut it down.

129. Acting on the Smith "radio silence" instruction, Saint Vincent's management ceased providing any information about the Debtors' business and operations to the Creditors Committee and its professionals. At the same time, Smith instructed McDermott attorneys to undertake an investigation of a rumor that the Creditors Committee had begun to interview candidates to replace the debtors' senior management. The investigation lasted four days, after which the McDermott Defendants determined that there was insufficient credible evidence to substantiate the rumor. Only then did Smith instruct Saint Vincent's management to reopen communications with the Creditors Committee.

- 44 -

130.    The McDermott Defendants' imposition of "radio silence" on Saint Vincent's management while the firm undertook an investigation of whether the Creditors Committee had begun to interview candidates to replace Speltz and Weis was emblematic of the McDermott Defendants' adversarial, counterproductive, disloyal, and grossly negligent representation of Saint Vincent.

## The Delayed Closure of St. Mary's Hospital

131.    By the time Saint Vincent filed for bankruptcy, the Board, at a June 1, 2005 meeting attended by Smith, had already decided to close St. Mary's Hospital. The closure was to occur by September 1, 2005.

132.    Once Saint Vincent filed for bankruptcy protection, the closure of St. Mary's was subject to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. McDermott, both bankruptcy counsel and counsel with respect to the St. Mary's disposition, was primarily responsible for obtaining Bankruptcy Court approval of the closure. Nonetheless, after Saint Vincent filed for bankruptcy, the McDermott Defendants continued to neglect their duties in connection with the closure of St. Mary's Hospital. Defendant Selbst, under the direction of Smith, was given the primary responsibility for obtaining the Bankruptcy Court's approval for the closing of St. Mary's.

133.    Despite knowing of the dire need to close St. Mary's, that St. Mary's was losing between $71,000 and $100,000 per day, and that Bankruptcy Court approval was required for closure, McDermott did not file for approval of closing St. Mary's in the series of motions that the McDermott Defendants filed on behalf of Saint Vincent on the first day of its bankruptcy filing.

134.    Selbst first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier than August 5, 2005, and the motion was not filed until August 18.  By that time, a successful resolution of the motion by September 1 was impossible. The Motion was palpably insufficient, moreover, because it was not accompanied by any supporting affidavits or financial analysis to document the economic exigency requiring prompt closure.

135.    In order for the Bankruptcy Court to grant the Motion for closure of St. Mary's, it was necessary for Saint Vincent to provide the Bankruptcy Court with a comprehensive, well-documented record of affidavits and supporting exhibits demonstrating to the press, public officials, and the public the economic and other facts that necessitated closure.  The belated motion papers the McDermott Defendants filed were carelessly prepared, were not supported by a single affidavit and did not attach any financial analysis to support the summary and conclusory assertions by the lawyers concerning the financial need to close St. Mary's.

136.    McDermott's delay in preparing and filing the motion to close St. Mary's Hospital was not the consequence of strategy, but inattention on the part of Smith and Selbst. Moreover, the failure to support the tardily filed motion with affidavits and financial analysis was not the consequence of strategy or the unavailability of data, but inadequate and untimely preparation by Smith and Selbst.  Instead of working diligently on the closure of St. Mary's, Smith was preoccupied with the effort to obtain the dual retention of SWLLC and Huron LLC.

137.    At a September 7, 2005 hearing on the Motion to Close, the Bankruptcy Court, unsupported by a sufficient record, adjourned the hearing without ruling on the Motion.

## Termination of McDermott as Debtors' Counsel

138.    On or about September 13th, before the Bankruptcy Court acted on the closure of St. Mary's Hospital, the Saint Vincent Board made the decision to terminate McDermott and substitute Weil Gotshal & Manges, LLP ("Weil") as Saint Vincent's bankruptcy counsel. The Board was informed that the McDermott Defendants were flailing about, had angered the Bankruptcy Judge and had destroyed any possible working relationship with the U.S, Trustee by the prolonged and hostile confrontation with the U.S. Trustee over the Huron/Speltz & Weis retention.

139.    On or about September 13, 2005, Saint Vincent made the decision to replace McDermott because it became readily apparent that the restructuring of Saint Vincent was in a quagmire, and that the McDermott Defendants had so alienated the U.S. Trustee and the Creditors Committee that the bankruptcy process could not go forward with the McDermott Defendants continuing as counsel to Saint Vincent.

140.    Because the Board had lost confidence in the McDermott Defendants' ability to guide Saint Vincent through the bankruptcy process and the U.S. Trustee and Creditors Committee and increasingly demanded the immediate appointment of a chief restructuring officer and/or trustee, the Board made the decision to replace McDermott as bankruptcy counsel to Saint Vincent on or around September 13, 2005.

## The McDermott Defendants' Deficient Performance

141.    The McDermott Defendants held themselves out as professionals who possessed special skills and experience in providing expert legal advice to hospitals and other healthcare facilities with respect to restructuring their businesses and planning, preparing and filing for Chapter 11 bankruptcy protection and reorganization.

142.    As trusted bankruptcy counsel, the McDermott Defendants were under the duty to act with due care generally expected of such professionals and to adhere to generally accepted standards of care applicable to such professionals.  These standards include providing the client with information that is material to a client's decision to pursue a given course of action and giving timely and reasonable advice and firm direction to file for bankruptcy when such a course of action is appropriate and generally giving proper legal advice to a client.  As was stated by the United States Bankruptcy Court in the Saint Vincent bankruptcy case, "experienced counsel in major Chapter 11 cases are paid to investigate the facts, to know the applicable principles of law, practice and ethics, to act timely to accomplish their clients' objectives, and to guide their clients with a firm hand to the course of action which is most beneficial to the debtor's estate." *In re Saint Vincent's Catholic Medical Centers of New York*, Case No. 05-B-14945 (ASH) (Bankr. S.D.N.Y. August 29, 2007) at pp. 19-20.

143.    Also, among the generally accepted standards applicable to such professionals is the standard reflected in Disciplinary Rule 5-109 of the New York Lawyer's Code of Professional Responsibility, which provides:

> If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization . . . and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization.  Such measures may include, among others:

> . . . .

- 48 -

> 3. Referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

144.    Because of the significant experience and expertise that the McDermott Defendants claimed they could provide to Saint Vincent as bankruptcy counsel, the McDermott Defendants were engaged by, and entered into a special relationship of trust and confidence with, Saint Vincent to render professional services and to provide expert advice for the purpose of guiding and directing Saint Vincent into and through its restructuring and bankruptcy process. The relationship of trust and confidence that the McDermott Defendants undertook with Saint Vincent carried with it fiduciary duties of loyalty, candor and the highest degree of good faith, honesty, fairness and fidelity to Saint Vincent in the course of their representation of Saint Vincent. As part of these duties, the McDermott Defendants had the duty to bring to Saint Vincent's attention all relevant considerations when recommending a course of conduct, to keep Saint Vincent informed as to the state of its business, to be open and frank with Saint Vincent and to not suppress the truth from Saint Vincent. In particular, the McDermott Defendants had a duty to report to the Board conduct by management or employees that violated their legal obligations to Saint Vincent.

**i.    Failure to Advise the Board of the SWLLC and Huron Inc. Transaction and Failing To Advise Saint Vincent The Ramifications Of The SWLLC/Huron Transaction**

145.    Despite the clear mandate of DR 5-109, when Smith learned that Speltz and Weis were negotiating with Huron Inc. for the sale of SWLLC, Smith failed to disclose this fact from the Board at any time prior to the consummation of the sale on May 5, 2005.

146.    As lawyers for Saint Vincent, the McDermott Defendants knew that Speltz, Saint Vincent's CEO, and Weis, Saint Vincent's CFO, were acting for their own interests and not for

the benefit of Saint Vincent, and in a manner that violated their statutory, common law, contractual, and governance obligations to Saint Vincent.

147.    The McDermott Defendants failed to disclose this information to the Board, the higher authority that could act on behalf of Saint Vincent.

148.    In further disregard of the duties the McDermott Defendants owed Saint Vincent, Smith actively worked with Speltz and Weis to make sure that Saint Vincent extended the SWLLC Agreement prior to disclosure of the SWLLC/Huron Transaction and assisted the Speltz and Weis Parties in keeping Saint Vincent out of bankruptcy long after the McDermott Defendants knew that bankruptcy protection was necessary.

149.    On May 5, 2005, despite the knowledge that bankruptcy was imminent, and that the disinterestedness standards of the federal Bankruptcy laws and procedures would prohibit Saint Vincent from retaining both SWLLC and Huron LLC in bankruptcy, the McDermott Defendants failed to provide this information to the Board and allowed the Board to extend the SWLLC Agreement without the benefit of this knowledge.

150.    Even after the fact of the SWLLC/Huron Transaction was disclosed to the Board on May 6, 2005, the McDermott Defendants failed to advise the Board about the significant negative impact that the SWLLC/Huron Transaction would have upon Saint Vincent, particularly that it posed conflicts that would preclude Saint Vincent's ability to file for bankruptcy protection and keep its management intact once Saint Vincent was in bankruptcy.

151.    Had the McDermott Defendants timely informed the Board of the SWLLC/Huron Transaction and advised the Board of the adverse ramifications of the SWLLC/Huron Transaction, the Board could have replaced the Speltz and Weis parties and/or Huron LLC in a

timely manner and taken other appropriate steps to protect itself from the subsequent damages it suffered by heading into bankruptcy with conflicted and non-disinterested parties at its helm.

### ii. Failure to Advise the Board to File Timely For Bankruptcy Protection

152.    When the McDermott Defendants were hired in September 2004 as bankruptcy counsel for Saint Vincent, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent was in a financial crisis and that its turnaround and restructuring efforts could not be successful outside bankruptcy.    Any reasonable bankruptcy counsel would have recommended to the Board at that time that Saint Vincent should file for bankruptcy and would have guided the Board with a firm hand to that course of action.

153.    In October 2004, when the McDermott Defendants delivered to the Saint Vincent's senior management (Speltz and Weis) an analysis that showed that Saint Vincent would be out of cash by January 2005, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent was in a financial crisis and that its turnaround and restructuring efforts could not be successful outside bankruptcy.    Any reasonable bankruptcy counsel would have informed the Board at that time that management was not performing competently, would have recommended the Board that Saint Vincent should have file for bankruptcy and would have guided the Board with a firm hand to that course of action.

154.    When the McDermott Defendants learned that Saint Vincent's accounts receivable were overstated by $60 million, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent was in a financial crisis and that its turnaround and restructuring efforts could not be successful outside bankruptcy.    Had the McDermott Defendants not done so before, any reasonable bankruptcy counsel would have recommended to

the Board at that time that Saint Vincent file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

155.    In February 2005, when Smith learned of the SWLLC/Huron Transaction, he further understood the complications that such a transaction would pose to Saint Vincent in filing for bankruptcy and realized that the Speltz and Weis Parties had personal incentives to keep Saint Vincent from filing for bankruptcy protection. Had the McDermott Defendants not done so before, any reasonable bankruptcy counsel would have advised the Board that Saint Vincent's management had personal incentives to avoid bankruptcy, would have recommended to Saint Vincent at that time that it file for bankruptcy protection, and would have guided the Board with a firm hand to that course of action.

156.    In March 2005, when Huron LLC informed Smith that bankruptcy was "inevitable," it would have been clear to any reasonable bankruptcy attorney that Saint Vincent's turnaround efforts were not succeeding and that bankruptcy protection necessary to allow Saint Vincent to restructure its operations. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy attorney would have advised Saint Vincent at that time that it should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

157.    In April 2005, when the McDermott Defendants learned that the Speltz and Weis Parties and Huron Inc. had come to terms for the SWLLC/Huron Transaction, they further realized that the Speltz and Weis Parties had personal incentives to keep Saint Vincent from filing for bankruptcy protection. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy counsel would have advised the Board that its management had personal incentives to avoid bankruptcy, would have recommended to Saint Vincent and that time that it

should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

158.    On May 31, 2005, when the McDermott Defendants learned that Saint Vincent's working capital lender was conditioning further advances on Saint Vincent moving toward a Chapter 11 bankruptcy filing, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent had no alternative to filing for bankruptcy protection. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy counsel would have recommended to Saint Vincent at that time that it should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

159.    In May 2005, when the McDermott Defendants learned that Saint Vincent's working capital lender was not offering adequate funding for the proposed limited restructuring plan, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent had no alternative to filing for bankruptcy protection. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy attorney would have recommended at that time to Saint Vincent that it should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

160.    Had the McDermott Defendants, at any of the times described in the eight preceding paragraphs, provided advice and direction to the Board that a bankruptcy filing was necessary and appropriate, and guided the Board with a firm hand to that course of action, Saint Vincent would have exercised its rights and protections under the Bankruptcy Code and filed for bankruptcy protection. In doing so, Saint Vincent would have obtained the following benefits, among others: collection efforts by all creditors would have ceased; pending malpractice actions would have been stayed; Saint Vincent would have been enabled to reject unfavorable executory

leases and contracts; Saint Vincent would have been enabled to renegotiate secured claims; Saint Vincent would have been enabled to close and sell non-profitable entities and operations more expeditiously and with less regulatory roadblocks; accrual of interest on unsecured claims would have ceased; and Saint Vincent would have been afforded a "time out" allowing it to restructure its organization in an orderly and undisrupted fashion.

161.    Because of the delay in filing for bankruptcy protection, Saint Vincent experienced continuing operating losses for an extended period of time and the Speltz and Weis Parties sold and encumbered Saint Vincent assets in order to continue funding losses and paying consulting fees.  Saint Vincent would have avoided these losses and fees, and it would not have sold or encumbered these properties had the McDermott Defendants timely advised the Board that Saint Vincent should file for bankruptcy and guided the Board with a firm hand to that course of action.

### iii. Failure To Plan Adequately For A Bankruptcy Filing

162.    Once Saint Vincent finally filed for bankruptcy, it did so in a rushed and haphazard fashion.  The pleadings delivered to the U.S. Trustee shortly prior to the bankruptcy filing, in accordance with local practice, were very preliminary, incomplete and full of blanks for information to be filled in.

163.    In addition, despite the fact that Saint Vincent had employed professionals, including the McDermott Defendants, more than eight months earlier to prepare for bankruptcy, the McDermott Defendants failed to assist Saint Vincent in the preparation of a business plan or proposal for how Saint Vincent would operate in bankruptcy or emerge from bankruptcy.  The McDermott Defendants failed to adhere to standards of care in allowing Saint Vincent to file for bankruptcy without any such plan or proposal.

164.    Any reasonable bankruptcy attorney, who had been working for months at Saint Vincent, would have made sure that Saint Vincent was properly prepared for a bankruptcy filing, would have seen to it that bankruptcy pleadings properly were prepared and would have had in place a proper plan on how to operate in bankruptcy.

165.    Because of the McDermott Defendants' failure reasonably and adequately to plan for bankruptcy, Saint Vincent's bankruptcy process was longer and more costly than it otherwise should have been.  Had the McDermott Defendants reasonably and adequately planned for Saint Vincent's bankruptcy, Saint Vincent would not have had to wait until October 2005 for competent management, such as Alvarez and Marsal, to take control of the entity; Saint Vincent would not have incurred extra transitional and bankruptcy costs; and Saint Vincent would not have suffered three additional months of losses during the transition.

### iv. Mishandling The St. Mary's Hospital Closure

166.    As the attorneys hired to effectuate the disposition of St. Mary's Hospital, the McDermott Defendants breached their duty of care to the Board when they continually failed to advise the Board that Kingsbrook, the only potential purchaser for St. Mary's, required $20 million in financing for which it did not have a source, and that Saint Vincent could not reasonably expect that St. Mary's could be sold to that potential purchaser.

167.    Despite the fact that St. Mary's was losing $71,000 to $100,000 a day, the McDermott Defendants unreasonably allowed the doomed discussions with Kingsbrook to drag on until April 2005, at which point Kingsbrook terminated the discussions.

168.    Once the Board voted to close St. Mary's, on June 1, 2005, the McDermott Defendants did not timely initiate closure proceedings.  Upon the filing of bankruptcy case, though they were aware of the importance of the St. Mary's issue, the McDermott Defendants

- 55 -

failed to seek Bankruptcy Court approval of the closure of St. Mary's in their initial bankruptcy filings. Such a Motion was not filed until August 18, 2005, more than five weeks after the initial bankruptcy filing. When the Motion was finally filed, moreover, it was incomplete and unaccompanied by necessary supporting affidavits or financial analysis to document the economic exigency requiring prompt closure, causing further delay and losses.

169. As a result of the failure of the McDermott Defendants to exercise reasonable professional care, in connection with the St. Mary's closure, St. Mary's was not closed until October 4, 2005, long after it should reasonably have been closed.

170. Because of the McDermott Defendants' failure to exercise reasonable professional care in preparing and filing the Motion to close St. Mary's Hospital, the Bankruptcy Court did not approve the closure until September 20, 2005, and St. Mary's Hospital was not closed until October 4, 2005, long after it should have been, and after subsequent bankruptcy counsel had been hired, causing losses to Saint Vincent between $71,000 to $100,000 per day for each day that Saint Mary's stayed open unnecessarily. This delay alone cost Saint Vincent an additional $2.4 million to $3.4 million in losses.

### v. Persistent Efforts To Seek Approval Of The Dual Retention

171. The McDermott Defendants persisted in their efforts to seek Bankruptcy Court approval of the dual retention of Speltz and Weis Parties and Huron Parties, when any reasonable bankruptcy attorney would have advised the Board prior to the filing of the bankruptcy that such retention could not be achieved.

172. Once bankruptcy was filed, any reasonable bankruptcy attorney would have further advised the Board that efforts to seek approval of dual retention would be costly,

unsuccessful, would alienate other bankruptcy constituents, such as the U.S. Trustee and Creditors Committee and would cause distraction and delay to the entire bankruptcy process.

173.    The McDermott Defendants, however, failed to give such advice and, instead, persistently sought approval by the Bankruptcy Court of both SWLLC and Huron LLC to the detriment, damage and injury of Saint Vincent.

174.    Because of the McDermott Defendants' persistent efforts to have both SWLLC and Huron LLC retained in bankruptcy and their other antagonistic behavior, Saint Vincent's bankruptcy process was longer and more costly than it otherwise should have been. Had the McDermott Defendants refrained from this unreasonable conduct, Saint Vincent would not have had to wait until October 2005 for competent management, such as Alvarez and Marsal, to take control of the entity. Moreover, Saint Vincent would not have incurred extra transitional and bankruptcy costs, and it would not have suffered three additional months of losses during the transition.

### vi. The Inadequate Disclosures To The Bankruptcy Court

175.    In conjunction with the McDermott Defendants' improper, persistent and unreasonable efforts to seek Bankruptcy Court approval of both the Speltz and Weis Parties and the Huron Parties, the Motions the McDermott Defendants filed on July 5, 2005, seeking approval of the SWLLC Agreement and retention of Huron LLC, were inadequate, and failed to contain complete or appropriate disclosures concerning the terms of the SWLLC/ Huron Inc. Transaction and the Speltz and Weis conflicts and fiduciary breaches. Smith had assigned the primary responsibility for the Retention Motions to Cleary, and Cleary had overseen the preparation of the Motions under the direction of Smith and Selbst.

176.    Because of the McDermott Defendants' inadequate disclosures to the Bankruptcy

Court, Saint Vincent's bankruptcy process was longer and more costly than it otherwise should

have been. Had the McDermott Defendants refrained from this deceptive conduct, Saint Vincent

would not have had to wait until October 2005 for competent management, such as Alvarez and

Marsal, to take control of the entity. Moreover, Saint Vincent would not have incurred extra

transitional and bankruptcy costs, and it would not have suffered three additional months of

losses during the transition.

### The Participation of the Individual McDermott Defendants

177.    Pursuant to their pattern and practice, Smith, Selbst and Cleary worked closely

together in coordinating their efforts and in managing and leading the other McDermott attorneys

who were performing the Saint Vincent engagement. In order to coordinate their efforts, Smith,

Selbst, and Cleary each kept the others fully informed as to all facts relevant to their work.

Among other things, they spoke to each other constantly and kept up a steady and voluminous e-

mail correspondence among themselves.

178.    In accordance with this established pattern and practice, when Smith learned from

Speltz that the Speltz and Weis Parties were engaged in secret negotiations to sell SWLLC to

Huron Inc., Smith promptly informed Selbst and Cleary. It was necessary for Smith to share this

information with Selbst and Cleary because Smith needed, sought and obtained their help in

searching for a method to circumvent the disinterestedness requirements of the Bankruptcy Code

and the conflict of interest requirements of the Jay Alix protocol. It was also necessary for Smith

to assure that Selbst and Cleary would assist in keeping the information secret from Saint

Vincent, and would not inadvertently disclose the information, because Selbst and Cleary both

communicated with Saint Vincent, and Selbst, in particular, attended Board meetings.

179.    Beginning in or about February 2005, when Smith first shared with Selbst and Cleary his knowledge of the secret negotiations for the sale of SWLLC, the McDermott Defendants conspired, confederated, combined and agreed with one another, and with the Speltz and Weis Parties and the Huron Parties, to defraud Saint Vincent and to breach the fiduciary duties owed to Saint Vincent by the McDermott Defendants, Speltz and Weis. Pursuant to this common design and purpose, each of the McDermott Defendants performed overt acts as described herein and committed the torts averred hereinafter in the First, Third, Fourth, Fifth and Sixth Causes of Action.

### Injuries, Damages, and Losses

180.    The McDermott Defendants' conduct, as alleged herein, directly and proximately caused Saint Vincent to suffer substantial injuries, losses, and damages. Had the McDermott Defendants acted timely, appropriately and had they reasonably advised the Board to file for timely bankruptcy protection, and guided Saint Vincent's hand to the most beneficial course of action, Saint Vincent, among other things, would have emerged from bankruptcy much sooner and with a substantially greater enterprise value. Saint Vincent would not have suffered prolonged operating losses; its net worth would not have been eroded by sales and encumbrances of assets to provide cash to fund the losses; its assets would not have been diminished while its liabilities were increased; and it would not have incurred fees for consulting and management services that were largely useless, and, in any event, had to be repeated (at further cost) by the Speltz and Weis Parties' successors. Saint Vincent was also damaged by the effects of a needlessly extended financial crisis that adversely affected its ability to attract patients, physicians and staff; delayed expenditures necessary for the delivery of improved and

competitive services; and diverted the time and attention that would otherwise have been devoted to Saint Vincent's future.

181.    In addition, the McDermott Defendants committed breaches of fiduciary duties that invoke well-established jurisprudential principles requiring the forfeiture and disgorgement of fees and the imposition of punitive damages.  The McDermott Defendants' tortious actions, involving intentional breaches of fiduciary duty and fraud, all to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

182.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

183.    Between December 2003 and September 2005, the McDermott Defendants were Saint Vincent's attorneys with respect to the turnaround of Saint Vincent, disposals of hospitals and preparing, planning and filing for bankruptcy.

184.    As attorneys for Saint Vincent, the McDermott Defendants were engaged to act for and give advice and guidance for the benefit of Saint Vincent with respect to the turnaround, disposals of hospitals and preparing, planning and filing for bankruptcy.

185.    Saint Vincent reposed trust and confidence in the McDermott Defendants.

186.    The McDermott Defendants were fiduciaries to Saint Vincent.

187.    As fiduciaries, the McDermott Defendants were obligated to exercise the highest degree of good faith, honesty, integrity, fairness, and fidelity.  Within these duties are duties of

frankness and candor in bringing to their client's attention all relevant considerations when recommending a course of conduct, in keeping their client informed as to the state of its businesses, and in not suppressing the truth from their client. Among these duties is the duty in situations where management or employees are engaged in conduct that violates their legal obligations to the organization, to inform the higher authority within the organization of such conduct.

188.    The McDermott Defendants failed to act in good faith or in the best interests of Saint Vincent and committed breaches of their fiduciary duties to Saint Vincent in matters related to their position as attorneys with Saint Vincent by, among other things: concealing from the Saint Vincent Board the potential Huron Inc. acquisition of SWLLC beginning in or about February 2005; continuing this concealment through May 6, 2005, when the transaction was finally disclosed to Saint Vincent; concealing from Saint Vincent the earnout terms of the SWLLC/Huron Inc. Transaction; concealing the conflicts of interest created thereby; actively asserting the Speltz and Weis Parties in effectuating the SWLLC/Huron Inc. Transaction by, among other things, telephoning Huron's General Counsel and falsely claiming to be conveying a message from Saint Vincent's Chairman; and in concealing the necessity of a prompt bankruptcy filing from the Board for the purpose of benefiting the Speltz and Weis Parties and the Huron Parties.

189.    The facts and advice concealed from the Saint Vincent Board were material to the Board's course of conduct.

190.    Saint Vincent would not have suffered injury but for the McDermott Defendants' breach of their fiduciary duty to Saint Vincent.

191.    The McDermott Defendant's breach of fiduciary duties was a substantial factor in causing Saint Vincent to sustain damages.

192.    As a direct and proximate result of the McDermott Defendants' breaches of fiduciary duties, Saint Vincent has suffered actual damages.

193.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## SECOND CAUSE OF ACTION

### Negligence -- Malpractice

194.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

195.    The McDermott Defendants were Saint Vincent's attorneys between December 2003 and September 2005, with respect to the turnaround of Saint Vincent, disposals of hospitals and preparing, planning and filing for bankruptcy.

196.    As attorneys, the McDermott Defendants are professionals under New York law.

197.    As professionals retained by Saint Vincent, the McDermott Defendants owed a duty of care to SVCMC to act with the care generally expected of such professionals adhering to generally accepted standards applicable to such professionals.

198.    The McDermott Defendants held themselves out as professionals who possess special skills and experience in providing expert legal advice to hospitals and other healthcare facilities with respect to restructuring their businesses and planning, preparing and filing for Chapter 11 bankruptcy protection and reorganization.

- 62 -

199.    The McDermott Defendants committed breaches of their duty of care to Saint Vincent.

200.    The McDermott Defendants' breaches of their duty of care to Saint Vincent included (1) repeatedly failing to advise Saint Vincent to file for bankruptcy protection, and repeatedly failing to guide Saint Vincent with a firm hand to seek bankruptcy protection prior to July 5, 2005; (2) failing to adequately plan for a bankruptcy filing; (3) mishandling the St. Mary's hospital closure by delaying seeking Bankruptcy Court approval and then filing and preparing a legally insufficient motion and failing to adequately address the objections made to the motion; (4) failing to advise the Board at the earliest point possible that the SWLLC and Huron Inc. transaction prohibited the retention of Speltz and Weis in a bankruptcy proceeding; (5) persisting in efforts to seek approval of the dual retention of SWLLC and Huron in the bankruptcy case in spite of the clear prohibition against such retention, the firm opposition of the United States Trustee and the Unsecured Creditors' Committee, and pursing those efforts in a manner that caused harm to Saint Vincent by alienating these entities; (6) failing to make adequate disclosures in connection with the Motions seeking to employ SWLLC and Huron; and (7) failing to maintain adequate supervision of Huron LLC, the financial advisers engaged by McDermott in connection with the preparation of Saint Vincent's bankruptcy filing.

201.    Saint Vincent would not have suffered injury but for the McDermott Defendants' breaches of their duty of their duty of care to Saint Vincent.

202.    The McDermott Defendants' breaches of their duty of care were a substantial factor in causing Saint Vincent to sustain damages.

203.    Saint Vincent suffered actual injuries as a direct and proximate result of the McDermott Defendants' breaches of their duty to Saint Vincent.

## THIRD CAUSE OF ACTION

### Aiding and abetting the Speltz and Weis Parties' breaches of fiduciary duty.

204.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

205.   The Speltz and Weis Parties were fiduciaries to Saint Vincent, in whom Saint Vincent reposed trust and confidence as professionals retained by Saint Vincent for the purpose of providing high level management and turnaround advisory services to Saint Vincent.  The Speltz and Weis Parties assumed day-to-day control and responsibility over Saint Vincent and the Saint Vincent Board expected that they would act for the benefit of Saint Vincent.  As a result of this relationship of trust and confidence, the Speltz and Weis Parties owed fiduciary duties, independent of their contractual duties, of, among other things, good faith, candor, loyalty, obedience, and care to the non-profit institution they were serving.

206.   Speltz and Weis owed additional, separate fiduciary duties, independent of their contractual duties, of care, loyalty, obedience, and good faith by virtue of their positions as CEO and CFO, respectively.

207.   As fiduciaries of Saint Vincent in their various capacities, the Speltz and Weis Parties were required at all times to act in Saint Vincent's best interests, with undivided allegiance and utmost fidelity, and were prohibited from placing their own interests over those of Saint Vincent.

208.   The Speltz and Weis Parties knowingly committed breaches of their fiduciary duties when they acted without care and in bad faith, betrayed Saint Vincent's trust, and were disloyal and disobedient by engaging in the conduct described herein, including, but not limited to, engaging in dishonest and self-dealing transactions that elevated their personal pecuniary

interests over the best interests of Saint Vincent, failing to avoid other circumstances that put them in conflict of interest with Saint Vincent, deliberately misrepresenting and concealing material information from the Board for personal gain of the Speltz and Weis Parties and others, and failing to restructure timely and file for protection under the Bankruptcy Code in order to churn fees and protect their secret sale plans with the Huron Defendants.

209.    The Board reasonably relied upon the Speltz and Weis Parties' advice, guidance and recommendations and that such advice, guidance and recommendations would be provided without influence by personal interests of the Speltz and Weis Parties. The Speltz and Weis Parties, however, betrayed the trust and abused the confidence of Saint Vincent and its Board by all of their conduct herein alleged.

210.    The McDermott Defendants were aware of Speltz, Weis and SWLLC's breaches of fiduciary duties.

211.    The McDermott Defendants knowingly and substantially assisted the Speltz and Weis Parties in their breaches of their fiduciary duties by concealing the Speltz and Weis Parties' conduct from the Board. By assisting the Speltz and Weis Parties in concealing from the Board the negotiations between the Speltz and Weis Parties on one hand and the Huron Inc. on the other hand, the McDermott Defendants disabled the Board from taking action to protect Saint Vincent's interests in light of the irreconcilable and damaging conflicts created by the Huron Inc. acquisition of Speltz and Weis' interests in SWLLC. The McDermott Defendants further aided the Speltz and Weis Parties' breaches by encouraging the combination of SWLLC and Huron Inc. in February 2005, by advising Speltz and Weis in April 2005 regarding potential conflicts of interest and the Jay Alix Protocol, by providing assurances to Huron Inc. that they falsely

attributed to the Chairman of the Saint Vincent Board; and by informing Huron Inc. prior to May 5, 2005 that the SWLLC engagement would be extended by Saint Vincent.

212.    As a direct result of the McDermott Defendants' aiding and abetting the Speltz and Weis Parties' breach of fiduciary duty, and of the Speltz and Weis breaches of fiduciary duty that were thereby aided and abetted, Saint Vincent suffered damages.

213.    Saint Vincent would not have suffered injury but for the acts of the McDermott Defendants in aiding and abetting the Speltz and Weis Parties in their breaches of fiduciary duty and for the Speltz and Weis breaches of fiduciary duty that were thereby aided.

214.    The acts of the McDermott Defendants that aided and abetted the Speltz and Weis Defendants in the breaches of their fiduciary duty, and the Speltz and Weis breaches of fiduciary duty that were thereby aided and abetted,, were a substantial factor in causing Saint Vincent to sustain damages.

215.    Saint Vincent suffered actual injuries as a direct and proximate result of the McDermott Defendants' aiding and abetting the Speltz & Weis Parties in their breaches of fiduciary duty.

216.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## FOURTH CAUSE OF ACTION

### Aiding and abetting fraud by Speltz, Weis, SWLLC, Huron LLC, and Huron Inc.

217.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

218.    As alleged above, the Speltz and Weis Parties knowingly made misrepresentations of material facts to Saint Vincents, both by false affirmative statements and by deliberate omissions and concealments, all of which the Speltz and Weis Parties knew were false and nonetheless made or concealed with the intent to deceive and induce the Board to take actions and to forbear from taking actions based upon such misrepresentations. The Speltz and Weis Parties knew that their misrepresentations of material facts were false when made. The Speltz and Weis Parties were under duties to disclose the information that they concealed and failed to disclose because they had fiduciary duties to disclose to Saint Vincent all material facts that would enable the Board to make reasoned and informed decisions, because they had superior knowledge of the facts that were not readily available to Saint Vincent, and because they made partial statements of fact that were false, deceptive and misleading without the facts that the Speltz and Weis Parties failed to disclose.

219.    Speltz and Weis attended monthly Board meetings and Saint Vincent committee meetings. These meetings took place, in relevant part, from December 2004 to May 2005. At each of the aforesaid meetings, Speltz and Weis had the opportunity to advise the Saint Vincent Board of their plan with Huron Inc. to sell SWLLC to Huron Inc., but chose to remain silent, thereby concealing their arrangements and the related conflicts of interest, and deluding the Board into thinking that the actions being recommended by the Speltz and Weis Parties were intended for the benefit of Saint Vincent when in fact they were intended to enhance, and did in fact enhance, the Speltz and Weis Parties' undisclosed selfish interests to sell SWLLC to Huron Inc.

220.    The Speltz and Weis Parties intended to defraud Saint Vincent by their materially false misrepresentations, omissions and concealments in order to enrich themselves at Saint

Vincent's expense. Speltz and Weis knew that, had the Board been advised as to the nature of the Speltz and Weis Parties' negotiations with Huron Inc. when those negotiations commenced in the fall of 2004, the Board would likely have terminated the SWLLC Agreement, not extended the initial SWLLC Agreement, and/or taken measures to prevent Speltz and Weis from using the SWLLC Agreement as an inducement for a sale of SWLLC to Huron Inc. by churning fees charged to Saint Vincent.

221.    The statements of Speltz and Weis were false, and the Speltz and Weis Parties knew they were false when they were made.

222.    The Board reasonably and justifiably relied on the Speltz and Weis Parties' representations and concealment of material facts.

223.    As a direct, substantial and proximate result of Saint Vincent's reasonable and justifiable reliance on the Speltz and Weis Parties' representations and omissions of material facts, Saint Vincent suffered damages.

224.    The Speltz and Weis Parties and the Huron Parties intended to defraud Saint Vincent by their materially false misrepresentations. SWLLC, encouraged by the Huron Parties, deliberately failed to disclose to the Board and concealed that Huron Inc. was negotiating the purchase of SWLLC.

225.    From January 2005 until May 6, 2005, the Speltz and Weis Parties intentionally failed to disclose and fraudulently concealed from Saint Vincent their negotiations with Huron Inc.

226.    Speltz and Weis Parties, encouraged by the Huron Parties, deliberately failed to disclose to the Board and concealed the fact that the proposed acquisition of SWLLC by the Huron Inc. was tied to SWLLC profits from its engagement with Saint Vincent and that as a

consequence, SWLLC, Speltz and Weis had a significant stake in charging excessive fees from Saint Vincent.

227.    As officers of Saint Vincent, Speltz and Weis were fiduciaries and had a duty to disclose the existence of the negotiations with Huron and all material matters related thereto.

228.    Saint Vincent reasonably and justifiably relied on Huron LLC's, Speltz's, Weis's and SWLLC's representations and omissions.

229.    As a result of Saint Vincent's reliance on the Huron LLC's, and Speltz and Weis Parties' representations and omissions, Saint Vincent suffered direct and proximate damages.

230.    As alleged above, the McDermott Defendants were aware of the Speltz and Weis Parties' fraud, materially false representations, omissions, and concealments, particularly the secret negotiations to sell SWLLC to Huron Inc.  McDermott was aware by no later than February 2005 that SWLLC, Speltz and Weis were negotiating the sale of SWLLC to Huron Inc.

231.    The McDermott Defendants, who knew that Speltz and Weis had made misrepresentation of material fact to the Board, and who knew that Speltz and Weis had failed to disclose and had concealed material facts from the Board, as alleged above, knowingly provided substantial assistance to the Speltz and Weis Parties and the Huron Parties by concealing the acquisition negotiations from the Board when they were aware that the Speltz and Weis Parties owed Saint Vincent fiduciary duties and were obligated to disclose the transaction.  McDermott Defendants further aided Speltz and Weis Parties' fraud by encouraging the combination of SWLLC and Huron Inc. in February 2005, by advising Speltz and Weis in April 2005 regarding potential conflicts of interest and the Jay Alix Protocol, and by informing Huron Inc. prior to May 5, 2005, that the SWLLC engagement would be extended by Saint Vincent.

232.    As a direct result of the McDermott Defendants' aiding and abetting the Speltz and Weis fraudulent misrepresentations, non-disclosures and concealments by Speltz and Weis, SWLLC, Huron LLC and Huron Inc., and of the fraudulent misrepresentations, non-disclosure and concealments that were thereby aided and abetted, Saint Vincent suffered damages.

233.    Saint Vincent would not have suffered injury but for the acts of the McDermott Defendants in aiding and abetting Speltz, Weis, SWLLC, Huron LLC and Huron Inc., and for the acts of Speltz, Weis, SWLLC, Huron LLC and Huron Inc. in making the fraudulent misrepresentations, non-disclosures and concealments that were thereby aided and abetted.

234.    The acts of the McDermott Defendants that aided and abetted the misrepresentations, non-disclosures and concealments by Speltz, Weis, SWLLC, Huron LLC and Huron Inc., and the misrepresentations, non-disclosures and concealments that were thereby aided and abetted, were a substantial factor in causing Saint Vincent to sustain damages.

235.    As a direct and proximate result of the fraud perpetrated on Saint Vincent by the Speltz and Weis Parties and the Huron Parties, and as a direct and proximate result of the McDermott Defendants' active and substantial assistance in that fraud, Saint Vincent suffered actual damages.

236.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## FIFTH CAUSE OF ACTION

### Breach of New York Judiciary Law § 487 Misconduct by Attorneys.

237.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181, 204-212, 217-231, as if fully set forth herein.

238.    The McDermott Defendants colluded with the Speltz and Weis Parties and the Huron Parties and deceived Saint Vincent with respect to Huron Inc.'s negotiations for, and acquisition of, SWLLC.

239.    The McDermott Defendants deceived the Bankruptcy Court and the U.S. Trustee by intentionally concealing the material facts relating to the Huron Inc. acquisition of SWLLC, including, but not limited to, the terms of the Acquisition Agreement (such as the earn-out provisions), in McDermott's Motions to retain Huron LLC and SWLLC.

240.    The McDermott Defendants, the Speltz and Weis Parties and the Huron Parties acted with the intent to deceive Saint Vincent, the Bankruptcy Court, and the U.S. Trustee.

241.    The McDermott Defendants acted with a chronic extreme pattern of legal delinquency.

242.    Saint Vincent would not have suffered injury but for the McDermott Defendants' breach of Judiciary Law § 487 as alleged herein.

243.    The McDermott Defendants' breach of Judiciary Law § 487 as alleged herein was a substantial factor in causing Saint Vincent to sustain damages.

244.    As a direct and proximate result of the McDermott Defendants' breach of Judiciary Law § 487, as alleged herein, Saint Vincent was damaged.

245.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper

and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

246.    Pursuant to N.Y. Judiciary Law § 487, Saint Vincent is entitled to recover treble damages for the violation of § 487.

## SIXTH CAUSE OF ACTION

### Fraudulent Concealment

247.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

248.    Speltz's and Weis's negotiations to sell SWLLC to Huron Inc. and Huron Inc.'s interest in purchasing SWLLC were facts material to the Board because, among other things, they raised conflicts of interest between Saint Vincent and SWLLC.

249.    The McDermott Defendants were aware in February 2005 that Speltz and Weis were engaged in secret negotiations with potential purchasers, including Huron Inc. to sell SWLLC.

250.    The McDermott Defendants also knew in or prior to April 2005 that the Speltz and Weis Parties and the Huron Parties had agreed that Huron Inc. would purchase SWLLC.

251.    The McDermott Defendants had a duty as counsel to Saint Vincent with respect to the turnaround efforts, debt restructuring plans, and bankruptcy preparation, to disclose to the Board that Huron Inc., that Speltz and Weis were in negotiations to sell SWLLC to Huron Inc. and, subsequently,  that the Speltz and Weis Parties and the Huron Parties had agreed to terms under which Huron Inc. would purchase SWLLC.

252.    At all times prior to May 6, 2005, the McDermott Defendants failed to disclose to Saint Vincent, and concealed from Saint Vincent, that Speltz and Weis were negotiating the sale

- 72 -

of SWLLC to Huron Inc. and subsequently, that the Huron Parties had agreed to terms under which Huron Inc. would purchase SWLLC.

253.    The McDermott Defendants intentionally concealed from Saint Vincent the fact that Speltz and Weis were negotiating the sale of SWLLC to Huron Inc. and, subsequently, that the Speltz and Weis Parties and the Huron Parties had agreed to terms under which Huron Inc. would purchase SWLLC.

254.    The Board reasonably and justifiably relied on the McDermott Defendants as Saint Vincent's counsel to provide material information regarding Huron Inc.'s interest to purchase SWLLC, the potential Huron Inc. acquisition of SWLLC and that the parties had had agreed to terms under which Huron Inc. would purchase SWLLC.

255.    Saint Vincent was damaged by the McDermott Defendant's fraudulent concealment of the fact that Huron Inc. had expressed an interest to purchase SWLLC and the negotiations between Speltz and Weis and Huron Inc. to acquire SWLLC.

256.    Saint Vincent would not have suffered injury but for the McDermott Defendants' fraudulent concealment as alleged herein.

257.    The McDermott Defendants' fraudulent concealment, as alleged herein, was a substantial factor in causing Saint Vincent to sustain damages.

258.    As a direct and proximate result of the McDermott Defendants' fraudulent concealment, as alleged herein, Saint Vincent has suffered actual damages.

259.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

**WHEREFORE**, Plaintiff requests this judgment be entered against the McDermott Defendants, jointly and severally as follows:

(i)    On the First Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive damages in an amount not less than treble the compensatory damages as determined at trial, jointly and severally, and requiring the disgorgement of all fees paid to McDermott in an amount not less than $4.5 million.

(ii)    On the Second Cause of Action, awarding damages against two McDermott Defendants in an amount not less than $200 million to be determined at trial, jointly and severally.

(iii)    On the Third Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive damages in an amount not less than treble the compensatory damages as determined at trial, jointly and severally.

(iv)    On the Fourth Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive damages in an amount not less than treble the compensatory damages as determined at trial, jointly and severally.

(v)    On the Fifth Cause of Action, awarding damages in an amount not less than $200 million, and trebled as provided by Judiciary Law § 487, jointly and severally.

(vi)    On the Sixth Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive

damages in an amount not less than treble the compensatory damages as determined at trial,

jointly and severally.

Dated: New York, New York
April 14, 2008

Alfredo F. Mendez, Esquire
Bruce A. Blakeman, Esquire
Sarah C. Lichtenstein, Esquire
Abrams Fensterman Fensterman Eisman Greenberg
  Formato & Einiger, LLP
630 Third Avenue
New York, New York 10017
212-279-9200

*Counsel for the Plaintiff*

William F. Ryan, Jr., Esquire
Paul M. Nussbaum, Esquire
Kevin G. Hroblak, Esquire
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
410-347-8700

and

Arnold M. Weiner, Esquire
Barry L. Gogel, Esquire
Law Offices of Arnold M. Weiner
2002 Clipper Park Road, Unit #108
Baltimore, Maryland 21211
410-769-8080

*Of Counsel*

*1779722*

# Exhibit B

**MEGA, Lead, PENAP, MDisCs, CLMAGT, APPEAL**

## U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
### Bankruptcy Petition #: 05-14945-ash

*Assigned to:* Judge Adlai S. Hardin Jr.                    *Date Filed:* 07/05/2005
Chapter 11
Voluntary
Asset

<table>
<tr><td>

*Debtor*
**Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers**
153 West 11th Street
New York, NY 10011
Tax id: 13-4077996

</td><td>

represented by **Andrew M. Troop**
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
(212)504-6000
Fax : (212)504-6666
Email: andrew.troop@cwt.com

**Burton S. Weston**
Garfunkel, Wild & Travis, P.C.

111 Great Neck Road - 5th Floor
Great Neck, NY 11021
(516) 393-2588
Fax : (516) 466-5964
Email: bweston@gwtlaw.com

**David D. Cleary**
Dewey & LeBoeuf LLP
Two Prudential Plaza
180 North Stetson Avenue
Suite 3700
Chicago, IL 60601
(312) 794-8000
Fax : (312) 794-8100
Email: david.cleary@dl.com

**Deryck A. Palmer**
Cadwalader, Wickersham & Taft LLP
One World Financial Center LLP
New York, NY 10281
(212)504-6000
Fax : (212)504-6666
Email: deryck.palmer@cwt.com

</td></tr>
</table>

*Claims and Noticing Agent*
**Epiq Bankruptcy Solutions, LLC Claims Agent**
(f/k/a Bankruptcy Services LLC)
757 Third Avenue, 3rd Floor
New York, NY 10017
www.bsillc.com
646-282-2500

| Filing Date | # | Docket Text |
|---|---|---|
| 07/05/2005 | <u>1</u> | Voluntary Petition (Chapter 11). Order for Relief Entered. *(with attachments)*. Filed by Gary Ravert of McDermott Will & Emery, LLP on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Ravert, Gary) (Entered: 07/05/2005) |
| 07/05/2005 | <u>2</u> | Motion for Joint Administration *(with attachments)* filed by Gary Ravert on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Ravert, Gary) (Entered: 07/05/2005) |
| 07/05/2005 | <u>3</u> | Motion to Approve *Certain Notice, Case Management, and Administrative Procedures* filed by Gary Ravert on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Ravert, Gary) (Entered: 07/05/2005) |
| 07/05/2005 | <u>4</u> | Motion to Allow *Motion for order (a) authorizing the maintenance of bank accounts, (b) authorizing the continued use of the existing cash management system, and (c) waiving the investment and deposit requirements of section 345(b) of the Bankruptcy Code* filed by Gary Ravert on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Ravert, Gary) (Entered: 07/05/2005) |
| 07/05/2005 | <u>5</u> | Motion to Allow *Debtors to (i) prepare a consolidated list of creditors and a list of equity security holders in lieu of a matrix, (ii) include the names and addresses of certain patients in the consolidated creditors list, (iii) file a consolidated list of the 30 largest general unsecured creditors, and (iv) mail initial notices* filed by Gary Ravert on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Ravert, Gary) (Entered: 07/05/2005) |
| 07/05/2005 | <u>6</u> | Application to Extend Time to File Schedules *of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs* filed by Gary Ravert on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Ravert, Gary) (Entered: 07/05/2005) |

| | | 4 Exhibit D) (Cantrell, Deirdra) (Entered: 03/10/2006) |
|---|---|---|
| 01/31/2006 | 1046 | So Ordered Stipulation signed on 1/30/2006, by and between the Attorneys for the Debtor and the Attorneys for GE Medical Systems. RE: Assume the Gem Agreement. (Tavarez, Arturo) (Entered: 01/31/2006) |
| 01/31/2006 | 1047 | Amended So Ordered Stipulation signed on 1/30/2006, by and between the Attorney for the Debtor and the Attorney for Comprehensive Cance Corp. of N.Y.. RE: Authorizing the Debtors Continued Use of Cash Collateral Through February 28, 2006. (Tavarez, Arturo) (Entered: 01/31/2006) |
| 01/31/2006 | 1048 | Application for Interim Professional Compensation for Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, Debtor's Attorney, period: 7/5/2005 to 9/30/2005, fee:$2227979.50, expenses: $104314.28. filed by Stephen B. Selbst. with hearing to be held on 3/15/2006 (check with court for location) Responses due by 3/3/2006, (Attachments: # 1 Exhibit 1 to Fee App Cert of S. Selbst# 2 Exhibit 2 to Fee App# 3 Exhibit 3 to Fee App.# 4 Exhibit 4 to Fee App# 5 Exhibit 5 to Fee App Part 1# 6 Exhibit 5 to Fee App Part 2# 7 Exhibit 5 to Fee App Part 3) (Selbst, Stephen) (Entered: 01/31/2006) |
| 01/31/2006 | 1055 | Transcript *of hearing held on August 4, 2005 RE: Hearing on OSC for a temporary restraining order* filed by Veritex, LLC. (Greene, Chantel) (Entered: 02/03/2006) |
| 01/31/2006 | 1056 | Transcript *of hearing held on August 5, 2005 RE: continued hearing on motions* filed by Veritex, LLC. (Greene, Chantel) (Entered: 02/03/2006) |
| 02/01/2006 | 1049 | Statement / *Notice of Deadline for Filing of Proofs of Claim on or Before March 30, 2006 at 4:00 p.m. (Prevailing Eastern Time)* (related document(s)1037) filed by Andrew M. Troop on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Troop, Andrew) (Entered: 02/01/2006) |
| 02/01/2006 | 1050 | Order signed on 1/31/2006 Approving Assumption of Extended Nonresidential Real Property Lease Located at 168 Canal Street. (Tavarez, Arturo) (Entered: 02/01/2006) |
| 02/01/2006 | 1051 | So Ordered Stipulation signed on 1/30/2006, by and between the Attorney for the Debtor and the Attorney for Jo Ann Costanzo. RE:Agreement and Order Between Debtors and Jo Ann Costanzo Modifying Automatic Stay. (Tavarez, Arturo) (Entered: 02/01/2006) |
| 02/02/2006 | 1052 | Transfer Agreement FRBP 3001(e) Transfer Agreement 3001 (e) 1 Transferors:Market Lab Inc(Amount 3,135.65).. To ASM Capital, L.P.. filed by Douglas Wolfe on behalf of ASM Capital, L.P..(Wolfe, Douglas) (Entered: 02/02/2006) |
| | | |

| 11/02/2006 | | Receipt of Motion for Relief from Stay (fee)(05-14945-ash) [motion,185] ( 150.00) Filing Fee. Receipt number 170640. Fee amount 150.00. (Porter) (Entered: 11/02/2006) |
|---|---|---|
| 11/02/2006 | 2360 | Motion to Amend *Date, Time and Place of Hearing* (related document(s) 2348) filed by Rhona A. Silverman on behalf of Marie Dumond. with hearing to be held on 11/16/2006 at 02:00 PM at Courtroom 520, White Plains Office (Silverman, Rhona) (Entered: 11/02/2006) |
| 11/02/2006 | 2361 | Motion to Authorize *Notice of Hearing and Application of the Official Committee of Tort Claimants for Authority to Retain Cooley Godward Kronish LLP as Substitute Counsel and to Terminate the Retention of Kronish Lieb Weiner & Hellman LLP, Nunc Pro Tunc as of October 1, 2006* filed by Richard S. Kanowitz on behalf of Official Committee of Tort Claimants. with hearing to be held on 11/16/2006 at 02:00 PM at Courtroom 520, White Plains Office Responses due by 11/13/2006, (Attachments: # 1 Application for Retention of Cooley Godward Kronish LLP# 2 Exhibit A - Kanowitz Affidavit in Support# 3 Proposed Order) (Kanowitz, Richard) (Entered: 11/02/2006) |
| 11/02/2006 | 2362 | Order signed on 10/30/2006 Granting Application to Employ Venable LLP as Special Counsel (Related Doc # 2296) . (Tavarez, Arturo) (Entered: 11/02/2006) |
| 11/02/2006 | 2364 | (WRONG PDF FILE ATTACHED - See Doc. 2365) Affidavit of Service *of Laura Campbell of Bankruptcy Services LLC* (related document(s) 2320, 2321) filed by Andrew M. Troop on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Troop, Andrew) Modified on 11/3/2006 (Tavarez, Arturo). Modified on 11/17/2006 (Correa, Mimi). (Entered: 11/02/2006) |
| 11/02/2006 | 2365 | Affidavit of Service *of Laura Campbell of Bankruptcy Services LLC* (related document(s)2320, 2321) filed by Andrew M. Troop on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Troop, Andrew) (Entered: 11/02/2006) |
| 11/02/2006 | 2366 | Affidavit of Service *of Julia Bealler of Bankruptcy Services LLC* (related document(s)2351) filed by Andrew M. Troop on behalf of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers. (Troop, Andrew) (Entered: 11/02/2006) |
| 11/02/2006 | 2367 | Transfer Agreement FRBP Transfer Agreement 3001 (e) 2 Transferors:Lifespire Inc. Supp. WK(Claim No.1986, Amount 88,140.42). To Cargill Financial Services International, Inc.. filed by Cargill Financial Services International, Inc..(Garabato, Sid) (Entered: 11/02/2006) |
| 11/02/2006 | 2368 | Objection */Limited Objection Filed on Behalf of Medical Liability Mutual Insurance Company in Response to the Joint Application for* |

# Exhibit C

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21ˢᵗ Floor
New York, New York 10004
Telephone: (212) 510-0500
Facsimile: (212) 668-2255
Deirdre A. Martini, United States Trustee
Tracy Hope Davis, Esq. (THD-8154)
Lisa Lambert, (LLL-4913)

HEARING DATE AND TIME:  March 13, 2006 2:30 P.M.
OBJECTION DEADLINE:  March 3, 2006 at 4:00 p.m. [1]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re:                                       :      Chapter 11
                                             :      Case No. 05 B 14945 (ASH)
SAINT VINCENTS CATHOLIC                      :
MEDICAL CENTERS OF NEW YORK                  :      (Jointly Administered)
d/b/a SAINT VINCENT CATHOLIC                 :
MEDICAL CENTERS, et al.,                     :
                                             :
        Debtors.                             :
                                             :
---------------------------------------------------------x

**OBJECTION OF THE UNITED STATES TRUSTEE TO FIRST INTERIM
APPLICATION OF McDERMOTT WILL & EMERY LLP PURSUANT TO
SECTIONS 330(a) AND 331 OF THE BANKRUPTCY CODE AND RULE
2016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE
DEBTORS FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

**TO THE HONORABLE ADLAI S. HARDIN, JR.,
UNITED STATES BANKRUPTCY JUDGE:**

        The Office of the United States Trustee for the Southern District of New

York (the "United States Trustee") has reviewed the first interim applications of the

following professionals retained in the case of Saint Vincents Catholic Medical

Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al. (the

---
[1]  The United States Trustee's time to file and serve her objection to the instant application was extended,
on consent of McDermott Will & Emery, LLP, to 5:00 p.m. on March 7, 2006.

1

"Debtors" or "SVCMC"), which seeks a first interim award of compensation in the

amount of $2,227,979.50 and reimbursement of out-of-pocket expenses in the

amount of $104,314.28 for the period July 5, 2005 through September 30, 2005 (the

"MWE Application").  ECF Doc. No. 1048.

**PRELIMINARY STATEMENT**

        Between July 5, 2005 and September 30, 2005, a mere three months,

MWE billed this estate $2,227,979.50 in expenses and $104,314.28 in out of pocket

expenses for which it seeks compensation.  The United States Trustee objects to the

allowance of fees and to the reimbursement of expenses requested by MWE for,

among other reasons, MWE has failed to satisfy its burden that (i) the fees sought

are "reasonable" within the meaning of 11 U.S.C. 330 of the Bankruptcy Code (the

"Bankruptcy Code"), (ii) the services rendered by MWE for the retention period

resulted in a benefit to the estate and creditors, and (iii) several of the disbursement

items submitted for reimbursement by MWE fail to comply with the United States

Trustee Guidelines.  For these reasons and for the reasons set forth below, the

United States Trustee is of the view that MWE's fee request should be substantially

reduced.

        Prior to chapter 11 filings, the Office of the United States Trustee advised

MWE of her concerns about the administration of these cases and SVCMC's

prospects for reorganization given that (i) SVCMC faced a serious liquidity crisis

which precipitated the chapter 11 filings, (ii) SVCMC had paid its pre-petition

restructuring advisors Speltz & Weis, LLC ("Speltz & Weis") whose named

principals were serving as CEO and CFO, had authorized the chapter 11 filing, and

2

had in the year preceding the chapter 11 filings billed and received payment from

SVCMC in excess of $29 million for pre-petition restructuring services, (iii) public

concern about patient care and employee relations due to the fact that the chapter 11

filings would likely result in the closings of major hospitals that served large

communities in the greater New York Metropolitan area and (iv)  uncertainty about

the board of directors of SVCMC's plan for hiring permanent managers and

selecting an independent board of directors.  These concerns were further amplified

following the chapter 11 filing, the appointment of an official committee of

unsecured creditors and involvement of HUD, DASNY, DOH and other major

constituents in the case.  In an effort to address these concerns, the United States

Trustee and the creditors committee, through their counsel and financial advisors,

initiated communications with MWE.  After not receiving comfort that the issues

and concerns raised above were being adequately communicated and addressed by

MWE, the United States Trustee and the committee's professionals requested and

held several in-person meetings with the Debtors' general counsel and the board.

        During MWE's engagement as general bankruptcy counsel to the Debtors,

the United States Trustee had received and reviewed several retention applications

and motions submitted by MWE that she would not consent to for, among other

reasons, the drafts submitted to the United States Trustee did not to comply with

protocols and practices established by the United States Trustee and the United

States Bankruptcy Court for the Southern District of New York.  Early on in these

cases, the United States Trustee also observed that MWE, a national law firm, with

offices in New York City, had staffed the case with partners and senior lawyers

3

from its Chicago office.  MWE had proposed the retention of Huron and Cain

Brothers, which staff is also based or resides in Chicago.

        MWE expended more than three months drafting, negotiating and revising

the Debtors' applications to retain Huron Consulting Group ("Huron") and its

subsidiary Speltz & Weis.  Despite the fact that the United States Trustee had

previously rejected the applications drafted by MWE for the retention of Huron and

Speltz & Weis as first day order, for among other reasons, the pleadings were

procedurally defective, legally improper and untimely in terms of the stage of the

case and the positions of the parties, MWE made minor revisions to the document,

refiled the applications with the Bankruptcy Court and obtained a hearing date for

their consideration by the Court.  The United States Trustee, having repeatedly

raised questions and issues about the timeliness, form and content of notices,

motions and applications proposed by MWE on behalf of the Debtors during the

first two months of the case, advised the Debtors and MWE, both orally and in

writing, that she would not tolerate the proliferation of counsel in these cases and

that her Office would closely monitor professional and administrative costs

incurred by MWE and the retained professionals.  The United States Trustee

observes that simple notices, significant retention applications and numerous

motions preliminarily drafted by MWE were further revised, renegotiated, filed and

approved by the Bankruptcy Court within a month of MWE's substitution.  MWE's

consternation in preparing, negotiating and submitting basic retention applications,

notices and motions to the United States Trustee, the Committee and the

4

Bankruptcy Court during their three month tenure delayed the progress of this case and resulted in unnecessary administrative expenses to the estates and its creditors.

The United States Trustee also found MWE unresponsive to other concerns raised concerning motions MWE proposed to file on behalf of the Debtors. During their three month engagement, the United States Trustee found that MWE was not forthcoming with financial information that the United States Trustee and the committees' professionals requested regarding the Debtors' management, asset disposition and financial affairs. The financial information requested was, in the United States Trustee's view, necessary and integral to fostering healthy chapter 11 negotiations among the Debtors, the United States Trustee, the Committee and the other major parties in the cases. As a result, the United States Trustee advised MWE that absent a change in management and the taking of various steps to address the Debtors' liquidity crises and obtain permanent financing, the United States Trustee would consider the filing a motion for the appointment of a chapter 11 trustee to oversee these cases.

Following lengthy and sometimes contentious negotiations among the parties, the Debtors determined that it was in their best interest to replace MWE with Weil Gotshal & Manges as general bankruptcy counsel. The Debtors hired, with the approval of the board and consent of the major parties in the case, Guy Sansone as Chief Executive Officer/Chief Restructuring Officer and Martin McGahan as Chief Financial Officer and to Enter into an Agreement with Alvarez & Marsal in respect of such services. Mr. Sansone and Alvarez & Marsal immediately assumed oversight of the day-to-day management and operations of

5

the Debtors. Communications between the Debtors and the major constituents in these cases vastly improved since September 2005. Most importantly, the aforementioned changes in management and counsel have led to positive developments in the administration of this case, i.e., permanent debtor in possession financing has been secured, a business plan has been developed, the Debtors have realized returns on their assets through hospital closures and the streamlining of administrative costs through the reduction of staff, pre-petition contracts and vendors. The administrative time and professional costs associated with the transition from MWE to Weil and the Debtors other retained professionals has been costly to the estate and creditors,2 meriting a substantial reduction in the fees requested by MWE for their mere three months of employment as general bankruptcy counsel to the Debtors.

The United States Trustee respectfully requests and evidentiary hearing with respect to this matter. In addition, annexed hereto as Exhibit B, is a list of the documents that the United States Trustee intends to produce at the evidentiary hearing. A copy of the documents listed in Exhibit B, which will be served on MWE, counsel to the Debtors and counsel to the Committee and delivered by overnight mail to the Court on or before the close of business on Thursday, March 9, 2006, are available upon request to any party requesting such information.

_____

2  Annexed hereto as Exhibit C, which is incorporated herein by reference, is a summary of professionals fees awarded and paid to date.

6

In support of this objection, the United States Trustee has annexed as Exhibit A, which is incorporated herein by reference, a chronology of the pertinent facts and pleadings filed in this case.3

**ARGUMENT**

I.  **Generally, MWE's Compensation Request Is Not Reasonable And Necessary Because The Legal Fees And Expenses Did Not Benefit The Estate.**

In accordance with 11 U.S.C. § 330, this Court awards professionals "reasonable compensation for actual, necessary services." *11 U.S.C. § 330(a)(1)(A).* When the United States Trustee or a party in interest objects or moves for a fee reduction, the Court may "award compensation that is less than the amount of compensation that is requested." *11 U.S.C. § 330(a)(2).* Here, the creditors' committee previously filed an objection to the MWE Fee Application *(ECF Doc. No. 1213).* The United States Trustee also objects to the MWE Fee Application.

"The court bears responsibility for seeing that attorneys do not overreach in their attempt to be paid fees from the estate." *In re Angelika Films 57th, Inc.,* 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998). Thus, the Court has an independent duty to review fees and expenses, *Angelika Films 57th, Inc.,* 227 B.R. at 42; and the Court may reduce fees on its own motion, *11 U.S.C. § 330(a)(2).*

_____

3  Recognizing That The Honorable Prudence Carter Beatty presided over this case until recently, attached as Exhibit A contains an extensive list of the primary events and motions filed in this case.

7

While the United States Trustee has detailed specific objections below, these specific objections are subsumed by one general objection. The services were not "beneficial at the time at which such services were rendered." *11 U.S.C. § 330(a)(3)(C).* Illustrations include the following:

- **MWE's Difficulty Obtaining Approval Of Debtor-In-Possession Financing:** Although many of the time entries relate to DIP funding, MWE failed to obtain a commitment, and the failure resulted in a cash flow crisis to the hospital, an issue that WGM resolved promptly after it took over the case;

- **MWE's Failure To Set Up And To Implement Creditor Response Procedures:** Instead of setting up a meeting with employees, a website, or a phone triage answering tree, MWE had attorneys – often a partner billing $487 per hour -- respond to creditors' questions as calls were received. Many of the attorneys have batch entries for responding to questions. *See MWE Fee Application, Fee Detail, pp. 66; 154-58 (entries in multiple categories – Vendor Matters).4*

_____

4  See In re The Bennett Funding Group, Inc., 213 B.R. 234, 248 (Bankr. N.D.N.Y. 1997) (reducing interim fees sought by chapter 11 professionals and paraprofessionals for administrative or clerical services such as "prepared papers for filing," "copying documents for distribution," "file same with court," and "checked faxes and delivered them to appropriate persons"); see also In re CF&I Fabricators of Utah, Inc., 131 B.R. 474, 489-90 (Bankr. D. Utah 1991) (in determining whether nature of services performed by paraprofessional are professional and thus compensable or are clerical and thus non-compensable overhead, court looks to type of services traditionally charged to overhead, amount of discretion allowed to paraprofessional, experience or education required to accomplish the assignment, responsibility delegated to the paraprofessional, and amount of supervision retained by the professional).

8

- **MWE's Failure To Scrutinize Critical Vendor List**: MWE obtained an order allowing $16.2 million in payments to 56 critical vendors. The Committee ultimately reduced these payments to less than $1.4 million for three critical vendors. *See Committee's Objection, ¶ 12.*

- **Tortious Interference Suit Against Creditors' Committee**: Many time entries relate to a potential lawsuit against the Committee for tortuous interference with the management's decisions. This lawsuit was never pursued. Moreover, the Debtors, the United States Trustee and the Committee reached a consensual agreement regarding management, which culminated in the hiring of Guy Sansone as Chief Executive Officer/Chief Restructuring Officer and Martin McGahan as Chief Financial Officer and to Enter into an Agreement with Alvarez & Marsal in respect of such services. Had MWE expended more time addressing concerns raised by the primary constituents in this case rather than wasting time preparing complaints against the Committee, this case may have progressed more smoothly in the early months following the chapter 11 filing.

- **MWE's Handling Of Retention And Employment Issues**: As MWE concedes, "[c]ertain of the retention [applications] were not filed, or did not become final, until after Weil Gotshal became main bankruptcy counsel to the debtors." *MWE Fee Application, p. 19, ¶ 47; see also, Exhibit A at paragraphs 14-17.*

9

- **MWE's Handling Of Other Ordinarily Routine Matters For A Chapter 11 Case Of This Size**:

    During the approximately three months that MWE represented the Debtor, the United States Trustee asked the Debtors to re-submit the Notice of Commencement of Case, which is based on the official form, on multiple occasions. On August 31, 2005 – approximately two months after the bankruptcy petitions were filed – MWE has time entries reflecting that they cannot decide how specific facilities should be listed on the Notice of Commencement. *08/31/05 G. Ravert Entry, MWE Fee Application, Fee Detail, p. 116.* The form motion to establish a claims bar date was not filed until WGM took over the Debtor's representation. In a chapter 11 bankruptcy case, a delay in the bar date can result in confirmation delays because it is difficult to evaluate feasibility when large claims have not been filed.

    The preceding illustrations reflect a macro view of the case. Specific objections that Courts traditionally consider when assessing fees further illustrate the problems with this fee application, and these specific points are addressed in the following sections.

**II.    MWE Fails To Honor Its Project Categories, So It Is Not Possible To Evaluate Time Spent On Projects.**

10

    In accordance with its responsibilities under 28 U.S.C. § 586(a)(3)(A), the United States Trustee Program adopted Fee Guidelines (the "Guidelines"). The Guidelines specify "all time and service entries should be arranged by project categories." *Appendix A to 28 C.F.R. §58(b)(4)(i)* "Time and service entries are to be reported in chronological order under the appropriate project category." *Appendix A to 28 C.F.R. §58(b)(4)(iv).5*

    Here, MWE bills specific projects to different categories, so it is not possible to evaluate how much time was spent on a specific task. In addition, instead of organizing the fee application by chronological order under each project

category, the fee application is organized by project categories under each month of billing activity.

    As examples,

- Medicare recoupment/setoff research appears in the project categories of Asset Management, Automatic Stay, Reclamation, Credit and Other Meetings, and Litigation (Avoidance); and several of the same attorneys are billing in the different categories on consecutive days. *(pp. 47, 53, 55 07/18/05-07/19/05 pp. 78-79 of Fee Detail; 07/18/05 Cleary, p. 82 of Fee Detail; 07/18/05 M. Hughes, p. 126 of Fee Detail.*

- The motion to approve payment of ordinary course professionals appears in the project categories for first day, employment, or fee application and statement *(07/13/05-07/15/05 entries for M. Khambati , pp. 138-40 of Fee Detail).*

- Research about admission of an appraisal appears in debtor-in-possession and real property lease *(07/14/05 and 07/19/05 A. Beal entries, p. 115 of Fee Detail; 08/12/05-08/14/05 D. Cleary entries, pp. 143-45 of Fee Detail).*

    Under 11 U.S.C. § 330(a)(3)(A), the Court evaluates whether a professional spent a reasonable amount of time on a project. *11 U.S.C. § 330(a)(3)(A).* Project categories facilitate assessment of work on a particular project when multiple billers with multiple tasks would make assessment of a chronological review onerous. When, as here, the project categories are not consistently followed and time for related tasks is spread through multiple categories, reviewing the fee application becomes more – rather than less -- difficult than a chronological recapitulation.

---

5  See also Hensley v. Eckerhart, 461 U.S. 424, 441 (1983) (Burger, Chief Justice, concurring) ("[T]he party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed."); In re ACT Mfg. Inc., 281 B.R. 468, 483 (Bankr. D. Mass. 2002) (chapter 11 "[p]rofessionals who lump time together or have woefully inadequate descriptions, such as 'research', 'work in motion', 'telephone calls to counsel for creditor', do so at their peril. No Court should be expected to intuit the benefit of such work to the estate."); In re Caribbean Const. Services, Inc., 283 B.R. 388, 395 (Bankr. D. Virgin Islands 2002) (fee application must be accompanied by contemporaneous time records that describe with specificity the tasks performed, when they were performed, and the time spent performing them); In re Cascade Oil Co., Inc., 126 B.R. 99, 105 (D. Kan. 1991) (noting examples of deficient time entries by chapter 11 professionals regarding conferences and research include listing "telephone conference" and "legal research" without any indication of subject matter, where substance of conferences and research not readily apparent from review of entire billing record); Matter of Navis Realty, Inc., 126 B.R. 137, 143 (Bankr. E.D.N.Y. 1991) (denying interim fees for applicant's failure to describe services with sufficient specificity, and citing "telephone call," "telephone call with Mrs. X," "conference," "meeting," "conference with X," or "conversation with X" as examples of deficient entries); In re Bicoastal Corp., 118 B.R. 855, 859 (Bankr. M.D. Fla. 1990) (disallowing interim fees for services so vaguely described that bankruptcy court could not determine if services rendered any benefit to debtor).

Not only does it become difficult to evaluate the time that is spent on specific projects, it also become difficult to quantify the cumulative time spent by a professional on a particular day so that one can evaluate whether meal expenses are proper. By conducting an Adobe PDF search by date, the following expenses correlated to the following billable hours:

| 07/11/05 | Business Meal | 1.00 | 16.29 |

SeamlessWeb Professional Solutions, Inc.; Invoice #79668;
Date 07/11/05; Order #21936507; Great American Health Bar: Beal

*Total hours for Beal entries on 07/11/05 = 1.8 hours
(1.6 hours on p. 114; .2 on p. 134)*

| 07/13/05 | Business Meal | 1.00 | 20.00 |

SeamlessWeb Professional Solutions, Inc.; Invoice #79668;
Date 07/13/05; Order #22032120; Mangia (48th St.): Ravert

*Total hours for Ravert entries on 07/18/05 = 4.8 hours
(.9 and1.2 on p. 45; 2.7 hours on p. 132)*

| 07/24/05 | Business Meal | 1.00 | 9.79 |

SeamlessWeb Professional Solutions, Inc.; Invoice #80166;
Date 07/24/05; Order #22377543; Majestic Deli: Slattery

| 07/24/05 | Business Meal | 1.00 | 20.00 |

SeamlessWeb Professional Solutions, Inc.; Invoice #80166;
Date 07/24/05; Order #22391427; Majestic Deli: Slattery

*No hours billed by Slattery on 07/24/05
(Note that L. Pittaway entry on p. 120 refers to discussions with Slattery)*

| 07/26/05 | Business Meal | 1.00 | 14.26 |

SeamlessWeb Professional Solutions, Inc.; Invoice #80775;
Date 07/26/05; Order #22459224; Majestic Deli: Slattery

| 07/26/05 | Business Meal | 1.00 | 20.00 |

SeamlessWeb Professional Solutions, Inc.; Invoice #80775;
Date 07/26/05; Order #22484097; Sosa Borella -8th Ave: Slattery

| 07/26/05 | Business Meal | 1.00 | 11.48 |

SeamlessWeb Professional Solutions, Inc.; Invoice #80775;
Date 07/26/05; Order #22487706; Majestic Deli: Slattery

*No hours billed by Slattery on 07/26/05*

| 07/26/05 | Business Meal | 1.00 | 20.00 |

SeamlessWeb Professional Solutions, Inc.; Invoice #80775;
Date 07/26/05; Order #22473771; Mangia (48th St.): Ravert

*Total hours for Ravert on 07/26/05 = 3.1
(2.5, 0.6, p. 135)*

The burden is on the professional, not the reviewing parties-in-interest or the Court, to establish entitlement to fees and expenses. *E.g. Prebor v. Collins (In re I Don't Trust)*, 143 F.3d 1, 4 (1st Cir. 1998) (omitting string citation); *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998). By failing to use the project categories and failing to establish time correlations to expenses, MWE has failed to meet its burden. *See In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 845 & n. 12 (3d Cir. 1994) (noting that federal courts should not have to parse through disorganized fee applications).

**III.    MWE Failed To Delegate Tasks.**

Under 11 U.S.C. § 330(a)(3)(B), the Court evaluates whether the rates charged were appropriate. When evaluating rates, the Court should consider whether tasks were delegated properly. Here, eighteen partners billed 2,468 hours at rates ranging from $395 to $690 per hour. Fourteen associates billed 2,230 hours. Three partners billed approximately 400 hours (Smith (396.30 hours), Cleary (429.30 hours), and Sullivan (487.00 hours)) while only one associate did,

and she was a senior associated with an hourly billable rate of $390 per hour. (N. Hazan 448.40 hours.)

Because the case was staffed with multiple billing professionals in different cities, many time entries stem from internal communications, group meetings, and multiple attendees at hearings. *E.g. 08/28/05 – 08/31/05 time entries, pp. 133-34; 08/16/05-08/17/05 time entries, p. 172 of Fee Detail.* 6

Further evidencing the lack of delegation, associates bill for paralegal and secretarial tasks such as assembling binders, downloading documents, and reviewing the docket sheet. *08/04/05 and 08/31/05 G. Ravert entries, Fee Detail, p. 59, 167.*

The lack of delegation also increased expenses. Specifically, MWE has experienced practitioners in its New York office, the Debtor is based in New York,

---

6  See In re Fleming Companies, Inc., __ B.R. __ , 2003 WL 23018828 *3-4 (Bankr. D. Del.) (reduction of interim fees of sophisticated chapter 11 debtors' counsel in complex bankruptcy case warranted where multiple attorneys represented debtors at every hearing, and counsel's fee application and supplemental fee report failed to adequately demonstrate meaningful contribution of each attorney present); In re ACT Mfg. Inc., 281 B.R. 468, 484 (Bankr. D. Mass. 2002) (duplication of effort on same tasks by more than one professional from same firm must be addressed in fee application and an explanation proffered to bankruptcy court); In re Malden Mills Industries, Inc., 281 B.R. 493, 498 (Bankr. D. Mass. 2002) (chapter 11 professionals, especially when involved in multi-professional cases, must ensure they do not duplicate work or perform work falling within purview of another professional, and must explain necessity for overlap if such occurs); In re Recycling Industries, Inc., 243 B.R. 396, 405-06 (Bankr. D. Colo. 2000) (bankruptcy court reduced interim fees sought by counsel for duplicative, "overlawyered" services); In re Jefsaba, 172 B.R. 786, 805 (Bankr. E.D. Pa. 1994) (notwithstanding complexity of case or litigiousness of parties, all professionals attending a hearing are required to have a role, and fee application must corroborate necessity of attendance by multiple professionals).

yet multiple professionals from Chicago bill for air fare, hotels, and meals in New York.

**Conclusion**

The United States Trustee objects to the allowance of fees and to the reimbursement of expenses requested by MWE for, among other reasons, MWE has failed to satisfy its burden that (i) the fees sought are "reasonable" within the meaning of 11 U.S.C. 330 of the Bankruptcy Code (the "Bankruptcy Code"), (ii) the services rendered by MWE for the retention period resulted in a benefit to the estate and creditors, and (iii) several of the disbursement items submitted for reimbursement by MWE fail to comply with the United States Trustee Guidelines. Specifically, MWE's time was not reasonable and necessary because the firm failed to delegate tasks appropriately. MWE's inability to complete routine chapter 11 tasks hindered case progress and therefore stressed rather than benefited the estate.

**WHEREFORE**, the United States Trustee respectfully requests that the Court enter

an order denying MWE's fees and expenses, in whole or in part, and that the Court grant

such other and further proper relief as the Court deems appropriate and just.

Dated: New York, New York
      March 7, 2006

                    Respectfully submitted,

                    DEIRDRE A. MARTINI
                    UNITED STATES TRUSTEE

BY:    /s/ Tracy Hope Davis
                    Tracy Hope Davis (THD-8154)
                    Lisa L. Lambert (LLL-4913)

17

# Exhibit D

THELEN REID & PRIEST LLP          Hearing Date: March 13, 2006 @ 2:30 p.m.
Martin G. Bunin (MB 1602)
Craig E. Freeman (CF 5085)
875 Third Avenue
New York, New York  10022
(212) 603-2000

Attorneys for the Official Committee of Unsecured
Creditors of Saint Vincents Catholic Medical Centers of
New York d/b/a Saint Vincent Catholic Medical Centers, et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
In re:                                                    :    Chapter 11
                                                          :    Case No. 05-14945 (ASH)
Saint Vincents Catholic Medical Centers of New            :
York d/b/a Saint Vincent Catholic Medical                 :    (Jointly Administered)
Centers, et al.,                                          :
                                Debtors.                  :
--------------------------------------------------------------X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
FIRST INTERIM APPLICATION OF MCDERMOTT WILL & EMERY LLP
PURSUANT TO SECTIONS 330(a) AND 331 OF THE BANKRUPTCY CODE AND
RULE 2016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURES FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE DEBTORS
FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

TO THE HONORABLE ADLAI S. HARDIN, JR.,
UNITED STATES BANKRUPTCY JUDGE:

        The Official Committee of Unsecured Creditors (the "Committee") of Saint Vincents

Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al., by

its undersigned counsel, submits this objection ("Objection") to the first interim application of

McDermott Will & Emery LLP for compensation and reimbursement of expenses for the period

July 5, 2005 through September 30, 2005 (the "McDermott Fee Application"). In support of this

Objection, the Committee respectfully represents as follows:

NY #702749 v1

---

## BACKGROUND

        1.      On July 5, 2005 (the "Petition Date"), Saint Vincents Catholic Medical Centers of

New York d/b/a Saint Vincent Catholic Medical Centers ("SVCMC"), CMC Physician Services,

P.C., CMC Radiological Services P.C., CMC Cardiology Services P.C., CMC Occupational

Health Services P.C., Medical Service of St. Vincent's Hospital and Medical Center, P.C., and

Surgical Service of St. Vincent's, P.C. (collectively, the "Debtors") filed voluntary petitions for

relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The cases

are being jointly administered for procedural purposes only.

        2.      The Debtors continue as debtors in possession pursuant to section 1107 and 1108

of the Bankruptcy Code. No trustee or examiner has yet been appointed.

        3.      SVCMC is a health care system which, as of the Petition Date, included seven

hospitals: St. Vincent's Hospital Manhattan; Bayley Seton, Staten Island; Mary Immaculate,

Queens; St. John's, Queens; St. Mary's Brooklyn (which closed in 2005); St. Vincent's Hospital,

Staten Island; and St. Vincent's Hospital, Westchester. As of the Petition Date, SVCMC also

operated numerous debtor and non-debtor affiliates, including four skilled nursing facilities, a

hospice, a system-wide home health care agency, and over 60 off-site ambulatory care centers,

which provide a broad array of medical, psychiatric and substance abuse services.

        4.      On July 18, 2005, the Office of the United States Trustee, pursuant to Section

1102 of the Bankruptcy Code, appointed the Committee. Thereafter, the Committee retained

Thelen Reid & Priest LLP as its counsel and Houlihan Lokey Howard & Zukin Capital as its

financial advisor.

2                                                        NY #702749 v1

---

## OBJECTION

        5.      The McDermott Fee Application seeks approval of fees in the amount of

$2,227,979.50 and reimbursement of expenses in the amount of $104,314.28 for a period of less

than three months. The Committee submits that the foregoing compensation is not reasonable in

light of the services performed, the results achieved by McDermott, or lack thereof, and the costs

associated with the Debtors' replacement of McDermott Will & Emery LLP ("McDermott") as

bankruptcy counsel. The Committee objects to the McDermott Fee Application and believes that

any fees awarded to McDermott should be awarded in an amount substantially less than the

amount requested by McDermott. The Committee believes that the services performed by

McDermott were often ineffective, misguided and/or provided little or no benefit to the these

estates and, in some instances, caused the estates to incur additional expense.

        6.      McDermott was ultimately replaced by Weil Gotshal & Manges LLP in

mid-September 2005. The Committee believes that the Debtors' replacement of McDermott,

while warranted, was costly to the Debtors' estates, both in terms of delay and the professional

fees related to Weil Gotshal's learning curve. The Committee submits that the costs related to

the replacement of McDermott as bankruptcy counsel should be borne by McDermott, not the

Debtors' estates.

        7.      Furthermore, there are numerous examples of instances where the services

provided by McDermott were ineffective and/or provided little benefit to the Debtors' estates.

Of particular concern is McDermott's work in connection with obtaining authority for the

Debtors to close St. Mary's Hospital. McDermott was unsuccessful in this regard. In the

Committee's view, there was a delay in the Debtors' obtaining authorization to close St. Mary's

Hospital due to McDermott's handling of this matter. Shortly after being brought into these

3                    NY #702749 v1

---

cases, Weil Gotshal & Manges was successful in obtaining authorization to close St. Mary's

Hospital. The Committee submits that the costs (such as the extended cash burn) associated with

the delay in the Debtors' obtaining authorization to close St. Mary's Hospital should be borne by

McDermott.

        8.      Other services performed by McDermott appear to have provided little or

no benefit to these estates. For example, McDermott filed a motion to approve a post-petition

agreement with SSI Surgical Services, Inc. for off-site instrument processing services. The

Committee objected to the motion because the proposed agreement was, in the Committee's

view, unreasonable. The proposed agreement was, effectively, for a two-year term, even though

the services were to be provided for St. Mary's Hospital (slated to close) and St. John's Hospital

and Mary Immaculate Hospital (both slated to be sold or disposed of in some other fashion,

including possible closure). The proposed agreement further sought to raise the cost for SSI's

services substantially in a manner that appeared to be designed to pay SSI's pre-petition debt in

full. The Court refused to grant the motion.

        9.      Similarly, McDermott filed a motion for authority to enter into a master

lease agreement with Cherry Creek Capital Partners, LLC. Although the Committee did not file

an objection, the Committee raised issues with McDermott and had concerns regarding this

motion which resulted in protective language being inserted into the proposed order. At the

hearing on this motion, the Court criticized the motion and refused to approve it. The motion was

subsequently withdrawn.

        10.     McDermott also filed a motion to approve sale procedures with respect to

the sale of Parsons Manor. This motion was also ultimately withdrawn, as the Debtors have

decided to include this property as part of the sale of Mary Immaculate Hospital.

4                    NY #702749 v1

11. With respect to the retentions of Speltz & Weis and Huron, it appears that McDermott either did not recognize the significant issues concerning these retentions or ignored them. McDermott continued to press forward on these retentions notwithstanding the issues raised by the Committee and the U.S. Trustee. It was not until after McDermott was replaced that a consensual resolution was reached regarding these retentions and a process was put in place for the Committee and the Debtors to select a new Chief Executive Officer/Chief Restructuring Officer and a new Chief Financial Officer.

12. McDermott also filed a motion and obtained authority to pay approximately 56 critical vendors a total of up to $16.2 million. Immediately after its appointment, the Committee filed a motion for reconsideration of the order granting the motion. Thereafter, the Debtors agreed to not make any critical vendor payments without the Committee's consent. To date, the Debtors have sought and obtained the Committee's consent to pay only 3 critical vendors an aggregate amount of less than $1.4 million. Although Judge Beatty did not rule on the Committee's motion for reconsideration (in light of the Debtors' agreement to not pay any critical vendor payments without the Committee's consent), Judge Beatty indicated that the relief granted with respect to the Debtors' critical vendor motion was too broad.

13. Similarly, McDermott filed a motion seeking authority to pay prepetition construction and lien claims. The Committee objected to the motion and an order was entered that authorized the Debtors to pay such claims up to $3 million but required the Debtors to give the Committee notice with an opportunity to object prior to the Debtors paying any such claims. To date, the Debtors have sought to pay only two construction lien claimants in the aggregate amount of less than $430,000.

14. The McDermott Fee Application makes reference to other services performed by McDermott which appear to have provided little, if any, benefit to the Debtors' estates. For instance, the McDermott Fee Application references a draft of a motion to modify and assume the Aramark contract. It does not appear that this motion was ever filed. Similarly, the McDermott Fee Application indicates that McDermott drafted and finalized a motion to set a bar date. Weil Gotshal ultimately filed a motion to set a bar date, but it is unclear whether the papers prepared by McDermott were helpful to or used by Weil Gotshal. The McDermott Fee Application further indicates that McDermott worked on an "[o]utline structure for a reorganization plan and disclosure statement." McDermott Fee Application, p. 28. It does not appear that these services provided any benefit to the Debtors' estates.

15. The McDermott Fee Application also indicates that McDermott performed numerous services concerning the Debtors' real property leases, including a review of the Debtors' leases and related communications with senior managers. McDermott Fee Application, p. 24. Yet, the Debtors only recently moved to reject a real property lease for premises located at 78-16 Cooper Avenue, Queens, New York even though the premises had never been occupied by the Debtors since the Debtors entered into the lease almost seven years ago. It appears that McDermott's analysis did not uncover the need to reject this lease.

16. With respect to cash collateral, the Debtors, through McDermott, entered into a stipulation with RCG Longview II, L.P., pursuant to which, among other things, the Debtors acknowledged the validity of RCG's liens. Given the rather obvious and basic issues regarding RCG's liens that were identified by the Committee (such as the fact that RCG's mortgages were not actually recorded by the recording office until after the Petition Date), it

5        NY #702749 v1

6        NY #702749 v1

appears that McDermott may not have conducted any or sufficient due diligence prior to the Debtors acknowledging the validity of RCG's liens.

17. Since McDermott's replacement as bankruptcy counsel, the Committee believes that the communication between the Debtors and the Committee and their respective professionals has vastly improved. In the Committee's view, McDermott was, in certain instances, more adversarial than it needed to be in terms of dealing with the Committee and/or its counsel. Indeed, at one point, upon information and belief, McDermott directed the Debtors to stop the information flow to the Committee and its professionals entirely due to an alleged leak on the Committee (which alleged leak McDermott ultimately concluded was unfounded).

18. Based on the foregoing, the Committee submits that the fees and expenses requested by McDermott, for a period of less than three months, are unreasonable. Accordingly, the Committee requests that any fees awarded to McDermott be awarded in an amount substantially less than the amount requested by McDermott.

WHEREFORE, the Committee respectfully requests that the Court substantially reduce the fees requested by McDermott and grant such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        March 3, 2006

                THELEN REID & PRIEST LLP

                By:/s/ Martin G. Bunin
                    Martin G. Bunin (MB 1602)
                    Craig E. Freeman (CF 5085)
                    875 Third Avenue
                    New York, New York 10022-6225
                    (212) 603-2000

                Counsel for the Official Committee of Unsecured
                Creditors of Saint Vincents Catholic Medical
                Centers of New York d/b/a Saint Vincent Catholic
                Medical Centers, et al.

7        NY #702749 v1

8        NY #702749 v1

# Exhibit E

```
 1            UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF NEW YORK
 2

 3   IN RE:                    .  Case No. 05-14945 (ASH)
                               .
 4   SAINT VINCENTS CATHOLIC   .  White Plains, New York
     MEDICAL CENTER, et al,    .  July 20, 2006
 5                             .  3:42 p.m.
          Debtors.            .
 6   . . . . . . . . . . . . . . .

 7         TRANSCRIPT OF TELEPHONE CONFERENCE
        BEFORE THE HONORABLE ADLAI S. HARDIN, JR.
 8            UNITED STATES BANKRUPTCY JUDGE

 9   APPEARANCES:   (Via Telephone)

10   For the Debtors:         Deryck A. Palmer, Esq.
                              John J. Rapisardi, Esq.
11                            WEIL, GOTSHAL & MANGES, LLP
                              767 Fifth Avenue
12                            New York, New York 10153

13
     For the Official Committee
14   of Unsecured Creditors:  Michael E. Johnson, Esq.
                              Craig E. Freeman, Esq.
15                            ALSTON & BIRD, LLP
                              90 Park Avenue
16                            New York, New York 10016

17   (Appearances Continued)

18   Audio Operator:          Electronically Recorded
                              by Court Personnel
19

20
     Transcription Company:   Rand Transcript Service, Inc.
21                            311 Cheyenne Road
                              Lafayette, New Jersey  07848
22                            (973) 383-6977

23

24   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
25
```

```
 1   A P P E A R A N C E S:   (Continued)

 2   For McDermott, Will
     & Emery:                 Michael L. Cook, Esq.
 3                            David M. Cohen, Esq.
                              SCHULTE, ROTH & ZABEL, LLP
 4                            919 Third Avenue
                              New York, New York 100022
 5
     Also Appearing:          Frank Oswald, Esq.
 6                            Howard P. Magaliff, Esq.
                              TOGUT, SEGAL & SEGAL, LLP
 7                            One Penn Plaza
                              New York, New York 10119
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                I N D E X

 2
                                            Page
 3

 4   CONFERENCE                               4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                              Colloquy        4
 1   (Telephone conference commences at 3:42 p.m.)

 2        MR. OSWALD:  Your Honor, this is Frank Oswald at

 3   Togut, Segal & Segal and my colleague Howard Magaliff.

 4        MR. JOHNSON:  Your Honor, this is Mike Johnson of

 5   Alston & Bird on behalf of the Creditors' Committee.  I'm

 6   joined by Craig Freeman.

 7        MR. COOK:  It's Michael Cook and David Cohen from

 8   Schulte Roth for McDermott.

 9        MR. PALMER:  Deryck Palmer and John Rapisardi from

10   Weil Gotshal on behalf of debtor.

11        THE COURT:  Okay.  Is that it?

12        Is the issue that paragraph of the stipulation and

13   order which says that the debtor will file its objection, if

14   any, to the fee application in question by July 21?

15        MR. OSWALD:  Yes, Your Honor.  Frank Oswald.  I'm

16   sorry.

17        THE COURT:  Is that the only issue?

18        MR. OSWALD:  Yes, Your Honor.  And as I indicted --

19   again, this is Frank Oswald for the recording system.

20        As I indicated in my letter to the Court, we have just

21   been asked to undertake a review for the debtors on the fee

22   application objections.  Mr. Palmer had previously written to

23   Mr. Cook.  I understand a letter had come down with the

24   proposed stipulation advising him that and suggesting that we

25   give him some time to do our due diligence so that if there was
```

Colloquy    5

1  a pleading and objection be filed, it would be detailed and
2  well informed, in everybody's best interest.
3      The suggestion was, in that letter, that perhaps we
4  conclude discovery on the current schedule, which I think is
5  September 29, and then we'd have the opportunity to file
6  something, if warranted and were, the U.S. Trustee and the Committee
7  have an opportunity to supplement their pleadings, if
8  warranted.  To the extent that something new or different was
9  raised, that is obviously they didn't have any problem with
10 providing some additional time for discovery on those issues.
11 And Mr. Cook had just told me that McDermott doesn't think
12 that's efficient, whether they would have that much time, and
13 we thought that we would try to get up to speed as quickly as
14 we can, use this opportunity, particularly this week, to figure
15 out what the issues really were, who we needed to talk to, the
16 scope of the documents before I circled back with a date
17 certain.
18     And my letter obviously crossed with Your Honor having
19 so ordered the stipulation, so that came up late in the day on
20 Friday, which obviously indicates now that that stipulation is
21 with the agreement of the debtors, but it's not -- I mean,
22 obviously, it was not signed by debtors' counsel.  So the
23 timing of that objection, if any, is the issue today.
24     THE COURT:  Okay.  Look, in December an order was
25 signed by Judge Beatty authorizing that McDermott, Will & Emery

Colloquy    6

1  to file its interim fee application or its fee application.  It
2  did so on January 31.  The Creditors' Committee and the UST's
3  office filed their objections on March 3 and March 7.  We had
4  litigation over this.  There was a scheduling order for
5  objections to the McDermott, Will & Emery fee application and a
6  trial was actually scheduled for June 5 on objections to
7  McDermott, Will & Emery's fee application.
8      And the company is now asking until September to file
9  a fee application?  Come on.  I don't understand that.  I
10 really don't.  I mean, I'm sort of amazed that the company
11 hasn't filed a fee application if it is disposed to do that
12 already.  I don't think -- I think -- I mean, good heavens,
13 this is unprecedented.  If it's a big fee application, sure,
14 that's fine.  Okay?  But there have been a lot of big fee
15 applications and it doesn't take months and months and months
16 to file objections to most fee applications, even giant ones,
17 let alone where others have objected and a trial was scheduled.
18     So I don't see why the --
19     MR. PALMER:  Mr. Oswald was not involved --
20     THE COURT:  I'm sorry?
21     MR. PALMER:  Your Honor, this is Deryck Palmer from
22 Weil Gotshal.  Mr. Oswald was not involved back then, therefore
23 --
24     THE COURT:  Well, so what?  So what?
25     MR. PALMER:  -- the debtor.

Colloquy    7

1      THE COURT:  So what?
2      MR. PALMER:  Excuse me, Your Honor?
3      THE COURT:  You know, you could retain a lawyer in
4  August and say he needed until November.  The fact that the
5  company decided after the case was actually supposed to have
6  been tried in early June to get a different set of lawyers to
7  decide whether the company would file an objection, what ice is
8  that supposed to cut?  .
9      MR. PALMER:  Your Honor, that's not the basis for the
10 objection with respect to the time they'd like.  There are two
11 simple points here, Your Honor.
12     One is the company took no position on the McDermott
13 Will fee application, either by Judge Beatty on that (sic)
14 because we thought this was more appropriately heard at the end
15 of the case.
16     Secondly, Your Honor, when it was clear this was going
17 forward, we recommended and was supported by other parties in
18 having this matter go to mediation; one, because we didn't want
19 to incur the expense and, two, because we didn't want the
20 distraction of having a fight over the fees of McDermott
21 because it involved very sensitive issues with respect to
22 whether the case should have been commenced or not.
23     So the issues that we have here today, Your Honor, is
24 out of the mediation it has become clear that this matter
25 cannot be consensually resolved and now that it's going to

Colloquy    8

1  litigation and this release issue has popped up as a key
2  element, Your Honor, we're simply asking for a reasonable
3  period of time -- I think through September 11th was the
4  proposal -- so that we can file an appropriate objection out of
5  we had no choice but to go forward on that.
6      The debtor has not sat by.  We've been a proponent and
7  tried to facilitate a resolution here.
8      THE COURT:  What release issue?
9      MR. PALMER:  McDermott, Will & Emery, Your Honor, have
10 asked for a release of a pre-petition as well as a post-
11 petition potential legal malpractice --
12     THE COURT:  Well, what does that have --
13     MR. PALMER:  -- an offer, at least for post-petition
14 services --
15     THE COURT:  What does that have to do --
16     MR. PALMER:  -- not in a position to go beyond that.
17     THE COURT:  Damn it all.  Why doesn't this thing work?
18     MR. PALMER:  -- but I understood this issue taken up
19 in court the last time this matter was put before the Court.
20     THE COURT:  Well, what does the release issue have to
21 do with their fee application?  They make a fee application,
22 we'll hear the fee application.  They want a release, you can
23 litigate that.
24     MR. PALMER:  Your Honor, if it's a simple fee
25 application and the release is not at all replicated, I think

Colloquy                    9

1  the debtor could respond relatively quickly, Your Honor.
2      THE COURT:  Fine.  End of July.  I'll change the date.
3      MR. RAPISARDI:  Your Honor, this is John Rapisardi.  I
4  was informed last night -- so you know -- that McDermott
5  (indiscernible) McDermott.  They have taken the position that
6  your ruling on the final fee application that will, in fact,
7  result in a release of all pre-petition claims that the estate
8  may have against McDermott, and we need a clarification on that
9  issue because that is forcing us that they're taking that
10  position and there's not clarity on that, that is what is
11  forcing us to take an in-depth review of McDermott's pre-
12  petition activities and that's why there has been, you know,
13  there's the question of extension.
14      THE COURT:  Why would my ruling on a fee application
15  implicate a release?
16      MR. RAPISARDI:  I would let Mr. Cook address that,
17  Your Honor.
18      MR. COOK:  To the extent that -- we did file some
19  papers, Your Honor, saying that your -- and I was very clear on
20  it, that the res judicata collateral estoppel effect of your
21  order would have to be determined at a later time.  It's a
22  basic principle of federal practice.  But what we had said, not
23  in any legal paper, not taking any legal position, is that if
24  they don't -- if they've got claims against us related to legal
25  services, that they have to raise them at the fee application

Colloquy                    10

1  hearing or they run the risk of being precluded later on from
2  raising them.
3
4      THE COURT:  Ah, I see.
5      MR. FREEMAN:  Your Honor, this is a carve-out of the
6  stipulation and this relates solely to their application of
7  what I would call a traditional objection basis.  We will
8  quickly abide (sic) by them if they had an application or an
9  objection on file.  It's this release issue that complicates
10  itself and that that's carved out in the stipulation, the
11  debtor had moved very expeditiously after and go forward with
12  it.
13      THE COURT:  Well, wouldn't you -- who?
14      MR. FREEMAN:  Craig Freeman from Alston & Bird on
15  behalf of the Creditors' Committee.
16      We're not moving forward with this with the
17  understanding that there's going to be any kind of a release
18  for pre-petition conduct when Your Honor rules on what is still
19  an interim fee application.  It was filed as an interim fee
20  application, we filed our objection to an interim fee
21  application.  That's all that's before you.  And we're, at the
22  present time, certainly haven't been on, investigating pre-
23  petition conduct, and we intend to do that at some point, but
24  we're focusing on the post-petition fees that are before Your
25  Honor on this interim fee application.  It certainly is not our

Colloquy                    11

1  understanding that any release is at issue.
2      Your Honor will rule on an interim fee application and
3  that will be it.
4      THE COURT:  Mr. Cook, I would have thought you would
5  want to get a ruling on your fee application.  Do you?
6      MR. COOK:  Yes, Your Honor.
7      THE COURT:  You want it sooner, rather than later?
8      MR. COOK:  Yes, Your Honor.
9      THE COURT:  All right.  Then why don't you all just
10  stipulate that the ruling will be on the fee application and it
11  will -- whatever the outcome of the ruling is will not
12  constitute a release or a waiver with respect to claims or
13  defenses in respect of whatever you want to call it,
14  malpractice or whatever?
15      MR. JOHNSON:  That's acceptable to the debtor, Your
16  Honor.
17      THE COURT:  Is it acceptable to everybody?
18      MR. COOK:  Our position -- our entire position, Your
19  Honor --
20      THE COURT:  Whose position?
21      MR. COOK:  McDermott.  To back up, Your Honor, to put
22  this in its proper perspective, as we discussed quite candidly
23  on June 1, the only issue, the only issue precluding a
24  settlement here -- and this is where the mediation broke down -
25  - was an issue of the release.  There was a misunderstanding --

Colloquy                    12

1  at best, a misunderstanding when the parties, namely
2  (indiscernible) and McDermott on May 3rd, when McDermott agreed
3  to reduce its fee application substantially.  It came away from
4  the session thinking -- believing they were getting a release
5  and that's the agreement that we promptly drafted after the
6  mediation.
7      The debtors said, no, we haven't done the
8  investigation.  My quick response back on May 19th was, well,
9  then do the investigation, tell me how much time it's going to
10  take you to do it so that we can settle the thing, it's over
11  with, we don't have to waste another cent on litigation.  Let's
12  just get this result.
13      And we're caught up in a large mumbo jumbo here.  On
14  April 24th, the debtor, in a pleading, filed a report that said
15  he is conducting an investigation and he is preparing a report
16  for his client.  Now, back on April 24th -- these are the words
17  of the debtors:
18      "Counsel for the debtors is in the process of
19      preparing a report to the debtors' board of directors
20      regarding McDermott's fee application.  Based upon a
21      preliminary assessment of the fees and expenses
22      requested by McDermott's fee application, but subject
23      to review and directions from the board after they
24      receive the report, the debtors believe it's likely
25      they will oppose at least a portion of the amounts on

Colloquy    13

1  the fee application."

2  That was April 24th. It's now July 20th. I mean,

3  Your Honor is right to point out the dates here. We're wasting

4  a lot of the Court's time and everybody else's time. I urge

5  counsel for St. Vincent's to take the time, with discovery

6  right now, and come up with a conclusion. McDermott spent six

7  to nine months prior to the bankruptcy and less than three

8  months after bankruptcy. We're not talking -- no one gets

9  debit or credit for it.

10  So the investigation should be very simple and they

11  could decide whether they want to bring a claim or not bring a

12  claim and releases the number that they agreed upon and we

13  don't have to -- the estate doesn't have to waste another cent

14  on two or three law firms and my client doesn't have to spend

15  another cent on fees either.

16  THE COURT: In other words, Mr. Cook, if I understand

17  you correctly, your client basically is saying, we're happy to

18  settle, but --

19  UNIDENTIFIED: We can't hear you, Your Honor.

20  THE COURT: What?

21  UNIDENTIFIED: We can't hear you, Your Honor.

22  THE COURT: God damn it. What's the matter with this

23  wretched system? Where am I supposed to stand that I can be

24  heard?

25  (Court and court personnel confer.)

Colloquy    14

1  THE COURT: Can you hear me now? Hello?

2  UNIDENTIFIED: Barely.

3  THE COURT: Yes or no?

4  UNIDENTIFIED: You're very faint, Your Honor.

5  THE COURT: Can you hear me now?

6  UNIDENTIFIED: That's fine.

7  THE COURT: So as I understand your position, Mr.

8  Cook, your client is prepared to say, we'd love to settle, but

9  we're not interested in settling our fee claim and then get

10  sued. Is that basically it?

11  MR. COOK: Right. And although we responded in

12  January it was called an interim fee application, it was

13  because the client thought that they were going to be used

14  after they were terminated in September. For all intents and

15  purposes, they have been.

16  And what we all agreed on, this was a complete

17  divorce. They haven't done any work, they're not doing any

18  work. This will be a final fee application.

19  THE COURT: Right.

20  MR. COOK: And it makes sense for everybody.

21  MR. PALMER: Your Honor, if I may be heard? Deryck

22  Palmer from Weil Gotshal.

23  THE COURT: Yes, briefly, Mr. Palmer.

24  MR. PALMER: Very briefly. Mr. Cook is absolutely

25  right that the debtor filed in a statement that Weil Gotshal,

Colloquy    15

1  as debtors' counsel, would do the investigation without going

2  into mediation, Your Honor. Not Mr. Cook, but his client, has

3  raised an issue about Weil Gotshal with respect to the issues

4  that are before this Court.

5  The debtor has brought in Togut, Segal & Segal to

6  address that, but the debtor is more than prepared to take the

7  solution that was proposed at the beginning and treat this as a

8  normal fee application and, therefore, we don't have to delay

9  it and we'll file the objection post haste, without any delay,

10  Your Honor.

11  THE COURT: All right. Now's that? I certainly can

12  understand Mr. Cook's client's position that they're not

13  prepared to compromise and now understand how the release

14  issue comes up, that they're not prepared to give away a part

15  of the store on the fee issue and then get sued. So if what

16  you really want to do is settle, then I guess you'll have to

17  deal with that issue. And if what you really want to do is

18  just litigate the fee application and reserve whatever right

19  you may have to a claim, well, fine, do that.

20  So what do you want to do, debtor?

21  MR. PALMER: The debtor will treat it as a regular fee

22  application, Your Honor, and reserve rights with respect to all

23  claims and we'll take the July --

24  (Counsel confer.)

25  MR. PALMER: 31. We'll take that date and we'll

Colloquy    16

1  comply with the provisions of the stipulation in all other

2  respects, Your Honor.

3  THE COURT: Mr. Cook, any problem with that?

4  MR. COOK: The only problem I have, Your Honor, is we

5  are not agreeing to -- we're not stipulating that they can go

6  through this process and then raise the malpractice claim

7  later. And if they want to preserve their right to do it, we

8  reserve the right also that -- due process. They can't do that

9  and they're going to be precluded later on and, you know, we'll

10  take our chances on that.

11  THE COURT: Okay. So basically you will -- you're

12  putting the debtor on notice that if it litigates the fee

13  dispute without having -- and obtains a ruling on that, you

14  will argue that that precludes them from asserting some claim

15  not relating to fees against McDermott, Will & Emery.

16  MR. COOK: Correct.

17  THE COURT: Well, okay. They know that.

18  MR. FREEMAN: Your Honor, this is Craig Freeman of

19  Alston & Bird on behalf of the Committee. And when Mr. Palmer

20  said he's going to treat it as -- he'd like you to treat it as

21  a regular fee application, there is a distinction between a

22  final and an interim and, again, Your Honor, our view is it was

23  filed as an interim, you know, hearing that Mr. Cook is

24  treating it as a final.

25  Now, we're talking about two, maybe three months of

Colloquy 17

1  work by McDermott at the beginning of the case. That's what
2  the fee app covers, I think July 5th through the end of
3  September. It's almost three months. We objected to the fee
4  app with the view that it was an interim fee app. It wasn't
5  filed as a final app and, Your Honor, I would respectfully
6  request that you treat it as an interim fee application.
7      THE COURT: What do you mean interim? It is the final
8  -- it's their final fee app. It's the last one they will be
9  making. Is it -- is anybody bound by a label?
10      UNIDENTIFIED: Your Honor, if they bring a claim for
11  malpractice, they would have actually commence an adversary
12  proceeding to do that; and, therefore, in this one particular
13  case, the labels are important here and the debtor has not
14  reviewed any of the legal files at McDermott whether it's pre-
15  petition or post-petition. We're prepared to treat it -- when
16  I say "a regular fee application," as an interim fee
17  application. If you want to treat it as a final, that's fine,
18  too, but I do not accept the stipulation that Mr. Cook put on
19  that we're somehow waiving our rights to inter a malpractice
20  claim when there's no provision in the bankruptcy code that
21  requires you to have a relatively short period to determine
22  when the result -- determine whether those claims are the
23  result of the case have to be inconclusive (sic) or even
24  determined.
25      Legal malpractice is not something that you determine

Colloquy 18

1  simply based on three-month post-petition services that are
2  reflected in that fee application.
3      THE COURT: Well, so the record becomes clear, I -- it
4  might be a good idea for Mr. Cook to file an appropriate piece
5  of paper saying, in effect, since McDermott, Will & Emery has
6  not been called upon to render any services since whatever the
7  date was, and will not be called upon to render any services,
8  its fee application -- its interim fee application dated
9  whatever it was dated is hereby denominated a final fee
10  application and proceed that way.
11      MR. COOK: That is exactly the position that we have
12  stated over the past several months and everybody knows it, so
13  -- and we, in fact -- whatever.
14      As Your Honor said on March 13th, with -- when Mr.
15  Smith was here; this is, for all intents and purposes, a final
16  fee application, and we'll state it openly on the record.
17      THE COURT: Well, I think that's a good idea.
18      Now, as far as the question of whether or not a ruling
19  on a final fee application bars claims, I haven't the slightest
20  idea what the outcome of that controversy is and I don't
21  express any opinion on it.
22      So you can all proceed on the basis that I don't know
23  anything about the answer to that question. It hasn't been put
24  before me and I express no view.
25      MR. PALMER: Your Honor, can we at least have a

Colloquy 19

1  schedule to brief that issue so we can address that right up
2  front? Because I don't want anyone to go down this path under
3  the assumption that they either have the protection (sic) or
4  don't have the protection of the ultimate ruling from the Court
5  as barring these claims.
6      THE COURT: Who is saying that?
7      MR. PALMER: This is Deryck Palmer from Weil Gotshal,
8  Your Honor.
9      THE COURT: Okay. Well, it will be up to either of
10  both sides to file whatever you want and take counsel and be
11  advised as to whatever the arguments might be on that question.
12  I have no view at all. It's a new one to me. I've just never
13  run across it.
14      MR. RAPISARDI: Your Honor, John Rapisardi, Weil
15  Gotshal. I think what we need is just a clarification that
16  this objection deadline did not preclude the debtors from --
17  not do the investigation with respect to pre-petition
18  activities, as to malpractice -- potential malpractice claims.
19  It does not prevent the debtor from commencing an adversary
20  proceeding after the deadline for objections to the fee
21  application.
22      It seems to me that would behoove the debtors, to
23  protect themselves, to commence that adversary proceeding on or
24  before the date that the Court rules on the fee application so
25  it's a matter of record that those malpractice claims, if they

Colloquy 20

1  -- if we conclude that there are claims on the record and that
2  they are, in fact, carved out.
3      THE COURT: I don't know what you're asking me.
4  You're -- it's --
5      MR. RAPISARDI: I'm just trying to clarify that this
6  deadline and this stipulation does not -- we don't want Mr.
7  Cook coming back in August or September if we choose to file an
8  adversary proceeding, concerning malpractice claims on behalf
9  of the estate against McDermott, that we waived or stipulated
10  that that adversary proceeding -- those claims would be raised
11  as part of this effective matter that comes before the Court.
12      THE COURT: Well, if you're addressing the comment to
13  me, I don't know what Mr. Cook will claim and I don't know what
14  the proper legal outcome of whatever he might claim might be.
15  And I'm not giving any advisory opinions on something I don't
16  know anything about, nor do I give --
17      MR. RAPISARDI: Your Honor, we would be satisfied with
18  just legal reservation of rights, as I indicated earlier, in
19  this situation so it's clear that we're not waiving any of our
20  rights, whether it's the debtor or the estate generally with
21  respect to these claims. And I think we don't need to burden
22  the Court any more today as long as that reservation of rights
23  is put into the stipulation.
24      THE COURT: Well, if you can agree upon a stipulation
25  that supercedes the one that I've already signed, which I guess

Colloquy                                    21

1   is not a stipulation and I guess I need to vacate my having
2   signed it, since it does have an effect on the debtor and the
3   debtor didn't agree.  So I will be happy to vacate that so
4   ordering --
5        UNIDENTIFIED:  Your Honor, I'm sure the debtors'
6   counsel or Mr. Oswald would be happy to send Mr. Cook the
7   language while the other parties that are on the phone that
8   would provide for this reservation of rights.  Hopefully we can
9   agree on a stipulation that's consensual on all parts to submit
10  to the Court.
11       UNIDENTIFIED:  Well, Your Honor, if I could make a
12  suggestion, I mean, we've had a lot of progress here.  This
13  stipulation is a discovery schedule, who is going to do what.
14  I'd hate to see all of that -- and it was identical to one that
15  everybody else agreed to (sic) for what the debtors referred to
16  as Paragraph 1, its deadline to object.  My suggestion is if
17  you want to vacate something, vacate that one paragraph and if
18  we could work out a stipulation with the debtor, what the
19  effect of their objections is going to be -- I don't think we
20  will, but I expect that we'll all reserve our rights and we'll
21  know also a specific date.  I think the date was July 31?
22       UNIDENTIFIED:  Yes.
23       UNIDENTIFIED:  For them to object.  And everything
24  else can move along, we don't have to keep bothering --
25       UNIDENTIFIED:  I really think we need to have one

Colloquy                                    22

1   stipulation by Mr. Cook that contains all these provisions so
2   there's no misunderstanding.
3        UNIDENTIFIED:  I just may be cross-references, because
4   what I'd hate to see happen here is we have a schedule in place
5   for discovery, what has to be done, and nobody has objection to
6   that and we're just taking out one thing, one simple thing that
7   the debtor has a problem with, and I think we stated our
8   position, and everybody reserving its rights.
9        THE COURT:  Well, I'm sorry.  I can't spend any more
10  time today, gentlemen.  You tell me what you want me to do with
11  the stipulation and order that I've already signed and if I can
12  do it, I'll do it.  If not, come back to me later.  Okay?
13       UNIDENTIFIED:  Okay.
14       THE COURT:  Thanks very much.
15  (Telephone conference concluded at 4:11 p.m.)
16                      CERTIFICATION
17       I certify that the foregoing is a correct transcript
18  from the electronic sound recording of the proceedings in the
19  above-entitled matter to the best of my knowledge and ability.
20
21
22       *Lisa Luciano*
23                                              July 31, 2006
    Lisa Luciano, AAERT Cert. No. 327
24  Certified Court Transcriptionist
    For Rand Transcript Service, Inc.
25

# Exhibit F

Michael L. Cook (MC 7887)
David M. Hillman (DH 8666)
SCHULTE ROTH & ZABEL LLP
Counsel for McDermott Will & Emery LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

*and*

McDERMOTT WILL & EMERY LLP
William P. Smith (WS-3210)
227 West Monroe Street
Chicago, Illinois 60606
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700

*and*

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst (SS-6963)
James M. Sullivan (JS-2189)
340 Madison Avenue
New York, New York  10017-4613
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444
Attorneys, *Pro Se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |

**NOTICE OF AMENDMENT OF APPLICATION OF McDERMOTT WILL & EMERY LLP
UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R. BANKR. P. 2016 FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES
[JULY 5, 2005 THROUGH SEPTEMBER 30, 2005]**

   **PLEASE TAKE NOTICE** that on January 31, 2006, McDermott Will & Emery LLP
("McDermott") filed the "First Interim Application of McDermott Will & Emery LLP Pursuant to
Sections 330(a) and 331 of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy
Procedure for Compensation for Professional Services Rendered and Reimbursement of Expenses

Incurred on Behalf of the Debtors for the Period July 5, 2005 Through September 30, 2005" (the "Application").

        **PLEASE TAKE FURTHER NOTICE** that, because McDermott has not provided services to the Debtors since September 30, 2005, and will not provide services to the Debtors in the future, consistent with the suggestion of the Court on July 20, 2006, it hereby denominates the Application as a final application for compensation and reimbursement of expenses.

Dated:  New York, New York
        July 21, 2006

SCHULTE ROTH & ZABEL LLP
Counsel to McDermott Will & Emery LLP


By: /s/ David M. Hillman
Michael L. Cook (MLC 7887)
David M. Hillman (DMH 8666)
(Members of the Firm)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

*and*

McDERMOTT WILL & EMERY LLP
Attorneys *Pro Se*

William P. Smith (WS-3210)
227 West Monroe Street
Chicago, Illinois 60606
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700

*and*

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst (SS-6963)
James M. Sullivan (JS-2189)
340 Madison Avenue
New York, New York  10017-4613
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444

# Exhibit G

TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for Debtors
and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut, Esq. (AT-9759)
Frank A. Oswald, Esq. (FAO-1223)

PRESENTMENT DATE/TIME: October 25, 2006 at 12:00 p.m.
OBJECTION DEADLINE: October 25, 2006 at 11:00 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re:                                              :
                                                    :    Chapter 11
SAINT VINCENTS CATHOLIC MEDICAL       :    Case No. 05-14945 (ASH)
CENTERS OF NEW YORK d/b/a SAINT VINCENT  :
CATHOLIC MEDICAL CENTERS, et al.,     :    (Jointly Administered)
                                                    :
                                    Debtors.  :
------------------------------------------------------x

**DEBTORS' APPLICATION FOR AUTHORITY TO RETAIN VENABLE LLP, AS
SPECIAL COUNSEL, UNDER SECTION 327(e) OF THE BANKRUPTCY CODE
FOR LIMITED PURPOSES, _NUNC PRO TUNC_ TO SEPTEMBER 29, 2006**

TO:    THE HONORABLE ADLAI S. HARDIN, JR.,
       UNITED STATES BANKRUPTCY JUDGE:

       Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent
Catholic Medical Centers, CMC Physician Services, P.C., CMC Radiological Services,
P.C., CMC Cardiology Services P.C., CMC Occupational Health Services P.C., Medical
Service of St. Vincent's Hospital and Medical Center, P.C., and Surgical Service of
St. Vincent's, P.C., as debtors and debtors in possession (collectively, the "Debtors"), by
and through their conflicts counsel, Togut, Segal & Segal LLP ("TS&S"), hereby makes
this application (the "Application") for entry of an order, under sections 327(e) and 328
of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal
Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of
New York (the "Local Rules"), authorizing the Debtors to retain Venable LLP
("Venable") as special counsel to the Debtors for the certain limited purposes described
herein, _nunc pro tunc_ to September 29, 2006, and, in support of this Application,
respectfully shows this Honorable Court that:

### INTRODUCTION

1.    The Court has scheduled an evidentiary hearing for October 23,
2006 (the "Fee Trial") regarding the First Interim Application of McDermott Will &
Emery LLP ("MWE") for Professional Services Rendered and Reimbursement of
Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 Through
September 30, 2005 (the "Fee Application").[1] Objections to MWE's Fee Application
have been filed by the Debtors, the Official Committee of Unsecured Creditors (the
"Creditors' Committee") and the United States Trustee.

2.    TS&S has taken the lead on behalf of the Debtors in addressing
issues regarding the Fee Application, including, among other things, interviewing
principal parties of the Debtors, preparing and filing the Debtors' objection dated
July 31, 2006 (the "Debtors' Objection"), and conducting discovery, including document
production and review and attending depositions, in anticipation of the Fee Trial.

3.    As explained in the Debtors' Objection, the Debtors did not file a
response to the Fee Application at the time it was originally filed because, _inter alia_, it
was filed as an interim application and the Debtors wished to defer their determination
of MWE's services and fees until the conclusion of these cases when all professionals'
fee applications are considered on a final basis by the Court following confirmation of a
Chapter 11 plan. Because the Fee Application is now being treated as a final application

2

and the issue of _res judicata_ as to any affirmative claims that the Debtors and their
estates may hold against MWE has been raised by MWE, the Debtors were required to
accelerate their consideration of MWE's services and the reasonableness of its fees.

4.    On a parallel track to the Fee Application dispute, TS&S has been
conducting due diligence concerning the pre and post-petition services MWE rendered
to the Debtors in connection with an affirmative claims review.

5.    Recognizing their fiduciary duties, the Debtors' senior management
and Board of Directors have determined that the Debtors require the employment of
special counsel that is experienced in the identification and viability of professional
malpractice, breach of duty and related claims to work with TS&S to conclude the
Debtors' investigation and determination of any affirmative claims against MWE.
Special counsel will not be expending any time in connection with the Fee Trial, which
will be handled by TS&S. The services, as described herein, are necessary and tailored
so that the Debtors can make an informed judgment regarding the existence and
viability of affirmative claims, if any, against MWE.

6.    Therefore, by this Application, the Debtors are seeking to employ
Venable as special counsel to, among other things, evaluate and report on potential
affirmative claims against MWE, together with TS&S, to the Debtors' senior
management and Board promptly in an effort to facilitate a settlement of the Fee
Application dispute and obviate the need for the Fee Trial, or in the alternative, to take
such action as may be needed to preserve the Debtors' rights in connection with such
claims. The proposed services are described below.

### BACKGROUND

A.    **The Debtors' Chapter 11 Cases.**

7.    On July 5, 2005 (the "Petition Date"), each of the Debtors filed a
voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United
States Bankruptcy Court for the Southern District of New York (the "Court").

8.    The Debtors are operating their businesses and managing their
properties as debtors in possession pursuant to sections 1107(a) and 1108 of the
Bankruptcy Code.

9.    The Debtors' Chapter 11 cases have been consolidated for
procedural purposes only and are being jointly administered pursuant to Bankruptcy
Rule 7015(b).

10.    On July 18, 2005, the United States Trustee appointed the Creditors'
Committee, and on May 17, 2006, the United States Trustee appointed an official
committee of tort claimants in the Debtors' Chapter 11 cases. No chapter 11 trustee or
examiner has been appointed in these Chapter 11 cases.

B.    **MWE's Retention and Fee Application.**

11.    On August 8, 2005, this Court entered a final order retaining MWE
as bankruptcy and general corporate counsel for the Debtors. On or about
September 13, 2005, after concluding that MWE's services were no longer in the best
interests of these estates, the Debtors advised MWE that they had decided to replace
MWE with Weil Gotshal & Manges LLP ("WG&M") as their primary bankruptcy
counsel. On November 7, 2005, this Court entered a final order retaining WG&M as the
Debtors' bankruptcy counsel and, to help facilitate the transition to new counsel,

---

[1]    MWE subsequently denominated its Fee Application as a final Fee Application.

retaining MWE as special counsel to the Debtors pursuant to section 327(e) of the
Bankruptcy Code.

12.    On January 31, 2006, MWE filed its Fee Application in which MWE
seeks fees of $2,227,979.50 and reimbursement of expenses of $104,314.28. The Fee
Application covers a period of approximately 12 weeks.

13.    On or about March 3, 2006, the Committee filed an objection to the
Fee Application (the "Committee Objection").

14.    On or about March 7, 2006, United States Trustee filed an objection
to the Fee Application (the "UST Objection," and together with the Committee
Objection, the "Objections").

15.    MWE filed its response to the Objections on or about March 20,
2006 (the "Response").

16.    The Court originally scheduled the Fee Trial for June 5, 2006.
MWE, the Committee and the United States Trustee commenced discovery efforts in
preparation for the Fee Trial while also engaging in settlement negotiations.

17.    On or about April 13, 2006, MWE filed a motion seeking the
appointment of a mediator to facilitate settlement discussions regarding the Fee
Application, which, if successful, would have obviated the need to conduct the Fee
Trial.

18.    Although the Committee filed a limited objection to the proposed
mediation on or about April 21, 2006, the Debtors agreed to participate in the mediation
to resolve disputes over MWE's Fee Application, provided that the Court approved the
appointment of a mediator. On April 27, 2006, the Court approved a mediation process.
The mediation, conducted by Bankruptcy Judge Stong of the Eastern District of New
York, did not result in a settlement of the Objections.

5

19.    Upon learning of the unsuccessful mediation, the Court
rescheduled the Fee Trial for October 23, 2006 at 9:30 a.m. The Court directed the
Debtors to file any objection to the Fee Application no later than July 31, 2006.

20.    On July 31, 2006, the Debtors' Objection was filed.

21.    On August 25, 2006, MWE filed its reply to the Debtors' Objection.

22.    In anticipation of the Fee Trial, the parties have been proceeding
with discovery.

23.    Shortly after the Debtors' Objection was filed, the Debtors sought
all of MWE's pre- and post-petition files for review only because MWE seeks a general
release of claims from these estates, as MWE's counsel described more fully to the Court
at a conference held on June 1, 2006 concerning the failed mediation. In light of the
possible res judicata effect that a final fee order may have on any affirmative claims that
the Debtors may hold, the Debtors have been proceeding on dual tracks (i.e., preparing
for the Fee Trial and conducting the affirmative claims due diligence).[2]

JURISDICTION

24.    This Court has subject matter jurisdiction over this Application
pursuant to 28 U.S.C. § 1334 and the "Standing Order of Referral of Cases to
Bankruptcy Judges" for the Southern District of New York, dated July 10, 1984 (Ward,
Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Court
can exercise its subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1).

25.    Venue of this proceeding and the Application is proper in this
district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief

---

[2] The Debtors do not concede that any claim they may hold against MWE would be barred by entry of a
final fee order and expressly reserved all of their rights in the Debtors' Objection.

6

sought in the Application are sections 327(e) and 328 of the Bankruptcy Code and
Bankruptcy Rule 2014.

RELIEF REQUESTED

26.    By this Application, the Debtors seek entry of an Order approving
the retention of Venable as special counsel for certain limited purposes, nunc pro tunc to
September 29, 2006, to advise and assist the Debtors in connection with their continuing
investigation into possible affirmative claims the Debtors and their estates may have
against MWE.

BASIS FOR RELIEF REQUESTED

A.    The Debtors' Need for Special Counsel

27.    The investigation into the merits of MWE's Fee Application has
been conducted on two parallel tracks under TS&S' guidance. The first track involves
MWE's postpetition services and MWE's entitlement to the compensation sought in its
Fee Application. In preparing for the October 23 Fee Trial, TS&S has identified and
reviewed for relevancy countless documents that MWE, the Committee, the United
States Trustee and the Debtors have produced. TS&S also has represented the Debtors
in the depositions of principal parties and third party witnesses relevant to the fee
application dispute wherein the services of MWE both pre and post-petition were
examined.

28.    The second track involves the investigation of MWE's prepetition
services and counsel to determine whether the Debtors have any bases to assert
affirmative claims against MWE for either pre or post-petition conduct and counsel and
to evaluate whether the Debtors can or should grant MWE a general release in
connection with any settlement of the Fee Dispute. At this stage of the claims

7

investigation and with fact discovery in the fee application dispute having closed on
October 6, 2006, the Debtors have determined that to complete the affirmative claims
investigation TS&S commenced, they require the assistance of special counsel that is
experienced with the analysis (and, ultimately, if necessary, the prosecution) of
professional malpractice, breach of duty or similar type claims.

B.    Venable's Proposed Retention for the Chapter 11 Cases

29.    After consultation with TS&S, the Debtors have determined that
Venable has the requisite experiences to provide those services in these cases. Venable
has committed to the Debtors that it will make every effort to avoid duplication of
services with TS&S in performing the contemplated services.

30.    The proposed services that are contemplated to be rendered by
Venable include:

(a)    investigating MWE's representation of the Debtors in these
Chapter 11 cases, including (i) reviewing and analyzing
documents, communications and other information related to
MWE's engagement as bankruptcy counsel for the Debtors which
has thus far been obtained by TS&S and such additional
documents that may be relevant; (ii) reviewing and analyzing
documents produced and deposition transcripts arising out of
discovery for the Fee Trial; and (iii) interviewing the Debtors'
management and other parties with knowledge regarding the
foregoing;

(b)    researching and evaluating potential claims the Debtors may have
against MWE for, among other things, breach of fiduciary duty,
breach of loyalty and professional malpractice;

(c)    providing the Debtors and their Board of Directors with an
assessment, jointly with TS&S, of possible claims against MWE;
and

(d)    to the extent requested by the Debtors, providing such other
services related to the investigation of potential claims against
MWE.

8

31.   The Debtors expect, in light of Venable's experience and the due diligence conducted thus far by TS&S, that Venable's work can be completed quickly and that such results may facilitate a global settlement of all outstanding issues between the Debtors, the Committee, the United States Trustee and MWE.

32.   Venable has extensive experience with providing clients with the services the Debtors require.  For example, according to the Affidavit of Michael Schatzow, a member of Venable (the "Schatzow Affidavit"), submitted in support of the Application and annexed hereto as Exhibit "1", Venable has represented several clients prosecuting legal malpractice and/or breach of fiduciary claims against law firms, and has defended several law firms against those types of claims.  The Debtors submit that Venable, working in conjunction with TS&S, can efficiently and effectively advise the Debtors in the areas in which the Debtors require Venable's specific expertise.

33.   Based on the Schatzow Affidavit, the Debtors believe that, except as set forth therein, the partners, counsel, and associates of Venable do not have any connection with, or hold any interest adverse to the Debtors or their estates with respect to the matters on which Venable shall be employed.

34.   Pursuant to section 328(a) of the Bankruptcy Code, the Debtors may retain Venable on any reasonable terms and conditions.  *See* 11 U.S.C. § 328(a).  As set forth in the Schatzow Affidavit, the current hourly billing rates of Venable personnel expected to work on this matter range from $275 to $500 for partners, $275 to $350 for counsel, $185 to $310 for associates, and $120 to $170 for paraprofessionals.  Venable contemplates that G. Stewart Webb, Jr., a member of Venable, will be the primary attorney on this matter in light of his experience and expertise in this area.  Mr. Webb's hourly rate is $500.  The Debtors submit that Venable's rates are reasonable for the legal services the Debtors require.  Therefore, the Debtors request that Venable be paid its

9

customary hourly rates for services rendered that are in effect, and that it be reimbursed for its disbursements according to Venable's customary reimbursement policies.

35.   In performing the services set out above and in the Schatzow Affidavit, Venable has agreed that its compensation for the legal services to be rendered to the Debtors shall not exceed $30,000.

36.   Venable will apply to this Court for allowance of compensation for all services performed, and the reimbursement of actual and necessary expenses incurred, during its employment by the Debtors.  As set forth in the Schatzow Affidavit, Venable will abide by the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the administrative orders of this Court and the guidelines of the Office of the United States Trustee for the Southern District of New York governing fee applications.

37.   As the Debtors anticipate that the proposed retention of Venable will be brief, the Debtors propose that the Court authorize and empower the Debtors to pay Venable up to $30,000 for compensation and reimbursement of expenses, upon receipt by the Debtors and their counsel, counsel for the Creditors' Committee, and the United States Trustee of reasonably detailed invoices indicating the nature of the services rendered and calculated in accordance with Venable's standard billing practices.

38.   The Debtors reserve their rights, however, to seek to expand the scope of Venable's retention and/or increase the allowable amount of Venable's compensation upon further application on appropriate notice and order of this Court.

39.   Based on the Schatzow Affidavit, the Debtors believe that, except as set forth therein, the partners, counsel, and associates of Venable do not have any

10

connection with, or hold any interest adverse to the Debtors or their creditors with respect to the matters on which Venable shall be employed.

40.   The Debtors seek retention of Venable *nunc pro tunc* to September 29, 2006.  The reason for this request is that, in light of the Fee Trial, expediting Venable's review and analysis prior to the entry of a retention order may lead to a global settlement and obviate the Fee Trial.  During that time, as noted in ¶ 5 of the Schatzow Affidavit, Venable began to provide certain limited services requested by the Debtors (i.e., communications with TS&S and document review).

41.   The Debtors submit that the proposed retention of Venable presents a classic example of the need for special counsel pursuant to section 327(e) of the Bankruptcy Code.  The scope of the retention is narrowly tailored to the services the Debtors require.  Duplication of the efforts of other counsel that have been employed to represent the Debtors in these cases, including, most notably, the efforts of TS&S, will be studiously avoided.  Finally, the proposed compensation is reasonable.

42.   The Debtors submit that the employment of Venable upon the terms set forth herein is appropriate and in the best interests of the Debtors, their estates and creditors.  Based on the foregoing, the Debtors respectfully submit that this Court should grant the Debtors the relief requested in this Application.

### NOTICE

43.   Notice of this Application is being provided by serving copies of this Application (with its exhibits) by first-class mail upon: (i) counsel to the Creditors' Committee; (ii) counsel to the post-petition secured lenders; (iii) counsel to the Tort Committee; (iv) the United States Trustee; and (v) all other parties on the Master Service List.  The Debtors have reviewed this Application and the proposed order of retention with counsel for the Creditors' Committee and the United States Trustee, both

11

of whom have indicated that they have no objection to the same.  The Debtors submit that the foregoing constitutes good and sufficient notice and that no other or further notice need be given.

44.   No previous application for the relief sought herein has been made to this or any other Court.

### WAIVER OF MEMORANDUM OF LAW

45.   As this Application raises no novel issues of law and the authorities relied upon are set forth above, the Debtors respectfully request that the Court dispense with the requirement pursuant to Local Rule 9013-1(b) that a memorandum of law be submitted herewith.

WHEREFORE, the Debtors respectfully requests that this Court (a) enter an Order, substantially in the form annexed hereto as Exhibit "2," authorizing the employment of Venable as special counsel by the Debtors, *nunc pro tunc* to September 29, 2006; and (b) grant such further relief as this Court deems just and proper.

DATED:  New York, New York
         October 16, 2006

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT
VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,
the Debtors and Debtors-in-Possession,
By their Conflicts Counsel,
TOGUT, SEGAL & SEGAL LLP
By:

/s/Frank A. Oswald
FRANK A. OSWALD (FAO-1223)
A Member of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

12

# Exhibit H

TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for the Debtors
 and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut (AT-9759)
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

HEARING DATE: **10/23/06**
AT: **9:30 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                 :
In re:                                                           :
                                                                 :
SAINT VINCENTS CATHOLIC MEDICAL           :     Chapter 11
CENTERS OF NEW YORK d/b/a SAINT VINCENT :     Case No. 05-14945 (ASH)
CATHOLIC MEDICAL CENTERS, *et al.*,       :
                                                                 :     (Jointly Administered)
                                             Debtors.            :
                                                                 :
-----------------------------------------------------------------x

### DEBTORS' RESPONSE AND OBJECTION TO FIRST INTERIM APPLICATION OF McDERMOTT WILL & EMERY LLP FOR COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE DEBTORS FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005[1]

TO THE HONORABLE ADLAI S. HARDIN, JR.,
UNITED STATES BANKRUPTCY JUDGE:

Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent

Catholic Medical Centers ("SVCMC"), CMC Physician Services, P.C., CMC Radiological

Services, P.C., CMC Cardiology Services P.C., CMC Occupational Health Services P.C.,

Medial Service of St. Vincent's Hospital and Medical Center, P.C., and Surgical Service of

St. Vincent's, P.C., as debtors and debtors in possession (the "Debtors"), hereby responds

and objects to the First Interim Application of McDermott Will & Emery LLP ("MWE") For

---

[1]    By Amended Notice dated July 21, 2006, MWE advised that the Fee Application shall be denominated its Final Fee Application pursuant to § 330 of the Bankruptcy Code.

Professional Services Rendered and Reimbursement of Expenses Incurred on Behalf of The Debtors For The Period July 5, 2005 Through September 30, 2005 (the "Fee Application"). The Debtors respectfully state that:

## INTRODUCTION

1.    A debtor's management may run the business, but its counsel runs the Chapter 11 case. Especially in a highly public reorganization such as this one, scrutinized by the press and of enormous interest to the public, what debtor's counsel says and does is extremely important. Counsel is, after all, the debtor's "face," its voice, its representative in public. Many constituent voices are heard, many points of view are raised, and many options are considered. But in the final analysis, it is counsel's job to navigate the rough waters of Chapter 11. Despite what MWE may have done behind the scenes, in its offices or in meetings, in public – in court where its performance really mattered – MWE's conduct and decisions hurt these Debtors. For Bankruptcy Judge Beatty to have made the following statement on the record was simply disastrous:

> "..., everything that they could have done wrong in this case so far they have succeeded in doing"[2]

Unfortunately, by the time Judge Beatty finally made this public statement, the damage had been done. Within six weeks of the Chapter 11 filing, as described below, MWE had lost the confidence of the U.S. Trustee, the Official Committee of Unsecured Creditors (the "Committee") and the Court, and as a result, parties were losing confidence in the Debtors. Especially in a Chapter 11 case, no debtor can afford for this to happen. The Debtors had no choice but to replace MWE as its Chapter 11 counsel and to reconstitute its senior management through a process that, while executed in a way that began to repair

---

[2]    Hon. Prudence Carter Beatty, transcript of hearing, 9/7/05, p. 70, ll. 7-10.

the fractured relations between the Debtors, on the one hand, and the U. S. Trustee, the Committee and other major constituents, on the other, necessarily increased the cost and expense of administering these cases.

## BACKGROUND

2.      SVCMC is one of the New York metropolitan area's most comprehensive healthcare systems, recording more than 82,000 inpatient discharges, more than 1,000,000 outpatient visits, and nearly 650,000 home care visits in 2005. SVCMC's emergency rooms, which include three level 1 trauma centers, received 240,000 visits in 2005. SVCMC is the largest provider of emergency medical services in the New York City Fire Department's 911 service, and more than 2,500 physicians are affiliated with the system. SVCMC also serves as the academic medical center of New York Medical College in New York City. SVCMC's extensive network of healthcare providers makes it one of the New York metropolitan area's largest employers, with approximately 10,600 full or part-time employees.

3.      On July 5, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The Debtors are operating their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      On July 18, 2005, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee. No trustee or examiner has been appointed.

**MWE'S RETENTION**

5. On August 8, 2005, this Court entered a final order retaining MWE as bankruptcy and general corporate counsel for the Debtors. On or about September 13, 2005, after concluding that MWE's services were no longer in the best interests of these estates, the Debtors advised MWE that they had decided to replace MWE with Weil Gotshal & Manges LLP ("WG&M") as their primary bankruptcy counsel. On November 7, 2005, this Court entered a final order retaining WG&M as the Debtors' bankruptcy counsel and, to help facilitate the transition to new counsel, retaining MWE as special counsel to the Debtors pursuant to section 327(e) of the Bankruptcy Code.

6. On January 31, 2006, MWE filed the Fee Application in which MWE seeks fees of $2,227,979.50 and reimbursement of expenses of $104,314.28. The Fee Application covers a period of approximately 12 weeks.

7. The Committee filed an objection to the Fee Application on or about March 3, 2006 (the "Committee Objection").

8. On or about March 7, 2006, U.S. Trustee filed an objection to the Fee Application (the "UST Objection," and together with the Committee Objection, the "Objections").

9. MWE filed its response to the Objections on or about March 20, 2006 (the "Response").

10. The Court originally scheduled an evidentiary hearing on the Fee Application for June 5, 2006 (the "Evidentiary Hearing"). MWE, the Committee and the U.S. Trustee commenced discovery efforts in preparation for the Evidentiary Hearing while also engaging in settlement negotiations.

11.    MWE filed a motion on or about April 13, 2006, seeking the appoint-ment of a mediator to facilitate settlement discussions regarding the Fee Application, which, if successful, would have obviated the need to conduct the Evidentiary Hearing.

12.    The Committee filed a limited objection to the proposed mediation on or about April 21, 2006.

13.    The Debtors agreed to participate in the mediation to resolve disputes over MWE's Fee Application, provided the appointment of a mediator was approved by the Court. The Court approved a mediation process on April 27, 2006.

14.    The mediation, conducted by Bankruptcy Judge Stong, did not result in a settlement of the Objections, and the Evidentiary Hearing has now been rescheduled for October 23, 2006 at 9:30 a.m. The parties are proceeding with discovery.

15.    The Fee Application was originally filed as, and was intended to be, an "interim" application. Accordingly, the Debtors did not previously file a response or an objection to the Fee Application, intending instead to hold its comments on MWE's fees until the conclusion of these chapter 11 cases when the Court will be asked to consider, upon the record of the entire case, all professionals' fee applications on a final basis.[3] Because MWE has, among other things, recently renamed the Fee Application as its Final Fee Application, the Debtors are compelled to make their determination now as to the reasonableness of MWE's post-petition fees and the benefit of its services to them and their estates, although, for the reasons set forth below, the Debtors object to the recharacteriza-tion or treatment of MWE's Fee Application as a final application.

---

[3]    As noted below, not only is it generally accepted that, under sections 327, 330 and 331 of the Bankruptcy Code, all fees and expenses incurred are subject to review at a case's conclusion, but section 1129(a)(4) of the Bankruptcy Code requires that all fees paid by the Debtors in connection with the case be reviewed for reasonableness at the time of confirmation.

## FEE APPLICATION ISSUES/OBJECTIONS

16.     This response is limited to the Fee Application only.  The Debtors expressly reserve any and all of their rights to refine or supplement this Objection based on their on-going investigation and discovery and to assert any affirmative claims, of whatever nature, that they may have against MWE arising from or related to the pre-petition and post-petition services and advice provided by MWE.

17.     The Debtors submit that the compensation requested by MWE is not reasonable when measured by the services performed, the results (or lack of results) achieved by MWE, and the additional costs associated with the Debtors' replacement of MWE as lead bankruptcy counsel and the replacement of senior management months after the Petition Date.  For several of the reasons set forth in the Objections, as well as those articulated below, the Debtors submit that MWE's fees should be allowed in an amount substantially less than the amount requested.

18.     MWE's statement that it "achieved a smooth filing of these cases" (Fee App., ¶ 22) is clearly not a view shared by the Debtors and their major constituents. Indeed, beginning immediately prior to the Petition Date and up until MWE's replacement as lead counsel, the Debtors, the U.S. Trustee, the Committee, the Court and other major parties in interest had their attention diverted from the critical tasks of stabilizing and reorganizing the Debtors' business because of the issues (and frankly, the easily antici-pated issues) arising from the motions filed by the Debtors, necessarily on advice of MWE, to (i) assume a management agreement between the Debtors and Speltz & Weis LLC ("S&W"), the Debtors' restructuring managers, and (ii) retain Huron Consulting Group ("Huron") as the Debtors' financial advisors. The Debtors and their current senior management, led by their Chief Restructuring/Executive Officer Guy Sansone, believe

that MWE handled these matters poorly and created such a hostile environment that it adversely affected the Debtors and their estates.

19.    MWE's response to the Objections repeats, again and again, that at all times the firm acted at the Debtors' (its clients') direction. That response, of course, begs the critical question: what advice and counsel did MWE give the Debtors' management and the Board upon which those decisions were made? And particularly as to the S&W and Huron issues, what information and advice was provided to the Board by MWE, directly or through S&W, about the blatant conflicts that existed for S&W and Huron? On these critically important issues for which independent legal advice was unquestionably necessary, MWE's Response is glaringly silent.

20.    In any event, even if, in fact, MWE simply followed its clients' instructions as to certain of the more contentious and attention-diverting matters that dominated the cases at the Petition Date, the poor results achieved lead to only two possible conclusions: the advice was either poor, or it was non-existent. Neither justifies the compensation that MWE seeks.

21.    Moreover, it is clear that the changing of counsel, as well as the costs and expenses that have been incurred because of the conduct of prior counsel, have increased the legal expense borne by these estates. It is estimated that these costs, which include an expedited transition, immediate attention to certain time-sensitive and, in some instances, heavily-contested matters, and the cost and expense of having to diffuse the charged atmosphere that pervaded these cases in September 2005, are approximately $690,000 for the Debtors' replacement counsel, alone, and without accounting for

increased costs and expenses from other professionals employed in these cases.[4] The

Debtors concur with the Committee and the U.S. Trustee that the costs related to the

replacement of MWE as bankruptcy counsel, as well as certain other additional costs that

could have been avoided had a different, more productive course been charted, should be

borne in large part by MWE, not the Debtors' estates.

A.    **Speltz and Weis/Huron Consulting**

22.    Even before these cases were filed, the U.S. Trustee, upon her review

of draft first-day pleadings, expressed substantial concern about the conflict created by

Huron's acquisition of S&W on or about May 5, 2005, just two months prior to the Petition

Date.

23.    Nearly a year and a half prior to this acquisition, in January 2004, the

Debtors entered into an agreement with S&W (the "S&W Agreement") to provide

management services and develop and implement an out-of-court turnaround plan for

SVCMC. At the same time, the Debtors applied for approval from the Dormitory

Authority of the State of New York and the Federal Department of Housing and Urban

Development for approval to enter into the S&W Agreement; such approval was given in

April 2004. Pursuant to the S&W Agreement, SVCMC obtained the personal services of

(i) David Speltz, as Chief Executive Officer; (ii) Tim Weis, as Chief Financial Officer; and

(iii) Robert Fanning, as Chief Operating Officer for one year. The S&W Agreement also

contemplated that services would be provided by other S&W personnel and independent

contractors hired by them. The S&W Agreement was extended in January 2005 for an

additional six months. As of the Petition Date, in addition to the three restructuring

---

[4]    As noted above, the Debtors reserve the right, based upon further investigation and discovery, to amend
or supplement this response to refine both the amount of extra costs incurred in these cases and the acts
or omissions by MWE that support reducing the amount of MWE's fee request.

officers (Speltz, Weis and Fanning), there were approximately 44 S&W employees performing various functions for the Debtors. As of the Petition Date, the Debtors had paid S&W approximately $29 million for 18 months of work.

24.    In the fall of 2004, at the recommendation of S&W, the Debtors retained MWE to provide counsel on certain matters, including insolvency and a possible bankruptcy filing. Also in the fall of 2004, at MWE's recommendation, the Debtors engaged Huron as financial advisors. Messrs. Speltz and Weis, as well as MWE, directly supervised Huron's work.

25.    In January 2005, Messrs. Speltz and Weis and Huron commenced discussions about a possible acquisition of S&W by Huron. This was around the same time that SVCMC and S&W were discussing a six-month extension of the S&W Agreement until October 2005. Messrs. Speltz and Weis, however, did not disclose their discussions with Huron to the Board.

26.    Mr. Speltz advised MWE about the Huron acquisition in mid-April 2005, two weeks before advising the Board. Mr. Speltz advised the Board of the Huron transaction on the date it closed, May 5, 2005. Although it had been SVCMC's counsel for approximately half a year, MWE did not advise SVCMC's Board of S&W's acquisition by Huron before May 5, 2005, notwithstanding the blatant conflict that existed because the Debtors' chief executive officer was both (a) negotiating his own firm's acquisition by one of the Debtors' other professionals, Huron and (b) overseeing the work flow to, and compensation paid to, Huron. This conflict existed regardless of the terms of the compensation to be paid by Huron for S&W. But to make matters worse, the terms of the compensation in fact exacerbated the conflict: the amount of compensation to be paid to Speltz and Weis would be affected by the level of fees paid by the Debtors to Huron.

27.    The Board, upon learning of the transaction, immediately understood that the transaction had potential negative implications.  As a result, SVCMC immediately retained independent outside counsel to conduct an investigation and to make recommendations to the Board as to the propriety of the S&W/Huron transaction under SVCMC's internal policies and the S&W Agreement.  It is important to note that, while MWE had at least two weeks to consider the implications of the proposed S&W/Huron transaction and to recommend a course of action for the Debtors, it was the Debtors' in-house counsel who recommended and urged the retention of outside counsel to the Board.

28.    While as of the Petition Date outside counsel had not yet rendered his final report and recommendations to the Board, ultimately outside counsel concluded that the Huron/S&W transaction violated the Debtors' internal conflict of interest policy and was a breach of the S&W Agreement.

29.    Even though outside counsel had not completed the report, MWE was completely aware of the situation and knew or should have known, as a matter of bankruptcy law, of the serious conflict issues that would be raised and encountered upon the filing of the Chapter 11 cases as a result of the relationship between S&W and Huron and the role each was cast to play.  Clearly, these factors required full disclosure at the outset of these cases of, at least, the full nature of the S&W/Huron relationship, the terms of the acquisition transaction, and the impact of that relationship and acquisition on the Chapter 11 retentions themselves.  As a matter of bankruptcy law, the fact that the Debtors' officers held a financial interest in the Debtors' outside financial advisors which they supervised raised serious questions about whether these retentions were appropriate.  These conflict issues are neither unique nor novel in connection with a Chapter 11 case.  Every debtor's counsel is sensitive to the need to analyze and disclose relationships that could negatively impact a professional's independence and disinterestedness.  Yet, the

10

conflict and disinterestedness questions raised by the S&W/Huron relationship were largely ignored by MWE. The applications and supporting affidavits prepared by MWE for the S&W and Huron retentions did not provide anywhere near the information and disclosure that they should have in light of the seriousness of the conflicts.

30.    Concurrently with the Chapter 11 filing, MWE sent a "first day" binder to the U.S. Trustee, which included the proposed S&W and Huron retention applications. The U.S. Trustee immediately expressed her concerns about these applications and advised MWE that, among other things, the retention of S&W and Huron violated the so-called "Jay Alix Protocol."[5] The U.S. Trustee and (upon its appointment) the Committee advised that each would object to the retentions of S&W and Huron, and seek the appointment of an independent chief restructuring officer as a result of the Debtors' intent to continue to rely on S&W and Huron, now affiliated entities, to provide interim management and financial advisory services.

31.    Several weeks of contentious discussions, meetings and letter exchanges followed. At one point, the U.S. Trustee advised that she was prepared to move for the appointment of a Chapter 11 trustee if the issue concerning the Debtors' management was not promptly resolved. Rather than trying to work with the U.S. Trustee and the Committee to reach an agreement over the most effective way to address and resolve these issues involving the Debtors' ability to remain in possession and manage their properties, MWE simply reiterated the position that the Jay Alix Protocol was not binding in this

---

[5]    The Jay Alix Protocol reflects an agreement reached between the U.S. Trustee for the District of Delaware and Jay Alix & Associates in the Safety-Kleen Corp. bankruptcy case intended to regulate the role of financial advisors, who at times both act as financial advisors and crisis managers, in a single case. The agreement recognizes, among other things, that, because there is an inherent conflict between an advisor's duties to a debtor and its own business venture when an advisory firm and its affiliates try to serve as both a financial advisor retained under section 327 of the Bankruptcy Code and a crisis manager (where its staff serve as corporate officers) in a single bankruptcy case, an advisory firm cannot do both. The Debtors' efforts to retain S&W as corporate officers and S&W's parent Huron as their financial advisor clearly violated the terms of the Jay Alix Protocol.

11

district; this allowed S&W and Huron to continue to provide interim management and financial advise to the Debtors.

32.    Even though the Debtors were not in a position to terminate the services of S&W and/or Huron immediately,[6] the inability of MWE to build a consensus approach to balance the Debtors' critical continued need for S&W and Huron, coupled with MWE's insistence that the Jay Alix Protocol should simply be ignored, created a completely adversarial atmosphere between the Debtors on the one hand, and the U.S. Trustee, Committee and certain of the Debtors' major creditors on the other.  While these disputes were raging during the first six weeks of the case, it appears that MWE did not impress upon the Board, until mid to late August, the strength of the U.S. Trustee and the Committee's objections or their resolve: "… on or about August 24, 2005, McDermott expressed to the Debtors' Executive Committee and Board of Directors concerns that had been articulated by the Committee and the U.S. Trustee regarding Speltz and Weis, which concerns resulted in the resignation and replacement of Messrs. Speltz and Weis" (Fee App., ¶ 48).[7]

33.    By this time in the case, however, the damage from taking an unwavering, contentious and non-negotiable position on the retention of S&W and Huron had been done.  The focus of the case was on S&W, not on SVCMC's restructuring, and as a result nearly everything in the case became a fight – both in and out of Court and whether appropriately adversarial so or not.  It became clear to the Debtors that, for the

---

[6]    As noted above, approximately 44 S&W employees filled critical middle management positions at the Debtors on the Petition Date.  The premature departure of these individuals from SVCMC would have been disastrous to the Debtors' ability to operate their business and provide first-rate medical care to its patients.

[7]    According to the MWE Fee Application, it expended approximately $140,000 in fees concerning the S&W and Huron retention issues.

good of the case and SVCMC's reorganization, management had to go.  Messrs. Speltz and Weis tendered their resignations on August 24.

34.    It also started to become clear to the then interim CEO and former Chairman of the Board (who stepped in to take over from Mr. Speltz) and the Board that MWE had lost the confidence of Court and the Debtors' major constituents and that MWE's ability to advance the Debtors' cases was impaired.  The comments made by Judge Beatty at the hearing to consider the Debtors' motion to close St. Mary's Hospital held on September 7, 2005 drove home this conclusion:

- The hospital doesn't operate on a disclosure basis.

- The St. Mary's situation has been handled as poorly as one can handle it.

- Everything that they possibly could have done wrong in this case so far they have succeeded in doing.

35.    MWE was replaced by WG&M in mid-September 2005.

36.    As noted in paragraph 32 and footnote 6, however, the termination of S&W and MWE did not obviate the business reality that, because S&W relied on so many of its own former (but now Huron) employees and Huron's employees to provide essential business functions at the Debtors, the Debtors could not have these employees leave their positions abruptly if the Debtors wanted to continue to operate.  As a result, WG&M was required – once retained – to work with the U.S. Trustee, the Committee and Huron to construct a way for these people to continue to provide needed services to this estate, notwithstanding continuing objections to Huron's involvement in the case based upon the S&W/Huron transaction and the subsequent departure of Messrs. Speltz and Weis.  Doing so required WG&M to understand certain aspects of S&W's prior retention, Huron's prior and proposed retention, and certain aspects of the S&W/Huron transaction, as well as the Debtors' current and critical needs.  Ultimately, a compromise was reached

that permitted many former S&W employees and Huron employees to stay on the job at SVCMC providing essential services for the Debtors' operations and reorganization. WG&M's fees for these efforts were approximately $98,000.

**B.**    **Transition**

37.    WG&M unquestionably has charged time to these estates that reflect "getting up to speed," relearning things about the Debtors and their operations that MWE had already learned, and learning things about what MWE and others necessarily already had done (or should have done) in these cases. Although some of this time was spent meeting directly with MWE and arranging for the transfer of documents and other materials from MWE to WG&M, some of this time also was spent reviewing and analyzing pleadings, the Debtors' debt structure and related documents, documents related to the Debtors' governance and corporate structure and the like, and effectively interviewing the Debtors' management and other professionals about the case, the Debtors' businesses and their operational and financial needs. In addition, as a necessary part of this transition, the Debtors incurred fees for obtaining court approval to retain WG&M. In total, approximately $120,000 in fees were incurred in these transition and retention matters.

**C.**    **St. Mary's Closure**

38.    In the Fee Application, MWE seeks payment of $97,115.75 for services rendered to obtain Court approval to close St. Mary's Hospital, and sale of the hospital. Both the U.S. Trustee and the Committee have objected to these fees, *inter alia,* because they allege that MWE unnecessarily delayed starting the process of obtaining Court approval of the closure of St. Mary's, which would have enabled SVCMC to implement the closure plan more promptly after receiving NY DOH approval on August 31, 2005. Instead, because Court approval was not obtained until September 20 (by WG&M, <u>not</u>

14

MWE), the Debtors incurred significant additional carrying costs of not less than $1.5 million.

39.    MWE's handling of the Debtors' request to close St. Mary's illustrates the negative impact of its management of these cases. The Court held two hearings related to the St. Mary's closure with MWE at the helm. The first, held on August 23, 2005, involved the Debtors' adversary proceeding against an elderly and indigent individual, Harriett McCloud. Ms. McCloud had initiated a state-court action seeking a declaration that the closure requirements under New York law had not been followed and thus the State of New York could not authorize the closure of St. Mary's. MWE filed a lawsuit against Ms. McCloud in the bankruptcy court seeking a determination that her state court action violated the automatic stay of section 362(a) of the Bankruptcy Code, an order effectively stopping the state court action, and damages against this elderly and poor individual. Although the Court found that the state court action violated the automatic stay of section 362(a), it expressed substantial concern over the way that MWE and the Debtors had handled the proposed closure of St. Mary's.

40.    The second hearing was held on September 7, 2005. At this hearing, the Court expressed the same concerns about closing St. Mary's, and refused to authorize the closing of the hospital, notwithstanding the dire and compelling business need. A review of the transcripts of those hearings as well as the documents prepared and submitted by MWE to support the requested closure, suggest that MWE was not fully prepared to press forward to seek Court approval. There were no affidavits or declarations from the Debtors' management and financial advisors to establish the business need for closing St. Mary's or that the Debtors' Board had exercised business judgment in reaching its decision to authorize the closing of St. Mary's, both fundamental points that had to be established to support the Court entering an order authorizing this hospital to

15

close. Similarly, it does not appear that MWE was prepared to offer witnesses at the September 7 hearing.[8] It also appears that MWE had done little before either of these hearings to address or manage the community's opposition to the closure of St. Mary's or the varied community-based proposals that (even if not feasible) were being put forth to stave off the closure, even though it appears that this failure was precisely what concerned the Court at the hearing on August 23, 2005.

   41.   In contrast, in the one week prior to the September 20 hearing where WG&M obtained approval to close St. Mary's (again, WG&M was retained only on September 13), WG&M, *inter alia*, prepared and submitted the following: (a) the Declaration of Dawn Gideon, Executive Director of St. Vincent's Hospital, Staten Island and Bayley Seton Hospital and the Interim Chief Restructuring Officer of SVCMC, (b) the Declaration of Sr. Jane Iannucelli, a member of SVCMC's Board, and (c) the Declaration of Thomas M. Barry, Managing Director of Cain Brothers & Company, LLC, the Debtors' investment bankers. In addition, WG&M, together with Cain Brothers, encouraged community groups with alternatives to closing St. Mary's to come forward, memorialize their proposals and meet with the Debtors about those proposals. One such group responded and the Debtors evaluated the proposal and met with the proponents of this alternative. Although the Debtors concluded that the alternative proposal was not feasible, as a result of the process undertaken, the Debtors were able to present a full explanation supporting their request to close St. Mary's, encompassing both their business judgment to close the hospital and their business judgment evaluating the only presented alternative.

---

[8]  It appears from a review of MWE's time records that the firm did not spend time either preparing evidentiary affidavits, or witnesses to testify in support of the closure.

42.    The Debtors agree with the Committee that the additional legal costs incurred in obtaining approval to close St. Mary's, as well as the extended losses suffered as a result of the delay in obtaining Court authority, should be borne, in part, by MWE.[9] WG&M's fees in connection with the closure of St. Mary's approximated $230,000.

**D.    The CRO Selection Process**

43.    Given the acquisition of S&W by Huron, the need to change management and/or the need to manage the issue of management in these Chapter 11 cases carefully, proactively and cautiously to build consensus should have been clear to MWE from before, or at least as of, the Petition Date.  The U.S. Trustee and the Committee both lodged substantive objections to the retention of S&W and Huron immediately upon learning of their relationship.

44.    As noted above, however, MWE charted a very different course for these Debtors.

45.    As a result, once the Debtors replaced MWE and agreed to a further change in management, the process to identify and hire an interim chief restructuring/executive officer and chief financial officer was necessarily more cumbersome and more expensive than the typical search process for an interim chief restructuring/executive officer.  The Debtors and their new counsel were required – because the Debtors lacked the confidence of the Committee, the U.S. Trustee and other major constituents – to include other constituents not only in the search process but also in the process of establishing the job description for the chief restructuring/executive officer, both in ways not typical of

---

[9]    The Debtors obtained approval of the closure plan on August 31, 2005 from DOH, but were not able to implement the plan until it was approved by the Bankruptcy Court.  *See In re Cenargo International, PLC,* 294 B.R. 571, 604-5 (Bankr. S.D.N.Y. 2003), where Judge Drain held, *inter alia,* that fees for debtor's counsel would be reduced by an amount attributable to the reasonably foreseeable confusion and disruption caused by the firm's strategic decision not to pursue certain relief for the debtor, where the decision resulted in two possible costs to the debtor's estate.

17

many cases. Although the Debtors believe (and sincerely hope) that the collaborative

effort to identify and hire the Debtors' chief restructuring / executive officer and chief

financial officer was an important step to re-building trust and the ability to work

cooperatively in the reorganization process, it seems clear that costs of this collaborative

effort in terms of the Debtors' legal expenses (approximately $240,000 in September and

October alone) exceeded the costs typically associated with identifying and obtaining

court approval for the retention of interim chief restructuring and financial officers during

the course of a case.[10]

**E.    Fee Guidelines Issues/ US Trustee**

46.    The Debtors also have conducted their own review of the time records

underlying the Fee Application and have found many of them to be too vague as to

determine whether the time expended was reasonable. MWE's entries in "DIP Financing,"

Project Category #20, are particularly illustrative and the Debtors have focused on this

project category because it is MWE's largest both in hours expended – 945.6 – and fees

requested -- $435,590.50. See Fee Application at Ex. B. From this analysis, the Debtors

have identified two primary areas of concerns regarding (i) lack of detail and (ii) incorrect

billing.

- Overall lack of detail. Throughout the DIP Financing category, MWE's personnel often use the term "DIP Financing" generically, thereby leaving it difficult to tell whether the services rendered relate to the initial DIP financing motion, objections to DIP financing, the interim or final DIP orders, negotiations for alternative or replacement DIP deals or the cash collateral request.[11] Other entries regarding, for example, the preparation of schedules, the

---

[10]  Since MWE was replaced as bankruptcy counsel, the Debtors and other major constituents must acknowledge that the communication between the Debtors and such parties has vastly improved.

[11]  For example, an MWE associate billed more than 80 hours to issues regarding the interim DIP order, including approximately 42 hours for drafting a reply to objections to "DIP Financing".

> investigations of liens, and multiple team and client
> meetings make it difficult to determine to what aspect
> of "DIP Financing" these services may relate.

- **Improperly billed entries.** The DIP Financing Project
  category contains several entries regarding the Cherry
  Creek Lease, the SSI agreement, the Aramark
  agreement, the motion to pay construction liens, and
  the Notice of Commencement. These entries
  aggregate to at least 15 hours. Similar examples
  appear in other project categories.

47.     In this example, it is difficult or impossible to determine, after

reviewing the time entries, to which aspect of DIP Financing many services were billed,

whether the amount of time billed to such services was appropriate and whether the

Debtors benefited from such services.

48.     In effect, MWE's time entries require parties in interest to read all the

time entries in every "Project Category" to be able to understand the entire scope of

services devoted to a particular "Project Category." This makes reviewing the Fee

Application unduly burdensome and impairs the ability of the Debtors to make a

reasonable evaluation as to the validity of MWE's fees.[12]

**G.     The Fee Application Should Remain Subject to Final**
**        Review and Approval At the Conclusion of These Cases**

49.     In a typical Chapter 11 case, all professional fees are subject to final

review in connection with confirmation of a plan of reorganization. This practice flows

directly from the Bankruptcy Code itself: Section 327 of the Bankruptcy Code authorizes

the retention of professionals such as attorneys. Section 330 of the Bankruptcy Code

provides for the payment to professionals, but specifically proscribes (i) that fees should be

---

[12]  The Debtors note that in its Reply, MWE has advised that it intends to amend entries prior to the hearing
on its Application. See Reply at 17. Absent further amendment of the time entries, the Debtors are not in
a position to determine whether MWE failed to delegate tasks appropriately, as the U.S. Trustee has
suggested in her objection. The Debtors do observe that MWE partners billed nearly 50% of the firm's
aggregate time during the relevant period.

reviewed based on a review of, among other things, whether the "services were . . . beneficial at the time at which the service was rendered toward the *completion*" of the case (emphasis added), (ii) that a final award should account of any interim payment of fees, and (iii) that amounts paid as interim compensation must be repaid if those payments exceed the final award. Section 331 authorizes the interim payment of fees before the conclusion of a case. And section 1129(a)(4) makes it a condition to confirmation that fees incurred by a debtor be reasonable. There is no way to harmonize these various sections of the Bankruptcy Code unless all fee awards are subject to final review for reasonableness at the conclusion of a case, where the overall results of a case can be assessed.

50.    MWE has sought to avoid scrutiny of its fees at the conclusion of these cases by re-naming its originally filed "interim" fee application a "final" fee application and seeking a determination of the "reasonable" amount of its fees and expenses now – before a plan of reorganization has even been filed for the Debtors.

51.    MWE should not be permitted to obtain a final review of its fees and expenses before the final results of these cases are known. Until then, while it is possible to consider certain factors contributing to whether MWE's fees were "reasonable," it is not possible to assess the amount of MWE's fees in terms of the ultimate results in these cases. Moreover, until those results are finally known, the full impact of MWE's conduct cannot be evaluated.

52.    Accordingly, the Fee Application should be treated as an interim application. This is particularly true here where questions of possible affirmative claims against MWE have been raised. Other courts have held that a final order approving fees in a bankruptcy case can have preclusive effect on a subsequent effort to assert affirmative claims against a debtor's counsel. Because the investigation into MWE's conduct is in its initial phase, and the ultimate results of these cases are unknown, the Debtors should not

be required to accelerate their analysis and decide now whether potential affirmative claims exist against MWE to protect against the possible preclusive effect that any final order entered on MWE's fees may have on such claims. (The Debtors do not concede that a final order would have a preclusive effect, but they also think that it is unnecessary to expend resources to decide this issue prematurely, where ruling on the Fee Application on an interim basis subject to final review would adequately address this concern on a current basis.)

## CONCLUSION

53.    Based on the foregoing, any fees awarded to MWE on the basis of the Fee Application should be reduced substantially.  Moreover, any reduced fees awarded should be awarded only on an interim basis, notwithstanding the re-naming of the originally "interim" Fee Application as a "final" Fee Application.  Subjecting MWE's fees to final review is consistent with the Bankruptcy Code and particularly important in this case to permit MWE's fees to be evaluated based on the results and outcome of the Chapter 11 case are known.

**[concluded on the following page]**

21

**WHEREFORE**, the Debtors respectfully request that the Court substantially reduce the fees requested by MWE and grant such other and further relief as this Court deems just and proper.

DATED: New York, New York
      July 31, 2006

                        SAINT VINCENTS CATHOLIC MEDICAL
                        CENTERS OF NEW YORK d/b/a SAINT
                        VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,
                        the Debtors and Debtors-in-Possession,
                        By its Conflicts Counsel,
                        TOGUT, SEGAL & SEGAL LLP
                        By:

                        /s/ Frank A. Oswald
                        ALBERT TOGUT (AT-9759)
                        FRANK A. OSWALD (FAO-1223)
                        Members of the Firm
                        One Penn Plaza, Suite 3335
                        New York, New York  10119
                        (212) 594-5000

# Exhibit I

Page 1

1

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4

5    ------------------------------------------X

     In re

6

     SAINT VINCENT'S CATHOLIC MEDICAL          Chapter 11

7    CENTERS OF NEW YORK d/b/a SAINT           Case 05-14945

     VINCENT CATHOLIC MEDICAL CENTERS,            (ASH)

8    et al.,

9                      Debtors.

     ------------------------------------------X

10

11

12            *   C O N F I D E N T I A L   *

13       *   U N D E R   P R O T E C T I V E   O R D E R   *

14

15            DEPOSITION OF WILLIAM P. SMITH

16                  New York, New York

17             Tuesday, September 26, 2006

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CSR, RPR

25   JOB NO. 8584

Page 10

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   act as financial advisor to the bondholders in a
3   busted de-inker in Worcester, Mass.
4       Q.   In a busted what?
5       A.   De-inking plant.
6       Q.   Oh, de-inker.
7       A.   D-e dash i-n-k-e-r, de-inker.
8       Q.   Got it.
9            Was that the only time that you
10  worked with Mr. Allison or any of the
11  professionals of Huron prior to Saint Vincent's?
12      A.   It's the only time I retained
13  Mr. Allison.  I had been across from Mr. Allison
14  several times.
15      Q.   Had Mr. Allison, in the course of
16  advising any company, recommended to that
17  company that it retain you or McDermott Will &
18  Emery to provide professional legal advice?
19      A.   He had none and to my knowledge he
20  never has.
21      Q.   Prior to Saint Vincent's, had you or
22  anybody at McDermott Will, to your knowledge,
23  ever done any work with Speltz & Weis LLC or
24  David Speltz and Tim Weis individually?
25      A.   Employing them or being across the

TSG Reporting - Worldwide       877-702-9580

Page 11

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   table from them?
3       Q.   Well, let's talk about on the same
4   side of the table first.
5            Had you ever worked with them
6   representing or advising the same company?
7       A.   I worked with Tim Weis on one
8   occasion advising a for-hospital, health system
9   outside of Boston where Tim was the CFO.
10      Q.   Was Tim Weis the CFO prior to your
11  involvement with that hospital system?
12      A.   I think so.
13      Q.   Do you know if Mr. Weis recommended
14  that the hospital system retain you?
15      A.   I'm sure he was asked his view, but
16  it was a pitch among a bunch of counsel.
17      Q.   Had you done any work on the same
18  side of the table with David Speltz prior to
19  Saint Vincent's?
20      A.   No, sir.
21      Q.   But it's fair to say that when you
22  came into Saint Vincent's in the fall of 2004,
23  you were familiar with the firm Speltz & Weis
24  LLC?
25           MR. COOK:  Objection.

TSG Reporting - Worldwide       877-702-9580

Page 12

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2       A.   Well, I actually came into Saint
3   Vincent's before them, but yes, I was familiar
4   with the firm Speltz & Weis LLC.
5       Q.   When did you first come into Saint
6   Vincent's?
7       A.   June '04.  Something like that.
8       Q.   And David Speltz and Tim Weis were
9   already on as the CEO and CFO respectfully,
10  correct?
11      A.   Correct.
12      Q.   And at that time was Huron a
13  consultant to Saint Vincent's?
14      A.   No, sir.
15      Q.   Do you know who recommended to the
16  board of Saint Vincent's that it retain Huron as
17  a consultant?
18      A.   In what role?
19      Q.   Was it retained in more than one
20  role?
21      A.   Yes, sir.
22      Q.   What role was it retained in?
23      A.   My understanding is it was initially
24  retained by Speltz & Weis for revenue cycle
25  work, Mukesh Gangwal's operation.

TSG Reporting - Worldwide       877-702-9580

Page 13

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2       Q.   I'm sorry.  What was that?
3       A.   Mukesh, M-u-k-e-s-h, Gangwal,
4   G-a-n-g-w-a-l.
5       Q.   Is that a person?
6       A.   Yes, sir.
7       Q.   With Huron?
8       A.   Yes, sir.
9            Check the website.  He's in charge of
10  the health care practice.
11      Q.   But I'm not deposing him so I don't
12  need to check his website, but thanks for the
13  pointer.
14           MR. MAGALIFF:  Can you read back the
15  last question?
16           (Question was read back as follows:
17           "QUESTION:  What role was it retained
18  in?")
19           MR. MAGALIFF:  And the answer was?
20           (Answer was read back as follows:
21           "ANSWER:  My understanding is it was
22  initially retained by Speltz & Weis for
23  revenue cycle work, Mukesh Gangwal's
24  operation.")
25  BY MR. MAGALIFF:

TSG Reporting - Worldwide       877-702-9580

4

Page 14

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      Q.   To your knowledge, at some point did
3  Huron's role change or expand?
4      A.   Yes.  In September of '04 when we
5  were asked to do Chapter 11 preparation for
6  cautionary. I advised David and Tim that we
7  would need someone to act in a financial
8  advisory capacity.  There were a number of firms
9  who could do that, one of which was Huron.
10     Q.   Did you recommend any firm other than
11 Huron or suggest any other firms?
12     A.   Sure.
13     Q.   Who were some of those firms?
14     A.   The -- it's a question of point in
15 time.  When the accounting firms split apart
16 their consultancy operations after the Worldcom,
17 Enron scandals, their professionals went in
18 different directions and formed alliances at
19 different times.
20          So, for example, the Arthur Andersen
21 people went into two or three different
22 consulting firms.
23          The people I would have recommended
24 were Tom Allison or Jim Feltman, both from
25 Arthur Andersen.  And at that point Allison was

TSG Reporting - Worldwide        877-702-9580

Page 15

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  with Huron, Feltman I believe may have been with
3  KPMG, he may have been with Mesirow.  They moved
4  around a bunch.
5      Q.   Had you worked with all three of
6  those people who you've just named at various
7  points in your career other than Mr. Allison?
8      A.   No, sir.
9      Q.   Do you know if Saint Vincent's or
10 Mr. Speltz or Mr. Weis interviewed any firms
11 other than Huron to provide the required
12 services?
13     A.   I don't know.
14     Q.   If you know, who recommended that
15 McDermott Will & Emery be hired by Saint
16 Vincent's to provide the advice that it was
17 hired to give?
18     A.   My understanding is that both
19 McDermott and Weil were on the payroll.  It was
20 David Speltz who recommended to the board that
21 McDermott be retained rather than Weil for this
22 particular job.
23     Q.   Do you know why Mr. Speltz made that
24 recommendation?
25     A.   My understanding is I have a history

TSG Reporting - Worldwide        877-702-9580

Page 16

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  of keeping companies out of Chapter 11 rather
3  than putting them in and that was a sales point
4  to the board.
5      Q.   But prior to that time you had never
6  worked with Mr. Speltz, right?
7      A.   On the same side of the table, that's
8  correct.
9      Q.   You'd been across from him on at
10 least one occasion?
11     A.   I have been across from him a bunch
12 of times.
13     Q.   So you knew each other prior to the
14 Saint Vincent's engagement --
15     A.   Oh, yes.
16     Q.   -- in a professional capacity?
17     A.   Yes, sir.
18     Q.   Did you ever socialize outside of the
19 professional environment; golf, dinner or
20 anything like that?
21     A.   No, sir.
22     Q.   You didn't run in the same social
23 circles at all?
24     A.   Well, he lives in New Hampshire and I
25 live in Chicago.

TSG Reporting - Worldwide        877-702-9580

Page 17

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2          We would have lunch at some airport
3  cafeteria when we were on a job together.
4          The last job we'd been on was Crouse
5  Hospital in Syracuse and so I'm sure we broke
6  bread at least at Hancock County Airport,
7      Q.   So it would be more like an
8  intersecting social circle, right?
9      A.   Yes, sir.
10     Q.   Did you sign an engagement letter
11 with Saint Vincent's?
12     A.   Yes, sir.
13     Q.   Do you recall who signed the
14 engagement letter on behalf of Saint Vincent's?
15     A.   Probably David Speltz.
16     Q.   In his capacity as CEO?
17     A.   Yes, sir.
18     Q.   In general terms, to whom did you
19 report at Saint Vincent's?
20     A.   David Speltz.
21     Q.   Anybody else?
22     A.   There was a cadre of senior people
23 who would act in effect as a management
24 committee.  That included David Speltz, Tim
25 Weis, Tom Allison was retained, Jim Woods, Dawn

TSG Reporting - Worldwide        877-702-9580

5

Page 18

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
1
2   Gideon, Bernadette Kingham-Bez, Elizabeth
3   St. Clair, and then depending on the issue, the
4   operating heads, Pat Wardell, Fitzsimmons and
5   the rest.
6       Q.   David Speltz and Tim Weis were
7   officers of Saint Vincent's during the course of
8   McDermott's engagement at least up through
9   August 24th, 2005; is that correct?
10      A.   That is correct, sir.
11      Q.   What about Dawn Gideon; was she an
12  officer of Saint Vincent's?
13      A.   She was head of -- I believe so. She
14  was executive director of Saint Vincent's Staten
15  Island and on August 24, 2005 was appointed the
16  interim CRO.
17      Q.   And Elizabeth St. Clair, is she an
18  officer of Saint Vincent's?
19      A.   Yes.
20      Q.   What about Bernadette Kingham-Bez?
21      A.   Yes.
22      Q.   What about Tom Allison?
23      A.   No.
24          Well, Mr. Allison became the interim
25  CFO on August 24, 2005.

Page 19

1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2       Q.   Prior to that time was he an officer
3   of Saint Vincent's?
4       A.   No, sir.
5       Q.   And what about Jim Woods; was he an
6   officer of Saint Vincent's?
7       A.   I believe he carried the title VP
8   real estate. Whether that is considered an
9   officer of Saint Vincent's or not, I don't know.
10  He was a Speltz & Weis employee and he may have
11  been one of the loan executives.
12      Q.   And what about Dawn Gideon, was she
13  employed by the hospital or was she employed by
14  the Speltz & Weis and Huron?
15      A.   She was a Speltz & Weis employee who
16  I suspect carried a title at Saint Vincent's
17  Staten Island.
18      Q.   Other than the people you've named,
19  Mr. Speltz, Mr. Weis, Ms. Gideon, Ms. St. Clair,
20  Ms. Kingham-Bez, Mr. Allison and Mr. Woods, is
21  there anybody else at Saint Vincent's that you
22  regularly reported to during your tenure as
23  counsel?
24      A.   Well, when called, I reported to Dick
25  Boyle as chairman of the board up to August 24

Page 20

1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   and as interim -- 2005, and as interim CEO from
3   August 24, the 2005 until I was invited to
4   leave.
5       Q.   Was Mr. Boyle the chairman of the
6   board in June 2004 when McDermott was first
7   retained?
8       A.   Yes, sir.
9       Q.   So throughout your entire tenure as
10  counsel to the hospital, Mr. Boyle was the
11  chairman of the board?
12      A.   No. On August 24, 2005, Ed Lebay
13  became chairman of the board and he was chairman
14  until we departed.
15      Q.   I believe you testified that you
16  regularly reported to Mr. Speltz as the CEO.
17          Other than by invitation to attend
18  board meetings, what was the frequency of your
19  communication with Mr. Boyle?
20      A.   Prior to August 24 or --
21      Q.   Prior to August 24.
22      A.   Extremely infrequent. Principally
23  when he had a question of me or wanted to give a
24  direction to me.
25      Q.   Is there any other board member that

Page 21

1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   you can identify with whom you had regular
3   contact prior to August 24, 2005?
4       A.   Other than in the board meetings?
5       Q.   Yes, other than in the board
6   meetings.
7       A.   I had sporadic contact with Sister
8   Jane Iannucelli, I-a-n-n-u-c-e-l-l-i, and Alan
9   Bernikow.
10      Q.   Did Mr. Bernikow an appointed title
11  on the board to your knowledge?
12      A.   Mr. Bernikow was on the finance
13  committee. Whether he chaired that or not I
14  don't know, but you refreshed my recollection.
15  I also periodically dealt with Bishop Sullivan,
16  Father Frawley and Mark Blane.
17      Q.   Mark Blane?
18      A.   Yes, sir.
19          Mark Blane is on the finance
20  committee. He's CEO of Fidelis.
21          Father Frawley is a priest who
22  replaced Bishop Sullivan as the representative
23  on the board of Bishop DiMarzio.
24      Q.   Is it fair to say, then, that when
25  McDermott refers in the various pleadings that

6

## Page 22

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  we're going to be considering as senior
3  management of the hospital, you're referring
4  primarily to Mr. Speltz and Mr. Weis?
5      A.  It would vary in that context, but
6  it's fair to say more likely than not it would
7  be Speltz & Weis, certainly prior to August 24,
8  2005.
9      Q.  What happened on August 24th, 2005
10 with respect to Mr. Speltz and Mr. Weis?
11     A.  There was a convened executive
12 committee meeting of the board of directors to
13 which all trustees and directors were invited
14 and most attended.  It was held by conference
15 call since Dick Boyle was in Spain on a golf
16 boondoggle.
17         The purpose for the meeting was for
18 me to report to the board, the executive
19 committee, the substance of the most recent
20 conversations I'd had with Deirdre Martini as
21 United States trustee and Martin Bunin as the
22 Creditors Committee counsel.
23     Q.  Do you know who Mark Googins is?
24     A.  He's a lawyer with Verrill & Dana in
25 Portsmouth, Maine.

TSG Reporting - Worldwide     877-702-9580

## Page 23

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      Q.  Do you know what, if any, involvement
3  he had with Saint Vincent's?
4      A.  Mark represented Speltz & Weis in the
5  negotiation of their initial contract with Saint
6  Vincent's and I believe he represented Speltz &
7  Weis in the sale of their company to Huron.
8      Q.  But he had nothing to do directly
9  with the hospital, right?  He didn't represent
10 the hospital at all?
11     A.  As far as I know he did not.  I think
12 the hospital paid his invoice for the
13 representation of Speltz & Weis in the initial
14 contract negotiations, but I'm not aware that he
15 ever acted as counsel to Saint Vincent's.
16     Q.  Let's talk a little bit about the
17 bankruptcy planning.
18         You were the lead lawyer for
19 McDermott Will in the engagement?
20     A.  Yes, sir.
21     Q.  Who else from your firm played a
22 significant role in advising Saint Vincent's on
23 a possible bankruptcy filing?
24     A.  I established two major lines of
25 responsibility; one went through Steve Selbst,

TSG Reporting - Worldwide     877-702-9580

## Page 24

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  who is head of our bankruptcy practice here in
3  New York, and the other is David Cleary, who was
4  an income partner in the Chicago office.
5          Mr. Selbst was to be in charge of
6  debt, the relationships with the court and the
7  U.S. Trustee and other projects as they came up.
8          Mr. Cleary's principal responsibility
9  was line advice on a daily basis to Saint
10 Vincent's, interaction with the health lawyer we
11 had assigned to Saint Vincent's and preparation
12 of the first day pleadings.
13         Each of them had teams in turn who
14 reported to them.
15     Q.  Who worked on Mr. Selbst's team?
16     A.  That's easy for you to say.
17         Mr. Selbst's team included I believe
18 James Sullivan, Gary Ravert, Nava Hazan and Abby
19 Beal, all in our New York office, and he also
20 used Cathy Scheineson in the Washington office
21 and Eric Rhymer, who co-offices in New York and
22 Los Angeles, and Scott Kaye in Los Angeles.
23         Kaye and Rhymer were principally
24 charged with DIP documentation negotiation, and
25 Scheineson was principally charged with debt

TSG Reporting - Worldwide     877-702-9580

## Page 25

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  analysis as part of the project.
3      Q.  And within Mr. Selbst's team, was
4  anybody tasked with asset sales or asset
5  liquidations?
6      A.  Probably and I'm guessing that that
7  would be James Sullivan.
8      Q.  What else was Mr. Sullivan
9  responsible for, if you know?
10     A.  I don't know what he was responsible
11 for as part of the preparation.
12         In the case itself he was principally
13 responsible for the negotiation on DIP and cash
14 collateral transactions relating to debt other
15 than the DASNY issued and HUD insured debt.
16     Q.  What about Mr. Ravert, what was he
17 responsible for during the case?
18     A.  During the case I think it was
19 principally his job to make sure that the
20 paperwork moved in and out of the court; that we
21 contacted the judge's office for hearing dates;
22 that we were supplying the information to the
23 U.S. Trustee, to the court and to the committee
24 professional, at least the lawyers; that they
25 were requesting.

TSG Reporting - Worldwide     877-702-9580

Page 26

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

2    Q.  And prior to the Chapter 11 filing,

3  what was Mr. Ravert's role?

4    A.  I don't have a precise recollection.

5    Q.  Now you said Mr. Cleary was

6  responsible for day-to-day line advice to the

7  client.

8      What does that mean?

9    A.  Saint Vincent's is the -- as it

10  exists today, is the product of three different

11  systems which came together in a rather

12  haphazard fashion in 2000.

13      When we began work, it was apparent

14  that Saint Vincent's had never integrated in

15  many of the senior management functions, not the

16  least of which was the law department.  That's

17  not for lack of effort on the part of Elizabeth

18  St. Clair who was in charge, but the different

19  hospitals acted in somewhat parochial fashion

20  and were reluctant to give her access to their

21  contracts.

22    Q.  I take it that's parochial in the

23  non-Catholic sense.

24    A.  Yes, sir.

25      She also was badly understaffed for a

TSG Reporting - Worldwide    877-702-9580

Page 27

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

2  project of this magnitude.

3      As a result, from early -- mid to

4  late March or possibly early April, I don't

5  recall precisely when, we assigned two lawyers

6  to her three days a week each.  David Ivel is an

7  income partner in our health law department and

8  he was there on Mondays, Wednesdays and Fridays

9  on 33rd Street to respond to any questions Saint

10  Vincent's might have with respect to health

11  regulatory and general health law issues, and

12  David Cleary was on site Tuesday, Wednesday and

13  Thursday of each week to answer bankruptcy

14  related questions and to help gather information

15  and parse through what was and was not

16  important, and how to react to different

17  constituents as they would contact the debtor.

18    Q.  You used the term "income partner"

19  twice; once for Mr. Cleary and once for

20  Mr. Ivel.

21      What does that mean?

22    A.  McDermott is a two-tiered

23  partnership.  After five years, an associate is

24  elected to what we refer to as income

25  partnership, which is a, not a partner in a

TSG Reporting - Worldwide    877-702-9580

Page 28

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

2  legal sense, but shares in the profits as part

3  of the compensation.

4      When that person has developed a

5  practice, they are then elected what we refer to

6  as capital partnership, which is a full legal

7  partner in the firm sharing the profits and

8  losses, and also voting in the management of the

9  firm.  It's characteristic of those of us who

10  live west of the Hudson.

11    Q.  Which is at least 25 percent of the

12  country, right?

13    A.  I'm not sure it's that large.

14    Q.  Who else worked on Mr. Cleary's team

15  prior to the Chapter 11 filing?

16    A.  He had a series of people principally

17  based in Chicago.  Mohsin Khambati, Tom

18  Augspurger, Nathan Coco, Peter Clark.  Oh,

19  golly.  I'm sure there were others.  Those I

20  think were the large ones or the people who were

21  more likely than not to be devoting significant

22  time to the project.

23    Q.  Who does McDermott take direction

24  from typically in a representation?

25    A.  Is that an ontological question?

TSG Reporting - Worldwide    877-702-9580

Page 29

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

2      The reason I smile is that I'm sure

3  you have the same lesson in law school that I

4  do; that unlike the accountants who work for the

5  shareholders and therefore report to the board,

6  counsel reports to the management as employed by

7  the management, so therefore McDermott typically

8  reports to the management.

9    Q.  And McDermott takes its direction

10  from the management?

11    A.  Yes, sir.

12    Q.  And that would be primarily

13  Mr. Speltz and Mr. Weis, at least through August

14  24th, 2005, right?

15    A.  Yes, sir.

16    Q.  Do you consider the board of

17  directors to be management in the same sense as

18  the CEO or the CFO?

19    A.  No, sir.

20    Q.  How would you differentiate the board

21  from senior management?

22    A.  It is the board's job to supervise

23  senior management, to set policy and then to

24  ensure that the policy is followed.

25  Particularly in a not-for-profit context, the

TSG Reporting - Worldwide    877-702-9580

## Page 30

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2 board is principally charged with mission-driven
3 directives and to make sure that the management
4 is sensitive to the mission related issues.
5     As you approach the zone of
6 insolvency, the board acquires additional
7 responsibilities towards the organization and
8 towards the stakeholders in the organization.
9     Q. And do you think that there is an
10 appropriate time within the course of a
11 representation where counsel should go directly
12 to the board and bypass senior management?
13     A. There very well may be. It depends
14 on what's going on with the organization.
15     Q. To whom do you as counsel owe your
16 fiduciary duty?
17     A. I owe my fiduciary duty to the
18 client, the Saint Vincent's Catholic Medical
19 Centers and its constituent corporations. That
20 is neither the board nor management. It is the
21 organization.
22     Q. In the course of your representation
23 of Saint Vincent's, can you recall any instance
24 where you went directly to Mr. Boyle or another
25 member of the board and bypassed senior

TSG Reporting - Worldwide     877-702-9580

## Page 31

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2 management, specifically Mr. Speltz and
3 Mr. Weis?
4     A. Yes.
5     Q. Can you tell me what that time or
6 times were?
7     A. Saint Vincent's is not only not
8 profit, not-for-profit, it is also a Catholic
9 organization listed in the Catholic directory.
10 In order to be listed in the Catholic directory,
11 it needs a public juridic person to act as its
12 sponsor.
13     In this case it had two public
14 juridic persons. The first were the Sisters of
15 Charity headed by Sister Dorothy for whom Sister
16 Jane Iannucelli is the board member, and the
17 second was Bishop DiMarzio, the bishop of
18 Brooklyn who acts in what's referred to as a
19 role of corporation sole, meaning that he is
20 power derived simply from his office.
21     I approached both of the sponsors.
22 These two organizations are typically referred
23 to casually as the sponsors. I spoke with the
24 sponsors directly on canonical and juridical
25 issues.

TSG Reporting - Worldwide     877-702-9580

## Page 32

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2     I spoke with Mr. Boyle directly on
3 issues that the board should be sensitive to.
4     Q. Any other issues that you spoke
5 directly to the board about without first
6 talking to Mr. Speltz or Mr. Weis?
7     A. As we approached the Chapter 11 in
8 June 2005, typically I would meet with Mr. Boyle
9 before the board meeting without Mr. Speltz.
10 That was an effort to go over the issues that
11 the bankruptcy was likely to raise, so he would
12 be sensitive to them and so that he could frame
13 the agenda for the executive session which would
14 discuss the issues.
15     Q. Did you ever talk to Mr. Boyle — did
16 you ever talk to Mr. Boyle privately about
17 Mr. Speltz?
18     A. Yes.
19     Q. Did you ever talk to Mr. Boyle
20 privately about Mr. Weis?
21     A. Yes.
22     Q. When did you first learn that Huron
23 was acquiring Speltz & Weis LLC?
24     A. Sometime in the spring. I have no
25 precise recollection when. David and Tim told

TSG Reporting - Worldwide     877-702-9580

## Page 33

1 * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2 me they were thinking of selling their company
3 and they were likely to be having discussions
4 with several entities. We discussed generally
5 the different management companies or
6 organizations that were likely to be interested
7 in their management company.
8     David and Tim were aware that I had
9 represented the management of Cambio when it
10 bought itself from Tryan and they were aware
11 that I was representing the management of Cambio
12 as it was selling itself to FTI.
13     So the initial conversation was
14 nothing other than we're thinking of doing this,
15 let's talk about the process.
16     At that time I told them that if they
17 were talking to Huron, it was going to raise
18 issues in the bankruptcy and they needed to be
19 careful.
20     Q. Did they identify Huron to you as a
21 possible merger company or —
22     A. Sure.
23     I apologize. You hadn't finished.
24     Q. Well, let's just stop the question
25 here.

TSG Reporting - Worldwide     877-702-9580

Page 34

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  A. Yes, along with several others.
3  Q. So was it in response to them
4  mentioning Huron that you made your remarks to
5  them about Saint Vincent's and Huron?
6  A. Sure.
7  Q. And what precisely did you tell them,
8  if you remember?
9  A. This is relatively early in the
10  spring and so I'm sure it was some casual
11  conversation along the nature of if you're
12  talking to Huron, you're going to have to be
13  careful because it will raise issues with any
14  bankruptcy.
15  But at that juncture, I'm guessing
16  March, the bankruptcy was a long way off, Speltz
17  was determined never to file it and their
18  interest was relatively casual as near as I
19  could tell or as they represented to me.
20  Q. So they came to you more to pick your
21  brain as it were than to seek advice?
22  A. Oh, absolutely.
23  Q. Did they ask you for advice?
24  A. I told them I couldn't give them
25  advice on that topic.

TSG Reporting - Worldwide    877-702-9580

Page 35

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  Q. What issues in your mind were raised
3  at the time vis-a-vis Huron as a merger partner?
4  A. At that point?
5  Q. Yes.
6  A. More vague uneasiness than anything
7  else. It wasn't far enough along to parse the
8  issues that later developed, a disinterestedness
9  and Jay Alix Protocol and conflict and all that
10  sort of stuff.
11  So in the initial conversation I'm
12  sure it was nothing other than you better watch
13  out, this is going to be a problem or this will
14  have issues.
15  Q. But you didn't elaborate as to what
16  kind of issues you were thinking about?
17  A. No, I doubt it.
18  Q. Do you recall if either of them asked
19  you what kind of issues you were referring to?
20  A. They came back later, much later,
21  late April, and I had a conversation I believe
22  with David Speltz when he said that they were
23  starting to get serious with Huron. He was
24  particularly concerned about the extension of
25  his management agreement which was due to expire

TSG Reporting - Worldwide    877-702-9580

Page 36

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  if it hadn't expired already, and he wanted to
3  know more about the issues, what should he be
4  worried about.
5  I told him that the issues were
6  disinterestedness, the Jay Alix Protocol and
7  conflicts and I asked if he talked to Dick Boyle
8  about this.
9  Q. Had he spoken to Dick Boyle?
10  A. He said that he had.
11  Q. And this was in late April 2005?
12  A. Yes, sir.
13  Q. Did you say anything to Dick Boyle
14  following that conversation?
15  A. No, sir.
16  Q. Why?
17  A. Because I had the representation of
18  David Speltz that he had talked to Dick Boyle
19  about it.
20  Q. And did you think as a fiduciary for
21  the company that that was sufficient, that you
22  did not have an independent duty to make sure
23  that the chairman of the board knew that these
24  discussions were going on?
25  A. I believed what David had told me at

TSG Reporting - Worldwide    877-702-9580

Page 37

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  the time, that Boyle knew it and so I didn't
3  pursue it.
4  Q. I'd appreciate an answer to the
5  specific question that I asked.
6  Would you like the reporter to read
7  it back?
8  A. If you would be so kind.
9  (Question read back as follows:
10  "QUESTION: And did you think as a
11  fiduciary for the company that that was
12  sufficient, that you did not have an
13  independent duty to make sure that the
14  chairman of the board knew that these
15  discussions were going on?")
16  A. As a lawyer to the board or, I
17  apologize, as a lawyer to the company, I believe
18  I had an obligation to make sure that the
19  company was aware of what was going on. That
20  company has many faces and it includes faces
21  beyond David Speltz, and I believed that the
22  company knew what was going on.
23  Q. But you still didn't answer the
24  question that I asked you.
25  A. Your question implies the existence

TSG Reporting - Worldwide    877-702-9580

Page 38

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   of fiduciary duty that I'm not sure is there and
3   your question implies the existence of a
4   possibly non-fiduciary duty that I'm not sure is
5   there, and I don't believe currently I'm in the
6   position of giving legal advice. I think I'm
7   being asked a fact, and the fact is that at the
8   time I believed the company knew. I did not
9   believe it was necessary for me to contact David
10  Boyle.
11      Q.  Which face of the company other than
12  David Speltz knew of the Huron-Speltz & Weis
13  transaction?
14      A.  I had no idea.
15      Q.  But you just said you believe that
16  the company which has many faces beyond
17  Mr. Speltz knew about it and therefore you
18  didn't think that you had to tell anybody, so
19  who knew?
20      A.  I believed I had a representation
21  that Dick Boyle knew and was satisfied.
22      I had a brief conversation with
23  Elizabeth St. Clair, although I can't tell you
24  if it was at that point. It may have been later
25  in the process.
```

TSG Reporting - Worldwide     877-702-9580

Page 39

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2       And if there was anyone else, there
3   very well may have been someone else. I simply
4   didn't know.
5       Q.  You testified early this morning that
6   you had a fiduciary duty as counsel to the
7   organization. Your words, not mine.
8       So I'm asking you, was it a breach of
9   your fiduciary duty as counsel to the
10  organization not to independently ascertain that
11  somebody other than the subject of the potential
12  conflict issue, again, your words, at the
13  hospital knew?
14      MR. COOK:  Objection.
15      You've asked it, he's answered it.
16  Let's move on.
17      MR. MAGALIFF:  I don't believe he's
18  answered the question.
19      Are you instructing him not to answer
20  it --
21      MR. COOK:  No.
22      MR. MAGALIFF:  -- the way I framed
23  it?
24      MR. COOK:  The record will show that
25  I didn't instruct him to answer, not to
```

TSG Reporting - Worldwide     877-702-9580

Page 40

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   answer. You've asked, it's been answered
3   at least twice and you're arguing with him.
4       A.  Okay. I'll take another swing.
5       Q.  How about a yes or a no answer?
6       A.  Let me take another swing.
7       If I testified that I had a fiduciary
8   duty as counsel to the corporation, I do not
9   believe I breached the fiduciary duty by not
10  contacting Dick Boyle directly as long as I had
11  a reasonable belief that the board chair knew
12  what was going on.
13      You must understand that Saint
14  Vincent's employed lots and lots and lots of
15  lawyers. I was one of many lawyers. I was far
16  from a dominant counsel in the Saint Vincent's
17  hierarchy. I was someone who, to be candid with
18  you, Dick Boyle didn't expect to hear from and I
19  hadn't spoken with him since the last board
20  meeting I had attended in September.
21      So the person to whom I'm reporting
22  told me he had advised the head of the
23  organization, the chair of the organization, and
24  I believed him. I don't believe that is a
25  breach of whatever fiduciary duty I may have had
```

TSG Reporting - Worldwide     877-702-9580

Page 41

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   at that time and under those circumstances.
3       Q.  But at that time and under those
4   circumstances you didn't tell anybody else, you
5   just took Mr. Speltz's representation, correct?
6       A.  Yes, sir, that's correct.
7       Q.  Who at McDermott had the primary
8   responsibility of advising Saint Vincent's of
9   potential conflicts of interest for bankruptcy
10  retention of professionals?
11      A.  I did.
12      Q.  Did you believe in late April 2005 as
13  you were preparing to possibly file for
14  bankruptcy that the Speltz & Weis-Huron
15  transaction posed a potential retention problem
16  because of a conflict of interest?
17      MR. COOK:  Objection.
18  BY MR. MAGALIFF:
19      Q.  In the bankruptcy context?
20      A.  In April of 2005, I very much doubted
21  that Saint Vincent's would file bankruptcy.
22      In April of 2005, I was by no means
23  convinced that Huron was going to acquire Speltz
24  & Weis.
25      In April of 2005, I commissioned and
```

TSG Reporting - Worldwide     877-702-9580

11

Page 42

1 • CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2 received research which indicated that were
3 Huron to acquire Speltz & Weis, it would create
4 issues in the bankruptcy, all of which were
5 resolvable and indeed were resolved.
6    Q.  Who did you commission to do that
7 research?
8    A.  My direction went to David Cleary and
9 his assignment went to Tom Augsperger.
10    MR. MAGALIFF:  Can I have Exhibit 1?
11    Can you mark that as Smith Exhibit 1,
12 please?
13    (Debtors' Exhibit Smith 1, Series of
14    emails, Bates No. MCWE044378, is marked for
15    identification, as of this date.)
16 BY MR. MAGALIFF:
17    Q.  Mr. Smith, turn to the second page of
18 Exhibit 1, which has Bates No. MCWE044378.
19    A.  Yes, sir.
20    Q.  There's an email about five, six
21 lines down from the top from Bill Smith.
22    Do you see that?
23    A.  Yes, sir.
24    Q.  Down at the lower half of the email
25 it says, "SWLLC is now stronger due to the

TSG Reporting - Worldwide    877-702-9580

Page 43

1 • CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2 merger with Huron and can bring in extensive
3 financial advisory services which it did not
4 have before, i.e. Huron financial advisory
5 services come through SWLLC."
6    Do you see that?"
7    A.  Um-hmm.
8    Q.  And the date of this email is April
9 28th, 2005, correct?
10    A.  Um-hmm.
11    Q.  So on April 28th, 2005, you knew that
12 Speltz & Weis had merged or was about to merge
13 with Huron, correct?
14    MR. COOK:  Objection.
15    A.  On April 28, 2005, the lawyers for
16 Speltz & Weis are looking for ways in which were
17 Speltz & Weis merge with Huron, Speltz & Weis
18 could continue to be employed by Saint Vincent's
19 and Huron could continue to be employed by Saint
20 Vincent's, and what you're seeing is a potential
21 solution.  Not an actuality, simply a potential
22 solution.
23    Q.  So at this point in time, April 28th,
24 2005, you had no personal knowledge that Huron
25 was about to merge with Speltz & Weis?

TSG Reporting - Worldwide    877-702-9580

Page 44

1 • CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2    A.  At this point in time I was doing
3 research to find out what such a merger would
4 mean for Saint Vincent's and was there a way to
5 accomplish what I understood to be the goals of
6 the three parties; Saint Vincent's goal to have
7 both organizations available to it, Speltz &
8 Weis' goal were a merger to occur of being able
9 to continue as crisis managers and Huron's goal
10 were it to the acquire Speltz & Weis of being
11 able to continue as financial advisor.
12    MR. MAGALIFF:  Mark this Exhibit 2
13 please.
14    (Debtors' Exhibit Smith 2, Memo dated
15    5/3/05 from Augsperger to Cleary, is marked
16    for identification, as of this date.)
17 BY MR. MAGALIFF:
18    Q.  Mr. Smith, there's a memo dated May
19 3rd, 2005 beginning on page 46070.
20    A.  Yes, sir.
21    Q.  From Thomas Augsperger to David
22 Cleary.
23    Do you recognize this memorandum?
24    A.  Yes.
25    Q.  Is this the memorandum that outlines

TSG Reporting - Worldwide    877-702-9580

Page 45

1 • CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2 the results of the research that you said a few
3 minutes ago that you commissioned?
4    A.  Yes, sir.
5    Q.  Was a copy of this memorandum shown
6 to you at or around May 3rd, 2005 when it was
7 prepared?
8    A.  Yes, sir.
9    Q.  Do you recall discussing the contents
10 of this memo with either Mr. Cleary or
11 Mr. Augsperger?
12    A.  I believe I discussed with
13 Mr. Cleary.
14    Q.  Did you discuss it with anybody else
15 at McDermott Will?
16    A.  I don't recall discussing it with
17 anyone else.
18    Q.  Do you recall if you discussed it
19 with Mr. Selbst?
20    A.  I may have.  I have no specific
21 recollection of doing so.
22    Q.  Did Mr. Cleary have the primary
23 responsibility for drafting the retention
24 pleadings that would be submitted on the first
25 day with the Chapter 11 petition?

TSG Reporting - Worldwide    877-702-9580

Page 54

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2    Q.   How so?
3    A.   The statute refers to, "a creditor,
4  equity security holder or an insider..." and
5  this says "...are not creditors, equity security
6  holders or insiders of the debtors."
7    Q.   So you misquoted it because of a few
8  extra esses?
9    A.   Well, actually it's not a quote, it's
10  a paraphrase.
11    Q.   Did you include either a quote or a
12  paraphrase of subpart D which excludes directors
13  and officers?
14    A.   No.
15    Q.   So is it fair to say that the
16  representation that's made in paragraph 34 of
17  this application is that Speltz & Weis is a
18  materially disinterested person, while ignoring
19  the requirement in the statute that if you're an
20  officer, you are not disinterested?
21    A.   You've just discovered, among other
22  reasons, why I directed this application to be
23  pulled after it was filed.
24    Q.   So the answer to my question is yes.
25    A.   The answer to your question is yes.

TSG Reporting - Worldwide    877-702-9580

Page 55

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2    Q.   Okay. Let's hold that thought then
3  and let's jump ahead, if you will, to the
4  amended application.
5    A.   Which one?
6    Q.   I'm going to tell you. This would be
7  the amended application dated -- there's no date
8  on the here. I think it's July 18th. Let me
9  ask you this question.
10        Let's look at -- let me show you the
11  whole thing and ask if this was ever filed.
12    A.   There was -- I can save you the
13  trouble. There was no application to retain
14  Speltz & Weis that was ever filed other than the
15  first application to retain Speltz & Weis.
16        There were many drafts which were
17  prepared between July 5, 2005 and August 24,
18  2005. I'd hazard a guess that there were 15 or
19  so. There were many cooks in the kitchen on
20  that application, including Huron's counsel,
21  Speltz & Weis' counsel, even Leo Crowley got to
22  weigh in on it. The world was changing between
23  July 5 and August 24, and the circumstances that
24  needed to be recited changed along with it.
25        And so I guess you have an

TSG Reporting - Worldwide    877-702-9580

Page 56

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  intermediate document we circulated too broadly,
3  one was roughly in the middle of July and the
4  other was at the end of July, and neither of
5  them contained disclosure which today accurately
6  reflects what transpired. They did at the time
7  reflect a good faith effort to state what we
8  understood the world to be at that point in
9  time.
10    Q.   Is that true with respect to each of
11  the drafts that were prepared?
12    A.   Couldn't tell you that.
13  Mr. Augsperger was furiously pumping out paper
14  in Chicago. I don't have a clue what he
15  understood.
16    Q.   After you discovered that the
17  original July 5th application did not make the
18  required disclosures, did you pay more careful
19  attention to each draft as it was prepared
20  thereafter?
21    A.   Actually, no. What I did was I spent
22  time trying to understand precisely what the
23  legal relationship was between Saint Vincent's,
24  Huron, Speltz & Weis and I focused on specific
25  paragraphs in drafts and negotiated with Huron's

TSG Reporting - Worldwide    877-702-9580

Page 57

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  counsel, Speltz Weis's counsel, Leo Crowley,
3  Saint Vincent's, the board and everybody else on
4  what it is we can and should be saying.
5    Q.   At the time, what did you believe
6  needed to be in that motion, that application
7  that was never entered?
8    A.   I don't know that there is something
9  that needs to be in it that was never in it.
10        There are additional items that can
11  be disclosed and weren't. I don't know that
12  those were material. I don't know that they
13  make much difference one way or the other.
14        What was happening was the legal
15  positions were changing. In the beginning there
16  was a disagreement between Huron and Speltz &
17  Weis over what the terms of their own earnout
18  was with Huron saying it's black and Speltz and
19  Weis saying it's white, and I'm standing in the
20  center saying, boys, you need to decide is it
21  black or white.
22        When the board retained Leo Crowley,
23  Crowley began an investigation and then
24  negotiated, or more accurately, Dick Boyle
25  negotiated what the board felt was a solution to

TSG Reporting - Worldwide    877-702-9580

Page 58

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  the problem and that required disclosure as
3  well. That changed some of the views of the
4  earnouts and led to other items that needed to
5  be disclosed. Some of the disclosures were made
6  verbally to Martin Bunin and Deirdre Martini
7  and were never put in writing.
8        MR. MAGALIFF:  Exhibit 3.
9        (Debtors' Exhibit Smith 3, Email
10       dated 5/19/05 from Smith to Selbst and
11       Cleary, is marked for identification, as of
12       this date.)
13  BY MR. MAGALIFF:
14       Q.  Exhibit 3 is an email that you wrote
15  on May 19th, 2005 to Steven Selbst and David
16  Cleary. The subject is "Management
17  Credibility."
18       Do you recognize this email?
19       A.  Give me a sec if you would.
20       (Witness reviewing exhibit.)
21       A.  Yes, I do.
22       Q.  Should I ask the obvious question,
23  Bill?  What's so funny?
24       A.  Oh, the first paragraph. It is an
25  accurate reflection of how the workout health

TSG Reporting - Worldwide     877-702-9580

Page 59

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  care geeks have viewed the New York market.
3  It's not terribly complimentary.
4       Q.  All right.  Well, I'm more interested
5  in what's in the second paragraph where you say,
6  "For any lender to have lived with this creditor
7  for as long as they have and not understand the
8  balance sheet problems much less the cash flow
9  problems is a worse case of denial than our
10  colleagues at Speltz & Weis."
11       What are you talking about there?
12       A.  When David Selbst was hired by Saint
13  Vincent's, he pledged that he would not alter
14  the footprint or take it into Chapter 11.
15  That's a pledge which was not made by -- you're
16  shaking your head alter the footprint. Alter
17  the footprint --
18       Q.  No.  I'm shaking my head because my
19  neck hurts.
20       A.  Oh, I'm sorry. I thought you didn't
21  understand the reference. Alter the footprint
22  means he wouldn't close hospitals.
23       From the beginning, David Selbst was
24  adamant that he was not going to file Chapter 11
25  for Saint Vincent's, and our efforts were wholly

TSG Reporting - Worldwide     877-702-9580

Page 60

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  precautionary. Simply as good management, he
3  needs a backup plan.
4       As late as the middle of June 2005,
5  he didn't believe we were going into Chapter 11.
6  He shut us down in the fall simply because he
7  managed to suck some money out of Sun Life,
8  secured refinance in the Westchester property.
9  And at each time, each real estate sale, David
10  believed that deus ex machina had arrived and
11  Saint Vincent's was saved.
12       Q.  And what is "deus ex machina"?
13       A.  "Deus ex machina" is a Latin phrase
14  which means God from the machine. It's used in
15  Greek tragedy to indicate that God comes down
16  literally out of a machine from the stage as a
17  metaphor for a current parlance; it is a miracle
18  from the heaven that lands fully expected
19  because it happens at the end of each Greek
20  tragedy where God explains how he's going to
21  unwind all this stuff, so it is inevitable, but
22  it's also something over which you have no
23  power.
24       Q.  What did you mean in here when you
25  said "a worse case of denial than our colleagues

TSG Reporting - Worldwide     877-702-9580

Page 61

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  at Speltz & Weis"?
3       A.  Neither David nor Tim understood, in
4  my view, the depth of the problem they were
5  facing or the inevitability of the Chapter 11
6  that was going to be required at Saint
7  Vincent's.
8       Q.  Why is that in your opinion?
9       A.  I think David was optimistic that he
10  would come up with some, if you don't like deus
11  ex machina, rabbit out of his hat that would
12  save them. I think Tim believed that their
13  turnaround plan was working, and if he had only
14  been given access to adequate working capital,
15  they'd be able to fix this without a Chapter 11.
16       Q.  Who was preparing the financial
17  projections in the turnaround plan that the
18  hospital was working on?
19       A.  Weis prepared the projections on
20  the -- well, actually that's not correct.
21       By May of 2005, Huron was preparing
22  the projections. Weis' organization was no
23  longer -- Speltz & Weis was no longer preparing
24  the projections.
25       We needed a good set of projections

TSG Reporting - Worldwide     877-702-9580

Page 62

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  for the DIP lenders and so we were using Huron;
3  Shawn Christen and there was another kid whose
4  name escapes me.
5     Q.  Did anybody from McDermott review the
6  projections and the turnaround plan on a regular
7  basis?
8     A.  There were three.  In the
9  pre-petition Saint Vincent's context there were
10  three turnaround plans that Speltz & Weis
11  prepared.
12      One was the massive study that was
13  completed in roughly April of 2004.
14      The second was turnaround two, which
15  was done in the first quarter of 2005 to reflect
16  a $60 million AR write-off which had been
17  unanticipated.
18      And the third was presented to the
19  board of directors on June 1st, 2005.
20      McDermott had nothing to do with any
21  of those three turnaround plans.
22      However, at the same time as
23  turnaround plan three was being prepared, we
24  were preparing for a Chapter 11.  We were
25  interested in real hard-nose, no kidding

TSG Reporting - Worldwide    877-702-9580

Page 63

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  projections that we could show to a real
3  hard-nosed, no kidding DIP lender, and so we
4  were having those projections and that
5  turnaround plan prepared by Huron.
6     Q.  Well, let me go back for a minute to
7  the May 3rd memo which was Exhibit 2 I think.
8     A.  Sure.  Yes, sir.
9     Q.  Did you show this memo to anybody at
10  Saint Vincent's?
11     A.  I don't know.  I did not.
12      Other people -- I would be surprised
13  if this wasn't discussed by David with Saint
14  Vincent's people.
15     Q.  Do you have any personal knowledge of
16  the subject of this memo being discussed with
17  anybody at Saint Vincent's?
18     A.  No, sir.
19     Q.  But you yourself didn't discuss it
20  with anybody at the time at Saint Vincent's?
21     A.  At the time actually, it would have
22  been discussed with Speltz, Weis, Allison, Huron
23  people.  I don't think it was discussed with
24  Elizabeth St. Clair.
25     Q.  Do you recall if you discussed it

TSG Reporting - Worldwide    877-702-9580

Page 64

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  with anybody on the board?
3     A.  No, I'm sure we didn't.
4      Well, the substance of the solutions
5  to the problem were discussed with the board,
6  but we didn't get as granular as this.
7     Q.  Was the substance to the solutions of
8  the problem discussed with the board prior to
9  the Chapter 11 filing?
10     A.  Yes, sir.
11     Q.  And I think you said that at the time
12  that this was written, you did believe that the
13  Jay Alix Protocol was applicable in the Southern
14  District of New York?
15     A.  No.  I believe the disclosure
16  obligation was applicable.
17     Q.  The disclosure obligation, not the
18  Jay Alix Protocol.
19     A.  Right.
20     Q.  Did you understand at the time,
21  independently of this memo, what the Jay Alix
22  Protocol was?
23     A.  Yes.
24     Q.  Had you ever been involved in a
25  bankruptcy case prior to Saint Vincent's where

TSG Reporting - Worldwide    877-702-9580

Page 65

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  the Jay Alix Protocol was deemed to be
3  applicable?
4     A.  No.
5     Q.  How did you know about the Jay Alix
6  Protocol prior to May 3rd, 2005?
7     A.  Do you know what the date on it is?
8     Q.  I do.
9     A.  What's the date?
10     Q.  What's the difference?
11     A.  Because if you know the date, then I
12  know you've read it.
13      If you don't know the date, you
14  haven't read it.
15     Q.  I have read it but --
16     A.  Good.  What's the date?
17     Q.  -- I'm asking you.  I'm asking the
18  questions.
19     A.  The date is September 11, 2001.
20     Q.  Okay.
21     A.  It's fairly well-known in the trade
22  that Jay Alix had itself a world of a problem in
23  safety claim.
24      It's fairly well-known they worked
25  for over a year for free.

TSG Reporting - Worldwide    877-702-9580

17

## Page 74

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      Why was Leo Crowley hired by Saint
3  Vincent's?
4      A.  Do you mean what was his job or is it
5  my understanding on how he was picked?
6      Q.  The former.
7      A.  Leo Crowley was hired as special
8  counsel to the board to look into the
9  relationship or to look into the Huron
10  acquisition of Speltz & Weis and determine if it
11  was problematic with respect to Saint Vincent's.
12      Q.  Leo's charge was to analyze the
13  acquisition for potential conflicts of interest
14  under Saint Vincent's own internal conflict of
15  interest policy; isn't that right?
16      A.  Actually I've never seen this
17  engagement letter so I don't know what precisely
18  his charge was.
19          My understanding of his charge was he
20  was looking into the acquisition as it related
21  to Saint Vincent's.  It would be logical for he
22  and I to talk because I did not expect him to be
23  the one who would decide what the pleadings
24  would look like were we to file bankruptcy.
25      Q.  So it's fair to say, then, that the

## Page 75

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  decision of whether or not to disclose in the
3  bankruptcy context was McDermott's --
4      A.  Absolutely.
5      Q.  The decision of whether or not to
6  disclose was McDermott's, not Mr. Crowley's.
7      A.  And the response is that's absolutely
8  correct.
9      Q.  Mr. Crowley was not their bankruptcy
10  lawyer?
11      A.  No.  He was not.
12      Q.  Was never hired to provide advice
13  regarding bankruptcy.
14          MR. COOK:  Objection.
15      A.  Mr. Crowley --
16      Q.  If you know.
17      A.  -- is also a bankruptcy lawyer.  It
18  was my understanding that he was hired because
19  he would be sensitive to and aware of the
20  intricacies of bankruptcy and the board's
21  conflict policy, not to represent them in the
22  bankruptcy and not to make the decision, but so
23  that the board had a completely independent
24  person with whom it could consult.
25      Q.  In the reply that McDermott filed to

## Page 76

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  the debtors' objection to the fee application,
3  it states, "Another law firm, not McDermott, had
4  been assigned to investigate and advise the
5  board on the acquisition of Speltz & Weis by
6  Huron."
7          Is that Mr. Crowley you're referring
8  to?
9      A.  Yes, it is.
10      Q.  Do you understand today that the
11  point that the debtor was asserting in the
12  objection was not that there was a firm engaged
13  by Saint Vincent's with respect to
14  non-bankruptcy related conflicts of interest,
15  but that the debtors are challenging the
16  services that McDermott provided in connection
17  with its decision of what not to disclose
18  regarding Speltz & Weis?
19          MR. COOK:  Objection.
20          I don't understand the question.
21  BY MR. MAGALIFF:
22      Q.  Do you understand the question?
23      A.  I have to go back and read the
24  objections again.
25          My impression as I sit here is that

## Page 77

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  may have been the debtors' intent but it was
3  singularly poorly phrased if that's what you
4  were trying to do.
5      Q.  Well, you're the master of the
6  written word, Bill, aren't you?
7      A.  Nope.
8      Q.  Is that a phenomenological answer or
9  non-phenomenological answer?
10      A.  Actually it's an ontological answer.
11      Q.  We looked at an email a while ago.  I
12  think it was Exhibit 3.
13      A.  Is this it?
14      Q.  That's the one I think.
15      A.  Yes, Exhibit 3.
16      Q.  That talked about management
17  credibility.
18      A.  Yup.
19      Q.  Do you think David Speltz was a good
20  CEO for Saint Vincent's?
21      A.  At what point in time?
22      Q.  From the time when McDermott started
23  preparing for the bankruptcy in the fall of 2004
24  onward.
25      A.  Think I think.

## Page 78

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      MR. COOK: Before you answer, I'm
3  going to object to the form of that
4  question.
5      A.  I think David was and is a very
6  capable and very talented guy who for many, many
7  months delivered good and valuable service to
8  Saint Vincent's.
9      I believe that as we got closer and
10 closer to the financial crisis which ultimately
11 enveloped Saint Vincent's, that David's
12 particular skills were less valuable to Saint
13 Vincent's and David's insistence on an approach
14 euphemistically referred to here as denial was
15 far less helpful.
16     When we got into the bankruptcy
17 itself, David's skills were not warmly
18 appreciated either by Saint Vincent's or by the
19 external constituencies, and that was not
20 helpful and the relation with Speltz & Weis and
21 Huron became a flash point along with other
22 flash points which ultimately made his tenure as
23 CEO absolutely insupportable.
24     Q.  At what point in time do you believe
25 his tenure as CEO became insupportable?

TSG Reporting - Worldwide      877-702-9580

## Page 79

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      A.  Probably the second week in August of
3  2005.
4      Q.  And is that an opinion that you
5  shared with Mr. Boyle as chairman of the board?
6      A.  It as an opinion I shared with
7  Mr. Boyle within the next week or so to be sure.
8      Q.  And is that one of those instances
9  where it's fair to say you went to Mr. Boyle
10 without first telling Mr. Speltz?
11     A.  It would be fair to say I went to
12 Mr. Boyle without telling Mr. Speltz.
13     Q.  Did you discuss your opinions about
14 Mr. Speltz with anybody other than Mr. Boyle at
15 that time?
16     A.  There were two groups, if you will,
17 within the happy Saint Vincent's family. There
18 were lifers and there were consultants.
19 Elizabeth St. Clair is a lifer. Bernadette
20 Kingham-Bez is a lifer. Mark Ackerman is a
21 lifer.
22     The consultants were the hired help
23 and the lifers by and large were not enamored of
24 the consultants. I was a consultant.
25     Among the consultants there were two

TSG Reporting - Worldwide      877-702-9580

## Page 80

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  camps; those who believed religiously in David
3  and Tim and those who did not.
4      As the summer progressed the members
5  of the first dwindled to two and --
6      Q.  Being?  Who were the two?
7      A.  David and Tim.
8      Q.  Were the only ones who believe in
9  themselves.
10     A.  And they were the only ones who
11 believed in themselves.
12     In fairness to them, they felt, Tim
13 in particular, that they were not being treated
14 fairly. They were in a situation which was
15 beyond their control and they reacted severely
16 adversely to it.
17     At one point I sent out some
18 disclosure on this thing to the working group,
19 Ron Barliant, who is Huron's counsel, my guys
20 working on this thing, Tim, David, you know, the
21 Saint Vincent's side of the world, saying this
22 is what I think we ought to say.
23     And Tim was so angry with me he
24 called spitting and sputtering, and hung up the
25 phone and wouldn't talk to me for the rest of

TSG Reporting - Worldwide      877-702-9580

## Page 81

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  the day because in my -- in his mind I had
3  personally abused him by laying his private
4  matters out to the world, and it takes me the
5  better part of 18 hours to calm down and say,
6  "Tim, you got to disclose this stuff."
7      Did I discuss my doubts with people?
8  Yes, I discussed them within the consultant
9  realm in the group of people who did not believe
10 in David and Tim, and within that group it was
11 widely known and widely understood.  And that
12 would include Tom Allison, that would include
13 Tom Halloran, that would include almost the
14 entire Huron team at the Huron office who were
15 not Speltz & Weis originally, it would include
16 most of the senior McDermott team and it would
17 include most of the consultants other than
18 conceivably David, Tim and Bob Fanning, although
19 I'd flip a coin over Fanning.
20     Q.  Would you say that the board was in
21 the Speltz & Weis camp or the other camp?
22     At this point in time?
23     A.  David and Tim tore it when they sold
24 themselves to Huron. I believe they lost the
25 confidence of Dick Boyle and as Leo Crowley

TSG Reporting - Worldwide      877-702-9580

## Page 86

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2    Q.   Did Dick Boyle ask you your opinion
3  about whether or not Speltz & Weis should be
4  fired or continued in their positions?
5    A.   Dick Boyle didn't care about my
6  opinion. My opinion was irrelevant to Dick
7  Boyle.
8    Q.   To your knowledge, prior to Saint
9  Vincent's, had David Speltz ever taken an
10  organization through a Chapter 11 case?
11    A.   He, working for Cambio, or actually
12  it was IRG at that point, as an employee of
13  Intensive Resources Group, which was then owned
14  by Quorum, he took Choat Sims Hospital through
15  Chapter 11 in '92, '93, something like that, and
16  then he was appointed CEO of Crouse Hospital in
17  Syracuse after the Chapter 11 had been filed.
18    Q.   Do you think David Speltz had the
19  capability to lead Saint Vincent's through a
20  Chapter 11 restructuring?
21    A.   Yes, he had the ability to do it.
22    Q.   At some point in time did your
23  opinion change about his ability to take Saint
24  Vincent's through the case?
25    A.   It's not a question of his ability,

## Page 87

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  it's a question of where he is in the process
3  by... We got a committee appointed in the third
4  week in July. I wasn't in town. I asked David
5  and Tim that we need to get with the committee,
6  and Steve Selbst, we need to get with the
7  committee as quickly as possible.
8    David said, "I want to do it first."
9  And so a dinner was scheduled last week in July,
10  first week in August, I don't remember, to which
11  the lawyers were not invited and it was David
12  and his team, and the committee and their team,
13  which I don't know if they were committee
14  members but it certainly was the Houlihan guys
15  and the Thelen Reid folks.
16    Near as I can tell, that dinner was a
17  mitigated disaster. To this day I still don't
18  know what happened at this dinner, but boy that
19  crowd didn't hit it off with each other because
20  the next day the carping and the crabbing that
21  was coming out of the committee increased
22  multiples.
23    I don't know what David said, I don't
24  know what David did. I don't know what Tim
25  said. They may not have said anything, but

## Page 88

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  after that dinner, the situation was steady
3  state terrible in decline continually.
4    So did David have the ability? Yeah,
5  I think David has the ability.
6    Did David do something or something
7  happened or he made the wrong answer to a
8  question or, you know, who knows what happened,
9  but something happened and I believe the
10  committee came to the conclusion we ain't going
11  to work with you anymore. And when the
12  committee comes to that conclusion, you're dead.
13    The committee came to the same
14  conclusion with me at some point with the same
15  result I might add.
16    Q.   Do you know if Tim Weis had ever been
17  the chief financial officer of a Chapter 11
18  debtor prior to Saint Vincent's?
19    A.   Tim had been the CFO of Crouse in
20  Syracuse.
21    He had not been the CFO but he had
22  been the debtor's financial consultant from a
23  management company perspective on a number of
24  engagements.
25    I first met him in Hernando Health

## Page 89

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER

1
2  Care in Tampa. Hernando went from 1990 to about
3  1997, '98, something like that. I think he
4  went -- dumped into Chapter 11 about '93 and he
5  was working for the management company. He was
6  the outside come in and do the whiz bang, make
7  new the projections.
8    Q.   In the April through July 2005 time
9  frame, do you believe that David and Tim were in
10  lockstep in terms of the approach to take with
11  Saint Vincent's; that is, whether to do an out
12  of court restructuring or an in court workout?
13    A.   No. Actually they were not in
14  lockstep and that was a problem.
15    Q.   Can you elaborate, please?
16    A.   David was determined not to file
17  Chapter 11 and David believed that he would keep
18  it out of Chapter 11; that New York State
19  somehow would save him, HUD, DASNY, the
20  governor, the closing commission, somebody was
21  going to solve Saint Vincent's problems.
22    Tim was living day to day with the
23  reality that our cash was disappearing and that
24  at one point we sold -- sold? No, it was the
25  financing of the mezzanine piece with RCG I

Page 90

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  think, the first RCG. We were within three
3  hours of missing payroll.
4      And so Tim in effect -- you must
5  understand they were in different places. David
6  is downtown on 12th Street in the Martin Paine
7  Building, and he's dealing with the doctors and
8  he's dealing with the board and he's dealing
9  with the New York Hospital association, and
10  Saint Vincent's global issues and how it relates
11  to other members of the community, and he's on
12  this and that and something else and he's called
13  to the mayor's council.
14      Tim is sitting on 33rd Street and
15  he's trying to figure out how we're going to get
16  money for blood and so Tim was focused on trying
17  to get more money out of HFG. Tim was focused
18  when it was apparent we weren't going to get
19  more money out of HFG, where we do find more
20  money. And as everybody said to us, we ain't
21  going to be your lender outside of Chapter 11.
22  We'll do your DIP but not outside.
23      Tim became convinced we have to take
24  this thing in and David was not going to take it
25  in. I mean they wouldn't even let us look for

Page 91

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  DIP financing until June.
3      Q.  That was David or Tim?
4      A.  David.
5      Q.  So David was the one who prohibited
6  McDermott from going out and finding DIP
7  financing --
8      A.  Our instructions were that we were
9  not to look for DIP financing until at least
10  after Memorial Day.
11      Q.  And that came from David?
12      A.  Yes.
13      Q.  Do you think in the April-May time
14  frame that Tim and/or David were more focused on
15  closing their transaction with Huron than in
16  doing what was in the best interests of Saint
17  Vincent's?
18      A.  I can't tell you that. David and Tim
19  both worked long days. I mean I would -- we
20  were all up with the dawn and we were still
21  emailing each other at 11, 12, 1, 2 in the,
22  morning. I remember it was almost a joke who
23  sent the last email because they would get later
24  and later and later. Typically, however, it was
25  Tim who was up late.

Page 92

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      There is no question in my mind in
3  the end of April and in the beginning of May,
4  they were focused on closing their transaction.
5      The transaction closed on May 9, it
6  was announced on May 10 and Tim simply went back
7  to work. It didn't have any impact on Tim
8  whatsoever.
9      And David went back to work doing
10  what David did, which was try to figure out how
11  we do this outside of a court proceeding.
12      What's ironic about it is they made
13  no effort whatsoever to integrate with Huron.
14  At one point, I want to say third, fourth week
15  in May, I finally invited David and Tom Allison
16  to lunch and said, "I want to introduce you to
17  each other. You guys need to know each other.
18  You're in the same corporate complex. David,
19  you need to know what Tom does. Tom, you need
20  to know what David does. Maybe the two of you
21  can help each other." Simply different spheres.
22      MR. MAGALIFF:  Could we mark this as
23  Exhibit 4, please?
24      (Debtors' Exhibit Smith 4, Series of
25  emails, is marked for identification, as of

Page 93

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  this date.)
3  BY MR. MAGALIFF:
4      Q.  If you turn to the second page of
5  this exhibit, the one that has Bates No. 45070
6  on it, there's an email in the middle of the
7  page from -- to you; from Tim Weis, cc Dave
8  Speltz dated 4/29/2005.
9      Do you see that?
10      A.  Yes, sir.
11      Q.  In the second paragraph here it says,
12  "Second, we are unaware Dick Boyle knows of the
13  pending Huron/SWLLC combination. Again, are you
14  aware of something we are not?"
15      Do you see that?
16      A.  Yes, sir.
17      Q.  Do you think that Tim was concerned
18  about Dick Boyle finding out that Huron was
19  going to acquire Speltz & Weis?
20      A.  No. You need to understand Tim Weis
21  and the mindset of somebody who goes to college
22  and majors in accounting. Tim believes in the
23  precision of numbers. Tim believes in facts.
24  Facts are black or facts are white. There are
25  no gray.

Page 94

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2         What Tim is saying is I don't know
3   that Dick knows, Dick Boyle knows. He says "we"
4   and so presumably what he's saying is, I don't
5   know and I don't think David knows. What do you
6   know?
7         Tim is not sufficiently reflective
8   that he's taking it to the next step and worried
9   about hiding something. That's not in his
10  nature. He doesn't hide things. David would
11  hide something but not Tim. All Tim is doing is
12  saying you made a statement or a statement has
13  been attributed to you that Dick Boyle knows. I
14  don't know whether Dick Boyle -- Dick Boyle I
15  wasn't aware knows. What is the fact. Does
16  Dick Boyle know.
17        Q.  Do you think David wanted to hide the
18  acquisition from Dick Boyle?
19        A.  Well, he certainly did not tell me an
20  accurate statement of the state of the world, so
21  I would assume from that he was interested in
22  hiding it from Dick Boyle.
23        Q.  And I presume when you say he didn't
24  give you an accurate statement, that's because
25  he told you that Dick knew and you assumed that
```

TSG Reporting - Worldwide        877-702-9580

Page 95

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   he was telling you the truth; is that right?
3         A.  And I later discovered that Dick did
4   not know.
5         Q.  And how did you later discover that?
6         A.  Because Dick told me.
7         Q.  When?
8         A.  After the acquisition had closed.
9         Q.  What did he say to you?
10        A.  It was in the context of saying
11  something like what an incredibly stupid thing
12  to do. He was miffed with David and Tim because
13  he believed they had denied him a corporate
14  opportunity. He expected to hire them as
15  officers of Saint Vincent's directly and he said
16  he didn't know until days before the thing
17  finally closed.
18        And I said, "David, I've been under
19  the understanding -- or "Dick, I've been under
20  the understanding you've known for some time,"
21  and he said no.
22        Q.  On page 1 of this exhibit, paragraph
23  number two, fourth line down, beginning at the
24  end it says, "I specifically did not tell her
25  that Dick was aware of the S&W-Huron
```

TSG Reporting - Worldwide        877-702-9580

Page 96

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   discussions, nor did I imply it (for the simple
3   reason that I don't know if Dick knows anything,
4   and it is not my place to tell her or him
5   anything about it). I did however communicate
6   to her my understanding of Dick's attitude and
7   she must have presumed the rest."
8         Now I know you've testified several
9   times this morning that you believed David when
10  he told you that Dick already knew, but why did
11  you believe it was not your place to tell Dick
12  Boyle anything about the S&W-Huron discussions?
13        A.  You need to look at the date. On sat
14  April 30, it was far from a certainty that Huron
15  was going to acquire Speltz & Weis. They were
16  talking but that wasn't a done deal.
17        The nature of the conversations I'd
18  had with Natalia Delgado indicated it was far
19  from a done deal. They were looking at it, they
20  were thinking about it, they were spending money
21  on lawyers, but that doesn't indicate that it
22  was going to close and that doesn't exclude the
23  fact that David and Tim may have been talking to
24  somebody else.
25        Now if David had said to the chairman
```

TSG Reporting - Worldwide        877-702-9580

Page 97

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   of his board, "I'm talking about selling my
3   company," it's not my place as counsel to the
4   company, having posed to me a very specific
5   bankruptcy question, to say to the chairman of
6   the board, by the way, have you heard that David
7   is thinking of selling Huron or thinking of
8   selling Navigant or David is selling to Cambio,
9   or David is selling to FTI or David is selling
10  to Tom, Dick and Harry. He could have been
11  doing all of those. I'm not the town crier.
12        Q.  You're the hospital's lawyer.
13        A.  I'm one of the hospital's lawyers,
14  yes.
15        Q.  And you already testified earlier
16  today that the possibility of Huron acquiring
17  Speltz & Weis raised certain potential
18  bankruptcy issues, right?
19        A.  You bet your boots.
20        Q.  So putting Navigant and Tom, Dick and
21  Harry and all the other potential acquisition
22  partners aside, is it your testimony that Huron,
23  which was a large vendor of Saint Vincent's,
24  possibly acquiring the company that provided
25  senior management, the CEO and the CFO, fell
```

TSG Reporting - Worldwide        877-702-9580

25

Page 98

* CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
1
2  into the same pot, so to speak, there was no
3  difference between a Huron transaction versus a
4  Navigant transaction or a Tom, Dick and Harry
5  transaction?
6      MR. COOK:   Objection.
7      A.   You know, it's interesting. I
8  finally read the Leo Crowley report after it was
9  mentioned in Elizabeth's deposition. Never seen
10 it before then. Leo was investigating whether
11 the fact that Speltz & Weis sold their company
12 violated Saint Vincent's conflict policy. They
13 could have been selling to General Motors and
14 Leo Crowley would have been investigating.
15     It had nothing to do with Huron. I'm
16 concerned with Huron because Huron is a vendor
17 and it creates bankruptcy issues.
18     I'm not concerned with the fact that
19 they're selling their company.
20     Q.   I'm not asking if you're concerned
21 with the fact that they're selling their
22 company. I appreciate the distinction.
23     I'm asking you if you're concerned
24 with the fact that they might be selling their
25 company to Huron as opposed to General Motors.

TSG Reporting - Worldwide    877-702-9580

Page 99

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2      A.   If they sell their company to Huron,
3  it is going to create bankruptcy issues.
4      On April 30, 2005, if it creates a
5  bankruptcy issue, it is a problem that I can
6  solve. I can solve it by replacing Huron, I can
7  solve it by replacing Speltz & Weis, I can solve
8  it by coming up with one of the three Jay Alix
9  solutions that were being discussed in varying
10 levels of distaste with the participants. It is
11 far from an unsolvable problem.
12     Q.   So you can solve it with one of the
13 three Jay Alix solutions that you don't believe
14 applied in the Southern District of New York?
15     A.   It is my job to the company, to Saint
16 Vincent's, to get them management and to get
17 them financial advice.
18     What I believe does and doesn't apply
19 is not necessarily relevant. It's a question of
20 as a lawyer, can I solve the problem for them.
21     I have at least three solutions to
22 the Jay Alix problem assuming it applies in the
23 Southern District of New York.
24     Q.   And you believed you could solve the
25 problem by getting rid of Speltz & Weis and

TSG Reporting - Worldwide    877-702-9580

Page 100

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  Huron, both of whom you knew the board very much
3  wanted to remain in place.
4      A.   No, that was not one of the three
5  solutions.
6      Q.   You just said I could get rid of
7  Speltz & Weis, I could get rid of Huron or I
8  could follow one of the three Jay Alix options.
9      A.   Right. That's five solutions I've
10 just given you. There are three Jay Alix
11 solutions or you can get rid of Speltz & Weis or
12 you can get rid of Huron. A total of five.
13     Q.   You knew you weren't going to get rid
14 Speltz & Weis, right?
15     A.   I didn't know that.
16     Q.   Let's jump ahead to the bankruptcy
17 filing. It's now July 5th, your filing, okay,
18 and you have a problem with Speltz & Weis and
19 Huron?
20     A.   Right.
21     Q.   Conflict, not disinterested.
22     You know the board wants to keep
23 Speltz & Weis in place, right?
24     A.   Um-hmm.
25     Q.   And you know the board wants to keep

TSG Reporting - Worldwide    877-702-9580

Page 101

1  * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2  Huron in place, right?
3      A.   Um-hmm.
4      Q.   So in your testimony that leaves you
5  with three options, which is the three
6  possibilities outlined in the Jay Alix Protocol,
7  right?
8      A.   No. The three options are the
9  solution we adopted initially, which is retain
10 Speltz & Weis in the 363, retain Huron
11 Consulting Services as a professional and argue
12 that services is disinterested because it's a
13 sister of Speltz & Weis, not a -- it's not
14 within the relation of affiliate. The Jay Alix
15 Protocol does not define affiliate. It simply
16 states as a fact what the affiliates are for
17 that particular problem.
18     That parenthetically is, as I
19 appreciate, the solution that was ultimately
20 adopted by Judge Beatty when she authorized the
21 retention of both Speltz & Weis and Huron in
22 November of 2005.
23     The second solution would be what we
24 went to with what I thought was the agreement of
25 Deirdre Martini and Martin Bunin, and that would

TSG Reporting - Worldwide    877-702-9580

Page 198

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   a discussion on what do you want to be when you
3   grow up.
4           And the thrust of the discussion was
5   that Saint Vincent's was sitting on some
6   astonishingly valuable real estate, which if you
7   kept it as a healthcare organization, it was not
8   going to be nearly as valuable.
9           Saint Vincent's on 12th Street sat
10  within three miles of several world class
11  academic medical centers, and rather than go
12  through Chapter 11, I could sell the Saint
13  Vincent's business to four or five people in New
14  York. They don't want the dirt, just sell them
15  the business. I could then sell the dirt and I
16  could pay off all the creditors and all the
17  lenders, and after all, you borrowed the money,
18  folks, and you'll end up with a charitable
19  foundation and you can do all the mission-driven
20  stuff you want to do.
21          I said guys, you sit here as the
22  least well-capitalized health system in the
23  Greater New York area, and if I take you through
24  Chapter 11, you're going to emerge, after I've
25  sold off your excess real estate, as the least
```

TSG Reporting - Worldwide     877-702-9580

Page 199

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   well-capitalized health system in the Greater
3   New York area and why do you want to do that?
4   Why don't you just punch it in, cash out the
5   chips, pay back the money and go do your
6   mission-driven business.
7           And in a discussion that was
8   fascinating to watch, the lay and the clerical
9   members debated back and forth what did it
10  actually mean to have Catholic healthcare, and
11  the decision of the board was notwithstanding
12  the fact that we could pay it all off, we're
13  going to go through Chapter 11, we're going to
14  scrape off what we can, we're going to try to
15  redo the real estate, and we're going to come
16  back out the other side with a Catholic health
17  system.
18          So when I said you can sin again,
19  it's nothing other you can go run up the debt
20  again, folks, and bring it around.
21      Q.   Are you testifying that it was
22  McDermott's advice to the hospital that it not
23  file for bankruptcy?
24      A.   McDermott's advice to the hospital
25  was that it had an alternative to bankruptcy but
```

TSG Reporting - Worldwide     877-702-9580

Page 200

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   not as an operator of acute care hospitals in
3   the Greater New York area.
4       Q.   And was it McDermott's advice to the
5   hospital that if it chose to file for bankruptcy
6   so that it could attempt to remain an acute care
7   provider within the Greater New York area, that
8   the bankruptcy would not solve the problems that
9   the hospital faced going into the case?
10      A.   No, it would solve the funda -- the
11  three fundamental problems that Saint Vincent's
12  had going into the case were dysfunctional
13  secured to lender, HUD, DASNY.
14          The second was about $250 million of
15  unsecured trade debt that you were never going
16  to be able to pay back.
17          There are four actually.
18          The third was the medical malpractice
19  liability exposure.
20          And the fourth was the dysfunctional
21  labor agreements.
22          Chapter 11 would solve each of those
23  problems. We can replace the HUD and DASNY, we
24  can deal with the unsecured debt, we can ring
25  fence the med mal liability, and if they want,
```

TSG Reporting - Worldwide     877-702-9580

Page 201

```
1   * CONFIDENTIAL - SMITH - UNDER PROTECTIVE ORDER
2   we can run an 1113 process on the labor
3   agreements. That's the toolbox to which you
4   will see referenced in Elizabeth's notes.
5           What Chapter 11 will not do, however,
6   is it will not cure the fact that when they come
7   out the other side, they are still going to be
8   the least well-capitalized health system in the
9   Greater New York area, which means that they are
10  the one most subject to an ill wind.
11      Q.   Do you recall any instances where the
12  board or senior management elected not to follow
13  McDermott's advice and instead instructed you to
14  do something contrary to your advice?
15      A.   No, I don't recall them. If they
16  did, it would be something like this. I didn't
17  advise one way or the other. I presented them
18  with an option. I told them you borrowed the
19  money, you've got an obligation to pay it back.
20  Here is a legitimate way that you can survive
21  without paying it back. So I didn't -- you made
22  reference to analogical and phenomenological.
23  This was an ontological and phenomenological
24  discussion.
25          And it's not my job as their lawyer
```

TSG Reporting - Worldwide     877-702-9580

**Exhibit J**

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4 ------------------------------------x
   In re

5

   SAINT VINCENT'S CATHOLIC MEDICAL     Chapter 11
6 CENTERS OF NEW YORK d/b/a SAINT        Case 05-14945
   VINCENT CATHOLIC MEDICAL CENTERS,     (ASH)
7 et al.,

8                    Debtors.
   ------------------------------------x

9

10

11              DEPOSITION OF STEPHEN SELBST

12                 New York, New York

13            Tuesday, September 19, 2006

14

15

16

17

18

19

20

21

22

23

24 Reported by:
   FRANCIS X. FREDERICK, CSR, RPR, RMR
25 JOB NO. 8583

Page 14

S. SELBST

1
2    A.   I said no one else was present.
3    Q.   I wasn't sure which meeting you
4    were referring to.  That was at both meetings
5    then?
6    A.   Correct.
7    Q.   The second meeting took place
8    when?
9    A.   Last week.
10   Q.   And how long did that meeting
11   last?
12   A.   Between an hour and a half and two
13   hours.
14   Q.   And you reviewed documents at
15   those meetings?
16   A.   No.
17   Q.   No documents were reviewed in
18   either meeting; is that correct?
19   A.   No.  Yes, that's correct.
20   Q.   But on your own you reviewed
21   documents in preparation for your deposition;
22   is that correct?
23   A.   Correct.
24   Q.   When did you first start working
25   on the St. Vincent's matter?

TSG Reporting - Worldwide     877-702-9580

Page 15

S. SELBST

1
2    A.   Late August or early September of
3    2004.
4    Q.   How did it come to pass that you
5    were asked to work on the St. Vincent's
6    matter?
7    A.   My partner, Bill Smith, asked me
8    if I could work on the matter.  If I had the
9    time to spend on it.
10   Q.   And when you first started working
11   on the matter, what were you doing?
12   A.   In August and September of 2004
13   St. Vincent's was losing money.  And with Bill
14   Smith and with the consultants from Huron we
15   were trying to evaluate the sources of the
16   losses, whether the then business plan was
17   sufficient to stem them and consider
18   alternatives if the business -- if the losses
19   could not be stemmed.
20        That's a broad description but
21   it's a -- but at the beginning of the case the
22   first thing you need to do is discover the
23   facts.
24   Q.   After the initial assessment what
25   was your role in the St. Vincent's matter?

TSG Reporting - Worldwide     877-702-9580

Page 16

S. SELBST

1
2    A.   That process, figuring out what
3    the sources of the losses were, what the
4    alternatives were, really never ended in the
5    fall of 2004.  But at the same time at the
6    direction of St. Vincent's we also began to
7    prepare for the possibility of a Chapter 11
8    filing.  And so with other lawyers at
9    McDermott I had oversight responsibility for
10   beginning that effort.
11   Q.   When did that effort begin?
12   A.   I don't remember the precise date
13   but it would have been sometime in the fall of
14   2004.
15   Q.   At whose direction did you begin
16   work on a Chapter 11 filing?
17   A.   Tim Weiss who was then the chief
18   financial officer told McDermott that he
19   wanted to be prepared for a Chapter 11 filing
20   if one were to become necessary.
21   Q.   Did you have that conversation
22   directly with Mr. Weiss?
23   A.   I'm not sure that I testified that
24   there was a conversation with Mr. Weiss.  My
25   recollection is that there were a series of

TSG Reporting - Worldwide     877-702-9580

Page 17

S. SELBST

1
2    group meetings at which I participated in
3    which the group came to a decision that that
4    was a necessary and prudent step to take.
5    Q.   Who attended these group meetings?
6    A.   There were a bunch of -- there
7    were a series of meetings in the fall of 2004.
8    So I can't recall specifically who attended
9    which meetings.  And I can't recall at this
10   time the exact dates of those meetings.  But
11   there were a series of meetings over that time
12   frame.
13   Q.   Was Tim Weiss present at each of
14   the meetings, to the best of your
15   recollection?
16   A.   I don't know if he was present at
17   each of the meetings so I can't answer that
18   question.
19   Q.   Was Bill Smith at each of the
20   meetings?
21   A.   I'm not certain of that either.
22   Q.   Was Bill Smith at most of the
23   meetings?
24   A.   Yes.
25   Q.   Was Tim Weiss at most of the

TSG Reporting - Worldwide     877-702-9580

Page 18

S. SELBST

1
2   meetings?
3       A.   I believe Tim Weiss was present at
4   most of the meetings.
5       Q.   Was David Speltz at most of the
6   meetings?
7       A.   No.
8       Q.   Do you recall if he was at any of
9   the meetings?
10      A.   Yes.
11      Q.   Was the sole subject of those
12  meetings the prospect of a Chapter 11 filing?
13      A.   No.
14      Q.   Do you recall what subjects were
15  discussed?
16      A.   Yes.
17      Q.   What was discussed?
18      A.   Alternatives to Chapter 11.
19      Q.   Did these meetings occur in the
20  fall of 2004 on a regular basis?
21      A.   They weren't scheduled -- if your
22  question was were they scheduled every third
23  Tuesday, the answer is no.  They were called
24  as needed.
25      Q.   And how many of them were there in

Page 19

S. SELBST

1
2   total?
3       A.   I don't know.
4       Q.   Was it more than five?
5       A.   I don't recall.
6       Q.   Do you recall what the
7   alternatives to Chapter 11 were that were
8   discussed?
9       A.   In a general sense.  Not
10  specifically.
11      Q.   And what do you recall about them?
12      A.   One alternative, which ultimately
13  was the alternative that St. Vincent's adopted
14  in the fall of 2004, was to monetize the value
15  of the real estate and generate funds from
16  real estate financing activities.
17           The other alternative was to
18  improve cash flow from operations.  And the
19  then goal was to put St. Vincent's in a
20  position -- where it would be positive cash
21  flow from operations.
22      Q.   And the option that was selected
23  in the fall of 2004 was to try to monetize the
24  value of the real estate; is that correct?
25      A.   No, it's not correct.  St.

Page 20

S. SELBST

1
2   Vincent's management was trying to do
3   everything it could to improve its financial
4   position.  So the management, headed by
5   Messrs. Speltz and Weiss were always
6   attempting to improve the cash flow from
7   operations.
8            But to the extent that they needed
9   additional liquidity beyond what the
10  operations were generating they were looking
11  to monetizing the value of real estate.
12      Q.   Were there any other alternatives
13  that were explored in the fall of 2004?
14      A.   Yes.
15      Q.   What do you recall about them?
16      A.   I recall that another alternative
17  was looking to get additional liquidity from
18  HFG, the receivables lender.
19      Q.   Any other alternatives that were
20  considered?
21      A.   David Speltz wanted to pursue
22  whether any additional funding or support
23  could be available from the New York
24  Department of Health and/or Governor Pataki's
25  office.

Page 21

S. SELBST

1
2       Q.   Any other alternatives that were
3   considered?
4       A.   If there were other alternatives
5   that were considered I can't recall them at
6   this time.
7       Q.   Was anything done to pursue the
8   possibility of getting additional liquidity
9   from HFG?
10      A.   I was not present for any meetings
11  with HFG.  But I learned from Tim Weiss that
12  he had had a series of conversations with HFG
13  about increasing the availability under the
14  receivables based line through the fall of
15  2004.
16      Q.   Was anything else done to get
17  additional funds from the New York Department
18  of Health or Governor Pataki's office?
19      A.   I don't know to what extent if any
20  David Speltz pursued those alternatives.  He
21  may have but I don't know.
22      Q.   Was the sale of St. Mary's
23  Hospital an alternative that was considered in
24  the fall of 2004?
25      A.   I was not directly involved in it.

6

Page 22

S. SELBST

1  But I knew that at that time St. Vincent's was
2  exploring the sale of St. Mary's Hospital.
3  
4      Q.   Do you know if anyone from
5  McDermott was involved at that time in the
6  possibility of selling -- strike that.
7          Do you know if anybody from
8  McDermott was involved in the possibility of
9  selling St. Mary's Hospital?
10     A.   I don't know the time frame but I
11 know that there came to be a time when my
12 partner, Bill Smith, was involved in exploring
13 alternatives for St. Mary's.
14     Q.   Did you ever have any involvement
15 in efforts to try to sell St. Mary's Hospital?
16     A.   At what time?
17     Q.   At any point in time.
18     A.   I had tangential involvement.
19     Q.   And when was that?
20     A.   In July of 2005.
21     Q.   And what possibility was there for
22 the sale of St. Mary's Hospital in July of
23 2005?
24     A.   In July of 2005 St. Mary's was
25 looking -- excuse me -- St. Vincent's was

Page 23

S. SELBST

1  looking at Kingsbrook taking over a number of
2  the clinics. But there was also some
3  additional real estate and I was involved with
4  the St. Mary's legal staff about attempting to
5  sell off some of the surplus real estate that
6  was associated with the St. Mary's campus.
7      Q.   Was any of that real estate
8  ultimately sold?
9      A.   I don't know.
10     Q.   Prior to September 13th, 2005, to
11 your knowledge, was it sold?
12     A.   To my knowledge, it was not sold
13 prior to September 13th, 2005.
14     Q.   Other than consulting with St.
15 Mary's legal staff what else was your
16 involvement in efforts to try to sell real
17 estate associated with St. Mary's Hospital?
18     A.   I believe that one of the parcels
19 that was associated with St. Mary's was a
20 facility known as Parson's Manor. And I
21 believe that the debtors filed a motion to
22 sell Parson's Manor. And that motion was
23 handled by my partner, James Sullivan, and I
24 did consult with him about that.
25

Page 24

S. SELBST

1  
2      Q.   When you say consulted with him
3  about that, what did you do?
4      A.   He asked me questions, I answered
5  them.
6      Q.   Did you review a draft of the
7  motion?
8      A.   I don't recall.
9      Q.   Was there anything else that you
10 did to aid efforts to try to sell real estate
11 associated with St. Mary's?
12     A.   Not beyond what I've testified to.
13     Q.   In connection with work that
14 McDermott did to prepare for a possibility of
15 a Chapter 11 filing, what was your role?
16     A.   I didn't have a single role.
17     Q.   What were your roles, then?
18     A.   I was one of the people who was
19 looking at the drafts of the various first
20 stay pleadings as they evolved over time. In
21 particular I had responsibility for the first
22 stay affidavit of Tim Weiss which was filed.
23 I also had responsibility for understanding
24 the pre-petition debt structure. And I was
25 the point person, both in looking for

Page 25

S. SELBST

1  
2  pre-petition non-DIP financing and then later
3  in looking for DIP financing.
4      Q.   Who was the draftsperson for the
5  Tim Weiss affidavit?
6      A.   I was the principal author.
7      Q.   When did you begin work on that?
8      A.   I can't recall the precise date.
9      Q.   Was it prior to June 1 of 2005?
10     A.   I just said I can't recall the
11 precise date.
12     Q.   Do you recall the time of year?
13 Was it in the spring?
14     A.   I'm just not sure.
15     Q.   Were there any other documents
16 filed in connection with the first stay
17 motions that you were the principal author of?
18     A.   No.
19     Q.   In addition to the work that you
20 were doing in connection with preparing for
21 the possibility of a Chapter 11 filing in the
22 latter part of 2004 and the first half of 2005
23 was there any other work that you were doing
24 on behalf of St. Vincent's?
25     A.   Yes.

Page 90

S. SELBST

1  court Supreme issuing such a binding order.
2  And we viewed that as absolutely detrimental
3  to St. Vincent's.
4      Q.   Who participated in making this
5  strategy decision about how to address the
6  TRO?
7      A.   I think it was primarily me and
8  Bill Smith. We certainly had conversations
9  with Elizabeth St. Clair about it as well.
10     Q.   You and Bill decided on a course
11 of action and then you made a recommendation
12 to Ms. St. Clair; is that how it went?
13     A.   I don't remember whether
14 specifically it was a recommendation. But it
15 was certainly -- it certainly culminated in a
16 recommendation. I think there was a
17 discussion and then we said this is what we
18 think the right answer is. So I think there
19 was a full collegial discussion and then I
20 think we said this is the way we think we need
21 to go.
22     Q.   And this full collegial
23 discussion, was that one that just you and
24 Bill was involved in or was Ms. St. Clair also

TSG Reporting - Worldwide    877-702-9580

Page 91

S. SELBST

1  participating in that?
2      A.   I know I spoke -- here's what I
3  remember. I remember I spoke to Bill at least
4  once that day. I know I spoke to Elizabeth at
5  least once that day. What I don't remember
6  was whether the three of us were on the call
7  together or whether it was serial
8  conversations. I just don't recall that. But
9  I know I spoke to both of them that afternoon.
10     Q.   Do you recall if Ms. St. Clair had
11 anything to say about the alternative of not
12 going in to fight the TRO and instead going to
13 Judge Beatty?
14     A.   I don't recall her saying anything
15 of that kind.
16     Q.   But you and Bill Smith considered
17 the possibility of going directly to Judge
18 Beatty in lieu of going to the state court
19 judge; is that correct?
20     A.   Um-hum. Yes, we did.
21     Q.   The decision on how to proceed was
22 made on that Friday, correct?
23     A.   I think we made the recommendation
24 that Friday and people were working on it. I

TSG Reporting - Worldwide    877-702-9580

Page 92

S. SELBST

1  think -- yeah, I can't recall whether it was
2  made the Friday or the Saturday. As I said,
3  as you pointed out in your question, it was a
4  fairly intense work weekend. So my
5  recollection is it was a Friday. If somebody
6  else testified it was a Saturday they might be
7  right.
8      Q.   And were you principally
9  responsible then for putting together the
10 papers to try to get the TRO lifted?
11     A.   No. I had people working at my
12 direction.
13     Q.   You were the one with ultimate
14 supervisory authority?
15     A.   Yes.
16     Q.   And on what date did your papers
17 go in?
18     A.   I believe our papers were filed at
19 the state court on that Monday, the 25th.
20     Q.   And what were the specific
21 documents that you filed?
22     A.   I think we filed an affidavit of
23 my partner, Larry Slattery. And I don't
24 recall at this time -- I mean, if you hand me

TSG Reporting - Worldwide    877-702-9580

Page 93

S. SELBST

1  the documents it may refresh my recollection
2  but I don't recall what additional papers were
3  filed.
4      Q.   Is Larry Slattery a litigation
5  partner?
6      A.   Yes.
7      Q.   After filing the papers in state
8  court what happened next?
9      A.   We appeared in state court on
10 Monday. My recollection is that it was Monday
11 afternoon before Justice Jones.
12     Q.   Did Larry Slattery make the
13 appearance or did you?
14     A.   Larry and I both appeared.
15     Q.   And did you both argue?
16     A.   The judge didn't take a formal
17 argument. He wanted a little bit of
18 discussion about what this case was about. We
19 did make a brief statement of why we believed
20 that the state court had no jurisdiction, why
21 the action interfered with the automatic stay.
22 The petitioner in the state court action
23 opposed that. And the Department of Health
24 was present but had not formally appeared in

TSG Reporting - Worldwide    877-702-9580

Page 234

```
1              S. SELBST
2      Q.   Did you participate either in
3  person or by phone in any discussions that
4  Bill Smith had with anybody from St. Vincent's
5  to discuss this issues prior to the bankruptcy
6  filing?
7      A.   I may have, Howard, but I don't
8  recall any specific conversations.
9      Q.   Do you recall any specific
10 conversations after the bankruptcy filing?
11     A.   The reason I'm pausing is I know
12 that Bill had discussions with Elizabeth St.
13 Clair about this issue after the Chapter 11
14 filing.  And what I'm not capable of
15 separating in my mind, Howard, is
16 conversations he may have had with me from
17 conversations he may have had with others.
18          And so the answer is I can't
19 recall a specific conversation.
20     Q.   You said Bill Smith had research
21 done on the disinterestedness issue prior to
22 the bankruptcy filing.  Did you see the
23 results of the research?
24     A.   No.
25     Q.   Did you have any discussion with
   TSG Reporting - Worldwide      877-702-9580
```

Page 235

```
1              S. SELBST
2  Bill or any of the other McDermott attorneys
3  about the results of the research?
4      A.   If I did it was in a very general
5  way and not a specific way.
6      Q.   And do you recall any discussion
7  about the conclusion having been reached that
8  the specific relationship between Huron and
9  Speltz and Weiss, and in particular
10 compensation or fee arrangements, needed to be
11 disclosed?
12     A.   I don't recall any specific
13 conversation about that.
14     Q.   Do you recall any conversations
15 among any McDermott attorneys about
16 specifically not disclosing any of those
17 things in Huron and Speltz and Weiss retention
18 pleadings?
19     A.   I most emphatically do not recall
20 any discussion with anybody at McDermott about
21 not disclosing things.
22     Q.   Did you have occasion to review
23 the retention papers that were filed initially
24 on July 5th, 2005 for Huron or Speltz and
25 Weiss?
   TSG Reporting - Worldwide      877-702-9580
```

Page 236

```
1              S. SELBST
2      A.   I'm sure I read them at some
3  point.
4      Q.   Do you recall having any reaction
5  to what was or was not disclosed in those
6  papers --
7      A.   No.
8      Q.   -- about the Speltz and Weiss
9  Huron relationship?
10     A.   While I -- as I said before, I
11 read lots of drafts of the first-stay
12 pleadings.  I don't recall any specific
13 recollection to the Speltz and Weiss
14 application and I have no specific
15 recollection of any reaction to the pleading
16 in any shape or form.
17     Q.   You had no discussions with
18 those -- with David Cleary about any of those
19 issues?
20     A.   No.  You know, most of my
21 discussions about case issues were really not
22 with David.  Most of my discussions about case
23 issues were with Bill Smith.
24     Q.   How would you characterize your
25 involvement in any issues in the case that
   TSG Reporting - Worldwide      877-702-9580
```

Page 237

```
1              S. SELBST
2  pertained to the Speltz and Weiss or Huron
3  retentions?
4      A.   I'm going to try to be consistent
5  and, as I told your colleague a few hours ago,
6  tangentially.
7      Q.   So it was not something that was
8  primarily on your plate.
9      A.   That's what I testified to
10 previous and it's my story and I'm sticking to
11 it.
12     Q.   I thought it was your testimony,
13 not your story.
14     A.   Okay.  It's my testimony.  And I'm
15 sticking to it.
16     Q.   Were you involved in any
17 discussions after the bankruptcy filing with
18 other McDermott attorneys to discuss the
19 concerns that the US Trustee and the committee
20 raised about the Speltz and Weiss or Huron
21 retentions?
22     A.   Yes.
23     Q.   Do you recall the substance of any
24 of those discussions?
25     A.   I recall one or more discussions
   TSG Reporting - Worldwide      877-702-9580
```

60

1          S. SELBST
2  with Bill Smith about whether he was making
3  progress in his negotiations with the US
4  Trustee's office and the creditors committee.
5       Q.   Did he think he was making any
6  progress?
7       A.   Initially he did.  As time passed
8  his optimism waned.
9       Q.   Did he express any opinions to you
10 about how he felt the US Trustee or the
11 committee were approaching these issues?
12      A.   I would say that from time to time
13 he expressed some frustration that he had not
14 been successful in persuading them of the
15 merits of his view.
16      Q.   Did he ever consider changing his
17 view to adopt his view to the merits of their
18 position?
19      A.   You're going to have to talk to
20 him about that.  He didn't express that to me.
21      Q.   So you have no personal knowledge
22 of that.
23      A.   That's correct.
24      Q.   Let's turn to the financing for a
25 little bit.  Did you have occasion from the

1          S. SELBST
2  fall of 2004 forward to review St. Vincent's
3  pre-petition debt and capital structure?
4       A.   Yes.
5       Q.   Did McDermott commission any
6  appraisals of the real estate that St.
7  Vincent's owned around the New York
8  metropolitan area?
9       A.   In the fall of 2004 James Woods,
10 whom I previously described as the acting head
11 of real estate for St. Vincent's, had gotten
12 relatively recent appraisals.  So I knew St.
13 Vincent's had relatively recent appraisals.
14      Q.   Do you have any recollection today
15 of the total value of the real estate as
16 appraised in the fall of 2004?
17      A.   No.  What I remember was that
18 there was discussion on the first -- I believe
19 that whatever the either appraised or
20 estimated value of the real estate was, it was
21 alleged in the cash collateral motion.  And I
22 remember there was colloquy with the Court
23 about the amount of the equity cushion on or
24 about July 5th.
25           But as I sit here today, I don't

1          S. SELBST
2  remember what the appraised value was.
3       Q.   Do you know if it was in excess of
4  $500 million in the fall of 2004?
5       A.   I don't recall.
6       Q.   Do you recall what the total debt
7  secured by real estate was in the fall of
8  2004?
9       A.   Not as I sit here today.
10      Q.   Did you ever discuss with St.
11 Vincent's -- let's talk about -- let's isolate
12 the periods.  In the period beginning in the
13 fall of 2004 until McDermott stopped working
14 the first time.  Did you ever have discussions
15 with St. Vincent's about obtaining additional
16 secured financing using the value of the real
17 estate as collateral?
18      A.   In general terms, yes.
19      Q.   Was there any serious
20 consideration given as you recall to obtaining
21 additional secured financing with the real
22 estate?
23      A.   There wasn't serious
24 consideration.
25      Q.   Why was that?

1          S. SELBST
2       A.   Because -- really there were two
3  reasons.  The first reason was that in the
4  fall of 2004 David Speltz and Tim Weiss were
5  still firmly behind their view that they had
6  effected a turn-around of the operations of
7  the hospital.  And they believed that by the
8  fourth quarter of 2004 the hospital would be
9  cash flow positive.
10          At that time Jim Woods was
11 pursuing -- and ultimately did pursue and
12 closed sometime either late third quarter or
13 early fourth quarter of '04 a $50 million real
14 estate financing.
15          And it was the belief of
16 management, meaning Speltz and Weiss, that the
17 combination of the turn-around which they
18 expected and the proceeds from this real
19 estate financing were going to solve St.
20 Mary's -- St. Vincent's -- we've been talking
21 about St. Mary's all day and it's on my
22 mind -- St. Vincent's cash flow problems once
23 and for all.
24      Q.   Who was the lender on that $50
25 million borrowing?

Page 242

S. SELBST

1
2    A.   I don't remember.
3    Q.   Was it Sun Life or RCG?
4    A.   I don't remember.
5    Q.   You don't remember.
6        At what point from April 2005
7    going forward did McDermott first start
8    considering debtor in possession financing?
9    A.   I don't recall the specific date.
10   But what I do remember is that we were only
11   authorized to pursue debtor in possession
12   financing after we had made extensive attempts
13   to secure nondebtor in possession financing.
14   Q.   Your efforts to secure nondebtor
15   in possession financing were in connection
16   with an out-of-court restructuring?
17   A.   A proposed out-of-court
18   restructuring, yes.
19   Q.   Do you recall any of the lenders
20   that you talked to about proposed non-DIP
21   financing?
22   A.   Yeah.  I testified to that this
23   morning.  JPMorgan Chase, CIT, Cerberus,
24   Silver Point, HSBC.  And there may have been
25   others.  But it was -- we made -- we made

Page 243

S. SELBST

1
2    efforts to contact every single potential
3    lender that had been identified either by
4    McDermott internally or by Huron Consulting as
5    being a potential lender to St. Vincent's
6    based upon the real estate collateral.
7    Q.   Were you personally involved in
8    those efforts?
9    A.   Yes.
10   Q.   When did it become apparent to
11   McDermott, Huron, St. Vincent's, that you
12   would not be able to obtain nondebtor in
13   possession financing?
14       MR. COOK:  Objection.
15   Q.   When did it become apparent to
16   McDermott that you would not be able to obtain
17   non-DIP financing?
18   A.   I don't recall the precise date
19   but I would have said it would be either late
20   May or early June of 2005.
21   Q.   And is it fair to say that the
22   debtors would have learned about that
23   inability to obtain non-DIP financing at or
24   around the same time?
25   A.   We certainly would have advised

Page 244

S. SELBST

1
2    them of the response of each and every
3    financial institutional lender as and when
4    received.
5    Q.   So after you learned that you
6    would not be able to obtain non-DIP financing,
7    who authorized McDermott or any other
8    professional to try to line up a DIP loan?
9    A.   I don't recall a specific
10   individual authorizing this.
11   Q.   Which lenders did you approach for
12   DIP financing?
13   A.   My recollection is basically we
14   went back to the same universe because a
15   number of those potential lenders had told us
16   they might be prepared to consider a DIP loan
17   but would not be prepared to consider a loan
18   outside of Chapter 11.
19   Q.   All right.  Did any of those
20   potential lenders give you any kind of an idea
21   of how much time it would take to line up firm
22   DIP financing?
23   A.   They gave varying estimates.
24   Q.   Were any of the estimates less
25   than 30 days?

Page 245

S. SELBST

1
2    A.   No.
3    Q.   Did you also talk to HFG about DIP
4    financing?
5    A.   Yes.
6    Q.   When did you start having those
7    discussions with HFG?
8    A.   Well, as I testified to Mr. Long
9    earlier today, HFG had had a strong view from
10   early 2005 that St. Vincent's needed to seek
11   relief under Chapter 11.  And so what I would
12   say is that there had been a series of
13   discussions.  And this is consistent with what
14   I told Mr. Long earlier today.
15   Q.   You mean Mr. Johnson?
16   A.   Mr. Johnson.  Excuse me.  Excuse
17   me.  Earlier today.  There had been a series
18   of discussions carried on in part between Tom
19   Allison of Huron Partners and HFG, and in part
20   between Mr. Weiss of St. Vincent's, about
21   additional liquidity being made available.
22       At some point, when it became
23   clear that HFG was not prepared to provide
24   additional liquidity outside of Chapter 11 the
25   conversations took the form of what would a

Page 246

S. SELBST

1  DIP look like. It would have been within the
2  time frame I previously testified to, either
3  late May or early June.
4      Q.   Do you recall having any
5  discussions with HFG at that time about paying
6  a $2 million termination fee for the
7  pre-petition receivables line?
8      A.   I don't recall that specifically,
9  no.
10     Q.   Are you aware as you sit here
11 today that St. Vincent's paid HFG a $2 million
12 termination fee right before they filed?
13     A.   I believe that it was not paid
14 voluntarily by St. Vincent's but that HFG
15 charged the account for that amount.
16     Q.   But you recall -- you don't recall
17 any discussions with HFG's lawyers about that?
18     A.   I don't recall any discussion with
19 HFG's lawyers. I remember Bill Smith told me
20 that he had gotten a call from Tim Weiss and
21 Tim was extremely unhappy about it. And the
22 way that Bill conveyed it to me was that HFG
23 had simply charged the loan account for that
24 amount.
25

Page 247

S. SELBST

1      Q.   Are you familiar with the term
2  Project Vulcan?
3      A.   I've heard that term.
4      Q.   Do you know what it refers to?
5      A.   I think its refers to the project
6  of getting St. Vincent's ready for Chapter 11.
7      Q.   Now, I believe you testified that
8  McDermott came back into the picture around
9  April '05 to start preparing for the Chapter
10 11. Is that accurate?
11     A.   Earth late March, early April
12 sometime in that time frame.
13     Q.   Late March, early April. Why is
14 it that if you were preparing for a Chapter 11
15 filing late March, early April '05 you didn't
16 turn your attention to DIP financing until
17 after out-of-court financing alternatives were
18 exhausted?
19     A.   Like a lot of Chapter 11 debtors,
20 there was deep, profound resistance and
21 reluctance to file for Chapter 11. And,
22 again, all this is laid out in Mr. Weiss's
23 affidavit. The senior management of St.
24 Vincent's, including Mr. Speltz and Mr. Weiss,
25

Page 248

S. SELBST

1  had a firm view that both the Chapter 11 would
2  not be necessary and that there was a strong
3  likelihood that they'd be able to effect an
4  out-of-court result. And so as a consequence
5  the advice that both McDermott gave and Huron
6  Consulting gave was that by the spring of '05,
7  that the debtors should be shopping for DIP
8  financing.
9      But, instead, the direction that
10 came from the senior management was you're not
11 authorized to seek DIP financing until we
12 exhaust the possibilities for an out-of-court
13 restructuring. Meaning out-of-court
14 refinancing.
15     Q.   Given that McDermott and Huron
16 were advising the debtors in the spring of '05
17 that they should be turning their attention to
18 DIP financing, do you recall -- do you recall
19 discussions with the debtors after they told
20 you that they didn't want you to look at DIP
21 financing at that time?
22     A.   I'm sorry. You're going to have
23 to parse that question more, please.
24     Q.   Let me rephrase the question.
25

Page 249

S. SELBST

1      Did McDermott ever say to the
2  debtors, Well, we understand you don't want to
3  look at DIP financing now. But if we're going
4  to prepare for a filing we're not going to be
5  able to get DIP financing, you know, in a
6  week. We need time to go out and line up
7  financing. Something like that?
8      A.   Yeah. It was said to the debtors
9  on more than one occasion.
10     Q.   So it's your belief that St.
11 Vincent's management, despite your advice, did
12 not want to go out and look for DIP financing?
13     A.   That's true. And I want to
14 elaborate just a little bit.
15     I've said before and I'm just
16 going to say again, David Speltz had a belief
17 that he was going to be able to obtain aid
18 from some third party that was going to keep
19 St. Vincent's out of Chapter 11. He believed
20 unfortunately wrongly that St. Vincent's was
21 too important politically and socially that it
22 wouldn't be rescued.
23     And so as a consequence, despite
24 being urged by both Huron and McDermott to
25

Page 250

S. SELBST

1  seek DIP financing, he basically said to us
2  you can't do that until you exhaust the
3  non-DIP alternatives. And it was really what
4  I've now testified to twice when we came back
5  with a bunch of no's, probably on or about
6  Memorial Day of 2005, then but only then did
7  he say you're authorized to look for DIP
8  financing, advisors.
9      Q.   Did one of the alternatives to
10 bankruptcy in the spring of 2005 include the
11 sale of any of St. Vincent's properties, if
12 you recall?
13     A.   That was an attempt -- that was a
14 project the debtors were pursuing, yes.
15     Q.   Do you recall which properties
16 they were trying to sell?
17     A.   There were a number of properties
18 the debtors were trying to sell. Jim Woods
19 had listed a bunch of the surplus properties
20 particularly in the outer boroughs with a firm
21 called Mazey & Bickel, they're just a local
22 New York City based real estate firm. But the
23 one that Jim had high hopes for which
24 ultimately did not come to fruition was a

TSG Reporting - Worldwide    877-702-9580

Page 251

S. SELBST

1  piece of property near the main St. Vincent's
2  campus in Greenwich Village, a parcel that was
3  called The Triangle which Jim had hoped to
4  sell for $30 million.
5      Q.   Do you know if Jim had any buyers
6  lined up for The Triangle property?
7      A.   He had a couple of people lined up
8  but he did not have land use approvals for the
9  sale. He had a couple of people who were
10 extremely interested and he had a high level
11 of confidence he could sell it. But he hadn't
12 jumped through the land use hoops.
13     Q.   Now, when you talked about trying
14 to accomplish an out-of-court restructuring,
15 by that you did mean both out-of-court
16 financing and sales of assets?
17     A.   There was a -- when I talked about
18 the out-of-court thing it was a combination of
19 things. It was sales and/or financing of the
20 real estate, plus operational turn-around,
21 plus repairing the somewhat damaged
22 relationship with the trade creditors as well.
23     So the idea was a multi-faceted
24 attempt to address both the immediate pressing

TSG Reporting - Worldwide    877-702-9580

Page 252

S. SELBST

1  problems, that is to say liquidity and trade
2  supplies, and the more structural problems
3  which is that the hospital wasn't operating on
4  a cash flow break-even which as I understand
5  it's still not operating today.
6      MR. MAGALIFF:  Thanks. I don't
7  have any other questions.
8      THE WITNESS:  Okay.
9      MR. COOK:  Good way to end it.
10 Thank you.
11     (Time Noted:    4:26 p.m.)

20     _____
       STEPHEN B. SELBST

22 Subscribed and sworn to before me
23 this ___ day of _____, 2006.

TSG Reporting - Worldwide    877-702-9580

Page 253

1
2          C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                     : ss.
5  COUNTY OF NEW YORK  )
6      I, FRANCIS X. FREDERICK, a
7  Notary Public within and for the State
8  of New York, do hereby certify:
9      That STEPHEN B. SELBST, the
10 witness whose deposition is
11 hereinbefore set forth, was duly sworn
12 by me and that such deposition is
13 a true record of the testimony given by
14 the witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that
18 I am in no way interested in the
19 outcome of this matter.
20     IN WITNESS WHEREOF, I have
21 hereunto set my hand this 29th day of
22 September, 2006.

25     _____
       FRANCIS X. FREDERICK

TSG Reporting - Worldwide    877-702-9580

64

# Exhibit K

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, et al.,

              Debtors.

Chapter 11
Case No. 05-14945 (ASH)

(Jointly Administered)

AFFIDAVIT OF WILLIAM P. SMITH IN SUPPORT OF APPLICATION OF McDERMOTT
WILL & EMERY LLP UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R. BANKR. P. 2016 FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES
JULY 5, 2005 THROUGH SEPTEMBER 30, 2005

STATE OF ILLINOIS      )
                   ) ss.
COOK COUNTY       )

      William P. Smith, being duly sworn, deposes and says:

1.     I am a member of McDermott Will & Emery LLP ("McDermott"), former primary attorneys for Saint Vincent's Catholic Medical Centers ("SVCMC") and each of its affiliated debtors, each a debtor-in-possession in the above-captioned cases (collectively, the "Debtors"). I submit this affidavit in support of McDermott's application (the "Fee Application") for compensation and for reimbursement of expenses for the period from July 5, 2005 through September 30, 2005 (the "Compensation Period").

2.     In preparation for this affidavit, I reviewed (i) the Fee Application; (ii) the objection of the creditors' committee in these cases (the "Committee"), dated March 3, 2006, opposing the Fee Application; (iii) the objection of the United States Trustee for the Southern District of New York (the "UST"), dated March 7, 2006, opposing the Fee Application.; (iv) McDermott's reply dated March 20, 2006, in support of the Fee Application; (v) the Debtors'

10255158.4        1

objection to the Fee Application, dated July 31, 2006; and (vi) McDermott's reply to the Debtors' objection, dated August 25, 2006.

Background

3.     On July 5, 2005 (the "Petition Date"), each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors own and operate one of the New York metropolitan area's most comprehensive health care systems, serving more than 600,000 patients annually.

5.     The Debtors serve as the academic medical center of New York Medical College in New York City.

6.     The Debtors are also one of the New York metropolitan area's largest employers with approximately 12,500 full and part-time employees.

7.     As of the Petition Date, the Debtors operated seven hospitals: St. Vincent's Hospital, Manhattan; Bayley Seton Hospital, Staten Island; Mary Immaculate Hospital, Queens; St. John's Hospital, Queens; St. Mary's Hospital, Brooklyn; St. Vincent's Hospital, Staten Island; and St. Vincent's Hospital, Westchester.

8.     In 2004, the Saint Vincent's system had total revenues (including gifts) of $1.557 billion and recorded a net operating loss of $143.4 million.

9.     The Debtors' chapter 11 cases are large and complex.

10.    The sheer size of the Debtors makes formulating a plan of reorganization an exceedingly intricate and lengthy process.

11.    The Debtors' cases are further complicated by the Debtors' status as not-for-profit entities, whose fiduciary duties run not only to their creditors, but also to their charitable purposes.

10255158.4        2

12.    Because the Debtors are not-for-profit debtors, they are required not only to address the concerns of their creditors, but also the concerns of their patients and of the communities that the Debtors serve.

13.    The Debtors are subject to a host of regulatory and licensing requirements that often require them to obtain approval for their major business decisions.

14.    The Debtors' status as not-for-profit corporations necessarily increases the complexity of these cases.

15.    Prior to the Petition Date, the Debtors lacked sufficient cash to make payroll.

16.    Prior to the Petition Date, the Debtors' relationships with vendors and employees were strained.

17.    Prior to the Petition Date, the Debtors were losing, on average, more than $1 million per week, with an acute loss of liquidity in April and May.

18.    While McDermott was primary bankruptcy counsel (from July 5 through September 13, 2005), the Debtors' condition and outlook had improved.

19.    The Debtors had obtained final authorization for debtor-in-possession ("DIP") financing with HFG of up to $100 million based on available collateral, $65 million of which was new money. Additionally, the Debtors' management told me that by September 13, 2005, the Debtors' cash and cash availability under the HFG DIP facility exceeded $70 million, $35 million of which was new money, which was more liquidity than had been available at any time during the prior year.

20.    By September 13, 2005, the Debtors were close to obtaining an order to close St. Mary's Hospital and cutting millions in losses.

10255158.4        3

21.    By September 13, the Debtors had negotiated definitive term sheets from CIT Healthcare, Inc., GECC, HFG/Marathon Structured Finance Fund, L.P., and General Motors Acceptance Corp. for an expanded, ultimately $350 million DIP financing facility.

22.    By September 13, the Debtors had restored relationships with many of their customers and vendors and were able to secure higher collections from customers and obtain better trade terms with many vendors.

23.    By September 13, 2005, the Debtors had the outline of a business plan and program for emerging from chapter 11.

24.    By September 13, 2005, the Debtors had obtained interim approval for DIP financing with Commerce Bank, for $27.5 million, to be used to repay pre-petition secured debts owed to Commerce Bank in the amount of $19 million plus $8.5 million of additional availability. In addition, the Debtors were very close to obtaining final approval of the Commerce Bank DIP financing, which provided the Debtors with $7.5 million of additional availability, for a total of $35 million.

25.    In addition, the Debtors were close to arrangements for $16 million in DIP financing from Commerce Bank, freeing up $323,356.92 of collateral from Commerce Bank, freeing up approximately $1.3 million in collateral from HSBC, and had obtained final approval for an additional $6.8 million of new money from DASNY and HUD.

McDermott's Retention

26.    McDermott served as the Debtors' primary bankruptcy counsel from July 5, 2005 through September 13, 2005.

27.    McDermott staffed the Debtors' cases with attorneys from McDermott's New York, Chicago, Washington, D.C. and Los Angeles offices.

28.    I was the McDermott partner in charge of the Debtor's bankruptcy cases.

10255158.4        4

29.    The Debtors requested that McDermott's Chicago lawyers work on the cases because of their expertise in healthcare-related and reorganization matters.

30.    The hourly billing rates of McDermott's Chicago attorneys are lower than even some junior attorneys in New York offices of other larger firms, sometimes by as much as $100 per hour.

31.    McDermott's staffing of the Debtors' cases was reasonable and appropriate.

32.    The Debtors terminated McDermott and replaced it with Weil Gotshal & Manges LLP ("Weil") on September 13, 2005.

33.    Upon McDermott's termination, Elizabeth St. Clair ("St. Clair"), the Debtors' Chief Legal Officer, sent a September 14, 2005 email, a copy of which is attached hereto as Exhibit A, stating, "on behalf of the institution, I apologize to each of you."

34.    St. Clair also reported to me in a September 16, 2005 email, a copy of which is attached hereto as Exhibit B, that the "[Weil] team underwhelming. I miss you all."

35.    At all times during these cases, McDermott's services were (a) at its client's request, (b) in furtherance of the Debtors' paramount concern: quality patient care and (c) in the best interest of these estates.

36.    At all times during the Period, McDermott was generally forthcoming with information that the UST and Committee requested regarding the Debtors' management, asset disposition and financial affairs.

Speltz & Weis LLC/Huron Consulting Retention

37.    On April 13, 2004, SVCMC engaged Speltz & Weis LLC ("SW") to provide management advisory services to SVCMC pursuant to the terms of a management agreement (the "Management Agreement") for a period of one year.

38.    The minutes of the September 17, 2004 Board meeting reflect that the Board resolved to appoint David Speltz ("Speltz") of SW as the Chief Executive Officer ("CEO") of SVCMC on September 17, 2004.

39.    The minutes of the September 17, 2004 Board meeting reflect that the Board resolved to appoint Timothy Weis ("Weis") of SW as the Chief Financial Officer ("CFO") of SVCMC on September 17, 2004.

40.    The Board resolved on May 5, 2005, to renew the Management Agreement until October 31, 2005.

41.    Messrs. Speltz and Weis served as CEO and CFO, respectively, of SVCMC until August 24, 2005.

42.    In September 2004, the Board retained McDermott to provide to SVCMC advice about a possible debt restructuring.

43.    On September 22, 2004, McDermott presented to the Board various restructuring alternatives, including seeking chapter 11 protection, describing the advantages and disadvantages of each alternative. A copy the minutes of the Board's September 22 Board meeting, attaching McDermott's presentation, is attached hereto as Exhibit C.

44.    McDermott described in its September 22 presentation the obligations of a debtor under chapter 11, including the reporting and disclosure requirements of "life in a fishbowl."

45.    The Board decided to cause Huron Consulting Services LLC ("Huron") to be retained as financial advisors on October 4, 2004. A copy of the Huron retention agreement is attached hereto as Exhibit D.

46.    On June 22, 2005, I received an email, a copy of which is attached hereto as Exhibit L, from Ronald Barliant of the law firm Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., introducing himself as Huron's counsel.

47.    Barliant, a former bankruptcy judge, represented Huron as counsel in these cases from at least the June 22, 2005, through the end of McDermott's engagement.

48.    Barliant participated in discussions with McDermott and the Debtors senior management regarding the strategy to retain SW and Huron in the Debtors' chapter 11 cases, starting on or about June 22, 2005.

49.    Barliant has never served as counsel to either SW or Huron.

50.    McDermott reported to Speltz and a number of other senior people at SVCMC who would act in effect as a management committee. Those people included Speltz, Weis, Tom Allison (of Huron), Jim Woods, Dawn Gideon, Bernadette Kingham-Bez, Elizabeth St. Clair, and, if appropriate, the SVCMC operating heads.

51.    I first learned in the winter of 2005 that Messrs. Speltz and Weis might sell SW and were in discussions with a number of potential purchasers, including Huron Consulting Group, Inc. ("Huron Group"), the parent of Huron.

52.    I learned from Messrs. Speltz and Weis in late April 2005 that the negotiations regarding Huron Group's potential acquisition of SW were becoming serious.

53.    Upon learning of the possible Huron acquisition of SW, I:

    •    commissioned research memoranda from McDermott attorneys regarding the issues that could arise from such an acquisition in the event of a SVCMC bankruptcy filing, including a memoranda prepared by Thomas Augspurger on May 3, 2005 (a copy of which is attached hereto as Exhibit F) and June 1, 2005 (a copy of which is attached hereto as Exhibit G)

    •    devised alternative strategies for addressing those issues, as noted in an email I sent to Weis on April 29, 2005 (a copy of which is attached hereto as Exhibit H); and

    •    discussed those alternative strategies with other attorneys, including Leo Crowley (a bankruptcy attorney and special counsel retained by the Board to investigate Huron Group's acquisition of SW) and Barliant, counsel for Huron.

54.    McDermott, in consultation with other attorneys, including Crowley and Barliant, determined initially to seek Court approval of the SW Management Agreement under Bankruptcy Code section 363 and of Huron's retention under Bankruptcy Code section 327.

55.    SW and Huron each wanted to be approved for retention by the Bankruptcy Court for public relation purposes.

56.    I understood, based on an email from David Cleary, a then McDermott partner, sent on June 22, 2005(a copy of which is attached hereto as Exhibit I), that Cleary had spoken with Barliant and given him our thoughts and approach. Barliant, after looking into the approach, believed that McDermott's strategy was correct and would have approached it the same way.

57.    On June 23, 2005, I reported in an email to Cleary (a copy of which is attached hereto as Exhibit J) discussing the SW and Huron retentions that Leo Crowley ("Crowley"), a bankruptcy lawyer and special counsel retained by the Debtors' Board to investigate the acquisition of SW by Huron Group, also agreed with McDermott's proposed approach regarding the SW and Huron retention. I also told Cleary that Crowley expressed concern about the reactions of external constituencies, such as Elliot Spitzer, examiners, the Committee, and disgruntled employees, if the Debtors' cases became a meltdown.

58.    McDermott reported those issues and the strategies to Speltz and Weis at SVCMC.

59.    As noted in an April 27, 2005 email sent to me by Speltz (a copy of which is attached hereto as Exhibit K), I had a telephone conversation on April 26, 2005, with Messrs. Weis and Speltz in which they discussed whether Huron's potential acquisition of SW would have any implications in the event SVCMC filed for bankruptcy and sought to retain SW and Huron on a post-petition basis.

60.    I advised Messrs. Speltz and Weis at that time that I could not provide legal advice to them relating to the potential sale of SW.

61.    In that April 26, 2005 telephone conversation, I also told Messrs. Speltz and Weis the retentions of SW and Huron could present issues concerning disinterestedness, the Jay Alix Protocol and conflicts.

62.    I did not immediately disclose Huron Group's potential acquisition of SW to the Board after my call with Weis and Speltz.

63.    I did not immediately disclose Huron Group's potential acquisition of SW to the Board after my call with Weis and Speltz because Speltz represented to me that he, Speltz, had already told Richard Boyle ("Boyle"), the chairman of the Board, about the negotiations between SW and Huron Group.

64.    Huron Group, SW, Speltz and Weis entered into an agreement, dated as of May 5, 2005, for Huron Group to acquire SW (the "Acquisition Agreement," a copy of which is attached hereto as Exhibit L).

65.    The acquisition of SW by Huron Group closed on May 9, 2006.

66.    Between May 5 and May 9, 2005, I understood that the acquisition was not certain to close.

67.    Upon learning of Huron Group's acquisition of SW, the Board retained as special counsel Crowley of Pillsbury Winthrop Shaw Pittman LLP to investigate and report to the Board any the conflict of interest and similar issues presented by the acquisition of SW by Huron Group.

68.    On June 23, 2005, Crowley interviewed me as part of his investigation.

69.    On June 23, 2005, I directed David Cleary another partner at McDermott, by email (a copy of which is attached hereto as Exhibit M) to include the disclosures about Huron Group's acquisition of SW; the Speltz and Weis employment agreements with Huron Group; and the earn-out arrangements between SW and Huron Group in the motion to approve the Management Agreement.

70.    On July 5, 2005, McDermott filed a motion in the Bankruptcy Court seeking approval of Huron's retention as the Debtors' financial advisors, a copy of which is attached hereto as Exhibit N.

71.    On July 5, 2005, McDermott filed a motion in the Bankruptcy Court to approve the Management Agreement (the "July 5 Motion," a copy of which is attached hereto as Exhibit O) for a limited three month term – July 5 through October, 2005.

72.    The term of the Management Agreement expired in October 31, 2005.

73.    The Debtors did not intend to extend the term of the Management Agreement beyond October, 2005.

74.    McDermott was responsible for determining which disclosures should be made in the July 5 Motion.

75.    Contrary to my instructions to Cleary, the July 5 Motion filed by McDermott did not disclose the details of the acquisition, the employment agreements, or the earnouts.

76.    The July 5 Motion did, however, disclose Huron Group's acquisition of SW.

77.    On learning that the July 5 Motion did not contain what were in my judgment the proper disclosures, I directed Cleary to withdraw the July 5 Motion.

78.    The July 5 Motion was withdrawn by McDermott at my direction.

79.    The hearing on the SVCMC motion to approve the Management Agreement was adjourned by McDermott on July 15, 2005, without a return date (as described below), although McDermott circulate many drafts among the interested parties for comment between July 5 and August 24, 2005. A copy of the Notice of Adjournment is attached hereto as Exhibit P.

80.    On July 25, 2005, I asked Boyle, the Chairman of the Debtors' Board, by email (a copy of which is attached hereto as Exhibit Q) whether McDermott "should [continue] pushing the Speltz & Weis retention application."

81.    Boyle responded by email on July 25 (a copy of which is attached hereto as Exhibit R), instructing me to "proceed for Speltz and Weis. The Executive Committee will meet on [July 29] and, [Boyle] expect[s], will approve the actions being taken by Huron and waive the conflict issue."

82.    During an Executive Session of the Board at the July 21 meeting, the Executive Committee discussed Crowley's report and the proposed remedial measures.

83.    Messrs. Boyle and Edward V. Lahey (the former general counsel for PEPSICO and a member of the Debtors' corporate governance committee and compliance committee) advised the Executive Committee in that Executive Session that they explored the possibility of discontinuing or substantially modifying the engagement of SW and/or Huron, and concluded that in the short run, especially due to the recent bankruptcy filing, that would be very disruptive

and therefore inadvisable. Boyle and Lahey then recommended that the Executive Committee and the Board waive the conflicts in question, subject to several conditions.

84.    The Executive Committee resolved that conflicts of interest disclosed to the Executive Committee be waived subject to the conditions and limitations recommended by the Crowley in his report.

85.    To implement Crowley's recommendation that SVCMC ensure detailed hands on supervision of Huron's work for SVCMC, including a review of staffing decisions, bills, budgets and work plans, the Board requested, and I agreed on McDermott's behalf by email on July 29, 2005 (a copy of which is attached hereto as Exhibit S), to review the fees and expenses charged by Huron for St. Vincents projects.

86.    As recommended by Crowley's report, SVCMC, SW and Huron Group also entered into a letter agreement on July 22, 2005 (approved by the Board on July 29, 2005), guaranteeing, among other things, that Huron would make the services of Messrs. Speltz and Weis available as required in the Management Agreement and would otherwise undertake to assure that SW performs its obligations under the Management Agreement.

87.    Crowley did not provide copies of his reports to McDermott

88.    St. Clair did not provide copies of Crowley's reports to McDermott.

89.    I told St. Clair that if she gave me a copy of Crowley report, I would have to give it to the UST and the Committee.

90.    I was aware of the J. Alix Protocol prior to July 5, 2005, and believed that it was not binding law on cases filed in the Southern District of New York because I believed there were cases in this district when the UST did not requirement compliance with the J. Alix Protocol.

91.    McDermott submitted to the UST, prior to the Petition Date, drafts of motions to be filed on the first day of the Debtors' chapter 11 cases, including a draft of the July 5 Motion.

92.    The UST objected to Debtors' attempt to retain both SW and Huron.

93.    McDermott, in consultation with other attorneys, including Ronald Barliant, a former bankruptcy judge acting as Huron's counsel, considered the UST's opposition to the dual retentions, but concluded that it disagreed with the UST's position.

94.    On July 21, 2005, the UST asked McDermott for a copy of the SW Management Agreement, and as I requested by email on July 21, 2005 (a copy of which is attached hereto as Exhibit T), McDermott provided the Management Agreement to the UST on July 22, 2005.

95.    McDermott understands that Huron's counsel later provided the UST with a copy of the Acquisition Agreement.

96.    On July 13, 2005, McDermott caused an amended motion to approve the Management Agreement, a copy of which is attached hereto as Exhibit U, to be filed with the Bankruptcy Court.

97.    The July 13, 2005 version of the motion to approve the Management Agreement was filed inadvertently.

98.    On July 15, 2005, McDermott filed a notice of adjournment without date of hearing on the July 13 motion to approve the Management Agreement.

99.    The UST met with Stephen Selbst and David Cleary of McDermott and St. Clair, the Debtors' Chief Legal Officer, on July 18, 2005, to discuss the concerns regarding the SW and Huron retentions.

100.    St. Clair reported to me by email on July 18 (a copy of which is attached hereto as Exhibit V), the outcome of the meeting with the UST, stating the UST "continues to be troubled

10255558.4

13

by the affiliate relationship and conflict of interest between SWLLC and Huron.  She is not satisfied with the written presentation of the details and sent us back to redo it.  She has not rejected it out of hand, but [St. Clair's] sense is that she remains somewhat dubious."

101.    I discussed the issues relating to the retentions of SW and Huron with Boyle and St. Clair on July 19, 2005.

102.    The UST sent a letter on July 20, 2005 (a copy of which is attached hereto as Exhibit W), to Stephen Selbst and David Cleary of McDermott and Ronald Barliant (Huron's counsel) stating the UST's objections to the dual retention of Huron and SW.

103.    I forwarded to St. Clair, Speltz and Weis by email on July 20, 2005 (a copy of which is attached hereto as Exhibit X), the UST's July 20 letter, informing them of the UST's stated objections to the retentions.

104.    As noted in my handwritten notes dated July 21, 2005 (a copy of which is attached hereto as Exhibit Y), I met with the UST and the Committee's counsel on July 21, 2005.

105.    On July 21, 2005, the UST objected to the Debtors' attempt to approve the Management Agreement and retain Huron as financial advisors in the chapter 11 case, but stated she would agree in effect to support the retentions of both through the end of October 2005 by having Huron consultants made available to SVCMC as seconded employees of SW.

106.    I reported to other attorneys at McDermott and Barliant in a July 21, 2005 email (a copy of which is attached hereto as Exhibit Z) that the UST said at the July 21 meeting that she would not oppose the motion to approve the Management Agreement if it was revised to provide that:  (i) Huron's application would be withdrawn; (ii) Huron personnel would be used to supplement SW's services; and (iii) the application to approve the Management Agreement otherwise complied with the J. Alix Protocol.

10255558.4

14

107.    I also forwarded to St. Clair by email on July 22, 2005 (a copy of which is attached hereto as Exhibit AA), my above-described report about the UST's remarks at the July 21, 2005 meeting.

108.    I understood, based on a July 21, 2005 conversation with Martin Bunin, acting as counsel to the Committee, that the Committee objected to the Debtors' attempt to approve the Management Agreement or retain Huron but gave no reasons for the Committee's opposition other than that the Committee thought SW were really bad guys and they had to go because they were paid a lot of money and their turnaround plan did not work.

109.    I understood, based on Bunin's comments, that there were no circumstances under which the Committee would agree to the retention of SW.

110.    1199 SEIU United Benefits Fund ("1199") is the Debtors' fourth largest unsecured creditor and a member of the Committee.

111.    The Committee, including 1199, did not support the SW management team.

112.    In fact, 1199 Healthcare Workers East purchased an ad in the New York Times on November 10, 2005 (a copy of which is attached hereto as Exhibit BB), for the purpose of publishing an open letter to Boyle stating that the "entire Board would resign" because:

> St. Vincent's mission is being abandoned... It is beyond comprehension how [Boyle] can permit the ravaging of this wonderful system by "professionals" and "consultants"...Sadly, it is bad enough that the Board has abandoned its obligation to the people of New York, but it can only be through either sheer incompetence, neglect or lack of vision that it has embarked on such path of destruction.  How else can it be explained that you paid your last set of highly priced consultants $29 million for just over 18 months of work?  And let them pay themselves an advance of nearly $1 million just days before they filed for bankruptcy?  A bankruptcy that has been a year in the making.  Who let them get away with this?  And failed to hold them responsible for "losing" track of $60 million in

10255558.4

15

revenue during their first year on the job... To say the Board had been asleep at the wheel is an undeserved kindness.

113.    McDermott advised the Board on or about July 29, 2005, that McDermott met on July 21, 2005, with the UST and counsel for the Committee.

114.    I conveyed to Speltz, Weis and to St. Clair the concerns expressed by the UST and Committee at the July 21, 2005 meeting and the UST's requested modifications to the motion to approve the Management Agreement.

115.    I recommended to Speltz and Weis on July 21, 2005, that the Debtors adopt the UST's requests made to me on July 21, 2005, because the UST's requests were reasonable and the Debtors should implement them.

116.    I advised the UST and Committee's counsel on July 21, 2005 that the Debtors would comply with the UST's requests described in paragraph 106.

117.    On July 27, 2005, I circulated by email (a copy of which is attached hereto as Exhibit CC) a revised draft of the motion to approve the SW Management Agreement to Ronald Barliant, Speltz, Weis, Crowley, and St. Clair requesting suggestions to the draft motion.

118.    In connection with reviewing disclosure issues in the revised draft of the motion to approve the Management Agreement circulated by McDermott, Crowley told St. Clair and me in a July 27, 2005 e-mail (a copy of which is attached hereto as Exhibit DD) that "[t]he final call on what to put in [motion to approve the Management Agreement] is yours in collaboration with the hospital, but without veto by interested parties."

119.    Crowley also told St. Clair and me in that July 27, 2005 email that "I think, however, that [Speltz] and [Weis] have a legitimate concern (which affects not just them but also the hospital) about opening the door and the possibility of the committee and the US Trustee rushing in. My own feeling is that the board identified a conflict and took appropriate advice and

10255558.4

16

reached a valid decision to waive it based on reasonable conditions. I think we are all a bit concerned that others might think that the board let them off too easy (although I certainly don't think so) or might use this issue as a lever to try seek some further remedy whether it be a trustee, examiner, or simply conditions and limits on the SWLLC/Huron engagement."

120. On July 28, 2005, McDermott circulated to the UST and the Committee for comment an amended draft motion to approve the Management Agreement. Copies of the July 28, 2005 email to the Committee and the July 29, 2005 email to the UST circulating the amended draft motion are attached hereto as Exhibits EE and FF, respectively.

121. The July 28 draft of the motion to approve the Management Agreement was an effort to address as many of the items requested by the UST and Committee as McDermott could at that time.

122. The July 28 draft of Weis's affidavit in support of motion to approve the Management Agreement disclosed:

> Huron's parent, [Huron Group], acquired SWLLC on May 9, 2005, after both Huron and SWLLC had begun performing services for the Debtors. Under the terms of that acquisition agreement, there are circumstances under which [Huron Group] would owe additional consideration if Huron personnel performed additional services on matters referred by SWLLC. Because that acquisition agreement was entered into after Huron and SWLLC had already been separately engaged by Saint Vincent's, and because of concerns by the Board about issues that might be raised by the acquisition (such as the form and manner of billing, management responsibilities for Huron personnel, the fulfillment of certain commitments under the Management Agreement and the potential for conflicts of interest), the Board, [Huron Group] and SWLLC entered into discussions regarding those issues. They have agreed, among other things, that notwithstanding the terms of the acquisition agreement, there will be no additional compensation due or paid directly or indirectly to the former owners of SWLLC as a result of the Saint Vincent's engagement (A copy of the letter agreement... is attached hereto) .... In addition, Huron will reimburse Saint Vincent's for attorneys' fees incurred by the

Board, which retained separate counsel for purposes of those discussions. Furthermore, SWLLC will manage and bill for the engagement as set forth in [the motion for approval of the Management Agreement].

123. Compiling the information for disclosure in the motion was complicated and difficult because of the number of people involved, including the UST; the Committee; inside and outside counsel for Huron (including Barliant); human resources personnel for Huron; counsel for SW; and Crowley.

124. Additionally, the information for disclosure in the motion was complicated by the fact that the J. Alix Protocol requires that all personnel who are working be listed in the application. There were many SW employees and many Huron employees providing services to the Debtors, and getting a list of who those people were, what their jobs were, and what their hourly rates were was extremely difficult.

125. McDermott withdrew the Huron Application on August 1, 2005, in response to the UST's request for withdrawal. A copy of the notice of withdrawal is attached hereto as Exhibit GG.

126. On August 12, 2005, the UST informed McDermott by letter (a copy if which is attached hereto as Exhibit HH) that UST's "concerns have not been resolved by the amendments to" the July 28 draft motion to approve the Management Agreement.

127. The UST's August 12, 2005 letter provided no further explanation as to why the July 28 draft of the motion failed to resolve her concerns.

128. The UST's August 12, 2005 letter made no mention of the motion's compliance with the J. Alix Protocol.

129. I responded by email on August 12 (a copy of which is attached hereto as Exhibit II) to the UST's letter, copying St. Clair (the Debtors' Chief Legal Officer), and expressing the

willingness of the Debtors and McDermott to meet with the UST and Committee to discuss their opposition to the SW retention.

130. By the second week of August 2005, I shared with Boyle, the Chairman of the Debtors' Board, my belief that the tenure of Speltz as CEO had become unsupportable.

131. On August 19, 2005, I attended a meeting with the Committee.

132. At that meeting, I understood that the members of the Committee would not accept the Debtors' retention of SW because, when I tried to appeal to their fundamental common sense by explaining that the Debtors were only seeking SW's retention for a limited time (through October, 2005), Ted Berkowitz, counsel for 1199, told me to shut up because nobody cared.

133. McDermott, the UST and the Committee's counsel then met later on August 19, 2005. A copy of my hand-written notes from that meeting is attached hereto as Exhibit JJ.

134. At the August 19 meeting, the UST stated that she would not consent to SW's retention, and the UST and Committee demanded the appointment of a "Chief Restructuring Officer."

135. From July 21 until August 19, McDermott prepared and circulated numerous draft motions to retain SW and Huron in the manner that was agreeable to the UST on July 21, 2005, but McDermott was unable to create an acceptable draft before the UST changed her mind on August 19, 2005, and demanded the dismissal of Messrs. Speltz and Weis.

136. On August 21, 2005, I requested that the Executive Committee of the Board schedule a meeting to be held no later than August 24, 2005, to discuss the opposition of the UST and Committee to the retention of SW.

137. On August 21, I sent an email (a copy of which is attached hereto as Exhibit KK) to St. Clair to report that I had requested that the Executive Committee meeting be schedule.

138. The Debtors' Executive Committee convened a "special" meeting on August 24, 2005, to discuss the August 19 meeting among McDermott, the UST and the Committee's counsel.

139. On August 24, 2005, I relayed to the Executive Committee of the Board the concerns articulated by the Committee and the UST regarding Messrs. Speltz and Weis.

140. At the August 24, 2005 meeting, after thorough and comprehensive discussion, it was decided, that the Executive Committee would ask Messrs. Speltz and Weis to resign from their positions as CEO and CFO respectively and that the Executive Committee appointed Boyle as interim President and CEO and Thomas Allison as interim CFO.

141. I advised the UST and Committee on August 24, 2005 by phone and by email of the outcome of the Executive Committee meeting.

142. No order was entered prior to August 24, 2005 approving the Management Agreement between SW and the Debtors on either an interim or final basis.

143. McDermott submitted no subsequent motion seeking approval of the SW Management Agreement to the Court for consideration after it adjourned without date a on July 15, 2005, the initial hearing on the motion.

144. After the resignations of Messrs. Speltz and Weis, the UST sent a letter to McDermott on August 25, 2005 (a copy of which is attached hereto as Exhibit LL), proposing that a Chief Restructuring Officer, to be selected by the Committee in consultation with the UST, be appointed to oversee the Debtors' operations (the "CRO Proposal").

145. Based on research conducted by McDermott, including the memoranda contained in emails from Nili Yolin (a McDermott associate) on September 2 and 4, 2005 (copies of which are attached hereto as Exhibits MM and NN, respectively) and an email from David Ivill (a McDermott partner) on September 6, 2005 (a copy of which is attached hereto as Exhibit OO), McDermott determined that the CRO Proposal was not feasible under the New York state regulatory scheme for the operation of a hospital.

146. The Debtors instructed McDermott to notify the UST and Committee of their decision to reject the CRO Proposal.

147. McDermott, as instructed by its client, advised the UST and Committee in a September 7, 2005 letter (a copy of which is attached hereto as Exhibit PP), that after consideration, the Debtors were unable to accept the CRO Proposal.

148. After consulting with Boyle, St. Clair, and other members of the Debtors' senior management, McDermott offered in the September 7 letter a counterproposal for procedures for selection of the Debtors' new permanent management.

149. After McDermott was replaced, Weil submitted on October 21, 2005, an application for an order authorizing Huron's retention *nunc pro tunc* to July 5, 2005, a copy of which is attached hereto as Exhibit QQ.

150. The October 21, 2005 application for authorization to retain Huron and the supporting papers, which were filed by Weil, did not disclose that Messrs. Speltz and Weis had employments contracts with Huron Group.

151. Attached to the October 21, 2005 application to retain Huron are "Supplemental Conditions to Huron/SVCMC Engagement Letter," dated as of July 21, 2005.

152. Those supplemental conditions contain a provision titled "Retention Controversy Fee Adjustment," which provides that "Huron and S&W agree that the estates have incurred or will incur administrative expense for the time spent by the Committee, the Debtors and their respective professional advisors in connection with the Huron/S&W retention and will reimburse (or take credit on fees approved for payment) the estates for such administrative expense as hereinafter provided."

153. The Court granted the SVCMC application to retain Huron on an interim basis on October 28, 2005 (a copy of the order is attached hereto as Exhibit RR), and on a final basis on December 14, 2005 (a copy of the order is attached hereto as Exhibit SS).

154. Huron currently provides management and restructuring consulting services, and SW personnel currently provide services to the Debtors through their "secondment" to Huron.

155. Huron was retained despite the fact that Messrs. Speltz and Weis currently have employment contracts with Huron Group.

156. I did not act inappropriately or unreasonably in not telling the Board in April or early May 2005 of the potential transaction between Huron Group and SW because: (i) I believed, on the basis of what Speltz told me (i.e., that he, Speltz, had informed Boyle) the Chairman of the Debtors' Board (Boyle) already knew of negotiations; (ii) I learned of the potential transaction from the Debtors' CEO (Speltz), making it unnecessary and inappropriate to disclose information to other individuals at SVCMC; and (iii) at that time, I understood that the transaction was not certain to close.

157. McDermott accepted the Debtors' instructions regarding the SW/Huron retentions, which McDermott believed were supported by the Debtors' business judgment.

158. McDermott advised the Debtors of the legal alternatives to obtain Court approval of the SW/Huron retentions.

159. Following (i) discussions of legal options with Speltz, Weis, St. Clair and Huron's counsel, including Ronald Barliant; and (ii) consideration of relevant legal issues (including the J. Alix Protocol), McDermott adopted flexible, pragmatic legal strategy at the outset of the Debtors' cases to obtain approval of the SW/Huron retentions.

160. I kept the Debtors' senior management and the Board informed of the concerns raised by the UST and Committee by providing regular updates to Speltz, Weis, St. Clair and Boyle regarding key meetings, conferences, and correspondence.

161. McDermott considered and analyzed the objections of the UST and the Committee to the SW retention.

162. McDermott revised the application to approve the SW Management Agreement in order to address the concerns of the UST and the Committee, including, among other things, (i) a discussion of the J. Alix Protocol; (ii) further disclosure of the relationship between SW and Huron; and (iii) disclosure of the remedial measures adopted by the Board to address potential conflicts raised by the SW/Huron relationship.

163. The disclosures contained in the revised July 28 draft motion to approve the Management Agreement were reasonable and appropriate under the circumstances, particularly because (i) Crowley's report was privileged and confidential, (ii) Crowley's report had made recommendations to rectify the issues raised in the report, which the Board had considered (and ultimately adopted on July 29), and (iii) McDermott was unable to obtain in time complete factual information from SW.

164. The position taken by McDermott with respect to negotiations with the UST and the Committee for the SW/Huron retentions was reasonable and pragmatic because McDermott was acting at its client's direction to obtain Court approval of critical retentions in their chapter 11 cases.

165. In connection with the SW/Huron retentions, McDermott spent approximately 209.6 hours during the Period, the approximate value of which is $97,380.16 based on McDermott's blended hourly rate for attorneys ($464.60) during the Period.

166. McDermott's services in connection with the SW/Huron retentions, at the time they were rendered, were beneficial to the estates.

167. The services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

168. A reasonable counsel in McDermott 's position would not have disregarded its client's instruction on the SW/Huron retentions.

Closure of St. Mary's Hospital

169. On June 1, 2005, prior to the Petition Date, the Debtors' Board of Directors (the "Board") resolved to close St. Mary's Hospital.

170. I attended the June 1, 2005 Board meeting. A copy of the minutes of the June 1, 2005 Board meeting are attached hereto as Exhibit TT.

171. On June 1, 2005, the Board instructed management and counsel, including McDermott, to take the necessary and appropriate action for the closure of St. Mary's Hospital.

172. In connection with the closure of St. Mary's, McDermott assisted the Debtors in negotiating with potential buyers of the hospital.

173. McDermott knew that the Debtors wanted to close St. Mary's as expeditiously as possible consistent with prudent practice, standards of care, and the regulatory environment.

174. McDermott knew that the Debtors wanted to close St. Mary's as promptly as applicable regulatory approvals could be obtained.

175. The closure of St. Mary's was subject to the rules and regulations of the New York State Department of Health ("DoH"), the regulations regarding not-for-profit corporations, and the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

176. McDermott was primarily responsible for obtaining Court approval of the closure of St. Mary's, while the Debtors' internal management, including Bernadette Kingham-Bez and St. Clair (the Debtors' Chief Legal Officer), was primarily responsible for the steps required to obtain canonical and regulatory approval of the closure.

177. The Debtors' management, not McDermott, had primary responsibility for obtaining DoH approval to close St. Mary's Hospital.

178. In June 2005, prior to the Petition Date, the Debtors made the application to the DoH to close St. Mary's Hospital.

179. McDermott did not review, and was not asked by SVCMC to review, the application to close St. Mary's that was made to the DoH prior to its filing.

180. At a June 17, 2005 meeting of the Executive Committee of the Board, the Executive Committee discussed the progress of the closure of St. Mary's Hospital setting as the target date for closure September 1, 2005. A copy of the minutes of the June 17, 2005 Executive Committee meeting are attached hereto as Exhibit UU.

181. I attended the June 17 meeting of the Executive Committee at which the Executive Committee set September 1, 2005, as the target date for the closure of St. Mary's Hospital.

182. In connection with the St. Mary's Hospital closure, McDermott provided certain services, including: (i) representing the Debtors in state court litigation (the "State Court Action") regarding the approval by the New York Department of Health of the closure plan; (ii) commencing an action in the Debtors' chapter 11 cases seeking, among other things, a declaration that the plaintiff in the State Court Action had violated the automatic stay; (iii) preparing and filing a motion, dated August 18, 2005, seeking authority to close St. Mary's Hospital (the "St. Mary's Motion"); (iv) responding to numerous objections filed in opposition to the St. Mary's Motion; (v) appearing at a hearing on August 23, 2005, on issues relating to the closure of St. Mary's Hospital; and (vii) appearing at a hearing on the St. Mary's Motion on September 7, 2005.

183. The St. Mary's community and employees contested the closure.

184. McDermott caused a series of motions to be filed on behalf of Debtors on the Petition Date (the "First Day Motions").

185. McDermott did not file a motion seeking permission to close St. Mary's Hospital with the First Day Motions.

186. McDermott could not have filed a motion seeking permission to close St. Mary's Hospital with the First Day Motions because its client had not authorized it to file such a motion at that time.

187. McDermott did not move for authority to close St. Mary's Hospital with the other procedural First Day Motions because it would have been irresponsible to do so at that stage in the case. The premature exposure of a hospital closure plan and closure proposals would draw precisely the type of litigation which ensued at a time when the regulatory environment was less settled on closure details, leading to a quagmire.

188. McDermott disclosed to the Court and interested parties the Debtors' intention to close St. Mary's Hospital on the Petition Date in an affidavit (i.e., Weis's affidavit under Local Bankruptcy Rule 1007-1, a copy of which is attached hereto as Exhibit VV) filed with the First Day Motions and in colloquy with the Court.

189. McDermott was not responsible for communications about the closure to St. Mary's employees.

190. On July 22, 2005, the Debtors issued notices of the St. Mary's closure to employees under the WARN ACT, a copy of which notice is attached hereto as Exhibit WW.

191. The notices issued by the Debtors under the WARN Act expired on October 4, 2005.

192. Between the Petition Date and July 22, 2005, McDermott took no steps to seek Bankruptcy Court permission to close St. Mary's hospital.

193. Between the Petition Date and July 22, 2005, McDermott could not have filed a motion seeking permission to close St. Mary's Hospital because its client had not authorized it file such a motion at that time.

194. McDermott did not seek Bankruptcy Court permission to close St. Mary's between the Petition Date and July 22, 2005, because the Debtors were not far enough along in the process of obtaining DoH approval of the closure.

195. In the State Court Action, where the Debtors were not named as parties, Harriet McCloud, a former patient of St. Mary's Hospital, obtained an ex-parte temporary restraining order in Kings County Supreme Court on July 22, 2005, restraining the New York State Department of Health ("DoH") from approving a closure plan for St. Mary's Hospital.

196. Immediately after receiving notice of the State Court Action, McDermott, on behalf of the Debtors, successfully took action in Kings County Supreme Court to persuade the state court that the State Court Litigation violated the automatic stay, and that the Kings County Supreme Court lacked jurisdiction.

197. When Harriet McCloud sought an emergency appeal in the Supreme Court, Appellate Division, McDermott, on behalf of the Debtors, successfully opposed the appeal.

198. After the State Court Action was commenced in Brooklyn state court, McDermott and St. Clair discussed on July 22, 2005, whether the Debtors should appear in the State Court Action or first seek relief from the Bankruptcy Court.

199. On July 22, 2005, McDermott and St. Clair concluded that the more prudent course was to appear in state court first, and to have papers prepared to seek relief in the Bankruptcy Court if the proceedings in the state court were not successful or going well.

200. On July 29, 2005, McDermott filed a complaint with the Bankruptcy Court, seeking a preliminary and permanent injunction to enjoin Ms. McCloud from prosecuting the State Court Action.

201. Stephen Selbst ("Selbst"), a McDermott partner, appeared on behalf of the Debtors at the August 4, 2005 hearing in the Bankruptcy Court on the Debtors' application for a preliminary and permanent injunction.

202. After the August 4 hearing, I directed that the closure plan for St. Mary's Hospital be filed with the Court.

203. McDermott prepared and filed on August 5, 2005, the 111-page affidavit of Bernadette Kingham-Bez (a copy of which is attached hereto as Exhibit XX) attaching the closure plan as an exhibit. The Kingham-Bez affidavit also provided financial information

regarding St. Mary's, described the Debtors' business rationale for seeking approval of the closure, described the Debtors' prior unsuccessful efforts to transfer St. Mary's, and described the process of obtaining the requisite regulatory approvals.

204.    After the August 4, 2005 hearing, Selbst and St. Clair both felt that someone else should handle the August 5 hearing in the adversary proceeding, and neither of them wanted to return to Bankruptcy Court the next day.

205.    I understood that St. Clair was not unhappy with McDermott regarding the August 4 hearing but was astonished that a federal judicial officer could act that intemperate fashion.

206.    McDermott had no senior bankruptcy lawyer other than Selbst who could appear at the August 5 hearing.

207.    I believe that Judge Beatty appeared to be calmer at the August 5 hearing, and she directed McDermott to bring a motion to close St. Mary's, which she would hear it in the normal course of business.

208.    After the August 5 hearing, McDermott took steps to increase the transparency of the closure process, including directing Cain Brothers to (i) create an E room for due diligence, into which McDermott could put all the St. Mary's financial material and other material that might be necessary for any inquirer to do fundamental due diligence on an acquisition of St. Mary's and (ii) contact a group of hospitals around the area again to see if they had any interest in St. Mary's.

209.    In the course of determining the appropriate response to and preparing for hearings in the State Court Action, inevitably anybody close to Saint Vincent's would have come to understand that bankruptcy court approval was absolutely mandatory.

210.    McDermott first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") on or about August 5, 2005, but had litigated the closure issue in the state court on July 24, 2005, and had submitted the 111-page Kingham-Bez affidavit to the Bankruptcy Court on August 5, 2005.

211.    McDermott filed the St. Mary's Motion on August 18, 2005.

212.    McDermott filed no affidavits or declarations in support of the St. Mary's Motion on August 18, but had filed the 111-page Kingham-Bez affidavit on August 5, 2005.

213.    McDermott did not include affidavits in support of the St. Mary's Motion because they were unnecessary to include, as McDermott had provided to the Court as part of the Order to Show Cause, Bernadette Kingham-Bez's August 5, 2005 affidavit attaching the closure plan and describing a variety of facts.  Moreover, it was McDermott's expectation that it would present evidence at a later hearing.

214.    I discussed with St. Clair prior to August 18, 2005, McDermott's strategy to present evidence through live witnesses rather than affidavits.

215.    I believed that St. Clair concurred with McDermott's conclusion that it would be better to put on fact witnesses at the hearing on the St. Mary's Motion than to include additional affidavits with the motion papers, particularly when the motion papers contained the material facts.

216.    McDermott was prepared to present evidence the next time McDermott appeared in Court regarding the St. Mary's Motion.

217.    The DoH approved the closure of St. Mary's Hospital on August 31, 2005.  A copy of the DoH closure order is attached hereto as Exhibit YY.

218.    Objections to the closure of St. Mary's Hospital were filed by the following objectors:  (i) Brooklyn Safety Net, LLC ("BSN") on August 30, 2005; (ii) Harriet M. McCloud on August 31, 2005; (iii) the Medical Staff (Physicians) Committee of St. Mary's, Mary Immaculate, and St. John's Hospitals on August 31, 2005; and (iv) the Bedford Stuyvesant Family Health Center, Inc. and Brownsville Multi Service Family Health Center on September 7, 2005.

219.    The UST took no position with respect to the Debtors' efforts to close St. Mary's Hospital.

220.    The Committee initially took no position with respect to the Debtors' efforts to close St. Mary's Hospital.

221.    During a weekly meeting of the Debtors' senior management and consultants on August 30, 2005, as my time records (a copy of which is attached hereto as Exhibit ZZ) reflect, I received a telephone call from Judge Beatty.

222.    During the above-described conversation, Judge Beatty explained how she wished St. Mary's to be handled and told me to appear on September 7 and have available all witnesses needed to answer any question that the Judge might ask,  but instructed me not to open my mouth.  She directed me to be quiet, humble, and apologetic.  She stated that she was going to take the steam out of the room, and then she was going to close St. Mary's.  She said that she was not going to do it on September 7, but would have another one or two hearings before she approved the closure.

223.    I reported to attendees of the meeting of the Debtors' senior management and consultants the substance of the above-described conversation with Judge Beatty, and the

attendees were pleased at the Court's undertaking to grant the relief prior to the expiration of the WARN Act notice.

224.    McDermott prepared and filed on September 2, 2005, the Debtors' omnibus reply to the objections to the St. Mary's Motion that comprehensively addressed the concerns raised by the objecting parties.

225.    As part of the Debtors' reply, McDermott filed no affidavits or declarations in response to any of the objectors' objections.

226.    Instead, McDermott intended to rely, if necessary, on live witnesses and the 111-page Kingham-Bez affidavit.

227.    The Committee filed a short response in support of McDermott's motion to close St. Mary's Hospital on September 2, 2005, a copy of which is attached hereto as Exhibit AAA.

228.    The Court held a hearing on the St. Mary's Motion on September 7, 2005.

229.    Selbst represented the Debtors at the September 7 hearing.

230.    I put Selbst in charge of the September 7 hearing because I did not have as extensive a background on the prior litigation proceedings to make the presentation as well as Selbst could, but I was available to step in if necessary.

231.    McDermott offered no testimony from any witnesses at the September 7, 2005 hearing in view of Judge Beatty's direction on August 30, 2005.

232.    I believe that by then, we knew precisely what Judge Beatty wanted.  Selbst's job was to stand up, make a brief introduction, and sit down while Judge Beatty, in her phrase, took the steam out of the room.

233.    At the September 7, 2005 hearing, the Committee's counsel, also with no supporting witnesses or declarations, made statements supporting the closure of St. Mary's Hospital, having been directed by the Court to take a position on the closure.

234.    The Court did not grant the St. Mary's Closure Motion on September 7, 2005, but adjourned the hearing, as she told me she would on August 30, 2005.

235.    On September 19, 2005, Weil, on behalf of the Debtors, filed the declarations of: Linda Brady, M.D., Kingsbrook HealthCare System LLC's president; Thomas M. Barry, Managing Director of Cain Brothers & Company, LLC (as supplemented on September 19, 2005); Dawn Gideon, the Debtors' then-Interim Chief Restructuring Officer; and Sister Jane Iannucelli, a member of the Board, in support of the St. Mary's Motion.

236.    The Court resumed the hearing on the St. Mary's Motion on September 20, 2005.

237.    The Court approved the closure of St. Mary's Hospital at the September 20, 2005 hearing.

238.    The closure of St. Mary's was approved by the Bankruptcy Court within approximately three weeks of the Debtors' September 1, 2005 target date and two weeks before the October 4 expiration of the WARN Act notice.

239.    The Debtors entered into an agreement on or about May 9, 2006, for the sale of St. John's Hospital and Mary Immaculate Hospital in Queens to Caritas Health Care Planning, Inc.  A copy of the motion seeking approval of the agreement is attached hereto as Exhibit BBB.

240.    The Court approved the terms of the sale on June 28, 2006.  A copy of the order is attached hereto as Exhibit CCC.

241.    To date, the debtors have been unable to obtain regulatory approval for the sale of St. John's Hospital and Mary Immaculate Hospital, and, as noted in the Debtors' motion, dated

10255158-4                                33

September 1, 2006, for approval of agreements between the Debtors and Wyckoff Heights Medical Center for Management Services at the Debtors' Queens Hospitals (a copy of which is attached hereto as Exhibit DDD), those hospitals continue to lose money.

242.    McDermott adopted a reasonable and appropriate legal strategy with regard to the timing of seeking bankruptcy court approval of the closure of St. Mary's because, among other reasons, (i) drafts of hospital closure plans are generally kept confidential until they are close to final; and (ii) the uncertainty of obtaining DoH approval of the closure.

243.    Indeed, St. Clair explained in colloquy with the Court at the August 4, 2005 hearing that the St. Mary's closure plan was a sensitive document that was subject to further modification at the time of that hearing.  An excerpt of the relevant portion of the August 4, 2005 transcript is attached hereto as Exhibit EEE.

244.    McDermott effectively worked with the Debtors to manage and respond to community opposition.

245.    McDermott effectively worked with the Debtors and their investment bankers to consider and address various community-based proposals regarding St. Mary's Hospital.

246.    McDermott's services, at the time they were rendered, were beneficial to the estates.

247.    McDermott's services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

248.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction on the St. Mary's Hospital closure.

249.    The Committee asserts that there was a delay in the Debtors' obtaining authority to close St. Mary's Hospital.

10255158-4                                34

250.    Any delay associated with the closure was not attributable to McDermott's handling of the matter.

Critical Vendors

251.    The Debtors' management determined, in exercise of its business judgment, that (a) the Debtors' viability as healthcare providers and (b) the welfare of their patients was dependent on their uninterrupted access to the goods and services provided by certain critical vendors, including suppliers of over-the-counter and prescription medicines, medical supplies, equipment, food and beverage supplies and sanitary items.

252.    The Debtors determined that the requested authority would not impair the Debtors' cash flows because (i) the authority was not a direction to pay and (ii) most of the Debtors' obligations to the critical vendors have customary payment terms and would not be payable in a lump sum.

253.    McDermott consulted with the Debtors' with respect to which vendors to include on the list of critical vendors to be the subject of the motion.

254.    McDermott advised the Debtors' Executive Committee that the list should include only a select few pre-petition vendors.

Construction Liens

255.    The Board determined, in the exercise of its business judgment, that for the Debtors' businesses to maximize value of the estates' assets, they had to maintain a reliable and efficient facility construction, repair and maintenance operation.

256.    The Debtors directed McDermott to obtain authority to pay certain prepetition claims relating to construction and other lien claimants in amounts, in the Debtors' business judgment, necessary and appropriate to maintain a reliable and efficient facility construction, repair and maintenance operation.

10255158-4                                35

257.    The Debtors estimated that the maximum amount needed to satisfy the secured claims of the construction and other lien claimants was approximately $2 million.

258.    McDermott, with Debtors' authorization, moved on July 5, 2005, for authority, but not direction, to pay the claims of approximately 67 construction and other lien claimants a total of up to $2 million (the "Construction Lien Motion"); a hearing was set for July 28, 2005.

259.    The UST took no position with respect to the Construction Lien Motion.

260.    After it formation on July 18, 2005, the Committee filed an objection on July 27, 2005 (a copy of which is attached hereto as Exhibit FFF), requesting an adjournment of the hearing to August 4, 2005, so as to give the Committee an opportunity to conduct due diligence regarding the Construction Lien Motion.

261.    The Court granted the Construction Lien Motion on August 25, 2005.

262.    The order approving the Construction Lien Motion requires the Debtors to give the Committee notice with an opportunity to object before the Debtors pay any such construction lien claims.

263.    While McDermott was the Debtors' primary bankruptcy counsel, the Debtors never made any payments to holders of construction liens without the Committee's consent.

264.    In connection with the Construction Lien Motion, McDermott spent approximately 10.1 hours during the Period, the approximate value of which is $4,692.46 based on McDermott's blended hourly rate for attorneys ($464.60) during the Period.

265.    The services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

266.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction in connection with the Construction Lien Motion.

10255158-4                                36

267.    McDermott's services in connection with the construction lien lists, at the time they were rendered, were beneficial to the estates.

<u>Lease Rejection</u>

268.    Before and following the Petition Date, McDermott advised the Debtors to review their leases for possible rejection.

269.    McDermott advised the Debtors that they should identify any contracts and leases that in their business judgment should not be assumed from an economic business perspective.

270.    McDermott suggested that, in evaluating whether to identify leases for rejection, the Debtors start with leases for property that were not occupied and the Debtors had no intention of occupying.

271.    McDermott also reviewed the Debtors' leases and contracts for such information as termination date, default remedies, and similar provisions that might affect the Debtors during their chapter 11 cases.

272.    As the Debtors identified leases for rejection, McDermott drafted each rejection motion and obtained an order authorizing such rejection.

273.    As the Debtors identified leases and agreements, McDermott filed motions within a week or ten days to reject them.

274.    The debtor's operations for lease analysis slowed materially during the beginning of the chapter 11 cases because the Debtors' real estate personnel were occupied with compiling schedules for the replacement DIP lenders rather than reviewing leases.

275.    McDermott moved on July 15, 2005 (the "<u>Lease Rejection Motion</u>") (10 days after the Petition Date), for authority to reject, among other things, seven executory contracts and unexpired leases for vacant premises.

276.    McDermott filed a supplemental rejection motion on July 28, 2005 (the "<u>Supplemental Rejection Motion</u>" and with the Rejection Motion, the "<u>Rejection Motions</u>") (23 days after the Petition Date).

277.    The Court granted the Lease Rejection Motion on July 29, 2005, and the Supplemental Rejection Motion on August 8, 2005.

278.    McDermott would have filed additional motions if directed to do so and the Debtors' management had not been occupied with other even more critical tasks (e.g., financing).

279.    McDermott's services in connection with the rejection of leases and contracts, at the time they were rendered, were beneficial to the estates. \

<u>DIP Financing</u>

280.    At the Debtors' request, McDermott began negotiating in mid-July 2005, the terms of post-petition financing with the DASNY and HUD, providing an additional approximately $6.8 million in financing.

281.    McDermott sought authority on August 2, 2005 for the Debtors to obtain financing from DASNY/HUD.

282.    The Court approved the DASNY/HUD financing motion on an interim basis on August 5, 2005, and on a final basis on September 8, 2005.

283.    By September 13, when Weil replaced McDermott, the Debtors' cash and cash availability exceeded $70 million.

284.    McDermott's services in connection with DIP financing, at the time they were rendered, were beneficial to the estates.

<u>Investigation of Tortious Interference Allegations</u>

285.    As early as August 2nd, the Committee and UST were discussing candidates to be replacement managers of the Debtors, and the Committee had interviewed at least Cambio, Navigant and Alvarez & Marsel.

286.    In mid-August 2005, the Debtors told McDermott that someone had apparently attempted to interfere with the Debtors' management.

287.    It was publicly known that the Committee was either contacting, interviewing or discussing the prospect of replacement management.

288.    Potential replacement managers were contacting the Debtors' staff and making proposals.

289.    I was told that one company was asked if it could have up to 20 administrative people in New York within three days of notice.

290.    McDermott investigated the facts and researched possible causes of action against anyone interfering with the Debtors' management.

291.    On August 11, 2005, I sent an email (a copy of which is attached hereto as Exhibit GGG) to the Debtors' management directing it to cease all communications and information transmittal to the Committee, cancel all meetings with the Committee's representatives, and "maintain radio silence" (the "<u>Radio Silence Instruction</u>").

292.    On August 13, 2005, I received an email from Speltz (a copy of which is attached hereto as Exhibit HHH) stating that "All of SV seems to know about the position of the committee and that Navigant, Cambio and [Alvarez & Marsel] [have] been again interviewed."

293.    After making the Radio Silence Instruction, I instructed McDermott attorneys to undertake an investigation of a rumor that the Committee had begun to interview candidates to

replace the Debtors' senior management and whether the Committee's efforts were interfering with the Debtors' management or affecting operations.

294.    McDermott's investigation lasted four business days.

295.    When McDermott determined that there was insufficient credible evidence of any wrongdoing, the investigation and research ceased.

296.    The investigation was short in duration and focused.

297.    After McDermott had concluded the investigation (four business days after issuance of the Radio Silence Instruction), I instructed Debtors' management to reopen communications with the Committee.

298.    In connection with the investigation of possible tortuous interference, McDermott spent approximately 109.5 hours during the Period, the approximate value of which is $50,873.70 based on McDermott's blended hourly rate for attorneys ($464.60) during the Period.

299.    McDermott's services in connection with the investigation of possible tortuous interference, at the time they were rendered, were beneficial to the estates.

300.    I believe that the tortuous interference investigation benefited the Debtors' estates because if McDermott had not performed that investigation, the Debtors' management would have demanded an investigation, and McDermott would have spent considerable time on deciding whether it should investigate the Committee. Having investigated and found nothing, McDermott was in a position to inform the Debtors that there was no claim against the Committee arising from the rumors.

301.    McDermott's services in connection with the investigation of tortuous interference allegations were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed

10/18/06  WED 10:02 FAX 312 554 7800    SRZ CHICAGO

SRZ Draft 10/17/06
Privileged and Confidential

William P. Smith

Notary Public

Sworn to before me this 8th day of October
2006

(Notary Public)

"OFFICIAL SEAL"
KIMBERLY J. MEINERT
Notary Public, State of Illinois
My Commission Expires Jan. 19, 2010

10255138.4                    41

---

**Index to Affidavit of William P. Smith**

| Smith Affidavit Exhibit | Description | Tabs in Joint Exhibit Binder |
|---|---|---|
| A | 9/14/05 (5:51 a.m.) E-mail from St. Clair to Smith, cc Selbst and Cleary re: SVCMC - Legal Advisors | 78 |
| B | 9/16/05 (11:07 a.m.) E-mail from St. Clair to Smith | 79 |
| C | 9/22/04 Minutes of the Special Joint Meeting of the Board of Directors and Finance Committee, attaching Restructuring Alternatives Presentation | 7 |
| D | 7/1/05 Huron Consulting Retention Agreement | 21 |
| E | 6/22/05 (10:02 a.m.) E-mail from Barliant to Smith, cc Ratekin and Roth re: St. Vincents | 17 |
| F | 5/3/05 E-mail from Augspurger to Cleary attaching memo from Augspurger to Cleary re: Project Vulcan - retention of crisis managers under the Bankruptcy Code | 10 |
| G | 6/1/05 memo from Augspurger to Smith and Cleary re: Retention Alternatives for Huron and SWJ.LC | 14 |
| H | 4/29/05 E-mail from Smith to Weis | 9 |
| I | 6/22/05 (1:42 p.m.) E-mail from Cleary to Smith re: St. Vincents | 18 |
| J | 6/23/05 (9:31 p.m. CST) E-mail from Smith to Cleary, cc Selbst re: SVCMC - S&W and Huron Retentions | 20 |
| K | 4/27/05 E-mail from Speltz to Smith, Weis and Holdren re: Short call today | 8 |
| L | 5/5/05 Membership Interest Purchase and Sale Agreement by and among Huron Consulting Group Inc., Speltz & Weis LLC, SC Holding, LLC David E. Speltz and Timothy C. Weis | 11 |
| M | 6/23/05 (9:31 p.m. CST) E-mail from Smith to Cleary, cc Selbst re: SVCMC - S&W and Huron Retentions | 20 |
| N | 7/5/05 Application for Entry of an Order for Employment and Retention of Huron Consulting Services LLC as Financial Advisors | 22 |
| O | 7/5/05 Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Approving Management Agreement with Speltz & Weis l LC for Restructuring Services | 23 |

10255178.2

---

SRZ Draft 10/17/06
Privileged and Confidential

**Index to Affidavit of William P.Smith**

| | | |
|---|---|---|
| P | 7/15/05 Notice of Adjourned Hearing (re: Speltz & Weis Motion) | 27 |
| Q | 7/25/05 (2:34 p.m.) E-mail from Smith to Boyle cc Crowley re: Revised Agreement | 40 |
| R | 7/25/05 (2:54 p.m.) E-mail from Boyle to Smith re: Revised Agreement | 41 |
| S | 7/29/05 (1:32 p.m.) E-mail from Smith to Boyle and St. Clair re: SVCMC - Speltz & Weis LLC | 49 |
| T | 7/21/05 (11:24 a.m.) E-mail from Smith to Barliant, cc Augspurger, Ravert, Selbst, Sullivan, Cleary re: SV - S=W & Huron | 35 |
| U | 7/13/05 Amended Motion for Entry of an Order Pursuant to Section 105 and 363 of the Bankruptcy Code Approving Management Agreement with Speltz and Weis LLC for Restructuring Services | 26 |
| V | 7/18/05 E-mail from St. Clair to Smith cc Selbst and Cleary | 30 |
| W | 7/20/05 Letter from Martini to Selbst, Cleary and Barliant | 33 |
| X | 7/20/05 (5:33 p.m.) E-mail from Smith to Speltz, Weis, Allison and St. Clair | 34 |
| Y | 7/21/05 Smith notes re: conference call with Martini and Davis | 36 |
| Z | 7/21/05 (11:24 a.m.) E-mail from Smith to Barliant, cc Augspurger, Ravert, Selbst, Sullivan, Cleary re: SV - S=W & Huron | 35 |
| AA | 7/22/05 E-mail from Smith to St. Clair re: SV-S&W & Huron | 39 |
| BB | 11/14/05 New York Times; open letter from Dennis Rivera of 1199 to Boyle. | 82 |
| CC | 7/27/05 (6:38 a.m.) E-mail from Smith to Barliant, cc Speltz, Weis, Crowley and St. Clair re: Saint Vincents | 45 |
| DD | 7/27/05 (12:00 p.m.) E-mail from Crowley to Smith cc St. Clair re: Saint Vincents | 46 |
| EE | 7/28/05 (8:41 a.m.) E-mail from G. Ravert to Freeman and Bunin, cc, Smith, Sullivan, Augspurger, Barliant, Ratekin re: SVCMC- Revised Speltz & Weis Motion, attaching blackline of motion | 47 |

10255178.2

---

SRZ Draft 10/17/06
Privileged and Confidential

**Index to Affidavit of William P.Smith**

| | | |
|---|---|---|
| FF | 7/29/05 (9:14 a.m.) E-mail from Ravert to Davis attaching blackline of Speltz & Weis application | 48 |
| GG | 8/1/05 Notice of Withdrawal of Application (for Huron Consulting Services LLC) | 51 |
| HH | 8/12/05 Letter from Martini to Smith, Selbst, Bunin and St. Clair. | 57 |
| II | 8/12/05 (4:08 p.m.) E-mail from Smith to Davis, cc Martini, St. Clair, Bunin, Selbst re: St. Vincents Medical Centers et al. | 58 |
| JJ | 8/19/05 Smith notes re: conference call with Davis, Martini, Niemann, Bunin, Freeman and Moskowitz | 62 |
| KK | 8/21/05 Smith e-mail to St. Clair re: Request from Speltz and Weis | 64 |
| LL | 8/25/05 Letter from Martini to Smith, Bunin, Moskowitz (re: CRO Proposal) | 65 |
| MM | 9/2/05 (2:40 p.m.) E-mail from Yolin to Selbst cc Smith and Roth | 69 |
| NN | 9/4/05 E-mail from N. Yolin to Selbst, cc Smith re: CRO Proposal | 72 |
| OO | 9/6/05 E-mail from Ivill to Selbst, cc Smith, Roth and Yolin re: CRO and SVCMC | 73 |
| PP | 9/7/05 Letter from Smith to Martini and Bunin | 74 |

10255178.2

SRZ Draft 10/17/06
Privileged and Confidential

**Index to Affidavit of William P. Smith**

| | | |
|---|---|---|
| QQ | 10/21/05 Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Huron Consulting Services as Restructuring and Management Consultants Nunc Pro Tunc to July 5, 2005, including all attachments | 80 |
| | Ex. A: Revised Engagement Letter | |
| | Ex. B: Gideon Declaration | |
| | Ex. C: Statement of Qualifications | |
| | Ex. D: 2004 Management Agreement | |
| | Ex. E: Amendment to Management Agreement | |
| | Ex. F: Huron Bankruptcy Project Agreement | |
| | Ex. G: Revenue Cycle Agreement | |
| | Ex. H: Interim Management | |
| | Ex. I: List of S&W/Huron Employees | |
| | Ex. J: July 22, 2005 Amendment to the Management Agreement | |
| | Ex. K: Seconded Personnel and Cost Calculation Methodology | |
| RR | 12/28/05 Interim Order Approving Huron Retention | 81 |
| SS | 12/14/05 Final Order Authorizing the Employment and Retention of Huron Consulting Services LLC as Debtors' Restructuring and Management Consultants Nunc Pro Tunc to July 5, 2005 | 83 |
| TT | 6/1/05 Board Minutes | 13 |
| UU | 6/17/05 Executive Committee Minutes | 16 |
| VV | 7/5/05 Affidavit of Timothy Weis Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Motions and Applications | 24 |
| WW | 7/22/05 WARN Act Letter | 38 |
| XX | 8/5/05 Affidavit of Bernadette Kingham-Bez | 53 |
| YY | 8/31/05 Letter from Department of Health to Boyle re: St. Mary's Hospital | 67 |
| ZZ | 1/31/06 McDermott Will & Emery's Fee Application, including all exhibits and time and expense report | 93 |
| AAA | 9/2/05 Statement of the Creditors' Committee in Support of Debtors' Motion for Entry of an Order Authorizing the Debtors to Close St. Mary's Hospital | 70 |

SRZ Draft 10/17/06
Privileged and Confidential

**Index to Affidavit of William P. Smith**

| | | |
|---|---|---|
| BBB | 5/9/06 Debtors Motion for (A) an Order Approving (i) Bidding Procedures with Respect to the Sale of Mary Immaculate Hospital and St. John's Queens Hospital, and Related Assets | 85 |
| CCC | 6/27/06 Order Pursuant to Sections 105 (a), 363(b), 365 and 1146(c) of the Bankruptcy Code Approving Sale of Debtors' Hospitals in Queens, N.Y. and Related Assets | 86 |
| DDD | 9/1/06 Motion to Shorten Time for Notice and Hearing on Debtors' Motion for Approval of Agreements between the Debtors and Wyckoff Heights Medical Center for Management Services at the Debtors' Queens Hospitals | 87 |
| EEE | 8/4/05 Transcript from Hearing p. 37-38 | 52 |
| FFF | 7/27/05 Limited Objection of the Official Committee of Unsecured Creditors for Motion for Entry of an Order Pursuant to Sections105(a) and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(A) Authorizing Debtors to Pay Certain Construction and Lien Claimants | 44 |
| GGG | 8/11/05 (6:02 p.m.p) E-mail from Smith to Speltz, Weis, Barliant, Gideon, cc Allison, Halloran, Rundell, Barry, Selbst, Cleary, and St. Chair re: SV-Committee Matters | 56 |
| HHH | 8/13/05 E-mail from Speltz to Weis, Allison, Rojas, Smith re: Committee rumor | 59 |

# Exhibit  L

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, *et al.*,

Debtors.

Chapter 11
Case No. 05-14945 (ASH)

(Jointly Administered)

**DECLARATION OF MICHAEL B. SOLOW REGARDING THE APPLICATION OF
McDERMOTT WILL & EMERY LLP UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R.
BANKR. P. 2016 FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

Michael B. Solow says:

1.    I am a Partner at Kaye Scholer LLP and co-head of the firm's reorganization group.  Prior to and during the early period in the captioned proceedings, I was the lead bankruptcy attorney for, and my firm acted as counsel to, HFG Healthco-4 LLC & Healthcare Finance Group, Inc. ("HFG"), who was the working capital lender to the Debtors pre-petition and the initial DIP lender to the Debtors post-petition.

2.    In that role, I was familiar with the services of McDermott Will & Emery LLP ("McDermott") as former primary attorneys for Saint Vincent's Catholic Medical Centers ("SVCMC") and each of its affiliated debtors (collectively, the "Debtors").  I submit this affidavit in support of McDermott's application (the "Fee Application") for compensation and for reimbursement of expenses for the period from July 5, 2005 through September 30, 2005.

Background

3.    On behalf of HFG, I worked with the Debtors and with McDermott both before and after the filing of the Chapter 11 proceedings.

10152595.2

4.    During the relevant period, the Debtors were complex organizations who were a challenge to finance, both pre and post petition, due to the convoluted nature of their corporate structure, their cash management system, and their capital structure.  For example, while HFG was the senior lender pre-petition on certain of the Debtors' receivables, the seniority was by contract with other lenders, requiring my client to be mindful not only of its borrower, but also its fellow lenders.  This complexity was made all the more difficult due to the Debtors' virtually continual default on the HFG loans pre-petition, the possibilities of the Debtors' defaults on fellow lenders' loans, and the well known difficulties and complexities of financing an organization where healthcare receivables are the principal collateral and the loan advances are a matter having some elements of discretion.

5.    The Debtors' cases were further complicated by the very nature of the Debtors' businesses.  Delivery of healthcare is an important but can also be an emotional undertaking, and lending to a healthcare entity, particularly one which is not for profit with a charitable mission, can be quite different than financing a restaurant or gas station. Whether for profit or not for profit, a healthcare business is heavily regulated, this regulation affects lending to this type of entity, and the Debtors were no exception to these complications.

6.    In the months prior to the filing, the Debtors conducted their business based on loan advances from my client and proceeds of collateral sales. This put the Debtors' finance staff in virtually daily contact with my client, and the continual defaults meant that my firm was in regular contact with McDermott on behalf of the Debtors.

7.    McDermott lead the legal effort to work with the Debtors' various lenders, including my client, to permit on-going operations and, as matters deteriorated, to enter Chapter 11.  Absent the efforts of McDermott, the Debtors would have experienced an extremely hard

2

landing in bankruptcy court, rather than the soft landing, with a first day DIP interim financing approved, that the Debtors actually experienced.

8.    I was in court on the first day of these cases for the hearing on approval of the interim DIP lending to the Debtors from my client, and I supervised lawyers from my firm at subsequent hearings for final approval.  McDermott ably and efficiently dealt with the myriad objections which were filed, both to our proposed financing, but also to the use of cash collateral.

9.    In addition, I supervised the lawyers in our firm who represented HFG as a bidder for the longer term and larger DIP loan, ultimately made by GE in December. While acting as the Debtors' counsel, McDermott supervised that process as well, negotiating with the various constituencies.

10.    In my view, during the relevant period, McDermott acted appropriately and did what I would expect Debtor's counsel to do to assure that the Debtors were adequately financed and run an appropriate process to assemble bids for post-petition loans.  Based on my twenty years experience doing the same type of work, for both borrowers and lenders, I would have conducted a similar process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September/3, 2006
        Chicago, Illinois

Michael B. Solow

CH99 4673545-2.074256.0031

3

# Exhibit M

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                                    :

                                                          :          Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL          :          Case No. 05-14945 (ASH)
CENTERS OF NEW YORK d/b/a
SAINT VINCENT CATHOLIC MEDICAL           :
CENTERS, *et al.*,
                                                          :          (Jointly Administered)

                                    Debtors.         :

---------------------------------------------------------------x

**DECLARATION OF RICHARD BOYLE IN SUPPORT OF
DEBTORS' RESPONSE AND OBJECTION TO FIRST INTERIM
APPLICATION OF MCDERMOTT WILL & EMERY LLP FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED
AND REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE
DEBTORS FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

I, Richard Boyle, hereby declare, pursuant to section 1746 of title 28
of the United States Code, that the following is true to the best of my knowledge,
information and belief:

1.      I have been the Chairman of the Board of St. Vincents
Catholic Medical Centers ("SVCMC") since April 2004. At the time of my
retirement in April of 1996, I was the Vice Chairman of the Board and Chief
Credit Officer of Chase Manhattan Bank, where I had worked for 31 years.

2.      In April of 2004, SVCMC's Board engaged the management-
consulting firm of SWLLC LLC ("SWLLC") to manage and operate SVCMC. At

that time the principals of SWLLC, David Speltz and Tim Weis, were named as
Chief Executive Officer and Chief Financial Officer of SVCMC, respectively.

3.      By May of 2005, dozens of SWLLC employees were working
for SVCMC as were employees of Huron Consulting Group Inc. ("Huron").
Huron was retained on the recommendation of McDermott, Will & Emery
("MWE"). MWE had been retained by SVCMC in 2004 at management's request,
for the purposes of providing SVCMC with bankruptcy and restructuring
services.

4.      During early May of 2005, I received a call from David
Speltz advising me that SWLLC had been acquired by Huron. At the time, I was
not aware of any of the details of the transaction other than that SWLLC was to
become a part of Huron, and that David Speltz and Tim Weis would become
Huron employees. My main concern was ensuring that the acquisition would
not impact Mr. Speltz's and Mr. Weis' respective abilities to continue in the role
as CEO and CFO of SVCMC.

5.      Shortly after being informed of the Huron acquisition, I
spoke with Bill Smith, a partner at MWE, who was the lead bankruptcy lawyer
providing services to SVCMC. Mr. Smith told me that he had been aware of the
potential acquisition prior to its announcement, but believed that I also had
knowledge of the transaction before it was announced. Prior to that

2

conversation, Mr. Smith had never informed me, or to my knowledge any Board
member, of the transaction.

6.      Thereafter, the Board retained Leo Crowley, of the firm
Pillsbury Winthrop Shaw Pittman, LLP, to investigate whether the Huron
acquisition violated SVCMC's conflict of interest policy or other contractual and
state law obligations that David Speltz and Tim Weis owed to SVCMC.

7.      Mr. Crowley's report concluded that David Speltz and Tim
Weis had violated SVCMC's internal conflict of interest policy and the SWLLC
Management Agreement between SWLLC and SVCMC.

8.      Following receipt of Mr. Crowley's report, I held
negotiations with Huron regarding certain aspects of their acquisition of SWLLC
that were unacceptable to SVCMC. One of the key elements of the Huron
transaction that was unacceptable to SVCMC included the fact that David Speltz
and Tim Weis would receive additional consideration from Huron in the form of
an "earn-out," which I understood was based upon SWLLC and Huron
generated revenues, including revenues earned from SVCMC. I also learned that
SVCMC had paid more for Huron's services than Huron charged to SWLLC for
the services of dedicated employees, and I felt that this "add-on" was
inappropriate. Huron agreed to eliminate both the "earn-out" and the add-on
charges, and David Speltz and Tim Weis both agreed to individually repay to
SVCMC $183,000 that they had already received from Huron as a result.

9.      When it became clear that SVCMC had no option but to
resort to filing for bankruptcy in early July of 2005, the Board determined that
David Speltz and Tim Weis should continue as CEO and CFO of SVCMC. In
making this decision, the Board felt that continuity of management was very
important to SVCMC.

10.     I am not aware of ever being advised by MWE prior to the
July bankruptcy filing of the impact that the Huron acquisition would have on
SVCMC's ability to retain SWLLC in the bankruptcy action. I was not informed
by MWE prior to the bankruptcy of the "disinterestedness" requirement in the
Bankruptcy Code as it related to the retention of SWLLC as bankruptcy
professionals.

11.     While my confidence in David Speltz and Tim Weis was
shaken in May of 2005 because of the Huron acquisition, I did not realize that
new management was needed until mid-August of 2005. Neither I nor the Board
became aware of the substantial issues related to the retention of SWLLC until
shortly before the August 24, 2005 Board meeting where it was determined that
David Speltz and Tim Weis would be asked to resign from SVCMC.

12.     At the August 24, 2005 Board meeting, I was named as
interim CEO of SVCMC, replacing David Speltz. Thereafter, I began to
participate in meetings with the U.S. Trustee (Deirdre Martini), the Creditors'
Committee, and MWE. It became readily apparent to me that the restructuring

3

4

of SVCMC was in a quagmire, and that the bankruptcy process could not go forward with MWE continuing as counsel to SVCMC, given the frayed relationships between MWE, on the one hand, and the U.S. Trustee and Committee on the other. I believed that an immediate change was necessary. I could not replace the Judge, I could not replace the U.S. Trustee, and I could not replace the Committee or its counsel. Because progress was not being made in terms of turning SVCMC around, and because the Board had lost confidence in MWE's ability to guide SVCMC through the bankruptcy process, we needed to replace MWE as counsel to the Debtors.

13.     While I personally believe that MWE should be compensated for services rendered to SVCMC, I have no opinion as to whether MWE is entitled to full compensation from a legal perspective.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 17, 2006.

Richard Boyle

5

# Exhibit N

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                            :    Chapter 11
                                                  :    Case No. 05-14945 (ASH)
SAINT VINCENTS CATHOLIC MEDICAL                   :
CENTERS OF NEW YORK d/b/a SAINT VINCENT           :
CATHOLIC MEDICAL CENTERS, *et al.*,               :    (Jointly Administered)
                                                  :
                                Debtors.          :
------------------------------------------------------------x

**DECLARATION OF LEO T. CROWLEY IN CONNECTION WITH
DEBTORS' RESPONSE AND OBJECTION TO FIRST INTERIM
APPLICATION OF MCDERMOTT WILL & EMERY LLP FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED
AND REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE
DEBTORS FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

I, Leo T. Crowley, hereby declare, pursuant to section 1746 of title 28 of the

United States Code, that the following is true to the best of my knowledge, information

and belief:

1.     I am a member of the law firm of Pillsbury Winthrop Shaw Pittman

LLP, where I practice in the firm's litigation and insolvency and restructuring sections.

I am presently the head of the firm's insolvency and restructuring section.

2.     In or about May 2005, I was engaged by St. Vincents Catholic

Medical Centers of New York ("SVCMC") to investigate whether the acquisition of

Speltz & Weis, LLC ("SWLLC") by Huron Consulting Group ("Huron") presented or

potentially presented any conflicts of interest or other similar issues for SVCMC, and to

examine whether the acquisition violated any contractual and state law duties that

David Speltz and Tim Weis owed to SVCMC, and to report my findings to the Board of

Directors.

3.     I was advised at the outset that SVCMC was financially distressed

and was taking steps to prepare for a possible chapter 11 filing, if one became necessary,

and that McDermott, Will & Emery LLP ("McDermott") represented SVCMC as

insolvency and bankruptcy counsel.

4.     I began my investigation in late May, 2005, and on July 6, 2006

issued my draft report dated June 29, 2005. I issued my final report on July 18, 2005.

5.     I gave copies of both the June 29 draft report and the July 18 final

report to Richard Boyle, the Chairman of the SVCMC Board, and to Edward Lahey, a

member of the SVCMC Board. I was not asked to, and did not, give a copy of either

report to Bill Smith or anyone else from McDermott, or to any other person.

6.     In conducting my investigation, I reviewed the following

documents and interviewed the following people:

Documents Reviewed

    SVCMC By laws

    SVCMC conflict of interest policy

    SVCMC conflict of interest disclosure statements submitted by Tim Weis,
    David Speltz, Dawn Gideon and Robert Fanning

    Report of the Governance Task Force to the SVCMC Board, dated
    November 4, 2004

    SVCMC Executive Committee minutes from January 2004 through June
    2005

    Management Agreement between SWLLC and SVCMC

    Letter from N.Y.S. Department of Health approving the Management
    Agreement

    Letter from U.S. Department of Housing and Urban Development
    approving the Management Agreement

    Regulatory Agreement between SVCMC and U.S. Department of Housing
    and Urban Development

    Press Release from Huron dated May 10, 2005 announcing its acquisition
    of SWLLC

    Form 8K filed by Huron on May 10, 2005 with the SEC, disclosing its
    acquisition of SWLLC

    Membership Interest Purchase and Sale Agreement among Huron,
    SWLLC, SC Holdings, David Speltz and Tim Weis

    Form of Senior Management Agreement entered into between Huron and
    each of David Speltz and Tim Weis

    Form of engagement letter between McDermott and Huron

    Motion filed by McDermott on behalf of SVCMC in Bankruptcy Court to
    retain Huron as an estate professional (later withdrawn)

    Motion filed by McDermott on behalf of SVCMC in Bankruptcy Court on
    July 13, 2005 to assume the SWLLC Management Agreement with the
    Huron engagement folded in as a subcontractor to SWLLC

Persons Interviewed

    David Speltz

    Tim Weis

    Elizabeth St. Clair

    Richard Boyle

    Bill Smith

7.     On June 23, 2005 I interviewed Bill Smith by telephone. I took

contemporaneous notes of our conversation, which was my usual practice, and

afterward I prepared a memo to the file summarizing the interview. A copy of the file

memo is attached as Exhibit "1".

8.     The first substantive question I asked Mr. Smith was whether there

were any issues presented under section 327 of the Bankruptcy Code relating to the

potential engagement of SWLLC and Huron, and how he planned to deal with any such

issues. Mr. Smith replied that he was concerned, and intended to informally consult

with the United States Trustee prior to filing a case, if one was to be filed, about how to

have the SWLLC Management Agreement approved and Huron engaged as a financial

advisor.

9.     During our phone call, Mr. Smith told me that he was aware about

two weeks before the announcement of the Huron acquisition of SWLLC that it was

going to take place, or at least that discussions were underway. Mr. Smith also told me

that his impression was that Messrs. Speltz and Weis had reported the acquisition to the

Chairman, Mr. Boyle, but that he didn't have any actual knowledge that it had in fact

ever been reported. I asked Mr. Smith what he would say if he learned that Mr. Boyle

was not aware of Huron's acquisition of SWLLC until right before it was announced. My

impression was that Mr. Smith was stunned, and clearly taken aback by the

suggestion that Mr. Boyle did not know sooner.

10.    Mr. Smith also told me during the same phone call that he was not

aware that Messrs. Speltz and Weis had individual employment agreements with

Huron, or that they were receiving earn-outs personally based upon Huron revenues

derived from services provided to SVCMC.

**[CONCLUDED ON FOLLOWING PAGE]**

11.     I reached no conclusions about whether, under bankruptcy law, Huron's acquisition of SWLLC precluded assumption of the SWLLC Management Agreement and/or retaining Huron and/or SWLLC as professionals in a chapter 11 case. I understood that those issues were being dealt with by McDermott and I confirmed such understanding in writing in both my June 29, 2005 draft report and my July 18, 2005 report.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 18, 2006.

_____
Leo T. Crowley

500106663v4

# Exhibit O

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re:                                                       Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL                              Case No. 05-14945 (ASH)
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, et al.,                            (Jointly Administered)

                                    Debtors.

-----------------------------------------------------------------x

**DECLARATION OF ELIZABETH ST. CLAIR IN SUPPORT OF
DEBTORS' RESPONSE AND OBJECTION TO FIRST INTERIM
APPLICATION OF MCDERMOTT WILL & EMERY LLP FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED
AND REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE
DEBTORS FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

I, Elizabeth St. Clair, hereby declare, pursuant to section 1746 of title 28 of
the United States Code, that the following is true to the best of my knowledge,
information and belief:

1.    I have been employed by St. Vincents Catholic Medical Centers
("SVCMC") since January 8, 2001, and have been the Chief Legal Officer of SVCMC
since that date. I am also the chief compliance officer for SVCMC, and in that capacity
am responsible, among other things, for overseeing SVCMC's conflict of interest policy
to ensure compliance by covered employees. SVCMC's chapter 11 filing in July 2005
was my first professional experience with bankruptcy law in any capacity.

2.    In April of 2004, SVCMC's Board engaged the management
consulting firm of Speltz & Weis, LLC ("Speltz & Weis") to manage and operate
SVCMC. At that time the principals of Speltz & Weis, David Speltz and Tim Weis, were
named as Chief Executive Officer and Chief Financial Officer of SVCMC, respectively.

3.    By May of 2005, dozens of Speltz & Weis employees were working
for SVCMC, as were employees of Huron Consulting Group Inc. ("Huron"). Huron
was retained on the recommendation of McDermott, Will & Emery ("MWE") to serve as
a vendor of services to SVCMC. MWE had been retained by SVCMC in October 2004 at
the request of Mr. Speltz, for the purposes of providing SVCMC with bankruptcy and
restructuring services.

4.    In April of 2005, I approached David Speltz to discuss a rumor that
Speltz & Weis was to be acquired by Huron. Mr. Speltz denied the rumor. On May 7,
2005, despite his denials only one month earlier, I received a call from Mr. Speltz
informing me that Speltz & Weis had been acquired by Huron.

5.    On May 9, 2005, I spoke with Bill Smith, a partner at MWE, who
was the lead bankruptcy lawyer providing services to SVCMC. During my
conversation with Bill Smith, I told him that I felt the acquisition of Speltz & Weis was
very problematic, and that I believed it violated SVCMC's conflict of interest policy for
officers and directors. Mr. Smith informed me that he had been aware of the acquisition
for approximately two weeks, and agreed that the acquisition was troubling. I was not
surprised by the fact that Bill Smith had not informed me of the potential Huron
transaction when he learned of it, given his business relationship with David Speltz.

6.    Shortly thereafter, I met with David Speltz and Tim Weis, and
informed them that I believed that the acquisition violated SVCMC's conflict of interest
policy. Mr. Speltz and Mr. Weis disagreed with my view that the acquisition presented
a conflict of interest. Nonetheless, I advised them that the conflict had to be disclosed to
the Board, and that I would recommend that the Board hire independent outside
counsel to investigate and determine whether the Huron acquisition violated SVCMC's
conflict of interest policy.

2

7.    I recommended to SVCMC's Board of Directors that Leo Crowley,
of the firm Pillsbury Winthrop Shaw Pittman, LLP, be retained for purposes of
determining whether the Huron acquisition violated SVCMC's conflict of interest
policy, and to examine whether the acquisition violated any contractual and state law
duties that David Speltz and Tim Weis owed to SVCMC. Because of the fact that the
investigation involved the actions of SVCMC's management – David Speltz and Tim
Weis – to whom I reported, I recommended to the Board that I not participate in the
investigation. Notably, Mr. Crowley was not asked to report on the impact that the
Huron acquisition would have on any bankruptcy filing by SVCMC, nor was he asked
to provide any recommendation on what impact the acquisition would have on
SVCMC's ability to have David Speltz and Tim Weis retained as professionals in a
bankruptcy case.

8.    On or about June 29, 2005, Mr. Crowley issued a draft of the
conclusions of his investigation, and on or about July 18, 2005 Mr. Crowley issued a
final report. Mr. Crowley concluded both in his draft and final reports, among other
things, that the Huron acquisition of Speltz & Weis violated SVCMC's conflict of
interest policy and that it could potentially result in a breach of David Speltz's and Tim
Weis' employment contracts with SVCMC to the extent that the transaction prevented
them from continuing as officers of SVCMC.

9.    Mr. Crowley was not retained to analyze what impact the Huron
transaction would have on SVCMC from a bankruptcy perspective. Instead, at all
times, MWE was responsible for addressing and resolving any bankruptcy related
issues that may have been raised by the Huron acquisition of Speltz & Weis.

10.    I discussed Mr. Crowley's report with Bill Smith, but did not
provide him with a copy. Bill Smith advised me not to provide him with the report,

3

because he would have to then disclose the report to the U.S. Trustee and the Creditors'
Committee.

11.    As noted, prior to SVCMC's chapter 11 filing, I had little to no
bankruptcy related experience as an attorney. When I became aware of Huron's
acquisition of Speltz & Weis, I immediately began the process of hiring outside counsel
to investigate the propriety of the transaction from both a state law and conflict of
interest perspective. I did not at that time, nor at the time of the bankruptcy filing, have
any understanding regarding the scrutiny and approval process related to professionals
for a chapter 11 debtor, nor was I familiar with the standards for doing so. I at all times
assumed that MWE would be responsible for raising and handling any bankruptcy
related issues regarding Huron's acquisition of Speltz & Weis.

12.    At no time prior to the bankruptcy filing was I informed by MWE
of the "disinterestedness" requirement in the Bankruptcy Code as it relates to the
retention of professionals. To the best of my knowledge, at no time prior to August 24,
2005 did MWE advise SVCMC's Board of the substantial issues that SVCMC faced in
getting Speltz & Weis retained by the Court, including the specific concerns that had
been raised by the U.S. Trustee.

13.    In hindsight, it is clear to me that MWE's single-minded pursuit of
the Speltz & Weis retention in the bankruptcy case was extraordinarily destructive to
SVCMC's credibility with the constituents in the bankruptcy process, including the
Court, the U.S. Trustee and the Creditors' Committee. This is particularly true now, as I
have experienced the scrutiny under which such retention is examined by the non-
debtor constituents in the bankruptcy process.

14.    Additionally, it is now clear to me that MWE's decision to take
a strong adversarial position against the U.S. Trustee and the Creditors' Committee did

4

not benefit SVCMC, and resulted in delaying SVCMC's restructuring process. For example, MWE consistently took the position that SVCMC did not need to comply with the "J. Alix Protocol" and that the "J. Alix Protocol" was simply a pretext for the Creditors' Committee to muscle its way into management. It is clear to me that Bill Smith was not concerned with building consensus with the U.S. Trustee as it related to retention of Speltz & Weis and the Jay Alix Protocol, and in fact advised that if the U.S. Trustee would not go along with his proposals on these issues, he would raise the issues with the Court. Since MWE's replacement as counsel, it is evident to me that the bankruptcy process has run much more smoothly, in part because SVCMC's present counsel recognizes the importance of open communications in working with the U.S. Trustee and the Creditors' Committee in moving the restructuring process forward.

[concluded on next page]

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 19, 2006.

_Elizabeth St. Clair_
Elizabeth St. Clair

6

# Exhibit P

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                                    Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL          Case No. 05-14945 (ASH)
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, et al.,        (Jointly Administered)

            Debtors.

AFFIDAVIT OF DAVID D. CLEARY IN SUPPORT OF APPLICATION OF McDERMOTT
WILL & EMERY LLP UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R. BANKR. P. 2016 FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES
JULY 5, 2005 THROUGH SEPTEMBER 30, 2005

STATE OF ILLINOIS        )
                         ) ss.
COOK COUNTY              )

    David D. Cleary, being duly sworn, deposes and says:

    1.    I am a member of LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"). Prior to
joining LeBoeuf, I was a member of McDermott Will & Emery LLP ("McDermott"), former
primary attorneys for Saint Vincents Catholic Medical Centers and each of its affiliated debtors,
each a debtor-in-possession in the above-captioned cases (collectively, the "Debtors"). I submit
this affidavit in support of McDermott's application (the "Fee Application") for compensation
and for reimbursement of expenses for the period from July 5, 2005 through September 30, 2005
(the "Compensation Period").

    2.    I am familiar with (i) the Fee Application; (ii) the objection of the creditors'
committee in these cases (the "Committee"), dated March 3, 2006, opposing the Fee Application;
(iii) the objection of the United States Trustee for the Southern District of New York (the
"UST"), dated March 7, 2006, opposing the Fee Application; and (iv) and McDermott's reply,
dated March 20, 2006, in support of the Fee Application.

10352585.3

    3.    On July 5, 2005 (the "Petition Date"), each of the Debtors filed a petition for
relief under chapter 11 of the Bankruptcy Code.

    4.    McDermott served as the Debtors' primary bankruptcy counsel from the Petition
Date through September 13, 2005.

    5.    The Court authorized McDermott's retention by final order dated August 8, 2005.

Critical Vendors

    6.    The Debtors' management determined, in exercise of its business judgment, that
(a) the Debtors' viability as healthcare providers and (b) the welfare of their patients were
dependent on their uninterrupted access to the goods and services provided by certain critical
vendors, including suppliers of over-the-counter and prescription medicines, medical supplies,
equipment, food and beverage supplies and sanitary items.

    7.    The Debtors directed McDermott to obtain authority to pay the critical vendors'
pre-bankruptcy claims only when nonpayment of the claims would lead to the interruption of the
delivery of goods and services or would seriously disrupt the Debtors' operations.

    8.    The Debtors estimated that the maximum amount needed to pay the pre-
bankruptcy critical vendors for claims was $16.2 million, and that it would not pay prepetition
claims in full, but pay critical vendors a maximum of 60% of their prepetition claims.

    9.    The Debtors determined that the requested authority would not impair the
Debtors' cash flows because (i) the authority was not a direction to pay and (ii) most of the
Debtors' obligations to the critical vendors have customary payment terms and would not be
payable in a lump sum.

    10.   At the Debtors' direction, McDermott moved on July 5, 2005, for authority to pay
the critical vendor claims (the "Critical Vendor Motion").

10352585.3                                          2

    11.   Computer Sciences Corporation responded to the Critical Vendor Motion on July
8, 2005.

    12.   To the best of my knowledge, the Court approved the Critical Vendor Motion on
July 11, 2005.

    13.   The Debtors did not disclose the identity of any vendors or amounts, except to the
Debtor's lenders, the court and the UST. Once McDermott obtained the requested authority, the
Debtors' finance staff dealt with critical vendor issues.

    14.   To the best of my knowledge, after its appointment on July 18, 2005, the
Committee moved on July 21, 2005, for reconsideration of the Court's consent.

    15.   At that time, the Debtors had made no payments to critical vendors.

    16.   To the best of my knowledge, the first critical vendor payment was to a blood
supplier on August 4, 2005, and was made with the Committee's consent.

    17.   To the best of my knowledge, the Debtors never made any payments to critical
vendors without the Committee's consent.

    18.   Upon information and belief, ultimately, the Debtors' improved liquidity lead to
only three critical vendor payments, for an aggregate of $1.4 million, or 9% of the total authority
under the critical vendor order.

    19.   McDermott accepted the Debtors' instructions regarding the critical vendors,
which McDermott believed were supported by the Debtors' business judgment.

    20.   McDermott's services, at the time they were rendered, were beneficial to the
estates.

    21.   According to the Fee Application, in connection with the Critical Vendor Motion,
McDermott provided approximately 61.6 hours during the Compensation Period.

10352585.3                                          3

    22.   To the best of my knowledge, the services were reasonably performed within a
reasonable amount of time commensurate with the complexity, importance and nature of the task
addressed.

    23.   A reasonable counsel in McDermott's position would not have disregarded its
client's instruction in connection with the Critical Vendor Motion.

Construction Liens

    24.   The Debtors' management determined, in the exercise of its business judgment,
that for the Debtors' businesses to maximize value of the estates' assets, they had to maintain a
reliable and efficient facility construction, repair and maintenance operation.

    25.   The Debtors directed McDermott to obtain authority to pay certain prepetition
claims relating to construction and other lien claimants in amounts, in the Debtors' business
judgment, necessary and appropriate to (i) obtain release of encumbered critical or valuable
goods, materials or equipment; and (ii) maintain a reliable and efficient facility construction,
repair and maintenance operation.

    26.   The Debtors estimated that the maximum amount needed to satisfy the secured
claims of the construction and other lien claimants was approximately $2 million.

    27.   At the Debtors' direction, McDermott moved on July 5, 2005, for authority to pay
the claims of the construction and other lien claimants (the "Construction Lien Motion"); a
hearing was set for July 28, 2005.

    28.   The UST took no position with respect to the Construction Lien Motion.

    29.   The Committee responded on July 27, 2005, requesting an adjournment of the
hearing to August 4, 2005, so as to permit the Committee time to conduct due diligence.

    30.   The Court granted the Construction Lien Motion on August 25, 2005.

10352585.3                                          4

31.    Upon information and belief, to date, the Debtors have sought to pay two construction lien claimants.

32.    To the best of my knowledge, the Debtors never made any payments to holders of construction liens without the Committee's consent.

33.    McDermott accepted the Debtors' instructions regarding the construction lien lists, which McDermott believed were supported by the Debtors' business judgment.

34.    McDermott's services, at the time they were rendered, were beneficial to the estates.

35.    According to the Fee Application, in connection with the Construction Lien Motion, McDermott spent approximately 10.1 hours during the Compensation Period.

36.    To the best of my knowledge, the services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

37.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction in connection with the Construction Lien Motion.

Lease and Contract Rejection

38.    Before and following the Petition Date, McDermott advised the Debtors to review their leases and contracts for possible rejection.

39.    McDermott also reviewed the Debtors' leases and contracts for such information as termination date, default remedies, and similar provisions that might affect the Debtors during their chapter 11 cases.

40.    As the Debtors identified leases for rejection, McDermott drafted each rejection motion.

41.    For example, McDermott moved on July 15, 2005 (the "Rejection Motion") (10 days after the Petition Date), for authority to reject leaseholds and severance agreements.

42.    McDermott filed a supplemental rejection motion on July 28, 2005 (the "Supplemental Rejection Motion" and with the Rejection Motion, the "Rejection Motions") (23 days after the Petition Date).

43.    The Court granted the Rejection Motion on July 29, 2005, and the Supplemental Rejection Motion on August 8, 2005.

44.    To the best of my knowledge, together, the Rejection Motions saved the Debtors more than $1.5 million in potential postpetition payment obligations.

45.    McDermott would have filed additional motions if directed to do so and the Debtors' management had not been occupied with other even more critical tasks (e.g., financing).

46.    McDermott accepted the Debtors' instructions regarding the rejection of leases and contracts, which McDermott believed were supported by the Debtors' business judgment.

47.    McDermott's services, at the time they were rendered, were beneficial to the estates.

48.    According to the Fee Application, in connection with lease rejection, McDermott spent approximately 42.4 hours during the Compensation Period.

49.    To the best of my knowledge, the services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

50.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction in connection lease rejection.

Communication with Vendors and Creditors

51.    At the outset of the Debtors' cases, McDermott assisted in establishing two separate, but linked websites, which remain in place, containing all of the relevant documents in these cases.

52.    One site is through St. Vincents' website and contains answers to frequently asked questions pages for both consumers and physicians with links to the second site maintained by Bankruptcy Services LLC-based ("BSI") and accessible through www.bsillc.com.

53.    McDermott also took steps to avoid unnecessary calls to its offices from creditors.

54.    Generally, McDermott only handled calls from counsel, which would have been inappropriate to pass along to the Debtors' staff.

55.    Once the contacts were established at the client's office, McDermott forwarded all non-attorney calls to Debtors' designated personnel or a member of the Huron Consulting Services LLC's restructuring team.

56.    McDermott also worked to help the Debtors establish a call center at BSI to field creditor calls.

57.    At the time of McDermott's replacement, the Debtors' managers were reviewing the concept and cost of the call center. To the best of my knowledge, subject to their approval, the center was ready to begin taking calls.

58.    McDermott facilitated communication with the Debtors' creditors, vendors and other interested parties in a cost-effective and efficient manner.

59.    McDermott's services in connection with these tasks, at the time they were rendered, were beneficial to the estates.

60.    According to the Fee Application, in connection with establishing communication programs and procedures, McDermott spent approximately 45.6 hours during the Compensation Period.

61.    To the best of my knowledge, the services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

Bar Date

62.    The UST argues that a bar date order was purportedly delayed, interfering with confirmation of a plan.

63.    Confirmation of a plan was many months away on September 13, 2005, when McDermott was replaced by Weil Gotshal & Manges LLP ("Weil"). Indeed, financing for continued survival was the Debtors' most critical objective at the time.

64.    In many cases, courts do not set a bar date within the first 10 weeks of the petition date.

65.    The Debtors' schedules were not due to be filed until the beginning of October 2005, approximately 13 weeks into these cases.

66.    McDermott had a complete or near complete draft of the bar date motion as of September 13, 2005, and to the best of my knowledge forwarded this draft to Weil.

67.    But for the transition of management and McDermott as bankruptcy counsel, the bar date motion would have been filed in late September or early October, 2005 instead of on

January 10, 2006, when it was actually filed.

<u>Aramark Contract</u>

68.    The Committee challenges work McDermott did in connection with a motion to modify and assume an agreement with Aramark Corporation that was never filed.

69.    Upon information and belief, Aramark provided a wide array of critical services to the Debtors, including day-to-day management services for certain of the Debtors' staff (outsourced); delivery of food products; maintenance of clinical equipment; housekeeping services; laundry services; running a gift and flower shop at one of the Hospitals (St. Mary's); and providing patient transportation services.

70.    According to the Debtors' bankruptcy filings, Aramark was one of the Debtors' largest prepetition creditors, owed approximately $4.5 million as of the Petition Date.

71.    Aramark was party to numerous prepetition contracts with the Debtors.

72.    To the best of my knowledge, on August 1, 2005, the Debtors and Aramark entered into a post-petition Management Services Agreement, which essentially encompassed - in one document - all of the various pre-petition agreements between Aramark and the Debtors.

73.    To the best of my knowledge, Aramark's counsel prepared the draft motion papers to obtain approval of the Management Services Agreement.

74.    The Debtors directed McDermott to assist Aramark's counsel in completing the pleadings.

75.    In doing so, McDermott reviewed and analyzed the various prepetition agreements between the Debtors and Aramark.

76.    McDermott spent considerable time communicating with Aramark's counsel and the Debtors' management regarding the business justifications for assumption of the Management Services Agreement.

77.    To the best of my knowledge, when Weil replaced McDermott, the parties were close to completing the necessary documents.

78.    McDermott's services, at the time they were rendered, were beneficial to the estates.

79.    According to the Fee Application, on the Aramark matter, McDermott spent approximately 27.3 hours during the Compensation Period.

80.    To the best of my knowledge, the services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

81.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction in connection the Aramark contract.

David D. Cleary

Notary Public

Sworn to before me this 15th day of
September, 2006

(Notary Public)

"OFFICIAL SEAL"
JANET L. VIRVA
Notary Public, State of Illinois
My Commission Expires 3/29/07

# Exhibit Q

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, *et al.*,

                                Debtors.

Chapter 11

Case No. 05-14945 (ASH)

(Jointly Administered)

DECLARATION OF THOMAS ALLISON IN SUPPORT OF APPLICATION OF
McDERMOTT WILL & EMERY LLP UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R.
BANKR. P. 2016 FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
JULY 5, 2005 THROUGH SEPTEMBER 30, 2005

Thomas Allison, says:

1.    I served as Interim Chief Financial Officer for Saint Vincents Catholic Medical
Centers (collectively with each affiliate debtor and debtor-in-possession in the above-captioned
cases, the "Debtors") from August 24, 2005 to October 31, 2005.  I am also formerly a member
of Huron Consulting Services LLC, the Debtors' financial advisors as retained on October 4,
2005.

2.    McDermott Will & Emery LLP ("McDermott") served as former primary
attorneys for the Debtors.  I submit this affidavit in support of McDermott's application (the "Fee
Application") for compensation and for reimbursement of expenses for the period from July 5,
2005 through September 30, 2005.

3.    On July 5, 2005 (the "Petition Date"), each of the Debtors filed a petition for
relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors own and operate one of the New York metropolitan area's most
comprehensive health care systems.

CH99 4682950-1 074256 0031

5.    The Debtors serve as the academic medical center of New York Medical College
in New York City.

6.    The Debtors are also one of the New York metropolitan area's largest employers.

7.    As of the Petition Date, the Debtors operated seven hospitals:  St. Vincent's
Hospital, Manhattan; Bayley Seton Hospital, Staten Island; Mary Immaculate Hospital, Queens;
St. John's Hospital, Queens; St. Mary's Hospital, Brooklyn; St. Vincent's Hospital, Staten
Island; and St. Vincent's Hospital, Westchester.

8.    The Debtors also operate numerous debtor and non-debtor affiliates - including
four skilled nursing facilities, a hospice, a system-wide home healthcare agency, and more than
60 off-site ambulatory care centers - providing a broad array of medical, psychiatric and
substance abuse services.

9.    The Debtors annually serve more than 600,000 patients.

10.    The Debtors' system is the largest provider of EMS services in the New York
City Fire Department's 911 service.

11.    In 2004, the Debtors had total revenues of approximately $1.55 billion and total
costs of approximately $1.7 billion.

12.    The Debtors' chapter 11 cases are large and complex.

13.    The Debtors have combined prepetition assets of approximately $1 billion and
combined prepetition debts of equal size, including more than $400 million in long term debt and
capital leases, $240 million in accounts payable and other current liabilities, and many diverse
financial obligations.

14.    The sheer size of the Debtors makes formulating a plan of reorganization an
exceedingly intricate and lengthy process.

2

CH99 4682950-1 074256 0031

15.    The Debtors' cases are further complicated by the Debtors' status as not-for-profit
entities, whose fiduciary duties run not only to their creditors, but also to their charitable
purposes.

16.    Because the Debtors are not-for-profit debtors, they are required not only to
address the concerns of their creditors, but also the concerns of their patients and of the
communities that the Debtors serve.

17.    The Debtors are subject to a host of regulatory and licensing requirements that
often require them to obtain approval for their major business decisions.

18.    The Debtors' status as not-for-profit corporations necessarily increases the
complexity of these cases.

19.    Prior to the Petition Date, the Debtors lacked sufficient cash to make payroll.

20.    Prior to the Petition Date, the Debtors' relationships with vendors and employees
were strained.

21.    Prior to the Petition Date, the Debtors were losing, on average, more than $1
million per week, with an acute loss of liquidity in April and May.

22.    While McDermott was primary bankruptcy counsel (from July 5 through
September 13, 2005), the Debtors' condition and outlook had improved.

23.    By September 13, the Debtors' cash and cash availability under a finally approved
debtor-in-possession ("DIP") financing facility exceeded $70 million (or more liquidity than had
been available at any time during the prior year).

24.    By September 13, the Debtors had negotiated definitive term sheets from CIT
Healthcare, Inc., General Electric Capital Corporation, HFG Healthco-4 LLC & Healthcare

3

CH99 4682950-1 074256 0031

Finance Group, Inc./Marathon Structured Finance Fund, L.P., and General Motors Acceptance
Corp. for an expanded, ultimately $350 million DIP financing facility.

25.    By September 13, 2005, the date that McDermott was replaced by Weil Gotshal
& Manges LLP, the Debtors had restored relationships with many of their customers and vendors
and were able to secure higher collections from customers and obtain better trade terms with
many vendors.

26.    By September 13, the Debtors had the outline of a business plan and program for
emerging from chapter 11.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Dated:  September 17, 2006
        Chicago, Illinois

                                        Thomas Allison

4

CH99 4682950-1 074256 0031

# Exhibit R

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, *et al.*,

Debtors.

Chapter 11
Case No. 05-14945 (ASH)

(Jointly Administered)

AFFIDAVIT OF JAMES M. SULLIVAN IN SUPPORT OF APPLICATION OF
McDERMOTT WILL & EMERY LLP UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R.
BANKR. P. 2016 FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
JULY 5, 2005 THROUGH SEPTEMBER 30, 2005

STATE OF NEW YORK   )
                    )  ss.
COUNTY OF NEW YORK  )

James M. Sullivan, being duly sworn, deposes and says:

1.    I am a partner at McDermott Will & Emery LLP ("McDermott"), former primary attorneys for Saint Vincent's Catholic Medical Centers ("SVCMC") and each of its affiliated debtors, each a debtor-in-possession in the above-captioned cases (collectively, the "Debtors"). I submit this affidavit in support of McDermott's application (the "Fee Application") for compensation and for reimbursement of expenses for the period from July 5, 2005 through September 30, 2005 (the "Compensation Period").

2.    In preparation for this affidavit, I reviewed (i) the Fee Application; (ii) the objection of the creditors' committee in these cases (the "Committee"), dated March 3, 2006, opposing the Fee Application; (iii) the objection of the United States Trustee for the Southern District of New York (the "UST"), dated March 7, 2006, opposing the Fee Application; (iv) McDermott's reply dated March 20, 2006, in support of the Fee Application; (v) the Debtors'

10255161.3
NYK 1062268-2.074236.0014

objection to the Fee Application, dated July 31, 2006; and (vi) McDermott's reply to the Debtors' objection in further support of the Fee Application, dated August 25, 2006.

Background

3.    On July 5, 2005 (the "Petition Date"), each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code.

4.    Prior to the Petition Date, the Debtors' management told me that the Debtors lacked sufficient cash to make payroll.

5.    Prior to the Petition Date, the Debtors' management told me that the Debtors' relationships with vendors and employees were strained.

6.    Prior to the Petition Date, the Debtors' management told me that the Debtors were losing, on average, more than $1 million per week, with an acute loss of liquidity in April and May.

7.    While McDermott was primary bankruptcy counsel (from July 5 through September 13, 2005), the Debtors' financial condition and outlook improved.

8.    The Debtors had obtained final authorization for debtor-in-possession ("DIP") financing with HFG of up to $100 million based on available collateral, $65 million of which was new money. Additionally, the Debtors' management told me that by September 13, 2005, the Debtors' cash and cash availability under the HFG DIP facility exceeded $70 million, $35 million of which was new money, which was more liquidity than had been available at any time during the prior year.

9.    By September 13, 2005, the Debtors had obtained interim approval for DIP financing with Commerce Bank for $27.5 million, which was to be used to repay pre-petition secured loans owed to Commerce Bank in the amount of $19 million plus provide $8.5 million of additional availability. In addition, the Debtors were very close to obtaining final approval of

10255161.3
NYK 1062268-2.074236.0101

2

the Commerce Bank DIP financing, which provided the Debtors with $7.5 million of additional availability, for a total of $35 million.

10.    In addition, the Debtors had freed up $323,356.92 of collateral from Commerce Bank and freed up approximately $1.3 million in collateral from HSBC, and had obtained final approval for an additional $6.8 million of new money from DASNY and HUD.

11.    By September 13, 2005, the Debtors had negotiated definitive term sheets with CIT Healthcare, Inc., GECC, HFG/Marathon Structured Finance Fund, L.P., and General Motors Acceptance Corp. for an expanded, potential $350 million DIP financing facility.

12.    By September 13, 2005 the Debtors' management told me that the Debtors had restored relationships with many of their customers and vendors and were able to secure higher collections from customers and obtain better trade terms with many vendors.

13.    By September 13, 2005, the Debtors had the outline of a business plan and program for emerging from chapter 11.

McDermott's Retention

14.    McDermott served as the Debtors' primary bankruptcy counsel from July 5, 2005 through September 13, 2005.

15.    McDermott staffed the Debtors' cases with attorneys from McDermott's New York, Chicago, Los Angeles, and Washington, D.C. offices.

16.    The hourly billing rates of McDermott's Chicago attorneys are lower than even some junior attorneys in New York offices of other larger firms, sometimes by as much as $100 per hour.

17.    McDermott's staffing of the Debtors' cases was reasonable and appropriate.

18.    The Debtors terminated McDermott and replaced it with Weil Gotshal & Manges LLP ("Weil") on September 13, 2005.

10255161.3
NYK 1062268-2.074236.0101

3

19.    At all times during these cases, McDermott's services on all matters that I supervised or in which I was directly involved were (a) at its client's request, (b) in furtherance of the Debtors' paramount concern: quality patient care and (c) in the best interest of these estates.

20.    At all times with respect to all matters that I supervised or in which I was directly involved during the Compensation Period, McDermott was generally forthcoming with information that the UST and Committee requested regarding the Debtors' management, asset disposition and financial affairs.

SSI Surgical Services, Inc.

21.    The Debtors' management determined, in the exercise of its business judgment, to enter into a post-bankruptcy contract with SSI Surgical Services, Inc. ("SSI").

22.    The Debtors' management told me that prior to the Petition Date, SSI had picked up medical instruments daily from the Debtors and returned sterilized medical instruments to the Debtors.

23.    The Debtors' management told me that SSI stopped providing services to the Debtors following the Petition Date.

24.    The Debtors' management told me that faced with SSI's demands for payment in full of its prepetition claim, the Debtors attempted to perform the sterilization services themselves.

25.    The Debtors' management told me that the Debtors concluded that they lacked the ability to perform the sterilization services performed by SSI as well and as safely as SSI.

26.    The Debtors' management told me that the Debtors tried, but were unable to find, an alternative supplier.

10255161.3
NYK 1062268-2.074236.0101

4

27. The Debtors' management told me that the Debtors determined that immediate patient care needs mandated the Debtors' resolution of these issues with SSI quickly.

28. SSI initially took the position that it would not resume services to the Debtors until the parties obtained Court approval of a postpetition agreement with SSI, but I convinced SSI's counsel that taking such a position would be frowned upon by the Court.

29. As a result, SSI modified its position and agreed to resume services to the Debtors upon agreement to a term sheet among SSI, the Debtors and the Committee.

30. I received a term sheet on July 26, 2005, from Paul Rundell of Huron Consulting LLC ("Huron") by email, a copy of which is attached hereto as Exhibit A.

31. The term sheet, which was subject to Court approval and definitive documentation, was agreed to among SSI, the Debtors, and the Committee on or about July 27, 2005.

32. The Debtors' management told me that SSI resumed services to the Debtors on or about July 27, 2005.

33. The Debtors' management told me that the failure to reach an agreement with SSI at that time might have jeopardized patient care.

34. On or about August 2, 2005, Paul Rundell of Huron, on behalf of the Debtors, and SSI began negotiating a formal agreement, which would be subject to Court approval.

35. Paul Rundell was primarily responsible for negotiating the business terms of the post-petition agreement with SSI (the "SSI Agreement") on the Debtors' behalf.

36. The Debtors, with McDermott's assistance, reached an agreement with SSI that did not require payment of SSI's prepetition claim, but, according to the Debtors' management,

reflected market pricing for services to facilities likely, but not certain, to close, be sold or be transferred.

37. At the time McDermott assisted the Debtors in negotiating the SSI Agreement, the Debtors had plans to close St. Mary's Hospital, which was obligated to buy services from SSI under the agreement.

38. At that time, the Debtors also had plans for the possible sale of other facilities, which were obligated to buy services from SSI under the agreement, as going concerns (in which an acquirer may want to continue the contract with SSI).

39. When the Debtors were negotiating the terms of the SSI Agreement, SSI refused to (a) include a term providing a pricing adjustment in the event that any of the facilities serviced under the agreement were closed or sold, (b) remove the option to renew unilaterally the Agreement for an additional one year period, or (c) exclude the broad release in favor of SSI (the "Requested Changes").

40. Based on communications I had with SSI's counsel, I informed the Debtors' management and the Committee's counsel that SSI wanted to attempt to gain Court approval of the SSI Agreement without the Requested Changes, but, if the Court had any problems with the SSI Agreement, SSI might be willing to include some of the Requested Changes.

41. Craig Freeman, counsel for the Committee, agreed that McDermott had cut the best deal with SSI that it could.

42. Freeman and I agreed we should play "good cop/bad cop," and he should attempt to negotiate more favorable contract terms with SSI.

43. On August 31, 2005, I sent an email (a copy of which is attached hereto as Exhibit B) to Mohsin Khambati ("Khambati"), a then associate at McDermott, informing him that "I think the Committee [will] take the lead on retrading the deal for the debtor's benefit."

44. Khambati responded to my e-mail (a copy of which is attached hereto as Exhibit C) after he spoke to Freeman, saying, "Your point is exactly right. Craig has agreed to play the "bad cop" for us in pushing SSI -- but not too far."

45. The Debtors agreed to the Committee's proposed approach to achieving more favorable contract terms with SSI so long as SSI continued to provide services.

46. McDermott, with the Debtors' authorization, prepared and filed a motion dated August 26, 2005 (the "SSI Motion"), to approve the Debtors' post-petition agreement with SSI.

47. The UST took no position with respect to the SSI Motion.

48. The Committee objected to the SSI Motion on September 2, 2005, arguing, among other things, that the agreement failed to provide a pricing adjustment in the event that any of the facilities serviced under the agreement were closed or sold.

49. After the September 7 hearing, the Debtors, the Committee and SSI continued to negotiate the business terms for SSI's provision of services.

50. As of September 13, 2005, McDermott had negotiated numerous concessions with SSI's counsel but an agreement had not yet been finalized. An e-mail from Khambati to Freeman dated September 12, 2005 describing these concessions is attached hereto as Exhibit D.

51. On March 27, 2006, Weil filed a motion seeking authorization to enter into an agreement with SSI. The agreement attached to the motion appears to be no more favorable to the Debtors than the agreement negotiated by McDermott as contemplated in Exhibit D.

52. Upon information and belief, SSI continued to provide services to the Debtors during those negotiations.

53. SSI's agreement to provide services to the Debtors without court approval of the SSI Agreement enabled the Debtors to achieve its goal of continuing services and ensuring the safety of patient care.

54. In connection with the SSI matter, McDermott spent approximately 47.1 hours during the Compensation Period, the approximate value of which is $21,882.66 based on McDermott's blended hourly rate for attorneys ($464.60) during the Compensation Period.

55. McDermott accepted the Debtors' instructions regarding the agreement with SSI, which McDermott believed were supported by the Debtors' business judgment.

56. The services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

57. A reasonable counsel in McDermott's position would not have disregarded its client's instruction on the SSI matter.

58. McDermott's services in connection with the SSI matter, at the time they were rendered, were beneficial to the estates.

Cherry Creek

59. The Debtors' management determined, in the exercise of its business judgment, to enter into a master lease agreement with Cherry Creek Capital Partners, LLC ("Cherry Creek") for essential medical equipment that the Debtors believed (because of financial constrains) they were unable to purchase outright.

60. The Debtors management told me that prior to the Petition Date, the Debtors had negotiated the master lease agreement between the Debtors and Cherry Creek (the "Master Lease Agreement").

61.   The proposed Master Lease Agreement contemplated schedules providing lease terms for individual pieces or sets of equipment covered by the Master Lease Agreement.

62.   The Debtors told McDermott that the form of agreement with Cherry Creek had already been approved by Department of Health (the "DoH").

63.   The Debtors directed McDermott to seek Court authorization to enter into the Master Lease Agreement. Because the Master Lease Agreement had already been negotiated and approved by the DoH prior to the Petition Date, the Debtors told me to do the bare minimum required to obtain bankruptcy court approval.

64.   I marked up the form of agreement and negotiated minor changes with Cherry Creek's counsel to put the Master Lease Agreement in a form necessary to obtain court approval.

65.   McDermott, with the Debtors' authorization, prepared and filed a motion, dated August 26, 2005 (the "Cherry Creek Motion"), requesting the authority to enter into the Master Lease Agreement.

66.   Schedules providing lease terms for individual pieces or sets of equipment covered by the Master Lease Agreement were not filed with the Cherry Creek Motion because, according to an email I received from Alan Motes (representing Cherry Creek) on August 30 2005, a copy of which is attached hereto as Exhibit E, the schedules had not yet been prepared and would not be finalized until the equipment was installed.

67.   The Committee did not file an objection to the Cherry Creek Motion, but it expressed certain concerns with McDermott regarding some of the terms of the Master Lease Agreement, which resulted in revisions to the Master Lease Agreement and to the proposed order filed with the Cherry Creek Motion.

68.   McDermott worked with the Committee and Cherry Creek to resolve the Committee's concerns about the Master Lease Agreement.

69.   The Committee eventually approved the form of Master Lease Agreement and the proposed form of order.

70.   Among other things, the proposed form of order was revised to require the Debtors, prior to entering into a lease schedule, to give the Committee notice of the Debtors' intent to enter into such lease schedule with an opportunity to object thereto.

71.   The UST took no position with respect to the Cherry Creek Motion.

72.   During the September 7, 2005 hearing on the Cherry Creek Motion, I clarified that the Master Lease Agreement would allow the Debtors to lease less than all of the equipment referenced in the Cherry Creek Motion.

73.   Following a September 7, 2005 hearing on the Cherry Creek Motion, the Court advised McDermott that, based on the clarification that the Debtors would be authorized to lease less than all of the equipment, a proposed form of order granting the Cherry Creek Motion could be submitted (no re-notice required) to the Court for approval.

74.   A revised proposed order authorizing the Master Lease Agreement was never submitted to the Court because, upon information and belief, the Debtors' improved liquidity enabled them to purchase, rather than lease, a subset of the equipment.

75.   In connection with the Cherry Creek matter, McDermott spent approximately 73.9 hours during the Compensation Period, the approximate value of which is $34,333.94 based on McDermott's blended hourly rate for attorneys ($464.60) during the Compensation Period.

76.   McDermott accepted the Debtors' instructions regarding the Master Lease Agreement, which McDermott believed were supported by the Debtors' business judgment.

77.   The services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

78.   A reasonable counsel in McDermott's position would not have disregarded its client's instruction on the Cherry Creek matter.

79.   McDermott's services in connection with the Cherry Creek matter, at the time they were rendered, were beneficial to the estates.

RCG Liens

80.   The Debtors determined that they needed access to cash collateral for essential operations.

81.   Accordingly, McDermott, with the Debtors' authorization, moved on July 5, 2005, for, among other things, authority to use cash collateral (the "Cash Collateral Motion").

82.   RCG Longview II, L.P. ("RCG"), a secured creditor of the Debtors, objected to the Cash Collateral Motion on July 13, 2005, and supplemented its objection on July 22, 2005.

83.   To facilitate approval of the Cash Collateral Motion, McDermott sought Court approval on August 25, 2005, of a stipulation, a copy of which is attached hereto as Exhibit F (the "Stipulation"), between the Debtors and RCG, which provided: (i) the Debtors would grant RCG replacement liens only equal in priority and extent to its prepetition liens, and only to the extent such pre-bankruptcy liens were valid; and (ii) any party in interest would have three months to challenge RCG's liens.

84.   I spoke to Freeman about the stipulation before it was filed and I told him what I knew about the RCG transaction. In addition, I agreed to let the Committee investigate RCG's liens. The Stipulation was consistent with a stipulation entered into with Sun Life Assurance Company of Canada and Sun Life Assurance Company of Canada (US) (collectively, "Sun

Life"), in which the Committee and other parties-in-interest were given three months to investigate Sun Life's liens.

85.   As Freeman indicated in an August 31, 2005 email (a copy of which is attached hereto as Exhibit G) to my associate Nava Hazan, Freeman on behalf of the Committee approved the Stipulation before it was filed.

86.   Pursuant to the Stipulation, the Debtors acknowledged the pre-petition validity of RCG's liens and acknowledged that the Debtors would not challenge RCG's security interest and liens.

87.   However, as per the agreement with Freeman on behalf of the Committee, the Stipulation gave the Committee and other parties in interest three months to investigate and challenge RCG's liens.

88.   The Court approved the Stipulation on September 8, 2005.

89.   The Court approved the Cash Collateral Motion on September 8, 2005.

90.   Upon information and belief, as a result of the Stipulation and approval of the Cash Collateral Motion, the Debtors had access to cash collateral in the aggregate amount of between $80 million and $120 million per month.

91.   The Debtors' estates would have incurred fees if McDermott had reviewed RCG's liens before entering into the Stipulation or litigated with RCG to obtain use of cash collateral, but the estates would not have had access to much-needed cash collateral during such a review or during such litigation.

92.   In connection with RCG's objection to the Cash Collateral Motion and the Stipulation, McDermott spent approximately 18.1 hours during the Compensation Period, the

approximate value of which is $8,409.26 based on McDermott's blended hourly rate for

attorneys ($464.60) during the Compensation Period.

93. The services were reasonably performed within a reasonable amount of time

commensurate with the complexity, importance and nature of the task addressed.

94. A reasonable counsel in McDermott's position would not have disregarded its

client's instruction in connection with the RCG Stipulation.

95. McDermott accepted the Debtors' instructions regarding RCG's liens, which

McDermott believed were supported by the Debtors' business judgment.

96. McDermott's services, at the time they were rendered, were beneficial to the

estates.

Critical Vendors

97. The Debtors' management determined, in exercise of its business judgment, that (a)

the Debtors' viability as healthcare providers and (b) the welfare of their patients was dependent

on their uninterrupted access to the goods and services provided by certain critical vendors,

including suppliers of over-the-counter and prescription medicines, medical supplies, equipment,

food and beverage supplies and sanitary items.

98. Upon information and belief, the Debtors directed McDermott to file a motion to

obtain authority to pay the critical vendors' pre-bankruptcy claims.

99. Upon information and belief, the Debtors estimated that the maximum amount

needed to pay the pre-bankruptcy critical vendor claims was $16.2 million, and that it would not

pay prepetition claims in full, but pay critical vendors a maximum of 60% of their prepetition

claims.

100. Upon information and belief, the Debtors determined that the requested authority

would not impair the Debtors' cash flows because: (i) the authority was not a direction to pay and

10253161.3
NYK 1062268-2.074256.0031

13

(ii) most of the Debtors' obligations to the critical vendors have customary payment terms and

would not be payable in a lump sum.

101. Upon information and belief, McDermott consulted with the Debtors' with respect

to which vendors to include on the list of critical vendors to be the subject of the motion.

102. Upon information and belief, McDermott advised the Debtors' Executive

Committee that the list should include only a select few pre-petition vendors.

103. McDermott, with the Debtors' authorization, moved on July 5, 2005, for authority,

but not direction, to pay the critical vendor claims (the "Critical Vendor Motion").

104. By the Critical Vendor Motion, the Debtors sought Court authority to pay

approximately 56 critical vendors a total of up to $16.2 million.

105. Upon information and belief, the list of critical vendors was never made public, and

was only made available to the Court, the UST, the Debtors' secured lenders, and counsel for the

Committee.

106. The Court approved the Critical Vendor Motion on July 11, 2005.

107. Once the Critical Vendor Motion was granted, McDermott handled incoming calls

from attorneys regarding critical vendor issues and referred other callers to the Debtors' finance

staff or Paul Rundell of Huron. The Debtors did not disclose the identity of any vendors or

amounts, except to the Debtor's lenders, the Committee's counsel, the Court and the UST.

108. After its appointment on July 18, 2005, the Committee moved on July 21, 2005, for

reconsideration of the Court's order, arguing among other things, that the list of critical vendors

that was the subject of the Court's order provided too much payment authority.

109. Freeman told me that the Committee was seeking reconsideration to afford it an

opportunity to review and comment on the critical vendors list.

10253161.3
NYK 1062268-2.074256.0031

14

110. Upon information and belief, at that time, the Debtors had made no payments to

critical vendors.

111. Prior to the hearing on the Committee's motion for reconsideration, in an effort to

address the Committee's concerns, the Debtors agreed to make payments to critical vendors only

with the consent of the Committee.

112. The Debtors used the Committee's reconsideration motion to their advantage with

creditors because many creditors agreed to provide goods and services without a critical vendor

payment after the Debtors cited the Committee's reconsideration motion as a reason for their

inability to make a payment.

113. Upon information and belief, the first critical vendor payment was to a blood

supplier on August 4, 2005, and was made with the Committee's consent.

114. Upon information and belief, the Debtors never made any payments to critical

vendors without the Committee's consent.

115. Upon information and belief, the Debtors' improved liquidity led to only three

critical vendor payments, for an aggregate of $1.4 million, or 9% of the total authority under the

critical vendor order.

116. In connection with the Critical Vendor Motion, McDermott provided

approximately 61.6 hours during the Compensation Period, the approximate value of which is

$28,619.36 based on McDermott's blended hourly rate for attorneys ($464.60) during the

Compensation Period.

117. The services were reasonably performed within a reasonable amount of time

commensurate with the complexity, importance and nature of the task addressed.

10253161.3
NYK 1062268-2.074256.0031

15

118. A reasonable counsel in McDermott's position would not have disregarded its

client's instruction in connection with the Critical Vendor Motion.

119. McDermott's services, at the time they were rendered, were beneficial to the

estates.

DIP Financing

A.    Commerce Bank

120. At the Debtors' request, McDermott negotiated, drafted the related pleadings, and

obtained interim Court approval on September 9, 2005 for $27.5 million in DIP financing from

Commerce Bank, which was used to repay pre-petition secured debts owed to Commerce Bank

in the amount of $19 million plus provided $8.5 million of additional availability. In addition,

the Debtors were very close to obtaining final approval of the Commerce Bank DIP financing,

which eventually provided the Debtors with $7.5 million of additional availability, for a total of

$35 million.

121. McDermott completed all work on this matter prior to the transition to Weil so that

little, if any, additional substantive work was required to obtain final approval.

122. The Court approved this financing on a final basis on November 7, 2005.

123. At the Debtors' request, McDermott negotiated, drafted pleadings, and obtained

Court approval on July 28, 2005, of an agreement to pay off a $30 million loan to Commerce

Bank.

124. The above-described agreement freed up approximately $323,000 of cash

collateral, allowing the Debtors to use that cash for operations.

B.    HSBC

10253161.3
NYK 1062268-2.074256.0031

16

SRZ Draft 10/18/06
Privileged and Confidential

125.    At the Debtors' request, McDermott also negotiated, drafted the related pleadings, and obtained approval on August 23, 2005, of an agreement with HSBC that freed for the Debtors' use approximately $1.3 million in funds pledged to HSBC.

126.    In connection with DIP financing, McDermott spent approximately 955.8 hours during the Compensation Period, the approximate value of which is $444,064.68 based on McDermott's blended hourly rate for attorneys ($464.60) during the Compensation Period.

127.    McDermott's services in connection with DIP financing were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

128.    McDermott's position would not have disregarded its client's instruction on the DIP financing.

129.    McDermott's services in connection with DIP financing, at the time they were rendered, were beneficial to the estates.

James M. Sullivan

Notary Public

Sworn to before me this 18th day of
October, 2006

_____
(Notary Public)

GARY O. RAVERT
Notary Public, State of New York
02RA6002005
Certificate Filed Kings County
Commission Expires July 30, 2008

10251161.3
NYK 1002268-2.074336.0031

17

Index to Exhibits to the Affidavit of James M. Sullivan[1]

| Sullivan Affidavit Exhibit | Description | Tabs in Joint Exhibit Binder |
|---|---|---|
| A | 7/26/05 (7:46 p.m.) E-mail from Sullivan to P. Rundell (attaching SSI Term Sheet). | 43 |
| B | 8/31/05 (8:53 a.m.) E-mail from Sullivan to M. Khambati Re: SSI | 99A |
| C | 8/31/05 (4:59 p.m.) E-mail from Khambati to Sullivan, cc Cleary re: SSI | 99B |
| D | 9/12/05 E-mail from Khambati to Freeman, cc Lawall, bcc Sullivan re: SVCMC: SSI | 99D |
| E | 9/1/05 E-mail from Alan Metes to Sullivan and Hazan, cc Eklund, Roger, and Dagenais attaching draft rental schedules | 68 |
| F | 9/8/05 Stipulation and Order Resolving the objections of RCG Longview to the motion for interim financing orders | 75 |
| G | 8/31/05 E-mail from Freeman to N. Hazan Re: RCG Stipulation / Final DIP Order | 99C |

_____

[1]    Due to the voluminous nature of the exhibits and the fact that they are contained in the Joint Exhibit Binder, McDermott has, for the Court's convenience, cross-referenced the exhibits to the Joint Exhibit Binder

10255.77.3

# Exhibit S

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re
SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, et al.,

Debtors.

Chapter 11
Case No. 05-14945 (ASH)

(Jointly Administered)

AFFIDAVIT OF STEPHEN B. SELBST IN SUPPORT OF APPLICATION OF McDERMOTT
WILL & EMERY LLP UNDER 11 U.S.C. §§ 330(a), 331 AND FED. R. BANKR. P. 2016 FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES
JULY 5, 2005 THROUGH SEPTEMBER 30, 2005

STATE OF NEW YORK    )
                     )    ss.
NEW YORK COUNTY      )

Stephen B. Selbst, being duly sworn, deposes and says:

1.    I am a member of McDermott Will & Emery LLP ("McDermott"), former
primary attorneys for Saint Vincents Catholic Medical Centers and each of its affiliated debtors,
each a debtor-in-possession in the above-captioned cases (collectively, the "Debtors"). I submit
this affidavit in support of McDermott's application (the "Fee Application") for compensation
and for reimbursement of expenses for the period from July 5, 2005 through September 30, 2005
(the "Compensation Period").

2.    In preparation for this affidavit, I reviewed (i) the Fee Application; (ii) the
objection of the creditors' committee in these cases (the "Committee"), dated March 3, 2006,
opposing the Fee Application; (iii) the objection of the United States Trustee for the Southern
District of New York (the "UST"), dated March 7, 2006, opposing the Fee Application; (iv)
McDermott's reply, dated March 20, 2006, in support of the Fee Application; (v) The Debtors'

10239157.3                                1

objection to the Fee Application, dated July 31, 2006; and (vi) McDermott's reply to the Debtors'
objection dated August 25, 2006.

Background

3.    On July 5, 2005 (the "Petition Date"), each of the Debtors filed a petition for
relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors own and operate one of the New York metropolitan area's most
comprehensive health care systems, serving more than 600,000 patients annually.

5.    The Debtors serve as the academic medical center of New York Medical College
in New York City.

6.    The Debtors are also one of the New York metropolitan area's largest employers
with approximately 12,500 full and part-time employees.

7.    As of the Petition Date, the Debtors operated seven hospitals: St. Vincent's
Hospital, Manhattan; Bayley Seton Hospital, Staten Island; Mary Immaculate Hospital, Queens;
St. John's Hospital, Queens; St. Mary's Hospital, Brooklyn; St. Vincent's Hospital, Staten
Island; and St. Vincent's Hospital, Westchester.

8.    In 2004, the Saint Vincent's system had total revenues (including gifts) of $1.557
billion and recorded a net operating loss of $143.4 million.

9.    The Debtors' chapter 11 cases are large and complex.

10.    The sheer size of the Debtors makes formulating a plan of reorganization an
exceedingly intricate and lengthy process.

11.    The Debtors' cases are further complicated by the Debtors' status as not-for-profit
entities, whose fiduciary duties run not only to their creditors, but also to their charitable
purposes.

10239157.3                                2

12.    Because the Debtors are not-for-profit debtors, they are required not only to
address the concerns of their creditors, but also the concerns of their patients and of the
communities that the Debtors serve.

13.    The Debtors are subject to a host of regulatory and licensing requirements that
often require them to obtain approval for their major business decisions.

14.    The Debtors' status as not-for-profit corporations necessarily increases the
complexity of these cases.

15.    Prior to the Petition Date, the Debtors faced liquidity pressures and were
concerned about their ability to make payroll.

16.    Prior to the Petition Date, the Debtors' relationships with vendors and employees
were severely strained, leading to interruptions in the supply of goods and services.

17.    Prior to the Petition Date, the Debtors were losing, on average, more than
$1 million per week, with an acute loss of liquidity in April and May.

18.    While McDermott was primary bankruptcy counsel (from July 5 through
September 13, 2005), the Debtors' condition and outlook had improved.

19.    The Debtors had obtained final authorization for debtor-in-possession ("DIP")
financing with HFG of up to $100 million based on available collateral, $65 million of which
was new money. Additionally, the Debtors' management told me that by September 13, 2005,
the Debtors' cash and cash availability under the HFG DIP facility exceeded $70 million, $35
million of which was new money, which was more liquidity than had been available at any time
during the prior year.

20.    By September 13, 2005, the Debtors were close to obtaining an order authorizing
the closure of St. Mary's Hospital and cutting millions in losses.

10235157.3                                3

21.    By September 13, the Debtors had negotiated definitive term sheets from CIT
Healthcare, Inc., GECC, HFG/Marathon Structured Finance Fund, L.P., and General Motors
Acceptance Corp. for an expanded, ultimately $350 million DIP financing facility.

22.    By September 13, the Debtors had restored relationships with many of their
customers and vendors and were able to secure higher collections from customers and obtain
better trade terms with many vendors.

23.    By September 13, 2005, the Debtors had the outline of a business plan and
program for emerging from chapter 11.

24.    By September 13, 2005, the Debtors had obtained interim approval for DIP
financing with Commerce Bank, for $27.5 million, to be used to repay pre-petition secured debts
owed to Commerce Bank in the amount of $19 million plus $8.5 million of additional
availability. In addition, the Debtors were very close to obtaining final approval of the
Commerce Bank DIP financing, which provided the Debtors with $7.5 million of additional
availability, for a total of $35 million.

25.    In addition, the Debtors were close to arrangements for $16 million in DIP
financing from Commerce Bank, freeing $323,356.92 of collateral from Commerce Bank,
freeing up approximately $1.5 million in collateral from HSBC, and had obtained final approval
for an additional $6.8 million of new money from DASNY and HUD.

McDermott's Retention

26.    McDermott served as the Debtors' primary bankruptcy counsel from July 5, 2005
through September 13, 2005.

27.    McDermott staffed the Debtors' cases with attorneys from McDermott's New
York, Chicago, Washington, D.C. and Los Angeles offices.

10235157.3                                4

28.  The Debtors requested that McDermott's Chicago lawyers work on the cases because of their expertise in healthcare-related and reorganization matters.

29.  The hourly billing rates of McDermott's Chicago attorneys are lower than even some junior attorneys in New York offices of other larger firms, sometimes by as much as $100 per hour.

30.  McDermott's staffing of the Debtors' cases was reasonable and appropriate.

31.  The Debtors terminated McDermott and replaced it with Weil Gotshal & Manges LLP ("Weil") on September 13, 2005.

32.  At all times during these cases, McDermott's services were (a) at its client's request, (b) in furtherance of the Debtors' paramount concern: quality patient care and (c) in the best interest of these estates.

33.  At all times during the Period, McDermott was generally forthcoming with information that the UST and Committee requested regarding the Debtors' management, asset disposition and financial affairs.

Closure of St. Mary's Hospital

34.  In connection with the St. Mary's Hospital closure, McDermott provided certain services, including: (i) representing the Debtors in state court litigation (the "State Court Litigation") regarding the approval by the New York Department of Health of the closure plan; (ii) commencing an action in the Debtors' chapter 11 cases seeking, among other things, a declaration that the plaintiff in the State Court Litigation had violated the automatic stay; (iii) preparing and filing a motion, dated August 18, 2005, seeking authority to close St. Mary's Hospital (the "St. Mary's Motion"); (iv) responding to numerous objections filed in opposition to the St. Mary's Motion; (v) appearing at a hearing on August 23, 2005, on issues relating to the

closure of St. Mary's Hospital; and (vii) appearing at a hearing on the St. Mary's Motion on September 7, 2005.

35.  The St. Mary's community and employees contested the closure.

36.  In the State Court Litigation, where the Debtors were not named as parties, Harriett McCloud, a former patient of St. Mary's Hospital, obtained an ex-parte temporary restraining order in Kings County Supreme Court on July 22, 2005, restraining the New York State Department of Health ("DoH") from approving a closure plan for St. Mary's Hospital.

37.  Immediately after receiving notice of the State Court Litigation, McDermott, on behalf of the Debtors, successfully took action in Kings County Supreme Court to persuade the state court that the State Court Litigation violated the automatic stay, and that the Kings County Supreme Court lacked jurisdiction.

38.  When Harriet McCloud sought an emergency appeal in the Supreme Court, Appellate Division, McDermott, on behalf of the Debtors, successfully opposed the appeal.

39.  Attorneys from McDermott and St. Clair discussed on July 22, 2005, whether the Debtors should appear in the State Court Action or first seek relief from the Bankruptcy Court.

40.  On July 22, 2005, McDermott and St. Clair concluded that it was more prudent to go to state court first, and have papers ready to go to the Bankruptcy Court in the event that Brooklyn was not successful or going well.

41.  After the State Court Litigation was commenced, I learned two things from St. Clair. First, I learned that St. Clair believed the Debtors were very close to getting DoH approval. Second, I understood from St. Clair's comments that the DoH had a strong preference for keeping these matters confidential until it was finally approved. The DoH was extremely skittish about exactly the kind of litigation that arose in the Supreme Court in Brooklyn.

Furthermore, the DoH was concerned that if the plan became public before it had been finally approved that it increased the likelihood that the DoH would be the subject of collateral litigation.

42.  On July 29, 2005, McDermott filed a complaint with the Bankruptcy Court, seeking a preliminary and permanent injunction to enjoin Ms. McCloud from prosecuting the State Court Litigation

43.  I appeared on behalf of the Debtors at the August 4, 2005 hearing in the Bankruptcy Court on the Debtors' application for a preliminary and permanent injunction.

44.  After the August 4 hearing, McDermott determined to filed the closure plan for St. Mary's Hospital with the Court.

45.  McDermott prepared and filed on August 5, 2005, the 111-page affidavit of Bernadette Kingham-Bez attaching the closure plan as an exhibit, a copy of which is attached hereto as Exhibit A.  The Kingham-Bez affidavit provided financial information regarding St. Mary's, described the Debtors' business rationale for seeking approval of the closure, described the Debtors' prior unsuccessful efforts to transfer St. Mary's, and described the process of obtaining the requisite regulatory approvals.

46.  At the August 4, 2005 hearing, the Court granted the temporary restraining order in the adversary proceeding.

47.  At the August 5, 2005 hearing, I accepted responsibility for Judge Beatty's criticism because, although I knew Judge Beatty was unhappy with some things McDermott had done, she was also unhappy with decisions that St. Vincent's had made.  So, to the extent that I could, I tried to take the blame and keep the blame off of my client because I felt it was my duty to get a result for a client and my own reputation was clearly secondary to that of the client.

48.  In the course of determining the appropriate response to and preparing for hearings in the State Court Litigation, inevitably anybody close to Saint Vincent's would have come to understand that bankruptcy court approval was absolutely mandatory.

49.  McDermott first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier than August 5, 2005, but had litigated the closure issue in the state court on July 24, 2005, and had submitted the 111-page Kingham-Bez affidavit to the Bankruptcy Court on August 5, 2005.

50.  I was advised by James Sullivan and Gary Ravert of McDermott that the Court would not provide the Debtors with a hearing date in mid to late August.  The first available hearing date after the August 4, 2005 hearing was September 7, 2005.

51.  I was advised by my associate Gary Ravert that the Debtors were having difficulty confirming (i) certain financial information contained in the St. Mary's motion, and (ii) which contracts could be rejected as part of the St. Mary's motion without impacting services at other SVCMC facilities.  Although the need for this information may have delayed the filing of the motion by a few days, the actual filing of the motion was keyed to the September 7, 2005 Court date given to the Debtors by Chambers.

52.  McDermott filed the St. Mary's Motion on August 18, 2005.

53.  McDermott filed no affidavits or declarations in support of the St. Mary's Motion on August 18, but had filed the 111-page Kingham-Bez affidavit on August 5, 2005.

54.  McDermott did not include affidavits in support of the St. Mary's Motion because McDermott's supporting fact affidavits were unnecessary to include because McDermott had already provided to Judge Beatty as part of the Order to Show Cause, Bernadette Kingham-Bez's

affidavit attaching the closure plan and describing a variety of facts, and McDermott also expected it would present evidence at a later hearing.

55.    Objections to the closure of St. Mary's Hospital were filed by the following objectors: (i) Brooklyn Safety Net, LLC ("BSN") on August 30, 2005; (ii) Harriet M. McCloud on August 31, 2005; (iii) the Medical Staff (Physicians) Committee of St. Mary's, Mary Immaculate, and St. John's Hospitals on August 31, 2005; and (iv) the Bedford Stuyvesant Family Health Center, Inc. and Brownsville Multi Service Family Health Center on September 7, 2005.

56.    The UST took no position with respect to the Debtors' efforts to close St. Mary's Hospital.

57.    The Committee initially took no position with respect to the Debtors' efforts to close St. Mary's Hospital.

58.    McDermott prepared and filed on September 2, 2005, the Debtors' omnibus reply to the objections to the St. Mary's Motion, a copy of which is attached hereto as Exhibit B, that comprehensively addressed the concerns raised by the objecting parties.

59.    As part of the Debtors' reply, McDermott filed no affidavits or declarations in response to any of the objectors' objections.

60.    Instead, McDermott intended to rely, if necessary, on live witnesses and the Kingham-Bez affidavit.

61.    The Committee filed a short response in support of McDermott's motion to close St. Mary's Hospital on September 2, 2005, a copy of which is attached hereto as Exhibit C.

62.    The Court held a hearing on the St. Mary's Motion on September 7, 2005.

63.    I represented the Debtors at the September 7 hearing.

9

64.    I had previously prepared Bernadette Kingham-Bez to testify on several occasions between July 22 and September 7, 2005, and I refreshed that preparation during the week before the September 7 hearing.

65.    McDermott offered no testimony from any witnesses at the September 7, 2005 hearing in view of Judge Beatty's direction on August 30, 2005.

66.    At the September 7, 2005 hearing, the Committee's counsel, also with no supporting witnesses, made statements supporting the closure of St. Mary's Hospital, having been directed by the Court to take a position on the closure.

67.    The Court did not grant the St. Mary's Closure Motion on September 7, 2005, but adjourned the hearing, as she had previously told my partner Bill Smith she would on August 30, 2005.

68.    At this time, St. Clair was most concerned about obtaining the required approvals to close St. Mary's before the expiration of the WARN Act notices.

69.    McDermott was reasonable in appearing on the Debtors' behalf in Brooklyn State Court in the State Court Litigation before seeking relief in this Court.

70.    McDermott was fully prepared to press forward for Court approval at the September 7 hearing because it had: (i) previously submitted the Kingham-Bezaffidavit to the Court in the context of the McCloud adversary proceeding; (ii) submitted to the Court pleadings that provided the economic basis for closure; and (iii) been prepared on August 23 and September 7 to make a full evidentiary presentation, including live witness testimony.

71.    The facts in the Kingham-Bez affidavit, the later supporting declarations and the facts on which the Court relied in its decision to approve the closure, were derived from the joint efforts of the Debtors and McDermott in the weeks leading up to the September 20 hearing and

10

had previously been presented in the St. Mary's Motion and the reply in support of that motion prepared and filed by McDermott.

72.    McDermott's services, at the time they were rendered, were beneficial to the estates.

73.    In connection with the St. Mary's Hospital closure, McDermott spent approximately 530.4 hours during the Period, the approximate value of which is $246,243.84 based on McDermott's blended hourly rate for attorneys ($464.60) during the Period.

74.    McDermott's services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

75.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction on the St. Mary's Hospital closure.

Debtor-in-Possession Financing

76.    One of the precipitating factors in the Debtors' decision to seek relief under chapter 11 was their steadily deteriorating working capital position in early 2005.

77.    As of the Petition Date, the Debtors' line of credit to borrow against accounts receivable had been terminated by their lender, HFG.

78.    On the Petition Date, the Debtors had a critical need for emergency DIP financing.

79.    Speltz, the Debtors' CEO, did not authorize the Debtors' advisors to seek DIP financing until late May 2005.

80.    In the first five weeks of the Debtors' cases, McDermott assisted the Debtors in relieving their immediate liquidity crisis, while simultaneously taking initial steps to obtain permanent long-term financing.

11

81.    With McDermott's assistance, the Debtors were able to obtain authorization for several different postpetition financing arrangements on an interim basis.

82.    In conjunction with the Debtors' financial advisor and investment banker, McDermott performed five categories of services in connection with DIP financing. McDermott assisted the Debtors to (i) negotiate term sheets for a substantially larger DIP facility; (ii) obtain critical DIP financing from HFG; (iii) obtain approval for its use of cash collateral; (iv) obtain DIP financing from DASNY/HUD; (iv) enter into an agreement with HSBC to free collateral; and (v) negotiate a grant-based DIP loan with Commerce Bank.

83.    McDermott, in conjunction with the Debtors' financial advisor, also assisted the Debtors in negotiating an agreement with Commerce Bank to free collateral.

84.    In connection with DIP financing, McDermott spent approximately 955.8 hours during the Period, the approximate value of which is $444,064.68 based on McDermott's blended hourly rate for attorneys ($464.60) during the Period.

85.    The services were reasonably performed within a reasonable amount of time commensurate with the complexity, importance and nature of the task addressed.

86.    A reasonable counsel in McDermott's position would not have disregarded its client's instruction on the DIP financing.

A.    Long-Term DIP Facility

87.    Since the Petition Date and in addition to addressing the Debtors' immediate financing needs, McDermott assisted in the process of helping the Debtors arrange a larger DIP facility.

88.    McDermott (and Huron) negotiated larger DIP financing loans with numerous potential lenders and drafted definitive term sheets, copies of which are attached hereto as

12

Exhibit D, and commitment letters with multiple lenders, taking four, including GECC, to the final commitment stage.

89.    McDermott drafted the related pleadings and orders approving the payment of due diligence-related work fees, appraisal fees, environmental report fees, and brokers fees required by the potential DIP lenders.

90.    McDermott further began the process of obtaining all necessary appraisals and environmental reports necessary to conclude the larger replacement DIP financing.

91.    While the potential DIP lenders conducted their due diligence, McDermott assisted the Debtors in negotiating with the prospective lenders.

B.  HFG

92.    At the first Court hearing on July 5, 2005, McDermott sought and obtained (i) the authority for the Debtors to use cash collateral, and (ii) the authority for the Debtors to obtain up to $[50] million of DIP financing from HFG Healthtech 4 LLC ("HFG") in amount, and at advance rates, in excess of what had been available under the Debtors' prepetition receivables line of credit. This included $15 million in additional DIP financing.

93.    McDermott resolved, and the Court overruled, all the objections that were filed with the Court or informally communicated to the Debtors.

94.    As part of the HFG financing motion, the Debtors also sought the use of cash collateral.

95.    McDermott resolved, and the Court overruled, all the objections that were filed with the Court or informally communicated to the Debtors.

96.    As part of the HFG financing motion, the Debtors also sought the use of cash collateral.

97.    By separate orders and through negotiations with multiple parties in interest, McDermott obtained emergency, interim, and final approval of the Debtors' use of cash collateral over the objections of and by resolving the objections of:  Comprehensive Cancer Corporation; Sun Life Assurance Company of Canada and Sun Life Assurance Company of Canada (U.S.); RCG; The Bank of New York; the United States Department of Housing and Urban Development ("HUD"); the Dormitory Authority of the State of New York ("DASNY"); General Electric Company, GE Healthcare, GE Medical Systems and GE Capital Public Finance, Inc.; Primary Care Development Corporation; and the New York State Nurses Association.

Stephen B. Selbst

Notary Public

Sworn to before me this 17th day of October 2006

(Notary Public)

GARY O. RAVERT
Notary Public, State of New York
02RA6062205
Certificate Filed Kings County
Commission Expires July 30, 2009

10258157.3          13

10258157.3          14

**Index to Exhibits to the Affidavit of Stephen B. Selbst[1]**

| Selbst Affidavit Exhibit | Description | Tabs in Joint Exhibit Binder |
|---|---|---|
| A | 8/5/05 Affidavit of Bernadette Kingham-Bez including Closure Plan | 53 |
| B | 9/2/05 Debtors' Omnibus Response to Objections to Debtors' Motion for Entry of an Order Authorizing the Debtors to Close St. Mary's Hospital | 71 |
| C | 9/2/05 Statement of the Creditors' Committee in Support of Debtors' Motion for Entry of an Order Authorizing the Debtors to Close St. Mary's Hospital | 70 |
| D | DIP Financing Term Sheets<br>1. $300 million Credit Facility with Greenwich Capital and GMAC<br>2. $300 million DIP Financing Proposal with HFG and Marathon Structured Finance Fund, L.P., dated August 9, 2005<br>3. Outline of Terms and Conditions for Secured Superpriority Debtor in Possession Credit Facility in the Amount of $300 million from CIT Healthcare and Merrill Lynch Capital<br>4. Proposal for $325 million DIP Credit Facility from GE Healthcare Financial Services | 88 |

<hr>

[1]    Due to the voluminous nature of the exhibits and the fact that they are contained in the Joint Exhibit Binder, McDermott has, for the Court's convenience, cross-referenced the exhibits to the Joint Exhibit Binder

10258263.2

# Exhibit T

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:                                                          :       Chapter 11
                                                               :
SAINT VINCENTS CATHOLIC MEDICAL                                 :       Case No. 05-14945 (ASH)
CENTERS OF NEW YORK d/b/a SAINT VINCENT                         :
CATHOLIC MEDICAL CENTERS, *et al.*,                             :       (Jointly Administered)
                                                               :
                                   Debtors.                     :
                                                               :
----------------------------------------------------------x

**DECLARATION OF GUY SANSONE IN SUPPORT OF
DEBTORS' RESPONSE AND OBJECTION TO FIRST INTERIM
APPLICATION OF MCDERMOTT WILL & EMERY LLP FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED
AND REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE
DEBTORS FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005**

I, Guy Sansone, hereby declare, pursuant to section 1746 of title 28 of the
United States Code, that the following is true to the best of my knowledge, information
and belief:

1.     I am a Managing Director in the turnaround crisis management
firm of Alvarez & Marsal. I currently serve as the Chief Executive Officer (CEO) and
Chief Restructuring Officer (CRO) of St. Vincents Catholic Medical Centers ("SVCMC").
I was appointed CEO and CRO effective October 21, 2005 pursuant to the *Final Order
Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Debtors to Employ
Guy Sansone as Chief Executive Officer/Chief Restructuring Officer and Martin McGahan as
Chief Financial Officer and to Enter Into an Agreement with Alvarez and Marsal, LLC in Re-
spect of Such Services*, dated December 14, 2005.

2.     When I first arrived at SVCMC, based on my personal observa-
tions, the chapter 11 case was chaotic and in disarray. The case was just 3 months old,

yet there was no firm commitment for debtor in possession financing, even though fore-
casts showed the company running out of cash by the end of January 2006, and the then
current draft of the company's business plan was unrealistic. Physicians within the
hospital system had lost confidence in the bankruptcy process – they felt they were
being ignored and not receiving information about the reorganization, so much so that
physician groups from Queens, Staten Island and Manhattan were all trying to form
separate creditors' committees. Employees at SVCMC expressed a lack of trust with
senior management. I fairly quickly came to the conclusion that much of the chaos and
disarray appeared to trace directly back to the efforts of McDermott – never successful –
to retain Speltz & Weis, LLC and Huron Consulting Group. It seemed to me that these
efforts had diverted attention away from other, more critical needs such as solidifying
financing to ensure adequate capital and liquidity to make it through the chapter 11
process and emerge with a confirmable and confirmed plan.

3.     I was also told by both Deirdre Martini and professionals retained
by the Committee that there was a pervasive perception that the chapter 11 process was
not being managed in a transparent fashion, and that unsuccessful efforts by McDer-
mott, Will & Emery on behalf of SVCMC to engage the firm of Speltz & Weis, LLC
caused a major distraction in the case, and that as a result SVCMC lost a great deal of
credibility with the Court, the U.S. Trustee, and the creditors.

4.     I learned that in September 2005, the Board of SVCMC fired
McDermott, Will & Emery as general bankruptcy counsel for the Debtors, and hired
Weil, Gotshal & Manges as replacement counsel.

5.     In my experience as CEO and CRO of SVCMC, I do not believe that
any of the problems that I learned about which existed during McDermott's tenure as
counsel continued after Weil replaced McDermott. SVCMC has restored its credibility

2

with the Court, the U.S. Trustee, the creditors, physicians, the communities that it
serves and other parties in interest in the case. I believe that Weil has effectively helped
the Debtors to achieve many of their objectives in this case smoothly and without acri-
mony, both in and out of court, and that Weil has assiduously and accurately conveyed
my expectations and directions as CEO/CRO to all parties concerned.

6.     As CEO, I am familiar generally with the aggregate amount of legal
fees incurred by SVCMC for chapter 11 estate professionals.

7.     In connection with the Debtors' Response and Objection to the
McDermott fee application, under my supervision, the invoices and time records that
Weil submitted for the period September 12 through October 31, 2005 were reviewed. I
am advised that these invoices and time records are publicly filed documents on the
Bankruptcy Court's website. Based upon review of those documents, it appears that the
Debtors incurred the following fees to Weil:

     a.  $120,000 (approximately) for services associated with the transi-
         tion of counsel from McDermott to Weil;

     b.  $98,000 (approximately) for services associated with negotiating
         a compromise with the U.S. Trustee and the Committee, which
         permitted former Spelt & Weis, LLC employees and Huron em-
         ployees to remain on the job at SVCMC, providing essential
         services;

     c.  $230,000 (approximately) for services associated with obtaining
         approval to close St. Mary's Hospital; and

     d.  $240,000 (approximately) for services associated with collabora-
         tive efforts to identify and obtain court approval for the reten-

tion of interim chief restructuring and financial officers during
the chapter 11 case.

8.     As CEO/CRO of SVCMC, I do not believe that the Debtors should
have to pay for those services described above that Weil was required to perform after
the firm replaced McDermott as counsel to the Debtors.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 17, 2006.



Guy Sansone

# Exhibit U

1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 05-14595

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6

7

8  SAINT VINCENT'S CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a

9  SAINT VINCENT CATHOLIC MEDICAL CENTERS,

10

11        Debtor.

12

13  - - - - - - - - - - - - - - - - - - - -x

14

15            United States Bankruptcy Court

16            300 Quarropas Street

17            White Plains, New York 10601

18

19            October 23, 2006

20            9:38 AM

21

22  B E F O R E :

23  HON. ADLAI S. HARDING

24  U.S. BANKRUPTCY JUDGE

25

---

2

1  TRIAL re Application for interim professional compensation.

25  Transcribed by:  Lisa Bar-Leib

---

3

2  A P P E A R A N C E S :

3  TOGUT, SEGAL and SEGAL LLP

4        Attorneys for Debtor

5        One Penn Plaza

6        New York, NY 10119

7

8  BY:  HOWARD P. MAGALIFF, ESQ.

9        FRANK A. OSWALD, ESQ.

10

11  SCHULTE ROTH and ZABEL LLP

12        Attorneys for McDermott Will and Emery LLP

13        919 Third Avenue

14        New York, NY 10022

15

16  BY:  MICHAEL L. COOK, ESQ.

17        DAVID M. HILLMAN, ESQ.

---

4

1  ALSTON and BIRD LLP

2        Attorneys for Creditors' committee

3        90 Park Avenue

4        New York, NY 10016

5

6  BY:  MICHAEL E. JOHNSON, ESQ.

7        NICOLE JACOBY, ESQ.

8        BROOK A. CLARK, ESQ.

9

10  U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE UNITED STATES TRUSTEE

11        Attorneys for U.S. Trustee

12        33 Whitehall Street

13        New York, NY 10004

14

15  BY:  ALICIA M. LEONHARD, ESQ.

16        TRACY HOPE DAVIS, ESQ.

89

1  employees. And, in some respects respectfully, I believe, the
2  Judge was playing to the crowd.
3  Q.  The judge also indicated that you hadn't learned what the
4  judge liked and didn't, correct?
5  A.  She said that.
6  Q.  You acknowledge that you had made serious mistakes and
7  that you were trying to learn from them?
8  A.  Once again, I was doing everything in my power to reflect,
9  for this is from the plan. And, as a professional I believe it
10  was my duty to step up and sort as much as the judges
11  displeasure as possible.
12  Q.  The judge was clearly unhappy with things that McDermott
13  did not correct?
14  A.  The record speaks for itself.
15  Q.  And, do you recall testifying to that effect in your
16  deposition?
17  A.  Yes.
18  Q.  You acknowledge that she was unhappy with things that
19  McDermott had done, correct?
20  A.  Yes.
21  Q.  We can agree that her relief was not awarded for
22  permission to close St. Mary's on September 7th and that the
23  hearing was adjourned, correct?
24  A.  Yes.
25  Q.  And, permission from the bankruptcy court to close St.

90

1  Mary's was not attained until after McDermott was terminated,
2  correct?
3  A.  Yes.
4  Q.  And, you're aware that Weil Gotshal picked up on the
5  motion to close after McDermott's termination?
6  A.  Yes.
7  Q.  And, that they filed a series of affidavits in support of
8  the motion to close?
9  A.  Yes.
10  Q.  And, that ultimately permission to close was obtained in
11  the bankruptcy court on September 20th, correct?
12  A.  The very next hearing it was closed.
13  Q.  And, closure then actually was affected on October 4th?
14  A.  I don't know exactly which date the closure was affected,
15  I know it happened in Court, sir.
16       LAWYER:  Thank you very much.
17       THE COURT:  Any other cross?
18       LAWYER:  Your Honor, just one administrative matter.
19  There are certain exhibits that were used that we will need to
20  move into evidence. But based on what we talked about earlier
21  this morning I won't move at this time for their admission.
22       THE COURT:  All right.  Is there any other cross?
23  Mr. Selbst, re-direct?
24  RE-DIRECT EXAMINATION BY
25  MR. COOK:

91

1  Q.  On cross-examination Mr. Johnson was asking you why the
2  closure motion wasn't filed before August 18th. What were you
3  doing between July 5 and August 18th in the case, sir?
4  A.  I was doing a lot of things. I was one of the principal
5  people for court appearances for the debtors. But the
6  principal activity that I was engaged in was helping the
7  debtors look for a much larger DIP facility than they had on
8  July 5th. Financing was one of the principal areas that I was
9  involved in.
10  Q.  And, why were you working on financing?
11  A.  As Tim Weiss's first day affidavit made clear, Mr. Cook,
12  lack of liquidity was the principal precipitating factor that
13  led to this Chapter 11.
14  Q.  What does that mean, lack of liquidity? What precipitated
15  the Chapter 11 filing?
16  A.  In simple English HFG the debtor's pre-petition received
17  both letters at first cut off -- reduced the amount of
18  availability on the foreign basis, reduced the amounts of loans
19  it was going to make. Then it declare the loan in default and
20  ultimately it accelerated the loan immediately prior to the
21  Chapter 11 filing. In plain English they cut off the gas.
22  Q.  When St. Vincent's entered Chapter 11 there was no
23  financing with HFGF?
24  A.  That's correct.
25  Q.  And what was HFG's role in the financing of St. Vincent's

92

1  up until the filing?
2  A.  They had been the primary working capital money. They had
3  made an asset based loan backed by St. Vincent's receivables.
4  Q.  So the petition is filed on July 5, what were you doing
5  with respect to financing?
6  A.  I did take a step back. I had been involved in the
7  debtor's efforts to avoid Chapter 11. Prior to Chapter 11 the
8  debtors had looked at the direction of their senior management
9  to see if anybody was willing provide substantial financing
10  outside of Chapter 11. And, so, as I testified at my
11  deposition, in the months of March, April, May of 2005 I spent
12  substantial amounts of time with the debtor's financial
13  advisors. And, in conjunction with the debtor's senior
14  management looking for some amount of financing that would have
15  allowed St. Vincent's to avoid a Chapter 11 filing.
16  Q.  Let's get back to the Chapter 11 filing. This application
17  deals with services rendered from July 5 to September 13th.
18  Okay. Chapter 11 petition is filed on July 5. What did
19  McDermott do for St. Vincent's with respect to financing?
20  A.  The reason that I was talking about the pre-petition
21  activity was it was really continued when it was clear that St.
22  Vincent wasn't going to be able to get pre-petition financing
23  the efforts turned to looking for post-petition 11 financing. And,
24  McDermott did a number of things. The first thing that result
25  in a successful motion for DIP financing on an emergency basis

93

1   was to obtain from HFG an emergency DIP credit agreement. And,

2   ultimately that DIP credit agreement provided for up to a 100

3   million dollars in availability. Day one, July 15th, we got

4   forty or fifty million dollars in brand new credit on that day.

5   Q. Okay. And you mention that ultimately resulted in a

6   larger financing. When did that happen?

7   A. That was ultimately approved in September, September 7th,

8   I believe.

9   Q. And, why was McDermott focusing on the fundings? You've

10   already talked about liquidity to keep the lights on, anything

11   else?

12   A. Sure. I mean, St. Vincent's was a classic cash

13   constrained debtor. St. Vincent's had significant arrearages

14   pre-petition. And, there were two problems with that. Number

15   1 was there were a number of trades who had already interrupted

16   supplies and equipment services. And, we were very concerned

17   on behalf of our client that did not happen in the post-

18   petition. But one of the things you do as the debtor's lawyer,

19   is not only get money just to pay the current bills, but you

20   also get as much DIP financing as you can to ensure that the

21   trade does not interrupt the supplies of goods and services on

22   a post-petition basis.

23   Q. Okay. Did anybody at St. Vincent's, a client, want

24   McDermott to focus on financing?

25   A. Yes.

94

1   Q. Who was that?

2   A. David Speltz and Tim Weiss.

3   Q. What about the board?

4   A. The board did as well.

5   Q. Anybody else?

6   A. Elizabeth St. Clair.

7   Q. Who was Elizabeth St. Clair?

8   A. The general counsel. I understood her title to be general

9   counsel.

10   Q. Okay. And, were they involved in that process?

11   A. Yes.

12   Q. Did anybody at St. Vincent's prioritize McDermott's work-

13   load during this period?

14   A. At all times prior to the Chapter 11 and during the brief

15   period that we were in Chapter 11, finance was a number one

16   priority at all times. Improving the debtor's liquidity was a

17   paramount responsibility for McDermott on behalf of our client.

18   Q. Okay. So you've testified about the HFG financing

19   facility. Did McDermott take any other steps during this

20   period between July 5 and September 13th with respect to

21   financing and cash collateral?

22   A. Yes.

23   Q. Tell the Court what and when?

24   A. As Mr. Weiss's first day affidavit indicated, St.

25   Vincent's had a relatively complicated capital structure.

95

1   There were a number of a different financings that were taking

2   place on the pre-petition period. There was, for example, some

3   separate real estate financing with a group called Sun Life.

4   There was a second loan with RCG. There was a separate

5   financing on St. Vincent's Westchester. There were blanket

6   needs in favor of HUD and Dasney. HUD being the Department of

7   Housing and Urban Development which had guaranteed some of the

8   mortgages. And, the dormitory authority of the State of New

9   York was the principal mortgage lender and it had liens on

10   substantially all of the real estate which is what had led to

11   the confusion before Judge Beatty. There were also some other

12   institutions that also had liens on specific cash collateral.

13   A company that ran St. Vincent's cancer unit, the CCU, Cancer

14   Care Unit. The operator of that facility had a lien on that

15   cash collateral. So in conjunction with getting the case ready

16   and in conjunction with the very first day of the motion, we

17   worked out cash collateral stipulations with virtually all of

18   those lenders. Again, to ensure that the debtor's access to

19   that cash collateral would not be depleted. In addition to

20   that, we also got -- we ultimately go approval for that, I

21   believe in September, another pre-petition lender, Commerce

22   Bank, made another eight and a half million dollars in DIP

23   financing available in addition to it's pre-petition exposure.

24   And, really what was most important, what McDermott was doing

25   on behalf of the client was continuing the pre-petition search

96

1   for a big DIP. And, to that end McDermott working with Buron

2   and working with St. Vincent's was looking for a 350 million

3   dollar facility. And, I spent considerable amount of my time

4   in the month of July working on the efforts to obtain that

5   facility.

6   Q. Can you be specific in terms of the dollar amounts of

7   cash?

8   A. 350 million dollars.

9   Q. But you talked about RCG, HUD, Dasney, Dormitory Authority

10   of the State of New York, the specific amounts that were freed

11   up or obtained, if you recall?

12   A. What I do remember -- I don't remember all of -- I don't

13   remember the principal amounts that with all the cash

14   collateral stipulation. But what I do remember is, as I said,

15   we got approval for a 100 million dollars from HFG. We got

16   approval for what was termed at 35 million dollar facility with

17   Commerce Bank. But there was only approximately eight and a

18   half million dollars in money. And, as I said the most

19   important thing with all the other money who had means of cash

20   collateral is that they didn't object to our use of cash

21   collateral. So that, in effect, our HFG loans would be real

22   fresh money to the debtors.

23   Q. How did you get them to agree to use cash collateral? Did

24   you have to litigate that?

25   A. We never litigated a thing. We knew that it was an issue

165

1    THE COURT: And, this resolution was agreed to in
2  June of '06?
3    MR. OSWALD: Yes, Your Honor.
4    THE COURT: After, was there much litigation in the
5  adversary proceeding? The adversary proceeding was commenced
6  in '05.
7    MR. OSWALD: Certainly, a lot less than this one.
8  But there was some documents exchanged. And, what had happened
9  was, Your Honor, is that RCG had title insurance. Mr. Sullivan
10 referred to RCG's counsel Mr. Ringle. Shortly after the
11 adversary proceeding was commenced, I think effective late
12 December, RCG put the claim, if you will, to the title company.
13 The company paid RCG, the title company stepped into the shoes
14 of RCG and their counsel negotiated the settlement with Mr.
15 Freeman.
16   THE COURT: I see. So RCG wasn't the one that rolled
17 over.
18   MR. OSWALD: Ultimately, that's correct. Ultimately,
19 the stipulation is with First American Title as successor in
20 interest to RCG. That may be unclear in the document, Your
21 Honor. But that I do understand is that there was a
22 substitution of the party in interest.
23   I merely ask because it seems to bear up
24 on the judgment call of stipulating, negotiating, litigating,
25 etcetera. But anyway, the think it matters.

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                516-608-2400

166

1    MR. OSWALD: I think it's fair to say -- I don't
2  think that the debtor or McDermott challenged that there was at
3  least a piece that was not validly recorded because it occurred
4  after the petition date.
5    MR. COOK: Your Honor, I think the record, at this
6  point, speaks for itself. I'm not prepared to make any
7  concessions. There was avoidable, perhaps there was
8  litigation, there were answers, there were counterclaims. I'm
9  told by Mr. Sullivan that there was a substantial
10 contemporaneous argument that was made. So this is for
11 argument, negotiate, litigate, stipulate, judgments.
12   THE COURT: Well, I'll hear argument on the point in
13 fullness of time, I guess, if there's anything to argue about.
14   MR. COOK: Before we continue with Mr. Smith can we
15 take a break for about three minutes and thirty second.
16   THE COURT: Absolutely. We can make it five minutes
17 and forty-five seconds.
18   (Recess)
19   THE COURT: Are we on the record then? I had some
20 matters on tomorrow morning that Lisa tells me have been
21 cancelled. So I think we can start tomorrow morning at 10.
22 Does that work for everybody?
23   MR. COOK: Yes.
24   MR. JOHNSON: Yes.
25   MR. MAGALIFF: Yes, Your Honor.

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                516-608-2400

167

1    THE COURT: All right. Now, the next witness is?
2    MR. MAGALIFF: William P. Smith.
3    THE COURT: Okay.
4    (Witness is sworn)
5    THE COURT: Cross examination by Mr. Magaliff.
6    MR. MAGALIFF: Thank you, Your Honor.
7  CROSS EXAMINATION BY
8  MR. MAGALIFF:
9    Q.  Good afternoon. Now, Mr. Smith, you've described life as
10 a debtor as being in a fish bowl. Are you familiar with that
11 analogy? Life in a fish bowl?
12   A.  Yes, sir.
13   Q.  By life in a fish bowl, I'll take it you mean that as a
14 debtor, everything's out in the open, full disclosure, nothing
15 hidden, is that fair?
16   A.  That's fair. Yes it is.
17   Q.  And I think that the first time that you used the term
18 life in a fish bowl for the debtor was back in September 2004
19 when McDermott Will and Emery made a presentation to the
20 executive committee of the board of directors. Do you recall
21 that?
22   A.  I recall the presentation. I'm not sure whether it was
23 the executive committee or the board.
24   Q.  But it's fair to say, though, that back in September 2004
25 there was a discussion concerning life in a fish bowl, if you

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                516-608-2400

168

1  will?
2    A.  Yes, sir.
3    Q.  There were -- an open commotto, I think, is another term
4  you used, right?
5    A.  That phrase has been attributed to me as well.
6    Q.  Let me ask you to turn in exhibit binder 1 to Tab #7.
7    A.  McDermott 1?
8    Q.  McDermott 1, yeah.
9    THE COURT: What was the reference in the exhibit, in
10 the tab?
11   MR. MAGALIFF: Tab #7 in binder 1.
12   THE COURT: Tab #7, okay.
13   MR. MAGALIFF: Tab #7.
14   Q.  In particular, what I'd ask you to look at is the
15 presentation entitled St. Vincent's Catholic Medical Centers of
16 New York Restructuring Alternatives, which comes after the blue
17 insert in that exhibit.
18   A.  That's the document labeled STVC at 278?
19   Q.  Yes. Actually, I think it may be a green piece of paper
20 in the bench binder.
21   A.  Yes, sir.
22   Q.  The first "life in a fish bowl" appears on pages 7 and 8
23 of this document, Mr. Smith. Is there anywhere in this
24 presentation to the board on Restructuring Alternatives that
25 the terms disinterestedness or Jay Alix Protocol appear?

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                516-608-2400

169

1   A.   No, sir.

2   Q.   And is there any discussion anywhere in this presentation

3   to the board that makes reference to the standards pursuant to

4   which professionals who represent the Chapter 11 debtor are

5   retained?

6   A.   I'd have to go through it but I wouldn't be surprised if

7   the answer was no.

8   Q.   Okay.  Now, your declaration and affirmative testimony

9   indicates that you first became aware in February of 2005 that

10  Speltz and Weiss was considering the possible sale of its

11  company to some other entity, is that correct?

12  A.   I believe so.  Is there a specific paragraph?

13  Q.   No.  And I believe you've also testified, and it's an

14  admitted fact in the joint pretrial statement, paragraph 28

15  that you wanted from Mr. Speltz and Mr. Weiss on or about April

16  26th, 2005 that their negotiations with Huron were becoming

17  serious, is that correct?

18  A.   Yes, sir.

19  Q.   And at that point, it's also correct that you did not

20  immediately notify Richard Boyle, the chairman of the board of

21  St. Vincent's, is that correct?

22  A.   Yes, sir.

23  Q.   And it's also correct that you did not immediately notify

24  anybody else from St. Vincent's, correct?

25  A.   Well, to the extent that David Speltz and Tim Weiss were

170

1   from St. Vincent's they were quite a conversation but, no, if

2   you mean someone else, the answer is no.

3   Q.   Well, fair enough.  Mr. Speltz was the CPO and Mr. Weiss

4   was the CFO, correct?

5   A.   Yes, sir.

6   Q.   And they were senior management at St. Vincent's, correct?

7   A.   They were part of it.

8   Q.   And they were the people to whom you primarily reported,

9   isn't that correct?

10  A.   They were an integral part of the group to which I

11  reported, yes, sir.

12  Q.   Okay.  And these were the gentlemen that were the subjects

13  of the conflict that arose concerning Speltz and Weiss and

14  Huron, correct?

15  A.   They and their organization and the financial advisory

16  group that ultimately acquired them.

17  Q.   Let me ask you --

18       THE COURT:  Excuse me just a moment.  Was Huron the

19  financial advisor for Speltz and Weiss prior to Huron's

20  acquisition of Speltz and Weiss?

21       THE WITNESS:  Well, Your Honor, Huron was a financial

22  advisory group that had been retained actually by McDermott

23  Will and Emery to assist St. Vincent's in September.

24       THE COURT:  I see.

25       THE WITNESS:  They --

171

1        THE COURT:  September of?

2        THE WITNESS:  2004.

3        THE COURT:  Oh, '04, okay.

4        THE WITNESS:  They put their company out for bid in

5   the early part of the year and Huron as Speltz and Weiss,

6   that's right.

7        MR. MAGALIFF:  May I continue, Your Honor?

8        THE COURT:  Yes, sir.  I'm sorry to interrupt you.

9   Q.   And as counsel to St. Vincent's Catholic Medical Centers,

10  McDermott Will and Emery owed a fiduciary duty to the

11  institution, didn't they?

12  A.   Yes, sir.

13  Q.   Let me ask you to turn in exhibit binder #4, which is the

14  debtor's exhibit binder, to Tab #104.

15  A.   Yes, sir.

16  Q.   This is an e-mail dated April 30th from you to Tim Weiss

17  with a cc to David Speltz, correct?

18  A.   Yes, sir.

19  Q.   In paragraph #2, it says beginning at the end of the

20  fourth line, "I specifically did not tell her", the "her"

21  being --

22       THE COURT:  I'm sorry.  You'll have to tell me where

23  you're looking.

24       MR. MAGALIFF:  Your Honor, I am in binder 4 --

25       THE COURT:  Right.

172

1        MR. MAGALIFF:  Tab 104.

2        THE COURT:  Got it.

3        MR. MAGALIFF:  Paragraph #2 that begins "As for Dick

4   Boyle."

5        THE COURT:  Okay.

6        MR. MAGALIFF:  And I'm down up four lines into that

7   paragraph beginning with the word "I."

8        THE COURT:  Okay.

9        MR. MAGALIFF:  Okay.

10  Q.   "I specifically did not tell her that Dick was aware of

11  the S&W Huron on discussions nor did I imply it (for the simple

12  reason that I don't know if Dick knows anything and it is not

13  place to tell her or him anything about)."  Now, Mr. Smith, tha

14  "who" -- the "her", rather, in this e-mail was Huron's in-house

15  counsel, is that correct?

16  A.   Natalia Delgado.  The "him" refers to Gary Holdren.

17  Q.   Okay.  And you say in here that you did not tell her, Ms.

18  Delgado, that Dick Boyle was aware of the Speltz and Weiss

19  Huron on discussions for the simple reason that you didn't know

20  if he knows anything and it's not your place to tell him

21  anything about it?

22  A.   Right.

23  Q.   You're testifying that it's not your place to tell Mr.

24  Boyle anything about it?

25  A.   No.  I'm testifying it's not place to tell Gary Holdren.

173

```
 1    Q.   Gary Holdren is who?
 2    A.   He's the chairman of Huron.  He's Natalia Delgado's boss.
 3  If you follow the string of e-mails, this begins with an e-mail
 4  string from Gary Holdren.  It then goes with Natalia Delgado
 5  through Tim Weiss, David Speltz and ultimately to me.
 6    Q.   You didn't tell Dick Boyle until approximately May 6th,
 7  correct, 2005?
 8    A.   I'm not sure, to be honest with you, Mr. Magaliff, if I
 9  told Dick Boyle on May 6th.
10    Q.   You told Dick Boyle on May 6th.
11    A.   I'm not certain that that's the fact.
12    Q.   Now --
13    A.   I'm certain that I discussed it with him after May 9 when
14  the merger was announced.  I simply don't know if it was
15  discussed before then.
16         MR. COOK:  Your Honor, before we go further down this
17  line of inquiry -- it's all very interesting, but the issue
18  today has to do with the value McDermott's services between
19  July 5, 2005 and September 13, 2005.  This is a few months
20  before and I don't know where it's leading, how it's relevant
21  to this particular application.
22         THE COURT:  I will consider how it's relevant when I
23  hear it.
24         MR. COOK:  Thank you.  Thank you, Your Honor.
25    Q.   Now, Mr. Smith, turn, if you will, to Paragraph 63 of your
```

174

```
 1  affidavit, please.
 2    A.   Yes, sir.
 3    Q.   In Paragraph 63 you state that "you did not immediately
 4  disclose Huron Group's potential acquisition of Speltz and
 5  Weiss to the board after your call with Weiss and Speltz
 6  because Speltz represented to me that he, Speltz, had already
 7  told Richard Boyle about the negotiations between SW & Huron."
 8  See that?
 9    A.   Yes, sir.
10    Q.   Okay.  Your testimony, if I understand it, is that because
11  Mr. Speltz who was the subject of the conflict told you that he
12  had told Mr. Boyle the chairman, you did not believe that it
13  was necessary to tell anybody else, correct?
14    A.   I'm not certain that's a fair appraisal of what I've said.
15    Q.   Well, you're representing here that Speltz told you that
16  Dick Boyle already knew.  Did you make any independent inquiry
17  of Mr. Boyle at the time to see whether or not he knew?
18    A.   No, sir, I had not spoken with Mr. Boyle since September
19  of 2004.
20    Q.   Did you make any inquiry of anybody else at St. Vincent's
21  at the time to see whether or not they knew?
22    A.   No, sir, I did not.
23    Q.   And you accepted the representation of Mr. Speltz, the
24  subject of the conflict, that because he had told Mr. Boyle
25  that was sufficient, correct?
```

175

```
 1    A.   I accepted the representation of Mr. Speltz that he had
 2  spoken with Mr. Boyle and Mr. Boyle was aware of the
 3  circumstances.
 4    Q.   Do you recall your deposition that was taken on --
 5    A.   September 26th.
 6    Q.   -- September 26th, 2006?
 7    A.   Yes, sir.
 8    Q.   And in connection with a similar line of questioning, do
 9  you recall testifying that St. Vincent's had many faces beyond
10  Mr. Boyle?
11    A.   Yes, sir.
12    Q.   Which face of the company other than David Speltz knew
13  about the Huron, Speltz and Weiss transaction?
14    A.   I have no idea other than Mr. Speltz and Mr. Weiss.
15    Q.   So, just so I'm clear, although the debtor had many faces,
16  your testimony is that to your knowledge the only two people
17  who knew about this transaction were Mr. Speltz and Mr. Weiss,
18  the two people who were the subject of the conflict, correct?
19    A.   On April 26th, 2005, what I understood from Mr. Speltz was
20  that he and Mr. Weiss were in conversations with Huron that Mr.
21  Boyle, as chairman of the Board, was aware of this and Mr.
22  Boyle was not troubled by it.  I did not --
23         THE COURT:  Wait.  Weiss told you that or Speltz?
24         THE WITNESS:  Speltz told me that, Your Honor.
25    A.   So that my understanding was that at least the chairman
```

176

```
 1  was aware of the pendency of discussions.  If your question is
 2  did I tell anyone else within the organization, I think the
 3  answer to that is no, sir, I did not at that time.
 4    Q.   So as a fiduciary for the organization when you learned on
 5  April 26th from the person who is the direct subject of the
 6  conflict that he had told the chairman of the board, you
 7  accepted that completely and made no other independent inquiry
 8  of anybody at the hospital to see if they knew, correct?
 9    A.   I accepted the representation of Mr. Speltz that he had
10  discussed this with Mr. Boyle and Mr. Boyle was satisfied.  I
11  did not make further inquiry.
12    Q.   And you are aware, I take it, of the stipulated fact that
13  Mr. Speltz did not disclose the acquisition to Mr. Boyle until
14  at least May 6th, 2005, correct?
15    A.   Yes, sir.
16    Q.   So it's fair to say that on April 26th or thereabout when
17  Mr. Speltz told you that he had told Mr. Boyle, he was lying,
18  correct?
19    A.   I can't draw that inference from what you said.  It may be
20  Mr. Speltz was lying.  It may be that.  It may be he was lying
21  at his deposition.  It may be that he doesn't recall.  Mr.
22  Speltz made a clear representation to me which I accepted.
23  What he knew and what he said past that I am not in a position
24  to advise.
25    Q.   So, knowing that Mr. Speltz was not completely forthcoming
```

177

1  with you on April 26th and given that he had a self-interest
2  and had a conflict, you still thought you had no duty to tell
3  the board, correct?
4     A.  I don't believe that's what I've testified, sir.  I
5  testified I did not make further inquiry.  I don't believe I've
6  given any indication of any testimony today of what my duties
7  may or may not have been .
8     Q.  Turn, if you will, please in Binder #1 to Tab #20.
9        MR. MAGALIFF:  Binder 1, Tab 20, Your Honor.
10    Q.  The second page of this exhibit, Mr. Smith, is an e-mail
11 that begins down at the bottom of the page, dated June 23rd at
12 8:28 p.m. to David Cleary and Steven Sikes (phonetic).  Do you
13 see that?
14    A.  Yes, sir.
15    Q.  On the next page, Paragraph 2,you say "it clearly smells
16 like David and Tim have a personal financial interest in
17 pumping up the Huron revenues."  See that?
18    A.  Yes, sir.
19    Q.  That "personal financial interest" that you're referring
20 to there is the earnout provision in the acquisition agreement,
21 correct?
22    A.  What I'm referring to is what's described in the second
23 paragraph.  Well, actually, both paragraphs numbered 1 and 2 of
24 that page.  Paragraph 1 indicates they have employment
25 contracts and Paragraph 2 indicates earnout arrangements

178

1  predicated on future business to Huron from Legacy, the Speltz
2  and Weiss clients.
3     Q.  All right.  Well, let's talk about those.  Mr. Speltz and
4  Mr. Weiss had employment contracts with Huron effective upon
5  the closing of the Huron acquisition of Speltz and Weiss,
6  correct?
7     A.  It has been represented to me that that is the case.  It
8  is ambiguous in the public filings with whom they have
9  contracts.  With which entity and what are the terms?
10    Q.  As of June 23rd, 2005, you're aware that Mr. Speltz and
11 Mr. Weiss had employment contracts with Huron?
12    A.  No, sir.  As of June 23rd, 2005, I was aware that Leo
13 Crowley had told me that Speltz and Weiss had employment
14 contracts with Huron.  He was not specific whether it was with
15 Huron Consulting Group or with Huron Consulting Services or
16 with another Huron affiliate.
17    Q.  Did you ever read the Huron 8K statement that was filed in
18 which the acquisition of Speltz and Weiss was disclosed?
19    A.  There was an 8K that was filed on May 9, 2005.
20    Q.  Did you ever read it?
21    A.  Yes, sir.
22    Q.  Okay.  Do you recall in the 8K that was filed the
23 disclosure of employment contract?
24    A.  I don't have any present recollection of that, no.
25    Q.  Do you have any recollection of discussing with David

179

1  Cleary of your office the need to make certain disclosures
2  based upon what you were told were contained in the 8K?
3     A.  Absolutely, sir.
4     Q.  And one of the things that needed to be disclosed was the
5  fact that Huron had acquired Speltz and Weiss, correct?
6     A.  Yes, sir.
7     Q.  And one of the things that needed to be disclosed was the
8  fact that Mr. Speltz and Mr. Weiss had employment contracts
9  with Huron, correct?
10    A.  Yes, sir.
11    Q.  And one of the things that needed to be disclosed was the
12 earnout that Mr. Speltz and Mr. Weiss were going to be paid by
13 Huron, correct?
14    A.  Yes, sir.
15    Q.  And the earnout payment was based in part upon revenues
16 generated by Speltz and Weiss through St. Vincent's, correct?
17    A.  I need a time reference.  If the question is as of June
18 23rd, the answer is yes.
19    Q.  And all of these items, the earnout, the transaction, the
20 employment contracts needed to be disclosed in the Speltz and
21 Weiss retention papers, correct?
22    A.  And in the Huron retention papers.
23    Q.  And in the Huron retention papers.  Correct as to both of
24 them?
25    A.  Yes, sir.

180

1     Q.  Okay.  And they were not disclosed in the July 5th motion
2  that was filed to retain Speltz and Weiss, correct?
3     A.  That is correct.
4     Q.  In fact, you testified that the July 5th motion was pretty
5  careless, pretty incomplete and inappropriate, correct?
6     A.  That's correct.
7     Q.  And I believe you also have stated that the July 5th
8  motion was withdrawn when you discovered that it was deficient,
9  correct?
10    A.  I directed that the motion be withdrawn when I came to
11 understand that it was not complete.
12    Q.  And do you know if a notice of withdrawal was ever
13 publicly filed on the docket?
14    A.  There was a -- the Huron motion was withdrawn on the
15 record in August.  I don't know whether notices of withdrawal
16 was filed on the docket for the Speltz and Weiss application or
17 not.
18        MR. MAGALIFF:  I will make a representation, Your
19 Honor.  If you want, you can take judicial notice of it, if you
20 think it's important that no notice of withdrawal of the July
21 5th motion to approve the Speltz and Weiss management contract
22 appears on the docket.
23        THE COURT:  All right.  I'll accept that.
24    Q.  Now, did you hear --
25        THE COURT:  Just a second.  But are you saying that

181

1  when you realized that the disclosure had been unsatisfactory

2  you instructed that the retention application for the Speltz

3  and Weiss firm or for Speltz and Weiss personally, you directed

4  that those retention applications be withdrawn?

5      THE WITNESS:  Yes, Your Honor.  They were withdrawn

6  and to my knowledge never presented to the Court at that point

7  or later.

8      THE COURT:  But there's no docket entry withdrawing

9  it?

10     MR. MAGALIFF:  We have not found one, Your Honor, on

11 the July 5th motion.

12     THE COURT:  All right.

13 Q.  Now, did you hear Mr. Cook's opening remarks this morning

14 when he indicated that the motion was never filed again?

15 A.  I heard that.  I also was reminded that inadvertently it

16 was filed on July thir -- a subsequent draft was filed on July

17 13 when a messenger who was to deliver it to the United States

18 Trustees Office instead delivered it to the clerk's office.

19 And that also was withdrawn on my instructions.

20 Q.  So two motions, one on July 5th and one on July 13th, both

21 deficient, were both filed and never prosecuted, correct?

22 A.  I don't believe I testified that the July 13 motion was

23 deficient but both motions, one filed intentionally and one

24 filed inadvertently, were both continued before taken off the

25 docket or not brought up for hearing or not prosecuted.

182

1  Q.  Isn't it true, Mr. Smith, that the United States trustee

2  was annoyed that the July 13th motion was filed without her

3  approval?

4  A.  It's my understanding that the United States Trustees

5  staff expressed some annoyance at the filing and the result was

6  an apology and an immediate withdrawal of the motion from the

7  active calendar.

8  Q.  Now, between July 13th when the second motion was filed

9  and September 12th when McDermott was hired as counsel to the

10 debtors, McDermott never filed another motion to retain Speltz

11 and Weiss, did it?

12 A.  Actually, I believe we were fired on September 13th not

13 September 12th.  I have cause to remember.  And that is

14 correct, we did not file another motion although we circulated

15 lots of drafts.

16 Q.  And the motion to retain Huron was withdrawn in August,

17 correct?

18 A.  Yes, sir.

19 Q.  And it's also correct that while McDermott was counsel to

20 the Chapter 11 debtors no orders were entered on either an

21 interim or final basis retaining Huron or approving the Speltz

22 and Weiss management agreement, correct?

23 A.  That is correct.

24 Q.  St. Vincent's was only the second case in which you ever

25 represented a hospital as a debtor, correct.

183

1  A.  No, that's not correct.  It's the second case I've been

2  recently.  But it's not the second time I've been debtor's

3  counsel in a hospital case in the last thirty years.

4  Q.  Do you recall a meeting of the executive meeting committee

5  of the board on June 30th, 2005 in which the Chapter 11 filing

6  was authorized?

7  A.  Yes, sir.

8  Q.  Do you recall at that board meeting discussing retention

9  issues about Speltz and Weiss and Huron?

10 A.  Yes, sir.

11 Q.  Nobody asked you any questions about the Speltz and Weiss

12 Huron retentions, did they?

13 A.  There were questions asked about other elements of the

14 presentation but there were no questions asked about that in

15 particular.  There was a remark actually by Sister Jane

16 Iannucelli who was concerned with the number of motions.  And

17 there was a response by a board member, Jay Chasnoff, who's the

18 founder of VSI about commenting how many first day motions

19 there are these days in the bankruptcy proceedings.

20 Q.  Nobody asked you specifically about disinterestedness of

21 professionals, correct?

22 A.  No, I believe they accepted the presentation which I made

23 to them on that topic.

24 Q.  Yet you never told the board, in fact, that there was a

25 possibility that neither Speltz and Weiss nor Huron would be

184

1  approved, did you?

2  A.  I don't believe that's correct.

3  Q.  Are you aware of the testimony given during discovery of

4  Mr. Boyle and Ms. St. Clair that they never knew prior to the

5  bankruptcy filing, in fact, until much later that there were

6  serious problems about Speltz and Weiss and Huron?

7  A.  I'm aware that each of them has testified to that effect.

8  Q.  Okay.  You heard Mr. Selbst testify this morning with

9  respect to St. Mary's that sometimes you have to "respectfully

10 and politely" tell our client that you needed to do something

11 different from what they do, correct?  Remember that testimony?

12 A.  I heard Mr. Selbst say that, yes.

13 Q.  Okay.  And it's true that you didn't ever respectfully and

14 politely even tell St. Vincent's that they couldn't have both

15 Speltz and Weiss and Huron, is it?

16 A.  I don't believe that is correct.

17 Q.  So is your testimony that you did in fact advise the board

18 that it was possible that the Court would approve neither

19 retention applications?  That it was possible that they would

20 get neither Speltz and Weiss nor Huron?

21 A.  Sure.

22 Q.  When did you tell them that?

23 A.  The first intimation was at an executive committee on May

24 19, 2005.  The second time was during the board meeting on June

25 30, 2005.  The third time would have been in the board meeting

193

1  date, isn't that true?

2  A.  I can't tell you whether or not someone said that to the

3  United States trustee's office.  I know I said that to the

4  United States trustee's office on July 21st or 22nd.

5  Q.  But you recall no discussions with members of McDermott's

6  team prior to July 21st that these issues should be disclosed

7  specifically to the U.S. trustee the board's concern with

8  Speltz and Weiss?

9  A.  Let me parse that apart, if I may?

10  Q.  Let me ask the question a different way.  I don't want to

11  parse my question.

12  A.  Well, I'd like to give an accurate answer to each of the

13  constituent elements.  The McDermott team was supposed to tell

14  the United States trustee what we're doing.  I can't tell you

15  whether they did or not.  The board's concern was not

16  technically a matter of discussion with the United States

17  trustee at this point.  And, as a third element to the

18  question -- and I'm sorry I don't remember it.

19  Q.  Now, Speltz and Weiss had been on board at St. Vincent's

20  since April 2004, correct?

21  A.  They actually had been working at St. Vincent's since

22  February of 2004.  They had contracts since April of 2004.

23  Q.  And McDermott came on board in September of 2004, correct?

24  A.  McDermott came on as restructuring counsel in December

25  2004.  We had been special counsel of the board negotiating the

194

1  Speltz and Weiss engagement in December of 2003 and we have

2  been rendering services to St. Vincent's on the closure of St.

3  Joseph's Hospital during the summer of 2004.

4  Q.  And in the spring of 2005, during the ramp up to the

5  Chapter 11 filing, McDermott had two lawyers basically on the

6  premises at St. Vincent's for two or three days each helping

7  the debtor to gather the information it needed from the filing,

8  isn't that true?

9  A.  That was one of the jobs.  Yes, we had two lawyers on site

10  each three days a week in the law department to help Elizabeth

11  St. Clair, the chief legal officer, handle not only the ramp up

12  for the filing and the acquisition of the information but also

13  assist in other matters that the law department was probably

14  struggling with.

15  Q.  And Huron was on board since October 2004, correct?

16  A.  Huron was retained by McDermott, Will and Emery at the

17  direction of St. Vincent's in late September, early October of

18  2004 for financial advisory work relative to preparing for

19  Chapter 11.  They had already been doing some work as I

20  appreciate it on revenue cycle assignments prior to that time.

21  Their restructuring work tailed off in October and restarted in

22  late March or early May of 2005.

23  Q.  And you're familiar with the Jay Alix Protocol?

24  A.  Yes, sir.

25  Q.  And you know that, consistent with the Jay Alix Protocol,

195

1  one of the things that needs to be disclosed are all the people

2  who are going to be providing services?

3  A.  Yes, sir.

4  Q.  Now, with all of these people who had a direct interest in

5  this on board at the hospital, you said at your deposition,

6  "intellectually sitting here a year plus later it should be so

7  easy.  I assure you it wasn't."  Do you remember that?

8  A.  Vividly.

9  Q.  So with all these people from Speltz and Weiss and all

10  these people from Huron and all these people from McDermott and

11  knowing precisely what the issues were, you still weren't able

12  to get a list together of all the people working for Speltz and

13  Weiss and Huron who needed to be disclosed, right?

14  A.  Mr. Magaliff, we were not able to get the list prior to

15  the filing of the petition.  We were not able to get the list

16  from the filing of the petition prior to July 28th nor were we

17  able to create a list from July 28th until the day we were

18  discharged on September 13th.

19  Q.  I'm sorry --

20  A.  There's a number of -- I apologize, what?

21  Q.  I didn't hear that last answer.

22  A.  The last piece was we were not able to get a list from

23  July 28th until September 13, the day upon which we couldn't do

24  that, not the least of which is that people were coming, people

196

1  were going, jobs were changing, hourly rates were changing and

2  the nature of the engagements were changing.  And compiling

3  these lists was not always the first item on the agenda of

4  people whose attention was required.

5  Q.  But even though you say that people were changing and

6  hourly wages were changing and what not, at a given point in

7  time when you were to file the motion, you could have compiled

8  an accurate list as of the specific date with titles, people

9  and amounts and file the motion and you didn't, right?

10  A.  Given the state of St. Vincent's in the two weeks before

11  Chapter 11, I do not believe it would have been physically

12  possible to compile an accurate of the Speltz and Weiss and

13  Huron employees, their job title, their hourly rate and a

14  description of what they were doing.

15     THE COURT:  Excuse me, sir.  Mr. Smith, I have

16  trouble understanding that because whatever the state of St.

17  Vincent's, presumably Speltz and Weiss and Huron were not in

18  the state and they were the ones who had their employees

19  working at the hospital.  So why couldn't they have provided

20  lists for the push of a few computer buttons?  You understand

21  my --

22     THE WITNESS:  Oh absolutely.

23     THE COURT:  -- uncertainty that provokes my question?

24     THE WITNESS:  You would think it's such a simple

25  thing.  Speltz and Weiss was acquired by Huron on May 9th,

197

1  2005. All Speltz and Weiss employees were transferred to the
2  Huron payroll and the Speltz and Weiss infrastructure was
3  disassembled.  The bank accounts were closed and the rest of
4  the stuff.  As a consequence the Speltz and Weiss computers no
5  longer were current on the aggregate number of employees who
6  were continued assigned to St. Vincent's and the Huron
7  computers were not yet up to speed with the precise identity of
8  the people they had on site.  Huron was also providing Speltz &
9  Weiss services in a number of different areas.  I made
10  reference before to the revenue cycle work.  This was a
11  completely separate group of Huron employees, quite a number of
12  them who were in the finance department trying to collect
13  invoices.  And despite our request for entreaties of these two
14  organizations, we were not able to receive a list of head
15  count, job description and hourly rate.  And it's not for lack
16  of asking.
17  Q.   And as of September 13th when McDermott was discharged,
18  there still had not been a list accurate or not compiled, true?
19  A.   I actually got into a rather intemperate conversation with
20  Judge Barliant, who was Huron's counsel, where I told him I
21  found it hard to believe at this late date he could not give me
22  a list of the people who were working.  But he could not.
23  Q.   Why were you discussing with Mr. Barliant terms of the
24  Huron retention?
25  A.   He was Huron's counsel.

198

1  Q.   At no point did you ever say to Huron and Speltz and
2  Weiss, this is the way we need to get it done or it isn't going
3  to happen.
4  A.   That's not correct.
5  Q.   When did you tell them that?
6  A.   July --
7  Q.   When did you say to the debtors, we have to do it this way
8  if we want to move this case forward?
9  A.   I had a meeting with the former United States trustee on
10  July 21st or 22nd -- I don't recall which day it was.  By
11  coming out of that meeting was what I believed to be an
12  arrangement which was acceptable to the prior United States
13  trustee on how we were going to accomplish this particular
14  task.  And the instructions to the client and the instructions
15  to Huron and the instructions to Speltz and Weiss were to stop
16  bickering and make it happen.  There's an e-mail to that effect
17  that I'm sure you'll see in discovery that describes at some
18  length and in some detail what the United States trustee wanted
19  us to do and how she wanted us to do it.  And the direction to
20  the client and to Huron and to Speltz and Weiss was do it.
21  Q.   But it never got done?
22  A.   Well --
23  Q.   Yes or no?
24  A.   The answer is no but there are as usual explanations.
25  Q.   In Paragraph 61 of your affidavit referring to the April

199

1  26th phone conversation where you first learned about the Huron
2  and Speltz and Weiss acquisition, you say "you told Messrs.
3  Speltz and Weiss the retentions of S.W. Huron could present
4  issues concerning disinterestedness, the Jay Alix Protocol and
5  conflicts."  Correct?
6  A.   Yes, sir.
7  Q.   Okay.  So at least as of April 26th, you were aware and
8  concerned about the applicability of the Jay Alix Protocol,
9  correct?
10  A.   Yes.
11  Q.   And it's true, however, that you advised the debtor that
12  the Jay Alex Protocol was not a binding protocol in the
13  Southern District of New York, correct?
14  A.   What I believe I advised the debtor was that there was no
15  decision by a binding court making the Jay Alix Protocol law in
16  the Southern District of New York.  That is was, however,
17  policy from the United States trustee's perspective usually
18  followed but not inflexibly.  But the issue is not necessarily
19  the applicability of the Jay Alix Protocol.  It's the degree of
20  consanguinity within the Jay Alix Protocol.
21  Q.   Well, we had a pretty close degree of consanguinity in
22  this case, didn't we?  Speltz and Weiss had been bought by
23  Huron and they were employees of Huron, correct?
24  A.   Speltz and Weiss, LLC was acquired by Huron Consulting
25  Group, a public company, which also owned Huron Consulting

200

1  Services, a consulting company, which was providing services to
2  St. Vincent's.  So you had -- that's why you referred to
3  degrees of consanguinity.  You have a brother and a sister who
4  are providing services.  The Jay Alix Protocol, if you read it,
5  does not define affiliate and the Jay Alix Protocol was
6  providing two services from a single organization.  So it is
7  not a precise DIP with the protocol --
8  Q.   Misdip.  I'm sorry.  Go ahead.
9  A.   No.  I --
10  Q.   Mr. Speltz was the CEO, correct, of St. Vincent's?
11  A.   Yes, sir.
12  Q.   And Mr. Weiss was the CFO, correct?
13  A.   Yes.
14  Q.   And they both had employment contracts or employment
15  agreements with Huron Consulting Group, correct?
16  A.   I don't know that their employment agreements were with
17  Huron Consulting Group.  I believe they were with Huron
18  Consulting Services.
19  Q.   Huron Consulting Services.  And that was the entity that
20  had been retained as the financial advisors?
21  A.   That's correct.
22  Q.   So Mr. Speltz and Mr. Weiss were employees of the entity
23  that they were supervising as a vendor to St. Vincent's, right?
24  A.   That's correct.  That makes them not disinterested.
25  Q.   Yes, we know that.  Thank you.  Now, you testified and

201

it's in your pretrial statement that Speltz and Weiss and Huron
public relations issues -- well, let me back up. Let me turn
to the relevant statement. In Paragraph 31 of the join
pretrial statement --

A. I'm not certain I've got that one here.

Q. Oh. I'll read it, if that's okay.

A. Okay.

Q. "Speltz and Weiss and Huron each wanted to be approved for
retention by the Bankruptcy Court for public relations
purposes." That's an undisputed fact in the case.

A. That's correct.

Q. You never advised the board or any board member that
Speltz and Weiss was putting its public relations concerns into
play, did you?

A. I advised the board that acquisition of Speltz and Weiss
by Huron created issues in the bankruptcy through the creation
of conflict have a need to address the Jay Alix Protocol. It
is quite possible in the course of a conversation, particularly
in the meeting on June 30 when we went through all the first
day motions, that I made reference to the board that Huron and
Speltz and Weiss wish to apply separately, each to be retained,
Speltz and Weiss under Section 363 and Huron under Section 327,
but that in the event it was not acceptable that they be
retained on that basis, it was possible that they be retained
on a different basis but both services would still be

202

available. I doubt as part of that explanation to the board
that I would have mentioned that the desire for them to be
retained independently preceded from public relations, although
that is certainly one of the factors that each of them
mentioned to me.

Q. In fact, it's in Paragraph 55 of your affidavit that
Speltz and Weiss and Huron each wanted to be approved for
retention for public relation purposes.

A. That's absolutely correct. St. Vincent's was a prominent
case. They are in the business of doing hospital turnarounds
and hospital financial advisory services and they each wished
their brand to be associated with the case.

Q. So you have two entities who are in direct conflict, both
of whom have self-interest in having public relations
associated with this case and yet you don't feel it's necessary
or even advisable to tell the board, right?

A. I don't believe that's a fair characterization of what I
said. What I said is that I advised the board that we were
going to apply separately. That in the event we were not able
to apply separately, there were other ways of assuring that
each organization would be available to the board. We would
try it this way first and if it didn't work, we'd try another
way. But I admit, I don't think I mentioned to the board that
one of the factors on Huron and Speltz and Weiss wanting to be
retained separately was they wanted the PR of the separate

203

service providers at St. Vincent's.

Q. And you accommodated them?

A. Mr. Magaliff, there is a reasonable --

Q. There was no question pending.

A. I apologize.

Q. As an experienced bankruptcy attorney, is it your
testimony that fee sharing provisions between the debtor's CEO
and CFO with the financial advisor, which was of grave concern
to the board, would not be of grave concern to the U.S. trustee
as of the filing date?

A. I don't think I could answer that yes or no.

Q. Well, you didn't tell the U.S. trustee on the filing date,
did you?

A. I didn't meet with the U.S. trustee prior to filing date.
I met with the United States trustee on July 21st or 22nd.

Q. Your papers didn't tell the U.S. trustee or the Court on
the filing date, did you?

A. No, sir. But I think we've indicated that my view of the
papers was they were not quite up to par.

Q. Now, you've also testified, Mr. Smith, that if McDermott
hadn't fired you would probably have resigned. Do you
remember that?

A. Yes, sir.

Q. And you also testified that it was apparent to you that
your effectiveness was at an end in your ability to help the

204

client was at an end. Do you recall that?

A. Yes, sir.

Q. So is it fair to say that McDermott's effectiveness ended
in part because you didn't have a large DIP in place, a
permanent 350 million dollar DIP in place after September 13th?

A. I don't think that had anything to do with it.

Q. Nothing to do with it?

A. Not a thing.

Q. Is it fair to say that part of the reason McDermott had
lost its effectiveness was because Speltz and Weiss were not
being retained and Huron had not been retained and there was
enough senior management other than an interim CEO?

A. I need to parse your question into pieces. Huron had not
been retained but was still working. Speltz and Weiss as
individuals were gone but their organization was still there
and still working. Neither had been paid. The senior
management was being supplied by Dick Boyle, former chairman of
the board, and Tom Allison, a seasoned financial professional
at Huron. And they were not getting paid. The relationship
between St. Vincent's and the creditors' committee and the
relation between St. Vincent's and the United States trustee
was poor. Our effectiveness and our lack of effectiveness was
driven by the relationship with the trustee and the committee.
It was not driven by Speltz and Weiss or Huron or senior
management or lack of senior management. It was apparent that

285

1  some of this stuff private and that I ought to cut back.
2  Q.  Okay, and let's take a look at Tab 46, is that the
3  communication you got from Mr. Crowley?
4  A.  Yes, it is.
5  Q.  And, did he send a copy to Ms. St. Clair, the chief legal
6  officer and chief compliance officer who's responsible for
7  conflict at St. Vincent's?
8  A.  Yes, he did.
9       THE COURT:  What was Crowley and Weiss upset about
10  being disclosed in Tab 46 that was personal to them, or
11  personal to Weiss?
12      THE WITNESS:  Let me see if I can track it down.  He
13  was annoyed about a footnote -- that I need to put my hands
14  on -- but in his view went over the deep end in terms of
15  telling people information about Speltz & Weiss and Huron.  I'm
16  sorry, I can't find it.
17  BY MR. COOK:
18  Q.  But did it have anything to do with the financial
19  relationship between Speltz & Weiss and Huron?
20  A.  I think it had to do with the arrangement that St.
21  Vincent's had reached with Huron.  In effect, Gary Holdren, who
22  was the chairman at Huron and Mr. Boyle, as the chairman of St.
23  Vincent's negotiated an arrangement outside of Speltz & Weiss
24  on the one hand and myself on the other.  So, they come up with
25  a formula or an agreement, to which I hadn't been a party --

286

1  that doesn't make any difference, I'm directed to implement.
2  But Tim and David were not aware of it.  And, in effect they
3  had changed the deal under which Speltz & Weiss sold their
4  company to Huron.  And Tim, I suspect, was deeply annoyed by
5  the change and doubly annoyed by the disclosure of the change.
6  I suspect he was reacting, among other things, to the loss of
7  the earnout arrangement.
8  Q.  We're now just three weeks into the Chapter 11 case.  Did
9  you talk to Mr. Boyle about the Speltz & Weiss conflict issues
10  during this time period?
11  A.  Yes, sir.
12  Q.  Take a look at Tab 49.
13  A.  Tab 49 is an e-mail from myself to Dick Boyle with a copy
14  to Elizabeth St. Clair which is following up on the
15  conversations -- the multiple conversations we've had regarding
16  the matters raised by the board as a result of the Speltz &
17  Weiss acquisition by Huron.
18  Q.  So, you are conferring with him -- prior conversations, in
19  the plural, issues raised by the board resulting from the
20  Speltz & Weiss and Huron.  As you know, and spell it out, just
21  what you talked about.  This was on July 29 from you to Mr.
22  Boyle.
23  A.  Correct.
24  Q.  Mr. Boyle was polite in this e-mail?
25  A.  He did.

287

1  Q.  What did he say?
2  A.  He thanked me for my willingness to help him with this and
3  directed that I move forward with the agreement.
4  Q.  And, you've seen the Pre-trial Statement filed in this
5  case, haven't you?
6  A.  Yes, sir.
7  Q.  And -- I refer you to the Pre-trial Statement, Paragraph
8  76.
9  A.  Yes sir.
10  Q.  What is Paragraph 76 referring to?
11  A.  Smith discussed the issues related to retention of Speltz
12  & Weiss and Huron with Boyle and St. Clair on July 19th, 2005.
13  Q.  Okay.  That was undisputed, right?
14  A.  Yes, sir.
15  Q.  Okay.  What did you discuss with Ms. St. Clair and Mr.
16  Boyle on July 19th.
17  A.  The conflict and the effect the conflict has on the
18  bankruptcy retention, of Speltz & Weiss on one hand and Huron
19  on the other.
20  Q.  And, Mr. Crowley's report -- do you know whether Mr.
21  Crowley gave a report to the board?
22  A.  Yes, he did.
23  Q.  And, do you know when the board got that report?
24  A.  Preliminary drafts of it were made available in early
25  July.

288

1  Q.  By whom, to whom?
2  A.  I believe that Mr. Crowley circulated a draft to Ms. St.
3  Clair and Mr. Boyle and I want to say a day or two after the
4  filing.
5  Q.  A day after the filing should be around July 6th?
6  A.  Something like that, yes.
7  Q.  A draft?
8  A.  Yes.
9  Q.  Anybody else besides Ms. St. Clair and Mr. Boyle?
10  A.  I believe it also went to Ed Leahy who is on the board and
11  formal general counsel of Pepsi.  And it went to Sister Jane
12  Iannucelli who is on the governance committee.
13  Q.  And you now -- subsequently seen Crowley beforehand didn't
14  you?
15  A.  I first saw him in discovery.  About a month ago.
16  Q.  Okay.  And what's he deal with?  In plain English?
17  A.  He deals with the conflict between -- the conflict
18  generated by the fact that officers of St. Vincent's, David
19  Speltz and Tim Weiss, sold a company which is a service
20  provider to St. Vincent's to another service provider of St.
21  Vincent's under terms in which they could benefit from
22  additional billings by their new lords and masters.
23  Q.  Okay.  That's on July 6th?
24  A.  Right.
25  Q.  They got that.  What else did you see in the Crowley

289

Report about McDermott?

1  A.   The Crowley Report, when I saw -- it goes onto almost a

2  page describing the legal strategy which I was going to use to

3  present the retention applications to the Bankruptcy Court and

4  how I propose to have both Huron retained and Speltz & Weiss

5  retained.

6  Q.   Now, on cross-examination you were asked about the

7  conversation you had with Mr. Speltz on April 26th regarding

8  something.  Tell the Court what Mr. Speltz told you on April

9  26th?

10  A.   David said that he and Tim had been discussing selling

11  their company.  They had discussed -- had inquiries from the

12  normal cast of characters in this particular world, but that

13  their discussions with Huron were beginning to be more serious.

14  Q.   Did he tell you that a deal had been done?

15  A.   No, quite to the contrary, he said the discussions were --

16  while they were getting more serious, they were not close to a

17  transaction.

18  Q.   Why was he telling you this?

19  A.   He was concerned and Huron was concerned on the impact the

20  acquisition would have, were there to be a subsequent

21  bankruptcy at St. Vincent's.

22  Q.   I believe you testified from one of them, Mr.

23  Speltz and Weiss a few weeks before they had told you about a

24  sale of the company.  Did they mention anyone else other than

25

290

1  Huron?

2  A.   Sure.  They were talking to Navigant, they were talking to

3  Cambio they were talking to a couple of others.

4  Q.   And what do you tell them when they mentioned Huron?

5  A.   I told them that Huron was problematic and they needed to

6  be careful.

7  Q.   Why was it problematic?

8  A.   Because if there was a filing for St. Vincent's the fact

9  that the management company was acquired by the financial

10  advisor would implicate the Jay Alix Protocol,

11  disinterestedness and require an arrangement in the bankruptcy.

12  It would affect retentions.  It was a conflict.

13  Q.   Okay.  And you testified on cross that Mr. Speltz told you

14  that he had kept Mr. Boyle in the loop about his conversations

15  with Huron?

16  A.   That's correct.

17  Q.   Okay.  And you examined Ms. St. Clair, didn't you?  You

18  deposed her, didn't you?

19  A.   I did.

20  Q.   Okay.  And did she tell you that she had a conversation

21  sometime in April with Mr. Speltz --

22  A.   Yes.

23  Q.   -- about the potential acquisition?

24  A.   She did.  There were rumors swirling around St. Vincent's

25  that David and Tim were getting close to selling the company.

291

1  Q.   Is that what she told you?

2  A.   Elizabeth said she confronted David with the rumors.

3  Q.   All right.  And she had a conversation with him sometime

4  in April?

5  A.   Yes.

6  Q.   And what did she say to him and what did he say to her?

7  A.   She asked if he was selling the company to Huron and David

8  denied it.

9  Q.   He denied it?

10  A.   Yes.

11  Q.   Okay.  Was he telling the truth?

12  A.   No.

13  Q.   And did there come a time when Mr. Speltz told Ms. St.

14  Clair about the Huron acquisition?

15  A.   My understanding is that after the transaction was

16  announced publicly, David called Elizabeth or Elizabeth called

17  David to discuss it and David apologized for lying to her

18  earlier.

19  Q.   Is that what she testified to?

20  A.   Yes.

21  Q.   That he acknowledged that he had lied to her?

22  A.   Yes.

23          MR. MAGALIFF:  Your Honor?

24          THE COURT:  Yes.

25          MR. MAGALIFF:  I have to object.  I realize that this

292

1  is a bench trial but Ms. St. Clair will be here to testify

2  tomorrow and she could be asked all these questions.  This is

3  all hearsay.

4          MR. COOK:  Fine I'll move on.  It's not a problem.

5  Q.   It was also suggested in your cross-examination that you

6  discussed the conflict issues only with Messrs. Speltz & Weiss.

7  And you testified already that you discussed with Ms. St. Clair

8  and you've told us how many times you talked to Ms. St. Clair.

9  Between May and September 13th, how many conversations did you

10  have with Mr. Boyle on the subject of conflict?

11  A.   A dozen.

12  Q.   Starting when?

13  A.   Would have started around May 19 it would have continued

14  sporadically until the arrangement that we negotiated with

15  Huron at the end of July and then would have accelerated after

16  Mr. Boyle became interim CEO on August 24th.

17  Q.   Okay.  So, we've got Ms. St. Clair, she's the legal

18  officer, she's the compliance officer and how about Mr.

19  Crowley?  Did you have any conversations with him during this

20  time period?

21  A.   Yes.

22  Q.   How many?

23  A.   Three that I recall.

24  Q.   Now, when we looked at Tab 66, your letter to the United

25  States Trustee dated August 26th, did you get a response from

305

1  A.  Ms. St. Clair was intimately involved.

2  Q.  Okay.

3  A.  She attended the meetings with the United States Trustee,

4  she attended meetings that I didn't attend with the United

5  States Trustee.  She received copies of papers, she knew

6  precisely what we were doing and when we were doing it.

7  Q.  Okay.  But back to St. Mary's -- she also knew about St.

8  Mary's, didn't she?

9  A.  Sure.

10  Q.  What was her role in St. Mary's?

11  A.  Elizabeth is a seasoned health care counselor.  She was

12  quarterbacking, from the legal perspective, the New York

13  regulatory process for the closure of St. Mary's.  Bernadette

14  Kingham-Bez doing on the community relations side and other

15  Speltz & Weiss or other St Vincent's employees were

16  coordinating other elements of it.  But Elizabeth, as you would

17  expect from general counsel was pulling together the disparate

18  elements on a very important part of the project.

19  Q.  Did she disagree with you on your timing strategy?

20  A.  No.

21  Q.  Did she disagree with anything that McDermott did during

22  July and August regarding St. Mary's?

23  A.  No.  She and I actually discussed that you don't willy-

24  nilly file motions in the Bankruptcy Court early.  She had an

25  experience when she was with the Corporation Counsel for the

306

1  City of New York where she had gotten canned under precisely

2  those circumstances.  You can draw an analogy to what happened

3  today.  I mean, Your Honor, you approved the sale of Mary

4  Immaculate Hospital and St. Johns in June.  You don't have

5  regulatory approval.  You might get it by the end of the year

6  but you don't have it right now and the debtor's losing money,

7  you even approved two months ago a new management company to

8  look at it.  So, you've got Speltz & Weiss supervising Wycoff

9  supervised by Alvarez.  It's -- if you step into the regulatory

10  area unjudiciously, you have a problem.  And understand, I'm

11  not being critical of the actions of the debtor's credit

12  management.  They're entirely appropriate.  I'm simply trying

13  to use as an example, you cannot force the regulators who are

14  exercising their police power to take action because it's

15  fiscally advantageous to you.  It's persuasion.  You can't

16  stamp your foot and demand this.

17       MR. MAGALIFF:  Your Honor, move to strike.

18       THE COURT:  Overruled.

19       MR. COOK:  No further questions.

20       THE COURT:  Any re-cross?

21  RE-CROSS EXAMINATION BY

22  MR. MAGALIFF:

23  Q.  Mr. Smith, do you recall testifying earlier about an e-

24  mail that you wrote on April 30th where you indicated that you

25  did not believe it was your place to disclose to Ms. Delgado

307

1  and Mr. Holdren the fact that Huron was seeking to acquire

2  Speltz & Weiss?  Do you recall that testimony?

3  A.  I recall you and I discussing that e-mail.  Why don't you

4  show me where it is and we'll figure out what it was we were

5  saying.

6  Q.  Well it was Tab 104 and the quote specifically was:  "I

7  did not tell her that Dick was aware of the essence of the

8  Huron discussions, nor did I imply it, for the simple reason

9  that I don't know if Dick knows anything and it's not my place

10  to tell her or him."  And I believe you testified that the

11  "her" was Ms. Delgado and the "him" was Mr. Holdren, correct?

12  A.  That is correct.

13  Q.  Okay.  Do you recall me asking you the same question at

14  your deposition on September 26th?

15  A.  I don't have a specific recollection but I believe you are

16  going to show me.

17  Q.  But you did testify under oath on September 26th, correct?

18  A.  Yes, sir.  I did.

19  Q.  And I asked you the exact same question and in response

20  you said:  "the nature of the conversations I had with Natalia

21  Delgado indicated it was far from a done deal.  They were

22  looking at it, they were thinking about it, they were spending

23  money on lawyers but that doesn't indicate that it was going to

24  close and that doesn't exclude the fact that David and Tim may

25  have been talking to somebody else.  Now, if David had said to

308

1  the chairman of his board -- that's Mr. Boyle, quote:  I'm

2  talking about something my company closed quote, it's not my

3  place as counsel to the company and it poses to me a very

4  specific bankruptcy question to say to the chairman of the

5  board, by the way, have you heard that David is thinking of

6  selling Huron or thinking of selling Navigant or David is

7  selling to Cambio or David is selling to FTI or David is

8  selling to Tom, Dick & Harry.  He could have been doing all of

9  those.  I'm not the town crier."  Do you recall that testimony?

10  A.  Yes, actually I do.  That sounds particularly like me.

11  Q.  Yes, it does.  My question is very simple.  Were you

12  telling the truth then when the reference in the e-mail was to

13  the chairman of the board or are you telling the truth today

14  when the reference in the e-mail was to Mr. Holdren?

15  A.  Mr. Magaliff, those two statements are not inconsistent.

16  Q.  They're completely inconsistent.

17  A.  I disagree.  I think if you carefully read what I

18  testified to, there is not a clear delineation that the "him"

19  you are referring to refers to Mr. Boyle.  The example I give

20  you refers to Mr. Boyle.  And the parable, if you will, refers

21  to Mr. Boyle.  But there is not a testimonial indication that

22  the pronoun in the paragraph is a reference to Mr. Boyle.  And

23  if there is such an indication I would appreciate you're

24  pointing it out to me.

25  Q.  Well the question that I specifically asked, to which you

309

1  gave that response was the following:  quote "now I know you've
2  testified several times this morning that you believed David
3  when he told you that Dick already knew, but why did you
4  believe it was not your place to tell  Dick Boyle anything
5  about the S&W, slash, Huron discussions?"
6          THE COURT:  What's the question?
7          MR. MAGALIFF:  That was the question.
8          THE COURT:  Now?
9  Q.  My question now is, is it still your testimony that when
10  you were writing to Ms. Delgado that it was not your place to
11  tell him you were referring to Mr. Holdren and not Mr. Boyle?
12  A.  What's the number?
13  Q.  It's Tab 104, Paragraph 2.
14  A.  It's a fair inference from reading this paragraph that the
15  "him" in the parenthetical in Paragraph 2 is a reference to
16  Dick Boyle, or it could be a reference to Gary Holdren.  I will
17  accept your characterization that it is more logical from the
18  text that you are referring to the Court, so to the degree that
19  I misspoke and said that it was a reference to Gary Holdren, I
20  will retract that.  Although I would observe that I was not as
21  precise as I would have preferred to have been in a matter that
22  has since taken on this level of importance of which, at this
23  time, was almost incidental.
24  Q.  So, your corrected testimony today is that as of April 26,
25  2005, you, as counsel to St. Vincent's who owed St. Vincent's a

310

1  fiduciary duty, learned that discussions with one of its
2  vendors was serious, you still did not believe that you had an
3  obligation to tell the chairman of the board, correct?
4  A.  On Saturday April 30, at 3:11 pm Chicago time, I did not
5  believe -- based on the facts available to me and the status of
6  St. Vincent's that I had an obligation to tell Dick Boyle about
7  the conversations which Speltz & Weiss were having with Huron
8  Consulting.
9          MR. MAGALIFF:  I have no other questions, Your Honor.
10         THE COURT:  Anything else then?
11         MR. JOHNSON:  Your Honor, I have a very brief re-
12  cross on behalf of the committee.
13  RE-CROSS EXAMINATION BY
14  MR. JOHNSON:
15  Q.  Mr. Smith, if you would turn to Tab 65.  I think it's the
16  second binder.
17  A.  Give me a second, I have a few too many binders.  Yes,
18  sir.
19  Q.  This is the CRO proposal that the U.S. Trustee made,
20  correct?
21  A.  Yes, sir.
22  Q.  And you responded to it with the letter that you looked at
23  on your redirect with Mr. Cook, that was Tab 74 -- the
24  September 7th letter?
25  A.  Yes, sir.

311

1  Q.  And I believe that you indicated that Mr. Boyle had told
2  you that the CRO proposal that the U.S. Trustee had made was
3  unacceptable to the board because the board was not willing to
4  cede control of St. Vincent's to somebody else, is that
5  correct?
6  A.  Correct.
7  Q.  Did you discuss with Mr. Boyle the fact that the U.S.
8  Trustee's CRO proposal contemplated that the CRO would continue
9  to report to the board?
10  A.  What I discussed with Mr. Boyle was that the trustee's
11  August 25th proposal had the CRO reporting to the board after
12  the CRO had consulted with the Creditors' committee.  Phrased
13  differently, the committee and the United States Trustee were
14  to get the information before the board did and the board
15  became a rubber stamp.  Rather than relying on his judgment I
16  commissioned research from the McDermott Health Care Department
17  in New York and received memoranda from them with the New York
18  license that I did not have, that agreed with my judgment that
19  the proposal as outlined would comport with the New York State
20  Health Regulations or the New York State Not-for-Profit
21  Statutes.
22  Q.  Mr. Smith, the CRO proposal did not contemplate that the
23  CRO would first make report to the committee and the U.S.
24  Trustee and only then report to the board, correct?
25  A.  Mr. Johnson, you're quibbling with me, believe me, I lived

312

1  through this stuff.  I knew exactly what Deirdre Martini
2  wanted.  She told me the afternoon of August 25th, she wanted a
3  trustee without filing a motion.  There was no ambiguity on
4  this whatsoever.  There is no ambiguity apparent.
5  Q.  Well there was no ambiguity in the document itself, but if
6  you look, Mr. Smith, it's clear on the face of the document
7  what the U.S. Trustee contemplated.  Turn to -- Mr. Smith,
8  let's look at the document.  Turn to page 467 in the lower
9  right hand corner, it's the fourth page of Tab 65.
10  A.  Yes, sir.
11  Q.  In little roman ii, the CRO proposal simply calls for the
12  CRO to provide updates to the committee and to this ad hoc
13  committee it was also contemplated.  It doesn't say anything
14  there, does it, Mr. Smith, about reporting into the committee
15  before working with the board of directors, correct?
16         THE COURT:  You're talking about Romanette, Mr.
17  Smith?
18         MR. JOHNSON:  Little roman ii.
19         THE WITNESS:  Your Honor, I appreciate he's
20  discussing Romanette II in the first full paragraph --
21         THE COURT:  Yes, but Romanette I bears on the issue.
22         THE WITNESS:  Yes, Your Honor, it does.  But what I
23  was doing was as I was wondering over to the succeeding page,
24  when the fourth paragraph of paragraph D " the ad hoc committee
25  indicates it will have the authority to review all material

**Exhibit V**

```
                                                      1
1
2    UNITED STATES BANKRUPTCY COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    Case No. 05-14595
5    - - - - - - - - - - - - - - - - - - -x
6    In the Matter of:
7
8    ST. VINCENT'S CATHOLIC MEDICAL CENTERS
9    OF NEW YORK d/b/a SAINT VINCENT CATHOLIC
10   MEDICAL CENTERS,
11
12        Debtor.
13
14   - - - - - - - - - - - - - - - - - - -x
15
16            United States Bankruptcy Court
17            300 Quarropas Street
18            White Plains, New York
19
20            October 24, 2006
21            8:52 a.m.
22
23   B E F O R E :
24   HON. ADLAI S. HARDING
25   U.S. BANKRUPTCY JUDGE
```

```
                                                      2
1    TRIAL re first interim application of McDermott, Will and
2    Emery, LLP for compensation of professional services rendered
3    and reimbursement of expenses incurred on behalf of the debtors
4    for the period of July 5, 2005 through September 30, 2005.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   Transcribed by:  Pnina Eilberg
25
```

```
                                                      3
1    A P P E A R A N C E S :
2    TOGUT, SEGAL and SEGAL LLP
3            Attorneys for Debtor
4            One Penn Plaza
5            New York, NY 10119
6
7    BY:   HOWARD P. MAGALIFF, ESQ.
8
9    SCHULTE ROTH and ZABEL LLP
10           Attorneys for McDermott Will and Emery LLP
11           919 Third Avenue
12           New York, NY 10022
13
14   BY:   MICHAEL L. COOK, ESQ.
15           DAVID M. HILLMAN, ESQ.
16
17   ALSTON and BIRD LLP
18           Attorneys for Creditors' Committee
19           90 Park Avenue
20           New York, NY 10016
21
22   BY:   MICHAEL E. JOHNSON, ESQ.
23
24
25
```

```
                                                      4
1    U.S. DEPARTMENT OF JUSTICE,
2    OFFICE OF THE UNITED STATES TRUSTEE
3            Attorneys for U.S. Trustee
4            33 Whitehall Street
5            New York, NY 10004
6
7    BY:   ALICIA M. LEONHARD, ESQ.
8            TRACY HOPE DAVIS, ESQ.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

33

1      THE COURT: Sustained. Move on.

2  Q.  Their assets are varied, correct?

3  A.  Well, we have real estate and accounts receivable. So,

4  yes, I guess they vary.

5  Q.  Their contractual relationships are many in number and

6  often very complicated, correct?

7  A.  Yes.

8  Q.  Their real estate holdings are located in, at least, four

9  boroughs of the City of New York and Westchester, correct?

10  A.  Yes.

11  Q.  The sheer size of the debtors makes formulating a plan of

12  reorganization an exceedingly intricate and lengthy process,

13  correct.

14      MR. MAGALIFF: Objection. Lack of foundation as to

15  this witness. She's not a bankruptcy lawyer.

16      THE COURT: What's the purpose of this?

17      MR. HILLMAN: Your Honor, the witness has testified

18  that she has an opinion that something that McDermott did or

19  did not do resulted, in her words, delaying St. Vincent's

20  restructuring process. The debtors, of which Ms. St. Clair is

21  the chief legal officer, had sought before this Court, a third

22  extension. Setting an extraordinary number of complicated

23  factors that are not for proper status of the companies. The

24  status of the -- as a health care provider. The host of

25  regulatory and licensing requirements. The complex regulatory

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                  516-608-2400

---

34

1  and licensing issues. All as a basis for explaining to this

2  Court why they need more time to file a plan. I was asking Ms.

3  St. Clare if she knew of these facts and if she understood

4  these facts. But if Your Honor would like me to cease the

5  questions on that I'm happy to move on.

6      THE COURT: Well, I think I have your point, you may

7  move on.

8      MR. HILLMAN: Thank you, Your Honor.

9  Q.  You state in your declaration, Paragraph 3, that

10  McDermott, Will & Emery was retained by St. Vincent's, your

11  words, at the request of Mr. Speltz, correct?

12  A.  Yes.

13  Q.  Mr. Speltz actually provided the board with a list of

14  three firms for the board to consider, McDermott, Weil and

15  Blank Rome, isn't that correct?

16  A.  I don't know.

17  Q.  Because you weren't at the board meeting?

18  A.  I don't know when he provided those names or what the

19  process was. I did not participate.

20  Q.  You didn't participate in the process pursuing towards the

21  board to select a bankruptcy counsel, is that your testimony?

22  A.  I would like to clarify. Mr. Speltz, over my objection,

23  directed me to hire -- to enter into a retention agreement with

24  McDermott Will & Emery, specifically with Bill Smith, around

25  the time we were going to close St. Joseph's Hospital. I

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                  516-608-2400

---

35

1  vehemently objected, I preferred somebody else, to work with

2  someone else. At that time I didn't know Mr. Smith. And, he

3  said he wanted a restructuring person in St. Vincent's on the

4  ground. And, that is what I know about how McDermott Will &

5  Emery came to be engaged at St. Vincent's. That would have

6  happened, I think, in about October of 2004.

7  Q.  Thank you, Ms. St. Clair. But I would like to go back to

8  your affidavit. You say that McDermott had been retained by

9  the hospital at the request of Mr. Speltz. And, all I want to

10  know is, all I want to understand is were you privy to the

11  board's deliberations about the selection process of terms for

12  this engagement? Yes or no.

13  A.  No.

14  Q.  In your affidavit, Paragraph 3, you state that Huron was

15  retained, your words, on the recommendation of McDermott,

16  correct?

17  A.  Yes.

18  Q.  The board selected McDermott, isn't that right? It's a

19  yes or no question.

20  A.  I told you what I know.

21  Q.  So are you telling me today that your testimony is you

22  weren't privy to the board's selection or deliberation process

23  in the selection of a financial advisor?

24  A.  I was not.

25  Q.  Thank you. Do you remember your deposition on September

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                  516-608-2400

---

36

1  7, 2006?

2  A.  Yes.

3  Q.  I asked you about -- or Mr. Smith asked you about hospital

4  closings and you agreed it could be complicated task, right?

5  A.  Yes.

6  Q.  You were involved with the efforts by St. Vincent's to

7  obtain the Department of Health Approval of the closure plan

8  for St. Mary's, right?

9  A.  Yes.

10  Q.  Is it fair to say that a draft closure plan is something

11  that is sensitive and generally not distributed to the public?

12  A.  Yes.

13  Q.  April 2005, you heard a rumor that Speltz and Weiss was to

14  be acquired by Huron, correct?

15  A.  Yes.

16  Q.  When you head that rumor you were concerned, right?

17  A.  Yes.

18  Q.  Because if true, the acquisition would present conflicts

19  of interest, correct?

20  A.  The rumor had no specificity, I didn't know what situation

21  could be presented. I just knew that, to my mind, warranted

22  further inquiry.

23  Q.  But you were concerned that if there was an acquisition

24  there could be serious issues if Huron acquires Speltz and

25  Weiss, correct?

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                  516-608-2400

37

1  A.  Actually, the rumor that I heard was that there was a some
2  kind of business transaction being negotiated between Huron and
3  Speltz and Weiss.
4  Q.  But it was a concern to you, right?
5  A.  Yes, very much.
6  Q.  And, you're the chief legal officer responsible for, among
7  other things, conflicts, right?
8  A.  I administer St. Vincent's conflict of interest disclosure
9  process.
10  Q.  So you're responsible for conflicts among St. Vincent's
11  officers, it's vendors, right?
12  A.  Well, I'm not responsible for the conflicts.  I'm
13  responsible for a process so any conflicts can be disclosed and
14  managed.
15  Q.  Fair enough.  When you heard about that rumor you never
16  told Boyle about it, right?
17  A.  No.
18  Q.  Instead you approached David Speltz to discuss the rumor
19  with him, right?  It's a yes or no question.
20  A.  Yes.
21  Q.  And, when you approached David Speltz about the rumor that
22  you had heard about the potential acquisition or business
23  combination he denied it, didn't he?
24  A.  Yes, he did.
25  Q.  On May 7th, Speltz told you about the acquisition,

38

1  correct?
2  A.  I don't remember if that was the exact date.  But it was
3  the Saturday closest to when the acquisition closed.  And, he
4  called me at home and apologized for having mislead me and said
5  that, indeed, Huron had purchased Speltz and Weiss.
6  Q.  So he apologized for lying to you earlier?
7  A.  Yes.
8  Q.  You worked under David Speltz since April of 2004 through
9  August 24 of 2005?  He was your boss, right?
10  A.  He became my boss slightly sooner than that.
11  Q.  But Speltz was your boss?
12  A.  Speltz and Weiss, yes.
13  Q.  The CFO was your boss, too?
14  A.  I was subordinate to the two of them, yes.
15  Q.  Okay.  And, after David Speltz sold his company to Huron,
16  in your view he became disengaged in the business affairs of
17  St. Vincent's, right?
18  A.  Yes.
19  Q.  You checked out?
20  A.  Yes.
21  Q.  In your view there was a vacuum in management, correct?
22  A.  Yes.
23  Q.  In fact, at your deposition you said there was
24  insufficient direct and leadership in the institution, correct?
25  A.  Yes.

39

1          MR. HILLMAN:  I'd like one moment, Your Honor?
2          THE COURT:  All right.
3          MR. HILLMAN:  I'm reserving a right for a re-cross.
4  I'll take my seat.
5          THE COURT:  Okay.  Redirect.
6          MR. MAGALIFF:  Thank you.
7  RE-DIRECT EXAMINATION BY
8  MR. MAGALIFF:
9  Q.  Ms. St. Clair, you're not a bankruptcy lawyer, are you?
10  A.  No, I'm not.
11  Q.  Prior to St. Vincent's had you ever been involved in a
12  bankruptcy case?
13  A.  No.
14  Q.  Not while you were employed by the Corporation Counsel of
15  the City of New York?
16  A.  No.
17  Q.  And, not while you were working for the Health and
18  Hospital's Corporation?
19  A.  No.
20  Q.  And, not in any other job that you had before St.
21  Vincent's, right?
22  A.  No.  Not at all.
23  Q.  And, is it fair to say that with respect to bankruptcy and
24  bankruptcy related matters, even though you were the chief
25  legal officer of St. Vincent's you relied exclusively on the

40

1  advice that McDermott Will & Emery was providing to you and the
2  hospital?
3  A.  Yes.
4  Q.  And, when you had a question about something that came up
5  in the bankruptcy case, would you normally go to Bill Smith or
6  somebody from McDermott to ask what was going on?
7  A.  Yes.
8  Q.  Did you believe, at the time, that you were getting candid
9  advice from Mr. Smith and McDermott about what was happening in
10  the case?
11  A.  Yes, absolutely.
12  Q.  And, as I think --
13          MR. MAGALIFF:  Withdrawn.
14  Q.  Tell me, Ms. St. Clair, and explain to the Court if you
15  will, what does a chief compliance officer of a not-for-profit
16  hospital do?
17  A.  Well, since the hospital collects most of its revenue from
18  the federal and state governor, from Medicare and Medicaid, a
19  compliance officer is primarily concerned with the integrity of
20  billings to the federal government and the state government.
21  So it's a function that involves doing a contemporaneous check
22  in of bills that are sent out to the state, say for a Medicaid
23  patient, for making sure that the service is delivered or
24  appropriate, that the services were medically necessary, that
25  the amounts charged were appropriate.  Mostly very technical

69

1  Q.   And when you spoke about the chaos and the disarray, you

2  spoke about getting numbers, do you remember that?

3  A.   What I was talking about specifically was more HR related.

4  Like, who would the pension plans, the -- who got what kind of

5  benefits, how many people were in this union, how many in that

6  union.  Things like that, I wasn't talking about specific

7  finance numbers.

8  Q.   How many employees does the hospital have -- do the

9  debtors have in total?

10  A.   Right now?

11  Q.   At the time of the filing, an estimate.

12  A.   10,000.

13  Q.   You said that, at one point in your direct or re-direct,

14  nothing else seemed to get done, do you remember using those

15  words?

16  A.   Yes.

17  Q.   You were describing McDermott, right?

18  A.   Yes.

19  Q.   Are you aware that at the first day of the case, first day

20  motions were filed?

21  A.   Yes.

22  Q.   And do you remember how many?

23  A.   No.

24  Q.   Do you remember if any of the first day motions were

25  denied?  Let me ask it differently.  In fact, all the first day

70

1  motions were granted, weren't they?

2  A.   I -- I don't recall.  I suppose you could look at the

3  docket.

4  Q.   Nothing else seemed to get done.  Sterilization services,

5  there was a time when SSI ceased to provide critical

6  sterilization services, right?

7  A.   Yes.

8        MR. MAGALIFF:  Objection, beyond the scope of direct

9  testimony.

10       MR. HILLMAN:  Nothing else seemed to get done.  I'd

11  like to explore with Ms. St. Clair, not on every single matter

12  of what got done, but many things got done, Your Honor.

13       THE COURT:  Well, I know that many things did get

14  done.  That's not really a matter of dispute, how much time do

15  you want to take on all the things that did get done?

16  Q.   Many things got done, didn't they?

17  A.   Well --

18  Q.   It's a yes or no question.

19  A.   Well, it's not really something I could say, you know,

20  yes, many things did and many things didn't.

21  Q.   I'll ask it differently.  Many motions were filed during

22  the bankruptcy case that were granted by Judge Beatty, correct?

23  A.   Yes, there were a number of motions granted and there were

24  -- there was a team of McDermott lawyers, lovely people.

25  People we enjoyed working with.  I mean, it was -- they were at

71

1  33rd Street where my office was at that time.

2  Q.   This is the two people that you're testifying, that were

3  at your offices?

4  A.   Often it was more than two.

5  Q.   Okay.

6  A.   And -- but when I said nothing else seemed to get done, I

7  meant at a, you know, at a directional level in the bankruptcy.

8  We were not -- we were not being advised by counsel how we were

9  going to get from this unexpected, kind of, emergency filing

10  that we hadn't, frankly, expected.  I mean, I was actually away

11  with my family over the July 4th weekend and, you know, it had

12  seemed likely that we were going to file but not a sure thing.

13  And David Speltz, in particular, kept saying oh, we'll be able

14  to avoid it.  We'll sell a little more property, we'll get a

15  few million here a few million there.  We'll win through.  And

16  then, all of a sudden, July 5th we filed.  And I flew home.

17  And so how we were going to get from that point, like, what,

18  you know, what it -- what in the bankruptcy -- what were we

19  going to do to get -- to make progress so we could get out of

20  the bankruptcy.  I mean --

21  Q.   Thank you.

22  A.   -- we weren't getting any help from, you know advice

23  about, like, well, what do you do when you start a bankruptcy.

24  What does the debtor need to do to get itself organized in a

25  bankruptcy proceeding to, you know, get things going.

72

1  Q.   Thank you.  You heard Mr. Speltz testify yesterday, right?

2  A.   Yes.

3  Q.   Do you know why -- the company filed because of a

4  liquidity crisis, isn't that correct?

5  A.   I think others are better suited to testify.

6  Q.   So you don't know why the company filed?

7  A.   I believe that NFG called a default on a loan.

8  Q.   As a result, there was a liquidity crisis, correct?

9  A.   We were about to not make payroll.

10  Q.   So what McDermott did was, insured through a number of

11  cash collateral and DIP financing motions that the company had

12  access to cash, correct?  It's a yes or no question.

13  A.   Yes, I suppose so.

14       MR. HILLMAN:  And the record certainly reflects, Your

15  Honor, that there are docket entries 198, 249, 250, 251, 257,

16  309, 354, 355, 356, 357, 358 and 363, among other orders that

17  are for financing.  That McDermott was able to achieve for

18  these debtors to insure that they had financing to survive.

19  Q.   You attend board meetings, don't you?

20  A.   Most.

21  Q.   And you get the copies of the minutes after board meetings

22  when Mr. Ackerman prepares them?

23  A.   Yes.

24  Q.   July 7, 2005, two days after the petition date, did the

25  executive committee of the board of directors hold a meeting?

101

1    hurdle --

2    Q.    Okay.

3    A.    -- then there was no going back.

4    Q.    Mr. Boyle, replace -- by replacing counsel you thought you

5    could defuse the situation, right?

6    A.    Yes, but that wasn't the primary reason.  In part that was

7    true.  I was anxious to get things moving forward and they

8    weren't because there was far too many arguments as opposed to

9    people working collectively and cooperatively to try to reach a

10   compromise and to move things forward.

11   Q.    But at your deposition you told me it would diffuse the

12   situation, right?

13   A.    Sure.

14   Q.    It was a business decision, right?

15   A.    Very much so.

16   Q.    And that's why you replaced McDermott?

17   A.    Yes.

18   Q.    Now, I asked you at your deposition -- you're not a

19   lawyer, right?

20   A.    No.

21   Q.    Okay.  I asked you at your deposition to leave the legal

22   issues aside and tell me, from a businessman's perspective, of

23   whether you believed it would have been possible, with any set

24   of lawyers, to get David Speltz and Tim Weiss retained as

25   crisis managers in the case?  And you said, no.  That's why I

102

1    asked for their resignations and the time I did.  Do you recall

2    that testimony?

3    A.    Back up.  You're talking now in the time frame of about

4    August 23, 22 about Speltz and Weiss not about Mr. Smith?

5    Q.    I asked you, do you think it would have been possible,

6    with any set of lawyers, to get David Speltz and Tim Weiss

7    retained as crisis managers in the bankruptcy case.  Do you

8    remember me asking you that?

9    A.    Yes, I do.

10   Q.    And your answer was no, that's why I asked for their

11   resignations at the time I did.

12   A.    That's correct.

13   Q.    You state that Huron was retained at McDermott's

14   recommendation in your affidavit?

15   A.    I believe that was the case.

16   Q.    Okay.  But the board ultimately approved the retention,

17   right?

18   A.    Of?

19   Q.    Huron.

20        THE COURT:  Are you talking about the initial

21   retention?

22        MR. HILLMAN:  Correct, Your Honor.

23        THE COURT:  Prior to bankruptcy?

24        THE COURT:  Correct, Your Honor.

25   A.    I'm not sure it was of such a dimension that it would

103

1    require a board approval.  I know Bill recommended Speltz and

2    Weiss with management at the time.  One of the others decided

3    to -- who they fire.  They regularly report to the board as to

4    incremental requirements of their contract and what kind of

5    monies would be needed, but we didn't get into the details as

6    to where they were going to go.

7    Q.    I understand.  You're aware that Weil Gottschalk and

8    Manges, on behalf of the debtors, filed a new application to

9    retain Huron Consulting Services as the financial advisor in

10   October -- it's October 21, 2005?

11   A.    I do not know that first hand.  I've heard that.

12   Q.    Okay.  You know that the debtors entered into an

13   engagement agreement with Huron, right?  I'm sorry, I couldn't

14   hear your answer.

15   A.    Yes.

16   Q.    In fact, you signed the engagement letter, right?

17   A.    I believe so.

18   Q.    And you read the engagement letter, right?

19   A.    Could you be more specific?

20   Q.    Sure.  Again, as I said to Ms. St. Clair, it's not a

21   memory test.

22   A.    It's not a memory issue.

23   Q.    Tab 80.

24   A.    Eighty in this book?

25   Q.    Eighty in one of the books?

104

1    A.    Which one?

2    Q.    Volume 2.  Why don't you look up at me, Mr. Boyle, when

3    you've reached Tab 80?

4    A.    All right.  I'm at -- I got there.

5    Q.    Okay.  Tab 80 is a large document.  It's got Exhibits A

6    through K at the bottom.  The first page is the Notice of

7    Hearing on an Application to Retain Huron Consulting Services,

8    do you see that?

9    A.    Yes.

10   Q.    Okay.  I'll just have you flip to Tab A.  It's entitled

11   Revised Engagement Letter, let me know when you're there.

12   A.    The date of this is October 28th?

13   Q.    Correct.

14   A.    All right.  Now, where do you want me to go?

15   Q.    I just want you to take a look at the signature page.

16   A.    Sure.

17   Q.    So if you're on Tab A -- no Tab A at the bottom, see those

18   bottom tabs?

19   A.    Tab A.  Okay.

20   Q.    This is a Huron Consulting Services LLC agreement, right?

21   A.    October 21st?

22   Q.    Right.  Why don't you just flip one, two, three -- on the

23   fourth page you'll see the signature block, acknowledge and

24   agreed Richard J. Boyle with an electronic version of

25   signature, do you see that?

# Exhibit W

**Page 1**

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-14595

5  - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  SAINT VINCENT'S CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a

9  SAINT VINCENT CATHOLIC MEDICAL CENTERS,

10

11          Debtor.

12

13  - - - - - - - - - - - - - - - - - - -x

14

15          United States Bankruptcy Court

16          300 Quarropas Street

17          White Plains, New York 10601

18

19          October 25, 2006

20          12:42 PM

21

22  B E F O R E :

23  HON. ADLAI S. HARDING

24  U.S. BANKRUPTCY JUDGE

25

**Page 2**

1  TRIAL re Application for interim professional compensation.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by: Pnina Eilberg

**Page 3**

1

2  A P P E A R A N C E S :

3  TOGUT, SEGAL and SEGAL LLP

4          Attorneys for Debtor

5          One Penn Plaza

6          New York, NY 10119

7

8  BY:   HOWARD P. MAGALIFF, ESQ.

9        FRANK A. OSWALD, ESQ.

10

11  SCHULTE ROTH and ZABEL LLP

12          Attorneys for McDermott Will and Emery LLP

13          919 Third Avenue

14          New York, NY 10022

15

16  BY:   MICHAEL L. COOK, ESQ.

17        DAVID M. HILLMAN, ESQ.

18

19

20

21

22

23

24

25

**Page 4**

1  ALSTON and BIRD LLP

2          Attorneys for Creditors' Committee

3          90 Park Avenue

4          New York, NY 10016

5

6  BY:   MICHAEL E. JOHNSON, ESQ.

7        NICOLE JACOBY, ESQ.

8        BROOK A. CLARK, ESQ.

9

10

11  U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE UNITED STATES TRUSTEE

12          Attorneys for U.S. Trustee

13          33 Whitehall Street

14          New York, NY 10004

15

16  BY:   ALICIA M. LEONHARD, ESQ.

17        TRACY HOPE DAVIS, ESQ.

18

19

20

21

22

23

24

25

29

1  eye myself on critical vendors, especially after that famous
2  decision in Chicago -- was it in Chicago?
3      MR. JOHNSON: Yes.
4      THE COURT: But I did before anyway because it's in
5  defiance of the code. I look critically at those and it's hard
6  to sneak one by me but that doesn't mean that lawyers who, at
7  the request of a client that has anxiety about the possibility
8  of there being critical vendors out there -- especially in the
9  medical context -- wouldn't accede to the client's wish to have
10 a pot of money to deal with some terribly squeaky wheel. You
11 know, how are we going to replace them? And if they succeeded
12 beyond their wildest expectations, perhaps, in getting a great
13 big wonderful critical vendor order, hey, bravo for the firm.
14 It doesn't mean that it's going to be used.
15     But why would one criticize them for acceding to
16 their client's request? It seems to me that that was a good
17 service and nothing to criticize. You need to help me if
18 that's wrong.
19     MR. JOHNSON: Your Honor, I hear the Court's concern.
20 I would only point out that the nature of the objection is
21 simply the number of creditors that were on that list. But I
22 would reiterate --
23     THE COURT: But look, there may have been a lot of
24 reasons why the creditor's committee would have jumped up and
25 objected or moved to strike the thing. Yeah, your clients were

30

1  the ones that were gored by this list and it may have been
2  something that could have been defeated all together. It may
3  have been that there was a completely inadequate basis to seek
4  it.
5      Well, as I say, they succeeded beyond their wildest
6  expectations, perhaps. But that's not a ground to the fact
7  that the creditor's committee had a legitimate objection which
8  it compromised simply by asking that no one be paid without
9  consulting the committee.
10     I don't see that as any grounds to criticize the
11 McDermott firm. It did a pretty good job I would have thought.
12 I'm not sure they would have gotten that much of an order from
13 me but I, fortunately, don't have to second guess that. They
14 did a good job.
15     MR. JOHNSON: Your Honor, that's what they were paid
16 for.
17     THE COURT: And the construction liens, I mean,
18 goodness. Well, is there anything more to be said in terms of
19 helping me understand why there was any basis at all to
20 criticize other than the radio silence? I have a problem with
21 that, obviously.
22     MR. JOHNSON: Your Honor, the committee is prepared
23 to stand down on other issues with the exception of the radio
24 silence instruction --
25     THE COURT: Okay.

31

1      MR. JOHNSON: -- as a basis for its objection.
2      THE COURT: Okay. Well, let's have bullet points
3  then from -- who wants to do the bullet points on the Speltz
4  and Weiss -- very, very concise.
5      MR. OSWALD: Your Honor, Frank Oswald, Togut, Segal
6  and Segal for the debtors. Mr. Cook asked the other day when
7  we started, where's the beef, what's the problem. And Your
8  Honor has now heard two days of testimony and we believe that
9  the testimony as well as the multiple volumes of exhibits that
10 you're going to have to read -- at least those ones that we've
11 highlighted over the last two days -- shows that we had serious
12 mistakes made, shows that the most thoughtless mistakes have
13 been conceded and shows that these fees should not be awarded
14 in full amount.
15     Mr. Cook used the phrase that the services needed to
16 be necessary and beneficial and reasonable at the time. And we
17 believe that that is true. That is one of the factors that you
18 have to look at. But we also believe the record has shown,
19 Your Honor, that it was not reasonable for McDermott not to
20 have disclosed to the board when Mr. Smith knew that the
21 combination between Speltz and Weiss and Huron was about to
22 happen, knowing that they had been in full Chapter 11 prep mode
23 in light of the liquidity crisis that was continuing from March
24 through the final date of July's filings.
25     It was not reasonable not to have reviewed the Speltz

32

1  and Weiss and Huron agreement on their own when that deal
2  closed on May 9th, to see what terms may or may not have
3  impacted retentions, whether on a dual basis or a separate
4  basis. They learned about the transactions, Mr. Smith has
5  testified, April 28th, maybe sometime earlier there was a
6  whisper of it. But clearly, the April 28, April 29 email
7  exchange between Mr. Smith, Mr. Weiss, Mr. Boyle -- who you heard from
8  concern about whether or not Mr. Boyle -- who you heard from
9  yesterday -- had any clue about what was going on.
10     Mr. Smith said that's not his duty, it wasn't his
11 place to disclose that to him. And perhaps had the board known
12 before the deal had closed, Your Honor, the steps might have
13 been taken, people would have had been educated in advance.
14 Perhaps some of these egregious fee-sharing provisions would
15 have been dealt with.
16     So we don't think McDermott took reasonable steps
17 with that. But then once the deal closed, there doesn't appear
18 to be any effort to look at these provisions, Your Honor. We
19 have the call between Mr. Smith and Mr. Crowley. You heard
20 from Mr. Crowley yesterday. It was June 23rd, a month and a
21 half after the deal closed and Mr. Crowley is pointing out the
22 Huron 8K and Mr. Crowley is pointing out this interest in the
23 securities. Mr. Crowley is pointing out the personal service
24 contracts. Mr. Crowley is pointing out the fee sharing.
25     And Mr. Smith, in his email to his colleague that

33

1  day, noting it certainly looks like David and Tim have a
2  personal interest here -- a reason to see the Huron fees pumped
3  up.  He sends that email to Mr. Cleary, another partner.  Let's
4  look at it.  Let's do the right thing in terms of disclosure.
5  Mr. Cleary writes back, pre-petition -- I think it's June 27
6  that email -- I've now looked at it, basically two months after
7  the closing.  I've looked at the 8k.  I've looked at the
8  agreement.  We've got issues.  We need to deal with those
9  issues.  And yet you have retention pleadings filed in the case
10  with no disclosure but for the date of the acquisition.  No
11  oral disclosure made to the US Trustee, Ms. Martini and her
12  staff attorneys.
13      And Ms. Martini agreed, when you get to her
14  testimony, she would have be so grateful, so comforted to know
15  that this debtor and this board was independently concerned
16  about those issues.  These were not bankruptcy experts, Your
17  Honor.  You heard Ms. St. Clair.  You heard Mr. Boyle.  They
18  were relying on the professionals.  They were relying on the
19  experts.  They were paying millions of dollars to the experts
20  to get good advice.  These people weren't there to question
21  that advice Mr. Smith told the Speltz and Weiss people.  He
22  says he told the board, told Ms. St. Clair, we heard it
23  throughout the record.  Jay Alex didn't apply.
24      But we can understand where he got that impression
25  because the May 3rd memo from his colleague right after he

34

1  learns about the Huron transaction, end of April.  May 30 now,
2  commission some research.  The email memo indicates that Jay
3  Alex is a Delaware protocol.  It's not binding in the southern
4  district.  Here in the southern district there's a more
5  flexible standard.  Look at the Adelphia case.
6      So the premise was wrong.  They didn't have the
7  facts.  Now maybe that's because they don't do much lead
8  Chapter 11 work here in the southern district.  I don't know.
9  Some have speculated that because Mr. Speltz introduced Mr.
10  Smith's restructuring group to the debtors and then McDermott
11  introduced Huron as the financial advisors that perhaps things
12  were overlooked, they weren't dealt with the way they might
13  have been otherwise dealt with but for that relationship.  I
14  don't think we need to get to that for this dispute, Your
15  Honor.
16      What we need to get to is that it was not reasonable,
17  knowing what they knew, to go into that bankruptcy on an
18  emergency basis and not disclose to the U.S. Trustee and even
19  Judge Beatty, for that matter, that we had these very serious
20  issues with dual retention.
21      So put Jay Alex aside, how we're going to get it
22  done.  Put aside the U.S. Trustee not even getting the
23  agreement.  We testified it was the end of July, she's still
24  looking for the documentation.  The U.S. Trustee, she has to go
25  find it on her own?  That's not the way these debtors need to

35

1  operate, particularly when you're in a not-for-profit situation
2  and you've got the interest of the community, you've got the
3  regulatory bodies, DOH and other people.
4      And you just talked about it, Your Honor, patient
5  care.  And that is the priority, isn't it?  Keep the lights on.
6  There's nobody who disagrees with that.  The debtors haven't
7  disagreed with that.  Keeping the lights on, making sure things
8  get done.  But you need to be, as Mr. Smith said, you need to
9  be fully open with the creditor body, particularly with the
10  Judge and the U.S. Trustee, and work cooperatively with your
11  creditor's committee.
12      And who knows, maybe if Judge Beatty had known about
13  the issues, she might have had the parties in front of her,
14  maybe a chambers conference.  Maybe they would have dealt with
15  the issues head on.  But they didn't get with it.  They
16  struggled to find a solution, Judge.  Mr. Smith talked about
17  how the deal was changing.  I didn't come back to the court.  I
18  didn't come back -- the deal was changing.  No one needed to
19  wait for Mr. Crowley's report to make disclosure of the facts
20  that we knew at that point.  We knew we had these offending
21  provisions.
22      And again, as Ms. Martini said, had I known that the
23  board was looking at it, I would have been comforted to know
24  that the board didn't have its head in the sand or was turning
25  the other way.

36

1      You heard from Ms. St. Clair.  She was horrified when
2  she learned about this.  It's not from bankruptcy
3  ramifications, but how could be have our CEO, CFO in this
4  transaction with our outside financial advisor, an important
5  vendor, prepare for Chapter 11 and now you have the CEO being
6  responsible for the outside vendor.  You have the CEO and CFO
7  getting these earn outs, kickbacks -- described by some --
8  based upon the amount of fees Huron is charging the debtor.
9  You have the markup passed on to the -- you heard Mr. Boyle
10  describe this markup, when they learned about that how upset
11  they were.
12      Okay.  So from the corporate governing perspective,
13  they did what they should have done.  Ms. St. Clair recommended
14  they have somebody look at this.  It's undisputed.  Mr. Crowley
15  was not here for the bankruptcy aspects, Your Honor.  He just
16  happens to be a bankruptcy lawyer.  It's not his role.  Mr.
17  Smith has conceded it was his role, McDermott's role, the
18  retention pleadings, the process, the disclosure.
19      There's no real answer of why that didn't happen.
20  The fingers go this way.  There's no partner in McDermott who
21  owns up to say, yeah I was in charge of those pleadings.  I was
22  supposed to read them before they went out.  You look at the
23  transcripts, the testimony.
24      But who got caught in the squeeze here?  The
25  debtor -- the debtor who was relying on these experts.  And so

37

1  you now have the emergency filing, Rome is on fire, people are
2  trying to put out the fire. You've got patient health care,
3  you know, at stake. And I'm sure, based upon the record, and
4  looking at Ms. Martini, again, saying I'm very uncomfortable
5  with what's going on here. They have very little liquidity.
6  They talk about that DIP from HFG. That HFG DIP, Your Honor,
7  basically the same post-petition DIP. The same lender backed
8  by the receivables provided an initial 15 million dollars in
9  liquidity. They had the good graces to take a 2 million
10  dollar termination fee on June 30th, terminated the pre-
11  petition line on June 30th, took 2 million dollars, turned
12  around, gave a DIP line on July 5th. There was 15 million
13  dollars to make payroll. Oh, and by the way, to protect
14  themselves, they got a lien on 600 million dollars worth of
15  real estate. But we've covered that end.
16      Ms. Martini was looking to work with this debtor. If
17  she didn't want to work with this debtor, she would have made
18  her trustee motion, Your Honor. The record is clear on that.
19  The credibility was lost on day one. The bell was rung. You
20  can't unring the bell. And we've heard the process. We heard
21  it deteriorate. You were not there. I was not there. But how
22  terrible must this situation have been with their committee and
23  Mr. Smith unilaterally shut down the communications, whether
24  it's a day, five days, or weeks it had to be a terrible
25  situation.

38

1      Whose caught in the middle? The debtor -- the
2  constituency. And you heard Ms. St. Clair again yesterday talk
3  about the community with St. Mary's which I'll get to in a
4  second.
5      But in terms of the bullet sheet -- the bullet points
6  that you wanted, pre-petition the services were not reasonable,
7  the acts taken were not reasonable based upon what they knew.
8  And post-petition they tried but they couldn't formulate. Now
9  they realized Jay Alex does apply so they've got to go to phase
10  two. How do we get the services here? That's what this board
11  knew, the CRO process. And we've heard. There's emails. They
12  did do research on it, Your Honor. There's research that
13  indicates that a CRO in a not-for-profit debtor context doesn't
14  fly. Guess what? We've had a CRO for a year. Guess what?
15  This Court has had very few contested hearings in that year.
16  And we're on the verge of filing a Chapter 11 plan. Mr.
17  Sansone is here. He's doing the job. There was a solution.
18  McDermott couldn't get it done. They had lost the credibility.
19  They had lost the confidence of the court, the Trustee, the
20  committee.
21      We've heard Mr. Smith testify. Ms. Martini was on a
22  power break. Mr. Bunin was inflexible. The judge was
23  exercised. It's everybody else. The debtor got squeezed
24  through this. All right.
25      As to St. Mary's, look at the record there, Judge.

39

1  No question they knew we were losing millions of dollars,
2  whatever the number was, 500 thousand a week, 700 thousand a
3  week, a tremendous amount of money. No question had to be
4  posed. Board authorizes to take the steps to close June 1.
5  We're talking about -- why was there no motion here. And we
6  understand the client direction. We understand the client
7  direction that you do not want to file a motion prematurely.
8  You want to make sure you have your ducks in a row. But
9  there's things that could have been done. We heard yesterday
10  from the -- I think it was Mr. Hellman made the comment, I
11  don't know -- that Mr. Speltz wasn't on vacation between July 5
12  and August 18. He was very busy doing other things. June 1
13  they knew it had to be closed. They couldn't get somebody on
14  the case to start putting the facts together. Do you remember
15  that testimony Your Honor? Just as important as getting the
16  motion filed quickly was getting it right. It's not even on
17  their radar screen until at least, if you want to take Mr.
18  Speltz testimony, the end of July when he gets caught up on the
19  McCloud state court action. It's not on the agenda. There's
20  nobody -- it's just not there.
21      Now, whether they thought bankruptcy court approval
22  wasn't needed, they just needed the DOH approval, we don't
23  know. But certainly it wasn't a matter of time. Between June
24  1 and August 1, the work could have been done on the facts,
25  even if the numbers are changing. And that sort of dovetails

40

1  back with Speltz and Weiss. I know Your Honor was making that
2  inquiry. We couldn't get a list of the people. Aren't they
3  billing every day? Are they not getting paid every payroll?
4  We couldn't get a list. We're working in full Chapter 11 mode
5  since the middle of March.
6      I'm going to come back to St. Mary's, no work
7  closure. That's not reasonable Judge, it's not reasonable.
8  Judge Beatty complains about it. She's upset that she doesn't
9  know about it. She's finding it out roundabout because of the
10  McCloud action.
11      Now the attention turns to the motion. The motion
12  gets filed the 18th. It's not reasonable, Judge, that the
13  bankruptcy court doesn't have a full record before it. It's
14  not reasonable that there were no declarations and no
15  affidavits filed in support. And I believe it's misleading, as
16  I put in my reply, to say that we filed a 111 page affidavit
17  to you when we now know that affidavit by the VP of
18  communications, was in connection with McCloud and basically
19  dealt with the closure plan just as the closure plan.
20      We know Judge Beatty had other questions about it.
21  We know she did. And believe me I've been practicing a long
22  time and I've had a lot of cases in front of Judge Beatty. I
23  understand what it is to get those kinds of calls or have those
24  kinds of communications where the Judge sees an issue and she
25  wants to help the case move along in the right way but it's no

# Exhibit X

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                      :
                                                            : Chapter 11
SAINT VINCENTS CATHOLIC MEDICAL                             : Case No. 05-14945 (ASH)
CENTERS OF NEW YORK d/b/a SAINT VINCENT                     :
CATHOLIC MEDICAL CENTERS, et al.,                           : (Jointly Administered)
                                                            :
                          Debtors.                          :
                                                            :
-------------------------------------------------------------x

**POST-TRIAL STATEMENT OF ECONOMIC CONSEQUENCES TO
DEBTORS' ESTATES ARISING FROM McDERMOTT, WILL &
EMERY, LLP'S SERVICES AS DEBTORS' COUNSEL BETWEEN
JULY 5, 2005 AND SEPTEMBER 30, 2005 SUBMITTED BY THE
UNITED STATES TRUSTEE, SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL
CENTERS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

The Acting United States Trustee for Region 2 (the "United States Trustee"), Saint Vincents Catholic Medical Centers of New York d/b/a/ Saint Vincent Catholic Medical Centers, *et al.* (the "Debtors"), and the Official Committee of Unsecured Creditors (the "Committee") (collectively, the "Objectors") respectfully submit this statement of economic consequences to the Debtors' estates arising from McDermott Will & Emery, LLP's ("McDermott") mishandling of (1) the St. Mary's Hospital closure and (2) motions to retain, post-petition, Speltz & Weis, LLC ("SWLLC") and Huron Consulting Services, LLC ("Huron").

**CLOSURE OF ST. MARY'S HOSPITAL**

1.      The economic harm associated with McDermott's delay in seeking and obtaining Bankruptcy Court approval to close St. Mary's Hospital is approximately $1,790,000. This represents the sum of (a) the losses associated with operating St. Mary's Hospital for 20 days beyond when the hospital should reasonably have been expected to close but for McDermott's failure (see

paragraphs 2-3 below) and (b) the legal fees incurred by the Debtors to win Bankruptcy Court approval of the closure of St. Mary's Hospital after the termination of McDermott (see paragraph 4 below).

2.      On June 1, 2005, the Board of Directors instructed McDermott to work with management to close St. Mary's Hospital as soon as possible. See Joint Pretrial Statement Regarding McDermott Will & Emery LLP Fee Application, Undisputed and Admissible Facts ("Undisputed Facts") ¶ 107. As of June 17, 2005, McDermott knew that the Debtors had set September 1, 2005 as the target for closure of St. Mary's Hospital. See Undisputed Facts ¶ 115. McDermott failed to obtain Bankruptcy Court approval by August 31, 2005 (when the Department of Health approved the closure), and Weil, as successor counsel, obtained authorization to close St. Mary's Hospital on September 20, 2005, one week after assuming its duties as Debtors' counsel. McDermott's mishandling of the St. Mary's Hospital closure motion thus resulted in a delay of 20 days.

3.      As of September 2005, St. Mary's Hospital was losing approximately $78,000 per day.[1] The losses associated with the 20-day delay in obtaining Bankruptcy Court approval are approximately $1,560,000.

4.      After terminating McDermott on September 13, 2005, the Debtors incurred approximately $230,000 in legal fees to obtain Bankruptcy Court approval to close St. Mary's Hospital on September 20, 2005. See Select Time Records of Weil, Gotshal & Manges, LLP for the Period Beginning September 13, 2005 Through October 31, 2006 (Exh. 103).

---
[1]  In the Motion to Close, McDermott represented to the Court that St. Mary's Hospital's daily losses were over $100,000. See Debtors' Motion to Close St. Mary's Hospital (Exh. 61), p. 18, ¶ 47. After the close of evidence at trial, the Court observed that St. Mary's was losing about $50,000 per day. 10/25/06 Tr. at 41:23-42:2. Based upon the average monthly losses incurred between July 5 and September 30, 2005, the cash burn at the hospital was approximately $78,000, or midway between what McDermott represented to the Court in its closure motion and what the Court calculated based on the trial testimony. If the Court requests, the Debtors will submit an affidavit attesting to the $78,000 daily loss.

2

**SPELTZ & WEIS/HURON RETENTIONS**

5.      The objectively measurable costs to the estates associated with McDermott's mishandling of the motions to approve the SWLLC management agreement and retain Huron total no less than $423,000. These costs include (a) the costs incurred by the Debtors and the Committee in connection with the collaborative effort to identify and obtain Bankruptcy Court approval for the retention of interim Chief Restructuring and Chief Financial Officers (see paragraphs 6-10 below), (b) McDermott's fees incurred in connection with the "radio silence instruction" (see paragraph 8 below) and (c) the costs incurred by the Debtors in transitioning from McDermott to Weil (see paragraphs 11-12 below). In addition to these readily quantifiable costs, an additional reduction in the fees to be awarded McDermott is appropriate to compensate the Debtors' estates for the "poisoned well" atmosphere that resulted from McDermott's misguided efforts to push through these retentions (see paragraphs 13-14 below).

6.      McDermott was aware that the Debtors required the continued employment of certain SWLLC/Huron employees entrenched in critical management and financial positions, but that they were prepared to transition from Mr. Speltz as CEO and Mr. Weis as CFO to new management. See 10/23/06 Tr. at 220:2-6. Rather than focus their efforts to negotiate an agreement among the Debtors, the United States Trustee and the Committee that would have allowed the Debtors to continue to employ SWLLC/Huron employees during a transition to new management, McDermott demonstrated a "relentless and unyielding persistence ... in seeking to avoid the consequences of the Speltz and Weis self-created conflicts and the attempts to really not deal with but to, in essence, evade the fundamental policies underlying the Jay Alix protocol." See 10/25/06 Tr. at 49:19-24. McDermott also advised the Debtors that they would not be able to retain a Chief Restructuring Officer. This advice was clearly wrong. See 10/24/06 Tr. at 108:18-109:16.

7.      McDermott's mishandling of the SWLLC and Huron retention motions and subsequent discussions with the United States Trustee and Committee resulted in a breakdown of the relationship between Debtors, on one hand, and the United States Trustee and Committee, on the other hand. See St. Clair Aff. ¶¶ 13-14; see also Martini Dep. Tr. at 29:22-30:2; 57:12-16; 75:12-16; 123:4-124:2. The Court observed that McDermott's failure to disclose any of the relevant facts in the initial retention applications and the failure to produce the relevant documents to the United States Trustee until after July 21, 2005, "[c]ombined with the radio silence instruction which, in the context of a bankruptcy, is just simply something that you can not do and preserve any credibility with the constituents that you are dealing with and whom you have shut out of the information booth," completely and obviously undermined trust and confidence. 10/25/06 Tr. at 49:7-18.

8.      In connection with McDermott's handling of the SWLLC/Huron retentions, the Debtors incurred legal fees for McDermott's services that not only brought no benefit to the Debtors but actually harmed them by damaging the relationship between the Debtors and the United States Trustee, the Committee and the Court. For example, McDermott incurred fees of approximately $50,874 in connection with the "investigation" it conducted in connection with the radio silence instruction. Undisputed Facts ¶ 271.

9.      As a result of McDermott's mishandling of the SWLLC/Huron motions and subsequent negotiations with the United States Trustee and Committee, the Debtors were required to include the United States Trustee and the Committee as integral participants in the search for and selection of interim Chief Restructuring and Chief Financial Officers. Although debtors commonly consult with the United States Trustee and creditors when selecting post-petition management, in this case counsel for the Committee, Committee members and representatives of the United States Trustee had no choice but to insist upon a much higher level of involvement, working side-by-side

4

3

with the Debtors' Board of Directors to negotiate the CRO proposal and then identify candidates, interview them and select the individuals who now serve as CRO and CFO. Had McDermott not mishandled the retention motions and negotiations, the process to select these officers would have been significantly less cumbersome and less expensive.

10.    On behalf of the Debtors, Weil incurred fees of approximately $240,000 in connection with the CRO/CFO selection process and the application to obtain Court approval. See Exh. 103. Counsel to the Committee incurred fees of approximately $63,000 in connection with the CRO proposal and CRO/CFO selection process. See First Interim Application of Thelen Reid & Priest LLP for Allowance of Fees and Reimbursement of Expenses as Counsel for the Official Committee of Unsecured Creditors for the Period July 18, 2005 Through October 31, 2005 (Exh. 130).[2]

11.    McDermott's mishandling of the SWLLC/Huron motions and subsequent negotiations with the United States Trustee and Committee ultimately left the Debtors with no choice but to terminate McDermott and retain Weil. See Boyle Aff. ¶ 12. After McDermott was fired, Weil took a more collaborative approach and was able to successfully negotiate the United States Trustee's and Committee's consents to the continued employment of certain SWLLC/Huron employees by the Debtors among the Debtors, the UST and the Committee.

12.    The Debtors incurred legal fees of approximately $120,000 in connection with the transition of counsel from McDermott to Weil. See Exh. 103.

13.    The economic consequences to the Debtors' estates are only partially quantifiable by reference to the objective criteria discussed in paragraphs 5 – 12, above. As the evidence at trial has shown, the Debtors' estates also suffered grievous – albeit not readily quantifiable – harm in

_____

[2]    Exhibit 130 was not offered or admitted into evidence at trial, but is filed in the case. See ECF doc. # 778.

5

connection with the loss of confidence and trust by the Court, the Committee and the United States Trustee caused by McDermott's representation of the Debtors. The "poisoned well" atmosphere that started on July 5, 2005 with the inadequate, incomplete and thoroughly deficient motion to approve the SWLLC management agreement so completely permeated McDermott's 10-week tenure that Mr. Smith was forced to concede at trial that, had McDermott not been fired, it would have resigned, because its effectiveness and ability to help its client was at an end. See 10/23/06 Tr. at 203:20-204:2.

14.    Although all of the harm that resulted from the "poisoned well" might not be readily quantifiable, the Court still has discretion to reduce the fees to be awarded to McDermott by an amount that fairly compensates the estates for the harm that resulted from the loss of confidence and breakdown in communication. See, e.g., In re C.F. Holding Corp., 164 B.R. 799, 808 (Bankr. D. Conn. 1994). In C.F. Holding, the Court determined that the failure of the financial advisor's law firm to disclose the financial advisor's conflict of interest warranted a $250,000 reduction in the fees to be awarded the law firm.[3] Id. Accordingly, in addition to reducing McDermott's fee award to reflect the economic harm that can be objectively measured (as set forth above), the Court should, in its discretion, further reduce the award by an amount that fully and fairly compensates the Debtors' estates for the consequences of McDermott's conduct. See also In re Angelika Films 57th, Inc., 227 B.R. 29, 40 (Bankr. S.D.N.Y. 1998), aff'd, 246 B.R. 176 (S.D.N.Y. 2000) (denying debtor's counsel's application for fees and expenses in its entirety where counsel improperly prioritized the interests of an insider (the debtor's principal) over those of the debtor); In re Granite Partners L.P., 219 B.R. 22, 46 (Bankr. S.D.N.Y. 1998) (sanctioning chapter 11 trustee $50,000 for failing to disclose to

_____

[3]    The C.F. Holding court took into account "the newness of the [disclosure duty] issue" in setting the reduction in fees at $250,000. Id. With the publication of the court's decision in C.F. Holding, the issue of outside counsel's duty to make full and adequate disclosure of another professional's conflict can no longer be considered new.

6

the court the lack of disinterestedness of a law firm selected by the trustee to perform investigation on debtors' behalf and reducing award of fees and expenses to the law firm by over $2 million).

Dated:    New York, New York
          November 10, 2006

DIANA G. ADAMS, ACTING UNITED
STATES TRUSTEE FOR REGION 2

By: _____
    Tracy Hope Davis (THD 8154)
    Alicia M. Leonhard (AML 6660)
    33 Whitehall Street, 21st Floor
    New York, New York 10004
    (212) 510-0500

TOGUT SEGAL & SEGAL LLP
Attorneys for the Debtors

By: _____
    Frank A. Oswald (FAO 1223)
    Howard P. Magaliff (HPM 2189)
    One Penn Plaza
    New York, New York 10119
    (212) 594-5000

ALSTON & BIRD LLP
Attorneys for the Creditors' Committee

By: _____
    Martin G. Bunin (MB 1602)
    Michael E. Johnson (MJ 0299)
    90 Park Ave.
    New York, New York 10016
    (212) 210-9400

7

# Exhibit Y

UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                              Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT VINCENT              Case No. 05 B 14945 (ASH)
CATHOLIC MEDICAL CENTERS, *et al.*,                 (Jointly Administered)

                        Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**SCHULTE ROTH & ZABEL LLP**
**Attorneys for McDermott Will & Emery LLP**
**By: Michael L. Cook, Esq.**
**        David M. Hillman, Esq.**
**919 Third Avenue**
**New York, NY 10022**

**McDERMOTT WILL & EMERY LLP**
**By:   William P. Smith**
**227 West Monroe Street**
**Chicago, IL 60606**

**McDERMOTT WILL & EMERY LLP**
**By: Stephen B. Selbst, Esq.**
**        James M. Sullivan, Esq.**
**340 Madison Avenue**
**New York, NY 10017-4613**

**TOGUT, SEGAL & SEGAL LLP**
**Conflicts Counsel for the Debtors**
**and Debtors in Possession**
**By: Frank A. Oswald, Esq.**
**        Howard P. Magaliff, Esq.**
**One Penn Plaza, Suite 3335**
**New York, NY 10119**

**ALSTON & BIRD LLP**
**Attorneys for the Creditors' Committee**
**By: Martin G. Bunin, Esq.**
**        Michael E. Johnson, Esq.**
**90 Park Avenue**
**New York, NY 10016**

**DIANA G. ADAMS**
**United States Trustee for Region 2**
**By: Tracy Hope Davis, Esq.**
**        Alicia M. Leonhard, Esq.**
**33 Whitehall Street, 21st Floor**
**New York, NY 10004**

---

ADLAI S. HARDIN, JR.
UNITED STATES BANKRUPTCY JUDGE

### DECISION ON OBJECTIONS
### TO APPLICATION FOR FEES AND EXPENSES

Before the Court is the application for legal fees of $2,227,779 and expenses of $104,314 of the law firm of McDermott Will & Emery ("McDermott"). The legal fees and expenses cover the period from July 5, 2005 (the "Petition Date") through September 13, 2005, during which McDermott served as the debtors' bankruptcy counsel.[1]  Objections to the application were filed by the Office of the United States Trustee, the Official Committee of Unsecured Creditors and the debtors.

The Court conducted a trial of the objections, and the parties exchanged post-trial briefs, replies and supplemental submissions as requested by the Court. The following constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

#### Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of referral to bankruptcy judges dated July 10, 1984, signed by Acting Chief Judge Robert J. Ward. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

#### Background

The Court's findings of fact are based on the parties' joint statement of "Undisputed and Admissible Facts,"[2] the documentary exhibits admitted in evidence including deposition transcripts, transcripts of Court proceedings, and the testimony of the witnesses.  I have included in this Background section only those facts necessary to understand the two objections which I have sustained to the extent set forth in this Decision.

---

[1]    Effective September 13, 2005, McDermott was discharged and replaced by Weil Gotshal & Manges as debtors' counsel.

[2]    Quotations, unless otherwise attributed, are from the statement of "Undisputed and Admissible Facts."

---

#### The Debtors

The debtors, collectively referred to as Saint Vincent Catholic Medical Centers ("SVCMC"), own and operate a New York metropolitan area comprehensive health care system. SVCMC serves as the academic medical center of New York Medical College in New York City.  As of the Petition Date, SVCMC owned and operated seven hospitals: Saint Vincent's Hospital, Manhattan; Bayley Seton Hospital, Staten Island; Mary Immaculate Hospital, Queens; Saint John's Hospital, Queens; Saint Mary's Hospital, Brooklyn; Saint Vincent's Hospital, Staten Island; and Saint Vincent's Hospital, Westchester.  As of the Petition Date, SVCMC also operated numerous debtor and non-debtor affiliates, including four skilled nursing facilities, a hospice, a system-wide home health care agency, and more than sixty off-site ambulatory care centers, providing a broad array of medical, psychiatric and substance abuse services.

#### McDermott

McDermott is a large American law firm with more than 1,000 attorneys and offices in nine American cities and five foreign cities.  The Court authorized McDermott's retention in the bankruptcy case by final order dated August 8, 2005.  McDermott staffed the debtors' cases with attorneys from its Chicago, New York, Washington, DC and Los Angeles offices.  William P. Smith ("Smith"), a partner in McDermott's Chicago office, was the partner in charge of the debtors' bankruptcy cases.

#### The Speltz & Weis, Huron and McDermott pre-petition retentions by SVCMC

On April 13, 2004 SVCMC engaged Speltz & Weis LLC ("SW") to provide management advisory services to SVCMC pursuant to the terms of a management agreement (the "Management Agreement") for a period of one year.  On May 5, 2005, the SVCMC Board of Directors (the "Board") voted to renew the Management Agreement through October 31, 2005.

David Speltz ("Speltz") and Timothy Weis ("Weis"), principals of SW, were the senior SW personnel acting under the Management Agreement with SVCMC.  On September 17, 2004, the

---

Board appointed Speltz and Weis as the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, of SVCMC.  They served in these capacities until August 24, 2005.

In September 2004, the same month in which the Board appointed Speltz and Weis as CEO and CFO, respectively, the Board retained McDermott to provide SVCMC with advice regarding a possible debt restructuring.  The Board retained McDermott upon the advice and recommendation of Speltz.  On September 22, 2004 McDermott presented to the Board various restructuring alternatives, including Chapter 11 protection.

The following month, on October 4, 2004, the Board authorized the retention of Huron Consulting Services LLC ("Huron") as financial advisors to SVCMC upon the advice and recommendation of McDermott, specifically Smith.

Weis and McDermott were responsible for supervising and directing Huron's work for and billings to SVCMC.

#### SW's undisclosed retention of Huron as subcontractor

In addition to Huron's disclosed engagement by SVCMC as financial advisor concerning insolvency issues, Huron was also engaged in late 2004 as a subcontractor to SW in connection with management reporting and claims denials.  Huron's subcontractor relationship with SW was not disclosed to SVCMC's Board.  As set forth in the Crowley report, discussed below:

> Huron suggested [to SW] that SVCMC needed improvements in the areas of management reporting and claims denials.  SWLLC then engaged Huron as a subcontractor to it and sought and obtained from the Chairman [of SVCMC's Board] authorization to add individuals to its management services team to perform such services but did not disclose that such individuals were Huron employees or that Huron — which at that point was already a significant vendor to SVCMC — had become a subcontractor to SWLLC with respect to these services.

#### The secret SW/Huron Group acquisition negotiations

Prior to January 2005, the chairman of Huron Consulting Group, Inc. ("Huron Group"), the parent of Huron, approached Speltz to discuss a potential business combination between SW and Huron Group.  As a condition of negotiations with Huron Group, Messrs. Speltz and Weis entered into a

confidentiality agreement with Huron in January 2005 which prohibited them from disclosing their

discussions with Huron Group.

Despite this confidentiality agreement, Smith first learned no later than February 2005

that Speltz and Weis might sell SW and were in discussions with a number of potential purchasers,

including Huron.  Smith did not disclose the existence of the negotiations between Speltz and Weis and

the Huron Group to his client, the Board of SVCMC.

SW and Huron Group entered into a term sheet for the sale of SW to Huron Group in

April 2005. Smith learned from Messrs. Speltz and Weis in an April 26, 2005 telephone conversation

that the negotiations regarding Huron Group's potential acquisition of SW were "becoming 'serious.'"

Once again, Smith did not disclose the fact of the negotiations to the SVCMC Board.

The parties have stipulated that "[a]fter learning that discussions of a Huron acquisition

of SW were becoming more serious, Smith commissioned a research memorandum from McDermott attorneys

regarding the issues that could arise from such an acquisition in the event of a SVCMC bankruptcy

filing." But it would appear that Smith must have given consideration to the "issues that could arise"

before April 26, because in the April 26 telephone conversation Weis, Speltz and Smith discussed

whether Huron's potential acquisition of SW would have any implications in the event SVCMC filed for

bankruptcy and sought to retain SW and Huron on a post-petition basis. On April 26 Smith advised

Speltz and Weis "that the issues were disinterestedness, the Jay Alix Protocol and conflicts."[3]

---

[3]      The Jay Alix Protocol is the name given to an agreement between the United States Trustee for the District of Delaware and Jay Alix & Associates in the <i>Safety-Kleen Corp.</i> bankruptcy case which concerns the role of financial advisors acting as both financial advisors and crisis managers in the same case.  The Protocol recognizes that there is an inherent conflict between an advisor's duty to a debtor and its own business interests where the advisory firm serves as both a financial advisor retained under Section 327 of the Bankruptcy Code and as a crisis manager and where the advisory firm's staff serve as officers of the debtor corporation.  The Jay Alix Protocol precludes an advisory firm from acting in both capacities in a single bankruptcy case because of this conflict.  The Jay Alix Protocol is applicable in the Southern District of New York, and as noted in the text, Smith advised Speltz and Weis in the April 26 telephone conversation that the Jay Alix Protocol would be an issue in any applications to retain both SW and Huron in the bankruptcy case.

- 5 -

Elizabeth St. Clair ("St. Clair") was SVCMC's Chief Legal Officer.  In mid-April St.

Clair approached Speltz to discuss a rumor that SW was to be acquired by Huron Group.  Speltz falsely

denied the rumor and did not disclose the ongoing negotiations between SW and Huron.

On May 5, 2005, the Huron Group, SW, Speltz and Weis entered into an agreement for

Huron Group to acquire SW (the "Acquisition Agreement").  The acquisition of SW by Huron Group

closed on May 9, 2005, and Speltz and Weis personally entered into employment contracts with Huron.

Prior to May 6, 2005, neither Speltz nor Weis had disclosed to the SVCMC Board their

discussions with Huron Group.  Neither Smith nor anyone else at McDermott disclosed the existence of

the SW/Huron negotiations before May 6, 2005.  Speltz finally disclosed Huron's acquisition of SW to

Richard Boyle ("Boyle"), Chairman of the SVCMC Board, on or shortly after May 6, 2005, and Speltz

disclosed the acquisition to St. Clair one or two days later.

Upon learning of Huron Group's acquisition of SW, and on the initiative St. Clair, the

Board retained as special counsel Leo Crowley ("Crowley") of Pillsbury Winthrop Shaw Pittman LLP to

investigate the Huron Group's acquisition of SW.  Crowley had been with Pillsbury Winthrop Shaw

Pittman LLP for twenty-six years and was the leader of the firm's insolvency and restructuring practice.

Crowley was advised by St. Clair and other members of the Executive Committee to treat the

investigation as a confidential matter, which would be subject to "attorney-client privilege."

On July 6, 2005 Crowley sent a draft report dated June 29, 2005 to SVCMC's Board

Chairman Richard Boyle and Edward Lahey, another member of the Board.  Crowley's final report,

labeled "**DRAFT**," was dated and delivered to the SVCMC Board Chairman on July 18, 2005.  The

discussion below is based on the July 18 report.

**Breaches of fiduciary duty and conflicts arising from the SW/Huron acquisition**

Under the Acquisition Agreement SW was not merged or dissolved.  It continued to exist

as a subsidiary of Huron Group.  Speltz and Weis, as former principals and owners of SW, received two

types of compensation or "earn-outs."  One was based on the post-acquisition revenues of SW.  The other

earn-out provision (the "percentage of SVCMC earnings" provision) was based on revenues derived by

- 6 -

Huron from SW clients, specifically SVCMC.  Under this percentage of SVCMC earnings provision,

Speltz and Weis would personally receive payments from Huron based on a percentage of what SVCMC

would pay to Huron for the insolvency services for which Huron had been previously engaged and which

Speltz and Weis were responsible for supervising and controlling on behalf of SVCMC.  As a conse-

quence of the acquisition, Speltz and Weis became employees of Huron under written employment

contracts.

The negotiations between Speltz and Weis and Huron Group and the contractual relation-

ships resulting from Huron Group's acquisition of SW gave rise to serious breaches of the Management

Agreement between SW and SVCMC, breaches of fiduciary duty and conflicts of interest on the part of

Speltz and Weis.  These breaches and conflicts are self-evident, but they are aptly summarized in the

Crowley report, from which I shall quote:

> [T]he present arrangement [referring to the SW/Huron Group Acquisition Agreement and
> the Speltz and Weis employment contracts], and the manner in which it was entered into,
> breached several aspects of the management agreement between SWLLC and SVCMC.
> . . .
>
> 1.  By signing the confidentiality agreements with Huron in January 2005,
>     their outside activities in negotiating with Huron interfered with the
>     performance of their duties [to] SVCMC because Speltz and Weis
>     undertook contractual obligations to Huron that were inconsistent with
>     their duty of disclosure to SVCMC.  . . .
>
> 2.  Speltz's and Weis' duties to SVCMC include supervising the work of
>     Huron as SVCMC's [sic] financial advisor, a matter of importance to
>     SVCMC.  They have effectively rendered themselves unable to fulfill
>     that responsibility because they (now being both SVCMC officers and
>     Huron employees) are conflicted from doing so.  The complex
>     arrangements among SWLLC, Speltz and Weis personally and Huron
>     have injected complications into the ability of SVCMC to engage Huron
>     as an estate professional under section 327 of the Bankruptcy Code.  At a
>     minimum all of these matters would have to be disclosed to the US
>     Trustee, and to the bankruptcy court in a public filing, and subject to
>     challenge and criticism by creditors and others.  . . .
>
> 3.  SWLLC's responsibilities under the management agreement cannot be
>     assigned or delegated, without the prior approval of the SVCMC board
>     (see clause 11j of the management agreement).  However, because
>     Speltz and Weis and apparently Fanning are no longer employees of
>     SWLLC but instead are employees of Huron, they have in effect
>     delegated responsibility to Huron without the Board's permission.  . . .

- 7 -

Regarding conflicts of interest, the Crowley report states:

> SVCMC's conflict of interest policy requires that "covered persons" (which includes
> Speltz and Weis because they are officers) must fully disclose any "potential or actual
> conflict of interest," and "must refrain from participating in any consideration of any
> transaction with a vendor until the matter has been reviewed and resolved."

This provision of the conflict of interest policy was obviously violated.  The Crowley report notes that

Huron was a major vendor of SVCMC as its financial advisor on insolvency matters, that Speltz and Weis

negotiated with Huron from January 2005 through the date of their written agreement on May 6, 2005,

and that "Speltz and Weis did not disclose their proposed transaction with Huron until Friday, May 6[th]."

The report notes: "[a]lso during the first part of 2005, SWLLC engaged Huron as a subcontractor to

perform services under the umbrella of the existing SWLLC management agreement," and that Speltz and

Weis "did not disclose . . . that Huron . . . had become a subcontractor to SWLLC. . . ."[4] The report notes

also that "there is no exception in the conflict of interest policy that permitted Speltz & Weis to

voluntarily place themselves in a position where they apparently had conflicting contractual obligations to

Huron and conflicting fiduciary obligations to SVCMC."  The Crowley report concludes as follows:

> 1.  They [Speltz and Weis] failed to disclose the potential conflict of interest created
>     by their discussions with Huron.  Because Huron was a significant and important
>     vendor to SVCMC which they were personally responsible for supervising and
>     because of the size of their personal financial interests, this failure was serious.
>     . . .  Huron, which was a relative newcomer to SVCMC having been engaged
>     only in the fall of 2004, was seemingly locking in its position by procuring the
>     favor of SVCMC's CEO and CFO. . . .
>
> 2.  They subcontracted Huron to SWLLC at a time when Huron was already a
>     vendor and presumably marked up Huron's rates (SWLLC bought services from
>     Huron wholesale and resold them at a higher price to SVCMC). . . . [T]he
>     conflict of interest policy prohibited Speltz and Weis from having an undisclosed
>     interest in a vendor as to which they were in a position to influence any
>     substantive business decision between SVCMC and the vendor.  An "interest" for
>     this purpose includes a contractual relationship, and Speltz and Weis had
>     management responsibility for Huron's work for SVCMC, and were responsible
>     for reviewing and approving Huron's bills.

---

[4]      The secret subcontractor relationship under which SW utilized Huron employees to perform services for SVCMC and charged SVCMC a mark-up on the Huron employees' costs was a particularly repugnant breach of fiduciary duty on the part of Speltz and Weis.  Board Chairman Richard Boyle testified that, upon discovery of this subcontractor relationship, the Board required SW to reimburse SVCMC $183,000 on account of the mark-up.  (Tr. Oct. 24, 2006 p. 93)

- 8 -

3.  They entered into a contract with an "earn-out" that pays them a percentage of what SVCMC pays Huron. While the preexisting management agreement gave SWLLC some financial interest in services rendered by their personnel, the Huron insolvency engagement is one that is not within SWLLC's line of business. Moreover, since Huron was willing to in effect cede to Speltz and Weis a portion of the revenues from its engagement with SVCMC, circumstances have the appearance of Speltz and Weis negotiating a discount from Huron for services rendered to SVCMC, and then appropriating for themselves the value of that discount. . . . .

Finally, the Crowley report noted that Speltz and Weis violated their fiduciary duty under New York law.

As officers of a New York not for profit corporation Speltz and Weis individually had inherent fiduciary duties to SVCMC, which included, among other things, complying with the conflict of interest policy, and not acquiring interests adverse to the interests of SVCMC unless such interests had been approved by the board after disclosure of all relevant facts.

**Bankruptcy retention of SW and Huron**

One of the two critical issues in these fee objections concerns McDermott's handling of SVCMC's prolonged, divisive and ultimately futile attempt to seek Bankruptcy Court approval of the proposed professional retentions of SW and Huron. The process commenced with the filing of retention applications with the "first day orders" on July 5, 2005, the petition date, and was marked by ever-increasing contention, animosity, and most devastating in a Chapter 11 case, lack of trust between the debtors and their counsel, McDermott, and the Creditors' Committee and the United States Trustee's office. The process culminated disastrously with the forced resignations of Speltz and Weis as CEO and CFO of SVCMC on August 24, 2005 and, three weeks later, the termination of McDermott as debtors' counsel on September 13, 2005.

SW and Huron each wanted to be approved for retention by the Bankruptcy Court for public relations purposes. McDermott determined initially to seek Court approval of the SW Management Agreement under Bankruptcy Code 363 and of Huron's retention under Section 327. McDermott reported to Speltz and Weiss, who were obviously conflicted, issues concerning approval of the SW Management Agreement and the retention of Huron and possible alternative strategies. But McDermott apparently did not report these issues adequately to the SVCMC Board. Smith was aware that Crowley

- 9 -

was investigating the propriety of the Huron Group acquisition of SW (Smith was interviewed by Crowley on June 23, 2005). McDermott attorneys responsible for the SVCMC bankruptcy case had studied the Acquisition Agreement and the Speltz and Weis employment contracts with Huron and were therefore aware of the multiple conflicts and breaches of fiduciary duty on the part of Speltz and Weis. Smith instructed another McDermott attorney to include disclosures about the Huron Group's acquisition of SW, the Speltz and Weis employment contracts and the earn-out arrangements between SW and the Huron Group in the retention motions to be filed with the Court.

In fact, McDermott never made full and candid disclosure respecting the Huron acquisition of SW and the consequent conflicts and breaches of fiduciary duty by Speltz and Weis.

On July 5, 2005 McDermott filed separate motions (the "July 5 Motions") to retain Huron under Section 327 of the Bankruptcy Code and to approve the SW Management Agreement under Section 363 of the Code. McDermott was responsible for determining the disclosure to be made in the July 5 Motions and thereafter. Although the Motions did disclose the bare fact of the Huron Group acquisition of SW, the July 5 Motions did not disclose any details of the acquisition, the Speltz and Weis Employment Agreements or the earn-out provisions. Nor was there any disclosure of the conflicts or breaches of fiduciary duty resulting from the acquisition and related agreements or their implications for the Huron and SW retentions, which were the object of the July 5 Motions. Indeed, the July 5 Motions represented that SW was a "materially disinterested person," despite the fact that Speltz and Weis were grossly conflicted as a consequence of the Huron Group acquisition of SW and the percentage of SVCMC earnings provision.

Smith acknowledged in testimony that the July 5 Motions were careless, incomplete and inappropriate. Both Motions were withdrawn shortly after July 5.

On July 13, 2005 McDermott filed an amended motion to approve the SW Management Agreement. The disclosures in the July 13 motion were also woefully deficient, and two days later McDermott filed a notice of adjournment without date of the July 13 motion. Between July 5 and August 24, 2005, McDermott circulated numerous drafts of the retention motions for SW and Huron

- 10 -

among parties including the U.S. Trustee's office, the Creditors' Committee, the debtors' senior management, Huron's counsel, SW's counsel and Crowley (although Crowley had no responsibility with respect to the retentions of Huron and SW or any other bankruptcy matters, which were solely the responsibility of McDermott).

It is unnecessary to this ruling to present a detailed recapitulation of the evidence concerning the increasingly contentious intercourse among the parties between July 5 and August 24 when the Board finally called for the resignations of Speltz and Weis. Suffice it to say that, as the weeks passed after the soon-aborted July 5 Motions and the adjourned-without-date July 13 motion, McDermott continued to press for the SW and Huron retentions despite the increasing resistance of both the Creditors' Committee and the U.S. Trustee. As the parties have stipulated:

Smith understood, based on a July 21, 2005 conversation with Martin Bunin, acting as counsel to the Committee, that the Committee objected to the Debtors' attempt to approve the Management Agreement or retain Huron but gave no reasons for the Committee's opposition other than "Speltz & Weis were really bad guys and they had to go;" they were "paid a lot of money"; and "their turnaround plan didn't work." Smith understood, based on Bunin's comments, that "there were no circumstances under which [the Committee] would agree to the retention of Speltz & Weis."

Nevertheless, McDermott continued to press for Court approval of the SW Management Agreement and Section 327 retention of Huron, until August 1. The parties have stipulated that "McDermott withdrew the Huron application on August 1, 2005;" but problems with the SW approval continued and "on August 12, 2005 the UST informed McDermott by letter that UST's 'concerns have not been resolved by the amendments to' the July 28 draft motion to approve the [SW] Management Agreement."

By early August the Creditors' Committee and the U.S. Trustee had grave doubts about the competence and efficacy of Speltz and Weis as the senior management of SVCMC. Both the Committee and the Trustee had lost confidence in Speltz and Weis. McDermott, the U.S. Trustee and the Creditors' Committee counsel met on August 19, 2005. At the August 19 meeting, the U.S. Trustee stated that she would not consent to SW's retention, and the U.S. Trustee and the Committee proposed the appointment of a "Chief Restructuring Officer" ("CRO").

- 11 -

The U.S. Trustee's CRO proposal obviously had very serious implications for SVCMC and its management. Responding to this impetus, the debtors' Executive Committee of the Board convened a "special" meeting on August 24, 2005 to discuss the August 19 meeting and its implications. At the August 24 meeting Smith relayed to the Executive Committee the concerns articulated by the Creditors' Committee and the U.S. Trustee regarding Speltz and Weis. After thorough and comprehensive discussion at the August 24 meeting, it was decided that the Executive Committee would ask Speltz and Weis to resign from their positions as CEO and CFO, respectively, and the Executive Committee appointed Richard Boyle as interim President and CEO and Thomas Allison as interim CFO of SVCMC.

**The closure of St. Mary's Hospital**

The other objection to McDermott's fee application which I have found meritorious relates to the firm's handling of the closure of St. Mary's Hospital. Closure of this Hospital was from the beginning a high priority for the debtors and the Hospital was costing SVCMC an average loss which the debtors put at $78,000 a day.[5] The background facts relating to this objection are concisely summarized in the parties' agreed statement of Undisputed and Admissible Facts, as follows:

D.   CLOSURE OF SAINT MARY'S HOSPITAL

105. On June 1, 2005, prior to the Petition Date, the Debtors' Board of Directors (the "Board") resolved to close St. Mary's Hospital.

106. Smith attended the June 1, 2005 Board meeting.

107. On June 1, 2005, the Board instructed management and counsel, including McDermott, to take the necessary and appropriate action for the closure of St. Mary's Hospital.

108. McDermott knew that the Debtors wanted to close St. Mary's as promptly as applicable regulatory approvals could be obtained.

109. The closure of St. Mary's was subject to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

---

[5]  *See* objecting parties' Post-Trial Statement of Economic Consequences page 2 at footnote 1. In its August 18 motion seeking Bankruptcy Court approval to close St. Mary's Hospital, McDermott referred in paragraph 47 to "[t]he continued expense of more than $100,000 per day to fund the losses of St. Mary's Hospital operations. . . ." In the Debtors' Omnibus Response to Objections to the SVCMC motion to close St. Mary's Hospital dated September 2, 2005, McDermott asserted that "St. Mary's Hospital is currently losing more than $500,000 per week," which would average approximately $71,428 per day.

- 12 -

110. McDermott was primarily responsible for obtaining Court approval of the closure of St. Mary's, while the Debtors' internal management, including Bernadette Kingham-Bez and Elizabeth St. Clair, Esq., was primarily responsible for the steps required to obtain canonical and regulatory approval of the closure.

111. In late June 2005, prior to the Petition Date, the Debtors had already obtained canonical authority to close St. Mary's.

112. The Debtors' management, not McDermott, had primary responsibility for obtaining DoH [New York Department of Health] approval to close St. Mary's Hospital.

113. In June 2005, prior to the Petition Date, the Debtors made the application to the DoH to close St. Mary's Hospital.

114. McDermott did not review, and was not asked by SVCMC to review, the application to close St. Mary's that was made to the DoH prior to its filing.

115. At a June 17, 2005 meeting of the Executive Committee of the Board, the Executive Committee discussed the progress of the closure of St. Mary's Hospital setting as the target date for closure September 1, 2005.

116. Smith attended the June 17 meeting of the Executive Committee at which the Executive Committee set September 1, 2005, as the target date for the closure of St. Mary's Hospital.

117. In connection with St. Mary's Hospital closure, McDermott provided certain services, including: (i) representing the Debtors in state court litigation (the "State Court Litigation") regarding the approval by the New York Department of Health of the closure plan; (ii) commencing an action in the Debtors' chapter 11 cases seeking, among other things, a declaration that the plaintiff in the State Court Litigation had violated the automatic stay; (iii) preparing and filing a motion, dated August 18, 2005, seeking authority to close St. Mary's Hospital (the "St. Mary's Motion"); (iv) responding to objections filed in opposition to the St. Mary's Motion; (v) appearing at a hearing on August 23, 2005, on issues relating to the closure of St. Mary's Hospital; and (vii) [sic] appearing at a hearing on the St. Mary's Motion on September 7, 2005.

118. Certain members of the St. Mary's community and employees contested the closure.

119. McDermott caused a series of motions to be filed on behalf of Debtors on the Petition Date (the "First Day Motions").

120. McDermott did not file a motion seeking permission to close St. Mary's Hospital with the First Day Motions.

121. McDermott disclosed the Debtors' intention to close St. Mary's Hospital on the Petition Date in an affidavit (i.e., Weis's affidavit under Local Bankruptcy Rule 1007-1) filed with the First Day Motions and in colloquy with the Court.

- 13 -

122. On July 22, 2005, the Debtors issued notices of the St. Mary's closure to employees under the WARN ACT.

123. Between the Petition Date and July 22, 2005, McDermott took no steps to seek Bankruptcy Court permission to close St. Mary's Hospital.

124. In the state court litigation, where the Debtors were not named as parties, Harriett [sic] McCloud, a former patient of St. Mary's Hospital, obtained an ex-parte temporary restraining order in Kings County Supreme Court on July 22, 2005, restraining the DoH from approving a closure plan for St. Mary's Hospital (the "State Court Litigation").

125. On July 29, 2005, McDermott filed a complaint with the Bankruptcy Court, seeking a preliminary and permanent injunction to enjoin Ms. McCloud from prosecuting the State Court Litigation.

126. On August 4, 2005, [McDermott attorney] Selbst appeared on behalf of the Debtors at a hearing in the Bankruptcy Court on the Debtors' application for a preliminary and permanent injunction.

127. After the August 4, 2005 hearing, Selbst and St. Clair both "felt that someone else had to handle the [August 5] hearing and neither of them wanted to go back into Court the next day."

128. McDermott first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier than August 5, 2005.

129. McDermott filed the St. Mary's Motion on August 18, 2005.

130. By August 18, 2005, the Debtors were close to obtaining, but had not obtained, DoH approval to close St. Mary's Hospital.

131. The DoH approved the closure of St. Mary's Hospital on August 31, 2005.

132. Objections to the closure of St. Mary's Hospital were filed by the following objectors: (I) Brooklyn Safety Net, LLC ("BSN") on August 30, 2005; (ii) Harriet M. McCloud on August 31, 2005; (iii) the Medical Staff (Physicians) Committee of St. Mary's, Mary Immaculate, and St. John's Hospitals on August 31, 2005; and (iv) the Bedford Stuyvesant Family Health Center, Inc. and Brownsville Multi Service Family Health Center on September 7, 2005.

133. BSN purported to be an entity formed by certain employees to purchase St. Mary's to avoid its closure.

134. The UST took no position with respect to the Debtors' efforts to close St. Mary's Hospital.

135. McDermott prepared and filed on September 2, 2005, the Debtors' omnibus reply to the objections to the St. Mary's Motion.

- 14 -

136. As part of the Debtors' reply, McDermott filed no affidavits or declarations in response to any of the objectors' objections.

137. The Committee filed a short response in support of McDermott's motion to close St. Mary's Hospital on September 2, 2005.

138. The Court held a hearing on the St. Mary's Motion on September 7, 2005.

139. Selbst represented the Debtors at the September 7 hearing.

140. McDermott offered no testimony from any witnesses at the September 7, 2005 hearing.

141. At the September 7, 2005 hearing, the Committee's counsel made statements supporting the closure of St. Mary's Hospital.

142. The Court did not grant the St. Mary's Closure Motion on September 7, 2005, and the hearing was adjourned.

143. On September 19, 2005, Weil, on behalf of the Debtors, filed the declarations of: Linda Brady, M.D., Kingsbrook HealthCare System LLC's president; Thomas M. Barry, Managing Director of Cain Brothers & Company, LLC (as supplemented on September 19, 2005); Dawn Gideon, the Debtors' then-Interim Chief Restructuring Officer; and Sister Jane Iannucelli, a member of the Board, in support of the St. Mary's Motion.

144. The Court resumed the hearing on the St. Mary's Motion on September 20, 2005.

145. Weil appeared on behalf of the Debtors at the September 20, 2005 hearing.

146. At the September 20, 2005 hearing, Weil presented testimony from Sister Jane Iannucelli, vice chairman of the Board.

147. The Court approved the closure of St. Mary's Hospital at the September 20, 2005 hearing.

**Termination of McDermott as debtors' counsel**

By the close of business on September 7, 2005, some progress had been made in the SVCMC reorganization proceedings. But two important objectives had not been accomplished, the Huron retention and closure of St. Mary's Hospital.

Professional retentions are generally presented to the Court as "first day orders" in major Chapter 11 cases. But after more than two months Huron had not been retained under Section 327 despite the fact that scores of its employees were devoting their full time to the debtors' affairs in essential

- 15 -

positions. As a quite predictable consequence of the Huron Group acquisition of SW and the insistence of Speltz and Weis that both Huron and SW be retained for public relations reasons, the Huron retention became intractably mired in the attempt, relentlessly pressed by the SVCMC management (i.e., Speltz and Weis) and McDermott, both to retain Huron and to approve the SW Management Agreement. This attempt was doomed from the outset because of the Huron Group/SW conflict prohibited by the Jay Alix Protocol, and the conflicts of interest and breaches of fiduciary duty on the part of Speltz and Weis. But the exercise in futility did not end until the SVCMC Board fired Speltz and Weis on August 24.

The closing of St. Mary's Hospital was critical triage to staunch the ongoing hemorrhage averaging $71,000 to $100,000 every day. Before the bankruptcy filing, the Board charged its professionals to accomplish this objective by September 1. All approvals necessary to achieve closing by September 1 had been obtained, except one — Court approval. Indeed, the Court did not have a sufficient record to approve the closing over the vociferous objections of various local groups at the hearing on September 7.

Both the Huron/SW retentions and Court authorization to close St. Mary's Hospital by the September 1 deadline set by the Board were the responsibility of McDermott. The disastrous outcome of the Huron/SW approval process undermined the debtors' and McDermott's credibility and relationship with the Creditors' Committee and the U.S. Trustee's office. The belated and unsuccessful proceedings relating to St. Mary's Hospital undermined the debtors' and McDermott's credibility with the Court as well as the debtors and the Creditors' Committee.

Following the September 7 hearing on St. Mary's, the Board made the decision to discharge McDermott and retain Weil, Gotshal & Manges as debtors' counsel. Boyle, then Chairman of the Board and Interim CEO of SVCMC, made the decision. Boyle made this statement in his trial declaration: "It became readily apparent to me that the restructuring of SVCMC was in a quagmire, and that the bankruptcy process could not go forward with MWE continuing as counsel to SVCMC, given the frayed relationships between MWE, on the one hand, and the U.S. Trustee and Committee, on the other. . . . [B]ecause the Board had lost confidence in MWE's ability to guide SVCMC through the bankruptcy

- 16 -

process, we needed to replace MWE as counsel to the Debtors." Boyle also gave this testimony as to the

reasons for the change in counsel:

it became increasingly obvious to me that the debtor and myself in this position was facing a significant credibility crisis with the [UST] and people on the [UST]'s staff, certain members of the creditors committee and certain of the creditors committee financial advisors and representatives. They were being increasingly demanding of the immediate appointment of a chief restructuring officer and demanding among other things the formation of a committee that would have been tantamount to the board giving up its responsibilities and threatening to appoint a receiver. It was clear to me as I went through these different deliberations that we could not replace the [UST], we certainly didn't have the power to replace the judge, there was no way we had any influence to replace the chair of the creditors committee or any of the advisors to the creditor [sic] committee. I thought long and hard over the weekend just prior to around the 10th of September, what we could do to remedy this quagmire we were in in terms of having all this lack of credibility. And I felt the only reasonable thing to do from a business point of view was to have a change in counsel.

Smith acknowledged in his testimony that if McDermott had not been terminated as

counsel the firm probably would have resigned because the firm's effectiveness was at an end. Smith

said: "It was apparent that the trustee and the committee were not willing to work with McDermott as

counsel at St. Vincent's."

Discussion

**I.      The Bankruptcy Code and retrospective review**

Compensation of professionals is covered in Section 330 of the Bankruptcy Code.

Section 330, as it existed prior to October 17, 2005, provided as follows, in pertinent part:

**11 USC § 330.   Compensation of officers**

(a) (1)    After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, or a professional person employed under section 327 or 1103 —

(A)   reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B)   reimbursement for actual, necessary expenses.

(2)    The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

- 17 -

(3)    In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including —

(A)   the time spent on such services;

(B)   the rates charged for such services;

(C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)   whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)    (A)    Except as provided in subparagraph (b), the court shall not allow compensation for —

(I)    unnecessary duplication of services; or

(ii)   services that were not —

(I)    reasonably likely to benefit the debtors' estate; or

(II)   necessary to the administration of the case.

This statute requires the Court to make a retrospective review of the services rendered by

counsel to determine whether the services were "necessary . . . or beneficial at the time at which the

service was rendered" and whether the services "were performed within a reasonable amount of time

commensurate with the complexity, importance, and nature of the problem, issue, or tax addressed". The

Court must determine long after the fact whether the services were or were not "reasonably likely to

benefit the debtor's estate" or "necessary to the administration of the case."

It is an inevitable fact of life that events and conduct are judged after the fact, with the

proverbial benefit of 20-20 hindsight. What may have been difficult for some to assess at the time may

appear self-evident to others in hindsight. But experienced counsel in major Chapter 11 cases are paid to

investigate the facts, to know the applicable principles of law, practice and ethics, to act timely to

accomplish their clients' objectives, and to guide their clients with a firm hand to the course of action

- 18 -

which is most beneficial to the debtor's estate. Counsel charge and are paid high compensation in the

fair expectation that their foresight and judgment will assess today's facts as the facts will be perceived

and judged tomorrow under the searching gaze of 20-20 hindsight. McDermott failed in this, at great cost

to the client.

**II.      Retention of Huron and SW**

It is not inappropriate to be reminded that McDermott was retained by SVCMC in

September 2004 on the recommendation of Speltz, and that Huron was retained by SVCMC in October

2004 on the recommendation of McDermott.

McDermott manifested an insensitivity to the interests of its client, SVCMC, and the

pitfalls inherent in the Huron Group/SW negotiations and acquisition from the outset. Smith learned no

later than February 2005 that Speltz and Weis were negotiating with Huron Group concerning a possible

acquisition. He learned in April 2005 that the negotiations with Huron Group were nearing finality.

Speltz and Weis, as the senior executives of SVCMC, were responsible for oversight of the activities of

and billings by Huron. The secret negotiations obviously gave rise to a clear and present conflict of

interest and a breach of fiduciary duty on the part of Messrs. Speltz and Weis. As counsel to SVCMC

and ultimately its Board of Directors (not Speltz and Weis), Smith should have disclosed his knowledge

of the Huron Group/SW negotiations to Boyle, as Chairman of the Board, and advised Boyle of the

potential issues which he advised the conflicted Messrs. Speltz and Weis, namely, "disinterestedness, the

Jay Alix Protocol and conflicts." Smith's reason for not disclosing his knowledge to the Board — that

Speltz told him he had already informed Boyle (denied by Speltz and concededly not true) — is no reason

at all. If Speltz, who is not a lawyer and was conflicted, had discussed the negotiations with Boyle, what

possible objection could there be to Smith's discussing the topic with Boyle in order to give Boyle legal

advice concerning the serious pitfalls from SVCMC's perspective.

As noted above, "SW and Huron each wanted to be approved for retention by the

Bankruptcy Court for public relation purposes," and this was the objective which the SVCMC senior

management (i.e., Messrs. Speltz and Weis) instructed McDermott to pursue. Competent counsel, acting

in the interests of the client, SVCMC, as distinguished from the interests of senior management Speltz

- 19 -

and Weis and their new employer Huron, should have recognized from the outset that the dual retention

of Huron under Section 327 and approval of the SW Management Agreement under Section 363 would

be a practical impossibility if full disclosure were made concerning all relevant terms of the Huron Group

acquisition of SW, the employment agreements between Huron Group and Speltz and Weis, the earn-out

provisions (especially the percentage of SVCMC earnings provision) and the breaches of fiduciary duty

and conflicts of interest on the part of Speltz and Weis.

The Jay Alix Protocol precluded the dual retention of Huron and SW. The Jay Alix

Protocol is posted on the website of the Office of the U.S. Trustee for the Southern District of New York

at http://www.usdoj.gov/ust/r02/manhattan/chapter11.htm and is applicable in the Southern District of

New York. Smith was aware of the Jay Alix Protocol prior to July 5, 2005, he advised Speltz and

Weis in the April 26 telephone conversation concerning the prospective consequences of the Huron

Group acquisition of SW on the dual retention of Huron and SW "that the issues were disinterestedness,

the Jay Alix Protocol and conflicts." In pertinent part the Jay Alix Protocol states:

JA&A and its affiliates [footnote omitted] will not act in more than one of the following capacities in any single bankruptcy case: (I) crisis manager retained under Sec. 363, (ii) financial advisor retained under Sec. 327, (iii) claims agent/claims administrator appointed pursuant to 28 U.S.C. § 156(c) and any applicable local rules or (iv) investor/acquirer; and upon confirmation of a Plan may only continue to serve in a similar capacity. Further, once JA&A or one of its affiliates is retained under one of the foregoing categories it may not switch to a different retention capacity in the same case.

* * *

A.    Pursuant to the "one hat" policy as stated above, after accepting an engagement in one capacity, JA&A and affiliates shall not accept another engagement for the same or affiliated debtors in another capacity.

McDermott was aware within a day after the July 5 Motions were filed that the U.S.

Trustee's office would oppose the Huron retention based on the Jay Alix Protocol. Thus, Crowley's

email dated July 6, 2005 to Richard Boyle stated: "Another point which I learned from Bill Smith, which

may have already reached your attention, is that the US Trustee would not approve of Huron as an estate

professional so Bill is trying an alternative approach which would have Huron function as in effect a sub-

- 20 -

contractor to Speltz & Weis LLC."[6]  The conflict of interest between Huron and SW resulting from the acquisition of SW by Huron Group was self-evident and lay at the core of the Jay Alix Protocol.  Smith knew of the Jay Alix Protocol, as he advised Speltz and Weis on April 26, and the Protocol appears on the website of the Office of the U.S. Trustee for the Southern District of New York.  Smith's subsequent disclaimer that he thought the Jay Alix Protocol might not be applicable to this Southern District because of other examples where the Protocol was not applied is unsupported and, in any event, was belied from the outset by the U.S. Trustee's firm position, as reflected in the July 6 email reporting that "the U.S. Trustee would not approve of Huron as an estate professional."

The Huron/SW conflict was immeasurably compounded by the personal conflicts and fiduciary breaches of Messrs. Speltz and Weis.  Smith's advice to Speltz and Weis in the April 26 telephone conversation about the prospective Huron Group acquisition would raise issues of "disinterestedness" and "conflicts" was prescient.  What Smith did not know on April 26, but what the McDermott lawyers certainly did know or should have known after reviewing the Acquisition and Employment Agreements and interrogating Speltz and Weis, was that the problems of lack of disinterestedness, conflicts of interest and breaches of fiduciary duty by Speltz and Weis were of such gravity that those matters (and, of course, the Crowley report itself) *could not be disclosed* without virtually annihilating any likelihood of approval of the Speltz and Weis retention and undermining public confidence in the management of SVCMC.

The seriousness of the Speltz and Weis conflicts and breaches and the need to prevent disclosure is clearly reflected in the trial evidence.  For example, in a June 23, 2005 email to his associate Cleary concerning the SW and Huron retentions, Smith said:

1.  Both Speltz and Weis have personal employment contracts with Huron; and

2.  Both Speltz and Weis have earnout arrangements predicated on future business to Huron from legacy S&W clients and insolvency business referred to Huron based on S&W engagements.  Crowley (who is a bankruptcy lawyer) suggested that at a minimum these were disclosure items for any retention applications involving Huron or S&W.

---

6.      Putting aside the questionable viability of this suggested palliative to avoid Section 327 disinterestedness scrutiny, it should be recalled that, unbeknownst to and unapproved by the SVCMC Board, Huron already was a subcontractor to SW by means of which SW was charging SVCMC a markup on the cost of Huron employees.

- 21 -

Better have whomever is doing these (Augsperger?) read, analyze, and tell us if we're saying what we need to say and doing it the way we should.  Also, be aware that my conversation with Crowley was privileged, his report when rendered may never be public, and he is trying to find a way from a corporate/NFP perspective to make this work, as should we, but his solution may involve some board member taking over supervision of Huron's engagement, since it certainly smells like David and Tim have a personal financial interest in pumping up the Huron revenues.

Smith's June 23 email clearly focused on the "earn-out arrangements predicated on future business to Huron from legacy S&W clients and insolvency business referred to Huron based on S&W engagements" and observed, correctly, that "it certainly smells like David [Speltz] and Tim [Weis] have a personal financial interest in pumping up the Huron revenues."  Smith's June 23 email also reflects Smith's comprehension of the seriousness of the Speltz and Weis conflicts and breaches of fiduciary duty and the consequent need to curtail disclosure of these matters.  He warns Cleary to "be aware that my conversation with Crowley was privileged, his report when rendered may never be public, and he is trying to find a way from a corporate/NFP [not for profit] perspective to make this work, *as should we*" (emphasis supplied).  Concerning his June 23, 2005 interview with Crowley, Smith said in his direct testimony trial affidavit (¶ 57):  "I also told Cleary that Crowley expressed concern about the reactions of external constituencies, such as Elliott Spitzer, examiners, the Committee, and disgruntled employees, if the Debtors' cases became a meltdown."

As noted above, the disclosure in the July 5 Motions was grossly and concededly inadequate, and none of McDermott's subsequent draft retention motions contained complete or appropriate disclosures concerning the terms of the Huron Group/SW acquisition and the Speltz and Weis conflicts and fiduciary breaches.

Smith well understood McDermott's obligation as debtors' counsel to make disclosure of these matters, but McDermott did not do so.  In his direct testimony by affidavit, Smith stated "I told St. Clair that if she gave me a copy of the Crowley report, I would have to give it to the UST and the Committee."  Speltz, Weis and even Crowley were aware of and concerned about the impact of complete disclosure.  As noted in McDermott's post-trial memorandum (¶ 50): "But Weis complained about Smith's complete disclosure (*see* Oct. 23, 2006 Tr., 283, 17-21), and even Crowley echoed Weis' concerns about too much disclosure.  *See* July 27, 2005 email from Crowley to Smith . . . ('[Speltz] and

- 22 -

[Weis] have a legitimate concern (which affects not just them but also the Hospital) about opening the door and the possibility of the Committee and the US Trustee rushing in.')."  The "possibility of the Committee and the US Trustee rushing in" — *i.e.*, seeking to replace management with a CRO or Chapter 11 trustee — was very real as it turned out, even without full disclosure.

Complete and timely disclosure of all relevant and material information and documents lies at the heart of the bankruptcy process.  This is particularly so in a Chapter 11 case, where the Creditors' Committee and the U.S. Trustee's office, each with fiduciary duties of their own, must have confidence and trust in the debtor and its professionals.  *See, In re Mercury*, 280 B.R. 55-56 (Bankr. S.D.N.Y. 2002) *aff'd and reinstated, Fellows & Hymowitz, P.C. v. Mercury* (*In re Mercury*), 122 Fed. Appx. 528 LEXIS 25481 (2d Cir. 2004).  For disclosure requirements in other contexts, *see also, Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (in the context of Chapter 11, "'Full and fair' disclosure is required during the entire reorganization process; it begins 'on day one, with the filing of the Chapter 11 petition.'" (quoting *In re Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)); *see also, Texaco Inc., v. Bd. of Commissioners for the LaFourche Basin Levee District, et al.* (*In re Texaco Inc.*), 254 B.R. 536, 561 (Bankr. S.D.N.Y. 2000) (Chapter 11).  "The courts have uniformly recognized that full and accurate disclosure of all material information is vital to the bankruptcy process." *In re Riccardo*, 248 B.R. 717, 723-24 (Bankr. S.D.N.Y. 2000) (Chapter 7).  *See also, In re Wincek*, 202 B.R. 161, 166 (Bankr. M.D. Fla. 1996), *aff'd*, 208 B.R. 238 (M.D. Fla. 1996) (Chapter 13) ("'[F]ull disclosure of all relevant information has always been an important policy of the bankruptcy laws.'"); *Cohen v. McElroy* (*In re McElroy*), 229 B.R. 483, 488 (Bankr. M.D. Fla. 1998) (Chapter 7) ("A debtor's complete disclosure is essential to the proper administration of the bankruptcy estate."); *in accord, In re Sharp*, 244 B.R. 889, 891-92 (Bankr. E.D. Mich. 2000) (Chapter 7).  The Jay Alix Protocol itself contains comprehensive disclosure requirements in Article I paragraph (e) and subparagraphs thereof, which provides:

E.      The application to retain JAS shall make all appropriate disclosures of any and all facts that may have a bearing on whether JAS, its affiliates, and/or the individuals working on the engagement have any conflict of interest or material adverse interest, including but not necessarily limited to the following:

[subparagraphs 1 through 8]

- 23 -

Consistent with the failure to make adequate disclosure concerning the SW and Huron retention applications, McDermott and, under McDermott's direction, SVCMC were not always forthcoming with documents and information.  Two examples are illustrative.  One is that McDermott did not provide the U.S. Trustee with a copy of the May 6, 2005 Huron Group Acquisition Agreement and related Employment Agreements for Speltz and Weis until July 22 (the U.S. Trustee testified that she never received these documents from McDermott), despite the fact that disclosure of these documents was obviously essential for the Trustee to assess the propriety of the July 5 Motions to retain Huron and approve the SW Management Agreement.  A second example is the extraordinary shutdown of information, or "radio silence" instruction, issued by McDermott.  On August 11, 2005 the Creditors' Committee informed Smith that it intended to object to the debtors' motion to retain SW.  The same day Smith sent an email to the debtors' management directing that it cease all communications and information transmittal to the Creditors' Committee, cancel all meetings with the Committee's representatives, and "maintain radio silence."  Acting on the McDermott "radio silence" instruction, the debtors' management thereafter ceased to provide any information about the debtors' business and operations to the Committee and its professionals.  At the same time Smith instructed McDermott attorneys to undertake an investigation of a rumor that the Creditors' Committee had begun to interview candidates to replace the debtors' senior management.  The investigation lasted four days, after which McDermott determined that there was insufficient credible evidence of any "wrongdoing."  Only then did Smith instruct the debtors' management to reopen communications with the Creditors' Committee.

The excuses for the failure to timely provide the Huron Acquisition documents — that the documents were never requested (denied by the U.S. Trustee), or that the U.S. Trustee could have obtained the documents from the Huron Group's Form 8-K SEC filing — speak volumes as to McDermott's uncooperative or even adversarial approach to the U.S. Trustee's office and the Creditors' Committee, and the firm's apparent failure to understand the necessity of a forthcoming approach in the conduct of a Chapter 11 reorganization, where the achievement of trust, confidence and consensus is the key to success.  The "radio silence" incident reflects fundamental misconceptions concerning the stewardship of a Chapter 11 case as debtors' counsel.  Open communications and the prompt furnishing of all data and

- 24 -

information necessary for other parties to fulfill their fiduciary responsibilities are absolutely essential to the conduct of a Chapter 11 case. Moreover, if the Committee had, in fact, begun to interview candidates to replace Speltz and Weis, there was nothing improper in the Committee doing so. McDermott's imposition of "radio silence" on the debtors' management while the firm undertook an investigation of whether the Committee would begin to interview candidates was emblematic of McDermott's adversarial and counterproductive representation of the debtors.

McDermott argues that in pursuing the dual retention of Huron and approval of the SW Management Agreement it was simply acting pursuant to the instructions of the SVCMC Board. Thus, McDermott asserts:

> Even after McDermott and St. Clair learned of the UST's concerns about the SW/Huron retentions, and after they discussed those concerns with Richard Boyle ("Boyle"), the Chairman of the Debtors' Board (see Oct. 23, 2006 Tr., 286: 8-11), SVCMC still directed McDermott to get Court approval of the Board/Crowley strategy while the Board and Crowley negotiated with SW and Huron. See July 25, 2005 email from Smith to Boyle, cc: Crowley [Tab 40]; July 25, 2005 email from Boyle to Smith responding to Smith's email [Tab 41] ("Please proceed for Speltz and Weis.    The Executive Committee will meet on Friday and, I expect, will approve the actions being taken by Huron and waive the conflict  issue."). As Boyle put it. [sic] "I did not realize that new management was needed until mid-August of 2005."  Boyle Aff. [Vol. 4, Exhibit C], ¶ 11.

> 30. McDermott cannot be held liable for following the instruction of its client to seek the retentions of the critical SW personnel in these cases — an instruction that was supported by the Debtors' sound business judgment and reached with the Debtors' full knowledge of the conflicts presented by the SW/Huron relationship. It is unjust to fault McDermott now for merely following the reasoned and informed direction of the Debtors' Board.

But the evidence does not support the conclusion that McDermott's failure in the Huron/SW retention debacle was "merely following the reasoned and informed direction of the Debtors' Board," or that the debtors' persistent pursuit of dual retention in the face of obvious conflicts and derelictions of Speltz and Weis reflected "sound business judgment."  In the Debtors' Reply dated October 19, 2006 to McDermott's response to the debtors' objection, the debtors argued their position as follows:

> Rather, the Debtors assert that the relevant questions are what advice and counsel was provided by MWE and to whom was it provided as to the substantive issues raised in the Debtors' Objection, and in particular, MWE's handling of the SW retention issues, including its failure to disclose those issues to the Court.  . . .  MWE's purported defense that it was simply taking direction from the "client" (i.e., senior management) is alarming given that the Debtors' senior management was comprised of Messrs. Speltz

- 25 -

and Weis, the conflicted parties, (acting as the Debtors' CEO and CFO, respectively), and is borderline absurd.  The record is also clear that the Debtors' Board and Elizabeth St. Clair . . ., who were not and are not bankruptcy experts, were wholly relying on MWE in these matters and MWE failed to make them completely aware of the seriousness of the issues and the positions of the United States Trustee until very late in the process.

The trial evidence fully supports the debtors' October 19, 2006 argument.  The Executive Committee's August 24 decision to fire Speltz and Weis certainly demonstrates that Boyle's July 25 "proceed for Speltz and Weis" email to Smith was neither reasoned nor informed.  The evidence compels the conclusion that McDermott did not inform and advise Boyle of the legal and practical realities of the dual retention and Speltz and Weis conflicts until mid-August.

Smith's direct testimony by affidavit reflects numerous occasions where he gave reports, advice and counsel to Speltz and Weis.  But the very first recitation in Smith's affidavit of any advice given to Boyle or the rest of the SVCMC Board appears in paragraph 113 concerning advice given *on July 29*.  In paragraphs 114 and 115 Smith states  "I conveyed to Speltz, Weis and to St. Clair the concerns expressed by the UST and Committee at the July 21, 2005 meeting" and "I recommended to Speltz and Weis *on July 21, 2005* that the debtors adopt the UST's requests made to me on July 21, 2005. . . ."  In paragraph 113 Smith stated "McDermott advised the Board *on or about July 29, 2005,* that McDermott met on July 21, 2005 with the UST and counsel for the Committee" (emphasis supplied).  It was not until August that Smith advised Boyle that Speltz and Weis were at the heart of the retention problem.[7]  In

---

[7]    *See,* for example, Smith's trial testimony on October 23, 2006 at page 230:

> Q.    The fight over Speltz and Weiss [sic], as you said, was a sideshow?
>
> A.    It began as a sideshow.    It became to dominate the reorganization by the end of the summer.
>
> Q.    Is it fair to say that uncertainty surrounding the Speltz and Weiss [sic] retention in senior management at St. Vincent's had become a distraction to the entire reorganization process, isn't it?
>
> A.    The threats that the committee and the trustee were leveled at St. Vincent's and its advisors make it very difficult about anything approximating the goal of reorganization.  The direct threat for any of the services that they rendered, that the trustee's office under no circumstances will ever agree, not for a time and as long as I'm at it, go tell the Speltz and Weiss [sic] people they're never going to be paid for the work they've done and, by the way, Mr. Smith, I don't think your fee application is going to be treated particularly well either.  Yes, that was deeply stabilizing [sic, should read destabilizing] to a reorganization neither with (continued...)

- 26 -

paragraph 130 Smith states "By the second week of August 2005, I shared with Boyle, the Chairman of the Debtors' Board, my belief that the tenure of Speltz as CEO had become unsupportable."[8]  Then came the August 19, 2005 meeting with the UST and the Committee's counsel at which both demanded the appointment of a Chief Restructuring Officer.  Following that seismic event, Smith finally called for a meeting of the Executive Committee of the Board which was held on August 24, at which the Executive Committee fired Speltz and Weis.

What is clear from the evidence is that McDermott never advised Boyle or the Executive Committee or the full Board until mid-August 2005 that the dual retention of Huron and SW was *from the outset* a dead letter by reason of the Jay Alix Protocol, Section 327(a) of the Bankruptcy Code and the serious conflicts of interest and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the Huron Group acquisition of SW in early May.  This is clear from Boyle's trial affidavit:

> 10.    I am not aware of ever being advised by MWE prior to the July bankruptcy filing of the impact that the Huron acquisition would have on SVCMC's ability to retain SW LLC in the bankruptcy action.  I was not informed by MWE prior to the bankruptcy of the "disinterestedness" requirement in the Bankruptcy Code as it related to the retention of SW LLC as bankruptcy professionals.
>
> 11.    While my confidence in David Speltz and Tim Weis was shaken in May of 2005 because of the Huron acquisition, I did not realize that new management was needed until mid-August of 2005.  Neither I nor the Board became aware of the substan-

---

[7](...continued)
them.

[8]    Smith's August 11 "radio silence" email to Speltz, Weis and others (but not Boyle) raises a question as to when in the second week of August Smith came to the belief that the tenure of Speltz as CEO had become unsupportable.  The August 11 email, set forth in full below, states "our intent" to bring on an application for retention of SW promptly.

> "In conversation this afternoon, I was advised by Comtee counsel that the Comtee will oppose retention of S+W.  Marty declined to be more specific, but said that nothing would change his or the Comtee's mind.
>
> "I have notified the UST of this, as well as our intent to bring the application on for hearing promptly.  Will liaise with Ron Barliant on strategy.
>
> "Effective immediately, please stop ALL communication or information transmittal to the Comtee, cancel ALL meetings with their representatives, and maintain radio silence.  If asked, refer inquiries to me.  We will attend the meeting next Friday, but it is an open question who, if anyone, other than Tom Allison and me will go.  This does not apply to OUR contacts with Comtee members, such as 1199.
>
> "Lots more will follow, and positions may change, but for now, shut it down."

- 27 -

tial issues related to the retention of SW LLC until shortly before the August 24, 2005 Board meeting where it was determined that David Speltz and Tim Weis would be asked to resign from SVCMC.

Boyle and other members of the Board undoubtedly saw the Crowley report, but they obviously did not comprehend the significance of the Jay Alix Protocol and the Speltz and Weis taint from the perspective of bankruptcy retention and the disinterestedness requirement under Section 327.  This is painfully evident from the July 25, 2005 email from Boyle to Smith (relied on to support McDermott's "merely following orders" argument) where Boyle said "Please proceed for Speltz and Weis.  The Executive Committee will meet on Friday and, I expect, will approve the actions being taken by Huron and waive the conflict issue."  The fact that the Executive Committee or the Board might be willing to waive the Huron/SW conflict, and the Speltz and Weis conflicts and breaches of fiduciary duty, was completely irrelevant from a bankruptcy perspective, because no waiver could be expected from the Creditors' Committee, or the U.S. Trustee's office, or the Court which is charged by law to enforce the law as written in Section 327(a).[9]  Indeed, the Board's waiver had the predictable result of undermining the Committee's and the U.S. Trustee's confidence in the Board itself, leading to the August 19 proposal for a CRO.

Boyle's trial affidavit and testimony that he was not advised of the gravity of the Huron and Speltz and Weis retention issues was confirmed in the testimony of Deirdre Martini, the U.S. Trustee.  Martini testified in her deposition (Tab 115 p. 78):

> Q.    You said that you had conversations with Dick Boyle that also led to you concluding that McDermott had not adequately communicated your positions.  Do you recall any of those conversations?
>
> A.    Yes.
>
> Q.    Can you tell me about any of them?
>
> A.    Dick Boyle had no idea about my — the level of my concern in the beginning of the case.  He had no idea that I was looking to possibly move for a trustee.

---

[9]    Section 327 permits retention of professional persons that "do not hold or represent an interest adverse to the estate, and that are disinterested persons."  Implementing this provision, the Jay Alix Protocol clearly precluded the dual retention of both Huron and SW after the Huron Group acquisition of SW.  For the same reason, the Huron Group/SW acquisition and their employment agreements (not to mention their breaches of fiduciary duty) disqualified Speltz and Weis personally from their positions as senior management of the debtors.

- 28 -

He had no idea that the Speltz & Weis issue had risen to such a crescendo. And he just said: "Deirdre, I just didn't know."

Q.  Were those discussions after August 24, 2005 when he became the CEO?

A.  Yes. This was when Weil Gotshal came in.

Boyle's and Martin's testimony was also corroborated by the trial declaration of St. Clair. SVCMC's Chief Legal Officer testified in her declaration:

12.  At no time prior to the bankruptcy filing was I informed by MWE of the "disinterestedness" requirement in the Bankruptcy Code as it relates to the retention of professionals. To the best of my knowledge, at no time prior to August 24, 2005 did MWE advise SVCMC's Board of the substantial issues that SVCMC faced in getting Speltz & Weis retained by the Court, including the specific concerns that had been raised by the U.S. Trustee.

13.  In hindsight, it is clear to me that MWE's single-minded pursuit of the Speltz & Weis retention in the bankruptcy case was extraordinarily destructive to SVCMC's credibility with the constituents in the bankruptcy process, including the Court, the U.S. Trustee and the Creditors' Committee. This is particularly true now, as I have experienced the scrutiny under which such retention is examined by the non-debtor constituents in the bankruptcy process.

14.  Additionally, it is now clear to me that that [sic] MWE's decision to take a strong adversarial position against the U.S. Trustee and the Creditors' Committee did not benefit SVCMC, and resulted in delaying SVCMC's restructuring process. For example, MWE consistently took the position that SVCMC did not need to comply with the "J. Alix Protocol" and that the "J. Alix Protocol" was simply a pretext for the Creditors' Committee to muscle its way into management.

Precisely because Speltz and Weis were conflicted in pursuing the dual Huron/SW retentions for public relations purposes, McDermott had no alternative but to take the matter to the SVCMC Board at the earliest stage possible, preferably even before the July 5, 2005 filing date, to preclude the ultimately disastrous confrontation with the Creditors' Committee and the U.S. Trustee's office. That was not done. As Boyle put it, "I did not realize that new management was needed until mid-August 2005."

I unequivocally reject McDermott's attempt to place responsibility on Crowley and St. Clair with respect to advising the SVCMC Board concerning the dual retention applications and the conflict issues. St. Clair was not a bankruptcy lawyer. Crowley was retained for a limited purpose which did not include acting as bankruptcy counsel for SVCMC or advising on bankruptcy issues arising in connection with professional retention applications or otherwise. The evidence makes unambiguously

- 29 -

From June 17 until after July 22, no McDermott attorney was assigned to begin work on a motion for Bankruptcy Court authority to close St. Mary's Hospital. On July 22 Harriet McCloud filed a State Court litigation in Kings County Supreme Court seeking to restrain the Department of Health from approving the St. Mary's Hospital closure plan. The McCloud suit seems to have been the catalyst for McDermott to focus on St. Mary's. A week later, on July 29, McDermott filed a complaint with the Bankruptcy Court to enjoin Ms. McCloud from prosecuting the State Court litigation. The August 4 hearing in the Bankruptcy Court seeking a preliminary injunction concededly was not handled well by McDermott on behalf of the debtors, but the motion was granted. It was not until August 5 that McDermott attorneys first began work on a motion for Bankruptcy Court approval to close St. Mary's Hospital, and the motion was not filed until August 18. The motion papers were not supported by a single affidavit and did not attach any financial analysis to support the summary and conclusory lawyer assertions in the motion concerning the financial need to close the Hospital. As the chronology shows, this was too little, too late. At the September 7 hearing on the motion to close, the Bankruptcy Court, unsupported by a sufficient record, adjourned the hearing without ruling on the motion.

At the resumed hearing on September 20, with the benefit of four supporting affidavits, prepared under the supervision of Weil as new counsel for the debtors, the Court finally granted the motion.

I reject McDermott's contention that it did not file the St. Mary's Hospital closure motion on July 5, or on July 22 "because the Debtors . . . were not far along enough in the process of obtaining regulatory approval from the Department of Health." No witness at the trial (other than McDermott) supported such a rationale. Nor do the facts and circumstances. SVCMC publicly announced in June its intent to close St. Mary's Hospital. The debtors' local Rule 1007-2 Statement filed on July 5 expressly stated the debtors' intention to close the Hospital. On July 22 the debtors, on their own, with no participation by McDermott, issued notices to St. Mary's Hospital employees pursuant to the WARN Act. The Selbst trial affidavit to the effect that St. Clair told him to delay the motion because the Department of Health had a strong preference for keeping details relating to the closure confidential until it had finally approved the closure is unsupported by any document, or by St. Clair, or by any witness from the Depart-

- 31 -

clear that everyone, including McDermott, understood that McDermott was responsible for representing the debtors on all matters relating to the bankruptcy proceedings and advising on all bankruptcy matters including bankruptcy retention issues.

### III.  St. Mary's Hospital closing

Little need be said regarding McDermott's performance on the closing of St. Mary's Hospital.

On June 1, 2005 the SVCMC Board instructed McDermott to work with management to close St. Mary's Hospital as soon as possible. As of June 17, 2005, McDermott knew that the debtors had set September 1, 2005 as the target for closure of St. Mary's Hospital. McDermott was charged with the responsibility of obtaining Bankruptcy Court approval. St. Clair and other SVCMC staff were responsible for obtaining Department of Health and canonical authority to close the Hospital.

Canonical authority was granted prior to the bankruptcy filing on July 5. Department of Health approval was granted on August 31. Bankruptcy Court approval was not obtained until the September 20, 2005 hearing at which SVCMC was represented by Weil, Gotshal & Manges.

The closing of any medical facility in a large city is almost certain to generate intense and emotional opposition from doctors, other hospital staff and affected local community groups. The Court must be sensitive to such pressures and must grant time and attention to the objecting community voices. Most important, the debtors must provide the Court with a comprehensive, well-documented record of affidavits and supporting exhibits demonstrating to the press, politicians and the public the economic or other facts of life requiring closure.

In order to meet the September 1 deadline set by the Board, it was absolutely essential for McDermott to prepare and file with the Bankruptcy Court a comprehensive, well-supported motion by the second or third week in July at the very latest to have any chance of holding a hearing in August and getting a favorable ruling by the September 1 deadline set by the Board. As shown in the recitation from paragraphs 104-147 of the parties' agreed statement of Undisputed and Admissible Facts, quoted above, McDermott simply did not get the job done.

- 30 -

ment of Health. The argument makes no sense, because by mid-July it was widely known public knowledge that SVCMC was seeking to close St. Mary's Hospital. In response to a question by the Court, St. Clair denied ever having a conversation with any lawyer from McDermott in which she asked McDermott, in words or substance, to hold up or refrain from filing a motion in the Bankruptcy Court (Tr. Oct. 24, 2006 p. 64). Nor was Selbst convincing in asserting that the Bankruptcy Court closure motion could not have been completed and filed before August 18 because McDermott "struggled mightily with the client to verify these . . . numbers . . . the losses, to figure out which contract[s] [would have] to be rejected and to try to address some of the concerns that Judge Beatty had expressed." If work on the motion had been commenced soon after the June 17 Board meeting which set the September 1 deadline, instead of August 5, the motion would have been timely filed. It was the Board that set the September 1 deadline, and it was McDermott's job to do what had to be done to comply with the Board's mandate.

The undisputed fact is that no McDermott lawyers began working on the Bankruptcy Court motion to approve the St. Mary's Hospital closure until August 5, following the impetus of the McCloud State Court litigation.[10] By that time a successful resolution of the motion by September 1 was impossible. Moreover, the motion was unaccompanied by any supporting affidavits or financial analysis to document the economic exigency requiring prompt closure. McDermott's delay in preparing and filing the motion was not the consequence of strategy, but inattention. The failure to support the motion when finally made with affidavits and financial analysis was not the consequence of strategy or the un-availability of data, but inadequate and untimely preparation.

### IV.  Consequences for the McDermott fee application

At the conclusion of the trial hearing I requested the objecting parties to submit a concise post-trial submission explaining with particularity the dollar consequences for the McDermott fee application which should result from the deficiencies in performance by the McDermott firm with respect to the

---

10    Paragraph 128 of the parties' statement of Undisputed and Admissible Facts states:

128. McDermott first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier than August 5, 2005.

- 32 -

Huron/SW retention proceedings (including the radio silence instruction) and the delay in filing the debtors' motion to close St. Mary's Hospital. I have carefully considered the objecting parties' Post-Trial Statement of Economic Consequences to Debtors' Estates resulting from McDermott's services, McDermott's Reply, McDermott's submission dated July 19, the objectants' response dated July 30, and McDermott's reply dated August 3. The following are my conclusions on these issues.

### A.  SW and Huron retentions

The parties have stipulated in their July 19 and July 30, 2007 submissions that the total of McDermott's fees incurred in connection with the SW and Huron retentions was $98,382.25. I conclude that McDermott should receive no compensation in respect of the firm's work in connection with these retentions. These efforts, including the grossly misleading and inadequate July 5 Motions, the improvident July 13 filing, and the August 1 withdrawal of the application to retain Huron, and the events leading to the August 24 Executive Committee meeting at which Speltz and Weis were fired were predictably futile from the outset. McDermott should have realized, and advised the Board early in July if not before the filing, that (as Smith advised Speltz and Weis on April 26) "the issues were disinterestedness, the Jay Alix Protocol and conflicts" and that dual retention of both Huron and SW could never receive support from the Creditors' Committee or the U.S. Trustee's office and could never be approved by the Court because of the patent conflict between Huron and SW after the Huron Group acquisition of SW and the very serious conflicts and breaches of fiduciary duty of Speltz and Weis. The entire retention process from the July 5 Motions to the August 24 Executive Committee meeting resulted in escalating friction and mistrust between the Committee and the U.S. Trustee, on the one hand, and the debtors and McDermott on the other. As Smith testified, the retention issues "[came] to dominate the reorganization by the end of the summer."

In short, the McDermott services relating to retention of professionals, at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtors' estates — they were affirmatively detrimental to the debtors' estates. Compensation of $98,382.25 in respect of retention services is denied.

- 33 -

Since canonical authority for the closure had been obtained in late June, and Department of Health approval of the closure was obtained on August 31, McDermott's failure to get the job done in accordance with its instructions from the client resulted in a twenty-day delay in closure of the Hospital.

The parties have stipulated that McDermott's fee application includes $248,704 in connection with the closure of St. Mary's Hospital. For the reasons elaborated in point III and summarized just above, I conclude that McDermott's compensation in respect of the St. Mary's Hospital closure should be reduced by $200,000. These services were grossly tardy and the work product was plainly inadequate because it did not provide the Court with a documented, factual predicate necessary for an order to close the Hospital.

To summarize, I conclude that McDermott's services in connection with the St. Mary's Hospital closure were not "performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed" within the meaning of Section 330(a)(3)(D) and that McDermott's delay in rendering those services was not "beneficial at the time at which the service was rendered" within the meaning of Section 330(a)(3)(C). I further conclude that $200,000 is an appropriate amount to deduct from McDermott's $248,704 billings for the Hospital closing.

### F.  Consequential damage claims

The debtors seek a reduction of McDermott fees to offset the damages sustained by SVCMC as a consequence of McDermott's default. The debtors assert that St. Mary's Hospital was losing approximately $78,000 per day resulting in a total loss of $1,560,000 for the twenty-day delay. I reject McDermott's argument that "there is no proof linking these purported losses to McDermott's services. This claim is pure speculation" (Reply at 8-9). The fact that St. Mary's Hospital was operated at a loss is neither speculative nor disputed. The precise quantum of loss sustained during this specific twenty-day period may be impossible to quantify with dollar and cents precision on the trial record. But there can be no doubt that the debtors suffered a large loss as a consequence of McDermott's delay in filing the motion. It must be noted that McDermott's position now contrasts sharply with McDermott's representations to the Court in its contemporaneous submissions in August and September 2005. As

- 35 -

### B.  The tortious interference investigation

The investigation conducted by McDermott during the radio silence instruction was unnecessary and inappropriate and conferred no benefit on the debtors' estates. Compensation for the stipulated $44,523 cost of the investigation is denied.

### C.  Change of management and CRO retention

The parties have stipulated that $74,180 of McDermott's fee application represent time charges in connection with the change in management and CRO retention matters resulting from the firing of Speltz and Weis on August 24, 2005. These matters are inextricably related to the disastrous SW and Huron retention proceedings and events described at length in this Decision. The debtors should not be required to bear this expense and, accordingly, compensation for this $74,180 in fees is denied.

### D.  Transition of counsel from McDermott to Weil

The parties have stipulated that McDermott's application for legal fees includes $43,458 in connection with the transition of counsel from McDermott to Weil. As shown in the discussion above, McDermott was terminated by the Board because of the shortcomings in the firm's performance which resulted in a crisis of confidence in SVCMC's management and Board and McDermott on the part of the Creditors' Committee, the U.S. Trustee and the Court. The debtors should not bear that cost. McDermott's billed transition fees of $43,457.50 will be deducted from McDermott's fee application.

### E.  Fees incurred for St. Mary's Hospital closing

On June 1, 2005 the Board instructed McDermott to take the necessary and appropriate action to close St. Mary's Hospital. On June 17 the Executive Committee set September 1 as the target date for closure of the Hospital. Smith attended the June 1 Board meeting and the June 17 Executive Committee. Despite these unambiguous instructions from the Board and the Executive Committee, McDermott did not even begin to prepare a motion for Court approval of the closing until August 5, and the motion was not filed until August 18. The motion as filed was defective because it was not supported by any affidavits or financial data to document the necessity for closing the Hospital. As a direct consequence of this delay, Court approval was not obtained until September 20.

- 34 -

noted in footnote 5, above, McDermott represented in the August 18, 2005 motion (¶ 47) that "The continued expense of more than $100,000 per day to fund the losses of St. Mary's Hospital operations is simply not justified and threatens the entire SVCMC reorganization." In the Debtors' Omnibus Response dated September 2, 2005 (¶ 5) McDermott represented to the Court that "St. Mary's Hospital is currently losing more than $500,000 per week," which equates to $71,428 per day or $1,428,560 for a twenty-day period.

However, the debtors' claim for consequential damages in connection with the St. Mary's Hospital closing delay is, in substance, a tort claim for professional malpractice. The contested matter before the Court is McDermott's application for legal fees and the objections to McDermott's fees filed by the objecting parties. In my view it is inappropriate to litigate a tort claim for malpractice in the guise of an objection to legal fees. The standards for determining the merits of a malpractice claim and the quantum of damages to be awarded, if any, are not necessarily the same as the standards for determining the appropriateness of legal fees under the Bankruptcy Code.

Accordingly, I deny the debtors' request to reduce McDermott's legal fee application by reason of consequential damages resulting from delay in the St. Mary's Hospital closing, without prejudice to the debtors' right to assert such damages in an appropriate malpractice action or proceeding.

Similarly, the debtors seek to recover (by deduction from McDermott's fee application) $230,000 in legal fees payable to Weil to obtain Bankruptcy Court approval to close St. Mary's Hospital and $120,000 of Weil legal fees for the transition. These costs also represent putative consequential damages. They may, or may not, be awarded as damages in a malpractice action, but they may not be recovered in an objection to McDermott's legal fees. Accordingly, these claims also are denied, without prejudice.

### Conclusion

Upon the foregoing, the objections to McDermott's fee application are sustained to the extent of $460,543, consisting of $98,382 in respect of the SW and Huron retentions, $44,523 for the tortious interference investigation, $74,180 for change of management and CRO retention, $43,458 for

- 36 -

McDermott's fees for transition of counsel, and $200,000 of McDermott's fees relating to the St. Mary's

Hospital closing.   The objections are sustained to the extent set forth herein and overruled to the extent

that the objectants sought a greater reduction in McDermott's legal fees.   Debtors' counsel will submit an

order consistent with this Decision, approved as to form by all parties but without prejudice to any party's

right to appeal.

Dated:   White Plains, NY
          August 29, 2007

                    /s/Adlai S. Hardin, Jr.
                         U.S.B.J.

- 37 -

# Exhibit Z

TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                                          :
In re:                                                    :
                                                          :
SAINT VINCENT'S CATHOLIC MEDICAL          :          Chapter 11
CENTERS OF NEW YORK d/b/a SAINT VINCENT  :          Case No.  05-14945 (ASH)
CATHOLIC MEDICAL CENTERS, *et al.*,           :          (Jointly Administered)
                                                          :
                              Debtors.                    :
                                                          :
------------------------------------------------------------------------x

**ORDER SUSTAINING, IN PART, OBJECTIONS TO FIRST AND
FINAL APPLICATION OF McDERMOTT WILL & EMERY LLP FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE DEBTORS
FOR THE PERIOD JULY 5, 2005 THROUGH SEPTEMBER 30, 2005, AND
AWARDING FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Upon consideration of (1) the Final Interim Application of McDermott

Will & Emery LLP ("MWE") for Professional Services Rendered and Reimbursement of

Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 Through

September 30, 2005[1] (the "Fee Application"), seeking fees in the amount of $2,227,979.50

and reimbursement of expenses in the amount of $104,314.28 (2) the objections

---

[1]    By Amended Notice dated July 21, 2006, MWE advised that the Fee Application shall be denominated
its Final Fee Application pursuant to § 330 of the Bankruptcy Code.

(collectively, the "Objections") to the Fee Application filed by (i) Saint Vincent's Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, CMC Physician Services, P.C., CMC Radiological Services P.C., CMC Cardiology Services P.C., CMC Occupational Health Services P.C., Medical Service of St. Vincent's Hospital and Medical Center, P.C., and Surgical Service of St. Vincent's, P.C., as debtors and debtors in possession (collectively, the "Debtors"), (ii) the Official Committee of Unsecured Creditors (the "Committee"), and (iii) the Office of the United States Trustee, and (3) the affidavits and declarations submitted in support of the Fee Application and the Objections, and a trial having been conducted on October 24-26, 2006, and the parties having submitted, and the Court having considered, post-trial briefs, replies and supplemental submissions requested by the Court, and upon the foregoing and the record made at the trial, the Court having issued its Decision on Objections to Application for Fees and Expenses on August 29, 2007 (the "Decision"), and MWE having been previously awarded and paid the amount of $1,200,000.00 for fees and expenses on an interim basis, it is

**ORDERED** that the Objections are sustained to the extent set forth in the Decision, and otherwise overruled; and it is further

**ORDERED** that the Findings of Fact and Conclusions of Law in the Decision are incorporated herein by reference; and it is further

**ORDERED** that MWE's fees be, and hereby are, reduced by the amount of $460,543.00; and it is further

**ORDERED** that, pursuant to 11 U.S.C. § 330(a)(1), MWE be, and hereby is, awarded final compensation for professional services rendered to the Debtors in the amount of $1,767,436.50, and reimbursement of expenses in the amount of $104,314.28, for a total final award of $1,871,750.78; and it is further

**ORDERED** that the Debtors are authorized and directed to make payment to MWE in the amount of $671,750.78, representing the difference between the final award authorized hereby and the prior interim payment made to MWE; and it is further

**ORDERED**, that the award of final compensation to MWE as set forth in this Order is without prejudice to: (a) any rights of the Litigation Trust and the Litigation Trustee (as those terms are defined in the First Amended Chapter 11 Plan of Reorganization for Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, and Chapter 11 Plans of Liquidation for Medical Service of St. Vincent's Hospital and Medical Center, P.C., Surgical Service of St. Vincent's, P.C., CMC Cardiology Services, P.C., CMC Physician Services P.C., and CMC Radiological Services P.C., dated June 5, 2007, confirmed by Order dated July 27, 2007 (the "Plan")) to assert claims and causes of action against MWE for consequential damages resulting from (i) delay in closing St. Mary's Hospital, (ii) the pursuit of bankruptcy retentions of Speltz & Weis LLC and Huron Consulting Services LLC, and (iii) the CRO/CFO selection process, including claims for legal fees paid to Weil, Gotshal & Manges LLP and counsel for the Committee; and (b) the right of MWE to assert any applicable defenses to all such claims and causes of action. (Any such claims

and causes of action described in the preceding sentence are hereby preserved for the

Litigation Trust and the Litigation Trustee, as those terms are defined in the Plan.)


Dated:   White Plains, New York
         September 21, 2007          /s/ Adlai S. Hardin, Jr.
                                     Adlai S. Hardin, Jr.
                                     United States Bankruptcy Judge

# Exhibit AA

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    BERNARD J. FRIED
                   *Justice*

**FBEM**

PART   60

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF SAINT VINCENTS CATHOLIC MEDICAL CENTERS
D/B/A SAINT VINCENT CATHOLIC MEDICAL CENTERS,

         Plaintiff,

     - v -

SPELTZ & WEIS LLC A/K/A WELLSPRING MANAGEMENT
SERVICES LLC, et al.,

         Defendants.

INDEX NO.   150446-2007

MOTION DATE _____

MOTION SEQ. NO. _____

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion: ☐ Yes ☐ No

*(vertical text at left margin):* MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Upon receipt of the Stipulation and Order signed by the parties and
filed with this Court on November 16, 2007, in which the parties agreed
that the caption should be amended; it is

ORDERED that GRAY & ASSOCIATES, LLC, in its capacity as
Trustee, on behalf of the SVCMC LITIGATION TRUST, be substituted as
plaintiff in the above-entitled action in the place and stead of plaintiff,
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SAINT
VINCENTS CATHOLIC MEDICAL CENTERS d/b/a SAINT VINCENT
CATHOLIC MEDICAL CENTERS, without prejudice to any proceedings
heretofore had herein; and it is further

ORDERED that counsel for plaintiff shall serve a copy of this Order

1

with notice of entry upon the Clerk of the Court and upon the Clerk of
the Trial Support Office (Room 158), who are directed to amend their
records to reflect such change in the caption herein.

SO ORDERED.

Dated:   11/26/07

Check one: ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST   ☐ REFERENCE

HON. BERNARD J. FRIED



2

---

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF SAINT
VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT
VINCENT CATHOLIC MEDICAL
CENTERS, et al.,

         Plaintiff,

   -against-

SPELTZ & WEIS LLC a.k.a. WELLSPRING
MANAGEMENT SERVICES LLC, DAVID
E. SPELTZ, TIMOTHY C. WEIS, HURON
CONSULTING GROUP INC. and HURON
CONSULTING SERVICES LLC f.k.a.
HURON CONSULTING GROUP, LLC,

         Defendants.

------------------------------------------------------------X

Index No.: 150446/2007

**STIPULATION AND ORDER**



WHEREAS, by Order to Show Cause, filed October 26, 2007, the Affirmation of
Michael E. Johnson, Esq., dated October 25, 2007 and the exhibits annexed thereto, Plaintiff
moved this Court for an order, pursuant to CPLR 1018 and 1021, substituting the Litigation
Trustee (the "Litigation Trustee") of the Litigation Trust Established Under the Litigation Trust
Agreement Pursuant to the First Amended Chapter 11 Plan of Reorganization for Saint Vincents
Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers (the
"Litigation Trust") as plaintiff(s) in this action; and

WHEREAS, by the Affirmation of Richard A. Lafont in Opposition, dated
November 5, 2007, defendants Speltz & Weis LLC, Huron Consulting Group Inc., and Huron
Consulting Services LLC responded to Plaintiff's Motion; and

LEGAL02/30600413v4

WHEREAS the motion was returnable and heard on the 9th day of
November, 2007 at 10 o'clock in the forenoon before the Honorable Bernard J. Fried;

IT IS HEREBY STIPULATED AND AGREED by the undersigned counsel to
the parties to this action that

1.   The Litigation Trustee and the Litigation Trust shall be substituted as
plaintiff in this action.

2.   In lieu of filing opposition papers to Defendants' pending motions to
dismiss the complaint, the Litigation Trustee shall file in this action an amended complaint,
which shall include allegations setting forth the identity of the Litigation Trust, on or before
February 4, 2008.

3.   Upon the Litigation Trustee's filing of the amended complaint,
Defendants' pending motions to dismiss shall be withdrawn, without prejudice. Defendants
expressly reserve the right to file motions to dismiss the amended complaint and this right shall
not be prejudiced or otherwise impaired by any provision of this Stipulation and Order.

4.   The *Status Conference* presently set for January 15, 2008 shall be continued by the
Court to February 19, 2008. at 9:30 a.m.

5.   The caption in this matter shall be amended to reflect the proper
identification and designation of the parties as follows:

LEGAL02/30600413v4         2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

GRAY & ASSOCIATES, LLC, in its capacity as Trustee,
on behalf of the SVCMC LITIGATION TRUST,

Plaintiff,

Index No.: 150446/07

-against-

SPELTZ & WEIS LLC a.k.a. WELLSPRING
MANAGEMENT SERVICES LLC, DAVID
E. SPELTZ, TIMOTHY C. WEIS, HURON
CONSULTING GROUP INC. and HURON
CONSULTING SERVICES LLC f.k.a.
HURON CONSULTING GROUP, LLC,

Defendants.

------------------------------------------------------------X

Dated: New York, New York
November ____, 2007

ALSTON & BIRD LLP
Attorneys for the Creditors' Committee
and the Litigation Trustee

By: _____ /s/ _____
      Michael E. Johnson
90 Park Avenue
New York, New York 10016
(212) 210-9400

STROOCK & STROOCK & LAVAN LLP
Attorneys for David E. Speltz and Timothy C.
Weis

By: _____ /s/ _____
      Kenneth Pasquale
      Stephen B. Marseille
180 Maiden Lane
New York, New York 10038
(212) 806-5400

MAYER BROWN LLP
Attorneys for Speltz & Weis LLC a/k/a Wellspring
Management Services LLC, Huron Consulting
Group Inc. and Huron Consulting Services LLC
f/k/a Huron Consulting Group LLC

By: _____
      Jean-Marie L. Atamian
      Richard A. Lafont
1675 Broadway
New York, New York 10019
(212) 506-2500

FILED
NOV 27 2007
NEW YORK
COUNTY CLERKS OFFICE

SO ORDERED:

_____
Honorable Bernard J. Fried, J.S.C.

11/26/07

# Exhibit BB

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF SAINT
VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT
VINCENT CATHOLIC MEDICAL
CENTERS, et al.,

         Plaintiff,

   vs.

SPELTZ & WEIS LLC a.k.a WELLSPRING
MANAGEMENT SERVICES LLC, DAVID
E. SPELTZ, TIMOTHY C. WEIS, HURON
CONSULTING GROUP INC. and HURON
CONSULTING SERVICES LLC f.k.a
HURON CONSULTING GROUP LLC,

         Defendants.

Index No. 150446/2007

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CERTAIN DEFENDANTS' CROSS-MOTION FOR ENTRY
OF AN ALTERNATIVE DOCUMENT PRESERVATION ORDER**

ALSTON & BIRD LLP
Attorneys for the Plaintiff
90 Park Avenue
New York, New York 10016
(212) 210-9400

LEGAL02/30574006v1

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CERTAIN DEFENDANTS' CROSS-MOTION FOR ENTRY
OF AN ALTERNATIVE DOCUMENT PRESERVATION ORDER**

Plaintiff, the Official Committee of Unsecured Creditors of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers (the "Committee"), et al., by and through its undersigned counsel, respectfully submits this Memorandum of Law in opposition to certain Defendants' Cross-Motion for Entry of an Alternative Document Preservation Order ("Defendants' Cross-Motion").

**PRELIMINARY STATEMENT**

Defendants' Cross-Motion seeking entry of an order imposing on the Committee (and the Committee's successor-in-interest in this litigation, the Litigation Trustee of the Litigation Trust Established Under the Litigation Trust Agreement Pursuant to the First Amended Chapter 11 Plan of Reorganization (the "Litigation Trust")) a duty to preserve documents in the possession of Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers ("Saint Vincents") is designed to secure a tactical advantage for the Defendants, not protect a legitimate interest in the preservation of documents. If Defendants were truly concerned that Saint Vincents might lose or destroy relevant documents, they would have requested that Saint Vincents voluntarily agree to preserve documents and data, and/or they would have served a subpoena *duces tecum*. They have done neither. Instead, Defendants seek an order imposing a duty on the Committee to preserve Saint Vincents' documents, a duty the Committee has no legal responsibility to perform and, regardless, is essentially powerless to fulfill. Accordingly, the Defendants' true motivation in making their Cross-Motion is revealed by the various points in their Cross-Motion where they acknowledge they intend to seek sanctions against the Committee (and potentially the Litigation Trust) if it is unable to secure

LEGAL02/30574006v1

---

Saint Vincents' compliance with Defendants' proposed preservation order. Such action defies logic and fairness. Indeed, Defendants obviously are intending to use their proposed order to create a discovery sideshow that will divert attention from the merits of the Committee's claims and gain and unjustifiable and unfair tactical advantage in this action. Defendants' gamesmanship should not be tolerated, and their Cross-Motion should be denied.

Of significance, Defendants acknowledge that there is no New York law that supports entry of an order requiring a party to preserve a non-party's documents, and the federal authorities Defendants have cited (all of which construe the Federal Rules of Procedure, not the CPLR) are inapposite because they deal *only* with production of documents and other evidence, not the preservation of evidence outside a party's control. That distinction is particularly significant in this action because the right of the Litigation Trustee to seek disclosure of evidence from Saint Vincents does not include the broad and distinct power to force Saint Vincents to implement policies and practices to ensure that evidence is preserved.

Defendants have not, and cannot, rebut the Committee's showing that it would be fundamentally inequitable to put the Committee and its successor-in-interest, the Litigation Trust, in the position of policing non-party Saint Vincents' compliance with a document preservation order. The operative documents governing the relationship between Saint Vincents and the Committee and Litigation Trust *do not* require Saint Vincents to preserve relevant evidence or heed any instruction the Committee or Litigation Trustee might give to preserve documents and data. Given the size of Saint Vincents, the many individuals it employs and the complexity and scope of its document and data storage systems, neither the Committee nor the Litigation Trustee is in a position to ensure that Saint Vincents takes all steps necessary to comply with a document and data preservation order.

2

---

Defendants also have no legal authority for their argument that an entity with a "substantial interest" in the litigation can be bound by a document preservation order entered in an action to which it is not a party. Even if such authority existed, it would not support entry of the order Defendants propose, because Saint Vincents has no such interest here. To the contrary, the relevant documents pertaining to the assignment of the rights to the claims in this action make clear that Saint Vincents' only interest in the outcome of this action is in repayment of a small loan it made to support the costs of prosecuting this action. This interest pales by comparison to that of the beneficiaries of the Litigation Trust, who stand to gain significant recoveries from the successful conclusion of this action against Defendants.

For these reasons, as discussed more fully below, the Court should decline to enter Defendants' proposed order.[1]

**ARGUMENT**

**I.    There is No Legal or Other Basis to Support Entry of a Document Preservation Order Extending to a Non-Party.**

The CPLR does not impose on the Committee preservation obligations with respect to documents and data in the possession of Saint Vincents. Under the CPLR, a party can be held accountable for evidence held by a non-party only where there is a clear showing of control by the party. CPLR § 3101(a)(2). As McKinney's Practice Commentaries explicitly recognize, where a non-party who assigned a claim to the plaintiff fails to abide by party disclosure obligations, its "default will not be visited on the ultimate party, who therefore cannot be punished under CPLR § 3126, absent some clear showing of control by the party or collusion."

---

[1] Defendants' shrill accusation that the Committee has sought intentionally to create the "misapprehension" that the proposed order attached to its opening Affirmation (as Exhibit A) is identical to the one attached to its September 24, 2007 letter to the Court is baseless. The Committee has nothing to gain by creating such a "misapprehension," and it was merely a clerical error that resulted in the newly proposed order being attached to the copy of the September 24 letter that appeared as Exhibit B to the Affirmation.

3

*See* Commentary C3101:20. Here, neither the Committee nor the Litigation Trustee has the requisite control over Saint Vincents' and its document and data retention policies and practices to support an order requiring the Committee or the Litigation Trustee to preserve evidence solely in the custody and control of non-party Saint Vincents.

Defendants' inapposite case authorities do not support entry of the order they propose. First, expressly conceding that there is no New York State laws supporting their position, Defendants seek to rely on federal case law construing the Federal Rules of Civil Procedure. *See* Defendants' Cross-Motion at 2, n. 2. It is black letter law, however, that New York State Court practice and procedure is governed by the CPLR, as construed by the courts in this state. *See M. J. Hall & Co., Inc. v. Johnson,* 92 N.Y.S.2d 202, 204 (Sup. Ct. 1940) ("[t]he practice and procedure prevailing in the state in which the action is brought govern").

Second, even the federal court authorities invoked by Defendants do not address the issue presented by Defendants' proposed order: whether the Committee should be obligated to secure Saint Vincents' compliance with a document and data preservation order. Instead, Defendants rely on cases that address *disclosure* of evidence by non-parties. *See Bank of New York v. Meridien BIAO Bank Tanzania Ltd,* 171 F.R.D. 135 (S.D.N.Y. 1997) (motions to compel documents and depositions); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Corp.,* 105 F.R.D. 16 (S.D.N.Y. 1984) (motion to compel production of documents); *Firemen's Mutual Ins. Co. v. Erie-Lackawanna R. Co.,* 35 F.R.D. 297 (N.D. Ohio 1964) (objections to interrogatories); *In re Infant Formula Antitrust Litigation,* 1992 WL 503465 (N.D. Fla. 1992) (production of documents); *JP Morgan Chase Bank v. Winnick,* 228 F.R.D. 505 (S.D.N.Y. 2005) (objections to document requests, interrogatories, and deposition notices); *M.L.C., Inc. v. North American Philips Corp.,* 109 F.R.D. 134 (D.C.N.Y. 1986) (motion for

4

imposition of sanctions based on allegations of untimely document production, suppression and destruction of documents); *In re Nasdaq Market-Makers Antitrust Litigation,* 169 F.R.D. 493 (S.D.N.Y. 1996) (motion to compel discovery of deposition transcripts and other documents); *Scott v. Arex, Inc.,* 124 F.R.D. 39 (D. Conn. 1989) (motion to compel interrogatory responses and production of documents). Defendants expressly concede that an assignee's document *preservation* obligations with respect to an assignor's documents is an issue of first impression for New York State courts. *See* Defendants' Cross-Motion at 2, n. 2.

Defendants point to the First Amended Chapter 11 Plan of Reorganization (the "Plan") and the Litigation Trust Agreement Pursuant to the First Amended Chapter 11 Plan of Reorganization for Saint Vincents (the "Litigation Trust Agreement") as evidence that Plaintiff has the power to compel Saint Vincents to preserve evidence. Even if they did, neither the Plan nor the Litigation Trust Agreement convey any rights from Saint Vincents to the current Plaintiff, the Committee. Accordingly, neither document supports entry of Defendants' proposed order. Moreover, neither the Plan nor the Litigation Trust Agreement imposes preservation obligations on Saint Vincents. Even if they did, it is not the Committee or Litigation Trust that should bear the burden and risk of Saint Vincents' compliance.

The Plan and the Litigation Trust Agreement do extend certain rights to the Litigation Trust, but those rights extend only so far as obligating Saint Vincents to provide documents and other evidence upon request, and only to the extent such documents and evidence are then in Saint Vincents' possession. In relevant part, the Litigation Trust Agreement provides:

> upon reasonable notice, [Saint Vincents] shall provide information, *to the extent [Saint Vincents] has such information,* to the Litigation Trustee sufficient to enable the Litigation Trustee to perform its duties hereunder. [Saint Vincents] shall cooperate with the Litigation Trustee in the administration of the Litigation Trust, including, without limitation, in providing documentation, witness

5

testimony, and other evidence in support of the prosecution of the Litigation Claims.

Johnson Aff., Ex. G § 2.6 (emphasis added); *see also* Johnson Aff., Ex. F § 6.5(n).

The provision on which Defendants rely thus extends to the Litigation Trustee the right to obtain disclosure of evidence from Saint Vincents, but not to dictate how Saint Vincents treats that evidence while it is still in Saint Vincents' possession. This distinction is significant because a document preservation order imposes different obligations on the entity subject to the order, obligations that require a high level of access to and control over the entity's personnel and processes.

In the case of Saint Vincents, compliance with a document preservation order will be a very significant undertaking. Saint Vincents is one of the New York metropolitan area's largest employers, with approximately 6,250 employees. Reorganized Saint Vincents includes two hospitals and also operates numerous affiliates, including four skilled nursing facilities, a hospice, a system-wide home health care agency, and dozens of off-site ambulatory care centers, all of which provide a broad array of medical, psychiatric and substance abuse services. Implementation of a document and data preservation order would be a monumental task for Saint Vincents itself, entailing the adoption of document and data retention policies and procedures tailored to the Saint Vincents organization, communicating those policies and procedures to relevant employees, and monitoring and ensuring compliance with those policies and procedures.

Imposing any preservation obligation of Saint Vincents on the Committee or Litigation Trust would be contrary to applicable law and would cause undue burden, expense, and unfairness. Indeed, the Committee and the Litigation Trustee have none of the tools needed to succeed at this massive undertaking. As set forth above, the Plan and the Litigation Trust Agreement require Saint Vincents only to provide documents and other evidence in its

6

possession to the Litigation Trustee upon request. Importantly, neither document conveys to the Litigation Trust the right to impose document and data polices and practices on Saint Vincents, the right to disseminate and implement those policies and practices, or the right to take steps to ensure compliance. *See* Johnson Aff., Ex. F.

If Saint Vincents were to refuse the Litigation Trust's request that Saint Vincents turn over evidence in its possession, the Litigation Trust could seek to enforce the parallel provisions in the Plan and the Litigation Trust Agreement in the bankruptcy court or other court of competent jurisdiction. But if Saint Vincents were to refuse to adopt and implement policies designed to ensure the preservation of documents and other evidence, the Litigation Trust would have no recourse.

While the Committee or the Litigation Trust is left without a remedy in the event Saint Vincents fails to take appropriate preservation measures, Defendants have made clear they fully intend to seek their own remedies, in the form of sanctions against the Committee or Litigation Trust. Defendants argue that "Plaintiff and the Litigation Trust must *bear the burden* of any failure by Saint Vincents to preserve documents." Defendants' Cross-Motion at 9 (emphasis added). Defendants also tout the "*in terrorem* effect of a spoliation charge and/or potential striking of the Complaint." *Id.* at 12, n. 7. Defendants' Cross-Motion thus reflects their transparent strategy to impose a duty on the Committee and the Litigation Trustee that will be difficult if not impossible to carry, and then seek to have sanctions imposed against the Litigation Trustee, creating a sideshow designed to distract from Defendants' massive breaches of contractual and other legal duties.

While entry of Defendants' proposed order would create a risk of serious prejudice to the Committee and the Litigation Trust, Defendants cannot demonstrate that any substantive harm

7

will result if their Cross-Motion is denied. Defendants do not dispute that they have taken no steps to secure Saint Vincents' voluntary agreement to implement appropriate preservation policies and procedures. Defendants have also failed to serve a subpoena on Saint Vincents prior to the Court's imposition of a discovery stay. Indeed, the Committee has already indicated that it has no objection to a limited carve-out from the discovery stay to permit Defendants to serve a subpoena *duces tecum* on Saint Vincents for the sole purpose of notifying Saint Vincents of the pending litigation and the requirement, in the future, that it may have to comply with the subpoena and document production related to the pending litigation. By serving a subpoena directly on Saint Vincents, Defendants could seek appropriate relief under the CPLR in the event Saint Vincents lost or destroyed evidence. CPLR § 2301, *et seq.* Defendants offer no explanation why they have not pursued any of these options.

Finally, Defendants' claim that the Committee and the Litigation Trust have been afforded "unfettered access to St. Vincents' documents prior to initiating this action" is baseless. Defendants' Cross-Motion at 11. Defendants ignore the reality that, having been formed nearly two years prior to the commencement of this action, the Committee has first-hand knowledge of many of the breaches of contractual and common law duties that form the basis of its Complaint. Moreover, most of the documents that lie at the heart of the action are already in the public domain, as they were filed by Defendant Huron Consulting Group Inc. ("Huron Inc."), a publicly held company, in connection with its acquisition of Defendant Speltz & Weis LLC or in the bankruptcy court in connection with Saint Vincents' bankruptcy case. The Committee also had significant information available to it by virtue of its direct involvement in the bankruptcy court dispute over the fee application made by Saint Vincents' former bankruptcy counsel, McDermott Will & Emery (the "McDermott Fee Dispute"). The conduct that supports the Committee's

8

claims against the Defendants in this action was also the subject of the McDermott Fee Dispute, which was tried in open court at a three-day hearing.[2] *See* Decision on Objections to Application For Fees and Expenses, August 29, 2007.[3]

For these reasons, the Court should decline to enter the Defendants' proposed preservation order.

## II. Saint Vincents Does Not Have a Substantial Interest in this Action.

In addition to there being no legal or other basis for entry of the Defendants' proposed preservation order, case law is clear that Saint Vincents does not have a substantial interest in this action to warrant the imposition of the Defendants' proposed order. In fact, Defendants do not, and cannot, cite any relevant authority to support their argument that a non-party's "substantial interest" in a litigation makes it appropriate to impose on a party a duty to ensure the non-party preserves relevant evidence. Defendants misplace reliance on *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 33-34 (S.D.N.Y. 1984). The court in the *Compagnie* case, interpreting the discovery requirements under Rule 34 of the Federal Rules of Civil Procedure, concluded that discovery should be permitted from the French government, a non-party, because it determined that the plaintiff, an agent of the government, was in possession and/or control of the government's documents. *Id.* at 32-33. The fact that the government had a "substantial interest" in the outcome of the case was only one factor in assessing whether an agency relationship existed. It was not, as Defendants suggest, the determinative factor in the court's decision to allow discovery of the French government.

---

[2] Indeed, counsel for Defendants Huron Inc. and Huron Consulting Services LLC was present to observe the hearing on the McDermott Fee Dispute, where evidence on nearly all of the key issues in this action was presented.

[3] A copy of the August 29, 2007 decision is available on the CM/ECF system, docket entry 3628.

9

Even if Defendants were able to articulate such a legal principle, which they cannot, the Plan and the Litigation Trust Agreement make clear that Saint Vincents has only a limited and indirect interest in the outcome of this action. The beneficiaries of the Litigation Trust are "the holders of Allowed General Unsecured Claims against SVCMC . . . . and such other beneficiaries as described in the Litigation Distribution Schedule." Johnson Aff., Ex. F, § 6.5(a). Saint Vincents is not a holder of "Allowed General Unsecured Claims," and it is not a beneficiary described in the Litigation Distribution Schedule.[4] The Plan further provides that "no other entity, including the Debtors or Reorganized SVCMC (other than Reorganized SVCMC with respect to the Litigation Trust Loan), shall have any interest, legal, beneficial, or otherwise, in the Litigation Trust or the Litigation Trust Assets upon their assignment and transfer to the Litigation Trust (other than as provided herein or in the Litigation Trust Agreement)." Johnson Aff., Ex. F, § 6.5(e).

The "Litigation Trust Loan" referenced in the Plan gives Saint Vincents only a limited interest in the outcome of this action. Pursuant to the terms of the Plan, Saint Vincents initially funded the Litigation Trust with a $1 million grant and a $250,000 loan (the "Litigation Trust Loan") to pay the expenses of the Litigation Trust. Johnson Aff., Ex. F, §§ 1.83, 1.85, 1.86, 6.5(d). If the Litigation Trust has not already been repaid by the time of the final disposition of this action, a portion of the recovery would be used to repay the loan.

Saint Vincents' limited interest in the repayment of the Litigation Trust Loan stands in sharp contrast to the interest the Litigation Trust beneficiaries have in the millions of dollars that

---

[4] A General Unsecured Claim is a trade creditor claim. General Unsecured Claim is defined in the Plan as "any Claim that is not a Secured Claim, Administrative Expense Claim (including fees and costs for professional compensation and reimbursement), Priority Non-Tax Claim, Priority Tax Claim, MedMal Claim, PBGC Claim, DASNY Subordinated Claim, or Intercompany Claim." *See* Affirmation of Michael F. Johnson in Support of Plaintiff's Opposition to certain Defendants' Cross-Motion for Entry of an Alternative Document Preservation Order, Ex. F, § 1.70.

10

will be distributed to them upon the successful conclusion of this action. The Plan contains a schedule, or waterfall, for the distribution of the assets of the Litigation Trust, including any recovery in this action. Johnson Aff., Ex. F, § 1.78. To the extent there are assets to be distributed, they will be distributed as follows: (1) to pay the litigation costs of the Trust, such as attorneys fees; (2) to repay the $250,000 Saint Vincents loan; (3) to pay the trade creditors of the bankruptcy debtors seven percent of the total amount of their claims; (4) to be paid to holders of medical malpractice claims against the bankruptcy debtors, and the trade creditors to satisfy other unpaid portions of their recoveries; and (5) to fund Saint Vincents' defined benefit pension plan. Johnson Aff., Ex. F, § 1.78. Accordingly, Saint Vincents' interest in recovering its $250,000 loan is clearly not substantial. Indeed, it is significantly smaller than the interests of the other persons and entities described as Litigation Trust Beneficiaries, yet Defendants do not (and cannot) seek to impose a duty on the Committee or the Litigation Trustee to ensure that these beneficiaries preserve relevant evidence.

Contrary to Defendants' assertions, the June 29, 2007 Bankruptcy Court Stipulation, Agreement and Order (the "June 29 Order") does not reserve for Saint Vincents any right to initiate or continue to prosecute the claims in this action. The June 29 Order reserves Saint Vincents' rights to initiate other actions against other parties, but it explicitly carves out "those Litigation Claims which may be brought by the Creditors' Committee, as specifically authorized herein." Johnson Aff., Ex. E ¶ 4. The Committee was clearly authorized to initiate this action, so the claims herein are subject to the June 29 Order's carve-out. As such, only the Committee and its successor-in-interest, the Litigation Trust, have authority to prosecute this action and Saint Vincents has no rights to press the claims in this litigation and any recovery cannot rise to the level of a substantial interest.

11

**CONCLUSION**

For all of the foregoing reasons, the Court should deny Certain Defendants' Cross-Motion for Entry of an Alternative Document Preservation Order.

Dated:  New York, New York
        November 1, 2007

                         ALSTON & BIRD LLP


                         By: /s/ Michael E. Johnson
                         Michael E. Johnson
                         Brook A. Clark
                         90 Park Avenue
                         New York, New York 10016
                         Tel: (212) 210-9400
                         *Counsel for the Official Committee of*
                         *Unsecured Creditors of Saint Vincents*
                         *Catholic Medical Centers of New York d/b/a*
                         *Saint Vincent Catholic Medical Centers, et*
                         *al.*

12

# Exhibit CC

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5 ------------------------------------------------X

  In re

6

  SAINT VINCENT'S CATHOLIC MEDICAL        Chapter 11

7 CENTERS OF NEW YORK d/b/a SAINT          Case 05-14945

  VINCENT CATHOLIC MEDICAL CENTERS,       (ASH)

8 et al,

9                    Debtors.

  ------------------------------------------------X

10

11

12          *   C O N F I D E N T I A L   *

13     *   U N D E R   P R O T E C T I V E   O R D E R   *

14

15          DEPOSITION OF TIMOTHY C. WEIS

16              New York, New York

17          Wednesday, September 27, 2006

18

19

20

21

22

23

  Reported by:

24 ANNETTE ARLEQUIN, CSR, RPR

  JOB NO. 8585

25

Page 66

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2     A.  I believe it was in January or
3  February of 2004 wherein we actually asked Bill
4  for his thoughts about if we were to sell our
5  company, who we should be talking to.
6     Q.  Did you disclose to Mr. Smith that
7  you had had some discussions with Huron?
8     A.  We did disclose that there was a
9  discussion that had started with Huron, but we
10  were looking for other, other input about other
11  ones we should be talking to.
12     Q.  And do you recall what Mr. Smith said
13  to you in that communication?
14     A.  He said that the Huron-Speltz & Weis
15  linkage would be in his view a very good one.
16     Q.  Did he say why he concluded that?
17     A.  Yes.
18     Q.  What did he say?
19     A.  He thought that there would be
20  services Huron could provide for Speltz & Weis
21  clients and Speltz & Weis would be able to
22  expand nationally under the Huron platform,
23  geographic platform, and also network based so
24  that synergistically it would be a very good
25  business combination.
TSG Reporting - Worldwide      877-702-9580

Page 67

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2     Q.  This was an in-person conversation
3  that you had with Mr. Smith?
4     A.  I believe so.
5     Q.  Do you recall where it took place?
6     A.  I believe it was at a restaurant for
7  breakfast nearby Saint Vincent's.
8     Q.  Did you and Mr. Smith discuss at all
9  what ramifications to Saint Vincent's a business
10  combination between Speltz & Weis and Huron
11  would have?
12     A.  At that time?
13     Q.  Yes, in that conversation.
14     A.  I don't recall at that time having
15  that discussion.
16     Q.  Do you recall discussing with
17  Mr. Smith the subject of whether disclosure
18  should be made of these discussions to Saint
19  Vincent's board of directors?
20     A.  At that time I don't recall having
21  that discussion.
22     Q.  Did you discuss at that time with
23  Mr. Smith whether a business combination between
24  Speltz & Weis and Huron would be a potential
25  violation of the agreements that you, that is
TSG Reporting - Worldwide      877-702-9580

Page 68

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  Speltz & Weis, had with Saint Vincent's?
3     A.  I don't recall having that
4  discussion.
5     Q.  At that point in time had you given
6  any consideration to whether a business
7  combination between Huron and Speltz & Weis
8  would be a violation of the agreements between
9  Speltz & Weis and Saint Vincent's?
10     A.  No.
11     Q.  Had you --
12     MR. ATAMIAN:  Can I get a proffer of
13  relevance here?
14     I'm not sure this has any relevance
15  with the McDermott fee application that
16  we're here for today.
17     This is all very interesting, but it
18  seems to me that this is beyond the scope
19  of this proceeding.
20     MR. JOHNSON:  Mr. Atamian, I disagree
21  that you're entitled to any proffer of
22  relevance.
23     Of course relevance objections are
24  preserved for trial, but I will indicate
25  that issues surrounding the disclosures
TSG Reporting - Worldwide      877-702-9580

Page 69

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  that were made to Saint Vincent's by
3  Mr. Speltz, Mr. Weis and the McDermott firm
4  are very central to the dispute over
5  McDermott's fee application.
6  BY MR. JOHNSON:
7     Q.  Did you have a subsequent
8  conversation with Mr. Smith about a potential
9  acquisition of Speltz & Weis by Huron?
10     A.  Yes.
11     Q.  When was that?
12     A.  I believe it occurred sometime in
13  April of 2004.
14     Q.  Do you recall when in April it was?
15     A.  No, I don't.
16     Q.  Was it before or after you had
17  entered into the term sheet with Huron?
18     A.  The term sheet negotiation process
19  occurred over several weeks and I can't tell you
20  if we had a conversation at the conclusion of
21  that process or during that process.
22     MR. MAGALIFF:  I just need
23  clarification.
24     You've been saying April 2004.  Do
25  you mean 2005?
TSG Reporting - Worldwide      877-702-9580

Page 70

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2      THE WITNESS: I'm sorry. I misspoke.
3      You're correct. Thank you.
4  BY MR. JOHNSON:
5      Q.  You had a meeting with Mr. Smith in
6  April of 2005?
7      A.  No.
8          Well, hold it. Let me ask you to
9  clarify the question you just asked, please.
10     Q.  I'm referring to the communication
11 you had with Mr. Smith concerning the potential
12 acquisition of Speltz & Weis by Huron.
13         Was that an in-person meeting you had
14 with Mr. Smith?
15     A.  I do not believe so.
16     Q.  Over the telephone?
17     A.  I believe it was over the telephone.
18     Q.  What was discussed in that telephone
19 call?
20     A.  We relayed to Bill that the
21 discussions with Huron had proceeded to a point
22 where they were now serious; that there was an
23 agreement on the general terms of an actual
24 acquisition and that we needed to consider what
25 implications that would have for Saint Vincent's

Page 71

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  in the context of a bankruptcy filing and where
3  both Huron and Speltz & Weis would be rendering
4  services post-petition.
5      Q.  Did you initiate that call?
6      A.  I believe we did.
7      Q.  And when you say "we," was Mr. Speltz
8  also on the call?
9      A.  Yes.
10     Q.  Was the sole purpose of the call to
11 have the discussion concerning the potential
12 bankruptcy ramifications in the transaction?
13     A.  I don't recall if that was the sole
14 purpose.
15     Q.  Do you recall how long that call
16 lasted?
17     A.  It was something more than 15 minutes
18 and something less than 45 minutes.
19     Q.  What did Mr. Smith say when you
20 raised the subject with him?
21     A.  Well, he talked about the Jay Alix
22 Protocol which we were familiar with, both David
23 and I, having done restructuring work before.
24 In bankruptcy having heard of the Jay Alix
25 protocol, we were somewhat familiar with it.

Page 72

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2          He did not believe that it had ever
3  been used in this district and did not see that
4  it would be asserted in this district, that it
5  was likely to be asserted, but if it were
6  asserted, there would be a solution, he
7  believed, that would resolve any problems that
8  the Trustee, U.S. Trustee, would have or other
9  constituents in the case as a result of the Jay
10 Alix Protocol.
11     Q.  Did he describe that solution to you?
12     A.  Yes.
13     Q.  What did he tell you?
14     A.  That Speltz & Weis could be retained
15 as the sole professional firm and that to the
16 extent Speltz & Weis needed additional
17 resources, those could be retained through a
18 contracting or temporary employment arrangement
19 between Speltz & Weis and Huron.
20     Q.  What was your reaction to that
21 solution?
22     A.  Well, it satisfied, you know, a
23 potential concern that we had for us continuing,
24 us combined, both Huron and Speltz & Weis being
25 able to continue to provide services to the

Page 73

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  organization which were critical to the ongoing
3  operation, day-to-day operation, and also the
4  added complexity of a bankruptcy process.
5          So we were, you know, reassured I
6  guess, that, you know, that shouldn't be a major
7  issue that we couldn't overcome or it wouldn't
8  be a problem for the debtor in particular.
9      Q.  Did you express a preference that
10 Speltz & Weis and Huron be separately retained
11 in the bankruptcy?
12         MR. ATAMIAN: In the course of that
13 conversation?
14         MR. JOHNSON: In the course of that
15 conversation.
16     A.  I don't recall expressing a
17 preference.
18     Q.  Did you in that conversation discuss
19 with Mr. Smith the possibility that the solution
20 he described be the structure that would be
21 presented to the bankruptcy court in the first
22 instance?
23     A.  No. This was in the context of in
24 the event that a Jay Alix Protocol was asserted,
25 this would be the remedy for that. So it was

Page 74

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  not going to be how the structure was going to
3  be presented initially.
4      Q.  In the phone call with Mr. Smith, did
5  you discuss anything else other than the Jay
6  Alix Protocol issues?
7      A.  I just don't recall what else might
8  have been discussed.
9      Q.  Do you recall if Mr. Smith raised the
10  issue of disinterestedness with you in that
11  call?
12      A.  I don't recall that being raised.
13      Q.  Do you recall discussing in that
14  phone call with Mr. Smith the possibility that
15  there would be a conflict of interest if there
16  were to be a bankruptcy filing and if Huron were
17  to have acquired Speltz & Weis?
18      A.  I don't recall that being discussed
19  on that call.
20      Q.  Did you discuss on that call with
21  Mr. Smith whether disclosure should then be to
22  the Saint Vincent's board of directors of the
23  possibility of an acquisition of Speltz & Weis
24  by Huron?
25      A.  I don't recall that being discussed
TSG Reporting - Worldwide      877-702-9580

Page 75

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  on that call. It may have been, but I just
3  don't recall it.
4      Q.  At this point in time did you intend
5  to make disclosure to the Saint Vincent's board
6  of directors of the possibility of a Huron
7  acquisition of Speltz & Weis?
8      A.  Yes, absolutely.
9      Q.  When did you plan to make that
10  disclosure?
11      A.  As soon as we were able to under
12  terms of the confidentiality agreement and other
13  negotiations with Huron.
14      Q.  Did you understand that the terms of
15  the confidentiality agreement you had with Huron
16  prevented you from making disclosure of the
17  possibility of a Huron acquisition of Speltz &
18  Weis to the Saint Vincent's board of directors?
19      A.  Yes.
20      Q.  Did you obtain legal counsel on that
21  subject?
22          MR. ATAMIAN:  I'm going to object on
23      privilege grounds.
24          MR. JOHNSON:  I think I'm entitled to
25      get an answer as to whether he obtained
TSG Reporting - Worldwide      877-702-9580

Page 76

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  legal advice. The fact of legal advice
3  isn't privileged, the substance is.
4      I'm looking only for a yes or no
5  answer.
6          MR. ATAMIAN:  I'll let you ask him
7      whether he spoke to counsel about that
8      issue at that time.
9  BY MR. JOHNSON:
10      Q.  Did you speak to counsel about that
11  issue at that time?
12      A.  And the time frame you're talking to
13  is?
14      Q.  The time frame when you had your
15  telephone call with Mr. Speltz and Mr. Smith
16  about the possibility of a Huron acquisition of
17  Speltz & Weis.
18      A.  I don't recall.
19      Q.  Did there come a point in time where
20  you obtained legal advice on that subject?
21          MR. ATAMIAN:  I'm going to object on
22      privilege grounds and instruct you not to
23      answer.
24          Move on.
25          MR. JOHNSON:  You're instructing him
TSG Reporting - Worldwide      877-702-9580

Page 77

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2  not to answer on the issue of whether he
3  obtained legal advice?
4          MR. ATAMIAN:  I don't want you
5      getting into any privileged,
6      attorney-client privileged communications
7      with my client.
8      Move on. Next question.
9  BY MR. JOHNSON:
10      Q.  Do you accept your counsel's
11  instruction not to answer my question?
12          MR. ATAMIAN:  Yes, he does. You
13      don't have to ask my client that question.
14      He will follow my instructions.
15          MR. JOHNSON:  I'd like an answer to
16      my question.
17          MR. ATAMIAN:  Go ahead. Answer.
18      A.  Yes, I take my counsel's advice.
19      Q.  Did you discuss with Mr. Speltz
20  whether the terms of the confidentiality
21  agreement that you had with Huron prevented you
22  from making disclosure to the Saint Vincent's
23  board of the possibility of a Huron acquisition
24  of Speltz & Weis?
25          MR. ATAMIAN:  Answer that only if you
TSG Reporting - Worldwide      877-702-9580

Page 78

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1   can do so without disclosing any potential
2   attorney-client communications.
3   A.  Yes.
4   Q.  When did you have those discussions
5   with Mr. Speltz?
6   A.  Well, from the beginning of when we
7   signed the confidentiality statement, we had
8   discussions about what we were entering into and
9   how that would preclude us from acknowledging
10  discussions about discussions with Huron on to
11  anyone; not just the Saint Vincent's board, but
12  other clients, our own employees, anyone else.
13  Q.  When did you enter into that
14  agreement with Huron?
15  A.  I believe it was in January of 2005.
16  Q.  Did you negotiate the terms of the
17  confidentiality agreement with Huron?
18      THE WITNESS: I can't answer that.
19      MR. ATAMIAN: Because of privilege
20  reasons?
21      THE WITNESS: Yes.
22  BY MR. JOHNSON:
23  Q.  Did you ask Huron for a carveout from
24  the confidentiality agreement to permit you to

TSG Reporting - Worldwide    877-702-9580

Page 79

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1   make disclosure to Saint Vincent's of the
2   possibility of a Huron acquisition of Speltz &
3   Weis?
4   A.  I do not remember.
5   Q.  Did you obtain a carveout from the
6   confidentiality agreement that allowed you to
7   make disclosure of the possibility of a Huron
8   acquisition of Speltz & Weis to Mr. Smith?
9       THE WITNESS: Can you repeat the
10  question?
11      (Question was read back as follows:
12      "QUESTION: Did you obtain a carveout
13      from the confidentiality agreement that
14      allowed you to make disclosure of the
15      possibility of a Huron acquisition of
16      Speltz & Weis to Mr. Smith.")
17  A.  I do not believe so.
18  Q.  Did you consider it to be a violation
19  of the terms of your confidentiality agreement
20  with Huron when you made disclosure of the
21  possibility of the Huron acquisition of Speltz &
22  Weis in April of 2005?
23  A.  It wasn't, it wasn't discussed.  What
24  was considered was more relevant, which was the

TSG Reporting - Worldwide    877-702-9580

Page 80

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1   implications that it would have for the
2   retention of Huron and Speltz & Weis in
3   bankruptcy.  We thought it was prudent for us to
4   seek proactive advice about that.
5   Q.  In that telephone call with
6   Mr. Smith, did you ask him not to make a
7   disclosure to the Saint Vincent's board --
8   A.  I --
9       MR. ATAMIAN: Let him finish.
10  Q.  -- of the possibility of a Huron
11  acquisition of Speltz & Weis?
12  A.  I don't recall that specifically.
13  Q.  Was it your understanding that
14  Mr. Smith was not going to make any disclosure
15  to the Saint Vincent's board of directors?
16      MR. ATAMIAN: I caution you not to
17  speculate.
18  A.  I can't -- I can't really answer
19  that.
20  Q.  In that phone call did Mr. Speltz ask
21  Mr. Smith not to make disclosure to the Saint
22  Vincent's board of directors?
23  A.  Okay.  What I recall is disclosing in
24  the conversation the fact that we were bound by

TSG Reporting - Worldwide    877-702-9580

Page 81

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1   a confidentiality agreement; that Huron
2   Consulting Group was a public company.
3   Disclosures about pending business transactions
4   could not be done with public companies without
5   violating potentially SEC rules.
6       And that, you know, the conversation
7   we were having was meant to be a private
8   conversation solely for the purpose of
9   determining implications of that business
10  combination for purposes of impacting the
11  retention of both firms in the event of a Saint
12  Vincent's filing.
13  Q.  Do you recall whether Mr. Smith
14  expressed any concern in that phone call that he
15  had a duty to make disclosure to the Saint
16  Vincent's board of directors?
17  A.  I do not remember.
18  Q.  Do you recall Mr. Smith expressing a
19  concern in that phone call that your disclosure
20  of this information to him put him in a position
21  where he had a conflict of interest?
22  A.  I don't recall that either.
23  Q.  Mr. Smith did not express any
24  concerns in that phone call to you about his

TSG Reporting - Worldwide    877-702-9580

Page 82

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1  ability to give you advice over the potential
2  implications that this transaction would have in
3  the event that Saint Vincent's filed for
4  bankruptcy; is that correct?
5      MR. MAGALIFF:  Could you read that
6  question back, please?
7      (Question was read back as follows:
8      "QUESTION:  Mr. Smith did not express
9  any concerns in that phone call to you
10  about his ability to give you advice over
11  the potential implications that this
12  transaction would have in the event that
13  Saint Vincent's filed for bankruptcy; is
14  that correct?")
15      A.   I don't recall any concerns being
16  expressed.
17      Q.   Speltz & Weis entered into the
18  membership interest Purchase and Sale Agreement
19  with Huron effective as of May 5th, 2005; is
20  that correct?
21      A.   Yes, I believe that's correct.
22      Q.   Let me show you a copy of the
23  document?
24      MR. JOHNSON:  And ask that the court

TSG Reporting - Worldwide    877-702-9580

Page 83

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1  reporter mark this as Weis Exhibit 3.
2      (Exhibit Weis 3, Purchase and Sale
3  Agreement between Huron Consulting Group,
4  Speltz & Weis LLC, SC Holding LLC, David E.
5  Speltz and Timothy C. Weis, is marked for
6  identification, as of this date.)
7  BY MR. JOHNSON:
8      Q.   Mr. Weis, the document the court
9  reporter has just handed you is marked as Weis
10  Exhibit 3 and it bears Bates No. MWE-C-3481
11  through 3521.
12      Do you recognize this document?
13      A.   Yes, I do.
14      Q.   What is it?
15      A.   I'm sorry?
16      Q.   What is it?
17      A.   What is it?
18      Q.   For the record, please.
19      A.   It's the Purchase and Sale Agreement
20  between Huron Consulting Group, Speltz & Weis
21  LLC, SC Holding LLC, David E. Speltz and Timothy
22  C. Weis.
23      Q.   And you entered into this agreement
24  on May 5th, 2005; is that correct?

TSG Reporting - Worldwide    877-702-9580

Page 84

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1      A.   Correct.
2      Q.   Between the time that you had the
3  telephone conversation with Mr. Speltz and
4  Mr. Smith in April of 2005 and May 5th, 2005,
5  did you have any other communications with
6  Mr. Smith where you discussed the potential
7  acquisition?
8      A.   I don't remember if there were any
9  others.
10      Q.   Do you recall if there were any
11  discussions that you had at any time prior to
12  May 5th, 2005 with any McDermott attorney about
13  the possible acquisition?
14      A.   I don't remember any others.
15      Q.   Prior to May 5th of 2005, did you
16  make any disclosure to the Saint Vincent's board
17  of directors of the potential acquisition?
18      A.   No.
19      Q.   To your knowledge, did Mr. Speltz
20  make any disclosure to Saint Vincent's board of
21  directors of the potential acquisition?
22      A.   Not to my knowledge.
23      Q.   Prior to May 5th, 2005, did you ever
24  understand that Mr. Speltz intended to make

TSG Reporting - Worldwide    877-702-9580

Page 85

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1  disclosure of the potential acquisition to the
2  Saint Vincent's board of directors in advance of
3  signing a final agreement with Huron?
4      MR. ATAMIAN:  Object to the form.
5  Calls for speculation.
6  BY MR. JOHNSON:
7      Q.   I just need your knowledge.  Please
8  answer.
9      A.   To my knowledge, no.
10      Q.   To your knowledge, prior to May 5th,
11  2005, did any McDermott attorney make disclosure
12  to the Saint Vincent's board of directors of the
13  potential acquisition?
14      A.   I'm not aware of that.
15      Q.   And was it your understanding at any
16  time prior to May 5th 2005 that any McDermott
17  attorney intended to make disclosure of the
18  potential acquisition to the Saint Vincent's
19  board of directors?
20      MR. ATAMIAN:  Objection. Calls for
21  speculation.
22  BY MR. JOHNSON:
23      Q.   I just need what you know or
24  understand.

TSG Reporting - Worldwide    877-702-9580

Page 186

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    A.  Correct.
3    Q.  Do you believe that up until August
4  24th, the board of Saint Vincent's had
5  confidence in you and David Speltz as CFO and
6  CEO of the hospital?
7    A.  Yes, I believe so.
8    Q.  Do you believe that you and David had
9  the ability to guide Saint Vincent's through a
10  Chapter 11 case?
11    A.  Absolutely.
12    Q.  We understand from other testimony,
13  not today, that McDermott Will & Emery became
14  more active in planning for Saint Vincent's
15  bankruptcy around March of 2005 than they had
16  been previously.
17    Does that comport with your
18  recollection?
19    MR. ATAMIAN:  In answering that, you
20  should disregard counsel's characterization
21  of what might or might not have been
22  testified to in other depositions.
23    A.  Okay.  My recollection is that the
24  activity picked up slightly later than that, in
25  the April time frame as opposed to March.

TSG Reporting - Worldwide       877-702-9580

Page 187

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    Q.  As the CFO, were you actively
3  involved in helping to prepare the company to
4  file for Chapter 11.
5    A.  Yes, I was.
6    Q.  Were you involved in helping the
7  company or helping McDermott obtain
8  debtor-in-possession financing?
9    MR. ATAMIAN:  Object to the form.
10  Compound.
11    Which one?
12  BY MR. MAGALIFF:
13    Q.  Were you involved in helping to
14  obtain debtor-in-possession financing for the
15  company for an eventual Chapter 11 filing?
16    A.  Yes, I was involved.
17    Q.  When did either McDermott or Huron
18  actively start seeking debtor-in-possession
19  lenders if you know?
20    A.  I believe it started occurring just
21  prior to the filing.
22    Q.  Would you say around the beginning of
23  June 2005?
24    A.  Probably sometime in June.  I don't
25  remember if it was the beginning or the end.

TSG Reporting - Worldwide       877-702-9580

Page 188

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    Q.  Did either you or, if you know, David
3  instruct McDermott Will & Emery prior to the
4  beginning of June 2005 not to seek
5  debtor-in-possession financing?
6    A.  Can you repeat that question?
7    Q.  I'll rephrase it.  Withdraw the
8  question.
9    Did you or David instruct McDermott
10  to first try to seek financing outside of a
11  Chapter 11 case rather than debtor-in-possession
12  financing?
13    THE WITNESS:  Okay.  Again, I'm
14  sorry, I have to ask you to repeat the
15  question.
16    (Question was read back as follows:
17    (QUESTION:  Did you or David instruct
18  McDermott to first try to seek financing
19  outside of a Chapter 11 case rather than
20  debtor-in-possession financing?")
21    A.  No, but McDermott wasn't charged with
22  seeking debtor-in-possession financing.
23    Q.  Who was charged with seeking
24  debtor-in-possession financing?
25    A.  Huron was.

TSG Reporting - Worldwide       877-702-9580

Page 189

1  WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    Q.  Prior to June 2005, was Huron seeking
3  debtor-in-possession financing for Saint
4  Vincent's?
5    A.  Again, I think I testified earlier
6  that that process started sometime in June of
7  2005.
8    Q.  Is there any reason, to your
9  knowledge, why Huron did not start trying to
10  line up debtor-in-possession financing prior to
11  June of 2005?
12    A.  Absolutely.  There were a number of
13  liquidity enhancing strategies that were
14  underway, all the way -- stemming all the way
15  back from the beginning of when we presented the
16  first turnaround plan in April of 2004, all the
17  way through June of 2005 until when it became
18  apparent that our strategies were being limited
19  in number and in magnitude and we were
20  increasingly entering a period of accelerating
21  financial crisis, that we were going have to be
22  seeking a filing and seeking therefore
23  debtor-in-possession financing.
24    Q.  Was McDermott aware of the fact that
25  prior to June 2005, debtor-in-possession

TSG Reporting - Worldwide       877-702-9580

48

Page 190

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    financing was not a high priority of the
3    company?
4        MR. ATAMIAN: Objection. As
5    presently phrased, calls for speculation.
6        THE WITNESS: Okay. I'm sorry. Can
7    you repeat the question?
8        (Question was read back as follows:
9        "QUESTION: Was McDermott aware of
10    the fact that prior to June 2005,
11    debtor-in-possession financial was not a
12    high priority of the company?")
13        MR. ATAMIAN: Object to the form.
14    Calls for speculation.
15    A.    Well, look, you know, a bankruptcy
16    filing was sort of on and off as far as a
17    possibility since even before David Speltz and I
18    got to the organization. Quite frankly the
19    organization was insolvent when we got there,
20    even before we got there, so therefore
21    debtor-in-possession financing, you know, would
22    have been a priority if the organization had to
23    file for bankruptcy.
24        It was possible the organization
25    could have filed for bankruptcy much earlier

TSG Reporting - Worldwide    877-702-9580

Page 191

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    than it did. As I said, we had a number of
3    liquidity enhancing strategies underway, many of
4    which were successful and we were successfully
5    able to keep the organization from doing a
6    filing and needing therefore a
7    debtor-in-possession financing vehicle.
8        It was only becoming very apparent
9    that a filing was going to be almost inevitable
10    sometime in June of 2005.
11    Q.    How many acute care hospitals have
12    you been involved with that ended up filing for
13    Chapter 11 prior to Saint Vincent's?
14    A.    How many hospitals?
15    Q.    Acute care hospitals that ended up
16    filing for Chapter 11 prior to Saint Vincent's,
17    if any.
18    A.    Over a dozen.
19    Q.    And how many acute care hospitals
20    have you been involved with outside of Chapter
21    11? More than a dozen?
22    A.    At least a couple dozen.
23    Q.    Okay. When you learned from
24    Elizabeth St. Clair that she was recommending to
25    the board that they engage outside counsel to

TSG Reporting - Worldwide    877-702-9580

Page 192

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    review the Huron Speltz & Weis transaction, did
3    you become incensed or angry?
4    A.    No.
5    Q.    Did you have any negative reaction at
6    all to the fact that she was going to recommend
7    bringing in outside counsel?
8    A.    No. I respected from a professional
9    standpoint her need to fulfill her professional
10    duty as counsel for the board and I respected
11    the board's fiduciary obligations to, for them
12    to be fulfilled, so no.
13    Q.    Is that what you told her?
14    A.    I don't remember if that's what I
15    told her. I don't remember if I said anything
16    at that time about her except that we would be
17    cooperative as I said earlier.
18    Q.    Did Speltz & Weis' counsel review the
19    retention application and your affidavit prior
20    to filing them on July 5th, 2005?
21        Separate and apart from McDermott,
22    was it counsel for Speltz & Weis that reviewed
23    the retention application and your affidavit?
24    A.    I don't believe so.
25    Q.    Do you recall any discussions with

TSG Reporting - Worldwide    877-702-9580

Page 193

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    anybody from McDermott Will & Emery about the
3    particular disclosures that would need to be
4    made in your affidavit or in the application?
5    A.    The discussions centered around the
6    financial arrangements.
7    Q.    Was that prior to the filing, if you
8    recall?
9    A.    There was, yeah, data that was being
10    requested of me relative to the amounts paid for
11    services or that would be charged for services
12    post-petition, and also the names of the people,
13    the rates that they charged, all that
14    information, that was the focus of the
15    disclosure as I recall. It wasn't much
16    discussion, if any, about additional
17    disclosures.
18    Q.    So you don't recall disclosures for
19    the July 5th set of papers pertaining to the
20    Huron transaction or the earnout or anything
21    like that?
22        MR. ATAMIAN: Object to the form of
23    the question. It's vague and ambiguous.
24    A.    Not to any detail.
25    Q.    Okay. Did you tell anybody at

TSG Reporting - Worldwide    877-702-9580

49

| | |
|---|---|
| Page 198 | Page 199 |

**Page 198**

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    your team and then changed them or redid them?
3        A.   Well, I asked them to make
4    alternative projections based upon what if
5    scenarios.
6        Q.   You're not aware of any situations or
7    you're not aware of any instances where Huron
8    came in and took a look at any of these
9    projections and said, these assumptions are
10   wrong, these calculations are wrong, these don't
11   make sense?
12       A.   Well, by the very nature of
13   projections, okay, they are subject to
14   estimations and assumptions and literally the
15   day after they're prepared, they are subject to
16   being updated based upon new information. So
17   every time we did a projection, there was always
18   an updating of the assumptions and the estimates
19   based upon new information.
20           And that was -- that is the very
21   nature of doing projections by both my staff and
22   Huron's staff and...
23       Q.   You testified?
24           MR. ATAMIAN:  Were you done?  I'm
25   sure you're not doing it on purpose, but
     TSG Reporting - Worldwide    877-702-9580

**Page 199**

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2        did you cut the witness off or were you
3        done with your answer?
4    BY MR. MAGALIFF:
5        Q.   Did I cut you off?  I thought you
6    were done.
7        A.   I am done.
8           MR. ATAMIAN:  I apologize.  Go ahead.
9    BY MR. MAGALIFF:
10       Q.   You testified that you've been
11   involved in many Chapter 11 cases, correct?
12       A.   Correct.
13       Q.   In a management role?
14       A.   Correct.
15       Q.   Okay.  As a person from a crisis
16   management firm who has been involved in a
17   management role in many Chapter 11 cases, do you
18   have any opinions as to the services that
19   McDermott and Bill Smith provided to the debtors
20   during your tenure?
21           MR. ATAMIAN:  Well, let me object.
22   He's not here as an expert witness.
23           MR. MAGALIFF:  I'm not asking him as
24   an expert witness.  I qualified it to lay a
25   foundation.
     TSG Reporting - Worldwide    877-702-9580

| | |
|---|---|
| Page 200 | Page 201 |

**Page 200**

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2    BY MR. MAGALIFF:
3        Q.   Do you understand the question?
4           MR. ATAMIAN:  It sounds like you're
5    asking for expert opinion, but go ahead.
6    BY MR. MAGALIFF:
7        Q.   I'm not asking you as an expert, I'm
8    only asking you in your experience.
9           THE WITNESS:  Can you repeat the
10   question?  Will you read the question.
11          (Question was read back as follows:
12   "QUESTION:  As a person from a crisis
13   management firm who has been involved in a
14   management role in many Chapter 11 cases,
15   do you have any opinions as to the services
16   that McDermott and Bill Smith provided to
17   the debtors during your tenure?")
18          MR. HILLMAN:  I have an objection to
19   the form of the question.  It's vague, it's
20   ambiguous.
21          What services are you referring to;
22   any and all services, the legal services?
23          Even if you could qualify him as a
24   layperson, you're asking him to give you an
25   opinion based upon his background and
     TSG Reporting - Worldwide    877-702-9580

**Page 201**

1    WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
2        you're asking him to give an opinion on
3        legal services, so I have an objection.
4    BY MR. MAGALIFF:
5        Q.   Notwithstanding all of these
6    objections which the judge may one day rule on,
7    do you have an opinion about the job that
8    McDermott did and Bill Smith did while you were
9    both employed by Saint Vincent's?
10          MR. HILLMAN:  Objection to the form.
11   BY MR. MAGALIFF:
12       Q.   You're allowed to answer if you can,
13   and if you don't have an opinion, you can say
14   that too.
15       A.   I have an opinion.
16       Q.   What is it?
17       A.   I believe that the work that was done
18   leading up to the bankruptcy filing was
19   extremely competent and value added for the
20   organization and valuable advice for the
21   management and the board at that time of the
22   organization.
23          The preparation for the filing was,
24   you know, although it was the first one I had
25   done, that is, an initial filing as opposed to
     TSG Reporting - Worldwide    877-702-9580

Page 202

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
1
2  being involved after filing, I thought was work
3  that was very well done and very accurate and
4  did the organization a very good job of
5  preparing it.
6        After the filing there were some
7  difficulties over the process to get St. Mary's
8  approved and to get Huron and Speltz & Weis
9  retained.
10        Those difficulties were in the case
11  of St. Mary's, I think one in which the court
12  was probably being a little bit difficult to
13  deal with, the court process, the bankruptcy
14  court process in this particular district.
15        The Speltz & Weis applications, I
16  think it was the Trustee and the Committee's
17  difficulties that for whatever reason, which
18  still remains a mystery to me today, they were
19  unable to overcome at that time on an
20  expeditious basis. I am still not sure if that
21  was McDermott Will's doing or other people.
22    Q.    Would you have done anything
23  differently as the chief financial officer of
24  Saint Vincent's if you had it to do over again?
25        MR. HILLMAN: Objection.

TSG Reporting - Worldwide        877-702-9580

Page 203

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
1
2        MR. ATAMIAN: Objection. Calls for
3  speculation. Objection to form.
4        MR. HILLMAN: Ditto.
5    A.    Based upon inform -- I need to ask
6  you to clarify. Is it based upon information I
7  knew at the time or based upon information I
8  know today?
9    Q.    Based on information you knew at the
10  time. Let's start with that.
11        MR. HILLMAN: Object to the form.
12        MR. ATAMIAN: Yeah, you're not an
13  expert witness. You really don't need to
14  speculate.
15        MR. MAGALIFF: I'm asking him.
16        MR. ATAMIAN: I understand that.
17        MR. HILLMAN: Are you asking him
18  what --
19        MR. ATAMIAN: But he's not an expert
20  witness. He's not here to speculate.
21        MR. HILLMAN: Are you asking him what
22  he would have done differently in the
23  bankruptcy case, before the bankruptcy
24  case, with respect to retention,
25  St. Mary's, anything that he's testified to

TSG Reporting - Worldwide        877-702-9580

Page 204

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
1
2  here today?
3        It's a slightly broad question,
4  notwithstanding the speculative nature of
5  the question as well.
6  BY MR. MAGALIFF:
7    Q.    Let me ask it this way: You were
8  surprised when you got fired, right?
9    A.    Yes.
10    Q.    Have you thought about the events
11  that led up to your firing between August 24th,
12  2005 and today?
13        MR. ATAMIAN: I'll object to your
14  characterization of what led Mr. Weis to
15  resign.
16        Go ahead.
17    A.    Okay, but yes, I've certainly thought
18  about that a lot.
19    Q.    Okay. And having had time to
20  reflect, is there anything that you think might
21  have been done differently that might have
22  caused the board not to ask you to resign?
23    A.    By me.
24    Q.    By you.
25        MR. HILLMAN: Objection.

TSG Reporting - Worldwide        877-702-9580

Page 205

WEIS - CONFIDENTIAL - UNDER PROTECTIVE ORDER
1
2    A.    Things that I would have done.
3    Q.    Yes.
4        MR. HILLMAN: Objection to form.
5        MR. ATAMIAN: Same objection.
6    A.    Okay. To be honest with you, based
7  on everything I knew and all the reflection I've
8  done on this particular issue since then, I'm
9  not aware of anything that I could have or
10  should have done differently at that time.
11    Q.    Thanks. It was a lot easier to
12  answer the question than it was to listen to all
13  the objections.
14        MR. MAGALIFF: I have no more
15  questions. Thank you.
16        (Recess is taken from 4:17 p.m. to
17  4:29 p.m.)
18        (Exhibit Weis 13, Email thread, is
19  marked for identification, as of this
20  date.)
21  EXAMINATION BY
22  MR. HILLMAN:
23    Q.    Good afternoon, Mr. Weis. My name is
24  David Hillman. I represent McDermott Will &
25  Emery in the fee application dispute and I

TSG Reporting - Worldwide        877-702-9580

# Exhibit DD

Michael L. Cook (MC 7887)
David M. Hillman (DH 8666)
SCHULTE ROTH & ZABEL LLP
Counsel for McDermott Will & Emery LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*and*

McDERMOTT WILL & EMERY LLP
William P. Smith (WS-3210)
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

*and*

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst (SS-6963)
James M. Sullivan (JS-2189)
340 Madison Avenue
New York, New York 10017-4613
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*, | Case No. 05-14945 (ASH) (Jointly Administered) |
| Debtors. | |

**POST-TRIAL MEMORANDUM IN SUPPORT OF FINAL FEE
APPLICATION OF McDERMOTT WILL & EMERY LLP UNDER 11 U.S.C. § 330**

10270226.12

TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

I.  MCDERMOTT PROVIDED BENEFICIAL SERVICES DESPITE THE DEBTORS' DYSFUNCTIONAL MANAGEMENT.....................................................................................2

    A.  Debtors' Antiquated Financial Systems.........................................................................3

    B.  Debtors' Management Problems ....................................................................................3

    C.  Debtors' Critical Need for Cash.....................................................................................4

II.  MCDERMOTT APPROPRIATELY AND REASONABLY HANDLED THE ISSUES CONCERNING THE CLOSURE OF ST. MARY'S HOSPITAL ...........................................6

    A.  McDermott's Timing in Seeking Court Approval of the SMH Closure Was Appropriate, Prudent, and Based On McDermott's Undisputed Professional Judgment .....................6

    B.  McDermott Provided the Court With a Complete Evidentiary Record to Approve SMH Closure .......................................................................................................................10

    C.  McDermott's Responses to Questions Posed by Court at October 25 Hearing .............14

III.  MCDERMOTT APPROPRIATELY AND REASONABLY HANDLED THE ISSUES CONCERNING THE RETENTION OF SW AND HURON ..................................................21

    A.  McDermott Did Not Mishandle Issues Relating to Huron's May 2005 Acquisition of SW ....23

    B.  McDermott Adequately and Appropriately Advised the Debtors about the UST's Concerns .....................................................................................................................24

    C.  McDermott Appropriately Handled the Discussions with the UST Regarding the Retentions ...................................................................................................................29

    D.  McDermott Appropriately Advocated for the Retention of Critical SW Personnel .......33

    E.  McDermott's Responses to Questions Posed by Court at October 25 Hearing ............34

IV.  THE BOARD'S DILEMMA ................................................................................................41

CONCLUSION.........................................................................................................................43

10270226.12       i

McDermott Will & Emery LLP ("McDermott"), former counsel for Saint Vincents Catholic Medical Centers and its affiliated debtors (collectively, the "Debtors"), submits this memorandum in further support of its final fee application, dated January 31, 2006 (the "Application"). McDermott also responds to questions raised by the Court on October 25, 2006, concerning the Debtors' proposed retentions of Speltz & Weis, LLC ("SW") and Huron Consulting Services ("Huron") and the closure of St. Mary's Hospital ("SMH").

**PRELIMINARY STATEMENT**

1.    On October 25, 2006, at the conclusion of a three-day evidentiary hearing (the "Hearing") on the Application, the Court asked McDermott to respond to questions regarding (i) the proposed retention of SW and Huron; and (ii) the closure of SMH. Specifically, the Court asked McDermott to explain the timing and preparation of the motion seeking Court approval of the closure of SMH and McDermott's presentation of evidence in support of that motion. The Court also asked McDermott about McDermott's disclosure of information to the Debtors, the United States Trustee ("UST"), the creditors' committee (the "Committee") in connection with the application to retain SW.

2.    McDermott first describes below the management and organizational disarray at SVCMC that it faced during the outset of these cases. It next addresses the SMH closure matter generally, followed by McDermott's responses to the Court's specific questions regarding SMH. McDermott then generally discusses the problems concerning proposed retention of SW and Huron, followed by McDermott's responses to the Court's questions regarding that matter. Finally, McDermott describes the record regarding the Debtors' decision to replace McDermott as bankruptcy counsel.

3.    At the time of McDermott's termination on September 13, 2005, the Debtors were close to obtaining Court approval based on pleadings and evidence put into record by

10270226.12       1

McDermott on August 4, 5 and September 7, 2005. Indeed, the Debtors, with McDermott's assistance, obtained all of the requisite approvals to close SMH (including Court approval) and closed the hospital just four months after the Board authorized the closure. In connection with the retention of SW and Huron, McDermott adopted a flexible, pragmatic and prudent approach to ensure that the Debtors had, as they repeatedly directed McDermott, uninterrupted access to critical SW and Huron personnel during the initial stage of these cases. In the words of the Bankruptcy Code, McDermott's services were "necessary… [and] beneficial at the time… rendered." 11 U.S.C. § 330(a)(3)(C).

4.    McDermott's services should not be evaluated with the benefit of "20/20 hindsight," but, rather, in light of the facts as they existed when the services were rendered. In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991); see also In re City Mattress, Inc., 174 B.R. 23, 26 (Bankr. W.D.N.Y. 1994) ("[t]he key issue is whether the services were necessary, not whether the debtor's activities were, in hindsight, necessary to achieve whatever outcome eventually occurs"). As McDermott showed at trial, there is neither factual reason nor legal justification to reduce the compensation sought by McDermott for the legal services it provided to the Debtors at their specific request and direction or to punish McDermott further. McDermott worked hard and well for the Debtors. Its public termination and related adverse publicity have been punishment enough.

**I.  McDERMOTT PROVIDED BENEFICIAL SERVICES DESPITE THE DEBTORS' DYSFUNCTIONAL MANAGEMENT.**

5.    The undisputed record shows that there was a management disarray at SVCMC during the first three months of these cases. It is unfair, however, to blame McDermott for the Debtors' "chaotic [management] and… disarray." See, e.g., Declaration of Guy Sansone, sworn to Oct. 18, 2006, Vol. 4, Exhibit B at ¶ 2.

10270226.12       2

A.   Debtors' Antiquated Financial Systems

6.    McDermott was not responsible for the lack of organization and efficiency at the

SVCMC organization.  Indeed, the former UST, Martini, described SVCMC as follows:

> [SVCMC] was an antiquated system, to begin with, that was
> merged together, with a view to be a more modernized system.
> But that takes a tremendous amount of money.  And I don't think
> the hospitals collectively were throwing off that much as far as
> revenue to fulfill whatever, you know, business plan the [pre-
> bankruptcy] merger was based upon. …  The data system was
> antiquated.  The accounts payable, accounts receivable, things
> were done by hand and not by computer.  And it just seemed like it
> was a tremendous amount of human capital that was required to
> operate the financial controls within the hospital. …  [The
> Debtors'] financial distress . . . flowed from [the pre-bankruptcy]
> merger. …

Transcript of October 6, 2006 Deposition of Deirdre Martini ("Martini Dep. Tr.") [Tab 115],

171: 24 - 173:4; 201:17-19.  It is thus no surprise that McDermott encountered difficulties in

attempting to gather financial, personnel and other information during the first months of these

cases.  Indeed, much of the Debtors' later success is directly attributable to McDermott's efforts

and achievements in overcoming these difficulties.

B.   Debtors' Management Problems

7.    Elizabeth St. Clair ("St. Clair"), the Debtors' Chief Legal Officer, also apparently

blamed McDermott for the management "disruption" she perceived at SVCMC during

McDermott's tenure.  Oct. 24, 2006 Tr., 57: 2.  Despite St. Clair's hostility to McDermott,[1] her

testimony confirms that McDermott was not the cause of any perceived disruption.  According to

St. Clair, the Debtors suffered a management vacuum because David Speltz, the Debtors' CEO,

had, in St. Clair's words, "checked out," and Timothy Weis, the Debtors' CFO, was "distracted."

---

[1]   St. Clair's testimony showed that she had a strong predisposition against McDermott before it was
even retained by the Debtors in 2004.  Id., at 35: 1 (St. Clair "vehemently objected" to the Debtors'
retention of McDermott).

---

Id., at 57: 2-11.  ("[St. Clair] saw the fighting… Tim Weis in particular was extremely angry that

-- Tim was angry at [her].  He was.  He was furious at the [UST].  He thought that we had made this thing

about the conflict of interest up.  He was completely… distracted by that.  And, he was our CFO

and we were in bankruptcy…  [A]nd David Speltz … had kind of checked out… And, so, you

know, [St. Clair] experienced the disruption.")

C.   Debtors' Critical Need for Cash

8.    In the face of these difficulties and the management vacuum, McDermott had to

marshal the Debtors' dysfunctional management and disorganized, antiquated financial control

system to meet its client's most immediate needs -- financing and cash.  See Oct. 23, 2006 Tr.,

94: 14-17. (according to Stephen Selbst ("Selbst"), a McDermott partner, "[a]t all times prior to

the Chapter 11 and during the brief period that [McDermott] were [representing the Debtors] in

Chapter 11, finance was a number one priority at all times.  Improving the debtor's liquidity [i.e.,

getting cash for immediate needs] was a paramount responsibility for [McDermott] on behalf of

our client.").  SVCMC was out of cash and unable to meet its payroll when it had to seek chapter

11 relief because of its major lender's refusal to fund on June 30, 2005.  See Affidavit of

Timothy Weis Under Local Rule 1007-2, sworn to July 2, 2005 [Tab 24], at ¶ 38.  Indeed, to

ensure the very survival of SVCMC, between July 5 and September 8, 2005, the first two months

of this case, McDermott obtained sixteen (16) court orders after litigation (3 motions) and

negotiation (of stipulated court orders) authorizing financing and the use of cash collateral with

such lenders as HFG; Commerce Bank; Dormitory Authority of the State of New York; U.S.

Dept. of Housing & Development; Sunlife Assurance; GE Capital Public Finance; HSBC; and

RCG.  See D.E. 30; 34; 35; 198; 224; 249; 250; 251; 257; 292; 309; 319; 354; 355; 356; 357;

358; 362; and 363.  Between July 5 and August 8 alone, McDermott obtained 7 court orders,

after filing 2 motions.  Id.  According to the uncontradicted testimony of Thomas Allison

---

(formerly of Huron), because of McDermott's work on the financing/cash collateral matters, the

"Debtors' cash and cash availability. . . exceeded $70 million;" "more liquidity than had been

available at any time during the prior year."  Affidavit of Thomas Allison, sworn to Sept. 14,

2006 [Tab 5], at ¶ 23.  Opposing counsel, Michael B. Solow, counsel for HFG, the Debtors' pre

and post-bankruptcy "working capital lender," also said, without contradiction, "[a]bsent the

efforts of McDermott, the Debtors would have experienced an extremely hard landing in

bankruptcy… rather than the soft landing, with a first day DIP interim financing approved, that

the Debtors actually experienced. … McDermott ably and efficiently dealt with the myriad

objections which were filed, both to… financing, but also to the use of cash collateral…

McDermott acted appropriately… [as] Debtor's counsel to… assure that the Debtors were

adequately financed and run an appropriate process to assemble bids for post-petition loans."

Declaration of Michael B. Solow, sworn to Sept. 13, 2006 [Tab 6], at ¶¶ 7-10.  McDermott also

assisted the Debtors to identify leases and contracts for rejection and obtain Court approval of

those rejections (see D.E. 201 and 260); engaged in regular communications with the Debtors

regarding the disposition of underperforming or losing assets, such as Parson's Manor (see D.E.

317 and 348), SMH (see Tab 61), Mary Immaculate Hospital, and St. John's Queens Hospital;

prepared a motion to establish medical malpractice arbitration procedures to administer

insurance proceeds equitably at a reduced cost to the Debtors; and negotiated favorable deposits

with utilities (see D.E. 327; 361; 368; and 474).

---

II.   McDERMOTT APPROPRIATELY AND REASONABLY HANDLED THE
      ISSUES CONCERNING THE CLOSURE OF ST. MARY'S HOSPITAL

A.   McDermott's Timing in Seeking Court Approval of the SMH Closure Was
     Appropriate, Prudent, and Based On McDermott's Undisputed Professional Judgment

9.    The record shows that McDermott: (i) sought Court approval of the closure of

SMH (the "SMH Motion") on August 18, 2005 (a mere six weeks after entering bankruptcy),

with its client's knowledge and participation, at the appropriate time; and (ii) was fully prepared

to press forward for Court approval at the September 7, 2005 hearing on the SMH Motion and

responded to the Court's directives at the time.

10.   Indeed, the record does not controvert McDermott's professional judgment on the

timing of the SMH Motion.  William P. Smith ("Smith"), the McDermott partner in charge of the

engagement, had significant prior experience in the complex process of closing a hospital,

having worked on the closures of "about two dozen" hospitals.  Oct. 23, 2006 Tr., 300: 25.

Accordingly, he was particularly sensitive to the risks associated with prematurely filing a

motion for Bankruptcy Court approval.  According to Smith:

> The risk of filing the motion is that the regulators freeze and, you
> are not far enough along in the process that they're sufficiently
> confident that the community needs will be addressed and that the
> third parties who are going to pick up a portion of the operations
> are ready to do their piece.  The closing of a hospital is a very
> delicate balance of a lot of different facts and movements and
> constituencies in the case of closing a hospital in bankruptcy you
> have the added overlay -- at the time you're closing you're also
> rejecting a series of leases and contracts.  It doesn't do you much
> good to bring the motion until you know what leases and contracts
> you're going to keep, which ones you're going to assume and
> assign and which ones you're going to reject.  And you're not
> going to know that until you are almost at the penultimate
> submittal to the [DoH] or the regulatory body and the third party
> who is going to undertake some of the services have gone through
> their regulatory process to get approval so they can accept them.

Id., 257: 6-23.

11. Thus, McDermott did not file the SMH Motion on July 5, 2005 (the "Petition Date"), because the Debtors (led by Bernadette Kingham-Bez and St. Clair (see Smith Aff. [Tab 1], at ¶ 176)) were not far along enough in the process of obtaining regulatory approval from the Department of Health (the "DoH"). As Smith noted, it would have been "irresponsible" to file the SMH Motion at that stage in the Debtors' chapter 11 cases. Oct. 23, 2005 Tr., 254: 25-255: 14. The Debtors had, however, disclosed their intention to close SMH in the Local Rule 1007-2 affidavit of Timothy Weis (the Debtors' then-CFO), sworn to July 5, 2005, filed at the commencement of the cases. [See Tab 24, at ¶ 14] The disclosure of the Debtors' intention to close SMH was appropriate at that time, but disclosure of the details regarding the closure plan would have been imprudent at that stage of the DoH approval process. See Oct. 24, 2006 Tr., 62: 12-20 (according to St. Clair, "DoH asked [SVCMC] to please not circulate to the community [the] draft proposal plan because they were concerned that then… instead of dealing [SVCMC] about it, they could just get out of control and too disorganized… So [DoH was] anxious to -- until the plan got closer to being final, they didn't want a draft of it floating around in the hospital. But everybody knew that… the decision had been made that the hospital had to close.").

12. Likewise, it would have been inappropriate to file the SMH Motion on July 22, 2005 (when the Debtors, on their own, with no participation by McDermott, issued notices to SMH employees pursuant to the WARN Act) because, according to Smith, the Debtors were "not far enough along in the regulatory process that [they] were ready to surface this as a separate motion in the bankruptcy." Id. at 256: 14-16.

13. Indeed, Selbst, a McDermott partner who became involved on July 22 with the Debtors' efforts to close SMH, learned from St. Clair, the Debtors' Chief Legal Officer, that the

DoH had a strong preference for keeping details relating to closure confidential until it had finally approved the closure. Affidavit of Stephen B. Selbst, sworn to Oct. 18, 2006 (the "Selbst Aff.") [Tab 2], at ¶ 41.

14. Despite the Debtors' stated concerns regarding premature disclosure of the closure plan, the Debtors believed they had to file the closure plan on the Court's docket in response to the Court's request at the August 4, 2005 hearing. Oct. 23, 2005 Tr., 74: 3-21. Accordingly, McDermott filed the closure plan as an exhibit (9 pages of text plus the 102-page closure plan). McDermott had also begun preparing the SMH Motion on August 3, 2005. See Application [Tab 93(E)], invoice dated Sept. 22, 2005, at p. 167 (time records of Selbst showing work on SMH Motion).

15. Additionally, the SMH Motion could not have been completed and filed before August 18 for another reason. According to Selbst, McDermott worked to balance the "trade off between getting [the SMH Motion] on file quickly and getting facts right." Oct. 23, 2005 Tr., 77: 5-7. In its effort to gather the necessary financial information and identify the contracts to be rejected, McDermott "struggled mightily with the client to verify these… numbers …, the losses, to figure out which contract[s] [would have] to be rejected and to try to address some of the concerns that Judge Beatty had expressed." Id., at 77: 8-15. Moreover, the Debtors could not definitively identify the leases and contracts to be rejected in connection with the closure until the DoH approval process was in its final stages. Id., at 257: 6-23. Attached to the motion as exhibits were: (i) the SMH Closure Plan; (ii) Kingsbrook's Plan in Response to SVCMC's SMH closure plan; (iii) a Commitment Letter from 1199 SEIU, New York's Health and Human Services Union; and (iv) a list of contracts to be rejected. The details of these exhibits were still being debated internally up to the date the motion was filed. For example, the Kingsbrook Plan

in response to the SMH closure plan, which contained critical information regarding the transfer of SMH clinics (information of the greatest interest to the SMH community), was not completed until August 4, 2005. See SMH Motion, dated Aug. 18, 2005 [Tab 61], at Exhibit 4.

16. As the undisputed record shows, the SMH Motion filed by McDermott on August 18, 2005, contained accurate and detailed information required by the Court to consider the closure. In preparing the motion, McDermott properly balanced the Debtors' need for prompt approval of the closure with the necessity to present the Court with a complete and accurate factual foundation for its ruling. No party has presented, nor could it present, evidence to contradict the propriety of McDermott's strategy, based on Smith's substantial prior experience, in preparing or filing the SMH Motion. McDermott's services were not only "necessary," but they were also "beneficial" because of McDermott's strategy "at the time rendered." 11 U.S.C. § 330(a)(3)(C). In similar contexts, courts in this Circuit defer to the reasoned judgments of experienced lawyers and refrain from second-guessing tactical decisions. See generally Achtman v. Kirby,McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir.2006) ("To properly plead negligence, a party must aver that an attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession…' A complaint that essentially alleges either an 'error of judgment' or a 'selection of one among several reasonable courses of action' fails to state a claim for malpractice…") (internal citations omitted); see also Fornaro v. Gannon, 2000 DNH 240,*6 (citing Meyer v. Wagner, 709 N.E.2d 784, 791 (Mass. 1999) (attorney is not guarantor of a favorable result and will be protected from liability for pursuing reasonable strategies, even if they fail, if he exercised the requisite skill and care). Such deference is particularly appropriate when, as here, complex issues are involved, there is no "one size fits all" solution, and the lawyer must balance not only the demands of his

own client, but also the interests and concerns of other constituents (e.g., creditors, the community, employees, patients, and regulatory bodies).

B. McDermott Provided the Court With a Complete Evidentiary Record to Approve SMH Closure

17. The record also shows that the Bankruptcy Court's approval of the SMH Motion was not delayed because of any purported failure by McDermott to provide the Court with sufficient evidence. The overwhelming, unrefuted evidence shows that McDermott did, in fact, provide the factual basis for the Court's granting of the SMH Motion on September 20, 2005.

18. The Court was aware as early as the Petition Date that the Debtors were seeking to close SMH. The Local Rule 1007-2 Weis affidavit stated that the Debtors had applied for DoH approval and expected to close SMH "before the end of 2005." Local R. 1007-2 Weis Affidavit, sworn to July 5, 2005 [Tab 24], at ¶ 14.

19. Likewise, the Court learned at the August 4, 2005 hearing in the Harriet McCloud adversary proceeding (premised on the impending closing) that the Debtors were working toward gaining the requisite approvals (including Bankruptcy Court approval) for the SMH closure. Indeed, the McCloud litigation was based on her improper attempt to block the DoH from approving the SMH closure. McDermott did not have to offer live testimony at the August 4 hearing because there was no factual dispute. The Debtors' suit against McCloud solely implicated legal issues -- whether McCloud's state court litigation seeking to enjoin the DOH approval process violated the automatic stay. See Oct. 23, 2006 Tr., 101: 18-21. Indeed, at the August 4 hearing, the Court found, based on the law and undisputed facts, that the automatic stay applied and enjoined the state court action. Aug. 4, 2005 Tr. [Tab 100], 24: 3-7. McCloud's improper state court litigation was the only agenda item, and the SMH closure was mentioned approximately 40 times.

20. The record of the August 4 (95 pages [Tab 100]) and August 5 hearings (25 pages dealing with SMH, with a 10 page discussion by the Court [Tab 101], at pp. 10-20]) confirms that, although McCloud's violation of the automatic stay was the central agenda item for the hearings, the Court used those hearings to provide the community with a forum to vent its concerns. See Aug. 4, 2005 Tr. [Tab 100], 13: 17-19 ("So [St. Mary's] hospital itself is part of the case and that whatever it is that anybody has a complaint about is going to have to be heard here"); Aug. 5, 2005 Tr. [Tab 101], 16:6-10 ("But I am saying that this case needs to have an understanding that when you are dealing with people who are not the [bankruptcy] players that they are dealt with in as low key a fashion as possible.").

21. At the August 4 hearing, the Court also requested that the Debtors immediately file the SMH closure plan to address community concerns about the closure, a foregone conclusion at the time. Aug. 4, 2005 Tr., at 41: 15-17 ("I strongly suggest that the hospital decide to give you a copy of [the closure plan] even if they want to do it in confidence."). In response, McDermott prepared and submitted on August 5, 2005, the Kingham-Bez affidavit detailing the Debtors' financial justification for the closure and attaching the closure plan as an exhibit. [Tab 53].

22. After the SMH Motion was filed, Judge Beatty told Smith in an August 30, 2005 telephone call how she intended to conduct the September 7, 2005 hearing, the first hearing on the contested SMH Motion.

> Judge Beatty explained how she wished St. Mary's to be handled and told [Smith] to appear on September 7 and have available all witnesses needed to answer any question that the Judge might ask, but instructed [Smith] not to open [his] mouth. She directed [him] to be quiet, humble, and apologetic. She stated that she was going to take the steam out of the room, and then she was going to close St. Mary's. She said that she was not going to do it on September

7, but would have another one or two hearings before she approved the closure.

Smith Aff., at ¶ 222 [Tab 1]

23. McDermott prepared for the September 7 hearing in response to the Court's direction. The Kingham-Bez affidavit had been in the record since August 5, 2005, and was submitted to the Court in a pleadings binder in advance of the September 7 hearing. McDermott also ensured that Kingham-Bez and four other SVCMC staff members with specific technical knowledge were available at the hearing to answer the Court's questions. Oct. 23, 2006 Tr., 108: 4-10 ("[Selbst] also had a number of other staff members there ... [He] wanted them there in case Judge Beatty asked questions that [he] couldn't answer ... [T]here were five people and [Selbst] remember[s] that [he] introduced them to Judge Beatty at the very beginning of that hearing.").

24. In fact, under Local Rule 9014-2, the September 7 hearing on the contested SMH Motion could not have been an evidentiary hearing. See Local R. 9014-2 ("[t]he first scheduled hearing in a contested matter will not be an evidentiary hearing at which witnesses may testify.") Bankruptcy Rule 9014, moreover, requires only "a motion" to support the relief requested, but McDermott had filed not only a detailed motion, but also the detailed August 5 Kingham-Bez affidavit. Kingham-Bez also was in Court on September 7 to testify.

25. McDermott further understood from Judge Beatty's August 30 call that she would grant the SMH Motion, but not on September 7. Indeed, Judge Beatty adjourned the September 7 hearing on the SMH Motion without ruling (not denying the motion), as she told Smith she would. Smith Aff., at ¶ 222 [Tab 1]. Judge Beatty refrained from ruling at the September 7 hearing, not because she lacked a necessary factual record, but because, in her words, she was "sort of caught between what [she] think[s] would be the right thing to do and what [she] think[s]

[she] ha[s] to do. That's neither here nor there and [she doesn't] have to do anything today [at the September 7 hearing] and that's good." Sept. 7, 2005 Tr. [Tab 102], 89: 9-13. See also id., 79: 9-12 ("we still have a large number of other matters that we need to get to and this one [the SMH Motion] is difficult. I still need to keep thinking about it.").

26. The Court did, however, grant the SMH Motion on September 20 -- the next hearing on the motion -- based on the SMH Motion prepared by McDermott, the Kingham-Bez affidavit, McDermott's success in the state court litigation, and McDermott's successful prosecution of the Bankruptcy Court injunction litigation. Prior to the September 7 hearing, nobody disputed the material facts presented by McDermott in support of the closure. McDermott made the reasoned judgment, therefore, that the Court had an ample record and would, if necessary, have the Kingham-Bez available to testify on September 7. The supplemental declarations filed by the Debtors on September 19, moreover, contained little additional substance to support the closure. See, e.g., Declaration of Sister Jane Iannucelli [Tab 122] (history of SMH); Declaration of Linda Brady, M.D. [Tab120] (services provided by Kingsbrook); Declaration of Thomas M. Barry [Tab 121] (Brooklyn Safety Net competing purchase proposal); Declaration of Dawn Gideon [Tab123] (overview of SMH closure plan). Rather, the declarations were largely responsive to the questions raised by the Court at the September 7, 2005 hearing. McDermott could not reasonably have predicted the content of the Court's collateral inquiries or the information needed to respond to those questions before that hearing. Nor is there any basis in the record to conclude that, absent McDermott's replacement before the September 20 hearing, McDermott would not have submitted similar declarations in response to questions asked by the Court on September 7 if McDermott had determined that such evidence was necessary.

**C.** **McDermott's Responses to Questions Posed by Court at October 25 Hearing**

- **Why did McDermott not prepare the SMH Motion before August 5, 2005, when SVCMC's Board had resolved to close SMH on June 1, 2005, and, on June 17, had set September 1, 2005, as a closure date?**

  o **ANSWER**: Preparation of the motion papers was not the issue. Getting the necessary supporting facts, however, was, and it was undisputed that the Debtors did not and could not have the facts before August 18. Indeed, preparing a draft of the SMH Motion before August 5 would not have enabled McDermott to file the motion before August 18, 2005. The undisputed record shows that there were material facts regarding the closure that had to be included in the SMH Motion, including contracts to be reviewed and rejected, that were in flux (i.e., being negotiated with DoH and others) until as late as the morning that the Motion was filed (August 18). Accordingly, McDermott could not have filed a complete and accurate motion until August 18.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Earlier drafting of the motion would still not have prevented the subsequent delay entailed in obtaining from SVCMC appropriate financial (i.e., stand-alone financials) and contract rejection information (which contracts were to be rejected/assumed). As late as 8/18/05, SVCMC senior management questioned financial information that was given to McDermott by Kingham-Bez for the closure motion. | Selbst Aff. at ¶ 51 | v. 1, Tab 2 |
| -- Moreover, on August 17, 2005, Kingham-Bez stated in an email to, among others, Smith and St. Clair that "the DoH continues to drag its feet while it works with neighboring provider Kingsbrook HealthCare System to assume management of most of St. Mary's clinics.[2] This is political... NYSDOH wants to announce a solution to meet community needs when they announce approval of our plan." | 8/17/05 E-mail from Kingham-Bez to Croston, cc Connolly, Smith and St. Clair. | v. 2, Tab 60. |

_____

[2]     SMH operated seven clinics.

## Page 15

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Indeed, a delay from DoH appeared probable to SVCMC; on August 17, Kingham-Bez reported that she "just spoke with the Kingsbrook CEO and it appears that they will be wrapping up emergency application to DOH over the next 10 days. DOH may delay our approval until then." | 8/17/05 E-mail from Kingham-Bez to Croston, cc Connolly, Smith and St. Clair. | v. 2, Tab 60 |
| -- Smith testified, without contradiction, that SVCMC had yet to determine "what leases and contracts [it was] going to keep,... assume,... assign,... [or] reject." (id.). More important, SVCMC would not "know that until [it was] almost at the penultimate submittal to the [DoH]... and the third party who is going to undertake some of the services have gone through their regulatory process to get approval" | Smith Testimony, 10/23/06 Tr. 257: 7-11 | |
| -- Smith continued, without contradiction, that "a motion to close a Chapter 11 hospital is going to crystallize a whole series of decisions, none of which follow a fortiori from the process. There are clinics,... employed physicians,... office leases,... [that] when you're in a bankruptcy may require assumption and assignment, may require rejection, may require modification. Dr. Smith may have an office in St. Mary's... and he may be transferring his practice... [and his] patients are going to be severely interested in where he's going.... The economic justification [to close the hospital] is the least of your concerns. The devil... is in the details." | 10/23/06 Tr. 258: 23 - 259: 14 | |

• **Did McDermott wait to file the closure motion? St. Clair testified that neither she nor anyone else at SVCMC had instructed MWE to wait to prepare the motion.**

 o  <u>ANSWER</u>: No. Smith believed, based on his prior experience with two dozen other hospital closures, that it would be irresponsible and imprudent to file the SMH Motion prematurely, exposing the Debtors to litigation and regulatory delay.

## Page 16

| Evidence | Source | Volume/Tab |
|---|---|---|
| Smith testified, without contradiction, based on his years of experience in "two dozen" hospital closings (Oct. 23, 2006 Tr., 300), that Court approval should, in his judgment, be sought late in the regulatory approval process in order to avoid having "the regulators freeze" because of a need to address "community needs"; "third parties who are going to pick up a portion of the operations" and whether they are "ready to do their piece." | Smith Testimony, 10/23/06 Tr., 257: 7 -11 | |
| -- Moreover, Smith testified that "if you announce the [details of the closure] too quickly, you're likely to draw community reaction which may result in a TRO that will stop you... or the sort of community opposition that in fact [SVCMC] experienced." | 10/23/06 Tr., 258: 2-6 | |
| -- Other experienced practitioners know that DoH had delayed approval process in other ch. 11 cases. | Bunin, Committee counsel, told Court at 8/4/05 hearing. ("In the New York United case... the [DoH] made the Debtor go through an unbelievable number of hoops that cost the Debtor millions of dollars and really required the hospital to keep the hospital open for a couple of months longer, I would say approximately three months longer than it wanted to.") | v. 4, Tab 100 at p. 18: 23 - 19: 4. |
| -- Kingham-Bez and St. Clair led SMH closure approval process (i.e., DoH approval, canonical approval, WARN Act notice), and they did not want premature disclosure of that closure plan") | Selbst Testimony, 10/23/06 Tr. at p. 71: 8-10 [uncontested] (there was a concern about premature disclosure at that time, July 22nd, there was a concern within St. Vincent's about premature disclosure of that closure plan") | |

## Page 17

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Seeking bankruptcy court approval required disclosure of the plan details, which were, as of August 17, 2005, still being negotiated with DoH. | 8/17/05 Kingham-Bez e-mail. | v. 2, Tab 60 |
| -- Although St. Clair told MWE on or around July 22, 2005, she thought that "the Debtors were very close to getting DoH approval" (Selbst Aff. at ¶41), she later told the Court on August 4, 2005, that DoH had recently "sent [SVCMC] back to the drawing board," with "laundry list of additional issues for [SVCMC] to address.... [SVCMC] submitted a second round of additions to the plan, amendments to the plan, and [DoH] said we are still not satisfied. There are some additional issues relating to particular kind of patients and when the patients' plan is finished then we have to show it." | St. Clair representation to Court at 8/4/05 hearing. | v. 2, Tab 52, at p. 38:6-16. |
| -- In light of Smith's considered legal strategy regarding seeking Court approval of the closure, MWE did not wait, but dealt with client's higher priority needs during first months. | Selbst Testimony, 10/23/06 Tr., 94: 14-17. ("[a]t all times prior to the Chapter 11 during the brief period that [MWE] were [representing the Debtors] in Chapter 11, finance was a number one priority at all times. Improving the debtor's liquidity was a paramount responsibility for [MWE] on behalf of our client.") | |
| -- Court had also put SMH matter on hold while an employee group explored possible purchase of SMH. | 8/17/05 Kingham-Bez email. ("the court has all on hold while an employee group explores the purchase of St. Mary's") | v. 2, Tab 60. |
| | 8/4/05 Tr., 30: 4-9 | v. 4, Tab 100. |

## Page 18

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Confirming Smith's judgment about the wisdom of synchronizing the Court approval process with DoH approval, SVCMC later obtained Court approval for the sale of Mary Immaculate Hospital and St. John's Queens Hospital, other hospitals in the SVCMC system, during June 2006, before obtaining DoH approval; but SVCMC has yet, after four months, to obtain DoH approval and hospital continues to lose money and to pay additional management fees. | 9/1/06 Motion to Shorten Time for Notice and Hearing on Debtors' Motion for Approval of Agreements between the Debtors and Wyckoff Heights Medical Center for Management Services at the Debtors' Queens Hospitals | v. 3, Tab 87. |

• **Why couldn't McDermott file a motion to close SMH without attaching the closure plan if it was private/sensitive?**

 o  <u>ANSWER</u>: There is no evidence in the record to dispute Smith's reasoned professional judgment or to show that Smith did not exercise the reasonable and appropriate standard of care in making that judgment. Regardless of whether the SMH Motion was filed with or without the closure plan attached, the sensitive content and material facts contained in that closure plan (i.e., the disposition of clinics and facilities, measures taken to ensure uninterrupted patient care) necessarily had to be disclosed in the motion (i.e., which contracts, leases would be assumed, rejected or assigned). Much of the information was simply unavailable from the Debtors because of, among other things, ongoing negotiations with DoH. Moreover, premature exposure of those details, which were changing and being negotiated during the DoH approval process, would delay DoH approval and draw litigation.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Smith testified (uncontested) that "[t]he risk of filing the motion is that the regulators freeze and, you are not far enough along in the process that they're sufficiently confident that the community needs will be addressed and that the third parties who are going to pick up a portion of the operations are ready to do their piece... [I]f you give the [details] too quickly, you're likely to draw community reaction which may result in a TRO that will stop you for a considerable period of time or the sort of community opposition that in fact [SVCMC] experienced." | Smith Testimony, Smith Testimony, 10/23/06 Tr., 257: 7 -11; 258: 2-6 | |

- *Was there a factual predicate for the Court to grant the SMH closure motion on September 7, 2005?*

  o ANSWER: Yes. Based on the undisputed facts put into the record by McDermott between July 29 and August 18, 2005, there was no need for anything further. Indeed, Judge Beatty told Smith on August 30, 2005, that she would grant the SMH Motion, but not on September 7. See Smith Aff. [Tab 1], at ¶ 222. There was a factual predicate before the Court, including the detailed SMH Motion and the August 5, 2005 Kingham-Bez affidavit plus the Debtors' motion papers and complaint filed on July 29, 2005. Moreover, McDermott had five witnesses available to testify at the September 7 hearing.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- MWE had submitted an undisputed factual record: the August 5, 2005 Kingham-Bez Affidavit with all the material facts (9 pages of text supported by 102 page closure plan) was already in the record, detailing case for Court approval (losses, underutilization, etc.), and it had been included in Court's hearing binder for the September 7 hearing. The Court had also reviewed the Debtors' complaint and motion for injunctive relief filed on 7/29/05 (See Adv. Pro. No. 05-02351 (ASH), D.E. 1) | Kingham-Bez Affidavit | v. 2, Tab 53 |
| -- MWE had live witnesses with specific knowledge re closure, including Kingham-Bez, available at 9/7/05 hearing to answer Court's questions. | Selbst Affidavit, at ¶ 54, 60, 64 | v. 1, Tab 2 |
| -- On August 30, 2005, Judge Beatty told Smith she did not want MWE to put on affirmative case at 9/7/05 hearing so she could "let steam out" of room (i.e., allow community to vent). | Smith Affidavit, at ¶ 221-23

Boyle Testimony, 10/24/06 Tr. at p. 106 (recalling that Smith received call from Judge Beatty during 8/30/05 meeting). | v. 1, Tab 1 |

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Under Local R. 9014-2, "[t]he first scheduled hearing in a contested matter will not be an evidentiary hearing at which witnesses may testify." (emphasis added). Accordingly, 9/7/05 hearing could not have been an evidentiary hearing. | Local R. 9014-2 | |
| -- Moreover, Fed. R. Bankr. P. 9014 requires only a "motion," which was supported by the testimony of Kingham-Bez and her 8/5/05 affidavit. | Fed. R. Bankr. P. 9014 | |
| -- Later affidavits filed by SVCMC on 9/19/05, added little or no substance to Kingham-Bez affidavit (e.g., Iannucelli declaration [history of SMH]; Brady declaration [services provided by Kingsbrook]; Barry declaration [Brooklyn Safety Net proposal]; Gideon declaration [overview of SMH closure plan]). | 9/19/05 declarations filed in connection with SMH closure. | v. 5, Tabs 120-23 |
| -- Factual record later submitted by SVCMC on motion to sell Mary Immaculate and St. John's on May 9, 2006 (Barry Affidavit [bidding procedures]; 11-page Sansone Affidavit) was not more substantively detailed than record MWE submitted in support of SMH closure. | Thomas Barry Aff., D.E. 1506

Sansone Aff. D.E., 1783 | |

27.   McDermott acted prudently, reasonably and pragmatically to facilitate the Debtors' attainment of the requisite regulatory and Court approvals in the most efficient manner possible. Smith, an experienced bankruptcy/health care law practitioner, knew that prematurely seeking Bankruptcy Court approval of the closure could derail the DoH approval process, leaving the Debtors in a regulatory quagmire. In fact, McDermott's undisputed legal strategy actually accelerated the process of obtaining the requisite approvals for the SMH closure. As Dr. Rodney Cooper, a SMH physician, stated to the Court at the September 7 hearing, "[consideration] of that [closure] plan was accelerated [by DoH] between August 4th, the hearing

that we had before this Court, and September 7th." Sept. 7, 2005 Tr. [Tab 102], 71: 4-7. Indeed, it was McDermott's strategy when seeking Bankruptcy Court relief to enjoin the pending state court litigation that focused DoH on the SMH closure plan and sped the approval process. Had McDermott followed a different course of action, the SMH closure plan could have languished for many months, if not years, before the DoH made a determination on the plan.

28.   Likewise, McDermott properly handled the SMH Motion and provided the Court with the necessary factual basis to approve the closure in the SMH Motion itself. It had also submitted the detailed Kingham-Bez Affidavit providing the economic justification for the closure, made witnesses with technical knowledge available at the September 7 hearing to respond to questions, and complied with Judge Beatty's request on August 30 regarding its conduct at the hearing. McDermott's services enabled the Court to enter an order on September 20 and the Debtors to close SMH before the expiration of the WARN Act notice period, just four months after the Debtors' Board authorized the closure.

## III.   McDERMOTT APPROPRIATELY AND REASONABLY HANDLED THE ISSUES CONCERNING THE RETENTION OF SW AND HURON

29.   The record is clear that McDermott acted reasonably and appropriately in connection with (i) the sale of SW to Huron's parent two months prior to bankruptcy; (ii) its advice to the Board about the UST's concerns regarding the SW and Huron retentions after bankruptcy; (iii) the negotiations with the UST regarding the retentions; and (iv) its advocacy, at the Debtors' direction, for the retention of the critical SW personnel. As shown at trial, McDermott at all times kept its client apprised and acted at its client's direction, with its knowledge, and in its client's best interest. The Debtors knew of the SW/Huron conflicts in early May, 2005, retained special counsel, Leo Crowley ("Crowley") in May, 2005, to help them address them, but wanted to continue the SW/Huron retentions on an interim basis during the

first three months of the bankruptcy to ensure the stability of the Debtors' management and their uninterrupted access to the more than 40 critical SW employees working at SVCMC. This interim strategy was coordinated by the SVCMC Board with Crowley's advice, but without McDermott's input. See Oct. 24, 2006 Tr., 90: 21 - 91: 8; Boyle Aff. [Vol. 4, Exhibit C], ¶ 9 ("...Board felt that continuity of management was very important..."). Even after McDermott and St. Clair learned of the UST's concerns about the SW/Huron retentions, and after they discussed those concerns with Richard Boyle ("Boyle"), the Chairman of the Debtors' Board (see Oct. 23, 2006 Tr., 286: 8-11), SVCMC still directed McDermott to get Court approval of the Board/Crowley strategy while the Board and Crowley negotiated with SW and Huron. See July 25, 2005 email from Smith to Boyle; cc: Crowley [Tab 40]; July 25, 2005 email from Boyle to Smith responding to Smith's email [Tab 41] ("Please proceed for Speltz and Weis. The Executive Committee will meet on Friday and, I expect, will approve the actions being taken by Huron and waive the conflict issue."). As Boyle put it. "I did not realize that new management was needed until mid-August of 2005." Boyle Aff. [Vol. 4, Exhibit C], ¶ 11.

30.   McDermott cannot be held liable for following the instruction of its client to seek the retentions of the critical SW personnel in these cases -- an instruction that was supported by the Debtors' sound business judgment and reached with the Debtors' full knowledge of the conflicts presented by the SW/Huron relationship. It is unjust to fault McDermott now for merely following the reasoned and informed direction of the Debtors' Board.

31.   Moreover, Huron and SW had agreed pursuant to the "Supplemental Conditions to Huron/SVCMC Engagement Letter," dated as of July 21, 2005 (attached to the Debtors' October 21, 2005 application to retain Huron in these cases) [Tab 80, Exhibit J], to reimburse the Debtors' estates for administrative expenses incurred in connection with the SW/Huron

retention. *See* Tab 80, Exhibit J (under the provision titled "Retention Controversy Fee Adjustment," "Huron and S&W agree that the estates have incurred or will incur administrative expense for the time spent by the Committee, the Debtors and their respective professional advisors in connection with the Huron/S&W retention and will reimburse (or take credit on fees approved for payment) the estates for such administrative expense as hereinafter provided.").

A. **McDermott Did Not Mishandle Issues Relating to Huron's May 2005 Acquisition of SW**

32.     Smith acted reasonably and appropriately when he learned of the potential SW/Huron acquisition on or about April 26, 2005 -- six weeks prior to bankruptcy -- based on the information known to him at the time.[3] As Smith testified without contradiction, Speltz told Smith on April 26, 2005, that Boyle already knew of the proposed transaction. *See* Oct. 23, 2006 Tr.: 290: 13-16. Smith had no reason to disbelieve Speltz at the time. Moreover, Smith also understood from Speltz on April 26 that the transaction was not certain to close. *Id.* at 289: 16-18 ("Speltz said the discussions [with Huron] were, while they were getting more serious, they were not close to a transaction"). Based on the information known to him at the time (late April), therefore, Smith reasonably had no reason to tell Boyle about the existence of the SW/Huron negotiations. In any event, Speltz told Boyle of the Huron acquisition no later than the first week of May, 2005. Boyle Aff. [Vol. 4, Exhibit C], ¶ 4.

33.     Following Huron's May 9, 2005 announcement of its acquisition of SW, SVCMC insulated McDermott from the issues relating to the SW/Huron acquisition, retaining Crowley, a bankruptcy lawyer, as special independent counsel to investigate issues arising from the transaction and to recommend a strategy. Oct. 24, 2005 Tr., 42: 20 - 43: 6. Crowley submitted a

---

[3]     McDermott objected to this line of inquiry on relevance grounds. The Application covers services rendered between July 5 and September 30, 2005.

draft report regarding his investigation with his recommendations to the Board on July 6, 2005, and submitted a final report on July 21. Oct. 24, 2006 Tr., 85:13-86:9. The Board adopted remedies proposed by Crowley and waived the conflicts arising from the SW/Huron acquisition on July 29, 2005. *Id.*, 92: 21 - 94: 3. McDermott was not part of this process. *See* Oct. 24, 2006 Tr. , 90: 3-8 (according to Boyle, discussions regarding the remedial measures in Crowley's report initially occurred among Boyle, Crowley, and Edward V. Lahey (the former general counsel for PEPSICO and a member of the Debtors' corporate governance committee and compliance committee), and "[s]ubsequently [they] also discussed it with other members of the governance committee. And after [Boyle] had had discussions with Huron, [Boyle, Crowley and Lahey] discussed it with the board."). According to Boyle, the Board adequately dealt with the conflicts of interest that Crowley identified and believed that the continued retentions of SW and Huron were in the Debtors' best interest. *Id.* Indeed, when Smith asked Boyle on July 25, 2005 [Tab 40] whether the Board still wanted McDermott to pursue the SW retention, after Boyle and St. Clair had both learned of the UST's concerns, Boyle responded, "Please proceed for Speltz and Weis. The Executive Committee will meet on Friday and, I expect, will approve the actions being taken by Huron and waive the conflict issue." [Tab 41] Boyle believed that "seeking a motion to retain Speltz and Weis as crisis managers, ... notwithstanding that [Boyle] had already received the Crowley report, was in the best interest of St. Vincent's and it's creditors." Oct. 24, 2006 Tr., 90: 21-25.

B. **McDermott Adequately and Appropriately Advised the Debtors about the UST's Concerns**

34.     Smith kept the Debtors' senior management and the Board informed of the concerns raised by the UST and Committee regarding the SW and Huron retentions by providing regular updates to St. Clair, Boyle, Speltz, and Weis regarding key meetings, conferences, and

---

correspondence. In addition, St. Clair, the Debtors' Chief Legal Officer and Chief Compliance Officer, who was most familiar with the conflicts of interest identified in Crowley's report, participated regularly in discussions among and received correspondence from the UST and Committee regarding the retentions during July and August. *See* Tabs 30, 32, 39, 45,46,49, 57,58, 64. *See also* Martini Dep. Tr. [Tab 115], 207: 13 - 208:12 (Martini had "six to eight" meetings with St. Clair between July and September and a "lot of conference calls" concerning "matters of substance that were of concern to [the UST]." St. Clair was "listening" and "absorbing everything."

35.     St. Clair immediately recognized the conflicts arising from the SW/Huron acquisition in May 2005, and recommended that the Board retain Crowley as special counsel to investigate the transaction and make recommendations to the Board. Oct. 24, 2006 Tr., 42: 20-43: 6.

36.     St. Clair received and read a draft of Crowley's report sometime between the Petition Date and July 18, 2005. *Id.* at 14:8-15. St. Clair thus was aware that, as stated in Crowley's report, "[t]he complex arrangements among SWLLC, Speltz and Weis personally, and Huron have injected complications in the ability of SVCMC to engage Huron as an estate professional under section 327 of the Bankruptcy Code." Crowley Report, dated June 29, 2005 [Tab 25], at p.4.

37.     Moreover, St. Clair and McDermott met with the UST on July 18, 2005 to discuss the retention issues [Tab 30]. St. Clair learned directly from the UST that the Huron/SW acquisition also complicated the process of retaining SW and Huron in these cases. Oct. 24, 2006 Tr., 14: 11 - 16: 4. In fact, St. Clair reported to Smith (who was not present at the July 18 meeting) in an email that:

[t]he [UST] continues to be troubled by the affiliate relationship and conflict of interest between SWLLC and Huron. She is still not satisfied with the written presentation of the details and sent us back to redo it. She has not rejected it out of hand, but my sense is that she remains dubious.

July 18, 2005 email from St. Clair to Smith, cc: Selbst and David Cleary [Tab 30].

38.     Smith also advised St. Clair on July 22,2005, of the UST's concerns about the retentions and the UST's proposed compromise to deal with those concerns. *See* July 22, 2005 email from Smith to St. Clair providing detailed report of Smith's July 21 meeting with UST and Committee [Tab 39]. St. Clair continued to be involved in the ongoing discussions among the interested parties regarding the SW retention issues throughout July and August. *See* July 27, 2005 email from Smith to, among others, St. Clair attaching draft revised SW retention application [Tab 45]; July 29, 2005 from Smith to Boyle and St. Clair following up on Executive Committee meeting regarding SW/Huron issues [Tab 49] ("this follows up on our conversations regarding the issues raised by the Board resulting from the acquisition of Speltz & Weis by Huron Consulting Group"); Aug. 12, 2005 email from Smith to UST, cc: St. Clair and bcc: Boyle [Tab 58] ("[SVCMC and McDermott] had planned to meet with the Creditors' Committee next Friday morning, but the matters raised by [the UST's August 12] letter are of sufficient significance that it may be more useful to meet with the [UST] and defer meeting with the Committee."); Aug. 21, 2005 email from Smith to St. Clair [Tab 64] ("[Martini] said that she had consulted with DOH, DASNY, HUD, US Atty, DOJ, HFG and the Committee, and it appeared that only the Board supported S&W. Under these circumstances, she could not support their retention. She asked the Board to consider a compromise... While I suspect there is some wiggle room, this is essentially a demand. Have asked Mark Ackermann to set up a call for Wednesday [August 24] with the, you, Jill [Mosokowitz] and [Smith] to discuss.").

39.     During the discussions among the Debtors, UST and Committee throughout July and August, McDermott accurately advised the Debtors of the UST's initial compromise position as McDermott understood her position at the time -- one acknowledging the conflict. Oct. 23, 2006 Tr., 278: 6-12; 281: 12-14 (by his July 22 email to St. Clair, Smith was " reporting to the client contact the current view of the [UST] on the conflict issue of Speltz & Weis and Huron"); 286: 15-17 (Smith described a July 29, 2005 email from Smith to Boyle and St. Clair following up on "the multiple conversations we've had regarding the matters raised by the board as a result of the Speltz & Weis acquisition by Huron").

40.     Between the Petition Date and August 12, the UST's concerns with the proposed SW retention were directed at procedural issues, and McDermott believed that it was cooperatively working with the UST to resolve those procedural issues. According to Smith:

> [the UST] took the position when [Smith] first met with her that she was willing to work with [McDermott] and come to an arrangement which allowed both organizations [SW and Huron] to make their services available to St. Vincent's.  Mr. Bunin [counsel to the Committee] indicated quite clearly that he was unwilling to agree to such an arrangement.  [McDermott] attempted to implement the arrangement that [Smith] believe[s] [he] had [with] the former United States trustee by revising the application and submitting it to her.  And there came a time later in August when [Smith] realized that [Martini] had succumbed to the arguments of the Committee and there were no circumstances under which she was prepared to agree with Speltz and Weis as individuals remaining at St. Vincent's as officers.

Oct. 23, 2006 Tr., 205: 17-206: 4.  During that time, St. Clair was, in her words, aware that Smith was looking into "structural fixes" to deal with the retention of SW and Huron. Oct. 24, 2006 Tr., 50: 19.

41.     Indeed, the UST described McDermott's Smith as "candid" [Tab 115, at p. 29]; stated she had received "no argument with McDermott" regarding the so-called Jay Alix protocol [Tab 115, at p. 59]; and that in late July, she "would review and consider any proposal that

McDermott postured" regarding SW [Tab 115, at p. 101].  The UST had not told McDermott of her substantive opposition to the retention of SW on competence grounds until August 19, 2005. Unbeknownst to McDermott, she began to change her position as early as July 30, 2005. _See_ July 30, 2005 email from Martini to Martin Bunin, cc: Tracy Hope Davis [Tab 50] ("I have reviewed the revised SWLLC retention papers and while they look like an improvement from the other drafts I am not convinced that they [SW] are the appropriate professionals to be running these hospitals.") (emphasis added).

42.     On August 19, 2005, the UST told Smith at a meeting that she would not support SW's retention because of its performance.  _See_ Notes of William Smith, dated August 19, 2005 [Tab 62] ("S&W:  Will not consent.").  According to Martini, at the August 19 meeting she told McDermott that the parties "had to come up with an acceptable game plan going forward.  And it was not going to be the retention of Speltz & Weis and Huron, as postured by McDermott Will & Emery."  Martini Dep. Tr. [Tab 115], 57: 7-11.

43.     During July and August, 2005, McDermott also ensured that the Board was advised of the ongoing discussions with the UST and Committee. Oct. 23, 2006 Tr., 184: 17 - 185: 14 (According to Smith, "the Board was aware that there was an issue.  It was aware that the issue required resolution.  It was aware that there were adverse possibilities and it was aware that there were multiple ways of solving the problem.  And it was aware that it is conceivable that the problem would not be solved.").  Further, St. Clair, who attended Board meetings and communicated with Board members, had a regular dialogue with the UST during July and August about the SW/Huron retention and other substantive matters.  Martini Dep. Tr. [Tab 115], 207: 15-25 (Martini had "six to eight" substantive" meetings with St. Clair between July and September).  _See also_ Oct. 23, 2006 Tr., 305: 3-6 (According to Smith, St. Clair "attended the

meetings with the [UST], she attended meetings that [Smith] didn't attend with the [UST].  She received copies of papers, she knew precisely what [McDermott] was doing and when [they] were doing it.").  As SVCMC's Chief Compliance Officer responsible for "overseeing SVCMC's conflict of interest policy and to ensure compliance by covered employees" (Declaration of Elizabeth St. Clair, sworn to Oct. 18, 2006 [Vol. 4, Exhibit A], at ¶ 1), St. Clair had to understand the conflicts of interest that affected the SW and Huron retentions under any circumstances, regardless of any bankruptcy.  Indeed, she hired special counsel (Crowley) to review and address them in May, almost two months before bankruptcy. Oct. 24, 2006 Tr., 42: 20 - 43: 6.

C.     McDermott Appropriately Handled the Discussions with the UST Regarding the Retentions

44.     According to the undisputed testimony of Deirdre Martini, the former UST, Smith was "candid" regarding Huron's acquisition of SW.  Martini Dep. Tr. [Tab 115], 27: 10-13 ("Bill Smith disclosed [the Huron/Speltz & Weis acquisition] to [Martini] early on.").  Martini recalls that Smith told her that Speltz & Weis were Huron employees in "early July." Id., at 193:12-5.  Martini also stated that she "learned the existence of the [SW] earn-out provision probably mid or -- ... third week of July, as more facts were coming to light about the acquisition and the status of Messrs. Speltz & Weis.... [she] think[s] it was Bill Smith [that told her about the earn-out]."  Id., at 194:14-20

45.     Moreover, Martini believes Smith was "compliant" in addressing Martini's concerns.  Id., at 37:11-18.  According to Martini, she told Smith that the "terms of whatever transaction occurred need to be disclosed.  And Mr. Smith was very -- you know, I believe he was very compliant.  He was like 'Okay, fine.  Just tell us what we need to do.'"  Id. According to Martini, "[she] just encouraged [Smith] to find [the J. Alix Protocol] and read it

and comply with it and understand it... I consistently told him that I would work with him to try to resolve any issues ..."  Id., at 51:11-15.

46.     McDermott thus understood as of July 21, 2005, that the UST was amenable to reaching a pragmatic compromise to address her concerns over the procedural issues raised by the SW and Huron retentions.  _See_ Martini Dep. Tr. [Tab 115], 162: 23 - 163: 2 (Martini had an "understanding of the Speltz & Weis retention application as a work in progress"); July 21, 2005 email from Smith to Ronald Barliant, cc: Thomas Auspurger, Gary Ravert, Selbst, James Sullivan, and David Cleary [Tab 39] ("The UST will go along with the revised S&W application that seeks approval under Section 363, provides that S&W skills are supplemented by Huron personnel and otherwise complies with the Jay Alix Protocol.").  To reach a mutually agreeable resolution, McDermott thus adjourned without date the hearing on the pending SW retention application on July 15, 2005.  _See_ Notice of Adjournment, dated July, 15, 2005 [Tab 27].  Because of the UST's substantive opposition, McDermott never refiled the application.  Affidavit of William P. Smith, sworn to October 18, 2006 ("Smith Aff.") [Tab 1], at ¶ 135.

47.     Between the Petition Date and late August, McDermott worked diligently to create an SW application that would satisfy the UST, "circulat[ing] many drafts among the interested parties for comment between July 5 and August 24, 2005."  Smith Aff. [Tab 1], at ¶ 79.  During that time, Smith stressed to the parties the need for full, complete disclosure.  _See_ July 27, 2005 email from Smith to Barliant, cc: Crowley, Speltz, Weis and St. Clair [Tab 45] ("My concern is that we disclose adequately both the arrangement and the payment of Pillsbury, and that [Weis's] Affidavit be complete and in no way misleading."  From July 21 through August 12, McDermott heard nothing further from the UST regarding the SW retention. In fact,

the only dispute between the Debtors and the UST first erupted in late August, when the UST demanded the appointment of a Chief Restructuring Officer ("CRO") after deciding to oppose Messrs. Speltz and Weis because of their prior performance, deeming them incompetent and telling McDermott of her new opposition on August 19 for the first time. See Martini Dep. Tr. [Tab 115], at 57:12-16 (SW/Huron would not be retained); Notes of William P. Smith, dated August 19, 2005 [Tab 62].

48.  Martini admitted that, in her proposal for appointment of a CRO (the "CRO Proposal"), she was "advocating [the] equivalent of a Chapter 11 Trustee. . . without the component of reporting to the Board. . . [she was] seeking some control," and "wanted a trustee like construct over St. Vincent's without filing a trustee motion. . . So [her] goal was to get as much that [she] would have gotten had a trustee been appointed without actually appointing a trustee and going through the motion before the Court." Martini Dep. Tr. [Tab 115], 127:8-128:3.

49.  According to Boyle, the Chairman of the Board, the UST's CRO Proposal was unacceptable to the Board because "[Boyle] tended to look at [the UST's] proposal as something akin to the appointment of a trustee. The Board would have basically lost control." Oct. 24, 2006 Tr., 97: 6-8. Accordingly, McDermott, at the Debtors' direction and after consultation with the Board (including Boyle), advised the UST on September 7, 2005 of the Debtors' decision rejecting the UST's CRO proposal and explaining its reasoning,[4] but also offered a counter-proposal. Joint Pretrial Statement, dated October 18, 2006, at ¶¶ 100-02. Boyle, St. Clair and others participated in the McDermott letter containing the Debtors' counterproposal. See Oct. 23, 2006 Tr., 294: 20-25 ("This [September 7] letter was widely

---

[4]     For example, the UST's proposal created problems under the New York Not-for-Profit Law and the New York DoH regulations, with which the UST was admittedly unfamiliar. Martini Dep. Tr. [Tab 115], at 210-11.

circulated among the working group on the St. Vincent's side -- that would have included Dick Boyle, Elizabeth St. Clair, Tom Berry, Tom Allison, conceivably Jim Woods, Dawn Gideon. This went through multiple drafts and it is subject to -- a lot of commentary.").

50.  At all times, McDermott appropriately handled the discussions with the UST based on the information provided by the Debtors to McDermott at the time. As agreed to and directed by the Debtors, McDermott adopted a retention structure in late July that would satisfy the UST's concerns and worked to create a SW retention procedure that would comply with her requests. Indeed, when circulating the latest draft internally before sending it to the UST, Smith stressed full, complete disclosure. See July 27, 2005 email from Smith to Barliant, cc: Crowley, Speltz, Weis and St. Clair [Tab 45] ("My concern is ... that [Weis's] Affidavit be complete and in no way misleading."). But Weis complained about complete disclosure (see Oct. 23, 2006 Tr., 283: 17-21), and even Crowley echoed Weis's concerns about too much disclosure. See July 27, 2005 email from Crowley to Smith, cc: St. Clair ("[Speltz] and [Weis] have a legitimate concern (which affects not just them but also the hospital) about opening the door and the possibility of the committee and the US Trustee rushing in."). When the UST later presented her, admittedly de facto trustee/CRO Proposal to the Debtors on August 25, 2005 [Tab 65], that proposal was, according to Boyle, unacceptable to the Board. Oct. 24, 2006, Tr. 111:16-18. McDermott appropriately explained to the UST the Board's concerns plus the substantive legal problems with the UST's proposal, and offered a counter-proposal formulated by the Debtors on September 7 [Tab 74]. McDermott stated a continued willingness to work with the UST and the Committee to find a way to ensure that the vital SW personnel (not Messrs. Speltz and Weis) employed at SVCMC. See Sept. 7, 2005 letter from Smith to Martini and Martin Bunin [Tab 74], at p. 2-4

---

("while [the Debtors] hope that this counter-proposal is acceptable to [the UST], [the Debtors] are aware that it may not address these issues in a manner that [the UST] believe[s] appropriate. To that end, should [the parties] disagree, [the Debtors] hope that any disagreement can proceed as it should:  a good faith dispute to be resolved as promptly and civilly as possible.").

D.  McDermott Appropriately Advocated for the Retention of Critical SW Personnel

51.  More than 40 SW employees had been providing essential services to the Debtors during July and August 2005. According to Boyle, they were critical to the stability of the Debtors' organization: "[SW] had so many people in very, very key positions, that putting those people out of their key positions and putting them out the door would have been... ludicrous." Oct. 24, 2006 Tr., 91: 5-12. After receiving the Crowley report in July, 2005, Boyle discussed with Smith his belief that there was no rational alternative to seeking the retentions of SW. Id., at 91: 18-21. Accordingly, as Smith testified, in Smith's dealings with the Committee and UST in late August, he was:

> trying to appeal to their common sense and indicate to them that if they stripped that number of individuals out of the management of the organization, chaos would ensue. It's nothing about David [Speltz] and Tim [Weis]. It's only about the stability of the organization and [Smith] was trying to indicate to them [SVCMC] only wanted [the SW employees] until the end of October.

Oct. 23, 2006 Tr., 302: 25 - 303:5. At the Board's direction, Smith thus tried to reach a compromise that would ensure the Debtors' continued access to the critical SW employees through October, 2005 (not Speltz and Weis individually). By late August, however, the UST and Committee were still opposed. Oct. 24, 2006 Tr., 96: 6-8 (As Boyle said, in late August "the former U.S. Trustee told [Boyle] she wanted everybody and anybody who worked for [SW] to have left" in a "matter of days". Around that time, Boyle also concluded, for the first time, that the retention of Messrs. Speltz and Weis as crisis managers was no longer in the Debtors' best

interest, and that is why Boyle "asked for their resignations at the time [he] did." See id., at 102: 10-11.

52.  Upon learning of the UST and Committee's position, Smith requested on August 21, 2005, a special meeting of the Executive Committe of the Board to discuss the UST and Committee's objection. See Aug. 21 email from Smith to St. Clair [Tab 64] ("Have asked Mark Ackermann to set up a call for Wednesday [August 24, 2005] with the Board, [St. Clair], Jill [Moskowitz] and [Smith] to discuss" the UST's request for appointment of a CRO). That August 24 Board meeting resulted in the forced resignations of Messrs. Speltz and Weis.

53.  The record shows that Smith advocated, at the client's direction, for the continued retention of 40-plus SW employees (not Speltz and Weis) to ensure the stability of the Debtors' management. He did not, however, pursue the retentions of Messrs. Speltz and Weis individually after the Board had lost confidence in their ability to serve as the Debtors' CEO and CFO, respectively, in late August, 2005.

E.  McDermott's Responses to Questions Posed by Court at October 25 Hearing

- Why did Smith not tell Boyle immediately of the potential SW/Huron acquisition when he heard about it more than two months prior to bankruptcy?

  o  ANSWER: Speltz told Smith on April 26, 2005, that Boyle knew of the potential transaction, and Smith had no reason to disbelieve Speltz. Moreover, Smith understood from Speltz that the transaction was not certain to close as of April 26, 2005. The issue is, in any event, not relevant to McDermott's Application, covering services rendered between July 5 and September 30, 2005.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Speltz told Smith that Boyle knew on April 26, 2005, and Smith had no reason to disbelieve Speltz at the time. | Smith Aff., at ¶ 63. Smith Testimony,10/23/06 Tr. 174: 23 - 175: 3; 176: 9-11; 290: 13-16. ("I accepted the representation of Mr. Speltz that he had discussed [the acquisition] with Mr. Boyle and Mr. Boyle was satisfied.") | v. 1, Tab 1 |
| -- Boyle, in any event, admitted learning of the deal from Speltz in "early May," no more than one week later. | Boyle Declaration, at ¶ 4. | v. 4, Exhibit C |
| -- Furthermore, Speltz recalls telling Boyle and St. Clair about the acquisition "the week before the transaction. And [Speltz] recall[s] calling Dick [Boyle] and telling him, and he was very congratulatory." | Speltz Designations from deposition on October 3, 2006, p. 56. | v. 3, Tab 89 |
| -- Smith did not understand from Speltz that a deal had been consummated, but that Huron was considering a deal. | Smith Aff., at ¶ 66. Tr. 289: 16-18 ("Speltz said the discussions [with Huron] were -- while they were getting more serious, they were not close to a transaction") | v. 1, Tab 1 |

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Weis also testified when asked if the acquisition was a "done deal" at the time of his April conversation with Smith that he and Speltz "told [Smith] that we had reached an agreement on the business terms, a term sheet... I mean this Purchase and Sale Agreement itself didn't come together just until literally within hours prior to the signing" and that it was "accurate" to say that during the conversation in April "it was not a certainty the acquisition would close." | Weis Designations from deposition on September 27, 2006, p.212-13 | v. 3, Tab 90 |

• *If Crowley had information available to him on June 29 to draft his report, why wasn't the same information available to Smith?*

   ○ ANSWER: Smith was aware of the SW earn-out and the employment contracts between Speltz, Weis, and Huron; those facts were evident from the SW Acquisition Agreement. Smith directed that information be included in the SW retention application, but it was inadvertently omitted on July 5 in the rush to get the SVCMC cases commenced and to get emergency interim financing. Smith did not know about the SW "mark-up," because it was not described, or even mentioned, in the SW Acquisition Agreement; he only learned of the improper mark-up *after* Crowley submitted his report to the Debtors in July.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Smith was aware only of the SW earn-out and employment contracts with Huron (but not the mark-up) when July 5 SW motion was drafted, and directed that David Cleary to include that information; when it was inadvertently omitted, Smith pulled the July 5 SW motion. | Smith Aff., at ¶ 75-76 | v. 1, Tab 1 |

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- Smith did not know of SW mark-up because it was not described in Acquisition Agreement. | SW Acquisition Agreement. | v. 1, Tab 11 |
| -- Smith first learned of the mark-up from Boyle in late July, and told Martini of the mark-up as soon as he learned of it. | 7/19/05 W. Smith notes re: conversation with Boyle | v. 1, Tab 32 |
| -- In fact, the mark-up was not even described in the 7/22/05 letter agreement among SVCMC, SW and Huron. | See 7/26/05 Email from D. Ratekin to Smith, attaching 7/22/05 Letter Agreement (agreement does not describe mark-up) | v. 1, Tab 42 |
| -- SVCMC had insulated MWE from SW contract issues in mid-May 2005, when it hired Crowley, who first talked to MWE on 6/23/05. | Smith Aff., ¶ 67-68 St. Clair Testimony, 10/24/06 Tr. 42: 20 - 43: 6 | v. 1, Tab 1 |

• *Why didn't MWE disclose the earn-out and mark-up provisions that were "outlandish conflict provisions" to the U.S. Trustee? How did MWE expect the U.S. Trustee to be "on board" with a "retention solution" if she did not know all the information?*

   ○ ANSWER: Smith *did* disclose to the UST the facts of the acquisition and the earn-out and the mark-up provisions at his first meeting with the UST on July 21, 2005. According to Martini, Smith was "candid" about the facts of the acquisition, and "compliant" to her requests regarding modifications to the structure of the proposed SW retention and disclosures in the application. McDermott did not know that the UST would be changing her position regarding the SW retention until August 12, at the earliest, when her concerns became performance-based (*i.e.*, she came to believe that Speltz and Weis were incompetent), *not* conflict-based.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- MWE promptly pulled the July 5 SW motion because it erroneously lacked the information Smith directed to be included. | Smith Affidavit, at ¶ 75-76 | v. 1, Tab 1 |

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- The revised July 13 SW motion did disclose the earn-out, but McDermott was unaware of mark-up until after Crowley disclosed it to Board in July and Boyle reported it to Smith on 7/19/06. | 7/13/05 SW motion | v. 1, Tab 26 |
| -- Board had promptly retained independent special counsel (Crowley) in May 2005 to investigate conflicts and suggest remedial measures. Board adopted Crowley's recommended remedies to rectify conflict issues on July 29, 2005. | St. Clair Testimony, 10/24/06 Tr., at p. 12: 14-16 Boyle Testimony, 10/24/06 Tr., at p. 84: 16 - 85: 4; 92: 16-20 Crowley Testimony, 10/24/06 Tr., at p. 116: 6-21 | |
| -- During his first meeting with UST on July 21, 2005, Smith described conflict and acquisition to UST, who was agreeable to negotiating a retention solution. | Smith Testimony, 10/23/06 Tr., 192: 23 -193: 4 Martini Dep. Tr., 29: 15-17 ("Bill [Smith] was candid and told me that [Huron] had purchased Speltz & Weis in May of 2005.") | v. 4, Tab 115 |
| -- The UST did not begin to change her position re retentions until around 7/30/05, when her objections were performance-based, not conflict-based. | 7/30/05 email from Martini to Bunin ("while [the S&W retention papers] look like an improvement from other drafts I am not convinced they are the appropriate professionals to be running the hospital.") | v. 2, Tab 50. |
| -- The UST did not inform McDermott of her change in position until 8/12/05, at the earliest. | 8/12/05 letter from Martini to Smith, et al. | v. 2, Tab 57 |

• *Did McDermott wait for the UST to ask for documents?*

   ○ ANSWER: No. McDermott did not wait for the UST to ask for information before disclosing it to the UST. McDermott voluntarily told the UST of the facts known to it about the SW/Huron acquisition at the outset of the case. Moreover,

because the SW Acquisition Agreement was publicly available as of May 9, 2005, McDermott believed that the UST had a copy of the agreement.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- MWE voluntarily told UST about facts known to it at outset of case. | Martini Dep. Tr., 29: 15-17 ("I think Bill [Smith] was candid and told me that [Huron] had purchased Speltz & Weis in May of 2005") | v. 4, Tab 115 |
| -- The SW Acquisition Agreement was publicly available in Huron's May 9, 2005 8-K. | Huron 8-K |  |
| -- When the UST did ask for a copy of the private, non-public agreement between SW and SVCMC, MWE promptly faxed it at Smith's direction on July 21, 2005. | McDermott Fee Application -- time records of A. Beal indicating sending SW agreement to UST's office. | v. 3, Tab 93(E), invoice dated 8/22/05, at p. 71 |

- Did MWE recognize that the Debtors, not SW, was its client?

    o ANSWER: Yes. McDermott at all times knew that the Debtors were its client and acted at its client's direction, in consultation with its client and in its client's best interest. According to Boyle, the Chairman of the Board, the debtors had a critical need of the 40-plus SW employees working at SVCMC, and McDermott worked to ensure that the Debtors' access to those employees would not be interrupted.

| Evidence | Source | Volume/Tab |
|---|---|---|
| -- MWE at all times was aware that SVCMC was its client, and acted at client's direction to obtain approval of retentions through October 2005. | Smith Testimony, 10/23/06 Tr. at 237-38; 268-69; 303-04. |  |

| | 7/25/05 Email from Smith to Boyle | v. 1, Tab 40 |
|---|---|---|
| -- Smith even expressly asked Boyle on 7/25/05 whether he should continue pursuing the SW retention; Boyle said that Smith should continue because Board was taking action to rectify conflicts. | 7/25/05 Email from Boyle to Smith ("Please proceed for Speltz and Weis. The Executive Committee… I expect, will approve the actions being taken by Huron and waive the conflict issue.") | v. 1, Tab 41 |
| -- Boyle testified that SW personnel were essential to SV operations, and to lose them would be "ludicrous." | Boyle Testimony, 10/24/06 Tr. at p. 91 |  |
| -- MWE never disputed applicability of J. Alix Protocol. | Martini Dep. Tr., 59: 13-23 (Martini "does not have any recollection" of "anybody from [MWE] ever advis[ing] [her] that they believed that the J. Alix Protocol was not binding in the Southern District of New York.") | v. 4, Tab 115 |
| -- MWE understood that UST would work with it in finding solution to "J. Alix" issue, and UST had done so in other cases. | Martini Dep. Tr., at p. 44 Smith Aff., at ¶ 90, 105 | v. 4, Tab 115 v.1, Tab 1 |

54. McDermott acted reasonably and appropriately in seeking the limited retentions of SW and Huron. It was charged with the difficult, if not impossible, task of getting Court approval for the Debtors to retain two professionals firms that provided critical management services to the Debtors, despite the conflicts created by the principals of those organizations. Boyle and the Board believed it would have been "suicidal" to the Debtors' reorganization efforts if they were deprived of the 40-plus SW and Huron employees providing services at SVCMC at the outset of these cases. Oct. 24, 2006 Tr., 91: 13-16 (St. Clair). Boyle also came to realize Speltz and Weis could never be hired. See id., at 102: 10-11 (Boyle came to realize

Speltz and Weis could not be retained and that is why Boyle "asked for their resignations at the time [he] did.") But the Board only wanted the SW/Huron services for a limited three-month period until it could retain permanent management. See Smith Aff. [Tab 1], at ¶ 71. Accordingly, the Board directed McDermott to seek Court approval for the retention of SW and Huron in the case. McDermott accepted its client's direction, and worked diligently to devise a procedure that would address the concerns of the UST. McDermott now cannot be faulted for following the instruction of the Board, advised by other counsel (Crowley), which was based on its business judgment, regarding the Debtors' critical need for the SW and Huron personnel. The Debtors benefited from McDermott's work because they had uninterrupted access to those critical personnel during first two months of these cases.

## IV.  THE BOARD'S DILEMMA

55. The Board was presented with a difficult dilemma in early September, 2005. Faced with the possibility of losing control in light of the UST's CRO proposal, Boyle, the Chairman of the Debtors' Board, decided to take two actions. First, Boyle decided to change the Debtors' legal position, agreeing to the UST's proposed framework for the selection of a CRO, which Boyle previously had not authorized McDermott to offer in its negotiations with the UST. In doing so, Boyle retained for the Board the bare minimum of authority necessary to make the CRO Proposal feasible under New York Not-for-Profit law.[5] Second, Boyle made the business decision to change counsel in order to "diffuse the situation" in these cases. Oct. 24, 2006 Tr., 101: 11-13.

---

[5]    Indeed, the structure for the appointment of a CRO that was ultimately agreed to among the Debtors and the UST after McDermott's replacement clearly differs from the counterproposal that the Debtors devised and authorized McDermott to propose in the September 7 letter. See Sept. 7, 2005 letter from Smith to Martini and Martin Bunin [Tab 74], at p. 2-4.

56. Boyle believed that if he "didn't recommend the change in counsel, the Board was going to lose control of the case." Id., at 100: 21-21.According to Boyle, the Debtors' hiring of new counsel in September, 2005, was an expedient "business decision." Id., at 101: 14-15. Indeed, because the Board "couldn't replace Ms. Martini [the former UST]," "the judge," or "counselor to the creditors' committee and the financial advisor to the creditors committee," Boyle determined that "' the only reasonable thing to do, from a business point of view, was to make a change in counsel." Id., at 99: 22-100:14.

57. According to the uncontroverted testimony of Smith, when he spoke to St. Clair and Boyle regarding the replacement of McDermott, neither told Smith that McDermott had done anything wrong. Oct. 23, 2006 Tr., 267: 2-5. Rather, there was "a clear implication in both conversations that they were completely satisfied with what [McDermott] had done, but they felt that the client was in such a circumstance that the change was going to be necessary." Id. Boyle told Smith at the time that " he would make sure that [McDermott] got paid." Id., at 267: 7-8. See also Sept. 14, 2005 email from St. Clair to Smith, cc: Selbst and David Cleary [Tab 78] (Smith states "Dick [Boyle] hopes [the UST] won't jack us around on fees."). In fact, according to his October 17, 2006 declaration, Boyle "personally believe[s] that [McDermott] should be compensated for services rendered to SVCMC." Declaration of Richard Boyle, sworn to Oct. 17, 2006 [v. 4, Exhibit C], at ¶ 13.

58. Moreover, despite St. Clair's admitted initial predisposition against McDermott, she apologized to Smith upon McDermott's termination. See Sept. 14, 2005 email from St. Clair to Smith, cc: Selbst and David Cleary [Tab 78] ("On behalf of the institution, I apologize to each of you."). On September 16, 2005, she sent another email to Smith stating, "I miss you all." Sept. 16, 2005 email from St. Clair to Smith [Tab 79]. The record shows that the Debtors'

replacement of McDermott was merely an expedient step to "diffuse the situation" in these cases, not dissatisfaction with McDermott's performance.  Oct. 24, 2006 Tr., 101: 11-13.

## CONCLUSION

59.    At all times during theses cases, McDermott's actions were (a) at its client's request, (b) in furtherance of the Debtors' paramount concern:  quality patient care, (c) in the best interests of these estates, (d) prudent, and (e) pragmatic.  McDermott should not now be further punished, because, in hindsight, some parties assert that McDermott performed less than perfectly under severe time pressure in the Debtors' time of deep crisis.  McDermott worked hard and well for the Debtors, but its public termination and related adverse publicity have been punishment enough.  The Debtors requested McDermott's services, which McDermott provided, in good faith with the intention of achieving the best results for the Debtors, its patients, and all constituents in these cases.  As the record shows, the Debtors benefited from McDermott's services.  McDermott's replacement with other counsel was a "business decision" made for expediency, not the result of any defect in those services.

**WHEREFORE**, McDermott respectfully requests that the Court (a) allow compensation for professional services and reimbursement for McDermott's actual and necessary expenses in the amounts set forth in the Final Fee Application; (b) authorize and direct the Debtors to pay the compensation sought plus 100% of the requested reimbursement; and (c) grant McDermott such other and further relief as is just.

Dated:  November 10, 2006

SCHULTE ROTH & ZABEL LLP,
Counsel for McDermott Will & Emery LLP

By:  _____
      Michael L. Cook (MC 7887)
      David M. Hillman (DH 8666)
919 Third Avenue
New York, New York  10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955
Email:  michael.cook@srz.com
          david.hillman@srz.com

*and*

McDERMOTT WILL & EMERY LLP
William P. Smith (WS-3210)
(admitted *pro hac vice*)
227 West Monroe Street
Chicago, Illinois  60606
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700

*and*

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst (SS-6963)
James M. Sullivan (JS-2189)
340 Madison Avenue
New York, New York  10017-4613
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444

# Exhibit EE

1              UNITED STATES BANKRUPTCY COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4  IN RE:

5  SAINT VINCENT'S CATHOLIC        )

   MEDICAL CENTERS OF NEW YORK  )

6  d/b/a SAINT VINCENT             )

   CATHOLIC MEDICAL CENTERS,    )Case No.

7  et al.,                         )05-14945 (ASH)

                                   )

8              Debtors.            )

9

10         The deposition of DAVID CLEARY, called as a

11  witness for examination, taken pursuant to Subpoena,

12  agreement and by the provisions of the Rules of

13  Civil Procedure for the United States District

14  Courts pertaining to the taking of depositions,

15  taken before TRICIA J. LATHOURIS, CSR NO.

16  084-004472, a Certified Shorthand Reporter within

17  and for the State of Illinois, at the office of

18  MCDERMOTT, WILL & EMERY, 227 West Monroe Street,

19  Chicago, Illinois, on the 29th day of September

20  2006, at 1:46 p.m.

21

22

23

24

25

Page 2

```
 1  APPEARANCES:
 2      ALSTON & BIRD, LLP
 3      BY: MICHAEL E. JOHNSON, ESQ.
 4          90 Park Avenue
 5          New York, New York 10016
 6          (212) 210-9400
 7              On Behalf of the Official
 8              Committee of Unsecured Creditors;
 9
10      MCDERMOTT, WILL & EMERY, LLP
11      BY: WILLIAM P. SMITH, ESQ.
12          227 West Monroe Street
13          Chicago, Illinois 60606
14          (312) 984-7588
15              On Behalf of McDermott, Will &
16          Emery;
17
18      TOGUT, SEGAL & SEGAL LLP
19      BY: HOWARD P. MAGALIFF, ESQ.
20          One Penn Plaza, Suite 3335
21          New York, New York 10119
22          (212) 594-5000
23              On Behalf of the Debtors and
24          Debtors-in-Possession.
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1              I N D E X
 2  THE WITNESS
 3    DAVID CLEARY
 4      By Mr. Smith       Pages:  4-5
 5      By Mr. Magaliff    Pages:  5-63
 6      By Mr. Johnson     Pages:  63-127
 7      By Mr. Magaliff    Pages:  127-137
 8      By Mr. Smith       Pages:  137-138
 9      By Mr. Johnson     Pages:  138-152
10
11              E X H I B I T S
12  CLEARY EXHIBIT NO.    MARKED FOR IDENTIFICATION
13      EXHIBIT 1        Premarked
14      EXHIBIT 2        14
15      EXHIBIT 3        26
16      EXHIBIT 4        32
17      EXHIBIT 5        48
18      EXHIBIT 6        49
19      EXHIBIT 7        60
20      EXHIBIT 8        98
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1              (Witness sworn.)
 2              DAVID CLEARY,
 3  called as a witness, having been duly sworn by the
 4  Certified Shorthand Reporter, was examined and
 5  testified as follows:
 6              * * * * *
 7              EXAMINATION
 8  BY MR. SMITH:
 9      Q   Mr. Cleary, let me hand you what's been
10  marked as Cleary Exhibit 1 and see if you can
11  identify that document.
12      A   Yeah, I did.
13      Q   Is that something you've seen before?
14      A   Yes, I have.
15      Q   Can you tell us what that is?
16      A   This is my Affidavit that was prepared
17  in connection with the McDermott fee application
18  dispute that we're here for today.
19      Q   Judge Hardin has expressed some concern
20  about receiving evidence from third parties such as
21  yourself by way of affidavits which are prepared by
22  lawyers.
23          While my colleagues undoubtedly will want to
24  know details of how this was executed all I'd like
25  you to indicate for the record is were I to read
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1  each paragraph to you as a question and ask you is
 2  that paragraph correct will your answer be yes, it
 3  is a shorthand for reading the entire thing into the
 4  record and then asking is that your testimony?
 5      A   Yes.
 6      Q   So if I were to ask, for example,
 7  Paragraph 79, according to the Fee Application on
 8  the Aramark matter, McDermott spent approximately
 9  27.3 hours during the compensation period, is that
10  correct, your answer would be yes?
11      A   Yes.
12      Q   To each of the paragraphs?
13      A   Yes.
14      MR. SMITH:  I have no further questions.
15      MR. JOHNSON:  For the record, I just wanted to
16  state that it was not clear to the committee the
17  nature of Judge Hardin's concern and we certainly
18  have no objection to the procedure that Mr. Smith
19  has followed just now with Mr. Cleary.  We don't
20  agree that that procedure has to be followed in all
21  instances, however.
22              EXAMINATION
23  BY MR. MAGALIFF:
24      Q   Have you been deposed before,
25  Mr. Cleary?
```

TSG Reporting - Worldwide    877-702-9580

Page 6

```
1      A    Testified.
2      Q    As a witness in a trial?
3      A    Yes.
4      Q    Have you ever --
5      A    I'm just trying to figure out -- I
6   don't recall if I testified before that or not.
7      Q    Have you ever taken a deposition?
8      A    Yes.
9      Q    So it's fair to say you're familiar
10  with the rules of a deposition generally and --
11     A    Generally, yes.
12     Q    Well, you just violated the first rule.
13  Let me finish the question.
14          When did you start work on the St. Vincent's
15  engagement, you as opposed to McDermott?
16     A    Can you refresh my recollection as to
17  what year the case was filed?
18     Q    The case was filed on July 5, 2005?
19     A    2005.  Okay.  So then I started work on
20  the case in the fall in 2004.
21     Q    And you were based here in the
22  McDermott Chicago office?
23     A    Yes.
24     Q    Do you recall what you were asked to do
25  in the fall of 2004 when you first started working
```

Page 7

```
1   on the St. Vincent's matter?
2      A    I recall that there were many things
3   that I was asked to do.  It was a very fluid
4   situation, but generally we were asked and I was
5   part of it, so I was asked to assist the debtor in
6   connection with its restructuring efforts.
7      Q    Are you a bankruptcy lawyer by current
8   trade?
9      A    Yes, I am.
10     Q    Do you have a lot of experience
11  representing debtors?
12     A    Yes, I do.  Well, I don't know what you
13  mean by "a lot" but I have represented debtors.
14     Q    Prior to St. Vincent's had you ever
15  represented a hospital as a debtor?
16     A    As a debtor, no.
17     Q    Prior to St. Vincent's had you ever
18  represented a not-for-profit corporation as a
19  debtor?
20     A    No.
21     Q    Have you ever represented hospitals in
22  restructuring or works outside of the bankruptcy
23  arena prior to St. Vincent's?
24     A    There was one that I briefly worked on
25  while working on other matters, yes, but I was
```

Page 8

```
1   trying to recall the name.  It was up in the
2   Northeast along with Mr. Smith.
3      Q    Was that the East Hills matter?
4      A    Yes.  Other than St. Vincent's --
5   scratch that.
6      Q    Beginning in April of 2005 can you
7   describe, to the best of your recollection, the
8   specific tasks and responsibilities that you had in
9   helping St. Vincent's prepare for a possible Chapter
10  11 filing?
11     A    In April 2005?
12     Q    Beginning in April 2005?
13     A    Well, I'm not sure when it occurred but
14  sometime in the spring of 2005 there was a need to
15  bring us back in to, again, be prepared for a
16  potential bankruptcy filing, so we were re-engaged,
17  although I had been participating on things
18  throughout the winter.
19          In that spring area that you're speaking
20  about we were more heavily asked to engage in
21  preparing the company for filing along with
22  restructuring efforts, out-of-court attempts, etc.
23     Q    Do you recall being asked to handle any
24  specific aspects of McDermott's general services in
25  helping the hospital prepare for a possible
```

Page 9

```
1   bankruptcy filing?
2      A    Well, I mean, if you had to put a label
3   on it, I was probably most labeled as preparing,
4   doing the due diligence, spearheading that team and
5   helping coordinate various aspects of that including
6   the first day motions and various issues that arose
7   out of that.
8      Q    What do you mean by "due diligence"
9   efforts?
10     A    Well, in connection with preparing for
11  a filing, you need to understand the operations, you
12  need to gather the information that both helps
13  implement a restructuring or serves as a basis for
14  the first-day motion, so you need to gather that
15  information.  That's due diligence as I call it.
16     Q    Were you probably at any time for the
17  debtor-in-possession financing?
18     A    I knew of it but I was not responsible
19  for it.
20     Q    Were you asked at any time to assist in
21  preparation of either a cash collateral motion or
22  DIP financing motion?
23     A    No.
24     Q    After the bankruptcy filing were you
25  asked at any time to participate in DIP financing
```

3

Page 10

1  efforts?
2      A    Again, I was not asked to participate
3  directly. I was knowledgeable about -- I was at
4  meetings when there were certain conversations and
5  to the extent it played into the overall strategy I
6  heard things, etc., but I was not participating in
7  negotiations, drafting or anything like that, no.
8      Q    So were you responsible for preparing
9  the petition for St. Vincent's and the other
10  debtors?
11     A    The petition? I don't think -- well, I
12  was not responsible for it. I saw the petitions.
13  That was more of a group effort because it required
14  some strategic thought, also, so I don't think
15  anybody was labeled as "in charge of."
16     Q    Since you were primarily responsible or
17  since you had a large role in performing the
18  pre-petition due diligence were you consulted while
19  the petition was being prepared?
20     A    About the petition or consulting --
21     Q    Let me ask the question a different
22  way.
23         Were you asked for input with the result of
24  your due diligence in preparing the petition or the
25  schedules?

TSG Reporting - Worldwide      877-702-9580

Page 11

1      A    By the people actually preparing it?
2      Q    Yeah. By the people at McDermott?
3      A    Yeah, sure. Yeah. Sorry.
4      Q    Did your due diligence include becoming
5  familiar with the capital structure of
6  St. Vincent's?
7      A    Yes, I understood it.
8      Q    You understood these various aspects of
9  the secured debt that St. Vincent's had prior to the
10  filing?
11     A    I knew of it. I wasn't deeply
12  engrossed as those with the DIP financing but I
13  understand the capital structure.
14     Q    Did your due diligence include gaining
15  an understanding of the real estate assets that the
16  hospital owned?
17     A    No. Well, did my due diligence or did
18  the firm's?
19     Q    The due diligence that you are
20  spearheading for the firm.
21     A    No.
22     Q    Did the due diligence that you are
23  spearheading for the firm include getting an
24  understanding of the various regulatory agreements
25  that the hospital was a party to?

TSG Reporting - Worldwide      877-702-9580

Page 12

1      A    Regulatory in the sense of which type
2  of documents? There's regulatory -- well, you can
3  tell me which ones you're looking for.
4      Q    Well, how about the documents that they
5  were a party to with HUD?
6      A    I knew them but that was more, I would
7  say, under the DIP basket.
8      Q    Are there any regulatory documents or
9  agreements that you're aware of that were not under
10  the DIP basket that the hospital was a party to?
11     A    Well, I guess it depends on how you
12  define "regulatory." I would conceivably say if you
13  were thinking of the managed care contracts and
14  things like that, broadly those would be regulatory
15  in some sense and part of the team did gather those
16  that I was looking over.
17     Q    So you had some familiarity with that
18  as well?
19     A    Yes.
20     Q    Prior to April of 2005 had you ever
21  heard of Speltz & Weis, LLC?
22     A    Prior to what date?
23     Q    April 2005.
24     A    Yes.
25     Q    Had you heard of them professionally?

TSG Reporting - Worldwide      877-702-9580

Page 13

1      A    Well, I heard of them in the context of
2  St. Vincent's in the fall of 2004.
3      Q    Other than in the context of
4  St. Vincent's did you have any familiarity with
5  Speltz & Weis?
6      A    No. No.
7      Q    Other than in the context of
8  St. Vincent's did you have any familiarity with
9  Huron Consulting?
10     A    Yes.
11     Q    Had you worked with them on other
12  cases?
13     A    Yes.
14     Q    Approximately how many Chapter 11
15  debtors have you represented during your career?
16     A    Filed or not filed?
17     Q    Filed.
18     A    Off the top of my head I can recall
19  three.
20     Q    That includes St. Vincent's?
21     A    St. Vincent's would be four. Does that
22  include current -- you said "filed." Okay.
23     Q    Okay. Prior to St. Vincent's had you
24  ever prepared applications to retain professionals
25  for the Chapter 11 debtor?

TSG Reporting - Worldwide      877-702-9580

# Exhibit FF

Page 1

1

2                  UNITED STATES BANKRUPTCY COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4

    IN RE:                        )
5                                 )
    SAINT VINCENT'S CATHOLIC      ) Case No.
6   MEDICAL CENTERS OF NEW YORK   ) 05-14945
    d/b/a SAINT VINCENT           ) (ASH)
7   CATHOLIC MEDICAL CENTERS,     )
    et al.,                       )
8                                 )
              Debtors.            )
9   _____)

10

              DEPOSITION OF DEIRDRE MARTINI

11

                 New York, New York

12

              Friday, October 6, 2006

13

14

15

16

17

18

19

20

21

22

23

    Reported by:
24  LYNN VAN DEN HENDE
    RPR, CSR, RMR, CRR, CLR
25  JOB NO. 8891

Page 14

D. Martini

1
2      So upon receipt of the binders, we
3  will go through -- I usually followed a team
4  approach to mega cases, so that there would be
5  more than one attorney assigned to a mega case
6  for coverage purposes.
7      And unfortunately, through experience,
8  I learned that, you know, if someone gets sick
9  and is out of the office for an extended period
10 and they're the only person that has a background
11 and familiarity with the company and the case,
12 then, you know, we're at a disadvantage.
13     So the team approach was implemented.
14     Upon review of the papers, we make
15 comments. We send them back.
16     And it's really just a work in
17 progress, ping-ponging back and forth, until we
18 get comfortable with the relief that they're
19 seeking, that it's appropriate and that it truly
20 is a first day order.
21     You know, there are some things that
22 are included in those binders that are not first
23 day issues.
24     And it's not incumbent upon the U.S.
25 Trustee to, you know, decide what the company

Page 15

D. Martini

1
2  should seek on the first day or not.
3      It's more of a courtesy to the Court
4  not to burden the Court.
5      Because if I have to review all the
6  papers, so does the Judge and his or her law
7  clerks.
8      So it's just a streamlining process,
9  so that when the company goes in, it's --
10 everything is done on a consensual basis; there's
11 a layer of civility, calmness, consensus, and the
12 company gets what it needs to focus on the
13 reorganization.
14     Q.   Was there an air of civility and
15 consensus -- what were the words you used?
16     A.   Calmness, civility, consensus.
17     Q.   Was there an air of calmness, civility
18 and consensus at the beginning of the
19 St. Vincent's case?
20     A.   I wouldn't say there was calmness.
21     I would say there was a sense of
22 concern, because the first day binders were in a
23 very very very preliminary stage, with a lot of
24 items not addressed, blanks; you know,
25 to-be-filled-in kind of thing.

Page 16

D. Martini

1
2      And so I would not say that
3  St. Vincent's came into Chapter 11 in an orderly
4  fashion.
5      Q.   Do you consider applications to retain
6  professionals for the debtor to be true first day
7  applications?
8      A.   No.
9      Q.   And was it the policy of the U.S.
10 Trustee's Office, in light of that answer, to
11 approve or not object to nunc pro tunc retention
12 applications back to the date of filing for
13 estate professionals?
14     A.   Can you repeat the question, please.
15     (Record read.)
16 BY MR. MAGALIFF:
17     Q.   Want me to rephrase the question?
18     A.   I don't think that we would object on
19 a nunc pro tunc basis, despite the Second Circuit
20 case law, which is I believe In Re Kerren,
21 K-e-r-r-e-n.
22     If a firm was seeking retention, you
23 know, six months into the engagement after the
24 filing, you know, that would raise an issue.
25     But I'd like to think that, you know,

Page 17

D. Martini

1
2  we gave the professionals in all cases an
3  opportunity to get their papers in and do the
4  conflicts check and sign off on the affidavit.
5      So, no, I don't think that we would
6  object.
7      We would encourage them to get their
8  retention papers in to at least get an interim
9  order authorized by the Court.
10     Q.   Did you have any type of a policy
11 regarding the allocation of work based upon --
12 the allocation of work in the U.S. Trustee's
13 Office based upon the substantive nature of the
14 pleading?
15     For example, was there somebody who
16 generally reviewed debtor and possession
17 financing motions while somebody else generally
18 reviewed retention applications?
19     A.   No.
20     All of the attorneys were very well
21 versed in all of the U.S. Trustee issues.
22     So we didn't parse it out like that.
23     I didn't think having, you know,
24 certain silos of expertise was in the best
25 interests of the office.

Page 30

```
 1              D. Martini
 2  the truth.
 3       Q.   Horrified, why were you horrified?
 4       A.   Because I just -- I couldn't believe
 5  that Speltz & Weis, who had been in St. Vincent's
 6  for a year and a half as their prepetition
 7  consultants, along with Huron later and then, you
 8  know, McDermott Will & Emery later -- I don't
 9  think McDermott was in there as long as Speltz &
10  Weis; I think they were in there maybe a year
11  before the filing -- that they would essentially
12  embark on a -- an economic -- an
13  economically-beneficial transaction based upon
14  the run rate of a not-for-profit hospital system,
15  and then -- which culminated into a free-fall
16  bankruptcy, and then seek to be retained as the
17  advisers to St. Vincent's, both Speltz & Weis and
18  Huron.
19       Q.   Did you believe as the United States
20  Trustee that that was prohibited by bankruptcy
21  law?
22       A.   Yes.
23       Q.   Did there come a time when you
24  learned, either from Bill Smith or through a
25  pleading filed with the Bankruptcy Court, that
```

TSG Reporting - Worldwide    877-702-9580

Page 31

```
 1              D. Martini
 2  David Speltz and Tim Weis had employment
 3  agreements with Huron Consulting?
 4       A.   I think it was the former.
 5            I think I -- I think I was told.  I
 6  don't recall seeing a pleading.
 7            I do recall requesting the underlying
 8  documentation for the transaction, which I did
 9  receive.
10       Q.   Which you did receive?
11       A.   I did, yes.
12       Q.   The underlying documentation for the
13  transaction being the purchase and sale agreement
14  between Huron and Speltz & Weis?
15       A.   Yes.
16       Q.   When did you receive that, if you
17  recall?
18       A.   Oh, it was much much later.
19            I think it was sometime in either late
20  August or early September when Michael Richman
21  from Mayer Brown was retained by Huron Consulting
22  to represent them in this whole retention issue.
23       Q.   Had you requested a copy of that
24  agreement before you received it?
25       A.   Yes, but I never -- I never did
```

TSG Reporting - Worldwide    877-702-9580

Page 32

```
 1              D. Martini
 2  receive it.
 3       Q.   Did you have to make multiple requests
 4  to get a copy of that agreement?
 5            MR. COOK:  Objection.  Vague.
 6       A.   I don't recall.
 7       Q.   Do you recall if there was any --
 8  withdrawn.
 9            Were there any other issues that you
10  recall about the Huron acquisition of Speltz &
11  Weis that gave you concern?
12       A.   Yes.
13       Q.   What were they?
14       A.   It had come to my attention that
15  Speltz & Weis billed St. Vincent's a tremendous
16  amount of money prepetition.
17            And admittedly, they had a lot of
18  their employees embedded in St. Vincent's.
19            Maybe upwards of 50 to 70 individuals
20  were working in St. Vincent's.
21            And I believe that the amount
22  prepetition that they billed was, you know, north
23  of $20 million.
24            I don't know what the -- what the
25  exact figure is.
```

TSG Reporting - Worldwide    877-702-9580

Page 33

```
 1              D. Martini
 2            So, in addition to the revenue that
 3  Speltz & Weis received from St. Vincent's, they
 4  also received $17 million in the Huron
 5  transaction.
 6            I believe the total purchase price was
 7  29 million, 17 of which they received in May of
 8  2005.
 9            And the other amounts were sort of
10  like -- I believe -- and I could be mistaken as
11  to the specific payout amounts, but the other 12
12  million was to be paid over time based upon the
13  run rate of St. Vincent's, what they were billing
14  St. Vincent's.
15            So my concern was generally that they
16  had made, you know, a tremendous amount of money
17  prepetition.
18            They made a tremendous amount of money
19  individually on the Huron purchase based upon the
20  run rate of St. Vincent's.
21            And the hospital system came into
22  bankruptcy like an asteroid that fell out of the
23  sky.
24            So that was really for me -- those
25  were the concerns that -- I felt there was a
```

TSG Reporting - Worldwide    877-702-9580

Page 34

1  D. Martini
2  tremendous amount of economic benefit that had
3  transpired basically on the back of
4  St. Vincent's.
5  Q.  One of the documents that we sent you
6  was the July 5th motion to approve the management
7  agreement with Speltz & Weis.
8  Do you have a copy of that with you?
9  A.  Yes, I do.
10  MR. MAGALIFF:  We're going to mark
11  that as Exhibit 1.
12  (Martini Exhibit 1, July 5 motion to
13  approve the management agreement with Speltz
14  & Weis, marked for identification.)
15  (Document review.)
16  MR. COOK:  Off the record.
17  (Recess taken from 9:09 a.m. to 9:16
18  a.m.)
19  BY MR. MAGALIFF:
20  Q.  Have you seen what's been marked as
21  Martini Exhibit 1 before today?
22  A.  I think it was in the binder.
23  Q.  The binder first day pleadings?
24  A.  Yes.
25  Q.  If you look on page 15, it's dated

Page 35

1  D. Martini
2  July 5, 2005; and it's signed by Steven Selbst?
3  MR. COOK:  Off the record, Howard.
4  (Discussion off the record.)
5  MR. MAGALIFF:  Take another two
6  minutes and look at this if you need to.
7  (Document review.)
8  THE WITNESS:  Okay.  I've looked at
9  it, and I'm looking at page 15.
10  BY MR. MAGALIFF:
11  Q.  Well we may not have to do that.
12  Do you recognize what's been marked as
13  Martini Exhibit 1?
14  A.  Yes.
15  Q.  What is it?
16  A.  It is the motion made by McDermott to
17  seek approval of the management agreement with
18  Speltz & Weis and St. Vincent's for restructuring
19  services.
20  Q.  Was this the first motion that you
21  recall that was filed by McDermott seeking
22  approval of the management agreement?
23  A.  Can you read back the question,
24  please.
25  (Record read.)

Page 36

1  D. Martini
2  THE WITNESS:  No.
3  Q.  There was an earlier motion that was
4  filed?
5  A.  There were other drafts that I saw.
6  There were several drafts, maybe, you
7  know, a few more that I did see.
8  Because, as I articulated earlier, in
9  the first day exchange we make comments and give
10  it back to the debtor and the company.  And then
11  they make amendments.  And then it comes back to
12  us.  We make comments again.
13  So the first day binders, it's really
14  the first day binders plural, because they evolve
15  over the course of -- of time before they get
16  filed.
17  In St. Vincent's we didn't have the
18  luxury of much time, because they had to file on
19  an emergency basis because of an alleged
20  liquidity crisis that they couldn't make payroll.
21  So I'm sure that there were some other
22  forms of this application that I reviewed, this
23  being the final -- one of the final products.
24  Because, as you can see, there are
25  blanks from previous drafts that have been filled

Page 37

1  D. Martini
2  in.
3  Q.  In the back and forth of discussion
4  that you had with McDermott about this motion, do
5  you recall specific discussions about the
6  disclosures that would need to be made about the
7  Huron/Speltz & Weis transaction?
8  A.  Yes.
9  Q.  What do you recall from those
10  discussions about the specific disclosures?
11  A.  That the existence and the terms of
12  whatever transaction occurred need to be
13  disclosed.
14  And Mr. Smith was very -- you know, I
15  believe he was very compliant.
16  He was like:
17  "Okay, fine.  Just tell us what we
18  need to do."
19  And that was -- you know, it was very
20  exasperating for our office in dealing with
21  McDermott, because it seemed to me that they had
22  never done a debtor case before, because they
23  were unaware of so many things to get a case
24  prepared and filed in the Southern District of
25  New York; that we were dealing with many people

# Exhibit GG

Page 1

1

2                  *** CONFIDENTIAL ***

3

4          UNITED STATES BANKRUPTCY COURT

5            SOUTHERN DISTRICT OF NEW YORK

6

7    IN RE:                          )
                                     )
8    SAINT VINCENT'S CATHOLIC        )
     MEDICAL CENTERS OF NEW YORK     ) Case No.
9    d/b/a SAINT VINCENT             ) 05-14945
     CATHOLIC MEDICAL CENTERS,       ) (ASH)
10   et al.,                         )
             Debtors.                )
11   - - - - - - - - - - - - - - -x

12

13          DEPOSITION OF DAVID SPELTZ

14

15            New York, New York

16         Tuesday, October 3, 2006

17

18

19

20

21

22   Reported by:

23   JEFFREY BENZ, CRR, RMR

24   JOB NO. 8811

25

Confidential

Page 154

```
1              Speltz
2    that McDermott was hired, or rehired, in the
3    fall/winter of 2004 to help the hospital gear up
4    for a Chapter 11 filing. Is that accurate?
5       A. Yes.
6       Q. When McDermott came on board in the
7    fall of 2004, were any lawyers from McDermott
8    assigned the task of helping Saint Vincent's
9    complete the transfer of Saint Mary's to
10   Kingsbrook Hospital?
11      A. Kingsbrook at that point was under the
12   due diligence process, so there was no
13   transaction under way at that point.
14      Q. Were any lawyers tasked with handling
15   the Saint Mary's transaction on behalf of
16   Saint Vincent's?
17         MR. HILLMAN: Objection to form.
18      A. Sister Margaret Mary was involved in
19   both the discussions as well as assisting in
20   seeking approvals from the Vatican for
21   transactions.
22      Q. Were there any non-canonical lawyers
23   at McDermott, Will & Emery who were assigned the
24   task of assisting Saint Vincent's in the sale or
25   transfer of Saint Mary's Hospital in the fall or
```

Confidential

Page 155

```
1              Speltz
2    winter of 2004?
3       A. Not that I recall.
4       Q. Do you recall any discussions with
5    Elizabeth St. Claire where she indicated to you
6    that she wanted to use the firm of Garfunkel,
7    Wild & Travis to handle the Saint Mary's
8    closing?
9       A. There was no transaction under way at
10   that point. No, I don't.
11      Q. Did a transaction ever get under way?
12         MR. ATAMIAN: Object to the form.
13      A. Kingsbrook did their due diligence and
14   pulled out.
15      Q. When did Kingsbrook pull out?
16      A. I believe it was the -- February or
17   March of 2005.
18         It may have been April as well. I
19   think -- no. It was in that period.
20      Q. Do you know if Tim Weis had any
21   personality issues with the people who worked in
22   the finance department at Saint Vincent's?
23         MR. ATAMIAN: Object to the form.
24   Overbroad.
25      A. Personality issues?
```

Confidential

Page 156

```
1              Speltz
2       Q. Yeah. Did they like him?
3         MR. ATAMIAN: Object to the form.
4    Calls for speculation.
5       A. People had an immense respect for Tim
6    Weis.
7       Q. Did a lot of Saint Vincent's employees
8    leave the hospital after Tim became the CFO?
9         MR. ATAMIAN: Object to the form.
10      A. A large number of Saint Vincent's
11   employees left before we arrived, and as we
12   arrived, primarily because they were being
13   poached --
14      Q. They were being what?
15      A. Poached, by our competitors.
16      Q. To your knowledge, did any of them
17   leave because of personality differences with
18   Tim Weis?
19      A. No.
20      Q. Do you know why the creditors
21   committee was so adverse to Speltz & Weis?
22         MR. ATAMIAN: Objection. Lacks
23   foundation.
24         Answer if you can.
25      A. I never met anyone on the creditors
```

Confidential

Page 157

```
1              Speltz
2    committee, nor counsel. Therefore, I have no
3    understanding of that.
4       Q. Now, do you recall that in or around
5    late March, early April 2005, McDermott, Will &
6    Emery started for a second time to prepare for
7    potential filing for Saint Vincent's?
8       A. Repeat the question?
9       Q. Do you recall that in late March,
10   early April 2005, McDermott, Will & Emery began
11   for a second time to prepare for a possible
12   Chapter 11 filing for Saint Vincent's?
13      A. They did not begin to prepare again.
14   They had begun preparations in the fall, winter,
15   and then they were slowed down, on the
16   assumption that it would not necessarily -- be
17   necessary. They were then asked to speed up
18   again when the liquidity issues arose.
19      Q. And was that in late March, early
20   April 2005?
21      A. Yes.
22      Q. Was McDermott, Will & Emery instructed
23   at that time to seek debtor-in-possession
24   financing for Saint Vincent's in the event of a
25   Chapter 11 filing?
```

Confidential

Page 158

Speltz

1
2     A.  McDermott Will, as I recall, was not
3  asked to seek debtor -- DIP financing.
4     Q.  Was anyone asked to seek DIP
5  financing?
6     A.  That was a specialty of Tom Allison
7  with Huron.
8     Q.  So in late March, early April 2005,
9  was Tom Allison and Huron instructed to begin to
10  seek DIP financing for Saint Vincent's?
11     A.  We began to seek alternatives to HFG.
12  So the answer is yes.
13     Q.  So do you believe that in late March,
14  early April 2005, a Chapter 11 filing for the
15  hospital was inevitable?
16     A.  No.
17     Q.  Did you instruct Huron or anybody else
18  to seek financing for the hospital that was not
19  DIP financing?
20     MR. ATAMIAN:  Object to the form.
21     THE WITNESS:  Repeat the question?
22     (The record was read back.)
23     A.  Saint Vincent's had properties that,
24  on a continuing basis, we were -- were
25  candidates for financing.  It was an ongoing

Confidential

Page 159

Speltz

1
2  process.
3     Q.  Did you consider selling any of
4  Saint Vincent's assets in the spring of 2005 as
5  an alternative to a Chapter 11 filing?
6     A.  Yes.
7     Q.  What assets did you consider selling?
8     A.  I don't recall all the assets that
9  were available.  Westchester, there's excess
10  land in Westchester.  There was the receiving
11  area across from Saint Vincent's downtown.
12     Q.  Is that what you and Mr. Johnson
13  referred to as the Triangle property this
14  morning?
15     A.  That's the Triangle.
16     There was, I believe, 550 Sixth
17  Avenue, I'm not sure if that was the address,
18  but it was property.  There was also some
19  property in Staten Island.
20     There was a relatively long list of
21  high value property that was available for
22  reallocating into patient care purposes and away
23  from real estate.
24     Q.  Is that your whole answer?
25     A.  That was -- that answers the question.

Confidential

Page 160

Speltz

1
2     Q.  Did you engage a broker to market any
3  of the properties that Saint Vincent's had that
4  you've just identified?
5     A.  Saint Vincent's did engage a broker.
6     Q.  Do you believe that had
7  Saint Vincent's sold any of those properties,
8  the bankruptcy filing would have been avoided?
9     MR. ATAMIAN:  Objection to form.
10  Calls for speculation.
11     A.  I don't know the answer to that, in
12  the long term.
13     Q.  What precipitated the bankruptcy
14  filing on July 5, 2005, if you know?
15     A.  There was a liquidity crisis, and the
16  ability to raise the money necessary to take us
17  through the summer was unavailable.
18     Q.  Was that a sudden liquidity crisis?
19     A.  No.  It had been developing over three
20  or four months.
21     Q.  And had Saint Vincent's been able to
22  sell any of the properties that you've
23  identified a few minutes ago, do you think that
24  would have avoided the liquidity crisis and
25  given the hospital the cash it needed to make it

Confidential

Page 161

Speltz

1
2  through the summer?
3     MR. ATAMIAN:  Objection to form.
4  Calls for speculation.
5     MR. HILLMAN:  Same.
6     A.  The -- I believe the projections
7  showed that that would be the case.
8     Q.  So the answer is yes?
9     A.  Yes.
10     Q.  And were these projections that were
11  prepared by Tim Weis and the people in his
12  finance department, or by professionals at
13  Huron?
14     A.  Both.
15     Q.  For how long have you been hospital
16  administrator, or a crisis manager, as a
17  professional?
18     A.  Since 1982.
19     Q.  And during that time, how many acute
20  care hospitals had you worked with, if you know?
21     A.  Several dozen.
22     Q.  Out of those several dozen hospitals,
23  prior to Saint Vincent's, how many end up in
24  Chapter 11?
25     A.  None.

Confidential

Page 198

Speltz

1
2    Q.   But it's your view that that's not
3    accurate, correct?
4    A.   That is not accurate.
5    Q.   Did Speltz & Weis have lawyers to
6    assist it in the negotiations with Huron
7    regarding the acquisition?
8    A.   We did.
9    Q.   Was that Verrill Dana?
10   A.   Yes.
11   Q.   Also Stroock, Stroock & Lavan?
12   A.   No.
13   Q.   Was there ever a time where Stroock &
14   Stroock & Lavan represented you personally?
15   A.   Yes.
16   Q.   In what capacity?  Or in what matter?
17        MR. ATAMIAN:  Need to talk?
18   Q.   How about I ask it differently.
19        Did they represent you in connection
20   at all with the Saint Vincent's bankruptcy case?
21   A.   Yes.
22   Q.   Okay.  Did they represent you
23   personally in connection with the retention of
24   Saint -- of Speltz & Weis, LLC?
25   A.   I don't believe so.

Confidential

Page 199

Speltz

1
2    Q.   Do you know if the lawyers from
3    Stroock & Stroock & Lavan ever spoke with the
4    lawyers from McDermott, Will & Emery, to the
5    best of your knowledge?
6    A.   No.
7    Q.   Do you recall your testimony earlier
8    today with Mr. Johnson regarding the definition
9    of earn-out?
10   A.   Yes.
11   Q.   Did you ever have a conversation, in
12   sum or in substance, in which you disclosed to
13   Bill Smith the earn-out?
14   A.   I don't recall specifically talking to
15   him about that.
16   Q.   Did you have a conversation with Bill
17   Smith where, in sum or in substance, you told
18   him about your employment contract with Huron?
19   A.   I -- I don't recall having any
20   discussions with Bill Smith about our contracts
21   or terms with Huron.
22   Q.   My goal will be to conclude before you
23   finish that water.
24   A.   I might surprise you.
25        MR. JOHNSON:  Gulp.

Confidential

Page 200

Speltz

1
2    Q.   Are you aware of any efforts by the
3    McDermott, Will & Emery lawyers to exclude any
4    facts relating to the Huron acquisition of
5    Speltz & Weis, LLC?
6    A.   To exclude any facts from what?
7        MR. ATAMIAN:  Yeah, object to the
8    form.  It's vague.
9    Q.   You testified about a series of
10   retention applications filed, at least one filed
11   with the bankruptcy court, to retain Speltz &
12   Weis, and one to retain Huron.  Do you recall
13   that?
14   A.   Yes.
15   Q.   You were shown some of the drafts of
16   the motion, and in one instance you were shown
17   the actual motion that was filed.  Do you recall
18   that?
19   A.   Yes.
20   Q.   There were disclosures made in those
21   motions, correct?
22        MR. JOHNSON:  Objection to the form.
23   Q.   There were facts in those motions,
24   correct?
25   A.   Yes.

Confidential

Page 201

Speltz

1
2    Q.   I'm asking you, sir, if you're aware
3    of any efforts by the lawyers of McDermott, Will
4    & Emery to conceal any facts from the retention
5    application.
6    A.   No.
7    Q.   Are you aware of any efforts by anyone
8    at Speltz & Weis, LLC, to conceal any facts from
9    being included in the retention applications?
10   A.   No.  The advice we had was to disclose
11   everything.
12   Q.   You were asked a series of questions
13   by Mr. Magaliff about what precipitated the
14   bankruptcy filing on July 5.  Do you recall that
15   testimony?
16   A.   Yes.
17   Q.   And he probed and questioned you about
18   whether or not you could have sold certain real
19   estate to avoid the liquidity crisis.  Do you
20   recall that?
21   A.   Yes.
22   Q.   Do you have any view as to whether or
23   not a short-term fix to the liquidity crisis
24   would have solved the long-term problems for the
25   hospital?

Confidential

Page 202

Speltz

1
2    MR. JOHNSON: Objection. Form.
3    MR. ATAMIAN: I assume you're asking
4  him whether or not he had a view at that
5  time, not what his view is today.
6    **Q.  That's correct.**
7    MR. JOHNSON: Same objection.
8    A.  Short-term fix would have bought the
9  time to make fundamental changes in the
10  turnaround plan that were necessary, based on
11  information that had arisen earlier in the year,
12  and which we reported to the board, in both
13  March and in June, and to HUD and to the
14  Dormitory Authority and to the governor's
15  office.
16    MR. HILLMAN:  We'll take a two-minute
17  break.  I'll just look at my notes and let
18  you finish your water.
19    (Recess from 4:59 to 5:05.)
20  BY MR. HILLMAN:
21    **Q.  Before the break, I asked you if you**
22  **had a view in July of 2005 as to whether or not**
23  **a short-term fix to the liquidity crisis would**
24  **have solved the long-term problems for the**
25  **hospital.  Do you recall that?**

TSG Reporting - Worldwide      877-702-9580

Confidential

Page 203

Speltz

1
2    A.  Yes.
3    **Q.  Do you have a current view as to**
4  **whether or not the -- a short-term fix to the**
5  **liquidity crisis would solve the problems for**
6  **the hospital in the long term?**
7    MR. ATAMIAN: I'll object on relevance
8  grounds, but there's no instruction not to
9  answer.  Answer if you can.
10    A.  No, it would not have solved the
11  problem.
12    **Q.  Why is that?**
13    A.  It would have bought time.
14    **Q.  Can you explain what you mean by that?**
15    A.  The fundamental issue at that time was
16  the fact that the turnaround plan, which was a
17  very good turnaround plan that anticipated
18  improvements about $160 million, was based on
19  audited reports by KPMG from 2003.
20    MR. MAGALIFF: From 2000 --
21    THE WITNESS: 2003, I believe.
22    A.  The $160 million improvement, if the
23  2003 audit were accurate and there were no
24  significant volume changes, would have put
25  Saint Vincent's into a viable position.

TSG Reporting - Worldwide      877-702-9580

Confidential

Page 204

Speltz

1
2    The KPMG audit was inaccurate and
3  overestimated revenues for that period, with the
4  result that we had a $60 million difference
5  between what we thought we had as a basis upon
6  which we designed the turnaround plan and what
7  we actually had.
8    Tim Weis, Speltz & Weis, within six
9  months of arriving, reached the conclusion that
10  the KPMG audit was inaccurate, and it took
11  another several months for KPMG to acknowledge
12  that. And March, I believe at the March board
13  meeting, KPMG acknowledged that there was a
14  major issue with the audit.
15    The result of that -- let me back up.
16    Based on the 2003 audit and the
17  analysis that we had done in early 2004, we
18  proposed at an April board meeting, April 2004,
19  that Saint Joseph's hospital be closed, a
20  non-performing asset, but that we attempt to
21  find a buyer for Saint Mary's because it was in,
22  number 1, a very difficult part of New York. It
23  was not served by anybody else.  And second, we
24  thought we had potential buyers.
25    We then went through many, many months

TSG Reporting - Worldwide      877-702-9580

Confidential

Page 205

Speltz

1
2  of putting the hospital on the market and going
3  through due diligence.  But in that period,
4  another $20 million for that year went into
5  subsidizing this hospital.
6    If in fact we had known about the
7  error in the KPMG audit, it really needed to
8  would not have felt it was time to find -- a
9  long period of time to find a buyer for
10  Saint Mary's and would have recommended closing
11  it, immediately, as we did for Saint Joseph's.
12    The discussion of all of that really
13  emerged and took off in terms of the fundamental
14  changes that needed to be made.  Beyond a
15  160 million turnaround plan, it really needed to
16  be a $220 million turnaround plan, after KPMG
17  acknowledged in March that there was an error.
18    The sale of the Triangle, or any other
19  money that may have been raised in the spring of
20  2005, would have bought time so that a revised
21  business plan that would supplement the
22  160 million could be put into force.
23    **Q.  So when Mr. Magaliff suggests to you**
24  **that bankruptcy could have been avoided for**
25  **Saint Vincent's, by simply selling some excess**

TSG Reporting - Worldwide      877-702-9580

Confidential

Page 206

Speltz
1      Speltz
2 real estate, is it your response that selling
3 real estate could have provided some short-term
4 liquidity, which then could have enabled
5 Speltz & Weis, LLC, to revise its business plan
6 and which, if implemented, could have solved
7 some of the long-term problems?
8      MR. MAGALIFF: Objection to form.
9      MR. JOHNSON: Objection.
10      MR. ATAMIAN: Do you want it read
11 back?
12      THE WITNESS: Read it back.
13   Q.  I'll ask it differently.
14   A.  Okay.
15   Q.  Mr. Magaliff -- withdrawn.
16      There were questions earlier that
17 suggested there was an easy and obvious fix to
18 avoiding bankruptcy.
19      MR. MAGALIFF: Objection to form.
20   Q.  Do you recall you were asked about
21 selling real estate as a way to solve short-term
22 liquidity crisis?  You recall that?
23   A.  I remember that question.
24   Q.  Is it accurate to say that if the real
25 property would have been sold prior to July 5,

Confidential

Page 207

Speltz
1      Speltz
2 that the short-term liquidity crisis would have
3 been solved?
4      MR. JOHNSON: Objection to form.
5   A.  Yes.
6   Q.  That would -- your answer assumes that
7 there were buyers for the real estate, correct?
8      MR. MAGALIFF: Objection.
9   A.  Yes.
10   Q.  And does your answer assume a purchase
11 price for the real estate parcels?
12      MR. JOHNSON: Objection to form.
13   A.  Yes.
14   Q.  And what are you assuming would be the
15 purchase price for the parcels of real estate?
16   A.  I don't recall the purchase price that
17 was being negotiated with buyers.
18   Q.  Would the aggregate consideration for
19 all the parcels of real estate have exceeded
20 $220 million?
21      Do you understand my question?
22   A.  I'm sorry, I don't.  I thought we were
23 talking about the Triangle.
24   Q.  Mr. Magaliff had asked you a series of
25 questions in which you identified certain

Confidential

Page 208

Speltz
1      Speltz
2 parcels that could have been sold in July 2005.
3 Do you recall that?
4   A.  Yes, I do.
5   Q.  And I believe it was some properties
6 in Westchester, the Triangle property, you said
7 550 Sixth Avenue.
8   A.  Yes.
9   Q.  And those were assets that could have
10 been sold, as you said, as an alternative to
11 Chapter 11; is that correct?
12   A.  These were assets that could have been
13 sold to finance a continued turnaround.
14   Q.  And why weren't those assets sold?
15      Let me ask it differently.  Did the
16 company try to sell those assets?
17   A.  One by one.
18   Q.  Did the -- did the companies exhaust
19 all possible means to avoid filing for
20 Chapter 11, all reasonable means?
21      MR. MAGALIFF: Objection to form.
22   A.  Yes, we did.
23   Q.  Did the debtors reasonably explore
24 asset sales as a way to raise cash prior to the
25 bankruptcy filing?

Confidential

Page 209

Speltz
1      Speltz
2   A.  Yes.
3   Q.  Did the debtors reach an informed
4 business judgment about whether or not they
5 could consummate asset sales to avoid the
6 necessity of filing for Chapter 11 on July 5,
7 2005?
8   A.  There was a great deal of discussion
9 about asset sales, how much longer they would
10 take, approvals from the Vatican, approvals from
11 the Dormitory Authority, approvals from HUD,
12 approvals from local regulators.
13   Q.  And so --
14   A.  And --
15   Q.  I'm sorry.
16   A.  And because of those discussions and
17 the facts that were available to the board, I
18 believe that they made an informed decision.
19      MR. HILLMAN: That completes the
20 questions that I have to ask you.  I'll
21 reserve the right to ask some follow-up
22 questions should Mr. Magaliff or
23 Mr. Johnson choose to ask you some
24 questions.
25

# Exhibit HH

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                                          Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT            Case No. 05-14945 (ASH)
VINCENT CATHOLIC MEDICAL CENTERS,
*et al.*,                                                    (Jointly Administered)

                                    Debtors.

**FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
FOR SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF
NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL
CENTERS, and CHAPTER 11 PLANS OF LIQUIDATION FOR
MEDICAL SERVICE OF ST. VINCENT'S HOSPITAL AND
MEDICAL CENTER, P.C., SURGICAL SERVICE OF ST.
VINCENT'S, P.C., CMC CARDIOLOGY SERVICES P.C., CMC
PHYSICIAN SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.**

**Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
(212) 504-6000**

**Attorneys for the Debtors and
Debtors in Possession**

**Dated: New York, New York
          June 5, 2007**

---

Article I.

**DEFINITIONS**

Definitions.  As used in the Plan, the following terms shall have the respective meanings specified below:

1.1    50% Milestone means the date upon which, after a 50% Milestone Triggering Event has occurred, and Reorganized SVCMC has elected to cause an additional estimation of the Claims remaining to be paid by each of the remaining MedMal Trusts, it has been determined in such additional estimation that the funds remaining in the MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time.

1.2    50% Milestone Triggering Event means the occurrence of either of the following (a) 50% of the amount of SVCMC's estimated liability for a MedMal Trust as established by the Caronia's Estimate shall have been paid out by that Trust, or (b) 50% of the number of claims identified by or for a MedMal Trust by the Caronia Estimate shall no longer be a Disputed Claim.

1.3    75% Milestone means the date upon which, after a 75% Milestone Triggering Event has occurred, and Reorganized SVCMC has elected to cause an additional estimation of the Claims remaining to by paid by each of the remaining MedMal Trusts, it has been determined in such additional estimation that the funds remaining in the MedMal Trust exceed 125% of all then remaining MedMal Claims subject to such MedMal Trust plus the estimated MedMal Defense Costs for such claims at such time.

1.4    75% Milestone Triggering Event means the occurrence of either of the following (a) 75% of the amount of SVCMC's estimated liability for a MedMal Trust as established by the Caronia's Estimate shall have been paid out by that Trust, or (b) 75% of the number of claims identified by or for a MedMal Trust by the Caronia Estimate shall no longer be a Disputed Claim.

1.5    Acceleration Event means a sale of all or substantially all of the assets of Reorganized SVCMC which is not also a Manhattan Real Estate Liquidity Event.

1.6    Additional Funding Schedule means payments, that may be required to be made pursuant to Section 6.6(n) of the Plan under certain circumstances, to each MedMal Trust of its Pro Rata Share of an amount equal to at least 25% of the greater of the Caronia Estimate and the Mercer Estimate, to be paid in five (5) equal annual installments commencing on the tenth (10th) Effective Date Anniversary and continuing through and including the fourteenth (14th) Effective Date Anniversary.

1.7    Ad Hoc Committee means the unofficial committee formed by Stonehill Capital Management LLC, CarVal Investors, LLC, and Davidson Kempner Capital

2

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                                          Chapter 11

SAINT VINCENTS CATHOLIC MEDICAL
CENTERS OF NEW YORK d/b/a SAINT            Case No. 05-14945 (ASH)
VINCENT CATHOLIC MEDICAL CENTERS, *et
al.*,                                                          (Jointly Administered)

                                    Debtors.

**FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
FOR SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF
NEW YORK D/B/A SAINT VINCENT CATHOLIC MEDICAL
CENTERS, and CHAPTER 11 PLANS OF LIQUIDATION FOR
MEDICAL SERVICE OF ST. VINCENT'S HOSPITAL AND MEDICAL
CENTER, P.C., SURGICAL SERVICE OF ST. VINCENT'S,
P.C., CMC CARDIOLOGY SERVICES P.C., CMC PHYSICIAN
SERVICES P.C., AND CMC RADIOLOGICAL SERVICES P.C.**

**Introduction**

Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, Medical Service of St. Vincent's Hospital and Medical Center, P.C., Surgical Service of St. Vincent's, P.C., CMC Cardiology Services P.C., CMC Physician Services, P.C., and CMC Radiological Services P.C., as debtors and debtors in possession, propose the following chapter 11 plans of reorganization and liquidation, pursuant to section 1121(a) of the United States Bankruptcy Code.  All capitalized terms used in the Plan are defined in either section 101 of the Bankruptcy Code or Article I below.

Briefly stated, but subject to more specific details provided herein, the Plan provides for the reorganization of SVCMC and the liquidation of SVCMC's five affiliated Debtors (the operating assets of three of which were sold or will be sold during the Chapter 11 Cases).  The Plan also provides for the preservation of SVCMC's mission, which is reflecting God's love by advancing Christ's healing ministry, with respect, integrity, compassion, and excellence to all who come to its system in need, especially the poor.  Although the Debtors' cases have been jointly administered, the Debtors and their estates have not been substantively consolidated.  Accordingly, the Plan is really six distinct plans, one for each of the Debtors.  The sections of the Plan generally apply to all of the Debtors, except where otherwise indicated.

1

---

Management LLC or entities affiliated with such parties, as assignees of General Unsecured Claims against SVCMC.

1.8    Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, other than the DIP Claim, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 328, 330 and/or 503 of the Bankruptcy Code, whether fixed before or after the Effective Date.

1.9    Allocation Method means the method of allocating certain costs among the Debtors or Post-Effective Date Debtors and reimbursing SVCMC or Reorganized SVCMC for payments made by SVCMC or Reorganized SVCMC under the Plan on behalf of another Debtor or Post-Effective Date Debtor, pursuant to Section 6.12 of the Plan.

1.10    Allowed means, with reference to any Claim, (a) any Claim allowed pursuant to the Plan, (b) any Claim that is not Disputed, (c) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order, (d) any Claim that, if Disputed, has been allowed by a Final Order, and (e) any timely filed proof of Claim as to which no objection has been or is interposed in accordance with Section 7.2 of the Plan or such applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bankruptcy Court and as to which any such applicable period of limitation has expired; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder; provided further, however, that a MedMal Claim shall only become an Allowed Claim after the MedMal Claim has been determined by Final Order of a court of competent jurisdiction or by settlement; provided further, however, that if a MedMal Claim was liquidated prior to the Effective Date and SVCMC has a structured payment obligation pursuant to the order or settlement agreement fixing the amount of that MedMal Claim, then such MedMal Claim shall be allowed by reinstating such MedMal Claim and the payment schedule under the applicable structured settlement or order and (i) treating as Allowed as of the Effective Date any unpaid payments that became due on or prior to the Effective Date under the structured settlement or order and (ii) treating each subsequent payment under the payment schedule as becoming Allowed on the date it otherwise would become due.  In determining the Allowed amount of any MedMal Claim, nothing contained in the Plan or in any of the supporting documentation, shall be deemed to limit, modify or otherwise impair the rights of the parties under applicable state law with respect to the prosecution and/or defense of such MedMal Claim.  Unless otherwise specified herein or pursuant to a Final Order, an "Allowed Administrative Expense Claim" or "Allowed Claim" shall

3

other professional of the Debtors, the Committees, the Ad Hoc Committee, the DIP Agent, or the DIP Lender, but only to the extent, in each case, such party served in such capacity on or after the Commencement Date; provided, however, notwithstanding anything herein to the contrary, none of the Litigation Parties shall be Released Parties.

1.159  Reorganized Articles of Incorporation means the articles of incorporation or similar corporate organizational document of Reorganized SVCMC, as amended and restated, substantially in the forms to be filed with the Plan Supplement. The Reorganized Articles of Incorporation of Reorganized SVCMC shall, among other things, prohibit the issuance of nonvoting equity securities, subject to further amendment of such Reorganized Articles of Incorporation as permitted by applicable law.

1.160  Reorganized By-laws means the by-laws or similar corporate organizational document, to the extent applicable, of Reorganized SVCMC, as amended and restated, substantially in the forms to be filed with the Plan Supplement.

1.161  Reorganized SVCMC means SVCMC on and after the Effective Date.

1.162  Restricted Assets means all cash, cash equivalents, or other assets of the Debtors as of the Effective Date, the use of which is restricted by New York Not-For-Profit Law or other applicable nonbankruptcy law to the furtherance of a particular purpose or purposes in accordance with the expressed or implied intent of the party that transferred or donated the asset to the Debtors.

1.163  Schedules means the schedules of assets and liabilities and the statements of financial affairs filed by each of the Debtors on October 3, 2005 as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

1.164  Secured Claim means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim, other than a MedMal Claim, that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant estate, to the extent of the value of the holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes that that is: (i) subject to an offset right under applicable law, and (ii) a secured claim against a Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.165  Secured Obligation means a debt payment obligation by Reorganized SVCMC to each holder of an Allowed General Unsecured Claim against SVCMC, secured by the Secured Obligations Liens, the principal amount of which obligation shall be equal to an amount, if greater than zero, which shall provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 85% of the Allowed Amount of its General Unsecured Claim against SVCMC after accounting for

24

payment of the Effective Date Cash Distribution, but prior to payment of the Unsecured Obligation or the distribution of the GUC Litigation Trust Interest, as set forth in Section 6.3 of the Plan.  The Secured Obligation shall include the Deferred Effective Date Payment, if any.

1.166  Secured Obligation Collateral means (i) the Miscellaneous Non-Operating Real Property, (ii) the Brooklyn/Queens Seller Notes, (iii) any security interest granted to SVCMC by Caritas, pursuant to the Caritas Settlement Agreement, (iv) the amount, if any, contained in the DASNY Arbitrage Rebate Account subject to the prior claims of DASNY, if any, to such amount, (v) any cash reimbursements owing to the Debtors from Bishop Mugavero Center for Geriatric Care, Holy Family Home and St. Elizabeth Ann's Health Care & Rehabilitation Center as of the Effective Date, and (vi) accounts receivable relating to services provided by the Divested Facilities, to the extent collected after the Effective Date; and (vii) the pool of bad debt receivables sold pursuant to a transaction approved during the Chapter 11 Cases that may be reversed pending a secondary sale, but only to the extent reversed prior to the Effective Date, and not re-consummated prior to the Effective Date; provided, however, that the Secured Obligation Liens shall not attach to any proceeds of the foregoing collateral, to the extent such proceeds, if any, are realized by the Debtors prior to the Effective Date.

1.167  Secured Obligation Liens means a first priority lien in the Secured Obligation Collateral.

1.168  Shortfall Payment means a payment made in respect of the obligation of Reorganized SVCMC to make payments to each of the MedMal Trusts under certain circumstances as specified in the Plan in the event funds in such MedMal Trust are insufficient to pay (i) all Allowed MedMal Claims to which such MedMal Trust is subject and (ii) accrued, unpaid Reimbursable Costs.

1.169  SSSV means Surgical Service of St. Vincent's, P.C.

1.170  Staff House means the Debtors' real property located at 555 6th Avenue, New York, New York 10011 (mailing address) / 101 W 15th Street, New York, New York 10011 (deed).

1.171  Staten Island Hospitals means SVCMC's Bayley Seton Hospital and St. Vincent's Medical Center of Richmond and other related facilities located in Staten Island, New York.

1.172  Sun Life Manhattan Notes means (i) the Sun Life O'Toole Note, (ii) the Sun Life Staff House Note, and (iii) the Sun Life Martin Payne Note.

1.173  Sun Life Manhattan Secured Claim means the Secured Claim of Sun Life Assurance Company of Canada or any of its affiliates, arising out of the Sun Life Manhattan Notes.

25

1.174  Sun Life Martin Payne Note means the Promissory Note, dated October 18, 2004, in the principal amount of $16 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's Martin Payne property.

1.175  Sun Life O'Toole Note means the Promissory Note, dated October 18, 2004, in the principal amount of $5 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's O'Toole building.

1.176  Sun Life Secured Claims means the Sun Life Westchester Secured Claim and the Sun Life Manhattan Secured Claim.

1.177  Sun Life Staff House Note means the Promissory Note, dated October 18, 2004, in the principal amount of $28 million, made by SVCMC to the order of Sun Life U.S., relating to SVCMC's Staff House property.

1.178  Sun Life Staff House Secured Claim means the Secured Claim of Sun Life U.S. or any of its affiliates arising out of the Sun Life Staff House Note.

1.179  Sun Life Westchester Notes means (i) the Promissory Note, dated February 11, 2005, in the principal amount of $22.5 million, made by SVCMC to the order of Sun Life Canada, relating to SVCMC's Westchester real estate and (ii) the Promissory Note, dated February 11, 2005, in the principal amount of $7.5 million, made by SVCMC to the order of Sun Life Canada, relating to SVCMC's Westchester real estate.

1.180  Sun Life Westchester Secured Claim means the Secured Claim of Sun Life Assurance Company of Canada or any of its affiliates, arising out of the Sun Life Westchester Notes.

1.181  SVCMC means Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers.

1.182  Tort Claimants' Committee means the statutory committee of tort claimants appointed in the Chapter 11 Cases on May 17, 2006 pursuant to section 1102 of the Bankruptcy Code.

1.183  Total Trade Claims means an amount equal to the sum of (x) the amount of General Unsecured Claims against SVCMC that have been Allowed (or for which proofs of claim have been filed to which the Debtors do not object) and (y) the GUC Estimate.

1.184  Trade Claims Monitor means the Person selected to monitor and enforce the payment obligations of Reorganized SVCMC with respect to and on behalf of all holders of the Secured Obligation (including the Deferred Effective Date Payment, if any) and the Unsecured Obligation which shall include but not be limited to monitoring and enforcing the determination of Excess Cash, Change in Control, Litigation Trust Contribution Events, the Liquidity Event Distribution Schedule and the Manhattan Real

26

Estate Liquidity Event.  The Trade Claims Monitor shall be the Person serving as the Litigation Trustee, and the professionals retained by the Litigation Trustee may also provide services to the Trade Claims Monitor.  SVCMC shall pay up to $30,000 per year in the aggregate to individuals serving as the Trade Claims Monitor and any professionals engaged by the Trade Claims Monitor, and any portion of the $30,000 not used in a given year will carry forward and may be applied in future years, provided, however, that the aggregate amount to be paid to the Trade Claims Monitor and any professional(s) engaged by the Trade Claims Monitor shall not exceed $90,000 in any year.

1.185  Triangle means that certain triangular parcel of real property located in Manhattan, New York, New York, that is bounded by Seventh Avenue, Greenwich Avenue and West 12th Street.

1.186  Unsecured Obligation means an unsecured debt payment obligation by Reorganized SVCMC to each holder of an Allowed General Unsecured Claim against SVCMC, the principal amount of which obligation shall be equal to the amount, if greater than zero, which shall provide each holder of an Allowed General Unsecured Claim against SVCMC a recovery equal to 93% of the Allowed amount of its General Unsecured Claim against SVCMC after accounting for payment of the Effective Date Cash Distribution and the Secured Obligation, but prior to the distribution of the GUC Litigation Trust Interest, as described in Section 6.4 of the Plan.  For the avoidance of doubt, the principal amount of the Unsecured Obligation shall not exceed an amount sufficient to provide each holder of an Allowed General Unsecured Claim a recovery greater than 8% of the Allowed amount of its Claim on account of the Unsecured Obligation.

1.187  Westchester Hospital means Saint Vincent's Hospital, Westchester, other related facilities in and around Westchester, New York, and the land on which those facilities sit.

1.188  Westchester Land means the land owned by SVCMC adjacent to Westchester Hospital.

**Construction of Certain Terms**

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

If a Claim is to be "reinstated" under the terms of the Plan, it shall mean that such claim shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding that the holder of such Claim shall not have any right to enforce, with regard to any default occurring prior to the Effective Date, any contractual provision

27

successors-in-interest of the Debtors shall waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

(b)    Nothing herein shall be interpreted as in any way compromising the effect or scope of releases under applicable New York State law with respect to MedMal Claims, and all such releases shall be enforceable to the fullest extent of New York State law.

(c)    No provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will discharge, release, or relieve any other party, in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of claims.

11.6    Injunction.

(a)    Subject to 11.6(c), all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to all Claims against and Equity Interests in the Debtors from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Post-Effective Date Debtors, the Released Parties, or their property, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Post-Effective Date Debtors, the Released Parties, or against the property or interests in property of the foregoing, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Post-Effective Date Debtors, the Released Parties, or any of their property, except as contemplated or allowed by the Plan, the Bankruptcy Code, or applicable law, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

(b)    All Persons are permanently enjoined, on and after the Effective Date, from asserting any Claim (x) which is released by such Person under the Plan or (y)

for which the party against whom the Claim is being asserted has received exculpation under the Plan, including: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of such Claim, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of such Claim, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of such Claim, (iv) asserting any right of setoff, directly or indirectly, against any obligation on account of such claim, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

(c)    The automatic stay imposed by section 362 of the Bankruptcy Code and the injunctions set forth in Sections 11.6(a) and (b) of the Plan shall not apply after the Effective Date to acts by holders of timely filed Claims alleging medical malpractice to seek payment from the Debtors' insurance companies for or to liquidate the amount of such Claims against the Debtors or a Covered Person in a court or administrative body of appropriate jurisdiction, except to the extent that it is determined by a Final Order either that such Claim was not timely filed or that the Claim shall not be Allowed. Notwithstanding the forgoing sentence, holders of MedMal Claims may only be paid on account of their MedMal Claims as provided for, and from assets specifically designated for payment of such MedMal Claims, under the Plan. Nothing in the Plan shall limit, modify or otherwise impair the rights of holders of timely filed Claims alleged to be for medical malpractice to seek payment for such Claims from the Debtors' insurance policies and/or from insurance policies for the benefit of a Covered Person which cover such Claims, it being the intent of the Plan to leave such timely filed Claims alleged to be for medical malpractice unimpaired except to the extent such Claims are MedMal Claims as defined by the Plan.

(d)    If, notwithstanding the injunction contained in this Section 11.6, any holder of a MedMal Claim shall assert such claim against a Covered Person, the injunction shall not preclude such Covered Person from asserting his or her right to indemnification against SVCMC (nor shall SVCMC be prevented from asserting all defenses, if any, to such asserted right to indemnification). Any indemnification amount owed to a Covered Person by SVCMC on account of a MedMal Claim shall be paid from the appropriate MedMal Trust; however, nothing in this Section 11.6(d) shall be deemed to supersede an obligation, if any, of SVCMC to provide legal representation for a Covered Person in the defense of a MedMal Claim.

11.7    Term of Injunctions or Stays.  Unless otherwise herein, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing of these Chapter 11 Cases.

11.8    Compromise of Controversies.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

11.9    Retention of Causes of Action/Reservation of Rights.

(a)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Post-Effective Date Debtors may have or choose to assert on behalf of their respective estates under any other provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code and (iii) the turnover of any property of the Debtors' estates.

(b)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Debtors and the Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such Claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Post-Effective Date Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)    Except for the Litigation Claims, which are being assigned and transferred to the Litigation Trust pursuant to the Plan and will be prosecuted by the Litigation Trustee, each of the Post-Effective Date Debtors shall, after the Effective Date, retain the rights to bring any causes of action that could have been brought by the respective Debtors at any time.

11.10    Section 506(c) Reservation.  The Debtors and the Post-Effective Date Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

11.11    Chapter 5 Reservation.  Without limiting Section 11.9 above, the Debtors and the Post-Effective Date Debtors reserve all rights under chapter 5 of the Bankruptcy Code.

11.12    No Benefit to Litigation Parties.  Notwithstanding anything to the contrary contained in this Article XI, none of its exculpation, release or injunctive provisions shall apply or provide any benefit to the Litigation Parties, and all Claims, causes of actions, demands, charges or demands against any of the Litigation Parties are hereby expressly reserved and preserved.

Article XII.

MISCELLANEOUS PROVISIONS

12.1    Effectuating Documents and Further Transactions.  Upon entry of the Confirmation Order, each of the Debtors, the Post-Effective Date Debtors, and the MedMal Trustees shall be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.2    Payment of Statutory Fees.  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by Reorganized SVCMC.  Any such fees accruing after the Confirmation Date also shall be paid by Reorganized SVCMC.

12.3    Modification of Plan.  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

12.4    Withdrawal or Revocation.  The Debtors may withdraw or revoke the Plan as to any Debtor at any time prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained