UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GRAY & ASSOCIATES, LLC in its capacity   :
As Trustee on behalf of the SVCMC   :
Litigation Trust,   :       08 CV 4401
  :
           Plaintiff,   :
  :       ECF Case
  :
       v.   :
  :
MCDERMOTT WILL & EMERY LLP,   :
WILLIAM P. SMITH, STEPHEN B. SELBST,   :
and DAVID D. CLEARY,   :
  :
          Defendants.   :
  :
  :
------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Frederick B. Warder III
PATTERSON BELKNAP WEBB
    & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
Fax: (212) 336-2222

Attorneys for Defendants
McDermott Will & Emery LLP,
William P. Smith, Stephen B. Selbst
and David D. Cleary

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. i

SUMMARY OF THE MOTION .......................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

   A.  The Saint Vincent Bankruptcy ................................................................................... 3

   B.  The Parties Litigate the Adequacy of the MWE Defendants' Representation ............ 5

      1.  Saint Vincent Raises Its Malpractice Claims ......................................................... 5

      2.  Saint Vincent's Objections ...................................................................................... 8

      3.  Discovery ............................................................................................................... 10

      4.  The Trial ................................................................................................................ 12

      5.  Post-Trial Briefing and Damages Claims ............................................................ 15

   C.  The Bankruptcy Court Rules on the Fee Application ............................................... 15

   D.  A New Complaint ..................................................................................................... 16

ARGUMENT ..................................................................................................................... 19

I.    THIS ACTION IS BARRED BY *RES JUDICATA* .................................................. 19

   A.  The Bankruptcy Court's Fee Decision Was A Final Judgment on the Merits ........... 21

   B.  The Bankruptcy Court Had Jurisdiction Over the Fee Dispute ................................ 21

   C.  The Parties to the Instant Action Are the Same as or in Privity with the Parties to
      the Fee Dispute ......................................................................................................... 22

   D.  The Fee Dispute and the Instant Action Constitute the Same Cause of Action ......... 23

      1.  The Fee Dispute and the Instant Action Arise out of the Same Transaction ......... 24

      2.  All of the Instant Claims Were Asserted or Could Have Been Asserted During the Fee
      Dispute ................................................................................................................... 26

      3.  *Res Judicata* Bars a Debtor from Asserting Malpractice Claims that Were or Could
      Have Been Raised during a Fee Dispute before the Bankruptcy Court .................. 32

   E.  Litigation of this Action Would Undermine the Bankruptcy Court's Fee Decision ......... 33

   F.  The Complaint Is Barred by *Res Judicata* Even Though the Fee Decision Contains
      Language Stating that Aspects of the Decision Are Without Prejudice ..................... 34

   G.  The Complaint Is Barred by *Res Judicata* Even Though the Reorganization Plan
      Contains a General Reservation Clause .................................................................... 37

CONCLUSION .................................................................................................................. 39

## TABLE OF AUTHORITIES

### CASES

In re Ames Dep't Stores, Inc.,
    76 F.3d 66 (2d Cir. 1996)................................................................21

Bonwit Teller v. Jewelmasters, Inc. (In re Hooker Invs., Inc.),
    162 B.R. 426 (Bankr. S.D.N.Y. 1993).....................................37, 38

Celeste Trust Reg. v. CBQ, Inc.,
    03 Civ. 9650, 2006 U.S. Dist. LEXIS 50367 (S.D.N.Y. July 20, 2006) ....................22

Celli v. First Nat'l Bank (In re Layo),
    460 F.3d 289 (2d Cir. 2006)..............................................19, 22, 23

Corbett v. MacDonald Moving Servs. Inc.,
    124 F.3d 82 (2d Cir. 1997).................................................20, 24

Covanta Onondaga Ltd. P'ship v. Onondaga Cy. Res Recovery Agency,
    318 F.3d 392 (2d Cir. 2003)......................................................35

D.A. Elia Constr. Corp. v. Damon & Morey, LLP (In re D.A. Elia Constr. Corp.),
    No. 07-cv-143A, 2008 U.S. Dist. LEXIS 25496 (W.D.N.Y. Mar. 31, 2008)
    ........................................................................20, 21, 28 32

Feige v. RCN Corp.,
    No. 07 Civ. 8539 (AKH), 2008 U.S. Dist. LEXIS 26922
    (S.D.N.Y. Apr. 3, 2008)..........................................................18

Gagliardi v. Am. Home Products Corp.,
    29 F.Supp. 2d 972 (E.D. Wis. 1998).............................................35

Grausz v. Englander,
    321 F.3d 467 (4th Cir. 2003) ..............................................19, 22, 32, 33

Grubin v. Rattet (In re Food Mgmt Group, LLC),
    380 B.R. 677 (Bankr. S.D.N.Y. 2008)...........................................22

Iannochino v. Rodolakis (In re Iannochino),
    242 F.3d 36 (1st Cir. 2001)..........................................20, 22, 33, 34, 35

Lawrence Group, Inc. v. Barton,
    262 B.R. 30 (N.D.N.Y. 2001) ..................................................22

Liu v. Silverman (In re Liu),
    No. 94-40970 (ALG), 2001 Bankr. LEXIS 547
    (Bankr. S.D.N.Y. May 23, 2001)................................................................20

Midway Motor Lodge of Elk Grove v. Innkeepers' Telemgmt. & Equip. Corp.,
    54 F.3d 406 (7th Cir. 1995) ...................................................................36

Murungi v. Mercedez Benz Credit Corp.,
    192 F. Supp. 2d 71 (W.D.N.Y. 2001)........................................................24

Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),
    200 F.3d 382 (5th Cir. 2000) ..............................................19, 25, 32, 33

Republic of Ecuador v. ChevronTexaco Corp.,
    376 F. Supp. 2d 334 (S.D.N.Y. 2005).........................................................5

Rodriguez v. Global Air Parts, LLC (In re Rodriguez),
    327 B.R. 86 (Bankr. D. Conn. 2005) .......................................................23

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000)......................................................................5

Stoll v. Gottlieb,
    305 U.S. 165 (1938)...............................................................................19

Sure-Snap Corp. v. State Street Bank and Trust Co.,
    948 F.2d 869 (2d Cir. 1991)............................................................. *passim*

Thickstun Bros. Equip. Co. v. Encompass Serv. Corp. (In re Thickstun Bros.
    Equip. Co., Inc.), 344 B.R. 515 (6th Cir. 2006)..........................................36

Vets North v. Libutti, No. CV 01-7773 (DRH) (ETB),
    2003 U.S. Dist. LEXIS 27675 (E.D.N.Y. Jan. 24, 2003) ............................23

Waldman v. Village of Kiryas Joel,
    207 F.3d 105 (2d Cir. 2000).....................................................................28

## STATUTES

11 U.S.C. 327 ......................................................................................14

11 U.S.C. Section 330.........................................................5, 21, 26, 33

Fed. R. Civ. P. 12(b)(6)..............................................................................18

## SUMMARY OF THE MOTION

Plaintiff alleges that Defendants McDermott Will & Emery, LLP ("MWE") and three of its individual partners (collectively, the "MWE Defendants") committed malpractice and related torts in connection with the bankruptcy of the Saint Vincents Catholic Medical Center hospital system ("Saint Vincent"). This action was filed on April 14, 2008, in the wake of an order issued by the United States Bankruptcy Court for the Southern District of New York ruling on objections lodged by Saint Vincent and the Official Committee of Unsecured Creditors ("Creditors Committee") to MWE's application for fees. That decision followed extensive discovery on all aspects of MWE's performance of services for Saint Vincent – both pre- and post-bankruptcy filing – and, ultimately, a trial. While the majority of the objections were overruled, the Bankruptcy Court criticized two specific aspects of MWE's work. Nevertheless, the court awarded MWE eighty percent of the fees and costs sought by the firm.

Saint Vincent and the Creditors Committee were represented by lawyers from three prominent law firms and were entirely aware of the facts and the theories underlying the purported claims alleged in this case. In addition, yet another law firm was specially retained during the pendency of the fee dispute for the specific purpose of advising whether there was a basis for malpractice claims against MWE. Indeed, Saint Vincent and the Creditors Committee used the fee dispute proceedings to attack the same conduct about which they complain **in this case**, to seek many of the same damages that they seek **in this case**, and to advance various theories of liability that they advance **in this case**.

So obvious was the agenda of Saint Vincent and the Creditors Committee—to trump up sweeping malpractice claims against MWE—that MWE specifically asserted that the

doctrine of *res judicata* required them to bring any and all such claims during the fee dispute. Saint Vincent even went so far as to ask the Bankruptcy Court to delay issuing a final order approving fees so that it could investigate its malpractice claims before a final judgment had been issued. The court delayed issuing its order for eleven months after the trial had been completed. Nevertheless, and knowing full well that by splitting their purported claims they risked losing them altogether, Saint Vincent and the Creditors Committee failed to assert their claims in the Bankruptcy Court.

Instead of asserting their claims in a timely manner, Saint Vincent and the Creditors Committee then assigned whatever rights they had to the Saint Vincent Catholic Medical Center Litigation Trust ("Litigation Trust"). Now, seven months after the fee decision was issued, the Litigation Trustee is attempting to revive Saint Vincent's claims against the MWE Defendants in this lawsuit. However, all of those claims are barred as a matter of law.

With the Complaint filed in the present action ("Complaint"), Saint Vincent, the Creditors Committee, and their privy, the Litigation Trustee, impermissibly seek a second bite at the apple. While the MWE defendants are confident that the claims alleged in the complaint are without merit, the Litigation Trustee has no right to assert them in the first place. If permitted to proceed, this case will waste judicial resources, cause the parties' litigation costs to skyrocket, and flout the final judgment in the bankruptcy proceeding. Courts consistently hold that a bankruptcy court's fee judgment is *res judicata* in a subsequently asserted malpractice action. The same result should obtain in this case.

## FACTUAL BACKGROUND

### A.    The Saint Vincent Bankruptcy

In 2000, Saint Vincent Hospital and Medical Center, Catholic Medical Centers of Brooklyn and Queens, and Sisters of Charity Healthcare in Staten Island merged to form Saint Vincents Catholic Medical Centers of New York ("Saint Vincent"). (Compl.[1] ¶¶ 2, 23, annexed as Exhibit A to the Declaration of Frederick B. Warder.[2]) Although the purpose of the merger had been to reduce operating costs and increase growth and revenues, the merger did not achieve the anticipated results. (Id. ¶ 24.) In 2001, 2002, and 2003, Saint Vincent incurred increasing operating losses. In fact, between 2002 and 2003, net operating losses increased from $22 million in 2002 to $81 million in 2003. (Id.) By December 2003, the Saint Vincent Board of Directors (the "Board" or "Saint Vincent Board") realized its financial crisis was sufficiently severe that it needed the assistance of professional turnaround specialists. (Id. ¶ 26.)

As a result, in early 2004, Saint Vincent retained Speltz & Weis, LLC ("SWLLC") to provide this assistance. (Compl. ¶¶ 2, 30, Def. Exh. A.) SWLLC and its two principals, David Speltz ("Speltz") and Timothy Weis ("Weis") (collectively, "the Speltz and Weis Parties") are "hospital turnaround management professionals" who specialize in "restructuring and turning around failing hospital systems." (Id. ¶ 2.) Under the terms of Saint Vincent's agreement with SWLLC, Speltz would serve as Saint Vincent's President and Chief Executive Officer and Weis would serve as Saint Vincent's Chief Financial Officer. (Id. ¶ 30.)

---

[1] All "Compl." citations herein are to Plaintiff's Complaint in this action dated April 14, 2008. For purposes of this motion only, the truth of the Complaint's factual allegations is assumed *arguendo* as required by the applicable rules.

[2] Hereinafter, references to exhibits annexed to the Declaration of Frederick B. Warder will be referred to as "Def. Exh."

In the end of the summer of 2004, Saint Vincent decided to consider whether to file a petition seeking protection under Chapter 11 of the Bankruptcy Code. (Compl. ¶ 43, Def. Exh. A.) At that time, Saint Vincent requested that MWE provide information on the procedures for filing such a petition. (Id. ¶ 44.) MWE provided the information that Saint Vincent requested and was engaged as counsel to Saint Vincent for bankruptcy-related matters. (See id. ¶¶ 45, 47.) On September 30, 2004, the Saint Vincent Board instructed MWE to "begin planning for a potential Chapter 11 filing[.]" (Id. ¶ 47 (internal quotation marks omitted).) Defendants William P. Smith ("Smith"), Stephen B. Selbst ("Selbst"), and David D. Cleary ("Cleary") "headed" the MWE bankruptcy team that was working on the potential Saint Vincent filing. (Id.)

For many months, Saint Vincent attempted to resolve its financial problems without seeking the protection of the bankruptcy laws, even instructing MWE to stop work in late October of 2004. (Compl. ¶ 54, Def. Exh. A) Ultimately, however, Saint Vincent's efforts to avoid bankruptcy proved unsuccessful, and Saint Vincent filed a petition under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York on July 5, 2005. (Id. ¶ 107; see also In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al., Case No. 05-14945 (ASH) (Bankr. S.D.N.Y.) ("In re Saint Vincent"), Docket Entry No. 1, Def. Exh. B.) Defendants Smith, Selbst and Cleary continued to manage the MWE bankruptcy team after the petition was filed. (Compl. ¶ 177, Def. Exh. A.)

MWE represented Saint Vincent in the bankruptcy proceeding before The Honorable Prudence Beatty until September 13, 2005, when Saint Vincent decided to retain a

different law firm to pursue its bankruptcy case and terminated its retention of MWE. (Compl. ¶¶ 138-40, Def. Exh. A.)

**B.    The Parties Litigate the Adequacy of the MWE Defendants' Representation**

As 11 U.S.C. § 330 requires that the bankruptcy court approve all claims by the debtor's counsel for attorneys fees and costs before any payment is made to counsel, MWE filed a fee application in the Bankruptcy Court on January 31, 2006 ("Fee Application"), pursuant to a deadline ordered by Judge Beatty. (See In re Saint Vincent, Docket Entry No. 1048, Def. Exh. B.)[3] In March 2006, the United States Trustee and the Creditors Committee each filed objections to MWE's fee application. (See Objections of United States Trustee ("U.S. Trustee Obj."), Def. Exh. C; Objections of the Creditors Committee ("Creditors Obj."), Def. Exh. D.)

**1.    Saint Vincent Raises Its Malpractice Claims**

Although Judge Beatty had presided over the Saint Vincent Bankruptcy action during its initial months, the action was transferred to The Honorable Adlai S. Hardin, Jr. on January 11, 2006.  As a result, Judge Hardin did not preside over the case during the MWE Defendants' representation of Saint Vincent, and did not observe any of the MWE Defendants' conduct in that regard.  Judge Hardin did, however, preside over the litigation of MWE's Fee Application.

---

[3] "In evaluating the allegations of a complaint on a motion to dismiss, a court may also consider 'documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" Republic of Ecuador v. ChevronTexaco Corp., 376 F. Supp. 2d 334, 375 (S.D.N.Y. 2005) (quoting, Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). A court may take judicial notice of a public record pursuant to Rule 201(b), Fed. R. Evid. Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000).  In this case, the court may consider the Bankruptcy Court's fee decision and other documents relating to the fee dispute, such as conference transcripts, objections, briefs, trial transcripts, affidavits, and deposition transcripts.  All of these documents (1) are public records that are subject to judicial notice, (2) are referred to in the Complaint, and/or (3) were relied upon by the Litigation Trustee in bringing this action.

On July 20, 2006, Judge Hardin held a telephone conference to address (1) the deadline for Saint Vincent to file objections to MWE's fee application and (2) issues related to whether the fee application was an interim or final application, including the *res judicata* effects of any judgment issued in the fee dispute. (Transcript of July 20, 2006 Telephone Conference ("Tele. Conf. Tr.") at 9, Def. Exh. E.)  Saint Vincent was represented by two different law firms at this conference—Weil, Gotshal & Manges, LLP and Togut, Segal & Segal, LLP—and the Creditors Committee was represented by Alston & Bird, LLP.

Although the Fee Application only sought fees for work MWE performed after the bankruptcy petition was filed, the July 20 conference also addressed claims that Saint Vincent purported to have against MWE for malpractice committed prior to the filing of the bankruptcy petition.  Saint Vincent's counsel acknowledged on the record that MWE had "taken the position that [the court's] ruling on the final fee application [ ] will, in fact, result in a release of all pre-petition claims that the estate may have against McDermott." (Tele. Conf. Tr. at 9:5-8, Def. Exh. E.)  Judge Hardin observed that MWE had successfully placed Saint Vincent and the Creditors Committee on notice of its position that *res judicata* would bar Saint Vincent and the Committee from later asserting any pre-petition malpractice claim that was not brought as part of the fee dispute. (Id. at 16:4-17.)

Judge Hardin expressed his displeasure with the fact that, at the time of the July 20 conference, Saint Vincent had failed to file its objections to the January Fee Application:

> And the company is now asking until September to file a fee [objection]?  Come on.  I don't understand that.  I really don't.  I mean, I'm sort of amazed that the company hasn't filed a fee [objection] if it is disposed to do that already.  I don't think – I think – I mean, good heavens, this is unprecedented.  If it's a big fee application, sure, that's fine.  Okay?  But there have been a lot

> of big fee applications and it doesn't take months and months and
> months to file objections to most fee applications, even giant ones,
> let alone where others have [already] objected and a trial was
> scheduled.  (Tele. Conf. Tr. at 6:8-17, Def. Exh. E.)

Saint Vincent advised MWE and the court that it needed additional time to investigate pre-

petition malpractice claims.  (Id. at 12:7-8.)  Despite Saint Vincent's extraordinary delay,

MWE's counsel "urge[d] counsel for Saint Vincent[ ] to take the time, with discovery right now,

and come up with a conclusion" as to whether it wants to "bring a claim or not bring a claim" for

malpractice.  (Id. at 13:4-12)

       After acknowledging MWE's *res judicata* argument arising from the fee

proceeding, Judge Hardin directed MWE to file a notice clarifying that its Fee Application was

intended to be a final application as opposed to an interim application.  (Tele. Conf. Tr. at 18,

Def. Exh. E.)  The deadline for Saint Vincent to object to the final fee application was discussed,

and Saint Vincent's own counsel concluded that, in order to preserve its claims, Saint Vincent

should file any and all malpractice claims before Judge Hardin ruled on the Fee Application:

> I think what we need is just a clarification that this objection
> deadline did not preclude the debtors from – not do the
> investigation with respect to pre-petition activities, as to
> malpractice – potential malpractice claims.  It does not prevent the
> debtor from commencing an adversary proceeding [that asserted
> the malpractice claims] after the deadline for objections to the fee
> application.
>
> It seems to me that [it] would behoove the debtors, to protect
> themselves, to commence that adversary proceeding on or before
> the date that the Court rules on the fee application so it's a matter
> of record that those malpractice claims, if they – if we conclude
> that there are claims on the record and that they are, in fact, carved
> out.  (Id. at 19:15-20:2.)

Clearly, Saint Vincent was on notice that the fee proceeding was the appropriate venue in which to assert its pre-petition and post-petition malpractice claims.

Although Judge Hardin made a clear determination at the conference that the Fee Application would be a "final" as opposed to an interim application, he explicitly refused to determine the *res judicata* effect of any judgment issued in the fee proceeding: "Now, as far as the question of whether or not a ruling on a final fee application bars claims, I haven't the slightest idea what the outcome of that controversy is and I don't express any opinion on it. So you can all proceed on the basis that I don't know anything about the answer to that question. It hasn't been put before me and I express no view." (Tele. Conf. Tr. at 18:18-24, Def. Exh. E.) Saint Vincent's counsel asked whether it could brief that issue so that the court could rule upon it "[b]ecause I don't want anyone to go down this path under the assumption that they either have the protection [ ] or don't have the protection of the ultimate ruling from the Court as barring these claims." (Id. at 19:2-5.) Judge Hardin invited the parties to "file whatever you want" and recommended that the parties obtain legal advice on the *res judicata* issue. (See id. at 19:9-11.)

As per Judge Hardin's instructions, one day after the conference MWE filed a Notice of Amendment clarifying that its Fee Application was a "final" fee application. (July 21, 2006 Notice of Amendment at 2, Def. Exh. F.) Saint Vincent never briefed the *res judicata* issue for Judge Hardin.

### 2.    Saint Vincent's Objections

Saint Vincent filed objections to MWE's Fee Application on July 31, 2006. These detailed objections, comprising more than twenty-two pages, described and analyzed the legal work that MWE performed going back to the fall of 2004 (when Saint Vincent first retained

MWE to provide bankruptcy advice, approximately nine months before Saint Vincent filed its

Chapter 11 petition).  (E.g. Saint Vincent's Response and Objection ("Saint Vincent Obj.") ¶¶

24-26, Def. Exh. H.)

The longest section in Saint Vincent's Objections was titled "Speltz and

Weis/Huron Consulting."  (Saint Vincent Obj. ¶¶ 22-36, Def. Exh. H.)  This section described

the contract between SWLLC and Saint Vincent as well as Saint Vincent's retention of financial

advisors Huron Consulting Group ("Huron").  (Id. ¶¶ 23-24.)  It continued to detail merger

negotiations between SWLLC and Huron, as well as the merger agreement that ensued.  (Id ¶¶

25-26.)  Further, Saint Vincent objected to MWE's alleged failure to disclose the merger

negotiations and agreement to the Saint Vincent board of directors despite an allegedly "blatant

conflict" that existed as a result of the fact that Speltz, Saint Vincent's chief executive officer,

"was both (a) negotiating his own firm's acquisition by one of [Saint Vincent's] other

professionals, Huron[,] and (b) overseeing the work flow to, and compensation paid to, Huron."

(Id. ¶ 26.)  Further, the Objections asserted that MWE's handling of the SWLLC/Huron issue

constituted malpractice:

> MWE was completely aware of the situation and knew or should
> have known, as a matter of bankruptcy law, of the serious conflict
> issues that would be raised and encountered upon the filing of the
> Chapter 11 cases as a result of the relationship between SWLLC
> and Huron and the role each was cast to play. Clearly, these
> factors required full disclosure at the outset of these cases of, at
> least, the full nature of the SWLLC/Huron relationship, the terms
> of the acquisition transaction, and the impact of that relationship
> and acquisition on the Chapter 11 retentions themselves. . . . Yet,
> the conflict and disinterestedness questions raised by the
> [SWLLC]/Huron relationship were largely ignored by MWE. The
> applications and supporting affidavits prepared by MWE for the
> [SWLLC] and Huron retentions did not provide anywhere near the

9

information and disclosure that they should have in light of the seriousness of the conflicts. (Id. ¶ 29.)

Saint Vincent's Objections placed all of the blame for issues arising from the SWLLC/Huron merger on MWE despite the fact that Saint Vincent's Board, upon learning of the merger on May 5, 2005, "immediately understood that the transaction had potential negative implications" and "immediately retained independent outside counsel to conduct an investigation and to make recommendations to the Board[.]" (Saint Vincent Obj. ¶ 27, Def. Exh. H.)

At the conclusion of its Objections, Saint Vincent acknowledged that "[o]ther courts have held that a final order approving fees in a bankruptcy case can have a preclusive effect on a subsequent effort to assert affirmative claims against a debtor's counsel." (Saint Vincent Obj. ¶ 52, Def. Exh. H.)  In light of this concern, Saint Vincent asked Judge Hardin to delay issuing a final judgment in the fee dispute so that it could investigate its malpractice claims against MWE.  (Id. ("Because the investigation into MWE's conduct is in its initial phase, and the ultimate results of these cases are unknown, [Saint Vincent] should not be required to accelerate [its] analysis and decide now whether potential affirmative claims exist against MWE to protect against the possible preclusive effect that any final order entered on MWE's fees may have on such claims."))

### 3.    Discovery

Saint Vincent's Objections to MWE's Fee Application indicate that Saint Vincent already had determined to assert a claim against MWE for malpractice allegedly committed during the period before the bankruptcy petition was filed, and Saint Vincent proceeded to take discovery regarding its pre-petition malpractice claims.  Saint Vincent and the Creditors Committee took testimony from four MWE partners, Speltz, Weis, one Huron executive, two

members of the Saint Vincent Board, Saint Vincent's General Counsel, the outside counsel that

Saint Vincent retained to advise it on conflict issues, the Saint Vincent CEO that succeeded

Speltz, and the former United States Trustee, about both pre- and post-petition facts. In total,

thirteen depositions were taken, the transcripts of which span 2,323 pages. MWE made available

to Saint Vincent and the Creditors Committee hundreds of thousands of pages of documents and

emails relating to both pre- and post-petition facts. Based on designations by Saint Vincent and

the Creditors Committee, MWE then produced close to 50,000 pages of pre- and post-petition

documents.

Saint Vincent used this discovery as an opportunity not only to raise objections

regarding MWE's post-petition legal services, but also to inquire further into the pre-petition

conduct alleged in the instant action. A few examples will provide an indication of the extent of

discovery into the pre-petition period:

- Saint Vincent's counsel asked Smith about whether Saint Vincent should
  have filed for bankruptcy in the first place (William P. Smith Deposition
  ("Smith Dep.") at 199:21-200:3, Def. Exh. I), as well as whether Saint
  Vincent wanted to file for bankruptcy during the pre-petition period (id. at
  58:14-61:15).

- Counsel for the Creditors Committee and Saint Vincent's counsel asked
  Selbst about MWE's analysis of whether Saint Vincent should go into
  bankruptcy as early as August or September 2004 and what alternatives to
  bankruptcy Saint Vincent had. (Stephen Selbst Deposition ("Selbst Dep.")
  at 14:24-22:3, 238:24-252:11, Def. Exh. J.)

- Saint Vincent's counsel solicited extensive testimony from Smith about
  (1) precisely when Smith learned of merger negotiations between SWLLC
  and Huron and when Smith first discussed the negotiations with Saint
  Vincent (Smith Dep. at 32:22-36:19, 93:4-100:15, Def. Exh. I), and (2)
  whether MWE had a legal or ethical obligation to disclose the existence of
  these negotiations to Saint Vincent (id. at 36:20-44:11).

- Saint Vincent's counsel asked Smith about MWE's pre-petition analysis
  of the potential conflict of interests posed by Saint Vincent's retention of

11

Huron and SWLLC after the two merged.  (Smith Dep. at 32:22- 35:14, 41:12-44:11, Def. Exh. I.)

As discovery was ending and the parties were preparing for trial, Saint Vincent determined that the two law firms representing it and the one law firm representing the Creditors Committee did not provide the legal resources needed to investigate pre- and post-petition malpractice claims against MWE.  As a result, Saint Vincent filed a petition to permit it to hire Venable LLP as special counsel to specifically investigate pre- and post-petition malpractice claims against MWE:  "Because the Fee Application is now being treated as a final application and the issue of *res judicata* as to any affirmative claims that [Saint Vincent] and [its] estate[] may hold against MWE has been raised by MWE, [Saint Vincent was] require[d] to accelerate their consideration of MWE's services and the reasonableness of its fees."  (Venable LLP Retention Application ¶ 3 (italics supplied), Def. Exh. G.)  Judge Hardin granted the application. (In re Saint Vincent, Docket Entry No. 2362, Def. Exh. B.)

### 4.    The Trial

Once discovery was completed, Judge Hardin presided over a three day trial.  Ten witnesses submitted testimony by affidavit or declaration.  (See Def. Exhs. K-T.)  The affidavits and declarations are collectively 109 pages in length.  (Id.)  Six of those ten witnesses also provided live testimony.  (See Transcript of Trial before Judge Hardin held on 10/23/06 - 10/25/06 ("Trial Tr. Day __"), Def. Exh. U (Day One – 10/23/06), Def. Exh. V (Day Two – 10/24/06), Def. Exh. W (Day Three – 10/25/06).)  The trial transcript is 485 pages.  (See Def. Exhs. U-W.)

This extensive trial testimony scrutinized MWE's representation of Saint Vincent prior to the July 5 filing of the bankruptcy petition.  As examples:  Saint Vincent's counsel asked

12

Smith about legal advice that MWE provided to the Board in September 2004 concerning whether Saint Vincent should file a Chapter 11 petition. (Trial Tr. Day One at 167:9-169:5, Def. Exh. U. See also Affidavit of William P. Smith ("Smith Aff.") ¶¶ 42-44, Def. Exh. K.) Michael Solow, the co-head of Kay Scholer LLP's reorganization group and the lead attorney advising one of the entities that lent Saint Vincent money during the pre-petition period, testified that, "[a]bsent the efforts of McDermott [during the pre-petition period to obtain and structure financing for Saint Vincent], [Saint Vincent] would have experienced an extremely hard landing in bankruptcy court, rather than the soft landing . . . that [Saint Vincent] actually experienced." (Declaration of Michael B. Solow ("Solow Decl.") ¶ 7, Def. Exh. L.) Saint Vincent General Counsel Elizabeth St. Clair ("St. Clair") testified that Saint Vincent CEO Speltz advised Saint Vincent in late June and possibly even early July 2005 that Saint Vincent would not need to file a bankruptcy petition. (See Trial Tr. Day Two at 71:6-20, Def. Exh. V.)

Much like the deposition testimony, trial witnesses also were asked to testify as to whether MWE disclosed the existence and terms of the Huron-SWLLC merger negotiations to Saint Vincent. Chairman of the Saint Vincent Board of Directors Richard Boyle ("Boyle") testified that Smith had failed to disclose the negotiations that occurred in the period before the early May 2005 merger. (Declaration of Richard Boyle ("Boyle Decl.") ¶¶ 4-6, Def. Exh. M.) Leo Crowley, the Pillsbury Winthrop Shaw Pittman attorney retained by Saint Vincent to advise it on conflict issues presented by the SWLLC-Huron merger, also testified as to statements Smith and Boyle made regarding when and how Smith and Boyle each learned about the merger. (Declaration of Leo T. Crowley ¶ 9, Def. Exh. N.) St. Clair testified that Smith acknowledged failing to disclose the Huron-SWLLC merger for a period of two weeks, saying that "I was not

13

surprised . . . given his business relationship with David Speltz." (Declaration of Elizabeth St. Clair ("St. Clair Decl.") ¶¶ 4-5, Def. Exh. O.) At trial, St. Clair asserted that Speltz first provided MWE's name to the Board and directed St. Claire to retain MWE over her objection. (Trial Tr. Day Two at 34:9-35:6, Def. Exh. V; see also St. Clair Decl. ¶ 3, Def. Exh. O.)

Similarly, Boyle and St. Clair claimed that MWE failed to advise them prior to the July 5 bankruptcy filing of the Bankruptcy Code's requirement that bankruptcy professionals be disinterested. (Boyle Decl. ¶ 10, Def. Exh. M; St. Clair Decl. ¶ 12, Def. Exh. O.) Saint Vincent also cross-examined Smith on the disinterestedness requirements under the Bankruptcy Code and the so-called Jay Alix Protocol,[4] Smith's pre-petition advice to the Board on that subject, and the disclosures that MWE prepared concerning the Speltz and Weis Parties' disinterestedness. (Trial Tr. Day One at 194:23-203:19, Def. Exh. U.)

During closing statements, Judge Hardin asked for "the bullet points on the Speltz and Weis[ ]" issues. (Trial Tr. Day Three at 31:2-4, Def. Exh. W.) Saint Vincent's counsel responded by making several points, including the following related to pre-petition conduct by MWE:

- "[I]t was not reasonable for McDermott not to have disclosed to the board when Mr. Smith knew that the combination between Speltz and Weis[ ] and Huron was about to happen, knowing that they had been in full Chapter 11 prep mode in light of the liquidity crisis that was continuing from March through the final date of July's filings." (Trial Tr. Day Three at 31:19-24, Def. Exh. W.)

- "It was not reasonable not to have reviewed the Speltz and Weis[ ] and Huron agreement on their own when that deal closed on May 9th, to see

---

[4] The Jay Alix Protocol is an agreement between the United States Trustee for the District of Delaware and Jay Alix & Associates governing that firm's role in a bankruptcy case in which the debtor sought to retain it pursuant to 11 U.S.C. § 327 as both financial advisor and crisis manager. The agreement was designed to address the conflicts that might arise in that case. The agreement has been cited approvingly by some courts outside the District of Delaware when dealing with such conflicts.

what terms may or may not have impacted retentions, whether on a dual basis or a separate basis." (Id. at 31:25-32:4.)

- "Mr. Speltz introduced Mr. Smith's restructuring group to the debtors and then McDermott introduced Huron as the financial advisors that perhaps things weren't dealt with the way they might have been otherwise dealt with but for that relationship." (Id. at 34:9-13.)

- "[P]re-petition [ ] services were not reasonable, the acts taken were not reasonable based upon what they knew." (Id. at 38:5-7.)

### 5.    Post-Trial Briefing and Damages Claims

All of the parties submitted extensive post-trial briefs. Most notably, Saint Vincent, the Creditors Committee, and the United States Trustee submitted a joint statement setting forth the "economic consequences to" Saint Vincent allegedly resulting from MWE's supposed "mishandling of (1) the St. Mary's Hospital closure and (2) motions to retain, post-petition, [SWLLC] and [Huron]." (Post-Trial Statement of Economic Consequences to the Debtors' Estates ("Post-Trial Dam. St.") at 1, Def. Exh. X.) Specifically, Saint Vincent and the Creditors Committee argued that Saint Vincent suffered consequential damages in the amount of $1,790,000 as a direct result of MWE's "delay in seeking and obtaining Bankruptcy Court approval to close St. Mary's Hospital." (Id. ¶ 1.) Saint Vincent also asked the court to compensate it for the "'poisoned well' atmosphere that resulted from McDermott's misguided efforts to push through the[] retentions [of Speltz and Weis and Huron]." (Id. ¶ 5.)

### C.    The Bankruptcy Court Rules on the Fee Application

As Saint Vincent had requested, the Bankruptcy Court did not rule on the Fee Application until August 29, 2007. (In re Saint Vincent, Decision on Objections to Application for Fees and Expenses (Bankr. S.D.N.Y. August 29, 2007) (unpublished) ("Fee Decision"), Def. Exh. Y.) In September 2007, the Bankruptcy Court issued an Order confirming the Fee Decision

("Fee Order"). (Fee Order, Def. Exh. Z.) Although the court sustained some of the objections to the Fee Application, the court granted the overwhelming majority of fees that MWE had requested: MWE sought $2,227,979.50 in attorney fees and $104,314.28 in costs, and was awarded $1,767,436.50 in attorney fees and $104,314.28 in costs. (Fee Order at 1, 3, Def. Exh. Z.) The Bankruptcy Court denied the Objecting Parties' claim for consequential damages in the absence of any claim that would support such relief: "it is inappropriate to litigate a tort claim for malpractice in the guise of an objection to legal fees." (Fee Decision at 36, Def. Exh. Y.) The court explicitly declined to address what claims, if any, remained viable following the final Fee Application decision and/or what defenses might apply to any such claims. (Fee Order at 3, Def. Exh. Z.)

## D.    A New Complaint

On April 14, 2008, seven months after the final fee order was issued, the Litigation Trustee filed the instant action in New York State Supreme Court stating claims against the MWE Defendants for breach of fiduciary duty, legal malpractice, attorney misconduct, fraudulent concealment, aiding and abetting breaches of fiduciary duty, and aiding and abetting fraud.[5] (Compl. at 1, Def. Exh. A.) The Complaint consists of 259 paragraphs that take up 75 pages and sets forth the Litigation Trustee's allegations in painstaking detail.

The Litigation Trustee is able to provide such comprehensive detail in the present Complaint precisely because the conduct alleged here was at issue in the fee dispute. In a state court action against Speltz, Weis, SWLLC, and Huron (the "SWLLC Action") alleging claims

---

[5] The MWE Defendants removed the action to federal court on May 9, 2008.

based on the same conduct alleged in the instant Complaint, the plaintiff[6] acknowledged that "the conduct that supports the [plaintiff's] claims against the Defendants in this action was also the subject of the McDermott Fee Dispute, which was tried in open court at a three-day hearing." (Creditors Committee's Memorandum of Law in Opposition to Certain Defendants' Cross-Motion for an Alternative Document Preservation Order ("Creditors Mem.") at 9, Def. Exh. BB.) In fact, the plaintiff admitted that **"evidence on nearly all of the key issues in this action was presented"** at the MWE fee dispute trial. (Id. at 9 n.2 (emphasis added).)

The instant Complaint asserts the following six claims against the MWE Defendants:

- The MWE Defendants breached their fiduciary duty to Saint Vincent by (1) failing to disclose the existence and terms of the merger of SWLLC and Huron, (2) failing to advise adequately Saint Vincent of the conflict of interest issues posed by the merger of SWLLC and Huron, (3) assisting the Speltz and Weis Parties in effecting the merger of SWLLC and Huron, and (4) failing to advise Saint Vincent that it should have filed for bankruptcy sooner than it did. (Compl. ¶ 188, Def. Exh. A.)

- The MWE Defendants committed legal malpractice by (1) failing to advise Saint Vincent that it should have filed for bankruptcy sooner than it did, (2) failing to plan adequately for the bankruptcy filing, (3) negligently handling the St. Mary's hospital closure, (4) failing to advise properly Saint Vincent of the implications that the merger of SWLLC and Huron had on the bankruptcy filing and reorganization plan, (5) negligently handling the retention of SWLLC and disclosures to the court related thereto, and (6) failing to supervise Huron properly. (Id. ¶ 200.)

- The MWE Defendants aided and abetted the Speltz and Weis Parties' breach of fiduciary duty. The Complaint alleges that the Speltz and Weis Parties breached their fiduciary duty by (1) engaging in self-dealing transactions with Huron (including the merger of SWLLC and Huron), (2) concealing the self-dealing transactions, and (3) failing to file timely for bankruptcy. The Complaint further alleges that the MWE Defendants

---

[6] The SWLLC Action was originally filed by the Creditors Committee. Ultimately, however, the Amended Complaint in that Action identified Gray & Associates, in its capacity as Trustee of the SVCMC Litigation Trust, as the plaintiff. (SWLLC Action, Index No. 150446/2007, Substitution Order, November 27, 2007, Def. Exh. AA.)

aided the Speltz and Weis Parties' breach by (1) concealing from Saint Vincent the merger negotiations between SWLLC and Huron and (2) encouraging the merger between SWLLC and Huron by providing advice to Speltz and Weis and providing assurances to Huron. (<u>Id.</u> ¶¶ 208-11.)

- The MWE Defendants aided and abetted the Speltz and Weis Parties' and Huron's fraud. The Complaint alleges that the Speltz and Weis Parties committed fraud by failing to disclose and misrepresenting the existence and terms of the merger agreement between SWLLC and Huron, and the negotiations related thereto. (<u>Id.</u> ¶¶ 218-220.) The MWE Defendants allegedly aided this fraud by (1) concealing the existence of the merger negotiations, (2) encouraging the merger by advising Speltz and Weis of potential conflicts of interest posed by the merger and informing Huron that Saint Vincent's engagement of SWLLC would be extended. (<u>Id.</u> ¶ 231.)

- The MWE Defendants breached New York Judiciary Law Section 487 by (1) colluding with the Speltz and Weis Parties and Huron to conceal the merger negotiations between Huron and SWLLC and (2) deceiving the Bankruptcy Court and the U.S. Trustee by concealing material facts relating to the merger of Huron and SWLLC. (<u>Id.</u> ¶¶ 238-39.)

- The MWE Defendants fraudulently concealed the merger negotiations between SWLLC and Huron and the terms of the merger agreement between the two entities. (<u>Id.</u> ¶¶ 252-53.)

## <u>MOTION TO DISMISS STANDARD</u>

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the factual allegations in the Complaint must be accepted as true, and those allegations—and the Complaint as a whole—must be considered in light of any public record documents that bear on the validity of the plaintiff's claim. "In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.'" <u>Feige v. RCN Corp.</u>, No. 07 Civ. 8539 (AKH), 2008 U.S. Dist. LEXIS 26922, at *3 (S.D.N.Y. Apr. 3, 2008) (Hellerstein, J.) (quoting, <u>Bell Atlantic v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007)).

**ARGUMENT**

I.     **THIS ACTION IS BARRED BY *RES JUDICATA***

      "Restraining litigious plaintiffs from taking more than 'one bite of the apple' has

been our avowed purpose since the common law doctrine of *res judicata* first evolved." Sure-

Snap Corp. v. State Street Bank and Trust Co., 948 F.2d 869, 870 (2d Cir. 1991) (italics

supplied).  It is well-established that, provided the doctrine's elements are satisfied, *res judicata*

bars relitigation of claims that were or could have been adjudicated before a bankruptcy court.

See Stoll v. Gottlieb, 305 U.S. 165, 170-71 (1938) (*res judicata* barred state court from

adjudicating dispute that had already been resolved during an adjudication under the Bankruptcy

Act's reorganization provisions); Celli v. First Nat'l Bank (In re Layo), 460 F.3d 289, 292-96 (2d

Cir. 2006) (holding that bankruptcy confirmation order was *res judicata* with respect to the

validity of mortgage liens listed in a reorganization plan); Sure-Snap, 948 F.2d at 877.

      In particular, provided that the elements of *res judicata* are satisfied, the doctrine

bars an action against a professional for malpractice where a bankruptcy court previously has

ruled upon an application by the same professional for fees.  All three Courts of Appeals to have

considered the issue have reached this conclusion.  See Grausz v. Englander, 321 F.3d 467, 472-

476 (4th Cir. 2003) (bankruptcy court's disposition of debtor's attorney's application for

attorney's fees precludes debtor's subsequent legal malpractice action); Iannochino v. Rodolakis

(In re Iannochino), 242 F.3d 36, 49 (1st Cir. 2001) (bankruptcy court's disposition of lawyer's

application for attorney's fees precludes subsequent malpractice action against attorney);

Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.), 200 F.3d 382, 391 (5th Cir. 2000)

(same in context of malpractice claim against accountant).  District and bankruptcy courts in this

Circuit have also reached the same conclusion. See D.A. Elia Constr. Corp. v. Damon & Morey, LLP (In re D.A. Elia Constr. Corp.), No. 07-cv-143A, 2008 U.S. Dist. LEXIS 25496, at *9-17 (W.D.N.Y. Mar. 31, 2008) (under doctrine of *res judicata*, legal malpractice action against debtor's counsel is precluded by bankruptcy court order disposing of fee application made by debtor's attorneys); Liu v. Silverman (In re Liu), No. 94-40970 (ALG), 2001 Bankr. LEXIS 547, at *25 (Bankr. S.D.N.Y. May 23, 2001) ("[T]here is also substantial authority that the award of attorney's fees to [an attorney who represented the debtor prior to the filing of the bankruptcy petition and the trustee after the filing of the bankruptcy petition] precludes a malpractice claim against him" and granting summary judgment for the attorney on the basis of *res judicata*).

The Second Circuit has held that courts must conduct a four-part inquiry in order to determine whether a bankruptcy court judgment precludes a subsequent action: Specifically, the court must consider whether (1) the prior decision was a final judgment on the merits, (2) issued by a court of competent jurisdiction, (3) the parties to the prior action were the same or in privity with the parties to the second action, and (4) the "causes of action" in the two actions were the same. Sure-Snap, 948 F.2d at 872-74. See also Corbett v. MacDonald Moving Servs. Inc., 124 F.3d 82, 87-88 (2d Cir. 1997). Further, in the bankruptcy context, the court inquires into "whether an independent judgment in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'" Sure-Snap, 948 F.2d at 874. The Second Circuit has characterized this last question as "an aspect of the test for identity of the causes of action[.]" Corbett, 124 F.3d at 88. Each of these requirements will be considered in turn.

A.    **The Bankruptcy Court's Fee Decision Was A Final Judgment on the Merits**

The Fee Decision and Fee Order issued by the Bankruptcy Court in August and September 2007, respectively, constitute a final judgment. The Fee Order specifically noted that "[b]y Amended Notice dated July 21, 2006, MWE advised that the Fee Application shall be denominated its **Final Fee Application** pursuant to § 330 of the Bankruptcy Code." (Fee Order at n.1 (emphasis added), Def. Exh. Z.) Courts specifically have held that this type of fee order is immediately appealable and is a final judgment on the merits for purposes of *res judicata*. See, e.g. In re Ames Dep't Stores, Inc., 76 F.3d 66 (2d Cir. 1996), overruled in part on other grounds, U.S. Trustee v. Lamie, 540 U.S. 526 (2004), (reviewing a final fee order pursuant to 11 U.S.C. § 330); D.A. Elia Constr. Corp. v. Damon & Morey, LLP, No. 07-cv-143A, 2008 U.S. Dist. LEXIS 25496, at *10 ("As to the first factor [of the *res judicata* analysis], the bankruptcy court's prior decision awarding attorneys' fees to [the debtor's attorney] under 11 U.S.C. § 330 was clearly a final judgment on the merits."). Cf. Iannochino v. Rodolakis, 242 F.3d 36, 43-45 (1st Cir. 2001) (even though a fee application was labeled an interim application, it was entitled to *res judicata* as a matter of law).

B.    **The Bankruptcy Court Had Jurisdiction Over the Fee Dispute**

Pursuant to 11 U.S.C. § 330, the Bankruptcy Court had jurisdiction over the fee dispute and the authority to adjudicate the Fee Application. The Litigation Trustee implicitly has conceded as much by citing to and relying upon the Bankruptcy Court's Fee Decision in the Complaint. (See, e.g. Compl. ¶¶ 10, 11, 108, 142, Def. Exh. A.)

**C.**    **The Parties to the Instant Action Are the Same as or in Privity with the Parties to the Fee Dispute**

Generally, for purposes of *res judicata*, a debtor and its creditors are treated as the same entity as a litigation trustee bringing a claim on behalf of the debtor or its creditors. See Celli, 460 F.3d at 290 (affirming the district court's "conclu[sion] that a Chapter 13 bankruptcy confirmation order was *res judicata* with respect to the validity of certain mortgage liens listed by the debtor in his Chapter 13 plan and therefore precludes the debtor's and the Trustee's subsequent attempt to avoid these liens on his property.")  Saint Vincent and the Creditors Committee were parties to the fee dispute and, as a result, the Litigation Trustee is the same party for purposes of *res judicata* as Saint Vincent and the Creditors Committee.

Even if the Litigation Trustee is not the same party as Saint Vincent and the Creditors Committee, this prong is satisfied because the Litigation Trustee is in privity with these two parties as a result of their assignment of the instant claims to the Trustee.  (Compl. ¶¶ 15-17, Def. Exh. A.)  See Grausz v. Englander, 321 F.3d 467, 472-73 (4th Cir. 2003) (bankruptcy trustee and debtor in privity for purposes of *res judicata*); Celeste Trust Reg. v. CBQ, Inc., 03 Civ. 9650, 2006 U.S. Dist. LEXIS 50367, at *14-16 (S.D.N.Y. July 20, 2006); Lawrence Group, Inc. v. Barton, 262 B.R. 30, 33 (N.D.N.Y. 2001).

Further, even if the Litigation Trustee is neither a party nor in privity with a party to the fee dispute, it is still barred from bringing the instant claims because it may only bring those claims that Saint Vincent or the Creditors Committee could bring. See Grubin v. Rattet (In re Food Mgmt Group, LLC), 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) ("A trustee acquires prepetition claims as property of the estate under Bankruptcy Code § 541(a)(1) subject to whatever infirmities (such as *in pari [delicto]* defense) that may have existed.").

22

Similarly, *res judicata* bars the Complaint even though Smith, Selbst, and Cleary were not explicitly named as parties in the fee dispute. First, Smith, Selbst, and Cleary were functionally parties to the fee dispute because the Fee Application sought compensation for work performed by them, and they clearly could not have filed a second fee application after Judge Hardin ruled on the compensation sought by MWE. Second, *res judicata* applies because Smith, Selbst, and Cleary are in privity with MWE, which was a party to the fee dispute. See Vets North v. Libutti, No. CV 01-7773 (DRH) (ETB), 2003 U.S. Dist. LEXIS 27675, at *34 (E.D.N.Y. Jan. 24, 2003) ("The partners are in privity with the partnership.").

### D.    The Fee Dispute and the Instant Action Constitute the Same Cause of Action

The requirement that the cause of action in the two cases be the same "means that the second action must involve the same 'claim,' or the same 'nucleus of operative fact,' as the first." Celli, 460 F.3d at 292 (quoting Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 90 (2d Cir. 1997)). "Sameness of evidence and factual issues does not require an exact sameness; rather *substantial* sameness is required." Rodriguez v. Global Air Parts, LLC (In re Rodriguez), 327 B.R. 86, 92 (Bankr. D. Conn. 2005) (citing Estate of Young v. Williams, 810 F.2d 363, 365 (2d Cir. 1987)). See also Restatement (Second) of Judgments § 24, Comment C ("That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief.").

Courts in this Circuit apply a transactional test in order "[t]o determine whether a claim being asserted is the same claim which was or could have been asserted in a prior action."

Under this transactional test, the first judgment will have a preclusive effect where the "same transaction or connected series of transactions" are at issue and "the same evidence is needed to support the claims." <u>Murungi v. Mercedez Benz Credit Corp.</u>, 192 F. Supp. 2d 71, 77 (W.D.N.Y. 2001) (<u>quoting</u>, <u>Woods v. Dunlap Tire Corp.</u>, 972 F.2d 36, 38 (2d Cir. 1999)). In other words, "[t]o determine whether the causes of action are the same, we examine whether the same transaction, evidence, and factual issues are involved in both cases." <u>Corbett</u>, 124 F.3d at 89.

Finally, it is "well-established" that any "any of the matters" that **"could have been raised"** in a prior action by the parties or those in privity with them, as well as those claims that actually were raised, are barred under the doctrine of *res judicata*. <u>Sure-Snap</u>, 948 F.2d at 873 (internal quotation marks omitted; emphasis supplied by <u>Sure-Snap court</u>).

In this case, the Creditors Committee of Saint Vincent already has acknowledged that **"evidence on nearly all of the key issues"** in the nearly identical action against the Speltz and Weis Parties and Huron **"was presented"** at the MWE fee dispute trial. (Creditors Mem. at 9 n.2 (emphasis added), Def. Exh. BB.) As detailed below, the Creditors Committee simply has recognized the obvious: the fee dispute and this action arise out of the same transaction and share the same common nucleus of operative facts, and all of the claims in this action were or could have been raised in connection with the fee dispute.

### 1. The Fee Dispute and the Instant Action Arise out of the Same Transaction

All of the instant claims and the objections raised during the fee dispute arise out of the same transaction—the MWE Defendants' representation of Saint Vincent on bankruptcy

issues. This transaction lasted a relatively short period of time: MWE was retained to advise

Saint Vincent on bankruptcy issues in September 2004 and was terminated in September 2005.

(Compl. ¶¶ 44, 138, Def. Exh. A.)  Saint Vincent's counsel even admitted during the fee

proceeding that the question of whether MWE's post-petition services were reasonable was

inextricably linked to the question of whether MWE committed malpractice pre-petition. (See

Tele. Conf. Tr. at 7:12-22, Def. Exh. E.)

     In Osherow v. Ernst & Young, LLP, 200 F.3d 382 (5th Cir 2000), the debtor's

trustee argued that a fee dispute before the bankruptcy court and a subsequent malpractice action

did not involve the same transaction: "The [Debtor's] Trustee argues that this action does not

meet the transactional test because the fee application hearing addressed whether Ernst & Young

'provided the time, incurred the expenses, or charged the appropriate hourly rate set forth in its

fee application,' while this malpractice claims is largely based upon what Ernst & Young did not

do, rather than what it did do." Id. at 386-87.  Later, in the subsequently filed malpractice action,

the trustee argued that the accountants' omissions had caused the debtor to have to file a second

bankruptcy petition, and sought damages arising from the second petition.  Despite the fact that

the debtor sought radically different damages in the fee dispute and the subsequent malpractice

action, the court "conclude[d] that the award of professional fees [by the bankruptcy court] and

the Trustee's malpractice claims . . . meet the transactional test" because "the Trustee's claims in

the present suit arise from Ernst & Young's alleged omissions in rendering the very same

services considered by the bankruptcy court in the fee application hearing." Id. at 387-88.  There

can be no question that the fee dispute and the instant case arise out of the same transaction—the

MWE Defendants' representation of Saint Vincent in connection with its bankruptcy.

**2.    All of the Instant Claims Were Asserted or Could Have Been Asserted During the Fee Dispute**

All of the instant claims could have been asserted during the fee dispute.  Indeed, many were asserted, albeit under different legal theories.  Those that were not explicitly asserted during the fee dispute could have been brought at that time because Saint Vincent and the Creditors Committee were already fully aware of the conduct on which they are based.

*i.    Claims that Were Asserted During the Fee Dispute*

During the fee dispute, MWE's conduct was alleged to be deficient within the meaning of 11 U.S.C. § 330 in a number of respects.  As indicated by the chart below, most of the claims stated in the Complaint are merely alternative legal theories for the claims asserted during the fee dispute:

| Fee Dispute Claim | Corresponding Legal Theory in Instant Complaint |
|---|---|
| Failure to disclose Huron-SWLLC merger negotiations.  (Saint Vincent Obj. ¶¶ 23-26, Def. Exh. H.) | • *Claim 1*:  Breach of fiduciary duty by failure to disclose Huron-SWLLC merger negotiations;<br>• *Claim 2*:  Legal malpractice by failing to disclose Huron-SWLLC merger negotiations;<br>• *Claim 3*:  Aiding and abetting Speltz and Weis Parties' breach of fiduciary duty by concealing the merger negotiations;<br>• *Claim 4*:  Aiding and abetting fraud by failing to disclose the merger negotiations and terms of merger agreement;<br>• *Claim 5*:  Breach of New York Judiciary Law Section 487 by colluding with Huron and the Speltz and Weis Parties to deceive Saint Vincent;<br>• *Claim 6*:  Fraudulently concealing the terms of the Huron-SWLLC merger agreement. |

| Fee Dispute Claim | Corresponding Legal Theory in Instant Complaint |
|---|---|
| Failure to properly advise Saint Vincent of the legal implications of the Huron-SWLLC merger, including with respect to the disinterestedness requirement of the bankruptcy laws. (Saint Vincent Obj. ¶¶ 16, 18-19, 22-29, Def. Exh. H; U.S. Trustee Obj. at 9, Def. Exh. C.) | • *Claim 1*: Breach of fiduciary duty by failing to properly advise Saint Vincent about the legal implications of the Huron-SWLLC merger;<br>• *Claim 2*: Legal malpractice by failing to properly advise Saint Vincent about the legal implications of the Huron-SWLLC merger and mishandling the SWLLC and Huron retention motions;<br>• *Claim 5*: Breach of Judiciary Law Section 487 by deceiving the Bankruptcy Court and the U.S. Trustee about the terms of the Huron-SWLLC merger. |
| MWE delayed and mishandled the closure of Saint Mary's Hospital. (Saint Vincent Obj. ¶¶ 38-42, Def. Exh. H; Creditors Obj. ¶ 7, Def. Exh. D; Post-Trial Dam. St. at 1, Def. Exh. X.) | • *Claim 2*: Legal malpractice by mishandling the closure of St. Mary's Hospital. |

Further, the Litigation Trustee now seeks many of the same damages that were sought in the fee dispute. During the fee dispute, Saint Vincent, the Creditors Committee, and the U.S. Trustee sought an elimination or reduction of fees and costs to be paid to MWE to reflect the alleged deficiencies in MWE's representation of Saint Vincent. (U.S. Trustee Obj. at 16, Def. Exh. C; Creditors Obj. ¶¶ 5-13, Def. Exh. D; Saint Vincent Obj. ¶ 21, Def. Exh. H.) They went so far as to ask the court to reduce MWE's fees by the amount of the alleged **consequential damages** sustained because of the delayed closure of St. Mary's Hospital and the purportedly negligent handling of the motions to retain SWLLC and Huron. (Post-Trial Dam. St. ¶ 1, Def. Exh. X.) These same types of consequential damages are sought in the Complaint. (See Compl. ¶ 180, Def. Exh. A.)

The Complaint is barred by *res judicata* despite the fact that the Complaint asserts novel legal theories and different types or amounts of damages for claims that were raised during

the fee dispute.  See Sure-Snap, 948 F.2d at 875 ("[A] party may not avoid the preclusive effect

of *res judicata* by asserting a new theory or different remedy.") (internal quotation marks

omitted) (italics supplied); D.A. Elia Constr., 2008 U.S. Dist. LEXIS 25496, at *11 n.3 ("It is of

no consequence that [the debtor] attempts to characterize some of its state law claims as breach

of contract, conversion and judiciary law violations because it is clear that all of those state law

claims are founded upon some complaint about the quality of legal services provided by the

[debtor's counsel] in connection with the Chapter 11 proceeding.").  By asserting different legal

theories for claims that had been raised in the fee dispute, the Complaint runs afoul of "the well-

established rule that a plaintiff cannot avoid the effects of *res judicata* by 'splitting' his claim

into various suits, based on different legal theories".  Waldman v. Village of Kiryas Joel, 207

F.3d 105, 110 (2d Cir. 2000).

> ii.     *Claims that Could Have Been Asserted During the Fee*
> *Dispute*

     The fact that some of the claims pled in the instant Complaint were not asserted

during the fee dispute is irrelevant because "the well-established rule . . . asserts that any attempt

by the parties or those in privity with them to relitigate any of the matters that were raised **or**

**could have been raised therein** is barred under the doctrine of *res judicata*."  Sure-Snap, 948

F.2d at 873 (internal quotation marks omitted; emphasis supplied by Sure-Snap court).

     Although five of the claims alleged in the Complaint were not explicitly raised at

the time of the fee dispute, they could have been raised at that time by filing an adversary

proceeding in the bankruptcy court.  This is demonstrated by the following chart, which

identifies these five claims and the corresponding evidence and findings of fact in the fee

dispute:

| Instant Claim(s) | Corresponding Fee Dispute Evidence and Findings |
|---|---|
| *Claim 1*: Breach of fiduciary duty by assisting the Speltz and Weis Parties in effecting the merger of SWLLC and Huron<br><br>*Claim 3*: Aiding and abetting the Speltz & Weis Parties' breach of fiduciary duty by encouraging the Huron-SWLLC merger<br><br>*Claim 4*: Aiding and abetting the Speltz & Weis Parties' fraud by encouraging the Huron-SWLLC merger | • Smith testimony regarding an April 26, 2005 telephone conversation in which Speltz and Weis revealed to Smith that the Huron-SWLLC talks were becoming serious. (Trial Tr. Day One at 169:13-18, Def. Exh. U; see also id. at 289:7-22; Timothy C. Weis Deposition ("Weis Dep.") at 69:7-72:10, Def. Exh. CC.)<br>• Weis testimony regarding the April 26 conversation in which (1) Smith actually provided advice on how Saint Vincent could retain both SWLLC and Huron (Weis Dep. at 69:7-75:3, Def. Exh. CC.) and (2) the existence of a Huron-SWLLC confidentiality agreement was disclosed to Smith. (Weis Dep. at 80:6-82:17, Def. Exh. CC.)<br>• Smith testimony regarding why he did not disclose the merger talks to the Board.[7] (Trial Tr. Day One at 173:25-176:24, Def. Exh. U.)<br>• Smith and St. Clair testimony regarding the allegation that Speltz denied merger talks were happening when St. Clair inquired. (Trial Tr. Day One at 290:17-291:10, Def. Exh. U. See also Trial Tr. Day Two at 36:13-37:24, Def. Exh. V.)<br>• Smith testimony regarding the allegation that he encouraged the merger during a conversation with the Huron General Counsel. (Trial Tr. Day One at 172:10-173:5, 306:23-310:8, Def. Exh. U.)<br>• Finding that Smith became aware of the SWLLC-Huron negotiations no later than February 2005, and failed to disclose the negotiations to Saint Vincent, even after the negotiations were "becoming serious." (Fee Decision at 5, Def. Exh. Y.)<br>• Finding that Speltz "falsely denied" the existence of the negotiations when confronted by Saint Vincent's General Counsel. (Id. at 6.) |

---

[7] Although MWE questioned whether this fact and similar facts were relevant to the claims that Saint Vincent and the Creditors Committee actually decided to assert at the time of the fee dispute (e.g. MWE Post-Trial Memorandum of Law at 34, Def. Exh. DD), Saint Vincent's ability and willingness to offer proof of such facts during the fee dispute demonstrates that Saint Vincent **could have asserted** claims based on such facts.

| Instant Claim(s) | Corresponding Fee Dispute Evidence and Findings |
|---|---|
| *Claim 2*: Legal malpractice by failing to plan adequately for the bankruptcy filing | • Cleary testimony regarding MWE's responsibilities to prepare for a bankruptcy filing. (David Cleary Deposition at 6:24-9:23, Def. Exh. EE.)<br>• Weis testimony regarding MWE's preparation for bankruptcy. (Weis Dep. at 201:5-202:5, Def. Exh. CC.)<br>• St. Clair testimony regarding her claimed exclusive reliance upon MWE for bankruptcy advice and MWE's failure to advise Saint Vincent properly about the steps a debtor must take to file a bankruptcy petition effectively. (Trial Tr. Day Two at 71:6-25, Def. Exh. V.)<br>• Smith testimony regarding the allegation that the first day retention motions were incomplete. (Trial Tr. Day One at 180:4-181:7, Def. Exh. U.)<br>• United States Trustee testimony regarding whether Saint Vincent entered into the bankruptcy process in an orderly fashion and the incompleteness of the first day motions. (Deirdre Martini Deposition at 15:20-16:4, 33:21-33:23, Def. Exh. FF.)<br>• Finding that MWE "simply did not get the job done"[8] in its efforts to close St. Mary's Hospital: finding that MWE (1) failed to begin preparing the motion papers needed to obtain Bankruptcy Court approval of the Hospital "soon after" June 17—as it should have—and (2) that the motion papers originally prepared by MWE were inadequate. (Fee Decision at 30-32, Def. Exh. Y.) |
| *Claim 3*: Aiding and abetting the Speltz & Weis Parties' breach of fiduciary duty by failing to file for bankruptcy in a timely manner | • Smith, Selbst and St. Clair testimony regarding MWE's advice as to whether Saint Vincent should have filed for bankruptcy at an earlier time. (Smith Dep. at 199:21-200:3, 58:14-61:15, Def. Exh. I; Trial Tr. Day Two at 71:6-20, Def. Exh. V; Selbst Dep. at 14:34-21:21, Def. Exh. J. See also Smith Aff. ¶¶ 42-44, Def. Exh. K.)<br>• Smith testimony regarding disagreements among the Saint Vincent Board and the retained bankruptcy professionals over whether and when bankruptcy was advisable. (Smith Dep. 77:19-78:23; 89:8-92:21, Def. Exh. I).<br>• Speltz testimony regarding whether bankruptcy was inevitable in either late 2004 or early 2005, what alternatives existed to bankruptcy, and why the |

---

[8] The extent to which any of Judge Hardin's findings or conclusions might collaterally estop either party in this action is not addressed herein and is expressly reserved.

| Instant Claim(s) | Corresponding Fee Dispute Evidence and Findings |
|---|---|
| | turnaround plan that SWLLC devised was ultimately unsuccessful. (David Speltz Deposition at 157:9-161:14, Def. Exh. GG. See also id. at 202:21-209:18). <br>• Weis testimony regarding the alternatives to bankruptcy pursued before filing, and the point at which filing for bankruptcy became inevitable. (Weis Dep. 189:8-191:10, Def. Exh. CC). <br>• Selbst testimony regarding why bankruptcy became necessary and the pre-petition work done to avoid bankruptcy. (Trial Tr. Day One at 91:1-92:15, Def. Exh. U). <br>• Bankruptcy attorney Michael Solow testimony regarding the advantages Saint Vincent gained by waiting to file for bankruptcy and obtaining financing during the pre-petition period. (Solow Decl. ¶ 7, Def. Exh. L). <br>• Finding that there was more than adequate evidence to conclude that Speltz and Weis breached their fiduciary duties to Saint Vincent because he specifically found that they committed such a breach. (Fee Decision at 21, Def. Exh. Y.) <br>• Finding that despite Smith's "comprehension of the seriousness of the Speltz and Weis conflicts and breaches of fiduciary duty", Smith continued to try to assist Speltz and Weis to the detriment of Saint Vincent. (Id. at 22.) |
| *Claim 2*: Legal malpractice by failing to supervise Huron adequately | • Smith testimony regarding MWE's retention of Huron. (Trial Tr. Day One at 194:15-22, Def. Exh. U.) <br>• Boyle testimony regarding the Board's involvement in the retention of Huron. (Trial Tr. Day Two at 102:13-103:6, Def. Exh. V.) <br>• Saint Vincent's counsel addressed the difficulties encountered in identifying which Huron employees were working for SWLLC. (Trial Tr. Day One at 195:9-197:25, Def. Exh. U.) |

In sum, each of the five claims asserted in the Complaint that were not asserted under some legal theory at the time of the fee dispute are based on facts that were presented during the fee dispute. As a result, all five claims **could have been brought** at the time of the fee dispute.

3.  ***Res Judicata* Bars a Debtor from Asserting Malpractice Claims that Were or Could Have Been Raised during a Fee Dispute before the Bankruptcy Court**

A bankruptcy court's ruling on a fee application has the same nucleus of operative fact as—and bars—a subsequent action for legal or accounting malpractice that challenges services provided in connection with the bankruptcy:

- Grausz v. Englander, 321 F.3d 467, 472-475 (4th Cir. 2003): "The 'core of operative facts' in the two actions here—the fee application proceeding and the malpractice action—are the same. Both actions relate to the nature and quality of legal services the [debtor's counsel] provided to [the debtor] in connection with the bankruptcy proceeding."

- Iannochino v. Rodolakis, 242 F.3d 36, 47 (1st Cir. 2001): Debtors' malpractice claim and fee application to the bankruptcy court "entails the same concern, as [debtors'] allegations of malpractice arise from the defendants' legal advice relating to the bankruptcy. It was this legal advice that formed the basis of [the lawyer's] fee application. Thus, the central factual question in both claims is the same: What advice did the defendants give to the [debtors] during the bankruptcy and what was the quality and value of that advice?"

- Osherow v. Ernst & Young, LLP, 200 F.3d 382, 388 (5th Cir. 2000): "[W]e conclude that the award of professional fees [by the bankruptcy court] and the Trustee's malpractice claims concern 'the same nucleus of operative facts' and meet the transactional test. Accordingly, there is an identity of claims between the fee application hearing and this malpractice suit."

- D.A. Elia Constr. Corp. v. Damon & Morey, LLP, No. 07-cv-143A, 2008 U.S. Dist. LEXIS 25496, at *11 (W.D.N.Y. Mar. 31, 2008): "The 'nucleus of operative facts' in both proceedings—this [legal malpractice] action and the bankruptcy fee application—are the same. Both actions challenge the quality of legal services rendered by [defendant] as debtor's counsel in the bankruptcy and related proceedings. All four state law claims are premised upon some allegation that the firm committed malpractice in rendering those legal services."

Further, the fact that the Bankruptcy Court was adjudicating a Fee Application that sought fees only for the period after the Chapter 11 petition was filed, while the instant

action raises malpractice and other claims concerning conduct occurring both before and after the petition was filed, in no way suggests that the two disputes do not share the same common nucleus of operative fact. See Iannochino v. Rodolakis, 242 F.3d at 46-49 (fee application to bankruptcy court for services provided after bankruptcy petition was filed has the same nucleus of operative facts as a subsequent action alleging attorney committed pre-petition malpractice). After all, Saint Vincent's counsel acknowledged during the fee dispute that it was in Saint Vincent's interest to bring the malpractice claim in an adversary proceeding before the Bankruptcy Court in connection with the fee dispute. (Tele. Conf. Tr. at 19:22-20:2, Def. Exh. E.)

### E.    Litigation of this Action Would Undermine the Bankruptcy Court's Fee Decision

In ruling on the objections to the Fee Application, 11 U.S.C. § 330 required Judge Hardin to assess the adequacy of the services performed by MWE. (See Fee Decision at 18 ("The Court must determine long after the fact whether the services were or were not 'reasonably likely to benefit the debtor's estate' or 'necessary to the administration of the case.'" (quoting, 11 U.S.C. § 330), Def. Exh. Y.) Accord Grausz, 321 F.3d at 473; Iannochino, 242 F.3d at 47; Osherow, 200 F.3d at 387. Although Saint Vincent, the Creditors Committee, and the U.S. Trustee made numerous objections as to the quality of services provided by MWE (e.g. U.S. Trustee Obj. at 7-16 (asserting seven objections), Def. Exh. C), Judge Hardin sustained only two objections. (See Fee Decision at 2 (explaining that the court is sustaining only two objections), Def. Exh. Y.) With respect to at least one of the sustained objections, Judge Hardin only sustained it in part. (Id. at 35 (MWE entitled to some fees for closure of St. Mary's Hospital).)

Adjudication of the instant Complaint would necessarily undermine the Fee Decision by (1) re-visiting the determinations made by Judge Hardin and (2) in the unlikely event that any of the instant claims actually prevailed, forcing MWE to disgorge fees to which Judge Hardin already has determined MWE is entitled. See Iannochino, 242 F.3d at 42 ("[A] successful malpractice action could impair rights that [debtors' attorneys] had gained from the order awarding them fees" by forcing the attorney to disgorge fees to which the bankruptcy court determined they were entitled.).

F.    **The Complaint Is Barred by _Res Judicata_ Even Though the Fee Decision Contains Language Stating that Aspects of the Decision Are Without Prejudice**

In this case, the Fee Order states that the decision is "without prejudice" to (1) the right of the Litigation Trust and Saint Vincent to argue that their claims for consequential damages for three types of harm—delay in closure of St. Mary's Hospital, pursuit of retentions of SWLLC/Huron, and the process of selecting a Chief Restructuring Officer and a Chief Financial Officer—survived the Fee Order and (2) MWE's right to assert that such claims are barred by any defense, such as _res judicata_.[9] (Fee Order at 3, Def. Exh. Z.) This language reflects the fact that Judge Hardin did not intend the Fee Order or Fee Decision to address the question of whether any subsequent malpractice claim by Saint Vincent or the Creditors Committee would be barred by _res judicata_. As Judge Hardin explained during the July 20 conference, "as far as the question of whether or not a ruling on a final fee application bars

---

[9] The Fee Order refers to the assignment of any existing claims to the Litigation Trust, but makes no finding regarding which, if any, claims survive the Fee Order. (See Fee Order at 3-4 ("**Any** such claims and causes of action described in the preceding sentence are hereby preserved for the Litigation Trust and the Litigation Trustee, as those terms are defined in the [Reorganization] Plan.)" (emphasis added), Def. Exh. Z.)

claims, I haven't the slightest idea what the outcome of that controversy is and I don't express any opinion on it. So you can all proceed on the basis that I don't know anything about the answer to that question. It hasn't been put before me and I express no view." (Tele. Conf. Tr. at 18:18-24, Def. Exh. E.) Judge Hardin explicitly permitted Saint Vincent and the Creditors Committee to brief the *res judicata* question, but they declined to do so. As a result, the "without prejudice" language in the Fee Order relating to any claims and any defenses to those claims makes clear that Judge Hardin was not ruling on the *res judicata* issue of which all parties and the court were acutely aware.

Even if the "without prejudice" language in the Fee Order could be construed to mean that Judge Hardin determined that the claims enumerated in the Order were not barred by *res judicata* (which it cannot), such a determination is without any effect whatsoever. Under well-established legal principles, the Bankruptcy Court lacked jurisdiction to determine the preclusive effect of its own judgment. Courts do not generally have the power to determine the *res judicata* effect of their judgment: "[O]rdinarily both issue preclusion and claim preclusion are enforced by awaiting a second action in which they are pleaded and proved by the party asserting them. The first court does not get to dictate to other courts the preclusion consequences of its own judgment." Covanta Onondaga Ltd. P'ship v. Onondaga Cy. Res Recovery Agency, 318 F.3d 392, 398 (2d Cir. 2003) (internal quotation marks omitted). See also Gagliardi v. Am. Home Products Corp., 29 F.Supp. 2d 972, 974 (E.D. Wis. 1998) ("It is well-established that in federal courts the court rendering the first judgment does not have the power to determine that judgment's effect; the second court is entitled to make its own decision.")

Further, the Second Circuit specifically has held that this law is applicable in the present circumstances because bankruptcy courts do not have the power to determine the preclusive effect of their own judgments. In <u>Sure-Snap Corp. v. State Street Bank and Trust Co.</u>, the debtor initiated an adversary proceeding against a bank challenging the validity of liens it had obtained against the debtor in the course of making loans to the debtor. 948 F.2d at 871. Ultimately, the bankruptcy court denied the claims and upheld the liens. <u>Id.</u> The debtor then filed several motions asking the court to modify the reorganization plan so as to explicitly preserve a claim against the same bank for wrongfully terminating the same loans. <u>Id.</u> In a colloquy, the parties and the court made clear their views that no action before the bankruptcy court would preclude the debtor from asserting the wrongful loan termination claims. <u>Id.</u> at 872. On that basis, the court denied the motion to amend the reorganization plan explicitly to preserve the unasserted claim against the bank. The debtor later argued that the judge's comment during the modification hearing precluded application of *res judicata* to bar the debtor's claim against the bank.

The Second Circuit rejected this argument: "we hold here that the judge's colloquy was not dispositive of [the debtor's] allegedly reserved right." <u>Id.</u> at 873. <u>Accord</u> <u>Thickstun Bros. Equip. Co. v. Encompass Serv. Corp.</u> (<u>In re Thickstun Bros. Equip. Co., Inc.</u>), 344 B.R. 515, 519-20 (6th Cir. 2006) (Bankruptcy court lacks jurisdiction to determine the preclusive effect of its own order.); <u>Midway Motor Lodge of Elk Grove v. Innkeepers'</u> <u>Telemgmt. & Equip. Corp.</u>, 54 F.3d 406, 409 (7th Cir. 1995) ("The bankruptcy judge assured ITEC that this would not happen: 'Your client doesn't have to be concerned that I will do something which will adversely affect its position on all of those other parcels.' In the law of

36

preclusion, however, the court rendering the first judgment does not get to determine that

judgment's effect; the second court is entitled to make its own decision, and the district court in

Illinois had a different view.").

As a result, whether or not Judge Hardin intended to rule upon the *res judicata*

question, the "without prejudice" language does not and cannot nullify that Fee Order's

preclusion of the claims in this case.

**G.    The Complaint Is Barred by *Res Judicata* Even Though the Reorganization Plan Contains a General Reservation Clause**

On June 5, 2007, the Bankruptcy Court confirmed the First Amended Chapter 11

Plan of Reorganization. Although the Reorganization Plan purports to preserve claims against

MWE, it cannot revive claims barred by *res judicata*. (See First Amended Plan of

Reorganization ¶¶ 1.75, 1.79, 1.81, 11.9, 11.12, Def. Exh. HH .) This is the case for three

reasons. First, Sure-Snap precludes such a finding. Second, the Reorganization Plan is not the

final judgment which bars the Complaint under *res judicata* principles. Rather, the Fee Decision

and Fee Order constitute the final judgment that precludes this action. As a result, district court

decisions finding that a specific reservation clause contained in a reorganization plan prevents

the reorganization plan from having *res judicata* effect on claims that fall within the scope of the

of the clause are inapposite. See Bonwit Teller v. Jewelmasters, Inc. (In re Hooker Invs., Inc.),

162 B.R. 426 (Bankr. S.D.N.Y. 1993).

Third, even if a specific reservation in a reorganization plan could, as a general

matter, prevent a judgment independent of the reorganization plan from having *res judicata*

effect, that rule does not apply in this case for several reasons. The Reorganization Plan was

issued months before the Fee Decision and Fee Order and cannot possibly govern the *res judicata* effect of a final judgment that had yet to be issued. Further, the reservation clause in the Reorganization Plan is insufficiently specific to preclude *res judicata*. See <u>Bonwit Teller</u>, 162 B.R. at 433-34 ("[W]hereas a blanket reservation would not be enough to escape the *res judicata* bar, an express reservation would.").

Finally, such reservation clauses should not disturb the operation of *res judicata* in cases—such as the instant one—where (a) the reservation clause purports to preserve claims and factual issues that were already actively and vigorously litigated during the bankruptcy proceeding, (b) the parties whose claims were supposedly reserved had actual knowledge of the claims and the facts underlying those claims, and (c) the parties whose claims were supposedly reserved were represented by competent and independent counsel at the time of the dispute before the Bankruptcy Court. Even if a reservation clause in a reorganization plan should preclude the operation of *res judicata* with respect to a fee dispute in certain cases, this is not one of those cases. In those cases where the adequacy of a law firm's representation is being vigorously contested in a fee dispute by a client that is represented by independent counsel and aware of all of the facts that underlie the malpractice claims the client may possess, it is in the interests of debtors, their attorneys, and state and federal courts to require debtors to litigate all of their malpractice claims that share a common nucleus of operative facts at one time. Courts' judicial resources and the parties costs will be significantly reduced if debtors are required to litigate all malpractice claims arising out of a common nucleus of operative facts at one time. The Litigation Trustee's attempt to split its claims in two separate actions is nothing more than a

38

blatant attempt to obtain two bites at the apple when the first bite provided it all of the justice to which it is entitled.

## **CONCLUSION**

For the reasons set forth above, the Complaint must be dismissed.

Dated: New York, New York
May 15, 2008

/s/ Frederick B. Warder III
Frederick B. Warder III
PATTERSON BELKNAP WEBB &
    TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222

Attorneys for Defendants McDermott Will &
Emery LLP, William P. Smith, Stephen B. Selbst
and David D. Cleary

39