PATTERSON BELKNAP WEBB & TYLER LLP
Frederick B. Warder III
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Attorneys for Defendants
McDermott Will & Emery LLP,
William P. Smith, Stephen B. Selbst
and David D. Cleary

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GRAY & ASSOCIATES, LLC in its capacity  :
as Trustee on behalf of the SAINT VINCENT  :
CATHOLIC MEDICAL CENTER LITIGATION  :    08 CV 4401
TRUST,                                  :
                                        :
Plaintiff,                              :
                                        :    ECF Case
v.                                      :
                                        :
MCDERMOTT WILL & EMERY LLP,             :    **NOTICE OF REMOVAL**
WILLIAM P. SMITH, STEPHEN B. SELBST,    :    **TO FEDERAL COURT**
and DAVID D. CLEARY,                    :    **[CORRECTED]**
                                        :
Defendants.                             :
                                        :
                                        :
-------------------------------------------------------------X

TO:    THE JUDGES FOR THE UNITED STATES DISTRICT
       COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

      Defendants McDermott Will & Emery LLP, William P. Smith, Stephen B. Selbst,

and David D. Cleary (collectively, "Defendants") respectfully show upon information and belief:

      1.      An action was commenced against Defendants in the Supreme Court of

the State of New York, County of New York on or about April 14, 2008, copies of which are

attached hereto as Exhibit A. No further pleadings or proceedings have been had therein.

      2.      It appears that the above-described action is a civil action of which this

Court has original jurisdiction under the provisions of 28 U.S.C. §§ 1331 and 1334, and is one

1607645v.1

that may be removed to this Court by defendants pursuant to the provisions of 28 U.S.C.

§ 1441(a), 28 U.S.C. § 1441(b), and 28 U.S.C. § 1452 in that it is a civil action other than one

specified in 28 U.S.C. § 1445.

3.     This action brings claims or causes of action that involve construction of

11 U.S.C. § 327.  (See, e.g. Complaint ¶¶ 10, 81, 108-09, 119.)

4.     This action is a civil proceeding arising under title 11, or arising in or

related to cases under title 11.

WHEREFORE, Defendants request that the above action now pending against it

in the Supreme Court of the State of New York, County of New York, be removed therefrom to

this Court.

Dated:     May 22, 2008

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP


By:    /s/ Frederick B. Warder III
     Frederick B. Warder III
     Attorneys for Defendants
     McDermott Will & Emery LLP,
     William P. Smith, Stephen B. Selbst
     and David D. Cleary
     1133 Avenue of the Americas
     New York, New York  10036-6710
     Telephone:  (212) 336-2000
     fbwarder@pbwt.com

TO:   ALFREDO MENDEZ, ESQ.
     BRUCE A. BLAKEMAN, ESQ.
     SARAH C. LICHTENSTEIN, ESQ.
     Abrams, Fensterman Fensterman Eisman
          Greenberg Formato & Einiger, LLP
     Attorneys for Plaintiffs
     630 Third Avenue
     New York, NY 10017
     Telephone: (212) 279-9200

1607645v.1

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X
GRAY & ASSOCIATES, LLC, in its capacity as Trustee,
on behalf of the SVCMC LITIGATION TRUST,

                                                 Index No.: *601108/08*

Plaintiff,

                    -against-                              **COMPLAINT**

MCDERMOTT WILL & EMERY LLP,
WILLIAM P. SMITH, STEPHEN B. SELBST
and DAVID D. CLEARY

Defendants.

------------------------------------------------------------X

        Plaintiff, Gray & Associates, LLC, in its capacity as Trustee, on behalf of the

SVCMC Litigation Trust (the "Trust") established in the bankruptcy case of *In re Saint Vincent*

*Catholic Medical Centers of New York, et al.*, by its undersigned counsel, sues McDermott Will

& Emery LLP ("McDermott"), William P. Smith ("Smith"), Stephen B. Selbst ("Selbst"), and

David D. Cleary ("Cleary") (McDermott, Smith, Selbst and Cleary collectively, the "McDermott

Defendants"), for breach of fiduciary duty, legal malpractice, attorney misconduct, fraudulent

concealment, aiding and abetting breaches of fiduciary duty, and aiding and abetting fraud, and

alleges as follows:

### INTRODUCTION

    1.    This case is about deceit, divided loyalties, gross violations of fiduciary duties and

breaches of professional standards of care committed by attorneys who put their personal

relationships and selfish economic concerns above the interests of the charitable institution they

were entrusted to protect.



NEW YORK
COUNTY CLERK'S OFFICE

APR 14 2008

NOT COMPARED
WITH COPY FILE

2.      By December 2003, after suffering more than $100 million in net operating losses during 2002 and 2003, Saint Vincent Catholic Medical Centers of New York ("Saint Vincent" or the "System"), which was formed by a merger in 2000 of the 150-year old Saint Vincent's Hospital in Greenwich Village with hospitals in Brooklyn, Queens and Staten Island, was in a severe financial crisis.  In desperate need of professional guidance and direction, the Saint Vincent Board of Directors (the "Board") turned to McDermott, its longstanding legal counsel, for advice and protection in December 2003 in connection with Saint Vincent's retention of Speltz & Weis, LLC ("SWLLC") and its two principals, David Speltz ("Speltz") and Timothy Weis ("Weis") (collectively, "the Speltz and Weis Parties"), hospital turnaround management professionals who purportedly specialized in restructuring and turning around failing hospital systems.  What Saint Vincent received instead from McDermott were attorneys who abused their relationship of trust and confidence with that charitable institution by violating their fiduciary duties of care, candor, and loyalty, engaging in fraud, pursuing the conflicting interests of professional colleagues to the substantial detriment of Saint Vincent, and by committing malpractice by, among other things, failing to advise Saint Vincent to file timely for bankruptcy reorganization.

3.      By September 2004, three-quarters of a year after turning to McDermott for help, Saint Vincent's dire financial condition had significantly deteriorated and Saint Vincent was in a death spiral.  Having already exhausted the full amount of the borrowings available under a $100 million working capital loan obtained just three months before in late May 2004, the System was well on its way to what would become a $143.4 million net operating loss for 2004.  Losing $400,000 a week, without taking into account debt service and needed capital expenditures, and unable to find a ready, willing and able buyer for its St. Mary's Hospital in Brooklyn that was

- 2 -

losing approximately $20 million a year (and for which McDermott had previously been specifically engaged to assist), Saint Vincent now faced the specter of even further eroding its valuable assets by placing multiple mortgages on its real estate to fund its continuing losses and to pay its professional advisers.

4.     Against this bitter backdrop, Saint Vincent further engaged McDermott in September 2004 to plan for a Chapter 11 reorganization filing under the protections of the United States Bankruptcy Code. In clear recognition of Saint Vincent's dire situation and need for a Chapter 11 filing, McDermott made sure that it protected itself by requiring Saint Vincent to pay weekly attorneys' fees with next-day remittance via wire transfers. Throughout its engagement, however, McDermott failed to advise the Board timely to restructure its operations under the protection of, and with the benefits afforded by, the Chapter 11 bankruptcy reorganization process, or to prepare adequately for a timely bankruptcy filing.

5.     For the purpose of assisting with the planning of a bankruptcy filing, McDermott, whose lead bankruptcy attorney, Smith, was based in its Chicago office, recommended to Saint Vincent's Board in September 2004 that the Chicago consulting firm of Huron Consulting Group, LLC ("Huron LLC"), a subsidiary of Huron Consulting Group, Inc. ("Huron Inc.") (collectively the "Huron Parties"), be engaged as an additional financial advisor for Saint Vincent purportedly to assist with the preparation of a plan for a Chapter 11 filing. This engagement of Huron LLC was authorized by the Board at the direction of McDermott.

6.     On July 5, 2005, eighteen months after Saint Vincent sought McDermott's aid in December 2003, and three-quarters of a year after McDermott's engagement was expanded in September 2004 to specifically include preparation for the Chapter 11 filing, Saint Vincent was belatedly placed into Chapter 11 bankruptcy on an inadequately prepared and emergency basis.

- 3 -

The Chapter 11 reorganization was commenced, however, only after Saint Vincent had been exploited by its professional advisors for their own selfish interests, such that Saint Vincent was in such a cash-strapped and economically drained position that it was unable to make payroll for its approximately 12,500 employees.

7.    During the year and a half period of McDermott's involvement between December 2003 and July 5, 2005, Saint Vincent's financial distress steadily worsened as Saint Vincent's professional advisors -- McDermott, the Speltz and Weis Parties, and Huron LLC -- placed their relationships and avarice above the interests of their client and the charitable institution they had agreed to serve.  Unknown to the Board, but known to McDermott, after McDermott and Huron LLC were engaged in September 2004 to prepare for a Chapter 11 filing, the Speltz and Weis Parties and Huron Inc. were negotiating a deal for Huron Inc. to buy SWLLC's "book of business," which was principally its fees from Saint Vincent, for a price based upon revenues to be generated from contemplated billings to Saint Vincent.

8.    Notwithstanding their ethical duties and fiduciary obligations to their client, the McDermott Defendants concealed from the Board their knowledge of the secret negotiations between Huron Inc. and the Speltz and Weis Parties.  In this regard, the McDermott Defendants failed to disclose to the Board the evident and prohibitive conflicts of interest involved and also failed to explain the significant adverse consequences that an acquisition by Huron of SWLLC would cause Saint Vincent to suffer upon a filing of a Chapter 11 proceeding.  In particular, the McDermott Defendants failed to advise the Board that, among other things, the conflict-of-interest requirements of the federal bankruptcy laws and rules would severely limit, if not preclude, SWLLC and Huron LLC from being retained to furnish services simultaneously as crisis managers and financial advisors.  Such a disqualification was an unacceptable economic

risk to the Speltz and Weis Parties and Huron Parties, and they, together with McDermott, were determined to preserve their "team" over the interests of a successful restructuring of Saint Vincent through a Chapter 11 reorganization.

9.    With their loyalties divided, McDermott and Smith chose personal interests over duties to Saint Vincent to facilitate Huron Inc.'s acquisition of SWLLC by falsely telling Huron Inc.'s General Counsel that the Chairman of Saint Vincent's Board had asked Smith to call and advise Huron Inc. that the hospital was going to extend its consulting agreement with SWLLC and that the Board saw SWLLC and Huron LLC as a team it wanted to keep. Within a few days of Smith's wrongful choice of allegiance and his breach of duties to Saint Vincent by pretending to speak for the Chair of Saint Vincent's Board, Huron Inc. closed on its purchase of SWLLC. As a result, in addition to the enormous fees already taken from Saint Vincent, the Speltz and Weis Parties received a $14 million cash payment, a promissory note for $3 million and the promise of earnout payments based primarily on revenue that SWLLC would receive in the future from Saint Vincent. Huron Inc., in turn, received SWLLC's ongoing revenue stream, approximately 85% of which was generated from Saint Vincent.

10.    Determined to further business relationships with the Huron Parties and the Speltz and Weis Parties, the McDermott Defendants also set out to find ways to circumvent or manipulate the rules and procedures of the federal bankruptcy laws so that McDermott, the Speltz and Weis Parties and Huron LLC could perpetuate their wrongful scheme to remain as a "team," to ensure even more fees for their firms in the event of an inevitable bankruptcy filing. As the United States Bankruptcy Judge for Saint Vincent's belated Chapter 11 proceeding later found, "[w]hat is clear from the evidence is that McDermott never told Boyle [*i.e.* the Board's Chair] or the Executive Committee or the full Board until mid-August 2005 that the dual

retention of Huron [LLC] and SW [SWLLC] was *from the outset* a dead letter by reason of the Jay Alix Protocol, Section 327(a) of the Bankruptcy Code and the serious conflicts of interest and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the Huron Group acquisition of SW in early May." *In re Saint Vincent's Catholic Medical Centers of New York*, Case No. 05 B 14945 (ASH) (Bankr. S.D.N.Y. August 29, 2007) (emphasis in original) at p. 27. And, as the United States Bankruptcy Court further found, "McDermott manifested an insensitivity to the interests of its client, SVCMC [*i.e.* Saint Vincent], and the pitfalls inherent in the Huron Group/SW negotiations and acquisition, from the outset." *Id.* at p. 19. As the Bankruptcy Court also found, "[a]s counsel to SVCMC and ultimately its Board of Directors (not Speltz and Weis), Smith should have disclosed his knowledge of the Huron Group/SW negotiations to Boyle, as Chairman of the Board, and advised Boyle of the potential issues which he advised the conflicted Messrs. Speltz and Weis, namely, 'disinterestedness, the Jay Alix Protocol and conflicts." *Id.* at p. 19.

11.    Once in Chapter 11 bankruptcy, albeit belatedly, the McDermott Defendants continued to abrogate their responsibilities and duties to Saint Vincent and instead placed their loyalty with the Speltz and Weis Parties and the Huron Parties above the interests of Saint Vincent's bankruptcy estate by insisting upon prohibited dual retention of SWLLC and Huron LLC in the Chapter 11 proceeding, thereby unnecessarily delaying progress in the bankruptcy case and alienating crucial constituencies whose trust and confidence are keys to a successful Chapter 11 reorganization. In this regard, the United States Bankruptcy Court found that "the McDermott services relating to retention of professionals, at the time those services were rendered, were not only not beneficial to the debtors' [*i.e.* Saint Vincent] estates and not

- 6 -

reasonably likely to benefit the debtors' estates -- they were affirmatively detrimental to the debtors' estates." *Id.* at p. 33.

12.    As a direct result of the McDermott Defendants' various tortious conduct, Saint Vincent was harmed in multiple ways.  In addition to the fees that McDermott was charging Saint Vincent, the McDermott Defendants enabled the Speltz and Weis Parties and the Huron Parties to continue to generate fees from Saint Vincent, and to generate the revenue to support Huron Inc.'s acquisition of SWLLC, all at a cost to Saint Vincent.  As a direct result of their failure to provide Saint Vincent's Board with competent and timely advice, guidance and direction, the McDermott Defendants also caused Saint Vincent to keep money-losing hospitals open for an unnecessarily extended time, which should have been sold or closed long before the July 2005 bankruptcy filing, thereby causing Saint Vincent to incur significant operating losses and expenses which would not have been incurred had the McDermott Defendants exercised appropriate care, skill and diligence, and provided timely and appropriate advice and direction to the Board.  Furthermore, McDermott had been engaged in June 2004 to dispose of one of the hospitals, but that hospital remained open until October 2005, at a cost of approximately $71,000 to $100,000 a day to Saint Vincent.  The McDermott Defendants also caused Saint Vincent to incur unnecessary costs and expenses, including excessive and unnecessary S,G&A expenses, consultant fees, IT contract costs, and middle management costs, it was caused to suffer diminution of revenue, including revenue from managed care contracts, and it was caused to suffer substantial loss of its enterprise value.

## THE PARTIES

13.    On July 5, 2005, Saint Vincent and several of its affiliates filed for bankruptcy protection under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the

United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in the case styled *In re Saint Vincents Catholic Medical Centers of New York, et al.*, No. 05-B-14945 (ASH).

14.    Following Saint Vincent's filing of the Chapter 11 proceeding, the Office of the United States Trustee, a division of the U.S. Department of Justice, appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") comprised of several of the more substantial creditors at risk in the bankruptcy case. The Creditors Committee served as an official oversight body in a fiduciary role to all pre-bankruptcy unsecured creditors of Saint Vincent.

15.    On June 29, 2007, the Bankruptcy Court entered an Order granting the Creditors Committee standing and approving Saint Vincent's assignment to the Creditors Committee of its rights to prosecute all claims, rights, and causes of action that could have been brought or raised by, or on behalf of, Saint Vincent against all parties, including the defendants herein, and authorizing the Creditors Committee to commence and pursue such actions.

16.    Pursuant to an Order entered on July 27, 2007, the Bankruptcy Court confirmed the First Amended Chapter 11 Plan of Reorganization for Saint Vincent (the "Plan"). The Plan became effective on August 30, 2007. Pursuant to the terms of the Plan and the July 27, 2007 Order of the Bankruptcy Court, the rights of both the Creditors Committee and Saint Vincent to all of their claims, with certain irrelevant exceptions, were assigned to the Trust.

17.    In connection with the Bankruptcy Court's approval of the Plan, Saint Vincent, the Creditors Committee, the Trustee and certain other parties entered into a SVCMC Litigation Trust Agreement (the "Litigation Trust Agreement"). Like the Plan, under the Litigation Trust

Agreement, Saint Vincent and the Creditors Committee assigned all their rights, title, and interest in all claims, with certain irrelevant exceptions, to the Trust.

18.     At all times relevant to this matter, Saint Vincent was, and is, a New York not-for-profit corporation and one of the New York metropolitan area's most comprehensive health care systems. In accordance with its mission as a charitable institution, Saint Vincent provided over $100 million in charitable care to poor and uninsured patients in 2004 alone.

19.     McDermott is an American law firm with more than 1,100 attorneys and offices in nine U.S. cities, including New York, and in five foreign countries. McDermott's New York City office is located at 340 Madison Avenue. McDermott is an Illinois limited liability partnership that regularly does and solicits business, and derives substantial revenue from commerce, in New York. Several of McDermott's partners are residents of New York and the claims asserted herein arise out of the business conducted by McDermott in New York.

20.     Smith, a partner in McDermott's Chicago office, was at all relevant times the head of the firm's bankruptcy practice and, from June 2004 through September 2005, the McDermott partner in charge of the engagement with Saint Vincent. Smith transacted business in New York and supplied services to Saint Vincent in New York. Smith also regularly solicits business, engages in a persistent course of conduct, and derives substantial revenue from services rendered in New York, and he expected, and should reasonably have expected, that the acts complained of herein had consequences in New York.

21.     Selbst, a partner in McDermott's New York City office, is the head of McDermott's New York bankruptcy practice. Selbst resides and transacts business in New York, and he supplied services to Saint Vincent in New York. Selbst also regularly solicits business, engages in a persistent course of conduct, and derives substantial revenue from services

-9-

rendered in New York and he expected, and should reasonably have expected, that the acts complained of herein had consequences in New York.

22.    Cleary, who at all relevant times was a partner of McDermott, transacted business in New York and supplied services to Saint Vincent in New York. Cleary also regularly solicits business, engages in persistent course of conduct, and derives substantial revenue from services rendered in New York, and, he expected, and should reasonably have expected, that the acts complained of herein had consequences in New York.

## FACTUAL BACKGROUND

23.    Saint Vincent was formed in 2000 as a result of the merger of Saint Vincent Hospital and Medical Center with Catholic Medical Centers of Brooklyn and Queens, and Sisters of Charity Healthcare in Staten Island. After the merger, Saint Vincent annually treated more than 600,000 outpatients and 92,000 inpatients, and it provided more than 640,000 home care visits. Saint Vincent's emergency rooms, which included three Level 1 trauma centers, received 255,000 visits in 2004. Saint Vincent also served as the academic medical center of New York Medical College in New York City. As of Saint Vincent's Chapter 11 bankruptcy filing, the System included seven hospitals: Saint Vincent Hospital in Manhattan, Bayley Seton Hospital in Staten Island, Mary Immaculate Hospital in Queens, St. John's Hospital in Queens, St. Mary's Hospital in Brooklyn, Saint Vincent Hospital in Staten Island and Saint Vincent Hospital in Westchester. The System also included four skilled nursing facilities, a hospice, a home health agency, and more than sixty off-site ambulatory care centers. Saint Vincent was also one of the New York metropolitan area's largest employers, employing approximately 12,500 full and part-time employees. More than 2,500 physicians were affiliated with the charitable institution.

24.    The 2000 merger was designed to unify the operations of the various entities, to enhance the revenues of the various entities and to reduce expenses of the various entities by taking advantage of growth opportunities (including referrals of patients needing tertiary care from the outlying hospitals to Saint Vincent in Manhattan) and operational efficiencies theoretically available to the combined entity. The financial health of Saint Vincent, however, declined after the merger due in part to the collective weight of the financially underperforming entities, and Saint Vincent suffered ever increasing net operating losses in 2001, 2002 and 2003. Indeed, between 2002 and 2003, the net operating loss more than tripled, from $22 million in 2002 to $81 million in 2003. In 2004, after the Speltz and Weis Parties had been on the scene for nearly a year, Saint Vincent's net operating loss escalated to $143.4 million, six times Saint Vincent's 2002 net operating loss and nearly double its 2003 net operating loss.

### Saint Vincent's Retention of McDermott

25.    For years prior to 2003, McDermott had represented Saint Vincent in a number and variety of legal matters. Among other things, McDermott had provided legal services and advice to Saint Vincent with respect to environmental matters, canon law issues, PHO questions regarding Saint Vincent's cancer center, relationships between Saint Vincent and medical groups, billing practices, a federal grand jury investigation, third party disputes and other general legal matters.

26.    By no later than early December 2003, the Board recognized that Saint Vincent was in a severe financial crisis and in need of direction from professional crisis and turnaround financial and legal advisors to address the System's worsening operational problems and financial distress.

27.     On or around December 16, 2003, Andrew Roth, a partner of McDermott, was informed by a third party that Saint Vincent was in financial distress and would "be bringing in an interim turnaround firm." Roth was advised that this news was "an excellent opportunity [for McDermott] to capitalize on" for further work from Saint Vincent.

28.     Within days, Roth, acting upon this information, was in communication with Bishop Joseph M. Sullivan, then Co-chairperson of the Board, regarding McDermott providing the legal services to Saint Vincent in connection with the hiring of professional crisis and turnaround advisors. As a result of this discussion, McDermott began providing legal services to Saint Vincent in connection with the retention of SWLLC, the turnaround firm that had been recommended to Saint Vincent.

29.     On or about February 5, 2004, McDermott executed an engagement letter with Saint Vincent relating to the services that McDermott had been providing to Saint Vincent since approximately mid-December 2003 "in connection with matters related to the Board's consideration and selection of a turnaround firm, and the negotiation of appropriate contract documents in connection therewith" and "such other matters as [Saint Vincent] may determine to assign to [McDermott]."

30.     Under the terms of the agreement for the retention of SWLLC, Speltz would become Saint Vincent's President and Chief Executive Officer ("CEO") and Weis would become its Chief Financial Officer ("CFO"). Because the SWLLC Agreement entailed a change in management, regulations promulgated by the New York State Department of Health ("DOH") required that DOH approve the SWLLC Agreement. Separately, the SWLLC Agreement was required to be approved by United States Department of Housing and Urban Development ("HUD"). Although Roth advised Saint Vincent to attempt to circumvent the required approval

from DOH, those attempts were unsuccessful and SWLLC was not completely approved for retention until April 13, 2004. Saint Vincent and SWLLC entered into a written management agreement dated as of April 13, 2004 (with subsequent amendments the "SWLLC Agreement"), to expire on April 30, 2005, unless extended.

31.    In January 2004, while awaiting the necessary governmental approvals, the Speltz and Weis Parties began work at Saint Vincent by, among other things, conducting an operational, financial and clinical assessment of the System and by agreeing to present a plan for addressing the problems identified in the assessment within 90 days. During these 90 days, Roth, who had earlier tried to help the Speltz and Weis Parties avoid regulatory requirements, met with Speltz to solicit further business for McDermott.

32.    McDermott's work with respect to Saint Vincent continued during this time frame, although for a conflicting party. In or around April 2004, McDermott was asked by another client, Fidelis Care New York ("Fidelis"), to provide legal advice in connection with a ten million dollar loan request that Saint Vincent had made of Fidelis. This financing for Saint Vincent was, at the time, of great significance to Saint Vincent.

33.    Though it stood in a direct conflict, albeit purportedly waived, to Saint Vincent's best interest and turnaround efforts for which McDermott had just been engaged, Roth counseled Fidelis, in a memo dated April 28, 2004, that Saint Vincent was in "dire financial straits"; that Saint Vincent's situation was "precarious"; that Saint Vincent was in "serious financial jeopardy"; that a Saint Vincent bankruptcy was imminent; that there would be a "serious risk of loss" if Fidelis were to make the requested loan; and that Fidelis' officers and directors might breach their fiduciary duties and responsibilities if they approved the loan.

34.    In the spring of 2004, the Speltz and Weis Parties recommended to the Board that two of the System's underperforming hospitals, St. Joseph's Hospital and St. Mary's Hospital, be closed or sold.  On or around May 3, 2004, Speltz suggested to Saint Vincent that it hire McDermott to lead the disposition.  Smith sent a proposal to Elizabeth St. Clair, the in-house counsel at Saint Vincent.  Internally at McDermott, Roth and Smith engaged in a struggle with regard to which attorney would receive the credit, and thus related financial reward within their firm, for the McDermott legal fees that would be generated from Saint Vincent in the future.

35.    In an effort to increase McDermott's fees from Saint Vincent, despite the McDermott Defendants' awareness that the charitable institution was in serious financial jeopardy, Roth suggested that McDermott could increase its then agreed-upon hourly rate structure with Saint Vincent significantly by having Smith charge a higher rate to Saint Vincent, than the discounted charitable institution rate that McDermott had theretofore charged Saint Vincent.  In fact, Smith billed Saint Vincent at $640 per hour for the new work, as opposed to $475 per hour for Roth's prior work.  In that same correspondence, Roth warned Smith to "be aware" of the need to protect McDermott's financial interest because Saint Vincent was "very close to Chapter 11."

### The Saint Mary's Matter in Summer 2004

36.    At the time that Saint Vincent asked the McDermott Defendants to provide services in connection with the disposition of St. Joseph's and St. Mary's hospitals, it was clear that the operating losses of Saint Vincent hospitals in Queens, Brooklyn and Staten Island were significant causes of cash drain that was destroying Saint Vincent.  In particular, Saint Mary's Hospital in Brooklyn was losing approximately $20 million per year.

37.     Though the closure of St. Joseph's Hospital was relatively orderly, the disposition

of St. Mary's Hospital was not. In the summer of 2004, the McDermott Defendants and the

Speltz and Weis Parties knew that the only potential purchaser for St. Mary's was Kingsbrook

Jewish Medical Center ("Kingsbrook"). They also knew that there was no realistic prospect that

Kingsbrook would be able to go forward with a purchase. As the McDermott Defendants and

Speltz and Weis Parties further knew, Kingsbrook required approximately $20 million in

financing before it could agree to consummate any purchase, and there was little or no likelihood

that the State, which was the only source for such financing, would supply the funds.

38.     The McDermott Defendants, nevertheless, assisted the Speltz and Weis Parties in

pressing the negotiations (with Kingsbrook) when it was clear to any reasonable observer that the

negotiations would be fruitless and that Kingsbrook was not reasonably able to purchase St.

Mary's Hospital. Under the watch of the McDermott Defendants, the Speltz and Weis Parties,

on behalf of Saint Vincent, signed a letter of intent for the sale of St. Mary's Hospital which they

knew, or should have known, to be illusory from the moment it was signed.

39.     On or around September 16, 2004, after speaking with counsel for Kingsbrook,

Smith informed the Speltz and Weis Parties that Kingsbrook did "not have the wherewithal to do

the deal absent outside financing in an as yet undetermined amount" and that Kingsbrook "had

no idea" where they would find such financing.

40.     The McDermott Defendants and the Speltz and Weis Parties allowed the

negotiations and discussions over the possible sale of St. Mary's to Kingsbrook to drag on for

many months in the vain and unreasonable hope that this speculative transaction might somehow

materialize. Throughout this period, the McDermott Defendants generated substantial legal fees

for themselves by preparing documents, conferring among themselves and communicating with

others about the proposed sale of St. Mary's to Kingsbrook that they knew, and should have known, would never take place.

41.    Assisted by the McDermott Defendants, the Speltz and Weis Parties continued to advise the Board that the potential sale of St. Mary's Hospital was viable even though the McDermott Defendants and the Speltz and Weis Parties knew and should have known that financing for the contemplated transaction was unavailable to Kingsbrook. In December 2004, for example, the Speltz and Weis Parties delivered to the Board a Status Report indicating that, among other things, a letter of intent had been signed for the transfer of Saint Mary's to Kingsbrook. The Status Report did not mention, however, that Kingsbrook had warned that the potential sale was predicated upon Kingsbrook being able to find $20 million in financing and that it was so unlikely that Kingsbrook would be able to obtain those funds that Saint Vincent should not rely upon the letter of intent.

42.    On April 27, 2005, after almost a year of fruitless delay, Kingsbrook formally withdrew its letter of intent for the purchase of St. Mary's Hospital. Despite their knowledge that the proposed Kingsbrook sale was never a viable option, and that St. Mary's was bleeding huge amounts of money daily, neither the McDermott Defendants nor the Speltz and Weis Parties availed themselves of the opportunity to develop an alternative closure plan while the tentative discussions with Kingsbrook were taking place. Only after Kingsbrook withdrew the letter of intent did the McDermott Defendants and the Speltz and Weis Parties begin to make plans for the closure of that facility.

### The Extended Preparation For Bankruptcy Protection

43.    By the end of the summer of 2004, Saint Vincent determined that it should begin to prepare for seeking the protections afforded under Chapter 11 of the Bankruptcy Code.

- 16 -

44.     At a September 8, 2004 meeting, with Smith present, the Board requested that McDermott provide information on the Chapter 11 bankruptcy process. At that same meeting, Weis noted that Saint Vincent was currently facing another liquidity crisis and had negligible cash on hand despite having obtained a $100 million working capital loan in or around May 2004. Weis explained that Saint Vincent had borrowed $52 million, the total amount available under the borrowing base formula for that loan, and that Saint Vincent was burning its available cash (even before capital expenditures and debt service) at the rate of $400,000 per week. He also reported that critical real estate financing, which had been expected to provide funds to cover these enormous ongoing cash shortages, would be delayed because of legal and regulatory complexities, and that Saint Vincent's meager cash situation was becoming increasingly problematic and would only worsen during the following month.

45.     On September 22, 2004, the Board and the Saint Vincent Finance Committee held a special meeting. Smith and Selbst were present as the McDermott representatives. Speltz and Weis were also present. At Speltz's request, Smith made a presentation about the options that the Board might consider, including Chapter 11 bankruptcy protection, in the event that Saint Vincent's liquidity crisis continued or worsened. Smith explained that "advance preparation" for, and "smooth entrance" into, a Chapter 11 bankruptcy proceeding were "key to successful emergence" from Chapter 11 bankruptcy and was necessary to avoid a "free fall."

46.     At the same meeting, Speltz stated that Saint Vincent had nearly run out of money the prior week; that the effort to raise cash from "excess real estate" had "stalled" and that Saint Vincent's liquidity "squeeze … could recur." Weis acknowledged that Saint Vincent was experiencing its third liquidity crisis since hiring the Speltz and Weis Parties, and that this latest crisis had been going on throughout the preceding four weeks. Weis admitted that the Speltz and

- 17 -

Weis Parties had not anticipated the latest cash crisis. He also conceded that Saint Vincent's collections had "deteriorated," and were "still not back on track." Weis also admitted that "Saint Vincent is as close to the edge as it had ever been."

47.     A week later, on September 30, 2004, the Board formally confirmed its request that McDermott begin "planning for a potential Chapter 11 filing . . . ." McDermott's bankruptcy team was headed by Defendants Smith, Selbst and Cleary. At McDermott's insistence, Saint Vincent agreed that McDermott would render weekly billings for its services, and that Saint Vincent would make next-day payments by wire transfer.

48.     At or around the time McDermott began preparing Saint Vincent's Chapter 11 bankruptcy filing, the McDermott Defendants knew and should have known that a Chapter 11 bankruptcy filing was essential to minimize the depletion of Saint Vincent's assets, to maximize Saint Vincent's enterprise value and to ensure that Saint Vincent's mission could be continued long-term. Despite the need for seeking Chapter 11 bankruptcy protection, the McDermott Defendants failed to provide proper and timely direction to the Board that Saint Vincent should immediately authorize the filing for bankruptcy protection under Chapter 11 to facilitate a successful restructuring, reorganization and rehabilitation of the System.

49.     On or near the same day that Saint Vincent engaged McDermott, and with Saint Vincent's approval, McDermott engaged Huron LLC to act as financial advisor to prepare and plan for a Chapter 11 bankruptcy filing. Weis and the McDermott Defendants were responsible for supervising and directing Huron LLC's work for, and billings to, Saint Vincent.

**"Pencils Down"**

50.     Throughout the month of October 2004, the McDermott Defendants geared themselves for a Saint Vincent bankruptcy filing, which McDermott code-named "Project

Vulcan." McDermott created a "war room" in which it collected and utilized, among other things, copies of Saint Vincent's audit reports and financial statements, loan and security documents, bond documents, labor union contracts, organizational documents, reimbursement agreements, agreements with creditors, financial documents, and other due diligence documents regarding Saint Vincent. In short, the McDermott Defendants had all information pertinent to Saint Vincent's financial condition and necessary for commencement of the Chapter 11 for Saint Vincent.

51.    On or around October 26, 2004, Huron LLC provided the McDermott Defendants with a financial analysis of the existing business plan for Saint Vincent, a plan developed by the Speltz and Weis Parties. Huron's financial analysis revealed severe negative variances with the existing business plan, including negative variances of approximately $44 million and $66.8 million in Saint Vincent's EBIDA (earnings before interest, depreciation and amortization) and net cash flow, respectively, over the next 14 months if Saint Vincent remained in a non-bankruptcy setting. Additionally, Huron's financial analysis of the existing business plan and its view of Saint Vincent's cash flows over the 9 weeks from November 5, 2004 to December 31, 2004 and the 4 weeks from January 1, 2005 to January 20, 2005, revealed insufficient liquidity.

52.    The McDermott Defendants immediately delivered Huron's financial analysis to the Speltz and Weis Parties, having concluded that Saint Vincent "is out of gas by January." The McDermott Defendants did not, however, forward this critical financial analysis to the Board, and they made no effort to see to it that this analysis, which reflected negatively upon Speltz and Weis' efforts, was brought to the attention of the Board.

53.    During this same period of time, the Speltz and Weis Parties were providing misleading reports about their performance and about the status and purported success of their

turnaround plans. Because the Board did not have the benefit of the McDermott Defendants' professional assessments and direction, they were not able to appreciate the extent and significance of the Speltz and Weis Parties' failures.

54.    On or around October 27, 2004, despite the analysis provided to Saint Vincent's senior management (i.e., the Speltz and Weis Parties) the day before, Smith sent an email to the rest of the McDermott Defendants, informing them that Saint Vincent management (*i.e.*, Speltz and Weis) had instructed all McDermott bankruptcy attorneys to put their "pencils down." Smith noted that this instruction was "for now" and that management had decided "to manage [Saint Vincent's financial] problem through existing lenders." Smith announced to the McDermott bankruptcy attorneys that he was "skeptical, but it is [the Speltz and Weis Parties'] call." Smith further expressed his anticipation that the McDermott Defendants would "be back to this one towards mid-December." Nonetheless, no communication of this was conveyed to the Board, nor was direction given to the Board as to the noted skepticism of Speltz and Weis' actions.

55.    Though the McDermott Defendants were admittedly skeptical of management in October 2004, they nevertheless sat silently and failed to give the Board the benefit of their unvarnished, frank and professional advice. Consequently, the Board was deprived of the benefit of the McDermott Defendants' professional bankruptcy analysis, advice and direction, for which McDermott had charged more than $400,000 by the end of October 2004, and the Board was misled and not fully informed by the attorneys it had specifically engaged to counsel, advise and direct them in this regard when they made business and bankruptcy decisions in the fall of 2004.

56.    The McDermott Defendants' conduct in facilitating the efforts of the Speltz and Weis Parties to mislead the Board, and in avoiding their professional responsibilities to provide

- 20 -

candid assessments, advice and direction to the Board, began during the first month of
McDermott's bankruptcy work and, as discussed below, continued to the severe detriment of
Saint Vincent thereafter. The Board, as the governing body of Saint Vincent, was continuously
deprived of material information from the McDermott Defendants. Decisions, action, and
inaction by the Board were often based upon inadequate information, advice and guidance
because the McDermott Defendants withheld material information, advice and guidance from the
Board. The McDermott Defendants had the duty to provide the information, advice and
guidance to the Board that they, as bankruptcy experts, knew was necessary for fully-informed
Board action beneficial to Saint Vincent.

**The Secret Negotiations to Sell SWLLC to Huron Inc.**
**Of Which The McDermott Defendants Knew**

57.    When Huron LLC came on the scene in September 2004, the Huron Parties
immediately recognized that the Speltz and Weis Parties had created a substantial cash flow for
themselves, and the Huron Parties undertook to capitalize on that cash flow by attempting to
purchase SWLLC from Speltz and Weis. Accordingly, in the fall of 2004, Gary Holdren
("Holdren"), the CEO of Huron Inc., telephoned Speltz and informed him that Huron Inc. wanted
to purchase SWLLC.

58.    The substantial price Huron Inc. was willing to pay for SWLLC was directly tied
to the income that the Speltz and Weis Parties had been able to generate, and would continue to
generate, from Saint Vincent. The prospective sale of SWLLC in the midst of the Saint Vincent
engagement, for a price that would be based on the payments the Speltz and Weis Parties were
able to generate from Saint Vincent, placed Speltz and Weis in an irreconcilable and direct
conflict of interest. While Saint Vincent's interests were in turning around Saint Vincent's
financial affairs as promptly as possible, and with the least costs possible, the Speltz and Weis

Parties' interests were in extending their Saint Vincent engagement as long as possible and to maximize the fees and profits they would earn from the engagement in order to create the revenue stream to support a sale to Huron Inc. In this regard, a Chapter 11 filing would be directly at odds with the Speltz and Weis Parties' objectives.

59.    Under these circumstances, the prospective sale of SWLLC by Speltz and Weis to Huron Inc. was a fact that was critical to Saint Vincent's Board and to its making of fully informed business and financial decisions that it would be called upon to make at the recommendations of the Speltz and Weis Parties and the Huron Parties.    However, notwithstanding the obvious and known materiality of the prospective sale to the Board's future decisions and actions, the Speltz and Weis Parties and the Huron Parties initiated and pursued their discussions about the prospective sale with deliberate deception. They agreed to conceal from the Board their discussions about the prospective sale and utterly failed to make any disclosure to the Board in this regard.

60.    Speltz and Weis were officers and fiduciaries of Saint Vincent. As such, the secret sale negotiations and eventual covert sale to Huron Inc. breached their fiduciary duties of loyalty, good faith, care, fair dealing, and obedience to Saint Vincent, as well as the terms of the SWLLC Agreement, Saint Vincent's by-laws, and its specific conflict of interest policy. Instead of revealing the negotiations, in January 2005 the Speltz and Weis Parties and the Huron Parties entered into a confidentiality agreement whereby they agreed to keep their negotiations secret.

61.    Also, at this same time in January 2005, the Speltz and Weis Parties were seeking to strengthen their position in their negotiations with Huron Inc. by requesting that the Board vote to extend the SWLLC Agreement, which was not set to expire for another three months. Speltz and Weis requested the extension of the SWLLC Agreement for the specific purposes of

guaranteeing the future cash flow for SWLLC and of enhancing the price Huron Inc. would pay

Speltz and Weis for SWLLC. As later events would show, Huron Inc.'s willingness to purchase

SWLLC was dependent upon the extension of the SWLLC Agreement.

**The McDermott Defendants' Misplaced Loyalty
And Concealment Of The Secret Negotiations**

62.    In or around February 2005, Speltz and Weis included the McDermott Defendants

in their secret plans when they sought advice regarding the proposed sale of SWLLC to Huron

Inc. Speltz and Weis told Smith that the information regarding their negotiations was secret by

virtue of the confidentiality agreement between the Speltz and Weis Parties and Huron Parties.

Consistent with the practice of the McDermott Defendants to inform one another of all important

facts regarding the Saint Vincent engagement, Smith promptly informed Selbst and Cleary of

those secret negotiations. Smith, along with the other McDermott Defendants, were not parties

to the confidentiality agreement, but were Saint Vincent's lawyers and were under a fiduciary

duty to disclose this critical information to the Board. Despite their clear legal obligations to

Saint Vincent, however, the McDermott Defendants placed their loyalty with the Speltz and

Weis Parties and wrongfully withheld the information from the Board. The McDermott

Defendants did not reveal their knowledge of these critical circumstances until after the sale of

SWLLC to Huron Inc. had closed in May 2005 and after Saint Vincent had been told of the

closing.

63.    As professed bankruptcy experts, the McDermott Defendants knew that a

combination between the Speltz and Weis Parties (Saint Vincent's management consultants) and

the Huron Parties (Saint Vincent financial advisors) would be at a minimum severely limited, if

not impermissible in a Saint Vincent bankruptcy because of the Bankruptcy Code and the so-

called "Jay Alix Protocol." The Jay Alix Protocol is a set of specific conflict of interest and

Federal bankruptcy law disinterestedness principles and rules first promulgated in the District of Delaware and later adopted by Bankruptcy Courts in other jurisdictions, including the Southern District of New York. Since 2003, if not before, the United States Trustee for the Southern District of New York had posted the Jay Alix Protocol on its web site. Under the Jay Alix Protocol, a debtor in a Chapter 11 bankruptcy case may not employ the same firm, or two firms that are commonly owned, to function as crisis manager or turnaround expert (as SWLLC was functioning for Saint Vincent) and as financial advisor (as Huron LLC was functioning for Saint Vincent).

64.    As the secret negotiations between SWLLC and Huron Inc. progressed, the Speltz and Weis Parties and Huron Parties recognized, and the McDermott Defendants understood, that the benefits that would accrue to the Speltz and Weis Parties and Huron Parties were dependent upon their continued success at discouraging and preventing Saint Vincent from seeking bankruptcy protection and, conversely, that a bankruptcy filing by Saint Vincent would be disastrous to their personal economic interests because they were not likely to be permitted to function as professionals in a Saint Vincent bankruptcy.

65.    As the McDermott Defendants further understood, and as Speltz and Weis realized, any bankruptcy filing would thwart the sale of their interests in SWLLC to Huron Inc., because, among other things, (i) it would diminish and shorten the duration of the cash stream to SWLLC; (ii) the SWLLC Agreement and the retention of Huron LLC would be subject to Bankruptcy Court approval; (iii) the Bankruptcy Code disinterestedness requirements and the corresponding Jay Alix Protocol would prevent the retention of SWLLC and Huron LLC in the event that they were owned by a common parent; (iv) even if it were somehow possible for both entities to be retained by Saint Vincent in a bankruptcy, outside constituencies in the bankruptcy

process would closely monitor, criticize, and prevent the payment of the unnecessary and excessive fees charged by SWLLC and Huron LLC and certainly would oppose such charges by these two entities; and, therefore, (v) since the sale of SWLLC was essentially a sale of SWLLC's future cash flow, and Saint Vincent accounted for approximately 85% of SWLLC's revenue (and for all practical purposes was its only client) a bankruptcy filing by Saint Vincent would create such uncertainty about SWLLC's future cash flow that Speltz and Weis's ability to sell SWLLC would be extremely doubtful.

66.    While Speltz and Weis actively resisted a bankruptcy filing for these reasons, on March 11, 2005, Smith told Speltz and Weis that someone from Huron LLC was reviewing Weis's current projections and that Huron LLC appeared to believe that a bankruptcy filing might be inevitable. The McDermott Defendants reported this to the McDermott attorneys working on the Saint Vincent engagement. Preferring the Speltz and Weis Parties and Huron Parties over their fidelity and duties to Saint Vincent, Smith failed to advise the Board that its financial advisor, whom McDermott was tasked to supervise, believed Saint Vincent could not avoid seeking Chapter 11 protection.

67.    On March 17, 2005, Huron LLC delivered a report to Smith that noted that the company had secured $94.3 million of funding over the prior twelve months through asset sales and refinancings, which had gone to fund operating losses, and identified other Saint Vincent assets that could be sold or further encumbered to generate cash to pay the Speltz and Weis Parties and fund Saint Vincent's continued operating losses. The report further included a bankruptcy analysis that assumed a bankruptcy filing on May 1, 2005, and enumerated benefits, including suspension of malpractice expenditures and debt service payments approximating $48 million, which Saint Vincent would be able to obtain if it were to file for bankruptcy protection.

With this knowledge, the McDermott Defendants failed again, however, to advise the Board to promptly file for bankruptcy protection.

68.    In April 2005, Speltz and Weis participated in a conference call with Smith for the purpose of discussing the conflict of interest issues that would face SWLLC and Huron LLC if they were under common ownership and Saint Vincent was in bankruptcy.  Despite their understanding that those issues would arise if Saint Vincent were to file for bankruptcy protection, and would unnecessarily complicate and delay the progress of a Saint Vincent bankruptcy case, the Speltz and Weis Parties and Huron Inc. nevertheless continued with their primary goal of achieving their sale and both they and the McDermott Defendants continued to conceal the impending transaction from Saint Vincent.

69.    Beginning as early as April 22, 2005, Defendant Cleary, at Smith's request, began looking for a way for SWLLC and Huron LLC to circumvent the conflict of interest and disinterestedness requirements of the Bankruptcy Code and the Jay Alix Protocol.

70.    On April 26, 2005, and again the next day, Speltz, Weis and Smith spoke with Huron Inc.'s Chief Executive Officer, Gary Holdren, to allay his concerns regarding the effect of the Jay Alix Protocol in the event that Saint Vincent were to file for bankruptcy after Huron Inc. acquired SWLLC.  In an email of April 27, 2005, Speltz described to Smith, Weis and Holdren the discussions they were having "to clarify how we ensure that the three of us and our respective companies remain as a team in case of a filing."  In that same email, Speltz emphasized Smith's role in bringing "comfort" to SWLLC and the Huron Parties.  The Board was not informed by the McDermott Defendants of Smith's telephone call to Huron Inc. and remained unaware of any aspect of the SWLLC and Huron Inc. transaction.

71.    On April 28, 2005, in an internal conference call among the McDermott Defendants, they confided to one another about problems that were not known by the Board. While the Speltz and Weis Defendants had been successfully preventing Saint Vincent from filing for bankruptcy protection to perpetuate its churning and accomplish their sale to Huron Inc., Saint Vincent's principal lender, Healthcare Finance Group, Inc. ("HFG"), was tightening the availability of cash and insisting to Speltz and Weis that Saint Vincent file for Chapter 11 protection. Even with the infusion of a new loan, it appeared likely to the bankruptcy attorneys that Saint Vincent "will be out of" cash by June or July. The attorneys also acknowledged among themselves that Huron Inc. was about to acquire SWLLC and that the acquisition could have the effect of "knocking both [SWLLC and Huron LLC] out of the picture" in the event of a bankruptcy filing.

72.    Also, on April 28, 2005, a McDermott attorney made a highly critical assessment of Speltz and Weis' efforts. The attorney noted that the Speltz and Weis' turnaround plan had not been oriented toward balance sheet maneuvers; that it burned through cash from real estate financings "with nothing to show;" that Saint Vincent's operations were not improving quick enough; and that Saint Vincent was financing and selling assets to fund current operations. The attorney also noted that Speltz and Weis want to avoid a bankruptcy filing.

73.    By April 29, 2005, Speltz and Weis were becoming increasingly concerned whether Huron Inc. would approve the acquisition of SWLLC at an upcoming Huron Inc. board of directors meeting scheduled for May 3, 2005. Speltz and Weis were particularly concerned that Huron Inc. would lose interest in the acquisition because of the dual retention prohibition if Saint Vincent were to file bankruptcy after SWLLC and Huron LLC were under common ownership and, also, because Saint Vincent had not yet signed the extension of the SWLLC

- 27 -

Agreement that, by its terms, expired on April 30, 2005. To ensure against such a negative reaction from Huron Inc., Speltz and Weis conferred with Smith, and the three decided that Smith would call Huron Inc.'s general counsel, Natalia Delgado, Esq., ("Delgado"), to allay any such concerns.

74.     On April 29, 2005, as he had agreed to do, Smith called Delgado. Delgado asked Smith if he was calling at the request of Speltz. In response, Smith falsely misrepresented to Delgado that he had not been requested to make the call by Speltz but, instead, was calling at the request of Richard Boyle ("Boyle"), the then Chairman of the Board of Saint Vincent. Smith also falsely represented that Boyle had asked Smith to confirm to Huron Inc. that SWLLC and Huron LLC would be able to continue to provide services in bankruptcy and that the Saint Vincent Board "saw S&W and Huron as a team of service providers that it wanted to keep on board." Smith assured Delgado that the extension to the SWLLC Agreement "would be executed within the next two weeks." Smith told Delgado that he knew that Huron Inc.'s board was going to consider approval of the acquisition the following week and that the Huron Inc. board is "likely to want to know this information in order to make its decision."

75.     Delgado promptly sent an email to Holdren reporting on Smith's call. Holdren, who was puzzled by Smith's call, forwarded the Delgado email to Speltz and Weis.

76.     Later that same day, Weis forwarded the Delgado and Holdren emails to Smith. Weis expressed surprise that Smith had falsely denied that it was Speltz who had asked him to call Delgado, observing that "the three of us [Speltz, Weis and Smith] agreed" that Smith would call Delgado "to mute her concerns before Huron's Board meeting." Weis also questioned Smith's prevarication that he was calling at the request of Saint Vincent's Chairman, stating that, "we are unaware that Dick Boyle knows of the pending Huron/SWLLC combination."

- 28 -

77.    The next day, April 30, 2005, Smith responded to Weis's email. Smith confirmed that Boyle knew nothing of the pending acquisition of SWLLC, stating that, "I haven't spoken with Dick since the last Board meeting I attended in the Fall." Smith went on state that he was angered by Holdren's reaction to his call to Delgado because Delgado had previously "called me first out of the blue asking for help" with the SWLLC acquisition. Smith also had told Huron Inc.'s general counsel that the acquisition would not impair Huron LLC's ability to perform services for Saint Vincent if it filed bankruptcy.

78.    In other e-mails, to Speltz and Weis, at about the same time, Smith also discussed the issues relating to disinterestedness, the Jay Alix Protocol, and conflicts of interest. Smith advised Speltz and Weis as to how they could "swerve" if they received "significant pushback from the US Trustee" in opposition to their potential retention in bankruptcy.

79.    Indeed, unbeknownst to the Board, after learning of the discussions between Huron Inc. and SWLLC, Smith and Cleary had instructed McDermott attorneys to prepare a research memorandum regarding the issues that would arise from such an acquisition should Saint Vincent eventually seek bankruptcy protection. Once more, neither the fact that this important research was being performed, nor the result of the research, was disclosed to the Board by the McDermott Defendants.

80.    As counsel to Saint Vincent and its Board (not to the Speltz and Weis Parties), the McDermott Deponents had a duty to disclose their knowledge of the Huron Inc./SWLLC negotiations to the Board, and to advise the Board of the conflicts, and the issues regarding disinterestedness and the related Jay Alix Protocol, that were posed by Huron Inc.'s proposed purchase of SWLLC.

- 29 -

81.     Competent counsel, as required by New York's Disciplinary Rule 5-109(b) and acting in the interests of the client, Saint Vincent -- as distinguished from the interests of senior management Speltz and Weis and their new employer Huron LLC -- should have recognized from the outset that the dual retention of Huron LLC under Section 327 of the Bankruptcy Code and approval of the SWLLC Agreement under Section 363 of the Bankruptcy Code would be a practical impossibility if full disclosure were made concerning all relevant terms of the Huron Inc. acquisition of SWLLC, the employment agreements between Huron LLC and Speltz and Weis, the earn-out provisions (especially the percentage of Saint Vincent earnings provision) and the breaches of fiduciary duty and conflicts of interest on the part of Speltz and Weis.

82.     In his April 30, 2005 email, Smith warned Speltz and Weis of a matter that was of "possibly greater significance." Smith recounted the difficulties that he had encountered the day before in attempting to secure approval of a new loan to finance Saint Vincent's continuing operating deficits. Smith noted that the Board was becoming concerned that Saint Vincent was "borrowing only to pay trade or go deeper into debt when the operations were not turning around;" that some members of the Board were expressing concern about their obligations "in the 'zone of insolvency;'" that, some members of the Board were becoming "skeptical" about "deteriorating hospital margins;" that "it wouldn't surprise [Smith] if [the Board] wanted a time table for the systematic realignment recommendations that they understand to be in process;" and that Speltz and Weis should be alerted that the Board was beginning to understand the "urgency" of Saint Vincent's problems and "may be more active and demanding in contrast to their historically more passive role."

83.     Despite the fact that Speltz, Weis and the McDermott Defendants met with members of the Board, and were in constant contact with the Board, they conspired and carefully

concealed from the Board, and from St. Clair, the facts of both the impending sale transaction among the Speltz and Weis Parties and Huron Parties and the extraordinary time and attention that the Speltz and Weis Parties, the Huron Parties and the McDermott Defendants were devoting to (and would be charging Saint Vincent for) the problems that the acquisition of SWLLC by Huron Inc. would cause in the event of a Saint Vincent bankruptcy filing. In fact, in mid-April, St. Clair had questioned Speltz about a rumor that Huron Inc. was about to acquire SWLLC, and Speltz falsely denied the rumor.

84.    On May 5, 2005, the Executive Committee of the Board, acting in ignorance and as a result of the Defendants' false pretenses, adopted a resolution approving the extension of the SWLLC Agreement. Speltz and Weis were both present, but neither of them disclosed the facts that they were about to sell SWLLC to Huron Inc. and that execution of the formal sale agreement and the closing of the sale were conditioned upon Saint Vincent's extension of the SWLLC Agreement.

### The Consummation of the Sale of SWLLC to Huron Inc.

85.    Until May 6, 2005, the Speltz and Weis Parties, the Huron Parties and the McDermott Defendants fraudulently concealed from the Board the discussions that had taken place among them leading to the execution of Acquisition Agreement. On May 5, 2005, however, after the SWLLC Agreement had been extended, and the Acquisition Agreement had been executed, Huron Inc., a public company, filed a disclosure of its execution of the purchase agreement with the United States Securities and Exchange Commission, as required by law.

86.    On or about May 6, 2006, Speltz telephoned Boyle and told him that Speltz and Weis had sold SWLLC to Huron Inc. Within days, Speltz also called St. Clair and told her about the acquisition. Speltz apologized to St. Clair for having previously denied that he and Weis

were negotiating with the Huron Parties. Speltz claimed that he had lied to St. Clair so as not to transgress the confidentiality agreement that the SWLLC Parties had signed with Huron Inc. Speltz offered no other explanation or excuse for having consciously violated his fiduciary duty of loyalty and his obligations to Saint Vincent in order to pursue his own, selfish financial interests by entering into the confidentiality agreement with Huron Inc. in the first place, and then by consummating a transaction from which he personally benefited at the expense of Saint Vincent.

87.    On May 9, 2005, the Speltz and Weis Parties and Huron Inc. closed on the Acquisition Agreement. As a part of the closing, Speltz and Weis each entered into an employment contract with Huron LLC, thereby becoming employees of Huron LLC. (The transaction evidenced by the Acquisition Agreement, closing documents, and employment agreements is referred to hereunder as the "SWLLC/Huron Transaction.")

88.    At the closing of the SWLLC/Huron Transaction, Speltz and Weis received consideration for their interests in SWLLC as follows: (i) a cash payment in the amount of $14 million; (ii) a note in the amount of $3 million payable over three years; and (iii) the promise of "earn-out" payments (the "Earn-Out").

89.    The Earn Out payments were of two types based on two formulas. Under one formula, Speltz and Weis were to receive Earn-Out payments based on the future profitability of SWLLC. Under the other formula, Speltz and Weis were to receive payments to be derived from future billings of Huron Inc. and its affiliates and subsidiaries attributable to work referred by Speltz or Weis, including referrals of work for Saint Vincent. These Earn-Out formulas encouraged Speltz and Weis to maximize billings to Saint Vincent for their own personal interests thereby causing a direct conflict of interest with the responsibilities and fiduciary duties

that Speltz and Weis owed Saint Vincent as its CEO and CFO, respectively, and that the Speltz and Weis Parties owed Saint Vincent by virtue of the trust and confidence that the Board had placed in them.

90.    Shortly thereafter, when the McDermott Defendants reviewed the SWLLC/Huron Transaction documents, the McDermott Defendants recognized that the Earn-Out payments created a conflict of interest that violated the fiduciary duties that the Speltz and Weis Parties owed Saint Vincent.  In emails among the McDermott Defendants, including an e-mail from Smith to Cleary, they observed that the "earn-out arrangements predicated on future business to Huron from legacy [SWLLC] clients and insolvency business referred to Huron based on S&W engagements" created an obvious financial conflict; that "it certainly smells like David [Speltz] and Tim [Weis] have a personal interest in pumping up the Huron revenues;" and that there would be severe adverse "reactions of external constituencies, such as [the Attorney General of New York,] examiners, the Creditors Committee and disgruntled employees, if the Debtors' [i.e. Saint Vincent's bankruptcy] cases become a meltdown."

### Promoting a Restructuring That Was "Too Little, Too Late"

91.    By the closing on the Acquisition Agreement, it had become clear to the McDermott Defendants and Huron LLC that the Speltz and Weis Parties' turnaround efforts were failing.  However, instead of counseling the Board that Saint Vincent should file for bankruptcy, the McDermott Defendants and Huron LLC continued to support the Speltz and Weis Parties' strategy of consistently presenting cash crises as short-term problems and supporting the Speltz and Weis Parties' efforts to present yet another revised turnaround plan to lenders and the Board.

92.    In an email in May 2005, Smith remarked to the other McDermott Defendants that Speltz and Weis were in denial concerning Saint Vincent's balance sheet and cash flow problems. Smith also suggested that Speltz and Weis were oblivious to the problems they were facing at Saint Vincent and to the inevitability of a Chapter 11 filing by Saint Vincent.

93.    McDermott also was aware of the inaccurate and unreliable nature of projections prepared by SWLLC, Speltz or Weis, and, when the McDermott Defendants desired reliable numbers, they turned to Huron LLC to supply projections. Again, despite their observation that the Speltz and Weis Parties were incompetent, and not handling their turnaround duties competently, the McDermott Defendants did not share their observation with the Board.

94.    Instead, on May 26, 2005, Smith sat by as Speltz issued a report to the Executive Committee of the Board in connection with the upcoming Board meeting, scheduled for June 1, 2005. Speltz stated in the report that, "in spite of numerous setbacks and surprises, the turnaround is a success to date," and "many positive signs have emerged" in recent weeks. Speltz presented to the Executive Committee a limited restructuring plan that the Speltz and Weis Parties would be presenting to the Board on June 1, 2005, and to creditors on June 2, 2005.

95.    On May 31, 2005, in advance of the presentation of the limited restructuring plan to the Board or to the creditors, Smith stated that the creditors would be "underwhelmed" by their plan. In an email of that date, Smith shared this opinion with the Speltz and Weis Parties, stating that in "anticipation of this, I suggest that we do a dry run page flip for the creditors' meeting." Smith noted that, "It would appear that HUD/DASNY may be underwhelmed with our strategic restructuring plan (*too little, too late, where have you been, etc.*)" (Emphasis added.) While Smith's assessment was correct, it was not conveyed to the Board. The secured creditors finally rejected Speltz and Weis' modest restructuring plan.

**The Creditors Bring An End To Financing Losses**
**Sending Saint Vincent Into Bankruptcy**

96.      At the same time that the McDermott Defendants, Speltz and Weis Parties and the Huron Parties were conspiring to make sure that a Saint Vincent bankruptcy filing did not interfere with the Acquisition Agreement, and the Speltz and Weis Parties were preparing their "underwhelming" revised turnaround plan, Saint Vincent's creditors expressed their firm conclusion that it was imperative that Saint Vincent be reorganized in bankruptcy.

97.      By the time of the April 28, 2005, internal conference call that Defendant Selbst had with other attorneys at McDermott, the McDermott Defendants knew that Saint Vincent's principal lender wanted Saint Vincent to file for Chapter 11 protection and had also said it would provide further financing known as debtor-in-possession financing with Bankruptcy Court protections if this was done. Notwithstanding the knowledge of the McDermott Defendants that debtor-in-possession financing was readily available from an identified source, the McDermott Defendants failed to take advantage of this opportunity for the benefit of their client.

98.      On May 31, 2005, HFG reluctantly made an overadvance of only $6 million to Saint Vincent on its existing line of credit to cover that week's cash shortfall. In a conversation with Smith, HFG's lawyers emphasized that, under the lending formula in the loan agreement, Saint Vincent was not entitled to the advance and, further, that Saint Vincent was in default under the loan agreement. HFG's lawyers went on to state that HFG was adamant that its willingness to make that overadvance was conditioned upon Saint Vincent seeking Chapter 11 protection. HFG's lawyers made it clear that Saint Vincent should not count on further overadvances if Saint Vincent did not proceed with a bankruptcy filing.

99.      Notwithstanding HFG's admonition to Smith that further advances were conditioned upon Saint Vincent's rapid bankruptcy filing, and despite Smith's anticipation that

- 35 -

Saint Vincent's creditors would react negatively to the Speltz and Weis Parties' limited restructuring plan, the Speltz and Weis Parties nevertheless presented a new turnaround plan to the Board on June 1, 2005, and recommended that it be approved. Smith was present at the June 1, 2005 Board meeting.

100.    While they acknowledged in their June 1, 2005 presentation to the Board that they failed to meet their turnaround targets, and stated that the "the actual performance of [Saint Vincent] [had been] far worse than originally anticipated," the Speltz and Weis Parties, as Smith sat by, continued to encourage the Board that a bankruptcy filing was not necessary, advising specifically that "the turnaround has seen significant progress of the past year moving toward stabilizing cash flow and rebuilding operational infrastructure." Additionally, they attributed the failures in the performance of the turnaround plan to a $60 million error in projected net realizable accounts receivables that they tried to blame on others.

101.    The Speltz and Weis Parties went on to concede that, during the period from July 2004 to April 2005, there had been a $94 million shortfall in operating cash flow (as compared to the projections of the turnaround plan) before debt service, capital expenditures and third party payments. Taking these additional recurring cash deficiencies into account, the Speltz and Weis Parties acknowledged that, as June 1, 2005, Saint Vincent's was continuing to experience a cash shortfall of between $10 million and $14 million per month.

102.    As proposed by the Speltz and Weis Parties to the Board on June 1, 2005, the new restructuring plan was to be accomplished outside bankruptcy and, with the exception of St. Mary's and Bayley Seton, it made no plan for disposing or closing the other three hospitals in Queens and Staten Island (St. John's Queens, Mary Immaculate and Saint Vincent Staten Island) that continued to accumulate losses at the aggregate rate of $10 million per month. The Speltz

- 36 -

and Weis Parties' restructuring plan, the same as their previous failed turnaround plan, was wholly inadequate, unrealistic and unreasonable.

103.    On June 1, 2005, David Hyams, HFG's Chief Credit Officer, sent a letter to Weis, formalizing HFG's admonition that it would not commit to make additional advances to Saint Vincent on any basis in the future.  Hyams also warned, ominously, that "Events Of Default" are "continuing as of the date hereof" and that HFG's "Lender rights ... have accrued thereunder." In the evening of June 1, 2005, at a meeting with an HFG representative, Weis acknowledged that "no access to capital is causing a death spiral." In an email after the meeting, Weis shared this observation with Speltz, Smith and the Huron Parties.

104.    On or about June 30, 2005, HFG terminated its loan to Saint Vincent and assessed an early termination fee as provided in the loan agreement between HFG and Saint Vincent.

105.    On June 30, 2005, at an emergency meeting of the Board, Boyle, reading from a memorandum prepared for him by Speltz, stated that "a severe liquidity crisis" had "overtaken" Saint Vincent and that Saint Vincent had "experienced an increasingly tight liquidity position" because of lower than expected revenues, increased pressure from trade vendors and "tightening" of the working capital loan leading to the declaration of an "event of default."  Speltz noted that an "emergency request" for $15 million had been made of the Dormitory Authority for the State of New York ("DASNY") and that, if DASNY did not provide the funding, Saint Vincent would be unable to meet its payroll obligations on July 5, 2005.  The Board empowered its Executive Committee to authorize the filing of a petition for Chapter 11 protection.

106.    On July 4, 2005, after DASNY had refused to grant the emergency request for $15 million, Speltz, with no evasive maneuvers left, finally relented, and recommended to the

Executive Committee of the Board that it authorize the filing of Saint Vincent's Chapter 11

petitions, which recommendation was adopted by the Executive Committee.

107.    On July 5, 2005, Saint Vincent belatedly filed for Chapter 11 bankruptcy

protection in the United States Bankruptcy Court for the Southern District of New York. *See In*

*re: Saint Vincent Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical*

*Centers, et al.*, Jointly Administered Case No. 05-14945 (ASH).  The Speltz and Weis Parties,

Huron LLC, and McDermott failed to make adequate plans for the bankruptcy filing, and these

failures and gross deficiencies directly contributed to the bankruptcy proceedings being chaotic,

disruptive, haphazard, and more costly.

### Misguided Efforts to Retain both SWLLC and Huron LLC In Bankruptcy And The Free Falling Saint Vincent Bankruptcy

108.    When Saint Vincent filed for bankruptcy protection on July 5, 2005, the

McDermott Defendants continued to put their interests and those of the Speltz and Weis Parties

and Huron Parties above their client's interests, and embarked upon a disastrous plan to obtain

the approval of the Bankruptcy Court for the retention of both SWLLC and Huron LLC.  As the

Bankruptcy Judge later observed, this dual retention strategy was *"from the outset* a dead letter

by reason of the Jay Alix Protocol, Section 327(a) of the Bankruptcy Code, and the serious

conflicts of interest and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the

Huron [Inc.] acquisition of SW[LLC] in early May."  Nevertheless, the McDermott Defendants

pursued this strategy at significant expense to Saint Vincent and at the cost of serious and

harmful delays in Saint Vincent's reorganization process.  This dual retention strategy and

related efforts nearly derailed Saint Vincent's Chapter 11 reorganization during the critical

months immediately following the bankruptcy filing.

109.    In their initial bankruptcy pleadings, the McDermott Defendants initially sought Bankruptcy Court approval of the SWLLC Agreement under Bankruptcy Code § 363 and of Huron LLC's retention under Section § 327. The Motions and supporting papers filed on July 5, 2005 (the "July 5th Motions"), seeking approval of the SWLLC Agreement and retention of Huron LLC, were carelessly drawn, incomplete and inappropriate. The disclosure in the July 5 Motions was grossly and concededly inadequate, and none of the McDermott Defendants' subsequent draft retention motions contained complete or appropriate disclosures concerning the terms of the SWLLC/Huron Inc. Transaction and the Speltz and Weis conflicts and fiduciary breaches. Smith charged Cleary with the primary responsibility for the preparation of the retention Motions and their supporting documents. The Motions and related documents were reviewed by Cleary, Selbst and Smith before they were filed, and Cleary, Selbst and Smith authorized the filing of the Motions and related documents.

110.    Although the Motions drafted by the McDermott Defendants seeking approval disclosed the bare fact of the Huron Inc. acquisition of SWLLC, they violated the Bankruptcy Code and Rules by not disclosing any details of the acquisition, the Speltz and Weis Employment Agreements with Huron LLC, the impermissible relationships and connections between the Speltz and Weis Parties and the Huron Parties or the Earn-Out provisions. Nor did the Motions contain any disclosure of the conflicts or breaches of fiduciary duty resulting from the acquisition and related agreements or their implications for the Huron LLC and SWLLC retentions. Indeed, the Motions falsely and inaccurately alleged that SWLLC was a "materially disinterested person," despite the fact that the Speltz and Weis Parties were grossly conflicted as a consequence of the Huron Inc. acquisition of SWLLC and the Earn Out provisions.

111.    The McDermott Defendants, along with the Speltz and Weis Parties and the Huron Parties, intentionally failed to disclose to the Bankruptcy Court, to the United States Trustee for Region II ("U.S. Trustee"), and to Saint Vincent's Creditors Committee ("the Creditors Committee") and creditors at large, the complete and full information about the SWLLC/Huron Inc. Transaction. The McDermott Defendants knew that the problems of lack of disinterestedness, conflicts of interest and breaches of fiduciary duty by Speltz and Weis were of such gravity that those matters *could not be disclosed* to the Bankruptcy Court. They knew that full and candid disclosure would eliminate any possibility of approval of the SWLLC Agreement and would undermine public confidence in the management of Saint Vincent. The McDermott Defendants were fully aware of the terms of the SWLLC/Huron Transaction and the multiple conflicts and breaches of fiduciary duty on the part of Speltz and Weis relating thereto.

112.    Within a day after the July 5th motions were filed, the McDermott Defendants were made aware that the U.S. Trustee's office would oppose the retention of SWLLC and Huron LLC based on the Jay Alix Protocol. Nonetheless, on July 13, 2005, McDermott filed an Amended Motion for approval of the SWLLC Agreement and the dual retention of SWLLC and Huron LLC. The disclosures in the July 13 Amended Motion were also woefully deficient. In face of a renewed objection by the U.S. Trustee, the McDermott Defendants withdrew the Motion.

113.    Indeed, upon learning of the conflict of interest that disabled the Speltz and Weis Parties and Huron LLC, the U.S. Trustee advised the McDermott Defendants that her office objected to the dual retention of SWLLC and Huron LLC as impermissible under the Bankruptcy Code and the Jay Alix Protocol.

114.    Based on a July 21, 2005 conversation with Martin Bunin, counsel to the Creditors Committee, Smith understood that the Creditors Committee also objected to the Debtors' attempt to approve the SWLLC Agreement and to retain SWLLC and Huron LLC. Smith also understood from Bunin's comments, that there were no circumstances under which the Creditors Committee would agree to the retention of Speltz and Weis.

115.    Instead of advising the Board to retain new management, the McDermott Defendants attempted an alternative and equally flawed maneuver of having Huron LLC function as a subcontractor to SWLLC in the face of the stated position of the U.S. Trustee and the Creditors Committee that Huron's acquisition of SWLLC tainted Messrs. Speltz and Weis and that they would object to their retention.

116.    Consistent with their failure to make adequate disclosure concerning the SWLLC and Huron LLC proposed retentions, the McDermott Defendants did not provide the U.S. Trustee with copies of the May 6, 2005 Acquisition Agreement or related Speltz and Weis Employment Agreements until July 22, 2005, despite the fact that disclosure of these documents was required by the Bankruptcy Rules and essential for the U.S. Trustee to assess the propriety of the July 5th Motions to retain Huron LLC and approve the SWLLC Agreement.

117.    In mid-August 2005, in recognition of the criticism of Saint Vincent's management, Smith advised Weis to proceed on three fronts:  (i) try to run the business; (ii) try to develop a competent business plan; and (iii) attempt somehow to justify what the Speltz and Weis Parties had done at Saint Vincent over the last 18 months at a cost of approximately $30 million.

118.    Before August was over, the relationship between the U.S. Trustee and the Creditors Committee, on the one hand, and the McDermott Defendants and the Speltz and Weis

Parties and the Huron Parties, on the other hand, had become totally adversarial. The U.S. Trustee was concerned that neither the Speltz and Weis Parties nor the McDermott Defendants had accurately informed Saint Vincent of what was occurring in its bankruptcy case. Accordingly, the U.S. Trustee took the extraordinary action of insisting on meeting directly with members of the Board to advise them of the inappropriateness of the dual retention that the Speltz and Weis Parties and Huron Parties and the McDermott Defendants were trying to accomplish and of the disaster for Saint Vincent that lay ahead. The Board members were surprised by the U.S. Trustee's revelations.

119.    Had Cleary and the other McDermott Defendants made adequate and timely disclosures on the date of the bankruptcy filing, the only reasonable course of conduct would have been the immediate replacement of Speltz and Weis as management and Saint Vincent would have been spared the disruption, delay in progress of the bankruptcy case and adversarial relationship that developed between Saint Vincent, on the one hand, and the U.S. Trustee and the Creditors Committee, on the other hand. Nevertheless, the McDermott Defendants continued until August 1, 2005 to press for Bankruptcy Court approval of the SWLLC Management Agreement and Section 327 retention of Huron LLC.

120.    On August 1, 2005, the McDermott Defendants withdrew the Huron LLC application, but problems with the SWLLC approval continued. On August 12, 2005, the U.S. Trustee informed the McDermott Defendants by letter the that U.S. Trustee's "concerns have not been resolved by the amendments to the July 28 draft motion to approve the [SWLLC] Management Agreement."

121.    By early August, the Creditors Committee and the U.S. Trustee had reached the conclusion that there were grave doubts about the competence and efficacy of Speltz and Weis as

the senior management of Saint Vincent. Both the Creditors Committee and the U.S. Trustee had lost all confidence in Speltz and Weis.

122.    Because of the insistence on the dual resolution by the McDermott Defendants, the Speltz and Weis Parties and the Huron Parties and because of the incompetence of the McDermott Defendants in pursuing various issues in the bankruptcy case, the U.S. Trustee threatened on several occasions to move for the appointment of a trustee to take over the operations of Saint Vincent.

123.    It was not until the second week of August 2005 that Smith advised the Board that Speltz and Weis were at the heart of the retention problem and that the tenure of Speltz as CEO had become "unsupportable." Until then, Smith had been counseling Saint Vincent that the U.S. Trustee's and the Creditors Committee's objections were ordinary, expected and resolvable.

124.    On August 19, 2005, McDermott met with the U.S. Trustee and the counsel for the Creditors Committee. At the August 19 meeting, the U.S. Trustee stated that she would not consent to SWLLC's retention, and the U.S. Trustee and the Creditors Committee proposed the appointment of a "Chief Restructuring Officer" ("CRO").

125.    The U.S. Trustee's CRO proposal obviously had very serious implications for Saint Vincent and its management. Responding to this impetus, the Executive Committee of the Saint Vincent Board convened a "special" meeting on August 24, 2005 to discuss the August 19 meeting and its implications.

126.    At the August 24, 2005 meeting, Smith relayed to the Executive Committee the concerns articulated by the Creditors Committee and the U.S. Trustee regarding Speltz and Weis. After thorough and comprehensive discussion at the August 24 meeting, the Executive Committee decided to ask Speltz and Weis to resign from their positions as CEO and CFO,

respectively. In addition, the Executive Committee appointed Boyle as interim President and CEO and Thomas Allison as interim CFO of Saint Vincent.

### The "Radio Silence" Instruction and Obstruction

127.    A further example of the McDermott Defendants' efforts to obstruct the orderly progress of the bankruptcy case and restructuring is the extraordinary shutdown of information, or "radio silence" instruction, issued by Smith. On August 11, 2005 the Creditors Committee informed Smith that it intended to object to the Saint Vincent's motion to retain SWLLC. The same day Smith sent an email to Saint Vincent's management, directing that they cease all communications and information transmittal to the Creditors Committee, cancel all meetings with the Creditors Committee's representatives and "maintain radio silence."

128.    Specifically, Smith stated:

> Effective immediately, please stop ALL communication or information transmittal to the Committee, cancel ALL meetings with their representatives, and maintain radio silence. If asked, refer inquiries to me. . . . Lots more will follow, and positions may change, but for now, shut it down.

129.    Acting on the Smith "radio silence" instruction, Saint Vincent's management ceased providing any information about the Debtors' business and operations to the Creditors Committee and its professionals. At the same time, Smith instructed McDermott attorneys to undertake an investigation of a rumor that the Creditors Committee had begun to interview candidates to replace the debtors' senior management. The investigation lasted four days, after which the McDermott Defendants determined that there was insufficient credible evidence to substantiate the rumor. Only then did Smith instruct Saint Vincent's management to reopen communications with the Creditors Committee.

130.    The McDermott Defendants' imposition of "radio silence" on Saint Vincent's management while the firm undertook an investigation of whether the Creditors Committee had begun to interview candidates to replace Speltz and Weis was emblematic of the McDermott Defendants' adversarial, counterproductive, disloyal, and grossly negligent representation of Saint Vincent.

### The Delayed Closure of St. Mary's Hospital

131.    By the time Saint Vincent filed for bankruptcy, the Board, at a June 1, 2005 meeting attended by Smith, had already decided to close St. Mary's Hospital. The closure was to occur by September 1, 2005.

132.    Once Saint Vincent filed for bankruptcy protection, the closure of St. Mary's was subject to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. McDermott, both bankruptcy counsel and counsel with respect to the St. Mary's disposition, was primarily responsible for obtaining Bankruptcy Court approval of the closure. Nonetheless, after Saint Vincent filed for bankruptcy, the McDermott Defendants continued to neglect their duties in connection with the closure of St. Mary's Hospital. Defendant Selbst, under the direction of Smith, was given the primary responsibility for obtaining the Bankruptcy Court's approval for the closing of St. Mary's.

133.    Despite knowing of the dire need to close St. Mary's, that St. Mary's was losing between $71,000 and $100,000 per day, and that Bankruptcy Court approval was required for closure, McDermott did not file for approval of closing St. Mary's in the series of motions that the McDermott Defendants filed on behalf of Saint Vincent on the first day of its bankruptcy filing.

134.    Selbst first began work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier than August 5, 2005, and the motion was not filed until August 18. By that time, a successful resolution of the motion by September 1 was impossible. The Motion was palpably insufficient, moreover, because it was not accompanied by any supporting affidavits or financial analysis to document the economic exigency requiring prompt closure.

135.    In order for the Bankruptcy Court to grant the Motion for closure of St. Mary's, it was necessary for Saint Vincent to provide the Bankruptcy Court with a comprehensive, well-documented record of affidavits and supporting exhibits demonstrating to the press, public officials, and the public the economic and other facts that necessitated closure. The belated motion papers the McDermott Defendants filed were carelessly prepared, were not supported by a single affidavit and did not attach any financial analysis to support the summary and conclusory assertions by the lawyers concerning the financial need to close St. Mary's.

136.    McDermott's delay in preparing and filing the motion to close St. Mary's Hospital was not the consequence of strategy, but inattention on the part of Smith and Selbst. Moreover, the failure to support the tardily filed motion with affidavits and financial analysis was not the consequence of strategy or the unavailability of data, but inadequate and untimely preparation by Smith and Selbst. Instead of working diligently on the closure of St. Mary's, Smith was preoccupied with the effort to obtain the dual retention of SWLLC and Huron LLC.

137.    At a September 7, 2005 hearing on the Motion to Close, the Bankruptcy Court, unsupported by a sufficient record, adjourned the hearing without ruling on the Motion.

### Termination of McDermott as Debtors' Counsel

138.    On or about September 13th, before the Bankruptcy Court acted on the closure of St. Mary's Hospital, the Saint Vincent Board made the decision to terminate McDermott and substitute Weil Gotshal & Manges, LLP ("Weil") as Saint Vincent's bankruptcy counsel. The Board was informed that the McDermott Defendants were flailing about, had angered the Bankruptcy Judge and had destroyed any possible working relationship with the U.S, Trustee by the prolonged and hostile confrontation with the U.S. Trustee over the Huron/Speltz & Weis retention.

139.    On or about September 13, 2005, Saint Vincent made the decision to replace McDermott because it became readily apparent that the restructuring of Saint Vincent was in a quagmire, and that the McDermott Defendants had so alienated the U.S. Trustee and the Creditors Committee that the bankruptcy process could not go forward with the McDermott Defendants continuing as counsel to Saint Vincent.

140.    Because the Board had lost confidence in the McDermott Defendants' ability to guide Saint Vincent through the bankruptcy process and the U.S. Trustee and Creditors Committee and increasingly demanded the immediate appointment of a chief restructuring officer and/or trustee, the Board made the decision to replace McDermott as bankruptcy counsel to Saint Vincent on or around September 13, 2005.

### The McDermott Defendants' Deficient Performance

141.    The McDermott Defendants held themselves out as professionals who possessed special skills and experience in providing expert legal advice to hospitals and other healthcare facilities with respect to restructuring their businesses and planning, preparing and filing for Chapter 11 bankruptcy protection and reorganization.

142.    As trusted bankruptcy counsel, the McDermott Defendants were under the duty to act with due care generally expected of such professionals and to adhere to generally accepted standards of care applicable to such professionals. These standards include providing the client with information that is material to a client's decision to pursue a given course of action and giving timely and reasonable advice and firm direction to file for bankruptcy when such a course of action is appropriate and generally giving proper legal advice to a client. As was stated by the United States Bankruptcy Court in the Saint Vincent bankruptcy case, "experienced counsel in major Chapter 11 cases are paid to investigate the facts, to know the applicable principles of law, practice and ethics, to act timely to accomplish their clients' objectives, and to guide their clients with a firm hand to the course of action which is most beneficial to the debtor's estate." *In re Saint Vincent's Catholic Medical Centers of New York*, Case No. 05-B-14945 (ASH) (Bankr. S.D.N.Y. August 29, 2007) at pp. 19-20.

143.    Also, among the generally accepted standards applicable to such professionals is the standard reflected in Disciplinary Rule 5-109 of the New York Lawyer's Code of Professional Responsibility, which provides:

> If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization . . . and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization. Such measures may include, among others:

. . . .

- 48 -

> 3. Referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

144.    Because of the significant experience and expertise that the McDermott Defendants claimed they could provide to Saint Vincent as bankruptcy counsel, the McDermott Defendants were engaged by, and entered into a special relationship of trust and confidence with, Saint Vincent to render professional services and to provide expert advice for the purpose of guiding and directing Saint Vincent into and through its restructuring and bankruptcy process. The relationship of trust and confidence that the McDermott Defendants undertook with Saint Vincent carried with it fiduciary duties of loyalty, candor and the highest degree of good faith, honesty, fairness and fidelity to Saint Vincent in the course of their representation of Saint Vincent. As part of these duties, the McDermott Defendants had the duty to bring to Saint Vincent's attention all relevant considerations when recommending a course of conduct, to keep Saint Vincent informed as to the state of its business, to be open and frank with Saint Vincent and to not suppress the truth from Saint Vincent. In particular, the McDermott Defendants had a duty to report to the Board conduct by management or employees that violated their legal obligations to Saint Vincent.

### i.    Failure to Advise the Board of the SWLLC and Huron Inc. Transaction and Failing To Advise Saint Vincent The Ramifications Of The SWLLC/Huron Transaction

145.    Despite the clear mandate of DR 5-109, when Smith learned that Speltz and Weis were negotiating with Huron Inc. for the sale of SWLLC, Smith failed to disclose this fact from the Board at any time prior to the consummation of the sale on May 5, 2005.

146.    As lawyers for Saint Vincent, the McDermott Defendants knew that Speltz, Saint Vincent's CEO, and Weis, Saint Vincent's CFO, were acting for their own interests and not for

- 49 -

the benefit of Saint Vincent, and in a manner that violated their statutory, common law, contractual, and governance obligations to Saint Vincent.

147.    The McDermott Defendants failed to disclose this information to the Board, the higher authority that could act on behalf of Saint Vincent.

148.    In further disregard of the duties the McDermott Defendants owed Saint Vincent, Smith actively worked with Speltz and Weis to make sure that Saint Vincent extended the SWLLC Agreement prior to disclosure of the SWLLC/Huron Transaction and assisted the Speltz and Weis Parties in keeping Saint Vincent out of bankruptcy long after the McDermott Defendants knew that bankruptcy protection was necessary.

149.    On May 5, 2005, despite the knowledge that bankruptcy was imminent, and that the disinterestedness standards of the federal Bankruptcy laws and procedures would prohibit Saint Vincent from retaining both SWLLC and Huron LLC in bankruptcy, the McDermott Defendants failed to provide this information to the Board and allowed the Board to extend the SWLLC Agreement without the benefit of this knowledge.

150.    Even after the fact of the SWLLC/Huron Transaction was disclosed to the Board on May 6, 2005, the McDermott Defendants failed to advise the Board about the significant negative impact that the SWLLC/Huron Transaction would have upon Saint Vincent, particularly that it posed conflicts that would preclude Saint Vincent's ability to file for bankruptcy protection and keep its management intact once Saint Vincent was in bankruptcy.

151.    Had the McDermott Defendants timely informed the Board of the SWLLC/Huron Transaction and advised the Board of the adverse ramifications of the SWLLC/Huron Transaction, the Board could have replaced the Speltz and Weis parties and/or Huron LLC in a

timely manner and taken other appropriate steps to protect itself from the subsequent damages it suffered by heading into bankruptcy with conflicted and non-disinterested parties at its helm.

### ii. Failure to Advise the Board to File Timely For Bankruptcy Protection

152.    When the McDermott Defendants were hired in September 2004 as bankruptcy counsel for Saint Vincent, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent was in a financial crisis and that its turnaround and restructuring efforts could not be successful outside bankruptcy.    Any reasonable bankruptcy counsel would have recommended to the Board at that time that Saint Vincent should file for bankruptcy and would have guided the Board with a firm hand to that course of action.

153.    In October 2004, when the McDermott Defendants delivered to the Saint Vincent's senior management (Speltz and Weis) an analysis that showed that Saint Vincent would be out of cash by January 2005, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent was in a financial crisis and that its turnaround and restructuring efforts could not be successful outside bankruptcy.  Any reasonable bankruptcy counsel would have informed the Board at that time that management was not performing competently, would have recommended the Board that Saint Vincent should have file for bankruptcy and would have guided the Board with a firm hand to that course of action.

154.    When the McDermott Defendants learned that Saint Vincent's accounts receivable were overstated by $60 million, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent was in a financial crisis and that its turnaround and restructuring efforts could not be successful outside bankruptcy.    Had the McDermott Defendants not done so before, any reasonable bankruptcy counsel would have recommended to

the Board at that time that Saint Vincent file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

155.    In February 2005, when Smith learned of the SWLLC/Huron Transaction, he further understood the complications that such a transaction would pose to Saint Vincent in filing for bankruptcy and realized that the Speltz and Weis Parties had personal incentives to keep Saint Vincent from filing for bankruptcy protection. Had the McDermott Defendants not done so before, any reasonable bankruptcy counsel would have advised the Board that Saint Vincent's management had personal incentives to avoid bankruptcy, would have recommended to Saint Vincent at that time that it file for bankruptcy protection, and would have guided the Board with a firm hand to that course of action.

156.    In March 2005, when Huron LLC informed Smith that bankruptcy was "inevitable," it would have been clear to any reasonable bankruptcy attorney that Saint Vincent's turnaround efforts were not succeeding and that bankruptcy protection necessary to allow Saint Vincent to restructure its operations. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy attorney would have advised Saint Vincent at that time that it should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

157.    In April 2005, when the McDermott Defendants learned that the Speltz and Weis Parties and Huron Inc. had come to terms for the SWLLC/Huron Transaction, they further realized that the Speltz and Weis Parties had personal incentives to keep Saint Vincent from filing for bankruptcy protection. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy counsel would have advised the Board that its management had personal incentives to avoid bankruptcy, would have recommended to Saint Vincent and that time that it

- 52 -

should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

158.    On May 31, 2005, when the McDermott Defendants learned that Saint Vincent's working capital lender was conditioning further advances on Saint Vincent moving toward a Chapter 11 bankruptcy filing, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent had no alternative to filing for bankruptcy protection. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy counsel would have recommended to Saint Vincent at that time that it should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

159.    In May 2005, when the McDermott Defendants learned that Saint Vincent's working capital lender was not offering adequate funding for the proposed limited restructuring plan, it would have been clear to any reasonable bankruptcy attorney that Saint Vincent had no alternative to filing for bankruptcy protection. Had the McDermott Defendants not done so earlier, any reasonable bankruptcy attorney would have recommended at that time to Saint Vincent that it should file for bankruptcy protection and would have guided the Board with a firm hand to that course of action.

160.    Had the McDermott Defendants, at any of the times described in the eight preceding paragraphs, provided advice and direction to the Board that a bankruptcy filing was necessary and appropriate, and guided the Board with a firm hand to that course of action, Saint Vincent would have exercised its rights and protections under the Bankruptcy Code and filed for bankruptcy protection. In doing so, Saint Vincent would have obtained the following benefits, among others: collection efforts by all creditors would have ceased; pending malpractice actions would have been stayed; Saint Vincent would have been enabled to reject unfavorable executory

leases and contracts; Saint Vincent would have been enabled to renegotiate secured claims; Saint Vincent would have been enabled to close and sell non-profitable entities and operations more expeditiously and with less regulatory roadblocks; accrual of interest on unsecured claims would have ceased; and Saint Vincent would have been afforded a "time out" allowing it to restructure its organization in an orderly and undisrupted fashion.

161.    Because of the delay in filing for bankruptcy protection, Saint Vincent experienced continuing operating losses for an extended period of time and the Speltz and Weis Parties sold and encumbered Saint Vincent assets in order to continue funding losses and paying consulting fees. Saint Vincent would have avoided these losses and fees, and it would not have sold or encumbered these properties had the McDermott Defendants timely advised the Board that Saint Vincent should file for bankruptcy and guided the Board with a firm hand to that course of action.

### iii. Failure To Plan Adequately For A Bankruptcy Filing

162.    Once Saint Vincent finally filed for bankruptcy, it did so in a rushed and haphazard fashion. The pleadings delivered to the U.S. Trustee shortly prior to the bankruptcy filing, in accordance with local practice, were very preliminary, incomplete and full of blanks for information to be filled in.

163.    In addition, despite the fact that Saint Vincent had employed professionals, including the McDermott Defendants, more than eight months earlier to prepare for bankruptcy, the McDermott Defendants failed to assist Saint Vincent in the preparation of a business plan or proposal for how Saint Vincent would operate in bankruptcy or emerge from bankruptcy. The McDermott Defendants failed to adhere to standards of care in allowing Saint Vincent to file for bankruptcy without any such plan or proposal.

- 54 -

164.    Any reasonable bankruptcy attorney, who had been working for months at Saint Vincent, would have made sure that Saint Vincent was properly prepared for a bankruptcy filing, would have seen to it that bankruptcy pleadings properly were prepared and would have had in place a proper plan on how to operate in bankruptcy.

165.    Because of the McDermott Defendants' failure reasonably and adequately to plan for bankruptcy, Saint Vincent's bankruptcy process was longer and more costly than it otherwise should have been. Had the McDermott Defendants reasonably and adequately planned for Saint Vincent's bankruptcy, Saint Vincent would not have had to wait until October 2005 for competent management, such as Alvarez and Marsal, to take control of the entity; Saint Vincent would not have incurred extra transitional and bankruptcy costs; and Saint Vincent would not have suffered three additional months of losses during the transition.

#### iv. Mishandling The St. Mary's Hospital Closure

166.    As the attorneys hired to effectuate the disposition of St. Mary's Hospital, the McDermott Defendants breached their duty of care to the Board when they continually failed to advise the Board that Kingsbrook, the only potential purchaser for St. Mary's, required $20 million in financing for which it did not have a source, and that Saint Vincent could not reasonably expect that St. Mary's could be sold to that potential purchaser.

167.    Despite the fact that St. Mary's was losing $71,000 to $100,000 a day, the McDermott Defendants unreasonably allowed the doomed discussions with Kingsbrook to drag on until April 2005, at which point Kingsbrook terminated the discussions.

168.    Once the Board voted to close St. Mary's, on June 1, 2005, the McDermott Defendants did not timely initiate closure proceedings. Upon the filing of bankruptcy case, though they were aware of the importance of the St. Mary's issue, the McDermott Defendants

failed to seek Bankruptcy Court approval of the closure of St. Mary's in their initial bankruptcy filings. Such a Motion was not filed until August 18, 2005, more than five weeks after the initial bankruptcy filing. When the Motion was finally filed, moreover, it was incomplete and unaccompanied by necessary supporting affidavits or financial analysis to document the economic exigency requiring prompt closure, causing further delay and losses.

169.    As a result of the failure of the McDermott Defendants to exercise reasonable professional care, in connection with the St. Mary's closure, St. Mary's was not closed until October 4, 2005, long after it should reasonably have been closed.

170.    Because of the McDermott Defendants' failure to exercise reasonable professional care in preparing and filing the Motion to close St. Mary's Hospital, the Bankruptcy Court did not approve the closure until September 20, 2005, and St. Mary's Hospital was not closed until October 4, 2005, long after it should have been, and after subsequent bankruptcy counsel had been hired, causing losses to Saint Vincent between $71,000 to $100,000 per day for each day that Saint Mary's stayed open unnecessarily. This delay alone cost Saint Vincent an additional $2.4 million to $3.4 million in losses.

### v. Persistent Efforts To Seek Approval Of The Dual Retention

171.    The McDermott Defendants persisted in their efforts to seek Bankruptcy Court approval of the dual retention of Speltz and Weis Parties and Huron Parties, when any reasonable bankruptcy attorney would have advised the Board prior to the filing of the bankruptcy that such retention could not be achieved.

172.    Once bankruptcy was filed, any reasonable bankruptcy attorney would have further advised the Board that efforts to seek approval of dual retention would be costly,

- 56 -

unsuccessful, would alienate other bankruptcy constituents, such as the U.S. Trustee and Creditors Committee and would cause distraction and delay to the entire bankruptcy process.

173.    The McDermott Defendants, however, failed to give such advice and, instead, persistently sought approval by the Bankruptcy Court of both SWLLC and Huron LLC to the detriment, damage and injury of Saint Vincent.

174.    Because of the McDermott Defendants' persistent efforts to have both SWLLC and Huron LLC retained in bankruptcy and their other antagonistic behavior, Saint Vincent's bankruptcy process was longer and more costly than it otherwise should have been. Had the McDermott Defendants refrained from this unreasonable conduct, Saint Vincent would not have had to wait until October 2005 for competent management, such as Alvarez and Marsal, to take control of the entity. Moreover, Saint Vincent would not have incurred extra transitional and bankruptcy costs, and it would not have suffered three additional months of losses during the transition.

### vi. The Inadequate Disclosures To The Bankruptcy Court

175.    In conjunction with the McDermott Defendants' improper, persistent and unreasonable efforts to seek Bankruptcy Court approval of both the Speltz and Weis Parties and the Huron Parties, the Motions the McDermott Defendants filed on July 5, 2005, seeking approval of the SWLLC Agreement and retention of Huron LLC, were inadequate, and failed to contain complete or appropriate disclosures concerning the terms of the SWLLC/ Huron Inc. Transaction and the Speltz and Weis conflicts and fiduciary breaches. Smith had assigned the primary responsibility for the Retention Motions to Cleary, and Cleary had overseen the preparation of the Motions under the direction of Smith and Selbst.

176.    Because of the McDermott Defendants' inadequate disclosures to the Bankruptcy Court, Saint Vincent's bankruptcy process was longer and more costly than it otherwise should have been. Had the McDermott Defendants refrained from this deceptive conduct, Saint Vincent would not have had to wait until October 2005 for competent management, such as Alvarez and Marsal, to take control of the entity. Moreover, Saint Vincent would not have incurred extra transitional and bankruptcy costs, and it would not have suffered three additional months of losses during the transition.

### The Participation of the Individual McDermott Defendants

177.    Pursuant to their pattern and practice, Smith, Selbst and Cleary worked closely together in coordinating their efforts and in managing and leading the other McDermott attorneys who were performing the Saint Vincent engagement. In order to coordinate their efforts, Smith, Selbst, and Cleary each kept the others fully informed as to all facts relevant to their work. Among other things, they spoke to each other constantly and kept up a steady and voluminous e-mail correspondence among themselves.

178.    In accordance with this established pattern and practice, when Smith learned from Speltz that the Speltz and Weis Parties were engaged in secret negotiations to sell SWLLC to Huron Inc., Smith promptly informed Selbst and Cleary. It was necessary for Smith to share this information with Selbst and Cleary because Smith needed, sought and obtained their help in searching for a method to circumvent the disinterestedness requirements of the Bankruptcy Code and the conflict of interest requirements of the Jay Alix protocol. It was also necessary for Smith to assure that Selbst and Cleary would assist in keeping the information secret from Saint Vincent, and would not inadvertently disclose the information, because Selbst and Cleary both communicated with Saint Vincent, and Selbst, in particular, attended Board meetings.

179.    Beginning in or about February 2005, when Smith first shared with Selbst and Cleary his knowledge of the secret negotiations for the sale of SWLLC, the McDermott Defendants conspired, confederated, combined and agreed with one another, and with the Speltz and Weis Parties and the Huron Parties, to defraud Saint Vincent and to breach the fiduciary duties owed to Saint Vincent by the McDermott Defendants, Speltz and Weis. Pursuant to this common design and purpose, each of the McDermott Defendants performed overt acts as described herein and committed the torts averred hereinafter in the First, Third, Fourth, Fifth and Sixth Causes of Action.

### Injuries, Damages, and Losses

180.    The McDermott Defendants' conduct, as alleged herein, directly and proximately caused Saint Vincent to suffer substantial injuries, losses, and damages. Had the McDermott Defendants acted timely, appropriately and had they reasonably advised the Board to file for timely bankruptcy protection, and guided Saint Vincent's hand to the most beneficial course of action, Saint Vincent, among other things, would have emerged from bankruptcy much sooner and with a substantially greater enterprise value. Saint Vincent would not have suffered prolonged operating losses; its net worth would not have been eroded by sales and encumbrances of assets to provide cash to fund the losses; its assets would not have been diminished while its liabilities were increased; and it would not have incurred fees for consulting and management services that were largely useless, and, in any event, had to be repeated (at further cost) by the Speltz and Weis Parties' successors. Saint Vincent was also damaged by the effects of a needlessly extended financial crisis that adversely affected its ability to attract patients, physicians and staff; delayed expenditures necessary for the delivery of improved and

competitive services; and diverted the time and attention that would otherwise have been devoted to Saint Vincent's future.

181.    In addition, the McDermott Defendants committed breaches of fiduciary duties that invoke well-established jurisprudential principles requiring the forfeiture and disgorgement of fees and the imposition of punitive damages. The McDermott Defendants' tortious actions, involving intentional breaches of fiduciary duty and fraud, all to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

### FIRST CAUSE OF ACTION

#### Breach of Fiduciary Duty

182.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

183.    Between December 2003 and September 2005, the McDermott Defendants were Saint Vincent's attorneys with respect to the turnaround of Saint Vincent, disposals of hospitals and preparing, planning and filing for bankruptcy.

184.    As attorneys for Saint Vincent, the McDermott Defendants were engaged to act for and give advice and guidance for the benefit of Saint Vincent with respect to the turnaround, disposals of hospitals and preparing, planning and filing for bankruptcy.

185.    Saint Vincent reposed trust and confidence in the McDermott Defendants.

186.    The McDermott Defendants were fiduciaries to Saint Vincent.

187.    As fiduciaries, the McDermott Defendants were obligated to exercise the highest degree of good faith, honesty, integrity, fairness, and fidelity. Within these duties are duties of

frankness and candor in bringing to their client's attention all relevant considerations when recommending a course of conduct, in keeping their client informed as to the state of its businesses, and in not suppressing the truth from their client. Among these duties is the duty in situations where management or employees are engaged in conduct that violates their legal obligations to the organization, to inform the higher authority within the organization of such conduct.

188.    The McDermott Defendants failed to act in good faith or in the best interests of Saint Vincent and committed breaches of their fiduciary duties to Saint Vincent in matters related to their position as attorneys with Saint Vincent by, among other things: concealing from the Saint Vincent Board the potential Huron Inc. acquisition of SWLLC beginning in or about February 2005; continuing this concealment through May 6, 2005, when the transaction was finally disclosed to Saint Vincent; concealing from Saint Vincent the earnout terms of the SWLLC/Huron Inc. Transaction; concealing the conflicts of interest created thereby; actively asserting the Speltz and Weis Parties in effectuating the SWLLC/Huron Inc. Transaction by, among other things, telephoning Huron's General Counsel and falsely claiming to be conveying a message from Saint Vincent's Chairman; and in concealing the necessity of a prompt bankruptcy filing from the Board for the purpose of benefiting the Speltz and Weis Parties and the Huron Parties.

189.    The facts and advice concealed from the Saint Vincent Board were material to the Board's course of conduct.

190.    Saint Vincent would not have suffered injury but for the McDermott Defendants' breach of their fiduciary duty to Saint Vincent.

- 61 -

191.    The McDermott Defendant's breach of fiduciary duties was a substantial factor in causing Saint Vincent to sustain damages.

192.    As a direct and proximate result of the McDermott Defendants' breaches of fiduciary duties, Saint Vincent has suffered actual damages.

193.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## SECOND CAUSE OF ACTION

### Negligence -- Malpractice

194.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

195.    The McDermott Defendants were Saint Vincent's attorneys between December 2003 and September 2005, with respect to the turnaround of Saint Vincent, disposals of hospitals and preparing, planning and filing for bankruptcy.

196.    As attorneys, the McDermott Defendants are professionals under New York law.

197.    As professionals retained by Saint Vincent, the McDermott Defendants owed a duty of care to SVCMC to act with the care generally expected of such professionals adhering to generally accepted standards applicable to such professionals.

198.    The McDermott Defendants held themselves out as professionals who possess special skills and experience in providing expert legal advice to hospitals and other healthcare facilities with respect to restructuring their businesses and planning, preparing and filing for Chapter 11 bankruptcy protection and reorganization.

199.    The McDermott Defendants committed breaches of their duty of care to Saint Vincent.

200.    The McDermott Defendants' breaches of their duty of care to Saint Vincent included (1) repeatedly failing to advise Saint Vincent to file for bankruptcy protection, and repeatedly failing to guide Saint Vincent with a firm hand to seek bankruptcy protection prior to July 5, 2005; (2) failing to adequately plan for a bankruptcy filing; (3) mishandling the St. Mary's hospital closure by delaying seeking Bankruptcy Court approval and then filing and preparing a legally insufficient motion and failing to adequately address the objections made to the motion; (4) failing to advise the Board at the earliest point possible that the SWLLC and Huron Inc. transaction prohibited the retention of Speltz and Weis in a bankruptcy proceeding; (5) persisting in efforts to seek approval of the dual retention of SWLLC and Huron in the bankruptcy case in spite of the clear prohibition against such retention, the firm opposition of the United States Trustee and the Unsecured Creditors' Committee, and pursing those efforts in a manner that caused harm to Saint Vincent by alienating these entities; (6) failing to make adequate disclosures in connection with the Motions seeking to employ SWLLC and Huron; and (7) failing to maintain adequate supervision of Huron LLC, the financial advisers engaged by McDermott in connection with the preparation of Saint Vincent's bankruptcy filing.

201.    Saint Vincent would not have suffered injury but for the McDermott Defendants' breaches of their duty of their duty of care to Saint Vincent.

202.    The McDermott Defendants' breaches of their duty of care were a substantial factor in causing Saint Vincent to sustain damages.

203.    Saint Vincent suffered actual injuries as a direct and proximate result of the McDermott Defendants' breaches of their duty to Saint Vincent.

### THIRD CAUSE OF ACTION

#### Aiding and abetting the Speltz and Weis Parties' breaches of fiduciary duty.

204.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

205.    The Speltz and Weis Parties were fiduciaries to Saint Vincent, in whom Saint Vincent reposed trust and confidence as professionals retained by Saint Vincent for the purpose of providing high level management and turnaround advisory services to Saint Vincent. The Speltz and Weis Parties assumed day-to-day control and responsibility over Saint Vincent and the Saint Vincent Board expected that they would act for the benefit of Saint Vincent. As a result of this relationship of trust and confidence, the Speltz and Weis Parties owed fiduciary duties, independent of their contractual duties, of, among other things, good faith, candor, loyalty, obedience, and care to the non-profit institution they were serving.

206.    Speltz and Weis owed additional, separate fiduciary duties, independent of their contractual duties, of care, loyalty, obedience, and good faith by virtue of their positions as CEO and CFO, respectively.

207.    As fiduciaries of Saint Vincent in their various capacities, the Speltz and Weis Parties were required at all times to act in Saint Vincent's best interests, with undivided allegiance and utmost fidelity, and were prohibited from placing their own interests over those of Saint Vincent.

208.    The Speltz and Weis Parties knowingly committed breaches of their fiduciary duties when they acted without care and in bad faith, betrayed Saint Vincent's trust, and were disloyal and disobedient by engaging in the conduct described herein, including, but not limited to, engaging in dishonest and self-dealing transactions that elevated their personal pecuniary

interests over the best interests of Saint Vincent, failing to avoid other circumstances that put them in conflict of interest with Saint Vincent, deliberately misrepresenting and concealing material information from the Board for personal gain of the Speltz and Weis Parties and others, and failing to restructure timely and file for protection under the Bankruptcy Code in order to churn fees and protect their secret sale plans with the Huron Defendants.

209.    The Board reasonably relied upon the Speltz and Weis Parties' advice, guidance and recommendations and that such advice, guidance and recommendations would be provided without influence by personal interests of the Speltz and Weis Parties. The Speltz and Weis Parties, however, betrayed the trust and abused the confidence of Saint Vincent and its Board by all of their conduct herein alleged.

210.    The McDermott Defendants were aware of Speltz, Weis and SWLLC's breaches of fiduciary duties.

211.    The McDermott Defendants knowingly and substantially assisted the Speltz and Weis Parties in their breaches of their fiduciary duties by concealing the Speltz and Weis Parties' conduct from the Board. By assisting the Speltz and Weis Parties in concealing from the Board the negotiations between the Speltz and Weis Parties on one hand and the Huron Inc. on the other hand, the McDermott Defendants disabled the Board from taking action to protect Saint Vincent's interests in light of the irreconcilable and damaging conflicts created by the Huron Inc. acquisition of Speltz and Weis' interests in SWLLC. The McDermott Defendants further aided the Speltz and Weis Parties' breaches by encouraging the combination of SWLLC and Huron Inc. in February 2005, by advising Speltz and Weis in April 2005 regarding potential conflicts of interest and the Jay Alix Protocol, by providing assurances to Huron Inc. that they falsely

attributed to the Chairman of the Saint Vincent Board; and by informing Huron Inc. prior to May 5, 2005 that the SWLLC engagement would be extended by Saint Vincent.

212.   As a direct result of the McDermott Defendants' aiding and abetting the Speltz and Weis Parties' breach of fiduciary duty, and of the Speltz and Weis breaches of fiduciary duty that were thereby aided and abetted, Saint Vincent suffered damages.

213.   Saint Vincent would not have suffered injury but for the acts of the McDermott Defendants in aiding and abetting the Speltz and Weis Parties in their breaches of fiduciary duty and for the Speltz and Weis breaches of fiduciary duty that were thereby aided.

214.   The acts of the McDermott Defendants that aided and abetted the Speltz and Weis Defendants in the breaches of their fiduciary duty, and the Speltz and Weis breaches of fiduciary duty that were thereby aided and abetted,, were a substantial factor in causing Saint Vincent to sustain damages.

215.   Saint Vincent suffered actual injuries as a direct and proximate result of the McDermott Defendants' aiding and abetting the Speltz & Weis Parties in their breaches of fiduciary duty.

216.   The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## FOURTH CAUSE OF ACTION

### Aiding and abetting fraud by Speltz, Weis, SWLLC, Huron LLC, and Huron Inc.

217.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

218.    As alleged above, the Speltz and Weis Parties knowingly made misrepresentations of material facts to Saint Vincents, both by false affirmative statements and by deliberate omissions and concealments, all of which the Speltz and Weis Parties knew were false and nonetheless made or concealed with the intent to deceive and induce the Board to take actions and to forbear from taking actions based upon such misrepresentations. The Speltz and Weis Parties knew that their misrepresentations of material facts were false when made. The Speltz and Weis Parties were under duties to disclose the information that they concealed and failed to disclose because they had fiduciary duties to disclose to Saint Vincent all material facts that would enable the Board to make reasoned and informed decisions, because they had superior knowledge of the facts that were not readily available to Saint Vincent, and because they made partial statements of fact that were false, deceptive and misleading without the facts that the Speltz and Weis Parties failed to disclose.

219.    Speltz and Weis attended monthly Board meetings and Saint Vincent committee meetings. These meetings took place, in relevant part, from December 2004 to May 2005. At each of the aforesaid meetings, Speltz and Weis had the opportunity to advise the Saint Vincent Board of their plan with Huron Inc. to sell SWLLC to Huron Inc., but chose to remain silent, thereby concealing their arrangements and the related conflicts of interest, and deluding the Board into thinking that the actions being recommended by the Speltz and Weis Parties were intended for the benefit of Saint Vincent when in fact they were intended to enhance, and did in fact enhance, the Speltz and Weis Parties' undisclosed selfish interests to sell SWLLC to Huron Inc.

220.    The Speltz and Weis Parties intended to defraud Saint Vincent by their materially false misrepresentations, omissions and concealments in order to enrich themselves at Saint

- 67 -

Vincent's expense. Speltz and Weis knew that, had the Board been advised as to the nature of the Speltz and Weis Parties' negotiations with Huron Inc. when those negotiations commenced in the fall of 2004, the Board would likely have terminated the SWLLC Agreement, not extended the initial SWLLC Agreement, and/or taken measures to prevent Speltz and Weis from using the SWLLC Agreement as an inducement for a sale of SWLLC to Huron Inc. by churning fees charged to Saint Vincent.

221.    The statements of Speltz and Weis were false, and the Speltz and Weis Parties knew they were false when they were made.

222.    The Board reasonably and justifiably relied on the Speltz and Weis Parties' representations and concealment of material facts.

223.    As a direct, substantial and proximate result of Saint Vincent's reasonable and justifiable reliance on the Speltz and Weis Parties' representations and omissions of material facts, Saint Vincent suffered damages.

224.    The Speltz and Weis Parties and the Huron Parties intended to defraud Saint Vincent by their materially false misrepresentations. SWLLC, encouraged by the Huron Parties, deliberately failed to disclose to the Board and concealed that Huron Inc. was negotiating the purchase of SWLLC.

225.    From January 2005 until May 6, 2005, the Speltz and Weis Parties intentionally failed to disclose and fraudulently concealed from Saint Vincent their negotiations with Huron Inc.

226.    Speltz and Weis Parties, encouraged by the Huron Parties, deliberately failed to disclose to the Board and concealed the fact that the proposed acquisition of SWLLC by the Huron Inc. was tied to SWLLC profits from its engagement with Saint Vincent and that as a

consequence, SWLLC, Speltz and Weis had a significant stake in charging excessive fees from Saint Vincent.

227.    As officers of Saint Vincent, Speltz and Weis were fiduciaries and had a duty to disclose the existence of the negotiations with Huron and all material matters related thereto.

228.    Saint Vincent reasonably and justifiably relied on Huron LLC's, Speltz's, Weis's and SWLLC's representations and omissions.

229.    As a result of Saint Vincent's reliance on the Huron LLC's, and Speltz and Weis Parties' representations and omissions, Saint Vincent suffered direct and proximate damages.

230.    As alleged above, the McDermott Defendants were aware of the Speltz and Weis Parties' fraud, materially false representations, omissions, and concealments, particularly the secret negotiations to sell SWLLC to Huron Inc.  McDermott was aware by no later than February 2005 that SWLLC, Speltz and Weis were negotiating the sale of SWLLC to Huron Inc.

231.    The McDermott Defendants, who knew that Speltz and Weis had made misrepresentation of material fact to the Board, and who knew that Speltz and Weis had failed to disclose and had concealed material facts from the Board, as alleged above, knowingly provided substantial assistance to the Speltz and Weis Parties and the Huron Parties by concealing the acquisition negotiations from the Board when they were aware that the Speltz and Weis Parties owed Saint Vincent fiduciary duties and were obligated to disclose the transaction.  McDermott Defendants further aided Speltz and Weis Parties' fraud by encouraging the combination of SWLLC and Huron Inc. in February 2005, by advising Speltz and Weis in April 2005 regarding potential conflicts of interest and the Jay Alix Protocol, and by informing Huron Inc. prior to May 5, 2005, that the SWLLC engagement would be extended by Saint Vincent.

232.    As a direct result of the McDermott Defendants' aiding and abetting the Speltz and Weis fraudulent misrepresentations, non-disclosures and concealments by Speltz and Weis, SWLLC, Huron LLC and Huron Inc., and of the fraudulent misrepresentations, non-disclosure and concealments that were thereby aided and abetted, Saint Vincent suffered damages.

233.    Saint Vincent would not have suffered injury but for the acts of the McDermott Defendants in aiding and abetting Speltz, Weis, SWLLC, Huron LLC and Huron Inc., and for the acts of Speltz, Weis, SWLLC, Huron LLC and Huron Inc. in making the fraudulent misrepresentations, non-disclosures and concealments that were thereby aided and abetted.

234.    The acts of the McDermott Defendants that aided and abetted the misrepresentations, non-disclosures and concealments by Speltz, Weis, SWLLC, Huron LLC and Huron Inc., and the misrepresentations, non-disclosures and concealments that were thereby aided and abetted, were a substantial factor in causing Saint Vincent to sustain damages.

235.    As a direct and proximate result of the fraud perpetrated on Saint Vincent by the Speltz and Weis Parties and the Huron Parties, and as a direct and proximate result of the McDermott Defendants' active and substantial assistance in that fraud, Saint Vincent suffered actual damages.

236.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

## FIFTH CAUSE OF ACTION

### Breach of New York Judiciary Law § 487 Misconduct by Attorneys.

237.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181, 204-212, 217-231, as if fully set forth herein.

238.    The McDermott Defendants colluded with the Speltz and Weis Parties and the Huron Parties and deceived Saint Vincent with respect to Huron Inc.'s negotiations for, and acquisition of, SWLLC.

239.    The McDermott Defendants deceived the Bankruptcy Court and the U.S. Trustee by intentionally concealing the material facts relating to the Huron Inc. acquisition of SWLLC, including, but not limited to, the terms of the Acquisition Agreement (such as the earn-out provisions), in McDermott's Motions to retain Huron LLC and SWLLC.

240.    The McDermott Defendants, the Speltz and Weis Parties and the Huron Parties acted with the intent to deceive Saint Vincent, the Bankruptcy Court, and the U.S. Trustee.

241.    The McDermott Defendants acted with a chronic extreme pattern of legal delinquency.

242.    Saint Vincent would not have suffered injury but for the McDermott Defendants' breach of Judiciary Law § 487 as alleged herein.

243.    The McDermott Defendants' breach of Judiciary Law § 487 as alleged herein was a substantial factor in causing Saint Vincent to sustain damages.

244.    As a direct and proximate result of the McDermott Defendants' breach of Judiciary Law § 487, as alleged herein, Saint Vincent was damaged.

245.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper

- 71 -

and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

246.   Pursuant to N.Y. Judiciary Law § 487, Saint Vincent is entitled to recover treble damages for the violation of § 487.

### SIXTH CAUSE OF ACTION

#### Fraudulent Concealment

247.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-181 as if fully set forth herein.

248.   Speltz's and Weis's negotiations to sell SWLLC to Huron Inc. and Huron Inc.'s interest in purchasing SWLLC were facts material to the Board because, among other things, they raised conflicts of interest between Saint Vincent and SWLLC.

249.   The McDermott Defendants were aware in February 2005 that Speltz and Weis were engaged in secret negotiations with potential purchasers, including Huron Inc. to sell SWLLC.

250.   The McDermott Defendants also knew in or prior to April 2005 that the Speltz and Weis Parties and the Huron Parties had agreed that Huron Inc. would purchase SWLLC.

251.   The McDermott Defendants had a duty as counsel to Saint Vincent with respect to the turnaround efforts, debt restructuring plans, and bankruptcy preparation, to disclose to the Board that Huron Inc., that Speltz and Weis were in negotiations to sell SWLLC to Huron Inc. and, subsequently, that the Speltz and Weis Parties and the Huron Parties had agreed to terms under which Huron Inc. would purchase SWLLC.

252.   At all times prior to May 6, 2005, the McDermott Defendants failed to disclose to Saint Vincent, and concealed from Saint Vincent, that Speltz and Weis were negotiating the sale

- 72 -

of SWLLC to Huron Inc. and subsequently, that the Huron Parties had agreed to terms under which Huron Inc. would purchase SWLLC.

253.    The McDermott Defendants intentionally concealed from Saint Vincent the fact that Speltz and Weis were negotiating the sale of SWLLC to Huron Inc. and, subsequently, that the Speltz and Weis Parties and the Huron Parties had agreed to terms under which Huron Inc. would purchase SWLLC.

254.    The Board reasonably and justifiably relied on the McDermott Defendants as Saint Vincent's counsel to provide material information regarding Huron Inc.'s interest to purchase SWLLC, the potential Huron Inc. acquisition of SWLLC and that the parties had had agreed to terms under which Huron Inc. would purchase SWLLC.

255.    Saint Vincent was damaged by the McDermott Defendant's fraudulent concealment of the fact that Huron Inc. had expressed an interest to purchase SWLLC and the negotiations between Speltz and Weis and Huron Inc. to acquire SWLLC.

256.    Saint Vincent would not have suffered injury but for the McDermott Defendants' fraudulent concealment as alleged herein.

257.    The McDermott Defendants' fraudulent concealment, as alleged herein, was a substantial factor in causing Saint Vincent to sustain damages.

258.    As a direct and proximate result of the McDermott Defendants' fraudulent concealment, as alleged herein, Saint Vincent has suffered actual damages.

259.    The actions of the McDermott Defendants were accomplished to the detriment of a venerable New York charitable institution, were undertaken and performed with an improper and evil motive, and with malice, wantonness, and dishonesty; they were morally reprehensible; and they entailed outrageous public wrongs.

- 73 -

**WHEREFORE,** Plaintiff requests this judgment be entered against the McDermott Defendants, jointly and severally as follows:

(i)    On the First Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive damages in an amount not less than treble the compensatory damages as determined at trial, jointly and severally, and requiring the disgorgement of all fees paid to McDermott in an amount not less than $4.5 million.

(ii)    On the Second Cause of Action, awarding damages against two McDermott Defendants in an amount not less than $200 million to be determined at trial, jointly and severally.

(iii)    On the Third Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive damages in an amount not less than treble the compensatory damages as determined at trial, jointly and severally.

(iv)    On the Fourth Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive damages in an amount not less than treble the compensatory damages as determined at trial, jointly and severally.

(v)    On the Fifth Cause of Action, awarding damages in an amount not less than $200 million, and trebled as provided by Judiciary Law § 487, jointly and severally.

(vi)    On the Sixth Cause of Action, awarding damages against the McDermott Defendants in an amount not less than $200 million to be determined at trial, plus punitive

damages in an amount not less than treble the compensatory damages as determined at trial,

jointly and severally.

Dated: New York, New York
April 14, 2008

Alfredo F. Mendez, Esquire
Bruce A. Blakeman, Esquire
Sarah C. Lichtenstein, Esquire
Abrams Fensterman Fensterman Eisman Greenberg
  Formato & Einiger, LLP
630 Third Avenue
New York, New York 10017
212-279-9200

*Counsel for the Plaintiff*

William F. Ryan, Jr., Esquire
Paul M. Nussbaum, Esquire
Kevin G. Hroblak, Esquire
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
410-347-8700

and

Arnold M. Weiner, Esquire
Barry L. Gogel, Esquire
Law Offices of Arnold M. Weiner
2002 Clipper Park Road, Unit #108
Baltimore, Maryland 21211
410-769-8080

*Of Counsel*

1779722

- 75 -

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GRAY & ASSOCIATES, LLC in its capacity as Trustee
on behalf of the SVCMC Litigation Trust,

                                        Plaintiff,         Index No.:

              -against-

MCDERMOTT WILL & EMERY, LLP, WILLIAM P.
SMITH, STEPHEN B. SELBST and DAVID D. CLEARY,

                                        Defendant.

---

## COMPLAINT

---

Abrams, Fensterman, Fensterman, Eisman,
Greenberg, Formato & Einiger LLP
*Attorneys for Defendant*
630 Third Avenue – 5th Floor
NEW YORK, NEW YORK 10017
Telephone: (212) 279-9200
Telefax:    (212) 279-0600


Signature (Rule 130-1.1-a)

ALFREDO F. MENDEZ

Service of a copy of the within                      is
hereby admitted on the        day of          2007


    Attorneys for

**PLEASE TAKE NOTICE:**
**NOTICE OF ENTRY:**  The within is a true copy of a                    entered in the office of the Clerk
of the within named Court on
**NOTICE OF SETTLEMENT:** The within, which is a true copy of an Order/Judgment will be presented
                          for settlement to the HON.                        one of the
                          Judges of the within named Court on the      day of        2007  at
                          9:30 A.M.


DATED: