UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GRAY & ASSOCIATES, LLC, in its capacity as Trustee,
on behalf of the SVCMC LITIGATION TRUST,

Plaintiff,

v.

MCDERMOTT WILL & EMERY LLP, WILLIAM P.
SMITH, STEPHEN B. SELBST, and DAVID D.
CLEARY,

Defendants.

08 CV 4401 (AKH)

ECF Case

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

_____

**William F. Ryan, Jr., Esq.**
**Paul M. Nussbaum, Esq.**
**Kevin G. Hroblak, Esq.**
**Whiteford, Taylor & Preston L.L.P.**
**Seven Saint Paul Street**
**Baltimore, Maryland 21202**
**410-347-8700**

**Alfredo F. Mendez, Esquire**
**Bruce A. Blakeman, Esquire**
**Sarah Lichtenstein, Esquire**
**Abrams Fensterman Fensterman Eisman**
    **Greenberg  Formato & Einiger, LLP**
**630 Third Avenue**
**New York, New York 10017**
**212-279-9200**

**Arnold M. Weiner, Esq.**
**Barry L. Gogel, Esq.**
**Law Offices of Arnold M. Weiner**
**2002 Clipper Park Road, Unit #108**
**Baltimore, Maryland 21211**
**410-769-8080**

**Attorneys for Plaintiff**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION AND OVERVIEW ......................................................................1

FACTUAL ALLEGATIONS ......................................................................................5

    A.    McDermott's Pre-Petition Representation of Saint Vincent, Beginning With Its Participation In Saint Vincent's Retention of the Speltz & Weis Parties ..............................................................5

    B.    McDermott's Engagement to Lead Disposition of Non-Performing Liabilities, Its Subsequent Undertaking to Prepare for Chapter 11 And Its Related Recommendation of Huron ...........................6

    C.    McDermott's Decision to Breach Its Trust With Saint Vincent, Place Its Allegiance Elsewhere And Commit Related Malpractice ........................................................................................8

    D.    McDermott's Failure to Discharge Its Professional Obligations Following The Belated Bankruptcy Filing .................................13

PROCEDURAL HISTORY ......................................................................................15

    A.    McDermott's Services As Counsel For The Debtors In The Saint Vincent Bankruptcy Case ..........................................................15

    B.    McDermott's Fee Application ...........................................................17

    C.    The Final Orders Of The Bankruptcy Court Confirming Saint Vincent's Reorganization Plan, Creating The Litigation Trust, Transferring The Litigation Claims To The Litigation Trust And Preserving The Litigation Claims .............................................20

    D.    The Bankruptcy Court's Decision On The McDermott Fee Application, Denying Fees For Certain Services Improperly And Deficiently Performed During The Bankruptcy Case And Preserving The Litigation Trustee's Causes Of Action For Consequential Damages Resulting Therefrom .........................................................23

    E.    The Present Action ...........................................................................26

ARGUMENT .............................................................................................................27

i

I.    The Order Entered by the Bankruptcy Court on July 27, 2007, Confirming the Plan of Reorganization, and Preserving Causes of Action Against the McDermott Defendants, to be Brought Later by the Litigation Trustee, Was a Final Order Entitled to *Res Judicata*, and the McDermott Defendants' Motion to Dismiss the Complaint in the Present Case is an Impermissible Collateral Attack Upon that Final Order ......................................................... 27

    A.    The Confirmed Saint Vincent Reorganization Plan, with its Creation of the Litigation Trust, and its Preservation of the Causes of Action Against the McDermott Defendants for Later Prosecution by the Litigation Trustee, is Fully in Accord with the Purposes Served by Such Bankruptcy Reorganization Plans ............................ 28

    B.    The Creation of the Litigation Trust, and the Preservation of the Causes of Action Against the McDermott Defendants for Later Prosecution by the Litigation Trustee, are Explicit and Essential Parts of the Reorganization Plan and the Confirmation Order ........................ 29

    C.    Settled Law Precludes the McDermott Defendants' From Collaterally Attacking the Confirmed Plan's Reservation and Preservation of the Causes of Action Against the McDermott Defendants ......................................................... 33

II.    The Fee Application Order Expressly Preserves the Causes of Action Against the McDermott Defendants for Consequential Damages Resulting From Their Improper and Deficient Performance as Counsel for the Debtors in the Saint Vincent Bankruptcy Proceedings ...................................................................... 35

III.    The McDermott Defendants' Motion is Based Upon Wholly Inapposite Authorities that Do Not Concern Confirmed Reorganization Plans or Other Orders that Specifically Reserve or Preserve Causes of Action ................................................................ 38

CONCLUSION ................................................................................................................ 44

## **TABLE OF AUTHORITIES**

**Page**

**Cases:**

*Amarex, Inc. v. Marathon Oil Co., et al. (In re Amarex, Inc.)*,
74 B.R. 378 (Bankr. W.D. Okla. 1987) ........................................................... 30

*Apparel Art Intern, Inc. v. Amertex Enter. Ltd.*,
48 F.3d 576 (1st Cir. 1995) ........................................................................... 35

*Bonwit Teller, Inc. v. Jewelmasters Inc. (In re Hooker Investments, Inc.)*,
162 B.R. 426 (Bankr. S.D.N.Y. 1993) ...................................................... 29, 39

*Celli v. Fist Nat'l Bank (In re Layo)*,
460 F.3d 289 (2d Cir. 2006) .................................................................... 33-34

*Corbett v. MacDonald Moving Services, Inc.*,
124 F.3d 82 (2d Cir. 1997) .............................................................................. 28

*Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc.*
*(In re Croton River Club, Inc.)*, 52 F.3d 41 (2d Cir. 1995) ............................... 38

*D.A. Elia Construction Corp. v. Damon & Morey, LLP (In re D.A. Elia*
*Construction Corp.)*, No. 07-CV-143A, --- F. Supp. 2d ---,
2008 WL 907366 (W.D.N.Y. March 31, 2008) ......................................... 42-43

*D&K Properties v. Mutual Life Ins. Co.*,
112 F.3d 257 (7th Cir. 1997) ................................................................... 30, 35

*Doral Center, Inc. v. Ionosphere Clubs, Inc., et al. (In re Ionosphere Clubs, Inc.)*,
208 B.R. 812 (S.D.N.Y. 1997) ......................................................................... 32

*Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp., et al. (In re Ionosphere*
*Clubs, Inc.)*, 262 B.R. 604 (Bankr. S.D.N.Y. 2001) ................................. 28-29, 35

*Goodman Bros. Steel Drum Co., Inc. v. Liberty Mutual Ins. Co. (In re Goodman Bros.*
*Steel Drum Co., Inc.)*, 247 B.R. 604 (Bankr. E.D.N.Y. 2000) .......................... 29

*Grausz v. Englander*,
321 F.3d 467 (4th Cir. 2003) ................................................................... 41, 42

*Iannochino v. Rodolakis,*
    242 F.3d 36 (1st Cir. 2001) ...................................................................41, 42

*In re Flagstaff Foodservice Corp.,*
    29 B.R. 215 (S.D.N.Y. 1983) .......................................................................32

*In re Palumbo Family Ltd. Partnership,*
    182 B.R. 447 (Bankr. E.D. Va. 1995) ...................................................... 35-36

*Kmart Corp. v. Intercraft Company, et al. (In re Kmart Corp.),*
    310 B.R. 107 (Bankr. N.D. Ill. 2004) ........................................................ 30

*Liu v. Silverman (In re Liu),* Case No. 94-40970 (ALG), Adv. Proc. No.
    00-2699 (ALG), 2001 LEXIS 547 (Bankr. S.D.N.Y. May 23, 2001) ........................ 43-44

*Maxwell Commc'n Corp. plc v. Societe Generale (In re Maxwell Commc'n Corp.),*
    93 F.3d 1036 (2d Cir. 1996)........................................................................29

*Midway Motor Lodge of Elk Grove v. Innkeepers' Telemgmt. & Equip. Corp.,*
    54 F.3d 406 (7th Cir. 1995) ..................................................................40-41

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.),*
    25 F.3d 1132 (2d Cir. 1994) ........................................................................38

*Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),*
    200 F.3d 382 (5th Cir. 2000) ................................................................41-42

*Parker v. Blauvelt,*
    93 N.Y.2d 343 (1999) ..................................................................................35

*Semi-Tech Litig. LLC v. Bankers Trust Co.,*
    272 F. Supp. 2d 319 (S.D.N.Y. 2003) ...........................................................28

*Silverman v. Tracar, S.A. (In re American Preferred Prescription, Inc.),*
    255 F.3d 87 (2d Cir. 2001) .........................................................................28

*Sure-Snap Corp. v. State Street Bank & Trust Co.,*
    948 F.2d 869 (2d Cir. 1991) ...........................................................29, 34, 38

*Thickstun Bros. Equip. Co. v. Encompass Serv. Corp. (In re Thickstun Bros.*
    *Equip. Co., Inc.),* 344 B.R. 515 (6th Cir. 2006) ....................................... 40-41

**<u>Statutes:</u>**

11 U.S.C. § 1109.................................................................................................32

11 U.S.C. § 1123.................................................................................................30

11 U.S.C. § 1128.................................................................................................28

11 U.S.C. § 1141.................................................................................................29

28 U.S.C. § 158..................................................................................................23

**<u>Other Authorities:</u>**

Federal Rule of Bankruptcy Procedure 2018................................................32

Federal Rule of Bankruptcy Procedure 8001................................................23

Federal Rule of Bankruptcy Procedure 8002................................................23

## INTRODUCTION AND OVERVIEW

Plaintiff, Gray & Associates, LLC, is the Litigation Trustee of the Saint Vincent Catholic Medical Center Litigation Trust (the "Litigation Trust"), a litigation trust created by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), pursuant to a confirmed chapter 11 plan of reorganization of Saint Vincent Catholic Medical Centers of New York ("Saint Vincent" or the "System").  The express purpose of the Litigation Trust is to prosecute claims against parties that include the Defendants.

The Litigation Trustee has brought this action against McDermott Will & Emery, LLP ("McDermott"), William P. Smith, Stephen B. Selbst and David D. Cleary (collectively, the "McDermott Defendants"), for intentional torts, including breaches of fiduciary duties, fraudulent concealment and attorney misconduct, and for legal malpractice, committed by the McDermott Defendants during the year-and-a-half that they served as counsel to Saint Vincent prior to Saint Vincent's chapter 11 bankruptcy filing and during the three months that the McDermott Defendants served as counsel to Saint Vincent during the bankruptcy proceedings. The Complaint alleges that the McDermott Defendants committed the wrongs in concert with other professionals retained by Saint Vincent, specifically David Speltz, Timothy Weis and Speltz & Weis LLC ("SWLLC" and collectively, with Speltz and Weis, the "Speltz & Weis Parties"), and Huron Consulting Services LLC ("Huron LLC") and Huron Consulting Group Inc. ("Huron Inc." and collectively with Huron LLC, the "Huron Parties").

While the McDermott Defendants have moved to dismiss the Complaint, asserting that the Litigation Trustee is barred from bringing the present action, their argument is nothing more than an impermissible collateral attack upon the final orders of the Bankruptcy Court that specifically preserve the causes of action against the McDermott Defendants and reserve them

for prosecution by the Litigation Trustee in this action.  On July 27, 2007, the Bankruptcy Court entered a final order confirming Saint Vincent's First Amended Chapter 11 Plan of Reorganization (the "Plan").  As set forth in the Plan, the Disclosure Statement filed with the Plan, and the Order confirming the Plan (the "Confirmation Order"), an essential purpose of the Plan is the preservation of Saint Vincent's causes of action against the McDermott Defendants, the Speltz & Weis Parties and the Huron Parties (specifically named and collectively described therein as the "Litigation Parties") that arise from the services that they performed for Saint Vincent and from the dealings among them while they were performing those services.  As confirmed by the Bankruptcy Court, the Plan specifically preserves these causes of action, creates the Litigation Trust and transfers the causes of action to the Litigation Trust for prosecution.

While the McDermott Defendants have chosen to ignore the legal significance of the Confirmed Plan, it is undisputed that the McDermott Defendants were personally served with the proposed Plan and the Disclosure Statement, that they filed no objection to the Plan or the Disclosure Statement, that they refrained from attending the confirmation hearing and that they did not appeal from the entry of the Confirmation Order.  Under these circumstances, the provisions of the Confirmed Plan, specifically those preserving the causes of action against the McDermott Defendants, and reserving those causes of action for prosecution by the Litigation Trustee in the present action, are binding on the McDermott Defendants.  Under well-settled principles of *res judicata*, the McDermott Defendants are barred from challenging those rights by way of their Motion to Dismiss the Complaint.

The McDermott Defendants have based their challenge to the rights of the Litigation Trustee upon the fact that McDermott had earlier filed an application for allowance of fees (the

"McDermott Fee Application") incurred during the time that McDermott had represented Saint Vincent in the bankruptcy case. The McDermott Fee Application was pending for decision at the time that the Bankruptcy Court entered the July 27, 2007 Order confirming the Plan and preserving Saint Vincent's causes of action against the McDermott Defendants. The McDermott Defendants fail to recognize that the same Bankruptcy Judge, the Honorable Adlai S. Hardin, Jr., who was holding the McDermott Fee Application under advisement, entered the final Order confirming the Plan, and that he was well-aware of the pendency of the McDermott Fee Application when he entered the Confirmation Order. If the McDermott Defendants believed that the pendency of their fee application was a reason for the causes of action against the McDermott Defendants not to be preserved, the time for the McDermott Defendants to make that argument was prior to the entry of the Confirmation Order. By consciously abstaining from doing so, and allowing the Confirmation Order to become final, the McDermott Defendants lost any right that they might have had to complain.

On August 27, 2007, when Judge Hardin decided the McDermott Fee Application, and on September 21, 2007, when Judge Hardin entered his Order on that decision, the Judge was keenly aware of the significance of the final Confirmation Order, and he specifically took the provisions of the Confirmation Order into account in granting and withholding relief. With specific relevance to the issues now raised by the McDermott Defendants in their Motion to Dismiss the Complaint in this case, Judge Hardin reserved decision on the consequential damages Saint Vincent suffered as a result of McDermott's post-petition misconduct and negligence and held that those claims were reserved by the Plan for later prosecution by the Litigation Trustee.

The McDermott Defendants have cobbled together a *res judicata* argument by avoiding altogether the well-established legal principle that *res judicata* does not preclude the bringing of subsequent litigation when a previously entered and final court order has specifically reserved claims or causes of action for later adjudication.  Significantly, none of the cases or other authorities relied upon by the McDermott Defendants concern causes of action preserved in an order confirming a plan of reorganization or in any other court order.  The cases cited by the McDermott Defendants deal only with malpractice actions against professionals that were brought after the clients had failed to oppose previous fee applications by the professionals, had actually supported the prior fee applications by the professionals whom they later sued, or had complained unsuccessfully about the quality of the professionals' services during the fee application process and simply repeated the rejected criticisms in their later suits.  In some of these cases, and in later cases interpreting them, the courts pointed out that the plaintiffs were barred from bringing their later actions because they had not earlier obtained court orders preserving their causes of action.

Finding themselves without any relevant legal authority to support their motion, the McDermott Defendants rely heavily upon a telephone conference with Judge Hardin in July 2006 and other colloquy that took place more than a year before the Bankruptcy Court entered the Confirmation Order specifically preserving the causes of action brought in this case.  The earlier informal discussion, on which the McDermott Defendants attempt to base their argument, was inconclusive at best.  In any event, those discussions were superseded by the Confirmation Order and the Order on the McDermott Fee Application entered in July and September 2007, respectively, and, as the McDermott Defendants concede elsewhere in their Memorandum to this Court, such informal colloquy with the court cannot give rise to *res judicata*.

**FACTUAL ALLEGATIONS**

A.    **McDermott's Pre-Petition Representation of Saint Vincent, Beginning With Its Participation In Saint Vincent's Retention of the Speltz & Weis Parties**

The facts of this case, while most egregious, are not complicated.  At its core, the six state law causes of action concern breach of trust and wrongful choices by lawyers who placed their self-interests and allegiance to others above the interests of the not-for-profit charitable hospital system that had turned to them for professional and legal guidance.  As the allegations in the Complaint make clear, in December 2003, when the Saint Vincent Board of Directors (the "Board") turned to the McDermott Defendants for advice and protection in connection with its engagement of the Speltz & Weis Parties, turnaround professionals with purported expertise in managing financially distressed hospital systems, the 150-year-old hospital was floundering in unknown waters that were or should have been familiar to those experienced in advising financially troubled institutions.  Complaint at ¶¶ 27-28.

First hired and beginning work in January 2004, SWLLC (then a two-person firm consisting of Speltz and Weis) entered into a professional management turnaround services contract with Saint Vincent's (the "SWLLC Agreement") in April 2004 after obtaining necessary approval from state and federal agencies to do so.  *Id.* at ¶¶ 30-31.  SWLLC and its principals were tasked to evaluate, manage and restore the financially distressed hospital system to good health.  *Id.*  The System had lost $81 million in 2003 and over $100 million in the prior two years.[1]  *Id.* at ¶ 23, 29, 30.  By its terms, the SWLLC Agreement was to expire on April 30, 2005.  *Id.* at ¶ 30.  As a part of this engagement, Speltz became Saint Vincent's President and Chief Executive Officer, and Weis became its Chief Financial Officer.  *Id.* at ¶ 30.  As the

---

[1]    The System was formed by the 2000 merger of the 150-year old Saint Vincent's Hospital in Greenwich Village with hospitals in Brooklyn, Queens and Staten Island.  *Id.* at ¶¶ 2, 23.

principal executive officers of the charitable institution, Speltz and Weis undertook responsibility for Saint Vincent's day-to-day affairs and assumed well-recognized and long-established fiduciary duties of loyalty, good faith, due care, fair dealing and obedience to Saint Vincent.

> **B.** **McDermott's Engagement to Lead Disposition of Non-Performing Liabilities, Its Subsequent Undertaking to Prepare for Chapter 11 And Its Related Recommendation of Huron LLC**

Three-fourths of a year after Speltz and Weis began work, the deterioration of the financial condition of the ailing charitable institution, which had provided over $100 million in charitable care to poor and uninsured patients in 2004 alone, was accelerating dangerously. *Id*. at ¶ 3. Having exhausted the borrowings available under a $100 million working capital loan obtained in late May 2004, by September 2004 the System was now well on its way to what would ultimately become a $143.3 million net operating loss for 2004, nearly double its 2003 net operating loss. *Id*. at ¶¶ 3, 24.

In the interim, the Board had already made the wrenching decision to close or dispose of two of the System's failing hospitals -- St. Mary's Hospital in Brooklyn, which was losing approximately $20 million a year, and St. Joseph's Hospital in Queens. *Id*. at ¶¶ 34, 36. McDermott had been asked to lead these dispositions in the late spring of 2004 with Defendant Smith at the helm. In undertaking this critical assignment, McDermott attorney Andrew Roth (who had taken the lead on negotiating the SWLLC Agreement) warned Smith "to be aware" of the need to protect McDermott's financial interest in collecting its fees because Saint Vincent was "very close to Chapter 11." *Id*. at ¶ 35. Roth's warning to Smith was similar to a warning Roth gave earlier that spring to another McDermott client, Fidelis Care New York, in which Roth informed Fidelis that a Saint Vincent bankruptcy was imminent. *Id*. at ¶¶ 32-33. This

information was of interest to Fidelis because Fidelis was contemplating making a $10 million bridge loan to Saint Vincent. *Id*.

While closure of St. Joseph's was relatively orderly, the St. Mary's situation was far different. *Id*. at ¶ 37. Although Kingsbrook Medical Center ("Kingsbrook") was identified as a potential buyer of St. Mary's in the summer of 2004, Kingsbrook candidly told McDermott and the Speltz & Weis Parties that it had little or no likelihood of obtaining the approximately $20 million in financing it would need to take over St. Mary's. *Id*. at ¶ 37.

Having virtually exhausted the working capital loan obtained after hiring the Speltz & Weis Parties, unable to shed St. Mary's and its staggering losses, burning cash at the rate of $400,000 per week (before capital expenditures and debt service), and having suffered three liquidity crises since hiring the Speltz & Weis Parties (*id*. at ¶¶ 36, 44, 46), the charitable institution's core mission was clearly in jeopardy by September 2004. The Board determined that it was then necessary to prepare to take advantage of the protections afforded under chapter 11 of the Bankruptcy Code. *Id.* at ¶¶ 3, 4, 43. Thus, in September 2004, the Board took a decisive step and requested that McDermott prepare for a chapter 11 filing. *Id*. at ¶¶ 4, 43-48. McDermott, in turn, facilitated the retention of Huron LLC, recommending to the Board that Huron LLC be hired as a financial advisor to assist in the bankruptcy preparation process. *Id*. at ¶¶ 5, 49. McDermott and the Speltz & Weis Parties (who were managing the hospital's day-to-day operations) were responsible for supervising and directing Huron LLC's work. *Id*. at ¶ 49. Huron LLC and its parent, Huron Inc., the same as McDermott and Smith, were based in Chicago.

As the allegations in the Complaint demonstrate, a crippling conflict of interest arose on the path to the bankruptcy court that caused the McDermott Defendants to abdicate their

responsibilities to prepare properly for a bankruptcy filing and to provide adequate and timely advice to Saint Vincent's Board regarding such filing. Moreover, the McDermott Defendants failed to advise the Saint Vincent Board of the significant issues associated with the disabling conflict.

The conflict arose because, shortly after Huron LLC was hired as a financial advisor to help prepare a chapter 11 filing for the ailing hospital system, the Huron Parties realized that they might be able to exploit a valuable economic opportunity for themselves from the revenue stream that the Speltz & Weis Parties were deriving from Saint Vincent. Thus, in the fall of 2004, Huron Inc.'s Chief Executive Officer called Speltz and told him that Huron Inc. wanted to buy SWLLC. *Id*. at ¶ 57. Neither the Speltz & Weis Parties nor the Huron Parties disclosed this overture to Saint Vincent. Instead, they concealed this material information from the Board and entered into secret discussions to sell SWLLC's business to Huron Inc. on the basis of the revenues extracted from Saint Vincent. *Id*. at ¶ 58. In May 2005, some six to seven months later, Huron Inc. bought Speltz's and Weis's interest in SWLLC for more than $17 million -- $14 million in upfront cash, $3 million in a note payable over three years, and the promise of future "earn out" payments from SWLLC's revenues, 85% of which was then generated from Saint Vincent. *Id*. at ¶¶ 9, 87-89. Huron Inc., in turn, effectively received SWLLC's ongoing revenue stream. *Id*. at ¶ 9. Speltz and Weis also executed employment contracts with and became employees of Huron LLC. *Id*. at ¶ 87.

### C.    McDermott's Decision to Breach Its Trust With Saint Vincent, Place Its Allegiance Elsewhere And Commit Related Malpractice

At the same time Huron Inc. was telling Speltz and Weis that it wanted to buy its revenue stream, Huron LLC was conducting a financial analysis of the existing business plan that the Speltz & Weis Parties had developed for Saint Vincent. *Id*. at ¶ 51. In late October 2004,

approximately a month after being brought in to help prepare for chapter 11, Huron LLC provided its analysis to the McDermott Defendants. *Id.* Huron LLC's analysis revealed severe negative variances between the Spetlz & Weis Parties' existing plan and Huron LLC's financial projections over the next 14 months if Saint Vincent failed to take advantage of bankruptcy protection, including, remarkably, negative variances of approximately $44 million and $66.8 million in EBIDA (earnings before interest, depreciation and amortization) and net cash flow, respectively, as well as insufficient liquidity beginning in November 2004. *Id.*

Having concluded that Saint Vincent "is out of gas by January," the McDermott Defendants immediately delivered Huron LLC's analysis to the Speltz & Weis Parties. *Id.* at ¶ 52. The day after delivering Huron LLC's assessment to Speltz and Weis, Smith sent an internal email instructing all McDermott bankruptcy attorneys to stop working and put their "pencils down." He explained that Speltz and Weis had decided that they would attempt to manage the problem through existing lenders. At the same time, Smith told the other McDermott bankruptcy attorneys that he was "skeptical" of the Speltz & Weis Parties' direction and that he anticipated they would resume preparations for a bankruptcy filing by mid-December. *Id.* at ¶ 54.

While Smith advised his colleagues at McDermott of his skepticism in following the path charted by Speltz and Weis, he failed to provide the Board with the benefit of his skepticism and made no disclosure or communication of this material information to the Board. *Id.* Instead, Smith fell in line behind Speltz and Weis, choosing merely to put his pencil down and to deprive the Board of the benefit of this important information and McDermott's professional bankruptcy advice. *Id.* at ¶ 55. At the same time, McDermott charged Saint Vincent more than $400,000 in legal fees by the end of October. *Id.*

As the late fall of 2004 passed into the winter months of 2005, the Speltz & Weis Parties continued their secret discussions with Huron Inc. Seeking to solidify and extend the revenue stream they were generating from Saint Vincent, the Speltz & Weis Parties went to the Board in January 2005 and asked the Board to vote to extend the SWLLC Agreement, even though it was not set to expire for another three months. *Id*. at ¶ 61. In so doing, the Speltz & Weis Parties failed to disclose that they were in negotiations with the hospital's financial advisor, which they were purportedly supervising, to sell their business to the advisor and that the sought-for extension was for the purpose of enhancing the prospects of the sale. *Id*. at ¶¶ 58-59.

By February 2005 at the latest, Speltz and Weis included the McDermott Defendants in their secret plan when they sought Smith's advice in connection with the proposed sale of SWLLC to Huron Inc. *Id*. at ¶ 62. The McDermott Defendants, in turn, withheld this material information from the Board, even though, as bankruptcy professionals, they knew such a sale would put Saint Vincent in a disadvantageous and compromised situation when it came to a bankruptcy filing because of the conflict of interest and disinterestedness principles applicable to professionals in bankruptcy proceedings. *Id*. at ¶¶ 62-65. Instead of advising their client of the risks and foreshadowed consequences in the event of the inevitable bankruptcy, the McDermott Defendants chose to work covertly with the Speltz & Weis Parties and the Huron Parties to find a way to circumvent the bankruptcy requirements and restrictions on the employment of consultants and professionals, a process that even continued after the belated July 1, 2005 bankruptcy filing. *Id*. at ¶¶ 69, 70, 78, 79, 178, 211.

Indeed, in an email of April 27, 2005, Speltz consulted with Smith, Weis <u>and</u> Huron Inc.'s CEO about the effect the sale might have upon the ability of the Speltz & Weis Parties, the Huron Parties, and the McDermott Defendants to continue to derive fees from Saint Vincent if

Saint Vincent filed for bankruptcy. Speltz stressed the need "to clarify how we ensure that the three of us and our respective companies remain as a team in case of a filing." *Id*. at ¶ 70. Speltz's email described the "comfort" that Smith was lending to SWLLC and the Huron Parties. *Id*. Thus, while actively advising and bringing comfort to the Speltz & Weis Parties and the Huron Parties in connection with the sale, Smith and his team at McDermott chose not to provide their client with any advice regarding this significant issue or even its existence.

At the same time the McDermott Defendants were attempting to find a way for the Speltz & Weis Parties and the Huron Parties to work around the conflict of interest and bankruptcy rules, the charitable institution's ongoing need for chapter 11 protection was multiplying each day. Indeed, in March 2005, Huron LLC delivered another bankruptcy analysis to Smith. *Id*. at ¶ 67. This analysis assumed a May 1, 2005 bankruptcy filing and explained that the benefits of bankruptcy protection included the suspension of malpractice expenditures and debt service payments of approximately $48 million. The following month, however, the McDermott Defendants noted amongst themselves that Huron Inc.'s acquisition of Speltz's and Weis's interests in SWLLC would "knock" both SWLLC and Huron LLC "out of the picture" in the event of a bankruptcy filing. *Id*. at ¶ 71. As one McDermott attorney candidly noted internally, Speltz and Weis wanted to avoid a bankruptcy filing. *Id*. at ¶ 72.

While all this was going on, the McDermott Defendants chose to cross far beyond its continuing failure to disclose material information and provide appropriate advice to the Saint Vincent Board, by joining with the Speltz & Weis Parties in affirmative and conspiratorial acts of deception. With Speltz having already lied to Saint Vincent's in-house counsel when she asked him about a rumor that Huron Inc. was going to acquire SWLLC (*id*. at ¶ 83), Smith assisted Speltz and Weis by telephoning Huron Inc.'s General Counsel and falsely claiming that

the then Chairman of the Saint Vincent Board had asked him to make the call.  *Id*. at ¶ 73-77.

Smith falsely represented to Huron Inc.'s General Counsel, who apparently had concerns about

whether the SWLLC revenue stream would continue (*id*. at ¶ 76), that Saint Vincent's Chairman

had asked Smith to confirm to Huron Inc. that both SWLLC and Huron LLC would be able to

continue to provide their services should Saint Vincent file for bankruptcy.  Smith also

represented that the Saint Vincent Board had told him to convey to Huron Inc. that it "saw S&W

and Huron as a team of service to Saint Vincent providers that it wanted to keep on board."  *Id*.

at ¶ 74.  Smith said that he knew that Huron Inc.'s board was going to consider approval of the

acquisition the following week and is "likely to want to know this information in order to make

its decision."  *Id*.

        In a later communication with Smith about Smith's call, Weis stated that "we are

unaware that [the Saint Vincent Chairman] knows of the pending Huron/SWLLC combination."

Smith responded by admitting: "I haven't spoken with [the Saint Vincent Chairman] since the

last Board meeting I attended in the fall."  *Id*. at ¶ 77.

        Following Huron Inc.'s acquisition of Speltz's and Weis's interests in SWLLC in early

May 2005, the McDermott Defendants intentionally stood idly by while the Speltz & Weis

Parties continued to lull the Board into believing that Saint Vincent could continue to avoid a

bankruptcy filing.  On June 1, 2005, Speltz and Weis made a presentation to the Board falsely

representing that Saint Vincent was on the road to recovery.  The presentation advised that

bankruptcy was not necessary, proclaiming that the "turnaround" had seen "significant progress"

over the past year.  *Id*. at ¶ 100.  The Speltz and Weis presentation included a new restructuring

plan to be accomplished outside of bankruptcy.  *Id*. at ¶ 102.  The presentation was preceded by a

May 26, 2005 report to the Board's Executive Committee, proclaiming that "in spite of numerous setbacks and surprises, the turnaround is a success to date." *Id*. at ¶ 94.

Smith received the June 1, 2005 presentation and restructuring plan before it was made to the Board and concluded that the hospital's creditors would be "underwhelmed" by the plan. Smith shared his professional opinion with the Speltz & Weis Parties but not with the Board. *Id*. at ¶ 95. He told Speltz and Weis that both HUD and the Dormitory Authority of the State of New York would say "too little, too late, where have you been, etc." *Id*. While Smith had confided to Speltz and Weis his assessment that the June 1, 2005 plan was destined to fail, he nevertheless deliberately refrained from sharing this crucial assessment with the Board. *Id*.

As Smith foresaw, but failed to advise the Board, Saint Vincent's creditors rejected the June 1, 2005 plan as unrealistic and refused to extend further credit to Saint Vincent outside of bankruptcy. A few weeks later, when Saint Vincent found itself unable even to meet payroll, the long-ailing hospital system was belatedly placed into bankruptcy. *Id*. at ¶¶ 105-07. In an emergency meeting called during the July 4th weekend, the Saint Vincent Board authorized the filing of a chapter 11 bankruptcy petition on July 5th. Notwithstanding the McDermott Defendants' engagement to prepare for a chapter 11 filing some ten months earlier, the McDermott Defendants placed Saint Vincent into bankruptcy on an inadequately prepared, emergent, and haphazard basis. *Id*. at ¶¶ 107, 162-63, 200.

### D. McDermott's Failure to Discharge Its Professional Obligations Following The Belated Bankruptcy Filing

After Saint Vincent was belatedly placed into chapter 11 bankruptcy protection, the McDermott Defendants continued to put their personal interests and those of the Speltz & Weis Parties and the Huron Parties above the interests of Saint Vincent, withholding information from the U.S. Trustee and embarking upon a disastrous plan to obtain Bankruptcy Court approval for

the continued retention of both SWLLC and Huron LLC. *Id.* at ¶¶ 11, 108. This course of action diverted attention from the urgent need to protect Saint Vincent's estate, resulted in unnecessarily adversarial relations with key constituents of the reorganization process, wrongfully drained resources, and caused further harmful delays. *Id.* at ¶¶ 11, 108, 176.

As part of their effort to remain a tripartite team, the McDermott Defendants filed misleading motions and supporting papers with the Bankruptcy Court that failed to disclose complete and accurate information to the Bankruptcy Court, the U.S. Trustee and the Creditors Committee. *Id.* at ¶¶ 108-13. And, after the U.S. Trustee and the Creditors Committee finally learned the specifics of the disabling conflict and expressed their objections to the McDermott Defendants, the hospital's lawyers failed to advise the Board of the need to retain new independent management. *Id.* at ¶¶ 113-15. Instead, they attempted an equally flawed maneuver of having Huron LLC become a subcontractor to SWLLC. *Id.* at ¶ 115. The Bankruptcy Court was to later find that McDermott's strategy was "from the outset a dead letter by reason of the Jay Alix Protocol, Section 327(a) of the Bankruptcy Code, and the serious conflicts of interest and breaches of fiduciary duty that tainted Messrs. Speltz and Weis from the Huron [Inc.] acquisition of SW[LLC] in early May." *Id.* at ¶ 108. The Bankruptcy Court also concluded that "the McDermott services relating to retention of professionals, at the time those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtor's estates -- they were affirmatively detrimental to the debtors' estates." *Id.* at ¶ 11.

Nevertheless, the McDermott Defendants advised Saint Vincent that the objections raised by the U.S. Trustee and the Creditors Committee were ordinary, expected and reasonable. *Id.* at ¶ 123. Concerned that Saint Vincent's Board was not being accurately informed of what was occurring in Saint Vincent's bankruptcy case, the U.S. Trustee finally took the extraordinary

action of insisting upon and having a direct meeting with the members of the Board to tell them of the McDermott Defendants' inappropriate effort to circumvent the disinterestedness principles applicable to chapter 11 proceedings. *Id*. at ¶ 118. Shortly thereafter, the Board asked for and received Speltz's and Weis' resignations (*id*. at ¶ 126), with McDermott to be fired a few weeks later. *Id*. at ¶ 138.

While McDermott was preoccupied with maintaining its sense of "team" following the bankruptcy filing, St. Mary's Hospital continued to lose between $71,000 and $100,000 each day. *Id*. at ¶ 133. Four weeks before the bankruptcy filing, the Board had directed St. Mary's closure. *Id*. at ¶ 131. Notwithstanding this critical directive, McDermott failed to take timely and adequate steps necessary to obtain Bankruptcy Court approval to close St. Mary's, even delaying beginning work on the requisite motion until August 5, 2005 at the earliest. *Id*. at ¶¶ 132-36. And, when it finally filed an emergency motion on August 18 to close St. Mary's, the motion was not supported by supporting affidavits or financial analyses, thereby causing the Bankruptcy Court to adjourn the subsequent September 7, 2005 hearing because of an inadequate record. *Id*. at ¶¶ 134-37. It was just a week later that the Board terminated McDermott and hired Weil Gotshal & Manges, LLP ("Weil Gotshal") as Saint Vincent's new bankruptcy counsel. *Id*. at ¶ 138.

## PROCEDURAL HISTORY

### A.    McDermott's Services As Counsel For The Debtors In The Saint Vincent Bankruptcy Case

On July 5, 2005, more than a year and a half after McDermott had begun acting as counsel for Saint Vincent in the events giving rise to this case, Saint Vincent and its related entities filed for chapter 11 bankruptcy protection. Declaration of Barry L. Gogel in Support of

Plaintiff's Opposition to Defendants' Motion to Dismiss, Exhibit 1.[2]  McDermott filed the bankruptcy petition, and, on that same day, filed applications for orders authorizing the employment of McDermott as counsel for the Debtors, authorizing the employment and retention of Huron LLC as financial advisors to the Debtors and approving the management agreement between SWLLC and the Debtors.  Gogel Exhibits 1-4.

Over the next ten extraordinarily contentious weeks, the McDermott Defendants persistently put themselves at odds with the U.S. Trustee and the Creditors Committee in pursuing the aborted effort to secure the dual retention of Huron LLC and SWLLC.  Gogel Exhibits 5, 7, 8, 16.  The McDermott Defendants also repeatedly clashed with the Bankruptcy Judge over the manner in which it was handling the proposed closure of Saint Mary's Hospital. Gogel Exhibits 6, 8, 16.  To dispel the atmosphere of acrimony and confrontation that was pervading the bankruptcy case, Saint Vincent, on August 25, 2005 fired Speltz and Weis, and three weeks later, on September 13, 2005, terminated McDermott.  Gogel Exhibits 8, 10, 21, 22.

Saint Vincent hired Weil Gotshal to replace McDermott.  Gogel Exhibits 11, 12.  On October 21, 2005, through the collaborative effort of all parties in interest, Saint Vincent hired Guy Sansone and Martin McGahan of Alvarez & Marsal as Chief Executive Officer/Chief Restructuring Officer and Chief Financial Officer, respectively.  Gogel Exhibits 40, 41.  Because consultants employed by SWLLC and Huron LLC had previously been put into a number of important management positions at Saint Vincent, the consultants could not all be replaced immediately without disrupting Saint Vincent's operations, but one of Mr. Sansone's responsibilities was "to examine . . . Huron and S&W personnel, eliminate any unneeded

---

[2]    Exhibits to the Gogel Declaration are hereinafter referred to as "Gogel Exhibit ___."

professionals, and endeavor to replace such professionals with permanent staff. . . ."  Gogel Exhibit 40 at ¶26.

**B.    McDermott's Fee Application**

On January 31, 2006, McDermott filed an application for compensation as former counsel to the chapter 11 debtors pursuant to Section 330 of the Bankruptcy Code, which section governs compensation to professionals in bankruptcy cases.  Gogel Exhibits 13, 14.  The McDermott Fee Application covered the brief period, from July 5, 2005 to September 13, 2005, during which the McDermott Defendants had represented Saint Vincent in the bankruptcy case.

Saint Vincent, the U.S. Trustee, and the Creditors Committee all objected to the McDermott Fee Application.  Gogel Exhibits 15, 16, 19.  They pointed out that, among other things, McDermott had spent weeks repeatedly pressing retention applications for SWLLC and Huron LLC that were procedurally inadequate, not in keeping with practice in the Southern District and otherwise improper; that McDermott had engaged in "contentious" behavior and "created such a hostile environment" that it "adversely affected" Saint Vincent and "diverted" the attention of the major parties in interest "from the critical tasks of stabilizing and reorganizing" Saint Vincent's business; that McDermott had been "unresponsive" to the U.S. Trustee's concerns and "not forthcoming with financial information;" that McDermott had "unnecessarily delayed starting the process" of closing St. Mary's Hospital; and that McDermott's conduct had caused Saint Vincent to incur the time and expense of transitioning to new management and counsel while in the midst of its bankruptcy.  The objecting parties asked that McDermott's fees be reduced substantially for these reasons.  Gogel Exhibit 15 at ¶¶ 5-8; Gogel Exhibit 16 at pp. 2-6, 9 and exhibit A thereto; Gogel Exhibit 19.  *See also* Gogel Exhibits 21, 22.

Beginning on October 23, 2006, Judge Hardin held an evidentiary hearing on the McDermott Fee Application.  On October 25, 2006, at the conclusion of the hearing, Judge Hardin gave counsel the benefit of his preliminary views of the evidence and asked for post-trial submissions addressing two issues that were of particular concern to him.  Gogel Exhibit 23 at p. 41-43.  As to the first issue, McDermott's services in connection with the closure of St. Mary's Hospital, the Judge stated that, while, on June 1, 2005 Saint Vincent had asked McDermott to assist in obtaining authority to close St. Mary's by September 1, 2005, McDermott did nothing at all until August 5, 2005, and, while the motion was made in August "too late" for the Bankruptcy Court to respond by September, McDermott submitted the motion without proper "factual record" or "evidentiary" support.  *Id.* at pp. 41-45.

The Judge stated that the second issue that concerned him was McDermott's role in pressing for the dual retention of SWLLC and Huron LLC in the bankruptcy case.  The Judge observed that the evidence showed that McDermott knew that "the deal that Messrs. Speltz and Weis signed onto despite their roles as the chief . . . operating officers of Saint Vincent" was "outrageous . . . from a corporate governance and a bankruptcy section 327 point of view"; that the terms of the purchase agreement for the purchase of SWLLC "were simply outlandish conflict provisions, shocking at first glance"; that there was "nothing close" or "borderline" about them; that the terms "were never disclosed in the initial application"; that the U.S. Trustee's effort to obtain disclosure of terms from McDermott "was like pulling teeth"; and that the U. S. Trustee "had been asking all along" to see the acquisition documents that were "so absolutely central to the entire issue of Speltz and Weis . . . conflicted stewardship."  *Id.* pp. 47.

The Judge said that, "trying to put oneself back in time," when the events took place, he was concerned by three aspects of the evidence relating to the retentions and wanted counsel for McDermott to "consider" that evidence "very carefully" in its post-hearing submission:

> To me, the starkest piece of evidence or pieces of evidence supporting the debtors, the U.S. Trustee's and the creditors' committee objections based on the Speltz and Weis applications for retention is to be found in three fundamental things. One, the truly outrageous provisions of the contracting documents whereby Speltz and Weis placed themselves, financially, in a position of outlandish conflict with their -- for the entity for which they were fiduciaries.

> Second, the utter failure to disclose any of the relevant facts in the initial applications for retention, the first day applications, and the painfully slow responses exemplified by the failure to produce these absolutely central and critical documents by the U.S. Trustee's office until after the July 21 meeting. Combined with the radio silence instruction, which, in the context of a bankruptcy, is just simply something that you cannot do and preserve any credibility. . . .

> And the third aspect of this is the relentless persistence by the firm, by McDermott, in seeking to avoid the consequences of the Speltz and Weis self-created conflicts and the attempts to really not deal with but to, in essence, evade the fundamental policies underlying the Jay Alix protocol. Which, at least by some point in time McDermott knew did apply and were applicable in the Southern District of New York.

> It seems to me that the firm, had it recognized that its client was Saint Vincent's Hospital and not Speltz and Weis, would have perceived the extreme difficulty of attempting to persist in these retention applications. At every step of the way with proposals that would have left Messrs. Speltz and Weis the principal fiduciaries of Saint Vincent's Hospital in charge of supervising the work and billings of the Huron organization in which they . . . were . . . personally economically interested.

Gogel Exhibit 23 at pp. 48-50.

**C.    The Final Orders Of The Bankruptcy Court Confirming Saint Vincent's Reorganization Plan, Creating The Litigation Trust, Transferring The Litigation Claims To The Litigation Trust And <u>Preserving The Litigation Claims</u>**

On June 5, 2007, more than seven months after the Bankruptcy Court had held the hearing on the McDermott Fee Application and while the decision was still pending, Saint Vincent filed its First Amended Chapter 11 Plan of Reorganization in its bankruptcy case. The Plan was accompanied by a Disclosure Statement as required by 11 U.S.C. § 1125. The Plan provided, *inter alia*, for the creation of a Litigation Trust to which Saint Vincent would assign all of its Litigation Claims against "Litigation Parties," defined as including "McDermott Will & Emery LLP, Speltz & Weis LLC, Huron Consulting Services LLC, . . . Huron Consulting Group, Inc.," their "affiliates and successors" and "any individual who is or was a member of, a managing director of, or a partner in" any of those entities. Gogel Exhibit 25 at §§ 1.79, 6.5, pp. 13-14, 57-64.

The Plan defined Litigation Claims as "all claims, rights . . . and causes of action . . . that could have been brought or raised by or on behalf of [Saint Vincent] arising before, on or after the Commencement Date [meaning July 5, 2005, the date on which Saint Vincent filed for chapter 11 bankruptcy protection], whether known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, under any theory of law, against any of the Litigation parties," with the sole exclusion of "claims against McDermott Will & Emery LLP relating to services provided <u>after</u> the Commencement Date <u>to the extent that they have been resolved by Final Order on or prior to the Effective Date</u>" of the Plan. *Id*. at § 1.75, p. 12 (emphasis added). The Plan defined "Final Order" as "an order of the Bankruptcy Court or District Court . . . as to which the time to appeal [or] petition for certiorari . . . has expired and as to which no appeal [or] petition for certiorari . . . shall then be pending. . . ." *Id*. at § 1.69, p. 10.

The Plan further provided that an acceptable Litigation Trust Agreement was to be executed, and all steps to establish the Litigation Trust were to be taken, prior to the Effective Date of the Plan. *Id*. at § 6.5(a), p. 57. As of the Effective Date, moreover, Saint Vincent and the Creditors Committee were to assign and transfer to the Litigation Trust "all of their rights, title and interest" in the Litigation Claims, and "no other entity," including Saint Vincent, "shall have any interest, legal, beneficial or otherwise" in the Litigation Claims. *Id*. at §§ 1.85, 6.5(a) and (e), pp. 15, 57-58. The Plan also provided for a Litigation Trustee to be appointed under the Litigation Trust Agreement and for the Litigation Trustee to "have the power and authority to prosecute and resolve any Litigation Claims. . . ." *Id*. at § 6.5 (i), p. 59. Beneficiaries of the Litigation Trust include medical malpractice claimants and Saint Vincent's retirement plan and defined benefit pension plans. *Id*. at § 1.78, at p. 13.

In the Disclosure Statement that accompanied the Plan, Saint Vincent described the secret negotiations that had led to Huron Inc.'s May 5, 2005 acquisition of SWLLC and the "serious ethical issues" that were raised by that acquisition. Gogel Exhibit 24 at pp. 42-43. The Disclosure Statement also explained Saint Vincent's belief that it had "substantial claims against the Litigation Parties" because of their conduct involved with the acquisition as well as their conduct and advice "concerning the advisability and timing of a chapter 11 filing and the advice concerning and pursuit of the post-petition dual retention of Speltz & Weis and Huron LLC. . . ." *Id*. at pp. 43-44, 70-71. The Disclosure Statement said that the conduct of the Litigation Parties gave rise to causes of action for *inter alia*, "breach of contract, inducement of breach of contract, unjust enrichment, breach of fiduciary duty, aiding and abetting, negligence, breach of New York not-for-profit corporation law, and fraudulent transfer law." *Id*. at 44. The Disclosure

Statement advised that these claims and causes of action "will be transferred to the Litigation Trust and will be pursued by the Litigation Trust." *Id*.

The Disclosure Statement took note of the fact that "certain claims" against McDermott had already been asserted "in the context of [McDermott's] request for allowance for compensation" for post-petition services and that the Bankruptcy Court had not yet ruled on the request. It went on to state, further, that there were "additional claims" against McDermott that would be assigned and transferred to the Litigation Trust. Among the "additional claims" were those "relating to the pre-petition period, including potentially claims relating to the advice provided to [Saint Vincent] prior to the chapter 11 filing, to certain acts and actions taken by [McDermott] with respect to the retention of Huron and with respect to Huron's acquisition of Speltz & Weis [LLC], and to the advice provided to [Saint Vincent's] Board (or the lack thereof) with respect to disclosure of that acquisition." *Id*. at p. 70.

Despite the fact that it was served with copies of the Plan and Disclosure Statement, McDermott did not file any objection to the Plan, and on July 27, 2007, after a public hearing at which McDermott did not appear, the Bankruptcy Court entered an Order confirming the plan. Gogel Exhibits 26-29. The Confirmation Order provided that all parties had been provided "a full and fair opportunity" to object to the Plan; that they had been given "appropriate and satisfactory notice"; and that the provisions of the Plan "shall bind" the holders of all claims against Saint Vincent. Gogel Exhibit 28 at ¶¶ 3, 4, 6. The Confirmation Order also provided that "Litigation Claims . . . are being assigned to the Litigation Trustee . . . and will be prosecuted by the Litigation Trustee," and, further, that, "all Claims, causes of action, demands, or charges against any of the Litigation Parties are hereby expressly reserved and preserved." *Id*. at ¶¶ 46, 47.

On August 27, 2007, the Bankruptcy Court entered an Order approving the Litigation Trust Agreement that had been fully executed pending Court approval.  Gogel Exhibits 30, 31. The Litigation Trust Agreement provided that Saint Vincent was transferring all Litigation Claims to the Litigation Trust "free and clear of any and all liens, claims, encumbrances of any kind. . . ."; that Gray & Associates, LLC was appointed Litigation Trustee "effective as of the effective date of the Plan"; and that the Litigation Trustee accepted the assets of the Litigation Trust (including the Litigation Claims) as of the Effective Date.  Gogel Exhibit 31 at preamble, §§ 2.1, 2.2(b).

McDermott did not appeal from either the July 27, 2007 Order of the Bankruptcy Court confirming the Plan or the August 27, 2007 Order approving the Litigation Trust Agreement. Accordingly, both Orders became final and binding.  28 U.S.C. § 158(a); Bankruptcy Rules 8001, 8002.

On September 5, 2007, Saint Vincent filed a Notice in the Bankruptcy Court, advising all parties that the conditions of the Plan had been satisfied and that the Effective Date of the Plan had occurred on August 30, 2007.  Gogel Exhibit 33.

**D.    The Bankruptcy Court's Decision On The McDermott Fee Application, Denying Fees For Certain Services Improperly And Deficiently Performed During The Bankruptcy Case And Preserving The Litigation Trustee's Causes Of Action For Consequential <u>Damages Resulting Therefrom</u>**

On September 21, 2007, after the Order confirming the Plan had become final, and the Plan had become effective, the Bankruptcy Court decided the McDermott application for fees incurred during the bankruptcy proceeding for the period between July 5, 2005 and September 13, 2005.  Gogel Exhibits 32, 34.  In his Memorandum Opinion dated August 29, 2007 and in his Order dated September 21, 2007, Judge Hardin denied fees to McDermott in connection with

bankruptcy services related to the closing of St. Mary's Hospital, the pursuit of dual retentions for SWLLC, as turnaround management, and Huron LLC, as financial advisor, the transition from Speltz and Weis to a new Chief Executive Officer/Restructuring Officer and a new Chief Financial Officer for Saint Vincent, and the transition from McDermott to Weil Gotshal. *Id*. Judge Hardin found that those aspects of McDermott's services did not merit compensation under 11 U.S.C. § 330. *Id*.

Judge Hardin also ruled that claims for consequential damages suffered by Saint Vincent were not properly before him. He determined that, under the terms of Saint Vincent's confirmed Plan, the right to pursue such claims had been preserved and reserved for the Litigation Trustee to assert in later proceedings, and as a part of his Order on the McDermott Fee Application, he specifically reaffirmed the preservation of the Litigation Trustee's right to bring such an action. Gogel Exhibit 32 at pp. 35-36; Gogel Exhibit 34 at pp. 3-4.

In his thirty-seven page Memorandum Opinion, Judge Hardin meticulously reviewed the evidence, resolved issues of credibility and carefully applied applicable law. Gogel Exhibit 32. In at least six instances, Judge Hardin found testimony by McDermott partners Smith and Selbst not worthy of belief because it was contradicted by other witnesses whom the Judge found credible or because it conflicted with McDermott's own contemporaneous documents. *Id*. at pp. 24, 27 n.8, 29, 31, 32, 35-36. The Bankruptcy Judge found from the evidence that McDermott had failed to follow Saint Vincent's urgent request to seek Bankruptcy Court approval for closure of St. Mary's by not filing such a request until a month after Saint Vincent was in bankruptcy and by failing to pursue the request in a competent manner. He determined that "McDermott's delay in preparing and filing the motion was not the consequence of strategy, but

inattention," and, further, that McDermott gave "inadequate and untimely preparation" to the matter. *Id*. at p. 32.[3]

Judge Hardin also determined that McDermott's handling of the dual retention applications for SWLLC and Huron LLC was a "prolonged, divisive and ultimately futile attempt . . ." that "culminated disastrously with the forced resignation of Speltz and Weis . . . and . . . the termination of McDermott. . . ." *Id*. at p. 9. The Judge also found that "the McDermott attorneys responsible for the . . . bankruptcy case . . . were . . . aware of the multiple breaches of fiduciary duty on the part of Speltz and Weis"; that they "never made full and candid disclosure respecting the Huron acquisition of [SWLLC] and the consequent conflicts and breaches of fiduciary duty by Speltz and Weis"; that they engaged in "increasingly contentious intercourse" with the other parties to the case; and that they generated "friction and mistrust" that only escalated as time passed. *Id*. at pp. 10-11, 33. "In short," the Judge concluded, "the McDermott services relating to the retention of professionals, at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtors' estates - they were affirmatively detrimental to the debtors' estates." *Id*. at p. 33.

In his Order dated September 21, 2007, Judge Hardin granted the Objections to the McDermott Fee Application for the services that he found to have been improper or deficient and also <u>preserved</u> the Litigation Trustee's right to assert causes of action against McDermott for consequential damages resulting therefrom. The Order specifically provided:

> **ORDERED**, that the award of final compensation to MWE as set forth in this Order is <u>without prejudice</u> to: (a) any <u>rights of the Litigation Trust and the</u>

---

[3]     At a hearing on September 7, 2005 concerning the closure of St. Mary's, the Honorable Prudence C. Beatty, the Bankruptcy Judge then assigned to the case, commenting on McDermott's handling of the matter, stated that, "As I say, everything that they could have done wrong in this case so far they have succeeded in doing," and that, "I felt that the whole thing was not well handled." Gogel Exhibit 9 at p. 70.

<u>Litigation Trustee</u> (as those terms are defined <u>in the First Amended Chapter 11</u>
<u>Plan of Reorganization</u> for Saint Vincents Catholic Medical Centers of New York
d/b/a Saint Vincent Catholic Medical Centers, and Chapter 11 Plans of
Liquidation for Medical Service of St. Vincent's Hospital and Medical Center,
P.C., Surgical Service of St. Vincent's, P.C., CMC Cardiology Services, P.C.,
CMC Physician Services P.C., and CMC Radiological Services P.C., <u>dated June</u>
<u>5, 2007, confirmed by Order dated July 27, 2007 (the "Plan")) to assert claims</u>
<u>and causes of action against MWE for consequential damages resulting from (i)</u>
<u>delay in closing St. Mary's Hospital, (ii) the pursuit of bankruptcy retentions of</u>
<u>Speltz & Weis LLC and Huron Consulting Services LLC, and (iii) the CRO/CFO</u>
<u>selection process, including claims for legal fees paid to Weil, Gotshal & Manges</u>
<u>LLP and counsel for the Committee</u>; and (b) the right of MWE to assert any
applicable defenses to all such claims and causes of action. (<u>Any such claims and</u>
<u>causes of action described in the preceding sentence are hereby preserved for the</u>
<u>Litigation Trust and the Litigation Trustee, as those terms are defined in the Plan</u>.)

Gogel Exhibit 34 at 3-4 (emphasis added).

### E.    <u>The Present Action</u>

On April 14, 2008, the Litigation Trustee filed the Complaint in the present action in the

Supreme Court of the State of New York, County of New York.  Gogel Exhibit 36.

The Complaint describes the McDermott Defendants' relationship with Saint Vincent,

from December 2003 through September 2005, and it alleges the improper and tortious conduct

in which McDermott engaged, in concert with the Speltz & Weis Parties and the Huron Parties,

to the detriment of Saint Vincent.  Complaint at ¶¶ 1-181.  The Complaint asserts six State law

causes of action against the McDermott Defendants:  breach of fiduciary duty; negligence-

malpractice; aiding and abetting the Speltz & Weis Parties' breaches of fiduciary duty; aiding

and abetting fraud committed by SWLLC, Speltz, Weis, Huron LLC and Huron, Inc.; breach of

New York Judiciary Law § 487 – misconduct by attorneys; and fraudulent concealment.  *Id.* at

¶¶ 182-259.[4]

---

[4]    On July 3, 2007, the Creditors Committee filed a Complaint in New York's Supreme
Court against the Speltz & Weis Parties and the Huron Parties.  The Litigation Trustee succeeded

On May 9, 2008, the McDermott Defendants removed the present action to this Court. Gogel Exhibits 37, 38.  On May 22, 2008, they filed a "Corrected" Notice of Removal.  Gogel Exhibit 39.

## ARGUMENT

I.      **The Order Entered by the Bankruptcy Court on July 27, 2007, Confirming the Plan of Reorganization, and Preserving Causes of Action Against the McDermott Defendants, to be Brought Later by the Litigation Trustee, Was a Final Order Entitled to _Res Judicata_, and the McDermott Defendants' Motion to Dismiss the Complaint in the Present Case is an Impermissible Collateral Attack Upon that Final Order**

The McDermott Defendants would have this Court overlook the fact that Judge Hardin, on July 27, 2007, entered an Order confirming the Saint Vincent Plan of Reorganization and that the Plan, as well as the Order confirming it, specifically preserved causes of action against the McDermott Defendants for their conduct while they were attorneys for Saint Vincent, for later litigation by the Litigation Trustee.  The Judge entered the Order Confirming the Plan before deciding the McDermott Fee Application and, as events later showed, he did so for the specific purpose, among others, of carving out the causes of action against the McDermott Defendants from the pending (and then-undecided) Fee Application.  Despite the fact that the McDermott Defendants were given notice of the Plan, including the portion of the Plan that would separate out and preserve causes of action against McDermott for later prosecution by the Litigation Trustee, McDermott did not oppose the Plan or appeal from the Order confirming the Plan. McDermott's dismissal motion in the present case, in which it seeks a ruling by this Court negating the right of the Litigation Trustee to bring this action, is nothing more than an impermissible collateral attack upon the final Confirmation Order.

---

the Creditors Committee as Plaintiff in that action, and, on February 19, 2008, filed an Amended Complaint.  Gogel Exhibit 35.

A. **The Confirmed Saint Vincent Reorganization Plan, with its Creation of the Litigation Trust, and its Preservation of the Causes of Action Against the McDermott Defendants for Later Prosecution by the Litigation Trustee, is Fully in Accord with the Purposes Served by Such Bankruptcy Reorganization Plans**

By ignoring the significance of the creation of the Litigation Trust, and the preservation of causes of action to be brought against the McDermott Defendants by the Litigation Trustee, the McDermott Defendants fail to grasp the significance of such provisions in a bankruptcy reorganization. Subchapters II and III of the Bankruptcy Code outline the framework for the presentation of a plan of reorganization as well as post-confirmation matters regarding the implementation and effect of a plan of reorganization. *See* 11 U.S.C. §§ 1121 to 1146. Section 1121(a) provides that a debtor in possession, such as Saint Vincent, may file a plan of reorganization after commencing a bankruptcy case and Section 1125 provides for the debtor to create a disclosure statement and solicit acceptance of the plan of reorganization. After notice, the Bankruptcy Court conducts a hearing on the confirmation of a plan, and any "party in interest" may object to the terms of the proposed plan and resist confirmation. 11 U.S.C. § 1128.

The McDermott Defendants cannot deny that a Bankruptcy Court's order confirming a reorganization plan in a Chapter 11 proceeding is a final order that may not be attacked collaterally and is itself entitled to preclusive effect under the doctrine of *res judicata*. *See Silverman v. Tracar, S.A. (In re Am. Preferred Prescription, Inc.)*, 255 F.3d 87, 92 (2d Cir. 2001) ("The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in an ordinary civil litigation."); *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82 (2d Cir. 1997); *Semi-Tech Litig. LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 325 (S.D.N.Y. 2003); *Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp., et al. (In re Ionosphere Clubs, Inc.)*, 262 B.R. 604, 612 (Bankr. S.D.N.Y. 2001) ("An order of confirmation

28

binds the debtor and its creditors whether or not they have accepted the confirmed plan and thus, it has preclusive effect.") (citing 11 U.S.C. § 1141(a); *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991)); *Bonwit Teller, Inc. v. Jewelmasters Inc. (In re Hooker Invs., Inc.)*, 162 B.R. 426, 433 (Bankr. S.D.N.Y. 1993) ("[Defendant] is correct in observing that a confirmed plan of reorganization has full preclusive effect and is binding on all parties thereto."); 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor [and] any entity acquiring property under the plan. . . .").

### B.  The Creation of the Litigation Trust, and the Preservation of the Causes of Action Against the McDermott Defendants for Later Prosecution by the Litigation Trustee, are Explicit and Essential Parts of the <u>Reorganization Plan and the Confirmation Order</u>

The scope of this preclusive effect is governed by the content of the reorganization plan and the confirmation order.  *Maxwell Commc'n Corp. plc v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1044-45 (2d Cir. 1996).  Where, as in this case, the Plan and the Order address the specific issue presented, namely whether the Litigation Trustee may maintain causes of action against the McDermott Defendants for their conduct as counsel for Saint Vincent, the Confirmation Order has preclusive effect and may not be challenged by way of a subsequent collateral attack, such as that by the McDermott Defendants here.  *Id.  See also Sure-Snap Corp.*, 948 F.2d at 873; *Goodman Bros. Steel Drum Co., Inc. v. Liberty Mutual Ins. Co. (In re Goodman Bros. Steel Drum Co., Inc.)*, 247 B.R. 604, 607 (Bankr. E.D.N.Y. 2000).  The Plan, Disclosure Statement and Confirmation Order, in preserving the causes of action, all identified the McDermott Defendants as parties against whom the causes of action were preserved; they specified the conduct out of which the causes of action arose; and they identified the party to which the causes of action would be assigned and which would later bring the causes of action. Under these circumstances, the Confirmed Plan meets the most exacting standards for such

provisions to be given preclusive effect. *Kmart Corp. v. Intercraft Company, et al. (In re Kmart Corp.)*, 310 B.R. 107, 120-21 (Bankr. N.D. Ill. 2004); *D&K Props. v. Mutual Life Ins. Co.*, 112 F.3d 257, 262 (7th Cir. 1997).

In pertinent part, Section 11.12 of the Confirmed Plan "expressly reserved and preserved" all "Claims, causes of actions, demands, charges or demands against" any "Litigation Parties," a term defined in Section 1.79 that expressly included McDermott and any individual who is or was a member of, a managing director of, or a partner in McDermott. *See* Gogel Exhibit 25 at p. 13-14, 91. With regard to the prosecution of such claims, Section 6.5 of the Confirmed Plan also provided for the establishment of the Litigation Trust to which all such claims were to be assigned and transferred for prosecution by the Litigation Trustee. *Id.* at p. 57. This reservation was fully in accord with section 1123 of the Bankruptcy Code, the statutory provision that specifically allows a debtor to retain causes of action in its plan for post-confirmation enforcement. That section declares, in pertinent part, that a plan may "provide for . . . the retention and enforcement of by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest. . . ." 11 U.S.C. § 1123(b)(3)(B).[5]

At the time Saint Vincent filed its proposed plan of confirmation in early June 2007, it also filed its Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code. The Disclosure Statement specifically explained that Saint Vincent possessed causes of action against McDermott in addition to the defenses already asserted in the context of McDermott's then pending request for compensation for its post-petition services:

> The Debtors believe that these estates have substantial claims against the Litigation Parties. As noted above, current chapter 11 counsel to the Debtors has

---

[5]    The specific purpose of Section 1123(b)(3) is to provide the debtor with the ability to reserve the estate's claims for later enforcement. *See Amarex, Inc. v. Marathon Oil Co., et al. (In re Amarex, Inc.)*, 74 B.R. 378, 380 (Bankr. W.D. Okla. 1987).

conducted a preliminary review of facts and circumstances surrounding the conduct of all parties involved in Huron Inc.'s acquisition of Speltz & Weis, as well as the conduct of and advice provided by the Debtor's professionals to the Debtors concerning the timing of the chapter 11 filing and the anticipated creditor recoveries in a chapter 11 case. Based upon the Debtor's chapter 11 counsel's preliminary review, there exist claims or causes of action which include (but are not limited to) breach of contract, inducement of breach of contract, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, breach of New York not-for-profit corporation law, and fraudulent transfer law. Because there is a common interest, the Debtors' chapter 11 counsel has informally shared that review with counsel to the Creditors' Committee in connection with discussion over the potential structure of, and returns to creditors under, the Plan. . . .

As also noted above, certain claims related to these cases against MWE [McDermott] already have been asserted in the context of MWE's request for allowance of compensation. The Debtors believe these estates may have additional claims against MWE relating to the prepetition period, including potentially claims relating to the advice provided to the Debtors prior to the chapter 11 filing, to certain acts and actions taken by MWE with respect to the retention of Huron and with respect to Huron's acquisition of Speltz & Weis, and to the advice provided to the Debtors' Board (or lack thereof) with respect to the disclosure of that acquisition. The facts and circumstances surrounding some of these potential claims are more fully set forth in the objections to the MWE Fee Application. Again, given these joint interests and the formal proceedings surrounding the MWE Fee Application, the Debtors' chapter 11 counsel has consulted with counsel to the Creditors' Committee, as well as counsel to the United States Trustee, in evaluating potential claims.

Gogel Exhibit 24 at p. 70-71.

On June 5, 2007, the Bankruptcy Court entered an Order approving the Disclosure Statement. *See* Order Approving Disclosure Statement dated June 5, 2007, attached hereto as Gogel Exhibit 43. As a part of this Order, the Court scheduled the confirmation hearing for July 27, 2007, and directed that any proposed modifications or objections to confirmation of the Plan be made by July 20, 2007. The proposed Plan, the Disclosure Statement, and the Court's Order approving the Disclosure Statement and establishing the objection procedures with respect to the proposed plan were served upon McDermott by overnight mail on June 5, 2007, to the attention of Defendants Smith, Cleary and Selbst. *See* Affidavit of Ross Matray dated June 11, 2007,

attached hereto as Gogel Exhibit 26.  None of the Defendants objected to the proposed Plan, even though, as administrative creditors, the McDermott Defendants were parties in interest and had standing to object to plan confirmation.[6]

After due notice of the proposed Plan, and after holding a hearing on July 27, 2007 to consider confirmation of the Plan, Judge Hardin entered the Confirmation Order.  Gogel Exhibits 27, 28.  There can be no question that Judge Hardin was fully aware of the fact that the McDermott Fee Petition matter was still pending and unresolved at the time that he entered the Confirmation Order and that he intended, as the Confirmation Order specifically provided, that the Debtor's affirmative causes of action against the McDermott Defendants were to be separated from that matter, assigned to the Litigation Trust and separately pursued by the Litigation Trustee.  The Confirmation Order stated explicitly that it was entered with "the Court being fully familiar with, and having taken judicial notice of, the entire record of the Chapter 11 Cases since the commencement of the Chapter 11 cases on July 5, 2005; and upon all of the proceedings held before the Court. . . ."  Gogel Exhibit 28 at p. 3.  Judge Hardin had presided over the October 2006 hearing on the McDermott Fee Application, and it was no accident that he deferred entering his Order on the McDermott Fee Application until after he had entered the

---

[6]      Bankruptcy Code § 1109(b) permits a "party in interest" to "appear and be heard on any issue in a case" under Chapter 11.  11 U.S.C. § 1109.  Undoubtedly, McDermott was a "party in interest" in Saint Vincent's bankruptcy case within the meaning of 11 U.S.C. § 1109(b) of the Bankruptcy Code and had the right to object to the proposed plan.  Section 1109 provides a non-exhaustive list of parties in interest.  "The general theory behind the section is that anyone holding a direct financial stake in the outcome of the case should have an opportunity…to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest."  *Doral Center, Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812, 814 (S.D.N.Y. 1997).  Section 1109(b) is "construed broadly to permit parties affected by a Chapter 11 case to appear and be heard."  *In re Flagstaff Foodservice Corp.*, 29 B.R. 215 (S.D.N.Y. 1983).  McDermott could also have intervened in the confirmation hearings pursuant to Bankruptcy Rule 2018.

Confirmation Order, preserving the claims against the McDermott Defendants, and until the Confirmation Order became final.

Consistent with the Plan, the Confirmation Order expressly provided that the Litigation Claims are "being assigned to the Litigation Trust pursuant to the First Amended Plan and will be prosecuted by the Litigation Trustee"; that "all claims, causes of action, demands or charges against any of the Litigation Parties are hereby expressly reserved and preserved;" and that "none of the exculpation, release or injunctive provisions [of the Confirmed Plan] shall apply or provide any benefit to the Litigation Parties." Gogel Exhibit 28 at ¶¶ 47, 48. Against this background, it is clear that the Confirmed Plan and Confirmation Order preclude the McDermott Defendants from asserting that the claims asserted in the present action are barred by the doctrine of *res judicata*. In fact, McDermott itself is precluded by the doctrine of *res judicata* from challenging the Trustee's pursuit of the instant litigation.

### C. Settled Law Precludes the McDermott Defendants' from Collaterally Attacking the Confirmed Plan's Reservation and Preservation of the Causes of Action Against the McDermott Defendants

The McDermott Defendants' collateral attack upon the Confirmed Plan's preservation and reservation of the Litigation Trustee's right to bring this action is squarely at odds with well-established *res judicata* law. Indeed, the McDermott Defendants themselves have acknowledged the *res judicata* effect of confirmation orders. *See* Defendants' Memorandum of Law In Support of Motion to Dismiss at p. 19 (citing *Stoll v. Gottlieb*, 305 U.S. 166 (1938); *Celli v. First Nat'l Bank (In re Layo)*, 460 F.3d 289, 292 (2d Cir. 2006); *Sure-Snap*, 948 F.2d 869). The Second Circuit, in *Celli*, quoted *Collier on Bankruptcy* for the proposition that a confirmation order "'represents a binding determination of the rights and liabilities of the parties as ordained by the plan[,]'" and, further, that, "'Absent timely appeal, the confirmed plan is res judicata and its

terms are not subject to collateral attack. . . .'"  *Celli*, 460 F.3d at 293 (quoting 8 Collier on Bankruptcy ¶ 1327.02 (15th ed. rev.)).

The McDermott Defendants do not deny that they received timely notice of the Saint Vincent Plan and Disclosure Statement and that they were fully aware of the date and time that had been set for the confirmation hearing.  *See* Gogel Exhibit 26.  The McDermott Defendants nevertheless decided that they would not object to the provisions of the Plan preserving and reserving the causes of action for subsequent prosecution by the Litigation Trustee against the McDermott Defendants.  The McDermott Defendants absented themselves from the confirmation hearing, and, after the Confirmation Order was entered, they refrained from appealing.  Having failed to avail themselves of the opportunity to make a timely challenge to the provisions of the proposed Plan that accorded the Litigation Trustee the right to bring the present action, the McDermott Defendants may not now belatedly mount a collateral attack upon the final Order that confirmed the Plan.

Furthermore, dismissal of the present action would nullify the Plan's express provisions preserving these claims and assigning them to the Litigation Trustee.  While *res judicata* may apply for the purpose of giving preclusive effect to the terms of the Confirmed Plan, it cannot be used as a means of stripping away the rights expressly granted by the Plan.  As the Second Circuit held in *Sure-Snap*, 948 F.2d at 874 (quoting *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133 (2d Cir. 1975)), "[a]lso dispositive to a finding of preclusive effect is whether an independent judgment in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'"

**II.    The Fee Application Order Expressly Preserves the Causes of Action Against the McDermott Defendants for Consequential Damages Resulting From Their Improper and Deficient Performance as Counsel for the Debtors in the Saint Vincent Bankruptcy Proceedings**

The McDermott Defendants' reliance upon *res judicata*, insofar as it relates to consequential damages resulting from the McDermott Defendants' improper and deficient performance as counsel for the debtors in the Saint Vincent bankruptcy proceedings, is altogether misplaced because Judge Hardin, in ruling upon the McDermott Fee Application, expressly refrained from deciding those issues. Instead, relying upon the provisions of the Confirmed Plan, the Judge reserved the causes of action for such consequential damages, which he described as malpractice damages, for later prosecution by the Litigation Trustee. Because the Judge declined to rule on those claims and reserved them for later litigation by the Litigation Trustee, there is no basis for the McDermott Defendants to assert *res judicata* as a bar to the present action.

The doctrine of "*res judicata* does not apply when a cause of action has been expressly reserved for later adjudication." *In re Ionosphere Clubs, Inc.*, *supra*, 262 B.R. at 612. As the Court of Appeals of New York has said, "[i]t would be inequitable to preclude a party from asserting a claim under the principle of *res judicata*, where, as in this case, '[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action.'" *Parker v. Blauvelt*, 93 N.Y.2d 343, 349 (1999) (quoting RESTATEMENT (SECOND) OF JUDGMENTS §26(1)(b)); *see also D&K Props.*, 112 F.3d at 260 ("[u]nder a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action."); *Apparel Art Intern, Inc. v. Amertex Enter. Ltd.*, 48 F.3d 576, 586 (1st Cir. 1995) (same); *In re Palumbo Family Ltd. Partnership*, 182 B.R. 447, 462 (Bankr. E.D. Va. 1995) ("*Res judicata* does not

35

operate as a bar when a court has expressly reserved the claimant's right to bring the subsequent action or claim.").

On August 29, 2007, a month after entering the Confirmation Order, the Bankruptcy Court issued its memorandum decision on McDermott's application for legal fees for post-petition services covering the period from July 5, 2005 (the commencement of Saint Vincent's chapter 11 proceedings) through September 13, 2005 (the date on which McDermott was terminated). Gogel Exhibit 32. While the Bankruptcy Judge had held a hearing on the McDermott Fee Application, and had taken other evidence in October 2006, he had withheld ruling until after the filing of the Plan and Disclosure Statement and after entering the Confirmation Order.

Judge Hardin found that McDermott had committed various improprieties, and had performed deficiently, during its representation of Saint Vincent in the bankruptcy case. *Id*. at pp. 9-17, 19-32. Accordingly, he denied compensation to McDermott for its divisive and contentious campaign to obtain Bankruptcy Court approval of the proposed retention of Speltz and Weis and Huron, for its mishandling of the closure of St. Mary's Hospital, for its time in transitioning the management of Saint Vincent from Speltz and Weis to the successor Chief Executive Officer/Chief Restructuring Officer and Chief Financial Officer and for its time in transitioning the Debtors' legal representation to Weil Gotshal. *Id*. at pp. 33-35.

In making his decision to reduce McDermott's fees for post-petition services, the Bankruptcy Judge specifically denied Saint Vincent's request to reduce McDermott's fees further by reason of consequential damages resulting from McDermott's inappropriate and faulty conduct. *Id*. at 35-36. The Judge also determined that Saint Vincent had suffered losses resulting from McDermott's mishandling of its assignment and, in particular, that "there can be

no doubt that the debtors suffered a large loss as a consequence of McDermott's delay in filing the motion." *Id.* at 36. Judge Hardin declined to reduce McDermott's post-petition fees by offsetting these losses, however, and, instead, specifically preserved the right to seek recovery of damages for these harms in a later civil action. *Id.* In this connection, the Judge specifically ruled that his decision was "without prejudice to the debtors' right to assert such damages in an appropriate malpractice action or proceeding." *Id.*

Judge Hardin was acutely aware of the Confirmation Order he had entered just a month before, in which he had "expressly reserved and preserved" all causes of action against the McDermott Defendants and had provided for those causes of action to be brought by the Litigation Trustee in later proceedings. Accordingly, Judge Hardin's Order of September 21, 2007, denying McDermott's fees for the services found to be inappropriate, expressly provided that the award was "without prejudice" to "any right of the Litigation Trust and the Litigation Trustee (as those terms are defined in the First Amended Chapter 11 Plan of Reorganization for Saint Vincents Catholic Medical Centers of New York . . ., confirmed by Order dated July 27, 2007) . . . to assert claims and causes of action" against McDermott "for consequential damages resulting from (i) delay in closing St. Mary's Hospital, (ii) the pursuit of bankruptcy retentions of Speltz & Weis LLC and Huron Consulting Services LLC, (iii) the CRO/CFO selection process, including claims for legal fees paid to Weil Gotshal & Manges LLP and counsel for the [Creditors] Committee. . . ." Gogel Exhibit 34 at p. 3. The Order also provided that "such claims and causes of action . . . are hereby preserved for the Litigation Trust and the Litigation Trustee. . . ." *Id.* at pp. 3-4.

Against this background, it is clear that the present claims are not precluded by the Bankruptcy Court decision on the McDermott Fee Application. Rather, the present claims

against the McDermott Defendants were affirmatively and expressly preserved by the Bankruptcy Court, both in its final Order confirming the Plan and in its Memorandum Decision and Order on the fee application.[7]

**III.    The McDermott Defendants' Motion is Based Upon Wholly Inapposite Authorities that Do Not Concern Confirmed Reorganization Plans or Other Orders that Specifically Reserve or Preserve Causes of Action**

The McDermott Defendants' have based their motion on a series of cases, wholly unlike the present case, in which no reorganization plan or order specifically reserved the causes of action that were challenged in later litigation. For example, in *Sure-Snap*, the debtor's confirmed plan did not contain any express provision preserving the debtor's right to bring subsequent actions for lender liability against two banks whose conduct allegedly precipitated the debtor's bankruptcy filing. After the plan was already in effect, the debtor filed a motion to modify the confirmation order to allow it to bring the action. The bankruptcy judge denied the motion to modify the plan, but, in the course of the modification hearing, in colloquy with counsel, speculated that the debtor might be able to bring the action without modification. 948 F.2d at 872. The Second Circuit held that the debtor's action was barred because the confirmed plan did not preserve the debtor's cause of action against the banks. *Id*. at 877.

---

[7]    Even if Judge Hardin's reservation of the right to bring an action for consequential damages had not been mandated by the express provisions of the Confirmed Plan, Judge Hardin had the discretion to reserve those causes of action for later proceedings in the exercise of his equitable powers. "It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.),* 25 F.3d 1132, 1136 (2d Cir. 1994). Bankruptcy courts may "sift circumstances surrounding any claim in order to ascertain that injustice or unfairness is not accomplished in the administration of the debtor's estate, and in so doing it may adopt that remedy which it deems most appropriate under the circumstances." *Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc.)*, 52 F.3d 41, 45-46 (2d Cir. 1995).

In a later case, *Bonwit Teller, Inc.*, the Bankruptcy Court for the Southern District of New York explained that the holding of the *Sure-Snap* case is that a subsequent action by or on behalf of the debtor is barred unless it is reserved in the debtor's reorganization plan.  162 B.R. at 433. The Bankruptcy Court stated that:

> There the *debtors' confirmed plan did not expressly preserve the right to bring outstanding causes of action* that had not yet been raised, so the debtors attempted to modify the plan to remedy the defect.  The bankruptcy court denied the debtors' motion as well as two subsequent motions to reconsider.  During the final hearing, the debtors inquired whether the court's refusal to modify the plan would preclude subsequent litigation; the court responded that it believed that any causes of action or claims would be reserved to the debtor.  In deciding the effect of the bankruptcy judge's statement, the Second Circuit concluded that "the judge's colloquy was not dispositive of appellants' *allegedly reserved right."*  Id. at 873 (emphasis added).  *The implication is that had the debtors' right to bring subsequent litigation been reserved expressly in the plan, such postconfirmation litigation would have escaped the* res judicata *bar.*  In fact, that is exactly what the debtors in *Sure-Snap* attempted, and failed, to accomplish when they moved to modify the confirmed plan.

*Id.* (emphasis added).

In *Bonwit Teller*, a creditor had filed a claim against the debtor's bankruptcy estate and the claim had been allowed.  Thereafter, the Bankruptcy Court entered an order confirming the debtor's plan of reorganization.  The confirmed plan provided for the creation of a committee to bring avoidance actions and expressly reserved the committee's right to bring avoidance actions against a creditor whose claim previously had been allowed.  The Court held that the committee was entitled to bring the action because the confirmed plan contained an express reservation of the right of the committee to bring such an action and that the creditor could not invoke *res judicata* to bar the committee from bringing the action.  *Id.* at 433-34.

Moreover, the McDermott Defendants fundamentally misconstrue the Bankruptcy Court's actions in the Saint Vincent bankruptcy proceedings when they attempt to equate final orders entered by the Court with colloquy between a judge and counsel during the course of a

hearing. Their attempt to override express language of court orders on the basis of a prior telephone call is hardly worthy of response. As the Second Circuit held in *Sure-Snap*, and as the Bankruptcy Court explained in *Bonwit Teller*, principles of *res judicata* apply to final orders and not to casual colloquy. In fact, it is the McDermott Defendants, and not the Litigation Trustee, who are trying to derive preclusive benefit from colloquy. The McDermott Defendants have devoted three full pages of their Memorandum in Support of their Motion to Dismiss to a colloquy that took place during a telephone conference that Judge Hardin held with counsel in July 2006. Defendants' Memorandum at pp. 6-8. Whatever was said during that telephone conference, and whatever comfort the McDermott Defendants might have taken from that colloquy, was superseded by the final Confirmation Order that Judge Hardin entered on July 27, 2007 and by the Order on the McDermott Fee Application that he entered on September 21, 2007, expressly preserving the causes of action for which the Litigation Trustee now brings this case.

Furthermore, the McDermott Defendants completely mischaracterize the Orders entered by Judge Hardin as an effort by a first court to opine as to the preclusive effect that its order might have in a second contested matter. Here, the Bankruptcy Judge <u>first</u> entered a Confirmation Order on July 27, 2007, preserving causes of action against McDermott for later prosecution by the Litigation Trustee. A month later, when Judge Hardin decided the McDermott Fee Application matter, he was acting in a <u>second</u> proceeding and it was necessary for him to take into account the effect of the previously Confirmed Plan. McDermott has no reason to fault him for doing so.[8]

---

[8]    The McDermott Defendants' citations to *Thickstun Bros. Equip. Co., Inc. v. Encompass Serv. Corp. (In re Thickstun Bros. Equip. Co., Inc.)*, 344 B.R. 515 (6th Cir. B.A.P. 2006) and *Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406

McDermott incorrectly attempts to analogize the present case to five cases, three by Courts of Appeal other than the Second Circuit and two by courts within this Circuit, that have nothing to do with provisions in confirmed reorganization plans and other orders preserving rights to bring subsequent litigation.   In all three of the appellate decisions, professionals employed by the debtor (an accounting firm in one case and law firms in the other two) had applied for allowance of fees; the debtors did not object in any way to the awards; and, after allowing the fees to be awarded without objection or comment, the debtors or their successors later attempted to bring actions for malpractice.  *See Grausz v. Englander*, 321 F.3d 467 (4th Cir. 2003); *Iannochino v. Rodolakis*, 242 F.3d 36 (1st Cir. 2001); *Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.)*, 200 F.3d 382 (5th Cir. 2000).

In one of these cases, *Osherow*, the debtor emerged from chapter 11 bankruptcy pursuant to a confirmed plan that did not contain a preservation of rights against the debtor's accounting firm.  After confirmation, the debtor reached an agreement with the accounting firm as to the fees that should be awarded and "unqualifiedly" supported the fee application.  *Osherow*, 200 F.3d at 385.  A representative of the debtor attended the hearing on the accounting firms fee application, and, in accordance with the debtor's agreement to provide "unqualified support" for the application, the debtor's representative did not raise any question at the hearing about the value or effectiveness of the accounting firm's services.  *Id*. at 389.  After the debtor went into

---

(7th Cir. 1995) are misplaced.  In *Thickstun*, a post-confirmation debtor, who was sued in a state court lawsuit, returned to the bankruptcy court seeking an interpretive declaration that the confirmed plan precluded the state court action.  The court merely held that the bankruptcy judge properly exercised his discretion in declining to issue the declaration and in allowing the state court, in which the dispute was then pending, to make the determination.  *Id*. at 521.  Likewise, in *Midway Motor Lodge*, the appeals court simply indicated that a bankruptcy judge's oral assurance that his ruling on the merits of a particular claim would not have a preclusive effect on other claims in another court is not a basis to overturn his ruling but rather is an issue to be considered by the other court in the later proceeding.  54 F.3d at 409.

bankruptcy a second time, the debtor's chapter 7 trustee brought an action against the accounting firm for alleged malpractice during the earlier chapter 11 case.  Affirming the dismissal of the malpractice case on the basis of *res judicata*, the appellate court held that the fee hearing had provided "an effective forum" for the debtor to raise any concerns about the quality of the accounting firm's services.  Because the debtor had deliberately abstained from criticizing the accounting firm during the fee hearing, the chapter 7 trustee was precluded from doing so in a subsequent malpractice action.  *Id*. at 390.[9]

The two cases decided by lower courts in this Circuit, relied upon by the McDermott Defendants, are similarly unhelpful to them.  In each of those cases, the court had found the debtor's challenge to the quality of the professional's services to be without merit, and, after losing the fee dispute, the debtor attempted to re-litigate the same allegations that had already been rejected in a subsequent malpractice action against the professional.  In *D.A. Elia Construction Corp. v. Damon & Morey, LLP* (*In re D.A. Elia Construction Corp.*), No. 07-CV-143A, --- F. Supp. 2d ---, 2008 WL 907366 (W.D.N.Y. March 31, 2008), an attorney represented the debtor in a "quite successful" bankruptcy proceeding that spanned ten years and left a "surplus in the estate."  Several of the attorney's interim fee applications were approved during the course of the bankruptcy without objection.  When the attorney filed his final fee application,

---

[9]     Similarly, the circumstances in *Iannochino* and *Grausz* are decidedly different from those of the present case and have no bearing on the issue before the court.  In *Iannochino*, the lawyer for the debtors withdrew from the bankruptcy case, and, when his partner filed a fee application on behalf of the partnership, the debtors did not question the quality of the services or attend the fee hearing.  242 F.3d at 40.  After the fee had been awarded, the debtors retained the lawyer again for the bankruptcy case.  Two years later, apparently without warning, the debtors sued the lawyer for malpractice.  *Id*.      In *Grausz*, the debtor's attorney represented his client in connection with a settlement with a creditor that was approved by the bankruptcy court.  Following the bankruptcy court's approval of the settlement agreement, the bankruptcy court approved two fee applications by the attorney which the debtor did not oppose.  Three years after the settlement agreement was approved by the bankruptcy court, and after both of the attorney's fee applications were granted without objection, the debtor filed a malpractice action.

the debtor "strenuously opposed" the final application, "asserting, among other things, that the firm had committed malpractice and labored under various conflicts of interest."   In rejecting the debtor's objection to the final fee application, the bankruptcy judge found that the debtor's objection "lacked credibility," was "belied by the record" and was "simply a 'gambit' to avoid paying counsel fees."   The bankruptcy decision granting the fee application was affirmed by both the district court and the Second Circuit.   The debtor subsequently sued the attorney for malpractice, making the same assertions as had been rejected in connection with the attorney's fee application.   On these facts, the district court in the later malpractice action found the allegations "astounding," and, ruling that the debtor was foreclosed from re-litigating previously decided issues, gave preclusive effect to the prior bankruptcy decision granting the attorney's fees.  *Id*. at *15-16.

In *Liu v. Silverman (In re Liu)*, Case No. 94-40970 (ALG), Adv. Proc. No. 00-2699 (ALG), 2001 LEXIS 547 (Bankr. S.D.N.Y. May 23, 2001), chapter 7 debtors sued the chapter 7 trustee and counsel for the trustee, alleging they were negligent in connection with the negotiation of the settlement of a lawsuit commenced by the debtors prior to the bankruptcy filing.  The settlement, however, had been approved by the bankruptcy court, and, in an appeal to the district court from that approval, the debtors had made the same allegations of negligence that they later made in their lawsuit.  The district court rejected the malpractice assertions and approved the settlement.   The Second Circuit affirmed.   Thereafter, the bankruptcy court approved payment of a contingency fee to the attorney out of the settlement proceeds.   In dismissing the subsequent negligence case, based on the same assertions that the district court and the Second Circuit had rejected in approving the settlement, the court pointed out that a final order had been entered approving the settlement and that the court's "approval did not reserve to

43

the trustee -- and manifestly not to the debtors or any other parties -- the right to sue the trustee's counsel on the ground that the settlement could have been higher if counsel had been better prepared or a better trial lawyer." *Id*. at *21.

The McDermott Defendants' suggestion that Judge Hardin, by ordering that his decision on the McDermott Fee Application be "without prejudice" to the claims specifically preserved in the Confirmed Plan and Confirmation Order, determined the preclusive affect of the Fee Application Order is meritless.  Judge Hardin did no such thing.  Rather, Judge Hardin simply preserved the claims already preserved by the Confirmation Plan and Confirmation Order by ruling that the Fee Application Order was "without prejudice" to the right of the Litigation Trustee to assert those causes of action and by entering an order in which he specifically ruled that "such claims and causes of action . . . are hereby preserved for the Litigation Trust and the Litigation Trustee, as those terms are defined in the Plan."

<u>CONCLUSION</u>

Plaintiff respectfully suggests that, for the reasons set forth above, the McDermott Defendants' Motion to Dismiss the Complaint should be denied.


Dated: New York, New York
       June 17, 2008

                              _/s/ William F. Ryan, Jr._____
                              William F. Ryan, Jr., Esquire
                              Paul M. Nussbaum, Esquire
                              Kevin G. Hroblak, Esquire
                              Whiteford, Taylor & Preston L.L.P.
                              Seven Saint Paul Street
                              Baltimore, Maryland 21202
                              410-347-8700

                              and

  /s/ Arnold M. Weiner      
Arnold M. Weiner, Esquire
Barry L. Gogel, Esquire
Law Offices of Arnold M. Weiner
2002 Clipper Park Road, Unit #108
Baltimore, Maryland 21211
410-769-8080

and

  /s/ Alfredo F. Mendez     
Alfredo F. Mendez, Esquire
Bruce A. Blakeman, Esquire
Sarah Lichtenstein, Esquire
Abrams Fensterman Fensterman Eisman Greenberg
  Formato & Einiger, LLP
630 Third Avenue
New York, New York 10017
212-279-9200


*Counsel for the Plaintiff, Gray & Associates, LLC,
in its capacity as Trustee, on behalf of the SVCMC
LITIGATION TRUST*

*1794585*

45